**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ) | Case No. 18-CV-07143-JFK |
| ) |  |
| ) | CLASS ACTION |
| ) |  |
| IN RE NIELSEN HOLDINGS PLC ) |  |
| SECURITIES LITIGATION ) |  |
| ) |  |
| ) | <u>DEMAND FOR JURY TRIAL</u> |
| ) |  |
| ) |  |
| ) |  |

<u>**AMENDED COMPLAINT FOR VIOLATIONS**</u>
<u>**OF THE FEDERAL SECURITIES LAWS**</u>

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ........................................................................................................ 1

II.     SUMMARY OF THE ACTION ................................................................................. 1

III.    JURISDICTION AND VENUE .............................................................................. 13

IV.     PARTIES AND WITNESSES ................................................................................ 14

      A.      Named Plaintiffs ............................................................................................ 14

      B.      Defendants & Their Roles as Control Persons of Nielsen .................................... 14

      C.      Confidential Witnesses .................................................................................. 17

V.      BACKGROUND ON NIELSEN'S BUSINESS ...................................................... 22

            (1)     The Buy Segment ................................................................................ 23

            (2)     The Watch Segment .............................................................................. 25

            (3)     Additional Explanation of Analytical Insights Business ........................ 27

VI.     SUBSTANTIVE ALLEGATIONS OF THE FRAUD AND EVENTUAL
       REVELATION OF THE TRUTH ........................................................................... 28

      A.      Prior to the Class Period Defendants Continuously Assert the Strong
           Position of Nielsen ........................................................................................ 29

      B.      The Beginning of the Fraud ........................................................................... 32

            (1)     4Q15: Nielsen Overstates its Position and Fails to Disclose Known
                   Material Negative Trends .......................................................... 32

            (2)     1Q16: Nielsen Falsely Boasts of Strong Position .................................... 33

            (3)     2Q16: Nielsen Downplays "Challenging" Environment, While
                   Continuing to Hide Known Material Negative Trends ............................ 35

      C.      Contrary to Public Statements, Defendants Knew Negative Trends Were
           Undermining Nielsen's Performance ................................................................ 37

            (1)     Nielsen's Business was in Decline ........................................................ 37

                (i)      Discretionary Buy Segment Spending was in Decline ................ 37

|  |  | (ii) | Interest in Insights Products was Diminishing............................ 40 |

|  |  | (iii) | Fast Emerging Market Growth Would be Short-Lived ............... 42 |

|  | (2) | Defendants Had Strong Visibility into the Decline in Nielsen's Business ....................................................................................... 45 |

| D. | 3Q16: Nielsen Surprises Market with Declining Performance, but Hides True Extent of the Businesses' Problems ........................................................ 52 |

| E. | 4Q16-4Q17: Nielsen Continues the Fraud, but is Repeatedly Forced to Report Disappointing Results Caused by its Waning Business.......................... 58 |

|  | (1) | Analyst Day (December 8, 2016) ............................................................ 59 |

|  | (2) | 4Q16 (February 9, 2017)......................................................................... 60 |

|  | (3) | 2017 10-K (February 17, 2017) .............................................................. 61 |

|  | (4) | 1Q17 (April 25, 2017)............................................................................. 61 |

|  | (5) | 2Q17 (July 27, 2017) .............................................................................. 63 |

|  | (6) | 3Q17 (October 25, 2017) ........................................................................ 65 |

|  | (7) | 2017 Analyst Day (November 9, 2017).................................................... 66 |

|  | (8) | 4Q17 & 2017 10-K (February 8, 2018) ................................................... 67 |

| F. | Fiscal Year 2018: The Extent of the Decline is Finally Revealed ...................... 70 |

|  | (1) | 1Q18 (April 26, 2018): Defendants Make False Assurances Regarding GDRP and China Amidst Continuing Business Weakness ................................................................................................. 70 |

|  |  | (i) | Background on the GDPR & Defendant's False Assurances Concerning the GDPR's Effect on Nielsen's Business ............... 70 |

|  |  | (ii) | 1Q18: Nielsen's Business Continue to Deteriorate, While Nielsen Continues to Mislead the Market Regarding Its Deteriorating Condition and GDPR.............................................. 73 |

|  | (2) | CWs Corroborate that Problems with GDPR Were Known to Nielsen Throughout the First Half of 2018................................................ 81 |

|  | (3) | 2Q18 (July 26, 2018): Nielsen Finally Reveals the Massive Multi-Segment Decline in its Business ......................................................... 83 |

|  |  | (i) | Final Revelation of Buy Segment Issues ..................................... 86 |

(ii)    Revelation of GDPR Issues Affecting Nielsen's Marketing Effectiveness Business ................................................................. 90

(4)    Subsequent Disclosures Further Confirm the Fraud ................................ 96

(i)    Abrupt Resignation of Defendant Jackson ................................... 96

(ii)    Subsequent Disclosures Fully Reveal Extent of GDPR Issues That Were Known to Nielsen ................................. 96

(iii)    Subsequent Disclosures Support That Nielsen Deceived Market About China Execution Issues ......................................... 98

(iv)    Nielsen Takes Massive Buy Segment Goodwill Write-Down ................................................................................... 99

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................... 100

A.    Chronology of the Other False and Misleading Statements ............................. 100

(1)    Statements Made From February 11, 2016 through October 25, 2016 ................................................................................... 100

(i)    February 11, 2016 (4Q 2015) ..................................................... 101

(ii)    April 20, 2016 (1Q16) ................................................................ 105

(iii)    May 18, 2016 ............................................................................. 106

(iv)    June 1, 2016 ............................................................................... 106

(v)    July 26, 2016 (2Q16) ................................................................. 108

(vi)    October 25, 2016 (3Q16) – Partial Revelation of the Truth ....... 112

(2)    Statements Made From December 8, 2016 through July 25, 2018 ......... 119

(i)    December 8, 2016 ....................................................................... 120

(ii)    February 9, 2017 (4Q16) ............................................................ 123

(iii)    April 25, 2017 (1Q17) ................................................................ 124

(iv)    July 27, 2017 (2Q17) ................................................................. 129

(v)    October 25, 2017 (3Q17) ............................................................ 132

(vi)    November 9, 2017 ....................................................................... 135

(vii)   February 8, 2018 (4Q17) ................................................................. 140

(viii)  February 28, 2018 ........................................................................... 144

(ix)    April 26, 2018 (1Q18) ..................................................................... 146

(x)     May 15, 2018 .................................................................................. 150

(xi)    May 16, 2018 .................................................................................. 151

(xii)   May 31, 2018 .................................................................................. 153

(xiii)  June 5, 2018 ................................................................................... 156

(xiv)   June 14, 2018 ................................................................................. 156

B.   MD&As During the Class Period ................................................................. 158

C.   Statements About the Value of Nielsen's Buy Segment and its Goodwill ......... 161

VIII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER ........ 174

A.   CWs Confirm Declining Business and that Defendants Knew of This
     Decline Because of Their Visibility into the Business ..................................... 175

B.   Additional Facts Supporting Scienter Preceding 3Q16 Partial Revelation
     of the Truth ................................................................................................. 175

C.   Additional Allegations of Knowledge or Recklessness That Nielsen was
     Misleading Investors Regarding GDPR .......................................................... 176

D.   Additional Facts Supporting Scienter Regarding Statements About China ....... 177

E.   By Speaking on the Subjects at Issue in this Complaint, Defendants Must
     Have Had Knowledge of the Conditions in Nielsen or They Were
     Reckless in Speaking On Those Subjects ........................................................ 178

F.   The Significance of the Subject of the False and Misleading Statements to
     Nielsen's Business Supports Scienter ............................................................. 178

G.   Defendants Barns' and Jackson's Terminations Support Scienter ................... 179

IX.   LOSS CAUSATION ............................................................................................. 179

X.    APPLICATION OF THE PRESUMPTION OF RELIANCE ....................................... 181

XI.   NO SAFE HARBOR .............................................................................................. 182

XII.  CLASS ACTION ALLEGATIONS ........................................................................... 183

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5  Promulgated Thereunder Against All Defendants .............................................................186

COUNT II Violation of § 20(a) of the Exchange Act Against the Individual Defendants ..............................................................................................187

XIII.   PRAYER FOR RELIEF ............................................................... 189

XIV.   JURY DEMAND ........................................................................ 189

## I.     INTRODUCTION

Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS"), and additionally named Plaintiff Monroe County Employees' Retirement System (together with MissPERS, "Plaintiffs"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiffs, and Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases and other public statements issued by Nielsen Holdings plc ("Nielsen" or the "Company"), Nielsen's filings with the U.S. Securities and Exchange Commission ("SEC"), interviews with Nielsen's former employees, and media and analyst reports about the Company.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be obtainable through a reasonable opportunity for discovery.  This suit alleges securities claims against Defendants Dwight Mitchell Barns, Kelly Abcarian, Stephen Hasker, Jamere Jackson ("Individual Defendants") and Defendant Nielsen (collectively, "Defendants").

## II.     SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Nielsen's publicly traded common stock between February 11, 2016 and July 25, 2018, inclusive (the "Class Period").  The action is brought against Nielsen and certain of its officers, directors and/or employees for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Nielsen is a data and analytics company.  It collects information about what consumers buy and watch, and it creates analytical products based on this information.  Nielsen then sells this data and these analytical products to its clients.  Nielsen's business has two similarly sized segments: Buy and Watch.

Case 1:18-cv-07143-JMF   Document 60   Filed 06/21/19   Page 8 of 197

3.      The Buy segment tracks billions of retail transactions around the world and transforms this data into products that assist consumer packaged goods ("CPG") companies – like The Procter & Gamble Company, The Coca-Cola Company, Nestle S.A., and the Unilever Group – in understanding their markets and consumers.  The results of the Buy segment are split into two reporting sub-segments: (1) Developed Markets, which generated about 2/3 of the Buy segment revenue, and (2) Emerging Markets, which provided the other 1/3 of the Buy segment revenue.

4.      The Company's Watch segment tracked user data from television, radio, and the internet for its clients.  Nielsen relied on data obtained from third-parties such as Facebook and Twitter for many of its products and services.  The Watch data is used by Nielsen's media clients to understand their audiences and establish the value of their advertising inventory (*e.g.,* "Nielsen Ratings").  The Watch segment also housed a business called "Marketing Effectiveness," which Nielsen promoted as fast growing and highly promising.

5.      Throughout the Class Period, which ranges from February 11, 2016, to July 25, 2018, Defendants defrauded the market by overstating the strength of Nielsen's business, when in reality the Company was in decline, and plagued by numerous problems that negatively affected its growth.

6.      In late 2015, immediately prior to the Class Period, Nielsen told the market at an Analyst Day presentation that the Company was poised for incredible growth.  Defendant Jackson, Nielsen's CFO, touted the business' strength and specifically called out the expected growth in the Buy segment.  Nielsen also discussed the launch of the Connected Buy System, which supposedly delivered data and analytics to clients.  It was promoted by Defendants as a response to "the most important trend" Nielsen was facing, its clients demanding answers to

2

questions like "*why* my market share went up."  In other words, it was promoted as a high-value product because it offered clients analytical insights about their business.

7.      At the start of the Class Period on February 11, 2016, Nielsen told the market that the Buy segment was continuing to "strengthen and expand" and that this strength was manifesting in both Developed Markets and Emerging Markets.  Defendant Jackson said that clients' discretionary spending was "stable" and that clients continued to invest in the analytics products that Nielsen provided.  The growth Defendants touted on February 11, 2016, was reflected in the guidance provided on that day, which was a reiteration of the strong guidance provided on Analyst Day in late 2015.  The market was excited by Nielsen's news of growth and client spending, and Nielsen's stock price increased by 4.2% that day, to close at $47.33.  Analysts called Nielsen a "safe haven" and discussed their confidence in Nielsen based on the "stability" in client discretionary spending that Defendants described.

8.      For the next two quarters, Defendants continued to tout the strength and growth in the Buy segment.  When releasing first quarter results on April 20, 2016, Defendant Barns told the market that "in both Watch and Buy" the Company was "executing well," and that "there's a lot to look forward to for the rest of the year and beyond."  On July 26, 2016, the Company reported "solid performance of both its Buy and Watch businesses" and reiterated the strong fiscal year guidance provided at Analyst Day in late 2015 – meaning the outlook for the Company remained strong and had not changed.  Analysts were again impressed by Nielsen's strong results in 2Q16 and were encouraged by Defendants' statements that Developed Markets would deliver full-year growth in line with guidance.

9.      However, unbeknownst to the market, Nielsen's Buy segment was in decline.  Numerous former employees of Nielsen confirm that starting at least by late 2015 – before the

Class Period even started – the Buy segment was experiencing a significant slowdown.  Former employees describe large clients, like Proctor & Gamble and Reckitt Benckiser, cutting back on discretionary spending on analytics, and provided information that major clients across the board cut spending on the analytical part of Nielsen's business.

10.     Together these former employees compellingly describe a dramatic trend: Nielsen's customers no longer wanted to pay for Nielsen's analytics.  These customers were shifting to Nielsen's competitors, like InfoScout and Market Track, and even Proctor & Gamble left Nielsen for a competitor.  Clients also had decided that it was preferable to purchase data from Nielsen, and to conduct the analysis of that data themselves.  Clients just didn't want the complicated and expensive analytics' products Nielsen offered, opting instead for "raw data" from Nielsen they could crunch themselves.  One former employee said that clients had doubts about the usefulness of analytics coming from Nielsen and that clients gave him feedback that Nielsen's analytics products were "antiquated" and that they weren't interested in them.

11.     The slowdown in clients purchasing the insights or analytics led, of course, to a marked slowdown in the Buy business' growth and revenue – a deterioration that one former employee called a "terminal decline" in the Buy side of the business.

12.     Defendants were keenly aware of this decline, even while they made positive statements to the market about the false Buy segment growth.  Many former employees describe internal Nielsen reports that were prepared regularly and sent to senior management including Defendants Barns and Jackson.  The reports contained detailed revenue metrics – both actual and forecasts, broken down by each client and region, in all lines of Nielsen's business.  Another employee described meetings where client revenues and budgets were discussed with Defendant Jackson.  Yet another employee talked about how Defendant Jackson had access to systems that

provided information about Emerging Markets and could provide this segment's performance to Defendant Jackson at any given time.

13.     This detailed internal reporting was not surprising given the fact that Nielsen was a data analytics company, that could, and did, analyze its own data just as well as it analyzed data for its clients.  Nielsen itself corroborated the accounts of these former employees – that they had superior visibility into revenues, forecast, and demand – when they explained to the market that "more than 70%" of its "annual revenue has been committed under contracts in" Nielsen's combined Buy and Watch segments, and that 30% of revenue was the revenue spent on "discretionary business" or analytics.  Nielsen was able to account predictably for a large portion of its business, and with the reports described by former employees, tracked the entire business fastidiously.

14.     On October 25, 2016, during Nielsen's 3Q16 earnings call, Nielsen shocked the market by reporting that, contrary to the positive statements made for the last several quarters about strength and growth in the Buy segment, the Buy segment, and in particular Developed Markets, was in decline.  Nielsen attributed these disappointing results to softness in client discretionary spending – the very thing that former employees confirm was going on as early as 2015.

15.     Defendant Barns explained that clients in Developed Markets were shifting away from custom analytic insights delivered via deep-dive projects, and they were shifting instead toward "everyday analytics."  He said that this shift in the Developed Markets was a "secular shift" not a "passing phase or a cycle that will swing back."  Nielsen also lowered 2016 guidance because of the deceleration in growth in the Developed Markets.

16.     On this news the stock dropped $9.28 (6.8%) per share, on extremely heavy trading volume, to close at $45.65 per share.  Analysts were astounded by this news and commented on the surprising nature of the miss – "*i.e.*, NLSN boasts about the visibility of the business, and while Buy can be lumpy, the dramatic change from 2Q earnings (07/26) & its various investor events thereafter, is confounding."  Another analyst commented: "The deceleration in NLSN's Developed Markets business came as a surprise to us, particularly after the confident tone that management struck at 2Q, guiding 2H16 to grow 1.5-3.5%."

17.     However, this was only a partial revelation of the truth.  Because while Defendant Barns admitted that clients were supposedly shifting toward "everyday analytics," he continued to hide from the market that the continuing weakness in the Buy segment was also due to a shift to "raw data" to the detriment of Nielsen's lucrative analytics products.  Nielsen also misled the market by blaming the decrease in discretionary spending on conditions in the CPG market, which it said had driven its client's to reduce discretionary spending.  This false explanation for the declining performance hid the truth from the market: that Nielsen's business was in decline because of customer demand for Nielsen's analytics products —not just because of market conditions.

18.     Defendants also took this opportunity during the 3Q16 earnings call to reassure investors that the Emerging Markets continued to produce solid top line growth.  However, even this reassurance was misleading because, as former employees confirm, the trends in Developed Markets was also affecting Emerging Markets, meaning that the fast growth in Emerging Markets would be short lived.

19.     Over the next several quarters, Defendants continued to provide guidance to the market about the business and continued to make positive statements about Emerging Markets.

However, Defendants continued to mislead the market.  Developed Markets continued to be weak and miss expectations but Defendants continued to claim this was just a result of conditions in the CPG market.  Instead of revealing the full truth, they continued to hide the fact that the clients' shift to "raw data" (and away from analytics products) would continue to substantially harm the value of the whole Buy side business.  In 2Q17, Defendants gave the market hope that it would stop the bleeding in Developed Markets, and that instead of declining, Developed Markets would come in flat.  Analysts saw this as a positive message that Developed Markets was turning around.  However, in the next quarter, Defendants announced another decline in Developed Markets.  Analysts were confused by this up and down in Nielsen's business and in Nielsen's message.  One analyst commented "the fact that NLSN is walking [its guidance of flat 2018 Developed Markets revenue] back just one quarter later (and not proactively) further hurts its credibility."  During this time, Emerging Markets came in strong for the most part, but the other shoe was still to drop for Emerging Markets  – a fact that Defendants knew, due to the shift away from analytic products and their visibility.  So while the stock price dropped multiple times from April 25, 2017 to April 26, 2018, Defendants continued to conceal the full truth about trends in the Buy side of the business.  Because of this significant (but undisclosed) trend, the Buy side of the business was worth considerably less than what Defendants claimed – and yet Defendants continued to value the goodwill of the Buy business on its balance sheet at significantly inflated levels.

20.     Then on February 8, 2018, the truth began to emerge about Emerging Markets during the 4Q17 earnings call.  Defendant Jackson explained that revenue was up 5% on a constant currency basis, which was below "full-year performance" for Emerging Markets.  Defendant Jackson attributed this to "disruption from natural disasters and some revenue

execution issues in China that caused our growth rate to dip."  However, on this same earnings

call, Defendant Barns falsely claimed that Nielsen had fully addressed the China issues and they

wouldn't be a problem moving forward.  On this news Nielsen's stock dropped $3.66 (9.7%), on

heavy trading volume, to close at $33.90.  By comparison the S&P 500 declined 3.9%.

21.     In the same time, Nielsen was fielding questions and concerns about the

implementation of the EU General Data Protection Regulation ("GDPR") and the potential

effects it would have on Nielsen's growth.  This sweeping data privacy law passed by the

European Parliament and Council in April 2016 was set to be implemented in May 2018.  Any

company that transacts in personal data is subject to the GDPR and fines for violations can be as

high as 4% of a Company's global annual revenue – so this was an important regulation for

Nielsen.

22.     On the very same 4Q17 earnings call on February 8, 2018, where Defendants

announced weakness in China, Defendants told the market they were ready for the GDPR and

that they did not see any impact on the Buy side of the business (or any impact on the business at

all), because GDPR would not affect access to the data they needed.  Over the next several

months, Defendants continued to tell the market that the GDPR was a "a net positive" for the

Company, assured investors Nielsen was "in a very good position" and "in good shape" on the

issue, said that those within the Company had been "focused" on it "for some time," and that it

would be a "non-event," which it did not expect would have "any major impact on [the]

business," since Nielsen would "still have access to all the data that we're going to need for our

products."

23.     This was not the case.  Nielsen's former Chief Privacy Officer, who spoke with

Lead Counsel about the matter, recounted how in the last 6 weeks, before the GDPR went into

effect, there was a "noticeable and markedly different" trend, in that clients were pulling back. He further advised that the general climate around the GDPR changed for clients, partners and vendors in those last 6 weeks prior to the enactment of the GDPR.  He described how Nielsen was impacted by clients "holding off on deployment to see how Europe shakes out," general "nervousness" about committing to new work because of the GDPR, and pressure from partners or vendors around the "transparency consent framework" insofar as "who's going to work with who."  He suggested that there were a lot of externalities related to the GDPR that had a negative impact on Nielsen.

24.     Notably, even in these last six weeks before the GDPR went into effect in May 2018, and amidst the trend of clients pulling back, that the Chief Privacy Officer described, Defendants continued to make positive statements about the GDPR, including statements on April 26, 2018, (the GDPR "plays as a net positive for our business"), May 31, 2018, (the GDPR has been "been a more of a non-event from our side"), and June 14, 2018, ("the privacy changes for our core measurement products were really, for us, when GDPR came really a non event").

25.     Amidst these statements about the GDPR, Nielsen also made positive statements about China on May 16, 2018, and May 31, 2018, to reassure the market that Emerging Markets was alive and well and that past problems in China – its largest Emerging Markets market – were over.  In particular, Defendant Jackson echoed his earlier assurances by saying the operational issues in China were "behind us," as Nielsen had made changes to "leadership and structure" and was now "operating pretty well."

26.      The full extent of the Company's faltering business and financial condition was disclosed on July 26, 2018, when Nielsen announced its Second Quarter 2018 financial results.

Defendant Jackson began his remarks by saying that the quarter was "one of the most challenging quarters for our business in over a decade."

27.     The Emerging Markets segment was guided to grow by 8%-10%, but it had barely grown at all (showing 0.3% growth)—and full year guidance dropped to 0% growth.  The Developed Markets segment was expected to decline by 2%-4%, instead it fell by 6.9%—and full year guidance was dropped to negative "mid-single digits."  The Watch segment was set to grow by 5%-6%, but instead it had grown by only 4%.   Specifically looking at the supposedly high-growth Marketing Effectiveness segment, Defendants had projected growth of 15%-20%, but instead it had grown by 6%—and full year guidance was dropped to an even lower 2.5%.  Macquarie Research described the quarter as "[d]isastrous" and stated that it "couldn't be much worse."  J.P.Morgan said, ***The Other Shoe Has Fallen***: Poor Results, Worse Outlook, and an Extremely Frustrated Investor Base."

28.     Other analysts were extremely negative and felt that Nielsen had misled them. Excerpts from those analyst's statements include: "[i]f confidence in the financials was low before, it has now been seriously damaged;" "We've been dead wrong on NLSN.  Developed Markets pressures have worsened and now bleed into Emerging Buy while the Watch segment has been disrupted near-term by GDPR *(all counter to management 3 months ago)*;" "How much confidence should we have in your guidance at this point given the repeated misses;" "why wasn't this sort of a little bit more known before;" "[t]hese results and outlook came as a shock."

29.     Unsurprisingly, as a result of this negative news, Nielsen's stock fell from a close on July 25, 2018 of $29.57 per share to a close on July 26, 2018 of $22.11 per share, which was just over a 25% decline.

30.     Nielsen attributed the Buy segment results to troubles in the CPG market, especially in Southeast Asia and China.  But by then the market understood the problems were Company specific.  As J.P.Morgan wrote, in polite understatement: "We observe a generally stable (or even increasing) commitment by multinational CPG and food companies to emerging markets, suggesting that at least some of Nielsen's issues are Company specific."  Furthermore, Nielsen revealed that the slowdown in China was sustained, and caused by Nielsen's declining business with its most important multinational corporation clients.  While Defendant Jackson had previously "assure[d]" investors the operational issues in China were behind the Company, he was now forced to admit that to be a lie, and told the market "we still have more work to do operationally there."  Months later, on October 25, 2018, after the Class Period, Nielsen announced it would need to install a "new management team," and that it was still "rebuilding" its commercial teams in China.

31.     On the Watch segment, the massive deceleration of the Marketing Effectiveness business was attributed to issues around the GDPR.  Despite Nielsen's many assurances to the contrary, including assurances up until nearly the end of the Second Quarter, Nielsen was now admitting that the GDPR had devastating consequences on Marketing Effectiveness' revenue.  As Defendant Barns eventually admitted during the 3Q18 earnings call, this was not a surprise, but a "logical" result of the GDPR going into effect.  He explained the pullback in terms of clients pulling back from ordering Nielsen's analytical insights, while the "dust is still settling" on how they can use those services.

32.     In an effort to cover up the Defendants' most-obvious mid-quarter lies, Defendant Jackson told yet another lie on this earnings call, and assured the market "we had all the data that we needed," further claiming the issue was just that clients were pulling back.  As Nielsen would

admit after the Class Period, they did not have all the data they needed.  On September 12, 2018,

(after the Class Period), Nielsen would admit that Nielsen's large data partners—which includes

Facebook— "turned off the ability for us to get any data . . . we had 120 campaigns being

measured, 120 campaigns, and it was literally switched off . . . that pretty much stops the

business during that time."

33.     In question after question on the 3Q18 earnings call, analysts confirmed that they

were not buying the prospect that Nielsen did not have visibility into the GDPR issues: "I think

last quarter and even intra-quarter conferences, you had said GDPR was a net positive and you

cut the Watch guidance in half . . . what changes in two months that causes such a big

disruption[?]" and "Investors are understandably concerned about the degree to which

management anticipated the accelerated weakness in Buy and the impact of GDPR on Watch-

segment revenues from Marketing Effectiveness products."  And the written reports were equally

harsh: "This comes after management noted last quarter that GDPR shouldn't be an issue;" "we

are compelled to point out that just ~3 months ago, on the 1Q18 earnings call, CEO Mitch Barns

said the greater focus on privacy, including GDPR, was a net positive for Nielsen's business;"

and "we found mgmt.'s explanation of the impact of GDPR on the Marketing Effectiveness sub-

segment of Watch somewhat confusing and lacking."

34.     The same day that Nielsen finally revealed the truth, it also announced that

Defendant Barns was retiring.  He had been "terminat[ed] without cause" and given severance.

This termination was abrupt and not previously announced.  A few weeks later, Defendant

Jackson also abruptly resigned from the Company, without prior notice.

35.     The severity of the problems and trends that Nielsen hid from the market for so

long were further emphasized by the fact that Nielsen was forced to take a massive write-down

of its Buy segment shortly after the Class Period.  Nielsen took a goodwill impairment of $1.4 billion, wiping out a massive 54% of the Buy's segment's entire goodwill – a write down they should have taken by at least late 2016 when the deceleration trends were known to Nielsen.

36.     As a result of Defendants' wrongful acts and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

37.     The claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b)), Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

38.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.  Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this judicial district.  Nielsen transacts business in this district, and the Company's offices are located within this judicial district.

39.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this suit alleges violations of the Exchange Act.

40.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national exchange within the United States.

## IV.   PARTIES AND WITNESSES

### A.   Named Plaintiffs

41.     On April 22, 2019, this Court appointed Public Employees' Retirement System of Mississippi ("MissPERS") to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 54).  As set forth in its PSLRA certification (*see* ECF No. 34-1), Lead Plaintiff purchased Nielsen common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

42.     Additionally Named Plaintiff Monroe County Employees' Retirement System ("Monroe") purchased Nielsen common stock during the Class Period, as set forth in the certification attached hereto as Exhibit A, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

### B.   Defendants & Their Roles as Control Persons of Nielsen

43.     Defendant Nielsen is incorporated in the United Kingdom, with principal executive offices located at Nielsen House, Oxford Business Park South - John Smith Drive, Oxford, OX4 2WB, United Kingdom.  The Company also has a major office at 200 W. Jackson Boulevard, No. 27, Chicago, Illinois, 60606.  The Company's stock is listed on the NYSE under the symbol "NLSN."

44.     The Individual Defendants, by virtue of their senior positions at Nielsen, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.

14

45.     Defendant Dwight Mitchell Barns ("Barns"), is and was at all relevant times during the Class Period, a member of the Board of Directors and Chief Executive Officer ("CEO") of the Company.  As stated in Nielsen's Fiscal Year 2016 Proxy:

> His prior roles with Nielsen include President, Global Client Service from February 2013 through December 2013, President of Nielsen's U.S. Watch business from June 2011 until February 2013, President of Nielsen Greater China from January 2008 until June 2011, President of Nielsen's Consumer Panel Services from March 2007 until January 2008 and President of Nielsen's BASES and Analytic Consulting units from July 2004 through February 2007. He joined Nielsen in March 1997 after 12 years with The Procter & Gamble Company.

46.     Barns received $10.1 million in total compensation in 2016, $10.2 million in 2017, and $10.8 million in 2018 – the same time period that Nielsen's stock price declined approximately 60%, from $55.81 on July 22, 2016 to $22.11 on July 26, 2018.  On July 28, 2016, Barns sold 60,136 shares of Nielsen for $53.75 per share, receiving total proceeds of $3,232,310. On March 27, 2017, Barns sold another 46,947 shares of Nielsen stock at $40.82 per share, receiving total proceeds of $1,916,377.  Both sales were made when Nielsen's stock traded at artificially inflated levels due to Barns and the other Defendants making materially false and misleading statements about Nielsen's business.

47.     As Nielsen's CEO and Board Chairman, Defendant Barns had executive control over the Company during the Class Period and would have had heightened control of the Company's statements regarding its financial condition and projections.  As alleged herein, Defendant Barns frequently signed SEC filings and participated in presentations to investors and analysts.  As alleged herein, Defendant Barns made false and misleading statements to investors during the Class Period.

48.     Defendant Jamere Jackson ("Jackson"), is and was at all relevant times during the Class Period, Chief Financial Officer ("CFO") of the Company.

49.     Jackson received $4.5 million in total compensation in 2016, $4.3 million in 2017, and $2.2 million in 2018 – the same time period that Nielsen's stock price declined approximately 60%, from $55.81 on July 22, 2016 to $22.11 on July 26, 2018.  On May 30, 2017, Jackson sold 11,500 shares of Nielsen stock for $38.55 per share, receiving total proceeds of $443,325.  On December 14, 2017, Jackson sold 16,000 shares of Nielsen stock for $36.30 per share, receiving total proceeds of $580,800.  On March 8, 2018, Jackson sold 19,000 shares of Nielsen stock for $32.97 per share receiving total proceeds of $626,430.  All of the sales were made when Nielsen's stock traded at artificially inflated levels due to Jackson and the other Defendants making materially false and misleading statements about Nielsen's business.

50.     As Nielsen's CFO, Defendant Jackson had control over the Company during the Class Period and had heightened control of the Company's statements regarding its financial condition and projections.  As alleged herein, Defendant Jackson frequently signed SEC filings and participated in the presentations to investors and analysts, where the false and misleading statements were made.  As alleged herein, Defendant Jackson made false and misleading statements to investors during the Class Period.

51.     Defendant Stephen Hasker ("Hasker") served as the Global President and Chief Operating Officer ("COO") from December 2015 to December 2017.

52.     As Nielsen's COO, Defendant Hasker had control over the Company during the his tenure and would have had a heightened control of the Company's statements regarding its financial condition and projections.  As alleged herein, Defendant Hasker made false and misleading statements to investors during the Class Period.

53.     Defendant Kelly Abcarian ("Abcarian"), is and was at all relevant times during the Class Period, Senior Vice President of Product Leadership of the Company.

16

54.     As the Senior Vice President of Product Leadership at the Company, Defendant Abcarian had direct day-to-day control over significant portions of Nielsen's business.  As alleged herein, Defendant Abcarian made false and misleading statements to investors during the Class Period.

C.     **Confidential Witnesses**

55.     The allegations in the Complaint are further informed by witness interviews conducted by and through Lead Counsel and its agents.  Lead Counsel interviewed numerous former employees of Nielsen who were employed at Nielsen in during the Class Period and who provided information in further support of the allegations herein.  These former employees are identified as Confidential Witnesses or "CW."

56.     Confidential Witness 1 ("CW 1") worked at Nielsen from before 2005 until the start of 2017.  From 2013 until the end of his[1] tenure, he was a Senior Vice President of Consumer and Shopper Insights and was responsible for client service and account management for U.S. CPG clients.  During the Class Period, he reported to Dennis Moore, the President of Professional Services at Nielsen North America, and then to Chris Morley, the U.S. President at Nielsen.

57.     Confidential Witness 2 ("CW 2") worked at Nielsen's office in Nairobi, Kenya, as an Executive Director for Emerging Markets, from April 2016 to April 2017.  He reported to the CFO of Emerging Markets, Samipendra Chaudhury, who reported to Defendant Jackson.

58.     Confidential Witness 3 ("CW 3") was a Director/Leader of Consumer Insights[2] team during the entirety of the Class Period and was in Africa, leading a region of Africa.  He reported to Akash Pal, Managing Director of Consumer Insights business in Emerging Markets,

---

[1] All Confidential Witnesses ("CW") are referred to using male pronouns, regardless of their gender.
[2] Consumer Insights is a business within Nielsen's Buy segment that "puts data into perspective" by providing analytics that purport to enable Nielsen's clients to understand their customers.

who reported to Nick Papagregoriou, President of Emerging Markets.  Nick Papagregoriou

reported to the Head of Operations outside of North America, who reported to Defendant Barns.

59.     Confidential Witness 4 ("CW 4") worked at Nielsen from October 2013 until July

2018.  He was a Financial Planning and Analysis Leader ("FPA Leader") at the Associate

Director level, in the Company's Dubai office, which was the headquarters for its emerging

markets business.  He was the FPA leader for Nielsen's Middle East and Africa regions.  He

reported to the CFO of Nielsen's Middle East, North Africa, and Pacific regions, Nalina Ranka,

who reported to CFO of Emerging Markets, Samipendra Chaudhury, who reported to Defendant

Jackson.

60.     Confidential Witness 5 ("CW 5") worked at Nielsen from 2011 until March 2017.

Throughout this time period, he was a Senior Vice President in Nielsen's Global Consumer

Packaged Goods business.  He reported to Karen Fichuk, whose title was President, Strategic

Initiatives, Developed Markets, Susan Dunn, whose title was Executive Vice President,

Professional Services, and Konrad Gerszke, whose title was Group President-Lead Markets.

61.     Confidential Witness 6 ("CW 6") worked at Nielsen from August 2015 until

January 2017, as the Manager of Marketing Return on Investment.  In this position, he was

responsible for panel data analysis, market mix modeling, and CPG analysis.  He reported to the

Vice President of Marketing Analytics.

62.     Confidential Witness 7 ("CW 7") was a Vice President in Nielsen's Buy segment

who worked remotely but rolled up into Nielsen's Central Region which was located in Chicago.

He worked at Nielsen from before the Class Period until the fall of 2017.  He was responsible for

selling to emerging accounts within the United States.

63.     Confidential Witness 8 ("CW 8") worked at Nielsen's office in Budapest, Hungary, from January 2013 to August 2016, as a Senior Global Report Liaison.  He reported to the Dedicated Design Manager, who reported to the Vice President of Global Product Leadership, Joe Rutecki.  He worked with the global marketing teams of Nielsen's largest clients, often for days, at the clients' corporate headquarters.  He worked with clients including PepsiCo, The Coca-Cola Company, Kimberly-Clark, and Reckitt Benckiser.

64.     Confidential Witness 9 ("CW 9") worked for Nielsen from 1995 until March 2017.  Toward the end of his tenure, he was an Executive Director of Global Operations in India and was in operations roles throughout his tenure.  He supervised the Retail Measurement Services ("RMS")[3] and Consumer Panel Services ("CPS")[4] for the Southeast Asia territory for the Company.  He reported to David Ponraj, who reported to Siegfried De Smedt.

65.     Confidential Witness 10 ("CW 10") worked as a Senior Market Research Analyst in Nielsen's United Arab Emirates offices from February 2016 until June 2017.  He reported to Associate Director of Retail Measurement Services, Gaurang Kotak, who reported to Executive Director Sunil Khiani, who reported to the Managing Director of Arabian Peninsula & Pakistan ("AP&P") Cluster, Arslan Ashraf, who reported to President of Emerging Markets, Nick Papagregoriou.  In his role as a Senior Marketing Research Analyst, he collaborated with Custom Insights in Nielsen's Buy segment in analyzing data and providing Middle East and North African clients with insights on where consumer categories were trending.  Prior to that, he

---

[3] RMS refers to products through which Nielsen collects sales data from retailers and provides its customers with information about distribution, pricing, merchandizing and promotion, as well as market share and competitive sales volumes.
[4] CPS collects data from consumers on the products they buy to provide Nielsen's customers with consumer level data, rather than just tracking total sales, CPS allows the data to track what consumers and househoulds are buying.

worked for Nielsen as a Client Consultant from October 2014 to January 2016, in the Company's Warsaw, Poland office.

66.     Confidential Witness 11 ("CW 11") worked in Nielsen's Florida offices from August 2013 until March 2018, with the title Senior Director, Global Engineering.  He worked in Nielsen's Watch segment until being transferred to the Buy segment around September 2017. His reporting chain was 3-4 levels below Megan Clarken, whose title was President – Watch.[5] His responsibility on the Buy segment included developing data partnerships for what was ultimately referred to as the Connected Buy System, though he said that it was not always called that while he worked on the project.

67.     Confidential Witness 12 ("CW 12") worked at Nielsen's offices in Dubai from September 2012 until February 2016, as a Senior Executive in Nielsen's Insights business.  His responsibilities included day-to-day client service and tracking project execution on the operations side.  He also said that beginning in 2015 and throughout the rest of his tenure, his responsibilities included revenue targets.  CW 12 last reported to Senior Manager – Public Development and Sustainability, Anand Marakani, who in turn reported to Director – Public Development & Sustainability, Jyotsna Nair, who in turn reported to Executive Director – Banking & Finance Research, MENAP Region, Anoop Sardeshpande, who in turn reported to Arslan Ashraf, who in turn reported Nick Papagregoriou.

68.     Confidential Witness 13 ("CW 13") worked for Nielsen from September 2015 until June 2018.  He was hired as Regional Director of APAC in Singapore, a title he had until June 2016, when he became the Head of Marketing for Central and Eastern Europe.  Then in

---

[5] Megan Clarken held the title of President, Watch from September 2017 onward.  She retained her prior title of President, Product Leadership and International Media, which she had since April 2015.

July 2017, he moved to the United States where his title changed to Director until the end of his tenure with Nielsen in June 2018.

69.     Confidential Witness 14 ("CW 14") worked for Nielsen from September 2014 until September 2018.  His job title was "Chief Privacy Officer" and at the time of his appointment to that role he reported to Executive Vice President for External Affairs Karen Kornbluh.  In this role, he was responsible for overseeing Nielsen's global privacy program.

Confidential Witness 15 ("CW 15") worked for Nielsen throughout the class period most recently as a Vice President in Nielsen's Watch division.  He was responsible for client development on the commercial side of the Watch division.

70.     Confidential Witness 16 ("CW 16") worked at Nielsen from 2008 to June 2018 as Data Quality Officer (Manager).  He worked as part of the Marketing Mix Modeling/Marketing Effectiveness team in a supporting role.  He was responsible for data collection and processing for the Marketing Effectiveness Models.  He worked out of the Company's Cincinnati, Ohio, offices.

71.     Confidential Witness 17 ("CW 17") was employed by Nielsen as a Vice President for a few years, with his tenure ending in March 2016.  His division was based in Rochester, New York.  His work was part of the Insights business in Nielsen's Buy segment.  In his chain of command, CW 17 was three levels below Managing Director, Consumer Insights & Innovation Mike de Vere.

72.     Confidential Witness 18 ("CW 18") was a Vice President of Client Services at Nielsen's Markham, Ontario office from 2015 to 2018.  He was responsible for negotiating contracts, business planning, and selling insights and solutions to major manufacturing CPG clients in Canada, including Pepsi, Unilever, Proctor & Gamble and Coca-Cola.  CW 18 reported

to Krista Thompson, senior vice president of Client Services, who reported to Managing Director of Canada, Mike Ljubisis, who reported to Karen Fichuk, President of Strategic Initiatives/Developed Markets – North America.  Fichuk reported to Defendants Hasker and Barns.

## V.   BACKGROUND ON NIELSEN'S BUSINESS

73.     Nielsen is a data analytics company that provides its clients[6] with detailed information about consumer preferences, especially in the consumer packaged goods ("CPG")[7] industry, as well as what programming consumers watch (*e.g.*, on television and streaming platforms) and listen to (*e.g.*, radio programming).  Throughout the Class Period, Nielsen's business was divided into two main reporting segments: (1) Buy and (2) Watch.

74.      The two segments accounted for similar portions of Nielsen's business during the Class Period, with the Buy segment representing 5% less of total revenue in 2018 than it did in 2016 and with the Watch segment correspondingly representing 5% more of total revenue.

75.     Nielsen's business depends on the collection of data.  Some of this data is collected by Nielsen through the use of surveys, panels, and by asking consumers to submit data to the Company.  Other data is gathered in connection with partnerships with retailers, such as by receiving point of sale information.  Still other data is collected from third parties such as Facebook and Twitter for many of its products and services.  By the Second Quarter of 2018, Nielsen's business was dependent on "data suppliers," in the form of over "200 data partners."

76.     As of 2016, Nielsen's principal competitors included Information Resources, GfK, Ipsos, Kantar, comScore and TiVo.  Nielsen also faced competition from companies such as Oracle, Google Analytics, and Adobe Analytics, as well as many local and newer companies.

---

[6] Nielsen uses the terms "clients" and "customers" interchangeably, as does this Complaint.
[7] CPG items are those used regularly by ordinary consumers that require routine replacement such as food, drinks, clothes, and household products.

77.     The following chart shows the total revenue, and percentage of Nielsen's total revenue, coming from both segments throughout the Class Period:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Buy segment Revenue | $3,322 million | $3,231 million | $3,097 million |
| Buy segment % of Total | 53% | 49% | 48% |
|  |  |  |  |
| Watch segment Revenue | $2,987 million | $3,341 million | $3,418 million |
| Watch segment % of Total | 47% | 51% | 52% |

**(1)    The Buy Segment**

78.     The Company's Buy segment tracks millions of retail transactions around the world and transforms this data into various products that assist CPG companies in their marketing decisions.  Each month throughout the Class Period, the Company processed approximately 9.5 billion purchasing data points.  Using its vast supplies of data, Nielsen then offered its clients analytics about consumers and their preferences and behavior.  The Buy segment's clients included the world's largest CPG merchandising companies such as Kraft Foods, The Coca-Cola Company, and The Procter & Gamble Company, as well as major retail chains like Safeway, Tesco, Walgreens and Wal-Mart Stores.

79.     Nielsen's Buy segment has developed a niche as the leading solution for CPG analytics with its level of global data collection.  The Company's Buy data is important to CPG companies that use it to manage advertising campaigns, improve supply chains, and understand their competitive positions with metrics such as market share.

80.     Within this segment, Nielsen provides retail measurement services, meaning that it collects retail sales information from electronic point-of-sale systems and from local field teams that collect this data.  Thus, in sophisticated markets, electronic retail sales information collected by stores through checkout scanners is transmitted directly to Nielsen.  But in some

Emerging Markets, it must collect the data through in-store inventory and price checks.  It then processes the data for use in its various products.

81.     Throughout the Class Period, Nielsen always conveyed to the public that its business was more sophisticated than the collection and sale of this data.  Thus, it did not describe selling this data directly, but instead said that the data was collected in Nielsen's database and that clients used the Company's "proprietary software" to "query the information" and then "conduct customized analysis and generate reports and alerts."

82.     Nielsen also collected data from consumer "panels" (i.e., surveys), which it says helped to explain consumer preferences and to augment their retail data collection.  The scope of this data collection is vast, with over 250,000 consumers, in over two dozen countries, using in-home scanners to record data on their shopping activity.

83.     The purpose of all this data collection has been described by Nielsen as providing a "wide and growing selection of consumer intelligence and analytical services that help clients make smarter business decisions throughout their product development and marketing cycles." Nielsen thus boasted to investors that the Company draws "actionable insights" for its clients from its data.  The following paragraph, from Nielsen's 2015 Annual Report, is exemplary in its description of the Buy segment's value to clients:

> We use consumer trends and comprehensive data analysis to advise our clients across their innovation process and apply a demand-driven approach to identify unmet consumer needs so they can develop breakthrough products. We use intelligence from comprehensive retail and consumer data analysis to inform client decisions on marketing spend for media, price, promotion and assortment. We help clients influence purchase decisions that shoppers make whether pre-store, in-store or online, and provide insights on how to market effectively along a shopper's path to purchase. We also help clients drive profitable growth using demand driven strategies that close the gap between consumer demand and sales, aligning what people want to what people buy.

84.     Throughout the Class Period, the Buy segment was divided into two main[8] sub-segments: "Developed Markets" and "Emerging Markets."  The major differences between the Emerging Markets and Developed Markets sub-segments were the geographic regions they covered.  The Developed Markets primarily included the United States, Canada, Western Europe, Japan, South Korea, and Australia.  The Emerging Markets sub-segment included Africa, Latin America, Eastern Europe, Russia, China, India, and Southeast Asia.  By February 28, 2018, Nielsen reported to the market that within the Emerging Markets, about 35% of the business was with local clients, whereas the rest was with large-multinational corporations.  The following chart shows the total revenue and percentage of Buy revenue each of these sub-segments accounted for from Fiscal Year 2016 to Fiscal Year 2018:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Developed Markets Revenue | $2,096 million | $1,999 million | $1,922 million |
| Developed Markets % of Buy | 63% | 62% | 62% |
|  |  |  |  |
| Emerging Markets Revenue | $1,063 million | $1,164 million | $1,145 million |
| Emerging Markets % of Buy | 32% | 36% | 37% |
|  |  |  |  |
| Corporate Revenue | $163 million | $68 million | $30 million |
| Corporate % of Buy | 5% | 2% | 1% |

**(2)     The Watch Segment**

85.     The Company's Watch segment "provides viewership and listening data and analytics primarily to the media and advertising industries across the television, radio, print, online, digital, mobile viewing and listening platforms."  According to the Company, its Watch data is used by media clients to understand their audiences and establish the value of their advertising inventory.

---

[8] It also had a general sub-segment titled "Corporate." According to Nielsen's Annual Reports, the "Corporate" sub segment includes: "Corporate includes slow growth and non-core services that are part of portfolio pruning initiatives."

86.     Watch has "a portfolio of solutions that enable clients to create optimized media plans to reach their desired audiences."  For example, "Nielsen Ad Intel," helps provide advertising intelligence across major markets, through which Nielsen furnishes clients with "unique insights for competitive brand and advertising creative activity, for shifts in advertising spend among media types, channels and brands, and for advertising sales lead generation."

87.     Nielsen also provides "Audience Measurement" and it develops "minute-by-minute" information on TV audience viewership (or listening, in the case of radio).  This creates the "currency" that is then used to value airtime for advertisers.  Nielsen measures how many people are watching so that networks and advertisers can determine how to value advertising over those channels.

88.     The segment also provides Marketing Effectiveness, which quantifies "the effectiveness of advertising by reporting behavioral observations, attitudinal changes and actual offline purchase activity."  To accomplish this, Nielsen collects data "to measure consumer engagement and recall of advertisements across television and online to provide important insights on advertising and content effectiveness."  It relies heavily on social media, such as Facebook, to collect this information.  For example, its 2016 Annual Report explained that Nielsen Social tracked "program-related activity on Facebook and Twitter around linear airtime" and tracked "Facebook and Twitter TV activity in the U.S. on a 24/7 basis for over 1,200 series and select special programs, including linear and over-the-top programming such as Netflix and Hulu, and over 2,000 brands and theatrical releases."

89.     Marketing Effectiveness was touted as a fast growing business.  Therefore, it was—at least in some ways—more similar to the Buy segment than much of Nielsen's Watch segment.  On May 18, 2016, at an analyst conference, Defendant Jackson explained that the

"Marketing Effectiveness" business is a "really nice product offering" where the Company brings the "watch and buy businesses together."  The following chart shows the business' revenue growth on a constant currency basis each quarter, as reported in each quarterly report:

| Marketing Effectiveness Revenue | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2016 | | | | 2017 | | | |
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 28.8% | 15.1% | 31.8% | 9.2% | 14.0% | 18.6% | 15.6% | 32.9% |

90.    Within the Watch segment, Nielsen reported the following sub-segments: Marketing Effectiveness, Audio, Audience Measurement, and a general "corporate" sub-segment. The following chart shows the total revenue and percentage of Watch revenue each of these sub-segments accounted for from Fiscal Year 2016 to Fiscal Year 2018:

| | 2016 | 2017 | 2018 |
|---|---|---|---|
| Marketing Effectiveness Revenue | $287 million | $350 million | $337 million |
| Marketing Effectiveness % of Buy | 10% | 10% | 10% |
| | | | |
| Audio Revenue | $500 million | $501 million | $497 million |
| Audio % of Buy | 17% | 15% | 15% |
| | | | |
| Audience Measurement Revenue | $1,978 million | $2,308 million | $2,446 million |
| Audience Measurement % of Buy | 66% | 69% | 72% |
| | | | |
| Corporate Revenue | $222 million | $182 million | $138 million |
| Corporate % of Watch | 7% | 5% | 4% |

### (3)    Additional Explanation of Analytical Insights Business

91.    Nielsen's public statements are peppered with the phrase "insights."  The term "insights" was used to describe a type of value that Nielsen could offer; it was a synonym for "analysis" and was often juxtaposed to the term "measurement."[9]  For example, its Annual

---

[9] Some specific products offered by Nielsen included the term "insights" in their name.  For example, in November 2013, Nielsen launched a product called "Nielsen Buyer Insights," that "extend[ed]

Reports filings frequently describe "measurement and insights."  Those reports also stated that the "Buy and Watch segments are built on a foundation of proprietary data assets that are designed to yield essential insights for our clients."  When describing Nielsen's Retail Measurement Services, its Annual Report said that it combines purchasing data with "in-house expertise" to produce "valuable insights that help our clients."  The page on Nielsen's website in February 2016 that described its products, had a banner at the top stating: "Comprehensive End-To-End Consumer Insights For Faster, Smarter, Better Decisions To Help Your Business Grow." Its current website a menu at the top of the site listing "Insights" as the first category.

92.      Altogether, the terms analytics and insights are used by Nielsen to describe products where it provides additional information and analysis to clients beyond the data it collects and sells.  The terms are used in that way throughout this Complaint.

93.      Additionally, while Nielsen's two segments have a degree of separateness, there is also significant overlap between the two businesses, especially to the extent they provide clients with analytical insights.  In each of Nielsen's Annual Reports throughout the Class Period, they explained that when the "information from [the] Buy and Watch segments [is] brought together" it "can deliver powerful insights into the effectiveness of branding, advertising and consumer choice by linking media consumption trends with consumer purchasing data to better understand behavior and better manage supply and demand as well as media spend, supply chain issues, and much more."  These "integrated insights" were said to better enable clients to "enhance the return on both long-term and short-term investments."

## VI.    SUBSTANTIVE ALLEGATIONS OF THE FRAUD AND EVENTUAL REVELATION OF THE TRUTH[10]

---

demographics in order to provide clients with superior insights" into categories such as "Retail, Travel, and Dining."

[10] All emphasis in bold and italics within this section has been added.

**A.**    <u>Prior to the Class Period Defendants Continuously Assert the Strong Position of Nielsen</u>

94.    Prior to the Class Period, Nielsen reported years of growth in revenues, adjusted EBITDA, net income and free cash flow, and Defendants assured investors that growth would continue despite numerous changes in the Watch and Buy markets.  During the Company's December 11, 2015 Analyst Day conference, Defendants Barns and Jackson highlighted the historical growth in various financial metrics.  For example, one slide of the presentation said:



95.    The presentation also emphasized the consistent revenue growth in the Company's Watch and Buy segments:



96.     During the Analyst Day conference, Defendant Jackson told investors that the Company had "remarkably consistent" revenue because it had a "powerful syndicated business model, with long-term contracts and blue-chip clients," and because it had "invested in expanding our product capabilities."  He highlighted how both segments demonstrated the consistency of Nielsen's business.  He forecasted revenue growth for Fiscal Year 2016 at 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93, and free cash flows of $950 million.  He concluded: "We have confidence in this financial framework because this is Nielsen, consistent, steady, mid-single digit revenue growth, ongoing margin expansion, an attractive and compelling free cash flow profile and a balanced capital structure.  We're well positioned to deliver incremental shareholder returns."

97.     Additionally, as part of the Analyst Day conference, a slide deck was presented showing guidance range of $6.1 billion in total revenue, with about $2.8 billion from Watch and about $3.3 billion from Buy.  It also showed that Developed Markets would experience 1.5% to 3.5% in constant currency revenue growth and the Emerging Markets would experience 8% to 10% in constant currency revenue growth.  For both it described "stable discretionary spend."

98.     Barns concluded his opening remarks at the analyst day conference by telling investors: "[Y]ou should continue to expect Nielsen to continue our steady, consistent performance" and added: "I feel great about the fundamentals of our business[,] leadership, our strategy, our ability to execute."  Before he concluded: "There has never been a better time to do what we do than right now.  And we've never been better positioned to do it."

99.     During the Analyst Day presentation, Nielsen also revealed that it had developed a new product called Connected Buy System.  Defendant Hasker described the product as a reaction to the "blizzard of innovation" that was taking place in the CPG industry.  He described a move from a "siloed and disintermediated" business to a "much more connected environment."  He also explained that the product provided two benefits.  It would help clients who were "demanding data much more frequently" and who "want direct access" to the data.  However, he described the "most important" trend as clients requesting to know "why my market share went up and down, and link it in an automated, right-time manner."  In other words, the "most important trend," was a greater demand for analytic insights.  Finally, he stated that it was a "very exciting place for us to be" and said that these trends were what "leads us to the connected buy system."

100.     In the same presentation, Nielsen's Senior Vice President ("SVP") of Investor Relations said that the Connected Buy System would "drive growth for the buy segment going forward."  Andrew Somosi, who was overseeing the product, described the "enormous growth opportunity" it offered and then described the product as allowing clients who are "relying on Nielsen data, analytics, software" to use the data "in unison" across their departments, rather than in a "fragmented" way.  He described the product as a "unique opportunity . . . to align organizational decision-making across our clients using one Nielsen system."

31

101.    Thus, despite extensive discussion of client demands and the purported purposes of the Connected Buy System, Defendants did not indicate that it was a response to any *negative* trends.  In fact, they stated just the opposite; that the product was an enormous opportunity—not to a declining willingness to pay for Nielsen's analytical insights, but a greater willingness to do so, as well as a desire to unify data used throughout the business of Nielsen's clients.

**B.      The Beginning of the Fraud**

**(1)      4Q15: Nielsen Overstates its Position and Fails to Disclose Known Material Negative Trends**

102.    The Class Period begins on February 11, 2016, when the Company reported its 4Q15 results before the market opened and reiterated the guidance given during Analyst Day.  In the earnings call, Defendant Jackson commented on the guidance, saying that he expected "Buy to be a slightly bigger contributor in 2016," because the Company was continuing to "scale in the emerging markets," and because "buy margins are moving in the right direction."

103.    In the press release, Defendants said that "[i]n times of economic turmoil and market volatility, the strengths of Nielsen's resilient business model are most evident."  They also stated that the "core measurement and analytics businesses . . . remain[ed] stronger than ever."

104.    During the earnings call for 4Q15, Defendant Barns told investors that the "buy business continued to strengthen and expand."  He described that growth was "led" by the Emerging Markets, but that there was also "solid growth in key developed markets including the US and Europe."  He added that the Company was continuing to win clients and that it had "continued to strengthen [its] positions with retailers around the world."  He elaborated that "Developed markets also exited the year with good momentum."

105.    Barns concluded his opening remarks to the earnings call for 4Q15, by saying "we feel great about our progress and confident about the year ahead," before adding: "While we certainly don't wish for difficult economic conditions, we're ready for them.  In fact, we know from experience that when economic conditions grow more challenging, our business model's advantages and strengths show through more clearly."

106.    During the earnings call for 4Q15, Defendant Jackson also assured investors that Nielsen's CPG clients were "pivoting to growth" and that "***we see the discretionary spend environment as being pretty stable. We see our clients investing in analytics and innovation***."

107.    Following the 4Q15 earnings release and earnings call, Nielsen's stock price increased 4.2% from the $45.42 closing price on February 10, 2011, to $47.33 on February 11, 2016.  By comparison, the S&P 500 declined 1.23%.

108.    Analyst reports following the 4Q15 earnings call, noted Defendants' positive statements about the Buy business given the volatile economic environment.  For example, a February 11, 2016, analyst report from Credit Suisse stated that "the resiliency in the emerging markets, better performance from Europe and a discretionary spend environment characterized as '***stable'*** all served as encouraging updates amidst a volatile backdrop."  Analysts for BMO Capital Markets stated on February 11, 2016, that "[a]s market volatility continues, NLSN's results reinforced its 'safe haven' status and shares should get even more relatively attractive if the current environment worsens."

(2)    **1Q16: Nielsen Falsely Boasts of Strong Position**

109.    On April 20, 2016, before the markets opened, Nielsen released its 1Q16 results. Nielsen reiterated its guidance and in the earnings call Defendant Jackson said: "We remain confident in our plan to deliver on all of the operational elements" laid out in the 4Q15 earnings call.

110.    The press release stated that "strong first quarter results were underpinned by [Nielsen's] steady and ***resilient business model***" and that its "unparalleled global footprint remains a core competitive advantage for both local and multinational clients."  The earnings call was equally self-congratulatory.  Defendant Barns said that "2016 is off to a good start for Nielsen, underpinned by our ***consistent, resilient business model.***"  He explained that the performance was fueled by the Buy segment's "continued strength in emerging markets and growing momentum with retailers."  He added that the Company was "executing well" and had "a lot to look forward to for the rest of the year and beyond."

111.    Defendant Jackson also assured investors that: (1) "Our teams are continuing to execute in line with the guidance framework we gave for 2016;" (2) the Developed Markets were "solid," while there was "broad-based growth" in the Emerging Markets;" and (3) that, "***discretionary spend remained stable with relative strength in areas like innovation***."

112.    In response to a question from an analyst with Robert W. Baird & Co., Defendant Jackson acknowledged that discretionary spending in the U.S. had been a bit lower in 1Q16 than in 4Q15, but stated that this was not a trend or concern, because "discretionary spending can be a little lumpy after a big quarter," and reiterated that "we feel pretty good about our two largest markets performing very well through the balance of the year."

113.    Analysts were encouraged by Defendants' positive statements about discretionary spending.  For example, Credit Suisse issued a report on April 20, 2016, stating that "we are encouraged by commentary on the discretionary environment, as well as a firming environment in Europe, and the healthy margin contribution from the Buy business this year."

### (3)   2Q16: Nielsen Downplays "Challenging" Environment, While Continuing to Hide Known Material Negative Trends

114.   On June 1, 2016, the financial analyst firm Sanford C. Bernstein & Co. hosted a conference with Defendant Barns.  Defendant Barns started his remarks by telling investors how stable the business was—noting  that the "way we're thinking about our business at a high level for the present time and for the next several years really isn't that different from the way we thought about our business for the past several years."  However, he vaguely explained that the Company was going to undergo a transformation from a "People as a Service" business to a "Data as a Service and Software as a Service business model."  He explained that this was "the biggest area that will change."  This apparently meant "re-engineering" and "re-designing" around the Connected Buy System so that "the core measurement service and the analytics capabilities . . . are interoperable with one another."  This was apparently going to lead to "a lot better differentiation of what Nielsen does versus all the competitive alternatives out there."

115.   Defendant Barns described the Connected Buy System in glowing terms stating that in 2017 and 2018 it would really start to "show up in a meaningful way" by enhancing Nielsen's "analytics capabilities" and "integrating these capabilities into a system."  This was supposed to provide "more differentiation" which, Defendant Barns said, "we think is positive."

116.   Barns assured investors that "the growth opportunity . . . still remains" and said "the Buy part of our business in the developed markets" is "somewhat correlated with growth in GDP in these markets," but that in the emerging markets "even if the overall economy is slowing down in terms of its growth rate, we saw a lot of white space to fill in."

117.   On July 26, 2016, before the market opened, Nielsen issued its Second Quarter 2016 Results.  In the 2Q16 press release, Nielsen reported "solid performance of both its Buy and Watch businesses" and disclosed that Buy Developed Market revenues increased just 0.9%

35

due to "softer discretionary spend."  But, Nielsen downplayed the softer discretionary spending

by continuing to tout the earnings quarterly growth saying it was "driven by our scalable,

***consistent business model***."  During the earnings call, Defendant Jackson said that the

"[p]roductivity pipeline remains strong" and that he was "confident in our guidance" including

the Buy segment guidance, and specifically the Developed Market guidance of 1.5%-3.5%.  He

expressly stated that "[w]e remain confident in our plan to deliver on all of the operational

elements that we laid out at the beginning of the year."

118.    Defendant Barns also assured investors that Nielsen was well-positioned with the

Connected Buy System and that "Clients have been enthusiastic in their feedback and they want

it now. And that's the key reason why we've accelerated the pace of our investment."  He

concluded his opening remarks by telling investors: "We're looking forward to the rest of the

year with continued confidence and excitement about the progress to come."

119.    Similarly, Defendant Jackson downplayed any concerns, noting that

"discretionary spending can be a little lumpy" and that Nielsen was "coming off stable two

quarters, so it's not uncommon to see these dynamics."  He also noted that the Company was

increasing its investment in the Connected Buy System, which would "enable" it to "create a

faster growing higher margin business in the developed markets."

120.    In response to a question from an analyst at Robert W. Baird & Co. regarding

when the Connected Buy System would materially impact Buy Developed Market revenues,

Defendant Barns acknowledged it would not help immediately—as it would only be coming

online at the end of the year and adding clients throughout 2017.  Investors did not believe that

was a problem, because Defendants assured them the soft discretionary spending would not have

a material impact on Nielsen's results.

121.    Following the 2Q16 earnings call, analysts reported that Nielsen reported strong results in 2Q16 and that they were encouraged by the statements by Defendants Barns and Jackson that the Buy Developed Market segment would deliver full year growth in accordance with guidance, despite the decline in discretionary spending.  Credit Suisse issued a report on July 26, 2016, which stated: "In light of a more optimistic tone at Q1 around the discretionary environment (described as stable to improving), the softness this quarter was a bit of a surprise." However, the report also stated: "We continue to be encouraged by commentary that the Developed Markets segment will deliver full year growth in line with prior guidance, implying notable acceleration in 2H16 vs. Q2."

### C.    Contrary to Public Statements, Defendants Knew Negative Trends Were Undermining Nielsen's Performance

#### (1)    Nielsen's Business was in Decline[11]

##### (i)    *Discretionary Buy Segment Spending was in Decline*

122.    Former employees of the Company from various regions, collectively corroborate that the buy segment was in decline throughout 2016.

123.    CW 1 worked as a Senior Vice President of Consumer and Shopper Insights and was responsible for client service and account management for U.S. CPG clients from 2013 until the start of 2017.  CW 1 explained that the problems in underperformance within the Company's Consumer Insights business in 2016, began much earlier than 2016.  He said that the problems began when large CPG clients, like Proctor & Gamble, began cutting back on discretionary spending with Nielsen.  He said that by 2015 and into 2016, it was "standard practice" for large CPG clients to cut their spending, and wanting the same amount or even more services for less money.  He said that during 2015, it was known that CPG clients spending less was "the new

---

[11] Because these pieces of information are interrelated, the following groupings have considerable overlap and the allegations within are mutually reinforcing.

norm" and that this change was a noticeable pattern of behavior to those within the Company.

He recalled clients "across the board" renegotiating and asking for more competitive pricing,

before the start of 2016. CW 1 added that senior management at Nielsen knew that the "new

norm" was a decrease in spending by CPG clients on analytics, and that he participated in

revenue calls with senior leaders where this was a "constant theme" of discussion. CW 1

recalled that there were monthly calls, but that the last month of each quarter, these calls were

held weekly. According to CW 1, Defendant Jackson and the CEO of North America were on

some of the revenue calls. He went on to say that Nielsen even assembled a renewals team led

by Lori Paradowski, whose current title is SVP, Global Professional Services, to "understand the

broader theme" and mitigate the concerns related to Nielsen losing business from their CPG

clients.

124.    CW 5 was a Vice President in Nielsen's Global CPG business from 2011 until

March 2017. He explained that the missed results in October 2016 had been "building over time."

He explained that due to Nielsen's stable long-term contracts and the fact that 80% of revenue is

contracted ahead of time, "there was no *Big-Bang* event that created the October 2016 missed

results."

125.    CW 6, a manager of Marketing Return on Investment from August 2015 until

January 2017, said that the underperformance within the consumer analytics business was

addressed in a meeting in the summer of 2016. During this meeting, it was stated that the

consumer analytics team was not doing well, and that "analytics overall" were taking a downturn,

and that after the meeting, some employees were asked to resign. He further explained that this

slowdown was caused by CPG clients cutting costs. He said that CPG cost cutting began "early

on" and was not just in 2016. He stated that clients were "not paying enough" and that Nielsen

had to cater to what the clients were willing to pay for, which negatively impacted Nielsen.  CW 6, also explained that a "big chunk of money" comes from Nielsen's clients who buy the data.

126.    CW 8 worked at Nielsen's office in Budapest, Hungary from January 2013 to August 2016, as a Senior Global Report Liaison with some of Nielsen's largest clients.  He explained that the Company's larger CPG clients, such as Reckitt Benckiser, had decided in late 2015 that they could do without much of the Company's Insight business.  Around fall 2015, CW 8 began getting feedback from Nielsen's major clients that they did not feel the need to pay for reports on, and analysis of, the globalized data Nielsen was selling.  CW 8 added that Nielsen traditionally offered its clients a package that included data, reports, consultancy, and other services, but CPG clients decided in late 2015 that they only wanted the data.

127.    CW 17 recalled participating in weekly sales tracking meetings for his division that used a spreadsheet that tracked proposed dollar value and probability of winning the bid for the job.  He also recalled that during 2015, it was discussed during these weekly sales tracking meetings that sales in his division were deteriorating.  According to CW 17, during these meetings he and the other participants discussed the issues of not winning new projects and having to generate new business.  He was next asked about the circumstances by which he was directed to focus on sales instead of research beginning in 2015.  He recalled being directed to switch his focus from research to sales in the middle of 2015 by his supervisor's boss, another Senior Vice President in the Buy segment, because business in his division began slowing down, and there was not enough business coming in.

128.    CW 18, who left Nielsen in 2018, stated that Nielsen's Developed Markets business in the Company's Buy segment had been trending downwards for around the last 5 years of his tenure.  He said that clients were looking to cut discretionary spending, including in

Canada, and that they most likely believed that they could do without Nielsen's analysis. He added that this was occurring in Canada, and he witnessed it with the retail CPG companies that he worked with as Group Director – Retail Services from 2012 – 2015. He described the cuts in discretionary spending in the Canadian market as "trending," saying that they began well before 2016.

<strong>(ii)</strong>     <strong><em>Interest in Insights Products was Diminishing</em></strong>

129.    CW 1, who is discussed above describing that Nielsen's clients were cutting spending back in 2015, also explained the changing interest in Nielsen's products. He said that there was a lot of building pressure resulting from CPG clients no longer wanting to purchase Nielsen's Insights products, and instead wanting more "real-time data." According to CW 1, this "came to a head" at the end of 2014 into 2015, when Nielsen competitors InfoScout and Market Track came into play with real-time data analysis. He confirmed that Nielsen's clients were specifically cutting back on insights and analytics. He attributed the cuts by Nielsen's clients to an increase in marketing research boutiques that were popping up at that same time and charging less while providing more real-time data. He went on to recount how Procter and Gamble, as an example, left Nielsen for a competitor.

130.    CW 1 further explained that "Connected Buy" was Nielsen's attempt to roll out a more modern platform to meet these changing demands. He added that Nielsen's Connected Buy System was a "major strategic shift" for the Company. According to CW 1, Nielsen's clients were building their own data lakes[12] and intelligence tools and that the Connected Buy

---

[12] An August 27, 2018, article of Forbes titled "What Is A Data Lake? A Super-Simple Explanation For Anyone" by Bernard Marr, defined data lakes, saying they hold "data in an unstructured way and there is no hierarchy or organization among the individual pieces of data. It holds data in its rawest form—it's not processed or analyzed. Additionally, a data lak[e] accepts and retains all data from all data sources, supports all data types and schemas (the way the data is stored in a database) are applied only when the data is ready to be used."

System was an attempt to adapt by providing faster access to data sets, such as by offering clients an API[13] to access Nielsen's data.  He further advised that changes began in 2013, but another major shift toward Connected Buy occurred in 2015/2016.  According to CW 1, Nielsen pulled development money from other tools, such as Nielsen Answers, to put into the development of Connected Buy.  He added that after being hired, Andrew Samosi oversaw the project.  CW 1 confirmed that CEO Barns and CFO Jackson were involved in the strategy related to Connected Buy, and that Andrew Samosi rolled up to Jackson.  He added that Jackson approved the funding for Connected Buy.

131.    CW 7 said that the Buy segment was experiencing a slowdown in 2016 with global accounts that were major CPG clients decreasing their spending.  He explained that clients gave him feedback that Nielsen's analytics products were "antiquated" and that they weren't interested in them.  CW 7 said that clients were moving away from Nielsen to competitors and that clients had doubts about the usefulness of analytics coming from Nielsen, and that the industry was "questioning the validity of Nielsen's analytics."  He advised that it was a "constant battle" for him in trying to develop business for Nielsen during the relevant time period.  CW 7 further advised that when he spoke with clients who had "fallen flat" with Nielsen and in an effort to win them back, those clients preferred a "more quick, nimble" systems.  He added that they would have group calls within his "pod" where they would discuss the pipeline of business on a weekly or bi-weekly basis.

132.    CW 8 is discussed above describing that Nielsen's larger CPG clients decided in late 2015 that they could do without much of the Company's Insight business and that these

---

[13] In this context, the term API is best understood as a system allowing users to access data owned or housed by another.  An API can be used to access raw data or can be used to request another computer conduct some operation before providing that data.  In a simple example, an API may allow a desktop office application to access a user's online calendar information hosted by another party (*e.g.*, Microsoft Outlook may use an API to download Google Calendar information).

clients were providing feedback to Nielsen that they did not feel the need to pay for reports on, and analysis of, the globalized data Nielsen was selling.  CW 8 further explained that these clients just wanted to pay for the data and conduct their own analysis.  CW 8 also explained that he would discuss this feedback and it was communicated up the chain to his direct report Joe Rutecki, including during meetings with Account Managers for the particular client, and the manager responsible for all accounts.  CW 8 added that he updated the team either by email, Skype call, or SharePoint, as they all worked in different offices around the world.  He added that information on client feedback was recorded in a form in Sharepoint.

133.    CW 13 explained that clients stopped buying analytics over time.  CW 13 also explained that clients could always buy only data, if they wanted, and Emerging Markets tended to only want data, and not Nielsen's analytics.  CW 13 said that he believed Nielsen's clients had declining interest in the Insights' businesses technology.

134.    CW 15 explained that the Buy side of the business was in "terminal decline."  He attributed the decline in Buy to "increased competition" at retailers such as Walmart and Amazon.  CW 15 went on to say that "the growth and power of the retailer," was detrimental to Nielsen.  He explained that retailers began to gather their own point-of sale data, then they would add their own analytics by hiring their own data scientists so there was no need to continue to outsource it to Nielsen.  He referred to this as the overall "market challenge" for Nielsen's Buy segment in the last few years.

### (iii)    *Fast Emerging Market Growth Would be Short-Lived*

135.    Despite Nielsen's assurances that there was broad-based growth in the Emerging Markets, and despite continuous assurances that Nielsen's business was poised to continue growing, those within the Company reported that the situation was more negative.

136.    CW 3 worked as a Director / Leader of Consumer Insights during the entire Class Period and was in Africa, leading a region of Africa.  He explained that the Africa Emerging Markets business experienced growth, but that the Insights' performance in China, India, and the Middle East declined or performed worse than expected, and that this began around the start of 2016.

137.    CW 4, a Financial Planning and Analysis Leader, at the Associate Director level in the Company's Dubai office, recalled that there was a pullback specifically in Nielsen's insights and analytics business in the Emerging Markets.  According to CW 4, because global CPG clients' businesses were global in nature, global trends impacted their businesses globally, including in Emerging Markets.  He also recalled that Emerging Markets CPG business was not on track in 2017, as most of those clients pulled back.

138.    CW 9 left Nielsen in March 2017.  He said that Nielsen was having trouble retaining clients, and that clients were not renewing contracts or were renegotiating the terms of their existing contracts with Nielsen.  He explained that operations produced the reports that the client requested and operations were indirectly part of the renewal process for clients, and if the client was not satisfied with the product that was generated by Nielsen, the client would not renew the expiring contracts.  He said that Nielsen was not adding new clients or getting the desired subscription rates, and clients were cutting back on marketing expenses.  He added that the Company cut costs and positions were eliminated in the Operations Division in India, due to declining profits.

139.    CW 10 was a Senior Market Research Analyst for the Gulf Coast from February 2016 until June 2017.  He recalled that during his tenure there were monthly town hall meetings in a big conference room in the Company's office in the United Arab Emirates, and that he

attended the meetings in person.  He said that these meetings were led by Arslan Ashraf, the

Managing Director AP&P Cluster, where Ashraf often stated that Emerging Markets was not

performing well as a segment.  According to CW 10, Arslan Ashraf often stated that Consumer

Insights was not performing well across the Emerging Markets segment.  He explained that

Emerging Markets Consumer Insights was divided into two parts based on the size of the clients.

He added that the Consumer Insights business was struggling across both parts.

140.    CW 10 also said that his supervisor, Associate Director of Retail Measurement

Services, Gaurang Kotak, told him that Arslan Ashraf was supposed to tell senior management in

the U.S. that the teams in the United Arab Emirates, Saudi Arabia, Bahrain, Oman, Qatar,

Kuwait, and Pakistan regions were not performing well and that the U.S. would be needed to pay

wages.

141.    CW 11 worked at Nielsen from August 2013 to March 2018, and was transferred

from the Watch segment to Buy segment around September 2017.  He said that he was

transferred along with some of the other "best" employees from across the Watch segment

because the Buy segment "fell behind."  He added that he was transferred to the Buy segment to

reverse its "downward spiral," and at that time he became aware that the Buy side had actually

been in trouble for quite a while.  CW 11 said that CPG clients were asking for better pricing on

their insights business.  He explained that this was not just a problem in the United States, but

was taking place with those clients of Nielsen that had a global presence, and that those clients

were looking for better pricing for every market.  CW 11 also explained that Nielsen was under

pressure in certain markets because its analytics cost more than clients were willing to spend.  In

particular, he said that Germany was facing a lot of difficulty, and that Nielsen's Germany and

Brazil markets were losing Buy clients.

142.     As previously described, this mirrors the statements of CW 7, who explained that the Buy segment was experiencing a slowdown in 2016 with global accounts that were major CPG clients decreasing their spending, and according to CW 7, these clients were no longer interested in Nielsen's legacy Insights business.

143.     CW 12 worked as a Senior Executive in Nielsen's Insights business from September 2012 until February 2016.  He said Consumer Insights in the Middle East Region of Nielsen's Emerging Markets was not performing well during his entire tenure.  CW 12 explained that Ashraf would host town  hall meetings, throughout his tenure, and he would explain that Consumer Insights in the Middle East region of Emerging Markets was not doing well.

### (2)     Defendants Had Strong Visibility into the Decline in Nielsen's Business

144.     Defendants knew about the decline in the business due to their clear visibility into Nielsen's own metrics.  Throughout the Class Period, Nielsen represented itself as "a leading global performance management company."  Nielsen's website boasted that it is a "global measurement and data analytics company that provides the most complete and trusted view available of consumers and markets worldwide."  It also said that "Nielsen helped its clients understand what's happening now, what's happening next, and how to best act on this knowledge."

145.     Nielsen's products are used to understand business and product performance.  For example, Nielsen explained that "[m]any of the world's largest brands rely on us as their information and analytics provider to create value for their business."  Nielsen further explained that its two segments are "built on an extensive foundation of proprietary data assets designed to yield essential insights for our clients to successfully measure, analyze and grow their businesses and manage their performance."

146.     Given that the subject of Nielsen's business is accurately and quickly measuring performance, it is no surprise that Nielsen has the capabilities to accurately measure its own performance.  This is especially true because the demand for Nielsen's product is driven by the demand for its clients' business - the very thing that Nielsen measures and analyzes at every moment.

147.     Given Nielsen's laser-focus on analytics and performance measurement, it is unsurprising that former employees also corroborate that real-time data about Nielsen's performance was available to those within the Company, including those in the C-Suite and the Individual Defendants in this Action.

148.     CW 1, a Vice President in Nielsen's U.S. Consumer & Shopper Insights business, explained the access to data available within the Company.  He explained that he would receive weekly reports from the finance department containing metrics such as detailed revenues and budget breakdowns by each client.  He further explained that all client service leaders received these reports from Vice Presidents all the way up to CEO Barns.  He also explained that upper management, including Defendant Barns, would have quarterly meetings at a minimum where client budgets and revenues were discussed in depth.  He explained that these metrics were tracked on a platform and that he had reports transferred from the platform into Excel sheets.  He added that he received weekly reports for his line of business and that CEO Mitch Barns was receiving similarly formatted reports.  He added that he was receiving the reports from his point of contact in finance and the data was coming from an internal share drive.

149.     According to CW 2, Nielsen's "systems were good enough" to provide CFO Jamere Jackson with various aspects of the Emerging Markets segment's performance at any given time, as well as for any region.  CW 2 recalled that CFO of Emerging Markets Chaudhury

met at least quarterly with CFO Jackson in New York, and the two spoke occasionally together

on the phone.  CW 2 also advised that attended quarterly market call, in which headquarters

participated.

150.    CW 3, a director of Consumer Insights at Nielsen, also explained the access to

data available within the Company.  He explained that very detailed reports on Consumer

Insights metrics, both actual and forecasted metrics, were kept and saved on Google Drives that

could be accessed by corporate headquarters in the United States.  He and his counterparts in the

Africa and Middle East regions discussing their metrics with Akash Pal on a quarterly basis on

Google Hangout (Google video conference) calls.  He added that he knew Akash Pal then

reported the information up to Nick Papagregoriou (who CW 3 advised also visited the Africa

region 2 or 3 times a year) and that Nielsen's emerging markets metrics, including sales and

financials, were "absolutely presented" to CEO Mitch Barns, at least on a quarterly basis.

151.    CW 3 also explained that Financial Planning and Analysis ("FP&A") information

and metrics were kept on Google Drives that corporate headquarters could access, and FP&A

reports made it "all the way up" to the Defendant Jackson.  He also said that all Financial

Planning and Analysis data was entered into Nielsen's SAP system, which was accessed by

corporate FP&A and CFO Jackson.  CW 3 explained that he was aware of corporate

headquarters' exposure and access to the Company's FP&A metrics because FP&A colleagues at

Nielsen had told him so.

152.    CW 4, an Associate Director at Nielsen, with the job title "Financial Planning and

Analysis Leader" ("FP&A Leader") for Nielsen's Middle East and Africa Regions, also

explained the access to data available within the Company.  He said that one of his

responsibilities was compiling weekly forecasts on revenue, costs, and EBITDA, for all lines of

Nielsen's business (including insights) in the Africa and Middle East regions.  CW 4 added that

Emerging Markets was divided into eight clusters or regions, each with their own FP&A Leader

(like CW 4 was for Africa and the Middle East), and that each FP&A Leader prepared their own

weekly report on their cluster, similar to CW 4's, that was sent to Samipendra Chaudhury.[14]

153.    CW 4 further explained that he and other FP&A Leaders collected data on a

"granular level" and compiled that data into reports that were entered into Nielsen's Google

Drives, that could be accessed by corporate headquarters.  These reports were communicated up

the chain of command on a weekly basis.  CW 4 explained that the eight regions in Emerging

Markets participated in weekly scheduled calls, which he recalled were held every Monday.  CW

4 described these as roughly 3-hour long discussions, with each region getting approximately 30-

minutes each to explain and answer questions about their respective forecasts.  CW 4 recalled

that Defendant Jackson occasionally participated on these calls.  He continued to explain that the

Finance heads of Emerging Markets and their counterparts from Nielsen's other businesses then

had their own weekly corporate conference calls which Jamere Jackson regularly participated in.

The CFO for the Middle East, North Africa, Pacific, regions, Nalina Ranka, informed him that

his reports were used on weekly corporate conference calls that Defendant Jackson participated

in.  He described the reporting on both actual and forecasts as "robust and accurate."  He advised

that the granular data should have meant few surprises for those above him in the chain of

command.

154.    CW 4 said that the forecasts provided in the weekly reports that he prepared were

based on the exact amount of operations that would be completed at a given time.  He added that

projections included exact numbers, and that field personnel in the operations team provided

---

[14] Samipendra Chaudhury is a Senior Vice President at Nielsen.  From July 2016 until August 2018 he
was the CFO of Neilsen's Emerging Markets business.

48

updates on project completions to him (as an FP&A Leader) on a daily basis.  He further

clarified that this forecasting method was used because Nielsen recognized revenue based on the

amount of the project that had been completed with reference to Nielsen's completion of the

requested tasks.  He clarified that analytics projects typically ran for 3-8 months, and that

Nielsen would recognize revenue throughout that period as they completed the project.

155.    CW 17, who worked in Nielsen's Insights business in the U.S., stated that he

participated in weekly sales tracking meetings for his division and that his division used a

spreadsheet that tracked proposed dollar value and probability of winning the bid for the job.  He

also stated that sales and revenue projections were kept in Excel spreadsheets and that he would

pass his updates to his boss, a Senior Vice President in Nielsen's Buy segment.  CW also stated

that the Managing Director, Consumer Insights & Innovation Mike de Vere provided updates at

least on a monthly basis to Nielsen's corporate office.

156.    CW 18, a Vice President – Client Services out of Nielsen's Canadian offices in

from 2015-2018, explained that he saved his projected revenue reporting in an Excel chart, and

emailed it to Nielsen – Canada's finance team, with Krista Thompson[15] copied in on the email.

He further recalled that an emphasis developed on reporting expected revenue during the last few

years of his tenure.  He said that this "immense pressure" on revenue reporting was reflected in

the increased rate it was expected to be done and added that he went from reporting revenue

monthly, quarterly, and sometimes weekly, to almost daily during the last few years of his tenure.

He further recalled that, during that time, Krista Thompson, Mike Ljubicic,[16] and Nielsen

Canada's head of finance were on revenue calls with corporate headquarters in the U.S. every

---

[15] Krista Thompson was a Senior Vice President at Nielsen.  From 2015 until 2016 she was a Senior Vice President of Strategy and Insights in the Toronto, Canada area.  From 2016 onward her title was "Senior Vice President – Client Services."

[16] Mike Ljubicic was a Senior Vice President of Client Service for Nielsen in Canada from August 2015 until September 2016.  From September 2016 onward, his title was "Managing Director Canada."

two weeks.  He believed that either CFO Jamere Jackson, or someone just under Jackson, attended these calls from corporate headquarters.

157.    Furthermore, in its public filings, Nielsen routinely informed the market about how much visibility it had into forthcoming annual performance at the start of each year. Beginning with its Fiscal Year 2015 Annual Report and in each report throughout the Class Period, Nielsen informed the market that typically, at the start of the year, "more than 70%" of its "annual revenue has been committed under contracts in our combined Buy and Watch segments."  In each of these Annual Reports, Nielsen also explained that its business was stable because it was driven by "long-term client relationships [] made up largely of multi-year contracts and high contract renewal rates."

158.    On October 25, 2016, Defendant Jackson said that the terms "discretionary business" and "analytics" were synonymous, and that the discretionary business accounted for about 30% of total revenue at that time—meaning that about 70% was the non-discretionary chunk known at the start of the year.

159.    Nielsen further explained that it had this same type of visibility with both of its segments.  For example, Nielsen informed the market in each Annual Report, beginning with Fiscal Year 2015 and continuing through the Class Period, that both its segments had historically "generated stable revenue streams that are characterized by multi-year contracts and high contract renewal rates."  In each Annual Report, for both segments, Nielsen explained the percentage of annual revenue for the upcoming year that is "typically" committed under existing agreements.  It also explained the percentage of revenue attributable to their top clients in each segment as between 18% and 23% across each Annual Report and that for each segment each

year no one client accounted for more than 10%.  This diversified client base meant that any major changes could only result from a trend, as opposed to issues with a single client.

160.    The assertion of visibility into annual revenue at the start of each year was not framed as a "projection."  Rather, it was a description of what sort of visibility the Company typically had into full-year revenue based on prior actual commitments.  The following chart shows the statements Nielsen made regarding overall visibility, and visibility into each segment in the Annual Report for each respective fiscal year:

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| Buy | Over 60% | Over 60% | Over 60% | Over 60% |
| Watch | Over 85% | Over 80% | Over 80% | Over 80% |
| Combined | Over 70% | Over 70% | Over 70% | Over 70% |

161.    As late as May 16, 2018, at the Barclays Americas Select Franchise Conference, Defendant Jackson said that the "visibility is still about the same as it has been."  He added "[we] typically walk into a year in our Buy business with about 60% on backlog in a contract.  The other 40% was more discretionary, more ad hoc in nature.  In today's world, again, the overall number has come down.  So, the visibility in terms of the year looks more like a 70/30-ish kind of mix."

162.    CW 5 explained 75-80% of the revenue for Nielsen's Buy clients in 2016 was predicated on contracts that were not up for renewal.  He further explained that the portion of Nielsen's revenue that was not from long-term contracts was from contracts that were typically 3-8 months in length.  He further explained that Nielsen could book some of the revenue right away, but under accounting rules, would need to book other revenue as the work was performed. He explained that when the terms of contracts were negotiated, Nielsen would not feel any changes right away.  He then said that for long-term contracts Nielsen may not feel the changes for nine months or more, depending on the terms of those contracts.

163.     CW 17, who worked in Nielsen's Insights business, explained that his division's contracts were normally for 3-8 months depending upon the scope of work, while other divisions' contracts could be 3-5 years in duration.

**D.      3Q16: Nielsen Surprises Market with Declining Performance, but Hides True Extent of the Businesses' Problems**

164.     On October 25, 2016, before the markets opened, Nielsen released its 3Q16 results and hosted an earnings call with Defendants Barns and Jackson.  In the press release, Nielsen shocked the market by reporting that Buy Developed Market revenues had declined 3.7%, or 2.5% on a constant currency basis, and that these disappointing results were due to softness in discretionary spending – the same softness which Defendants had repeatedly assured investors previously was not a problem and would not prevent Nielsen from reporting 2016 results in line with guidance.

165.     Despite the softness in Developed Markets, Defendant Barns told the market that in the Buy segment "emerging markets continued to produce solid top line growth as our investments in coverage and granularity and our balanced strength with both local and global clients continue to pay off."

166.     Defendant Barns then explained that the Company was "updating guidance" but deferred to Defendant Jackson to explain the change.

167.     Defendant Jackson explained the financial results: the Buy Business constant currency revenue was $809 million, with Developed Markets at $542 million, for a decrease of 2.5%, which he said was due to "softness [in] discretionary spend, especially in the U.S."  He said the Emerging Markets business was at $267 million.  He then explained that the Company was slashing full year 2016 guidance to 1.5%-2% for the Buy segment and, more specifically, 3.5%-4% in Developed Markets.

168.     Defendants Barns also admitted, in his opening remarks, that the trend was known earlier in the year, and that Nielsen had actually responded to the trend internally—all while misleading the market to the contrary.  He said: "***Earlier this year as we saw these more challenging trends unfolding***, we realigned our Buy business to be more focused in our product development and more efficient in our overhead.  More recently as the trends continued for our clients, we stepped up our efforts to reduce our cost base, reallocate resources and accelerate our investments in initiatives that will help our clients and better position our business for the future."

169.     Defendant Barns also explained the Company's purported response to this situation.  It apparently was going to aggressively move away from slower-growing non-core services and instead invest in the Connected Buy System.  The Connected Buy System would supposedly provide "faster data-driven decisions on everyday questions related to pricing, promotion, distribution, new product innovation, assortment and marketing mix optimization."

170.     Thus, not only did Defendant Barns admit to knowing of the trends, he admitted that the Company had known about the trends for long enough to launch a major new product in response to those issues.  However, this contrasted sharply with Nielsen's prior promotion of the Connected Buy System in glowing terms, assuring investors that it was a reaction to positive trends regarding Nielsen's enhanced market position as clients demanded more—not less—of its analytics.

171.     Defendant Barns also assured investors that Nielsen's clients "continue to value our core measurement services, especially given the growing product and retail fragmentation in the market.  But, when it comes to analytics, their needs have been shifting, clients are shifting away from custom insights delivered via deep-dive projects, and they are shifting toward

everyday analytics."  He said that this shift in the Developed Markets was a "secular shift" not a "passing phase or a cycle that will swing back."

172.    Thus, while Nielsen disclosed part of the problem—that its business was seeing softness in discretionary spending and that there was a shift away from certain of its analytics products, it misleadingly continued to conceal the extent of the issues.  Namely, that the problems it was facing were related to its analytics products in general, not just a subsection of those products.  Nielsen also continued to mislead investors in two additional ways, both of which succeeded in partially concealing the issues Nielsen faced.

173.    First, Nielsen provided assurances that its Emerging Markets business was strong. For example, during the earnings call, Defendant Barns assured investors that "emerging markets continued to produce solid top-line growth as [the] investments in coverage and granularity and our balanced strength with both local and global clients continue to pay off."  Defendant Jackson described "growth" in Emerging Markets as "broad based," and especially touted Nielsen's strength with multinational companies in Emerging Markets.  Defendant Jackson also described the Company's "continued strength" in Emerging Markets.  During his closing remarks in the Third Quarter earnings call, Defendant Barns boldly said that in the Buy business, "emerging remain[ed] solid."  But, as shown in Section IV(C), Emerging Markets was already seeing problems—which was unsurprising since most of Nielsen's Buy clients in both Developed Markets and Emerging Markets were global CPG companies.

174.    Second, Nielsen assured the market that the decrease in demand was driven by a lack of growth among Nielsen's clients, and not a decrease in their intrinsic interest in the products Nielsen was selling.  For example, Defendant Barns said that Nielsen's U.S. clients, "found it increasingly difficult to achieve growth in markets with growing fragmentation in

consumer demand, more competition from smaller and local players and increased commodity

pric[es]," and that this lead them to "seek efficiencies and productivity in their business and our

business." This explanation conflicted with Nielsen's prior assurances that it was prepared for a

tough market condition, and merely sought to conceal the true cause of Nielsen's declining

performance.

175.    Analysts were surprised by these adverse disclosures given Defendants' previous

repeated assurances that Nielsen would report results in line with guidance despite any softness

in discretionary spending. For example, during the questioning, an analyst from Morgan Stanley

asked for more information about the decline in discretionary spending and, in response,

Defendant Barns admitted that the decline in discretionary spending was known in 2015 and was

a trend expected to continue in the long run. Specifically, he said:

> What we're seeing in the U.S. market – let me give you a couple of examples in terms of the external environment that our clients are dealing with. First, if you just focus in on food and beverage manufacturers, ***2015, we saw this trend starting to emerge*** where the small and medium sized manufacturers accounted for about half of the growth in the categories. And, private label accounted for about a quarter of the growth and the big – the top 25 players, they accounted collectively for only 3% of the growth in food and beverage categories in 2015. And that situation really hasn't changed that much in 2016. The reason why that's especially noteworthy for our business is the strength of our business just so happens to be the biggest global companies, the biggest global players. And so, you see that reflected in our U.S. results.
>
> What all these companies are dealing with, both food and beverage and others, is a combination of things. Product fragmentation where consumers are increasingly shifting their purchasing to smaller specialty, more niche products, moving away a little bit from the bigger brands. You see retail fragmentations of purchases moving across additional channels. You of course, see the 3G effect sweeping through the fast moving consumer goods industry where companies, whether 3G is a factor or not are practicing zero-based budgeting, they're running their own internal 3G play. And, they add up all these things together and that's the situation that our clients are contending with and you see that reflected back in our results.
>
> Now for us, what that means in terms of their discretionary spend, as I said, they're shifting from these more deep dive projects that help them think about what they're going to do next year and focused much more on these everyday

analytics that help them with activation. What should I do today or tomorrow or this week and that's where the shift is happening in the marketplace.

And so we're realigning our portfolio to better serve those client interests and those client needs. And as I mentioned, we don't see this as just a passing phase that the marketplace is going through. We see this as a trend that will continue on more of a secular basis over the long run.

As we make this shift and as we build out this Connected System, you see us building a very different business really frankly. Right now, it's very much a professional services model for Nielsen, as that Connected System starts to unfold in the marketplace, it helps us to move from a professional service or people as a service business model to much more as a data as a service and software as a service business model. And that all results in us, as Jamere said in his opening comments, having a stronger higher margin business. Jamere, what would you add?

176.    An analyst at William Blair & Co. asked Defendant Barns how long it would take to "make the transition" toward the use of the Connected Buy System, and asked "how long will this be a headwind?"  Defendant Barns admitted that the Connected Buy System would not help with the problems over the short term—as it would only be rolled out to 25-35 clients by the middle of 2017—he concluded: "it'll start to show up meaningfully, significantly in our business, especially the financial results, in the 2018 timeframe."

177.    After hearing that the unexpected decline in 3Q16 Buy Developed Market revenues was caused by a decline in discretionary spending, which Defendants knew about in 2015, and that the Connected Buy System would not address the decline for over a year, an analyst from Barclay's pointed out that "the revenue backdrop you described doesn't seem that new" and the "margin investments in Connected and the total Buy system or whatever, that isn't new as well," so he asked, "Q-over-Q what really changed . . . I'm just a little confused quite honestly on what changed over the quarter."  Defendants Jackson and Barns responded:

> [Jackson] So, a couple things. First of all, if you're **looking back to the third quarter of last year**, you saw our developed markets business grow 4.8% constant currency and as part of that discussion **we've said that we saw a pretty strong discretionary environment. We have not seen that since** then and if you look at

our results in our developed Buy business they've sequentially been going in the other direction and part of that is because that stable or I would say the environment in the third quarter last year actually ran a little hot.

[Barns] And, what I'll add to that, Manav, is that *you're right, it's not new.* But we've always viewed this part of the business as lumpy. And so, some quarters up, some quarters down. I think what it comes down to is, we're just not thinking of it so much that way. This – some of these characteristics we're not viewing as lumpiness, we're as I said seeing them more as secular shifts. And so, we just reached the conclusion that it's not viable for the long term to keep running after these short-term revenue opportunities and keep trying to chase these and work our way through the lumpy nature of this part of our business.

Instead, a much better future is about investing in something that transforms our product portfolio.  That takes some of the lumpiness out of this part of our business that better fits with what our clients need and where their needs are evolving toward. And, that's what that Connected System is designed to do.

And so, we're not running after those short-term revenue opportunities as much in the quarter and that will continue going forward. And that allows us to reallocate, enables us to reallocate resources to build faster and do more as we develop this Connected System initiative. So you see all of that reflected in the results in the quarter and our outlook going forward.

178.    Defendants also admitted the situation would not improve over the short term.  An Analyst from Jefferies asked, "how should we be thinking about the growth rates in the developed markets beyond 2016?"  Defendant Barns responded that "especially for the U.S." Nielsen was "planning for it to continue to be a tough environment next year," and added "[W]e don't see this as just a cycle that the market is passing through . . .  we see it as more of a secular shift and we're designing and transforming our product portfolio accordingly."

179.    On this news, Nielsen's stock fell $9.28 per share, or 16.8%, to close at $45.65 per share.

180.    Unsurprisingly, analysts reacted negatively to this news.  Perhaps most notably, on October 25, 2016, Barclays said "*it's hard for us not to be critical about . . . the surprising nature of the miss*" and noted that "NLSN boasts about the visibility of the business."  The report added that the situation "*invites . . . credibility issues*" around Nielsen's other guidance.

Credit Suisse wrote on October 25, 2016, that "The deceleration in NLSN's Developed Buy business came as a surprise to us, particularly after the confident tone that management struck at 2Q."  Morgan Stanley wrote on October 25, 2016, that "NLSN delivered weaker-than-expected 3Q16 results, as Buy growth decelerated dramatically and management lowered FY16 guidance." On October 25, 2016, Jefferies stated "NLSN reported earnings that missed on both [revenues] and EPS . . . as Buy results significantly below expectations overwhelmed nice growth in Watch." The report also stated: "We are not surprised to see shares trading down materially on the print and the unexpectedly negative discretionary Buy commentary."

      **E.**     **4Q16-4Q17: Nielsen Continues the Fraud, but is Repeatedly Forced to Report Disappointing Results Caused by its Waning Business**

181.    With the abysmal 3Q16 results, Nielsen had acknowledged the long-term decline in Developed Markets.  Nielsen had also partially revealed that there was a decline in interest in certain of its analytics products, but as previously stated, this was only part of the story.  In truth, as the Confidential Witnesses explained in Section IV(C), Nielsen's clients had lost interest in Nielsen's analytics generally and were shifting towards purchasing data.

182.    Another core aspect to the fraudulent story that the Defendant maintained following 3Q16, was that any issues Nielsen was experiencing were the result of changes in the underlying CPG market, which allegedly hurt Nielsen's clients, and resulted in them pushing to cut spending on Nielsen.  It was misleading to attribute the problems Nielsen was facing to this softness, rather than admit to the true issues observed within the Company regarding demand for its products.  Nielsen tried to misdirect the market by boasting of its short-lived growth in various aspects of its business, but ultimately repeatedly underperformed as a result of the undisclosed systemic problems with the Company's business.

183.    One allegedly fast-growing area of Nielsen's business was the Emerging Markets component of the Buy segment.  While this segment did post growth for several quarters, it was destined to fail for the same undisclosed reasons that Developed Markets was faltering in the Developed Markets—a decline in interest for its analytics.  The Confidential Witnesses in Section IV(C) described this decline.  The other reason the eventual downturn in Emerging Markets was inevitable, was that—while Nielsen broke out its reporting by geographic region— in reality, most of its revenue came from multinational CPG companies.  The same declining interest in Nielsen's analytic insights that had pushed those companies to abandon Nielsen in the U.S. market, would soon lead them to the same result around the globe.

### (1)    Analyst Day (December 8, 2016)

184.    On December 8, 2016, Nielsen hosted its annual Analyst Day, where it boasted of the strong performance within the Emerging Markets business.  Defendant Barns called the Emerging Markets business "solid" and said he expected "another good growth year for our business in emerging markets."  He continued by saying: "I want to just reiterate, emerging markets continues to be very solid."

185.    With respect to the Developed Market, he continued to play off the issues as though they were driven by changing market conditions for Nielsen's clients, saying that they were contending with "zero-based budgeting,"[17] and a tough CPG market, without disclosing any change in demand for Nielsen's products.  During the presentation, Defendant Barns purported to describe the situation in the U.S., continuing to boast of the Company's supposed strong position, and dismiss any issues as trends in the underlying CPG market, rather than systemic issues with Nielsen's business.

---

[17] Zero-based budgeting is a phrase that refers to budgeting based on value created by expenses in coming periods, rather than based on historic practices.  In a zero-based budgeting system, organizations do not justify budgetary decisions with reference to historic costs.

186.     Also during the Analyst Day, Nielsen indicated that its guidance for 2017

Developed Markets was a decrease in revenue of 1% to 1.5% on a constant currency basis.  In

the Emerging Markets Nielsen guided that there would be growth of 8% to 10%.  Altogether, it

guided that there would be total core Buy revenue growth of 2-3% and that total Buy revenue

would span between a 0.5% decrease and a 0.5% increase.  Defendant Hasker stated that the

guidance was "pretty conservative" and based on conditions being "very difficult" for Buy

Developed Market clients.

### (2)     4Q16 (February 9, 2017)

187.     On February 9, 2017, Nielsen released its 4Q16 results.  The Fourth Quarter

Developed Market Buy revenue of $545 million, which was a growth of 0.4% on a constant

currency basis as compared to the guidance during the prior Analyst Day of 1.5% to 3.5%.

Nielsen increased its full year 2017 guidance for the full business up from 2% to 3% as stated at

Analyst Day to 5% to 6%, but did not update its segment-by-segment guidance.  Defendant

Jackson said: "There is no change to our original underlying core growth forecast."

188.     During the earnings call, Defendant Jackson described "broad-based growth in the

emerging markets."  Defendant Barns discussed Nielsen's "compelling story in emerging

markets," including "a strong position in the markets that are growing the fastest."  He also said

that a "healthy demand for our broad range of analytics offerings will continue to drive growth in

this part of our business."  An analyst from Barclays Capital asked Defendant Jackson to explain

the 7% growth in Emerging Markets, noting that it was the third consecutive quarter of declining

growth, and asking "what's going on there?"  Defendant Jackson downplayed the results saying

that the change was just a quarterly "swing," that Nielsen had "good momentum," and that there

were "no concerns there in terms of a deceleration."

189.     In the 4Q16 results press release, Nielsen continued to falsely blame its declining Developed Markets business on "trends in the fast moving consumer goods industry" that "put pressure" on the Company.  Nielsen said that the Connected System would lead to higher margins over time.

### (3)     2017 10-K (February 17, 2017)

190.     On February 17, 2017, Nielsen filed its 2016 Form 10-K with the SEC.  The 10-K was signed by Defendants Barns and Jackson.  Defendants misled investors by representing in the 10-K that total assets in the Buy business were $6.697 billion (including $2.696 billion of goodwill), that there was no impairment of the value of the Buy business goodwill and that the Buy business goodwill actually exceeded the $2.696 billion carrying value by at least 20%.  The Buy segment was badly impaired and worth far less than Defendants stated, because, contrary to the assumptions used to support the valuation, Nielsen's business was in decline.

191.     As detailed in Section VII(C), these representations were materially false and misleading because Nielsen's impairment assessment assumed, but did not disclose, that Buy segment cash flows would grow by more than 8% from 2017-2021 and then grow 1.0%-3.0% thereafter.  Those assumptions were unreasonable and contradicted the lowered 2016 Buy revenue guidance revealed on October 25, 2016, the 0.7% decline in Buy revenues reported by Nielsen in 2016 and by 2017 Buy revenue guidance initially provided on December 8, 2016, which projected Buy segment revenues would range between a 0.5% increase and a 0.5% decrease.

### (4)     1Q17 (April 25, 2017)

192.     On April 25, 2017, Nielsen released its 1Q17 results.  It reported an unexpected decline in Developed Market revenues of 7.3% on a constant currency basis, a decline in total Buy segment revenues of 3.7% on a constant currency basis.  These results were substantially

worse than the already conservative guidance of a 1%-1.5% decline in Developed Market

revenues and the plus/minus 0.5% growth in total Buy revenues.

193.    While vaguely acknowledging that the Watch and Emerging Markets businesses

would be "larger contributors" to "overall results" compared to the "original plan," (i.e.,

compared to the guidance provided on Analyst Day and affirmed on February 9, 2017), Nielsen

reiterated its overall guidance for the year.  Defendant Jackson partially clarified by stating that

Developed Market revenues "could actually be down low single digits in 2017."

194.    Nielsen continued to mislead investors by implying any weakness in the

Developed Market had nothing to with changing demand for Nielsen's products.  Defendant

Barns stated that "growth of discount retailers, e-commerce players, and subscription models is

creating competitive pressure for our clients," and that those clients were conducting "zero-based

budgeting, putting downward pressure on their spending" on Nielsen's products.  Nielsen also

continued to disclaim any weaknesses in demand for its products.

195.    When discussing Emerging Markets, Nielsen continued to promote the sub-

segment as extremely promising.  Defendant Jackson stated during the analyst call that "the

important thing there is as we look at our client base and you listen to our clients in terms of

where they see growth opportunities, the emerging markets represent a significant growth

opportunity for our clients."  He continued by saying Emerging Markets was "going to be a

growth driver for the business" and that while the U.S. has "been a little bit challenged" the

"activity in the emerging markets pick[ed] up, and that's a good sign for our emerging markets

business as well."  Reiterating comments from Analyst Day, Defendant Barns described the

"compelling story" in the Emerging Markets and said "we have a lot of confidence in the

emerging market story in 2017 and beyond."  The press release accompanying the 1Q17 results

said that Nielsen saw "continued strength" in Emerging Markets.  During the earnings call, Defendant Jackson said "[w]e continue to see robust growth in emerging Buy markets" and "[w]e see good momentum in the emerging markets."

196.   Following the release of Nielsen's First Quarter 2017 results, the Company's stock price fell $1.61 (3.87%) per share, on heavy trading volume, to close at $39.98 per share on April 25, 2017, while the S&P500 increased 0.61%.

197.   During the 1Q17 earning call, Nielsen continued to promote the strength of its Marketing Effectiveness business.  Commenting on the Marketing Effectiveness business, Defendant Jackson said: "what we feel good about is really the strong demand that we're seeing from both advertisers and publishers for ROI solutions and data sets that really amplify the value of a publisher's inventory."

### (5)   2Q17 (July 27, 2017)

198.   On July 27, 2017, Nielsen released its 2Q17 results.  Defendant Jackson maintained the same story, describing a "tough U.S. market," but saying that there is "ongoing strength in emerging markets."  He described the "robust growth in the emerging markets."  With respect to Developed Markets, he continued to push the narrative that any decline was due to clients "seeing challenging market conditions and cycling through significant cost cuts" and that "as a result, they make near-term decisions about some of our products and services as they lower overall spend."  Defendant Barns said essentially the same: "They're dealing with both price and volume pressure, and as a result, they're managing their spend very carefully."  These statements failed to recognize any serious change in the demand for Nielsen's products.

199.   Defendant Jackson stated that Nielsen was lowering total revenue guidance to approximately 4% to reflect first-half results and the Company's outlook in Developed Markets, and was lowering guidance for the Developed Markets to be down by 3% to 5%.  However,

Defendant Jackson mitigated the negative implications of this revelation by offering investors enormous false hope, in the form of guidance that Nielsen's Developed Markets business was strengthening and would actually return to flat performance in 2018.  He said:

> In the U.S., *we expect the second half to continue to improve versus the first half, though not enough to land us at our prior guidance*. We're not forecasting an improvement in the market environment for the back half of 2017.  *However, a review of our revenue pipeline for 2018, which includes renewals and new business, suggests an improvement in our business in 2018. This, along with an improving market environment, suggests a return to flat revenue in developed Buy for the full year for 2018* versus 2017.

200.     During the earnings call, an analyst from Morgan Stanley asked "what gives you the confidence in being able to forecast the business to be flat in 2018?" Defendant Jackson responded by referring to the "current revenue pipeline, which includes renewals and new business wins," which he said "sugges[t] that developed Buy should be flat for 2018."  He added, "from our client's perspective, again, *we know that our* data and *analytics are critical to help them understand their performance and business drivers*."

201.     Following the July 27, 2017, earnings call, Nielsen's stock price increased 3.3% to $41.21.  By comparison, the S&P 500 declined 0.10%.

202.     Analysts attributed the increase to Emerging Market revenue growth, an expected decline in Developed Market revenues of just (1.2%), the preliminary guidance that 2018 would return to flat growth in Buy Developed Market revenue (meaning the Buy Developed Market was stabilizing), and positive statements about Nielsen winning new business, renewing contracts and the Connected Buy System.

203.     Macquarie Research analyst Tim Nollen issued a report on July 27, 2017, titled "Much needed relief in Q2" in which he wrote that Defendants' positive statements were the reasons for the increase in Nielsen's stock price.  Credit Suisse issued a report on July 27, 2017, titled "2Q In-Line, Guide Cut, but *Relief Emerges on Developed Buy*; Execution Crucial."

204.     During the earnings call, Nielsen continued to promote the strength of its Marketing Effectiveness business.  Defendant Barns called out the 19% constant currency quarterly growth in that business, noting that: "Marketing Effectiveness is an area of strength."

### (6)     3Q17 (October 25, 2017)

205.     On October 25, 2017, Nielsen published its results for 3Q17.  In the press release associated with these results, Defendants reported that results in Developed Markets were a disappointing 5.4% decrease in constant currency, 10.8% in Emerging Markets on a constant currency basis, for a total Buy segment decline of 2.1% in constant currency.  The press release continued to blame the poor Developed Markets results on "softness in our U.S. market."

206.     During the earnings call, Defendants Barns and Jackson blamed the weak results in Developed Markets on the CPG market in the U.S., and once again failed to disclose any change in demand for Nielsen's products, including the fundamental shift from analytics to raw data.  They also continued to boast of Nielsen's strength.  For example, Defendant Barns said that Nielsen "continued to execute on our strategy to provide uniquely better measurement and analytics products to drive growth and efficiency."  He also said: "We made significant progress even while facing rapidly changing environments in both Watch and Buy."  He added, "business in emerging markets continues to be robust, driven by our balanced portfolio of local and multinational clients, along with our investments in coverage and granularity."  Defendant Jackson also asserted that the Company saw "continued strength in the emerging market" and that "[o]ur business in the emerging markets is exceptionally strong."

207.     Defendants did not reveal that Buy Developed Market revenues would decline in 2018, rather than being flat as they had represented just the previous quarter, until an analyst from Sanford Bernstein asked "last quarter, you said the Buy segment developed revenue would be flat in 2018.  Just wanted to confirm that you still see it that way."  Defendant Jackson

cryptically responded: "We do still expect the Developed Buy business to be down less in 2018 than in 2017."  This answer revealed that performance would be "down," not flat.

208.    Following the October 25, 2017, earnings call, Nielsen's stock price declined $2.57 (6.25%), on heavy trading volume, to close at $38.56.  By comparison, the S&P 500 declined just 0.47%.

209.    Analysts attributed the decline to Developed Markets revenue declining more in 3Q17 than 2Q17, and the reduction in 2018 Developed Markets revenue guidance.  As one analyst report Barclays put it on an October 25, 2017: "While we (& others) thought that the guide of "flat" Buy Developed in 2018 was always at risk, the fact that NLSN is walking it back just one quarter later (and not proactively) *further hurts its credibility*."  The report drove the point home, reiterating: "***This headwind is not surprising, but what is, is the decision making that prompted NLSN to proactively put out 'flat' during 2Q and then reactively walk away from it one quarter later.***"  An analyst from Credit Suisse issued a report on October 25, 2017 stating: "the real (negative) surprise came on the earnings call" when "Mgmt. commentary dampened 2018 Developed Buy expectations once again, after the uplift provided by the 2Q commentary that Developed Buy could be flat in 2018."

210.    During the 3Q17 earning call, Nielsen continued to promote the strength of its Marketing Effectiveness business.  Defendant Jackson said: "we saw our Marketing Effectiveness assets this quarter deliver 15.6% growth.  That was all organic."  And Defendant Barns said: "Marketing Effectiveness continues to see solid double-digit growth."

### (7)    2017 Analyst Day (November 9, 2017)

211.    On November 9, 2017, Nielsen hosted its annual Analyst Day presentation and both Defendants Barns and Jackson presented.  First, Nielsen reiterated the Company's full-year 2017 guidance.  It then provided 2018 guidance:  On the Watch side, it estimated $3.3 billion in

revenue, and Defendant Jackson said that Marketing Effectiveness would be up 15% to 20%, driven by "tremendous momentum."  Looking out to 2020, he said that Marketing Effectiveness would see double digit growth, noting that there was "tremendous demand for marketing ROI products."  On the Buy side, Nielsen guided that revenue in 2018 would about $3.2 billion in revenue from the Buy segment, with a 1% decline to 1% increase in constant currency revenue. Specifically, it said Emerging Markets would grow 8-10% while Developed Markets would decline 2-4%.

212.    With respect to the Buy segment, Defendant Barns said that Nielsen was seeing "solid growth" from clients in the "key emerging markets around the world."  Speaking about the Developed Markets, he repeated the false narrative that "it's much more a story about . . . cost" because clients were engaged in zero-based budgeting and "working to reduce their spend."  He also continued to tout the Connected Buy System as a way to "adapt to that and adjust to," the efforts of clients to reduce their spending.  At the conclusion of his opening remarks, Defendant Barns represented that "we have a high level of confidence that we'll continue to deliver on our long-term financial framework."

### (8)    4Q17 & 2017 10-K (February 8, 2018)

213.    On February 8, 2018, Nielsen reported its Fourth Quarter Results for 2017. Defendant Jackson explained that the earnings in the Developed Market segment were down 6.7% on a constant currency basis (more than the 3%-5% 2017 guidance and the 2%-4% 2018 guidance), and blamed this on "continued softness in the U.S."  Although, he had indicated in the previous quarter that the environment was "getting better," and that contracts were renewing at 100%, he was now indicating that they were "not contemplating a snapback in spending" in Developed Markets in 2018.  Altogether, Nielsen ended the year down 5.2% in the Developed Markets segment on a constant currency basis.  This compared poorly to the guidance that had

been provided earlier, showing a much more modest decrease of only 1% to 1.5% on a constant currency basis.

214.    Turning to the Emerging Markets segment, Defendant Jackson explained that revenue was up 5% on a constant currency basis.  This was below "full year performance" and Defendant Jackson said this was due to "disruption from natural disasters and some revenue execution issues in China that caused our growth rate to dip."

215.    Defendant Jackson also assured investors that, excluding these factors, there was "broad-based growth in the emerging markets."  Defendants falsely represented that Nielsen was well positioned to report continued revenue growth in 2018 and maintained 2018 guidance - originally provided at the November 9, 2017 Investor Day – which included strong revenue growth in Emerging Markets (8%-10%) and Marketing Effectiveness (15%-20%).

216.    Defendant Jackson explained the underperformance in Emerging Markets in terms of natural disasters and the fact that Nielsen had some "revenue execution issues" in China, but told investors that "We've addressed these, and we expect the improvement in 1Q in 2018, but the underlying China market is very healthy."

217.    During the earnings call an analyst from William Blair & Co., asked "Can you elaborate on what execution issues were? I guess, I wasn't clear what happened, and then you said you addressed them. So, how did you address whatever issues were there?"  Defendant Barns said that Nielsen has a "very innovative team in China, but some of the recent bets that they made, they didn't pay off," which caused Nielsen a "stumble."  He then concluded:

> What I can assure you is we've addressed those. And the team's refocused on the core business. And we'll be back on track during 2018. This is still the most important growth market in the world, have no doubt about that. Our balanced client portfolio with the local clients and the global clients remains just as much of the strength today as it was before. And there's still plenty of opportunity to grow our penetration in the market, as I mentioned before.

218.    In the press release, Defendants represented that Nielsen would drive growth

and efficiency in 2018, that the Company remained well positioned in the Buy Emerging

Markets business and maintained 2018 guidance, notwithstanding the alleged continued

"pressure" in the U.S. and the reported issues in China.

219.    On the news of these results, Nielsen's stock price fell 9.7% to close at $33.90,

compared to a prior day close of $37.56.  By comparison the S&P 500 declined 3.75%.

220.    On February 8, 2018, J.P.Morgan wrote that "the NLSN story continues to be

driven by *negative* trends within the Company's Buy/Developed Markets (Buy/DM) segment

caused by ongoing struggles at U.S. consumer packaged goods companies, and the NLSN stock

was down ~10% today."  Pivotal Research Group wrote on February 8, 2018, that "Nielsen

reported 4Q17 earnings that were generally in line with our expectations, although they featured

surprisingly weak Buy segment revenues in developed markets.  Still, we think that a rebound is

likely to occur eventually and note the relative strength of the more important Watch segment."

Deutsche Bank wrote on February 9, 2018, that "We note that Emerging Markets growth came in

light to expex due to disruption from natural disasters and execution issues in an otherwise

healthy China market."  And Jefferies wrote on February 8, 2018, that: "Strong results in Watch

were offset by greater than expected weakness in Buy.  DM Buy headwinds do not [show] any

signs of letting up, while slower than anticipated growth in EM Buy puts it on our radar," and

that "EM growth of 6.8% is actually better than the headline 4.8% after normalizing for revenue

execution problems in China (i.e., bad bets) and natural disasters in countries such as India."

221.    Nielsen's 2016 Form 10-K was signed by Defendants Barns and Jackson.

Defendants misled investors by representing in the 10-K that total assets in the Buy business

were $6.862 billion (including $2.844 billion of goodwill, that there was no impairment of the

value of the Buy business goodwill and that the Buy business goodwill actually exceeded the

$2.844 billion carrying value by at least 20%.  The Buy segment was badly impaired and worth

far less than Defendants stated, because, contrary to the assumptions used to support the

valuation, Nielsen's business was in decline.

222.     As detailed in Section VII(C), these representations were materially false and

misleading because Nielsen's impairment assessment assumed, but did not disclose, that Buy

cash flows would grow by more than 19% from 2018-2022 and then grow 2.5%-3.0% thereafter.

Those assumptions were baseless and contradicted by the lowered 2017 Buy revenue guidance

revealed on April 25, 2017, and July 27, 2017, the 3.3% *decline* in Buy revenues reported by

Nielsen in 2017 and the 2018 Buy revenue guidance initially provided on November 9, 2017,

which projected Buy revenues would range between a 1.0% increase and a 1.0% decrease.

Indeed, despite further deterioration in the Buy business in 2017, the assumed growth rates were

higher than the assumed growth rates utilized in the 2016 impairment assessment.

### F.     Fiscal Year 2018: The Extent of the Decline is Finally Revealed

#### (1)     1Q18 (April 26, 2018): Defendants Make False Assurances Regarding GDRP and China Amidst Continuing Business Weakness

##### (i)     *Background on the GDPR & Defendant's False Assurances Concerning the GDPR's Effect on Nielsen's Business*

223.     The GDPR was a sweeping data privacy law passed by the European Parliament

and Council in April 2016.  It provides a regulatory system governing the use of personal data.

Several of its key provisions require the consent of those whose data is being used, the

anonymization of certain collected data to protect privacy prior to the processing of that data,

provisions regarding data breach notifications, and rules regarding establishing policies for

ensuring the safe handling of data across borders.

224.    The GDPR is not limited in application to European companies, and purports to regulate the behavior of those processing data covered by the act regardless of location.  For example, anyone who markets goods and services to EU residents or who processes the data of EU residents must comply with the GDPR.  Fines for failing to abide by the GDPR are massive. They can range from 2-4% of a Company's global annual revenue or between €10m or €20m, whichever is greater; for a Company the size of Nielsen this could have meant fines of $131 million to $263 million based on 2017 Revenue.

225.    The GDPR was set to go into effect on May 25, 2018.  Leading up to its implementation, it was a heavily publicized piece of legislation and the focus of intense scrutiny. For example, on May 24, 2018, the *New York Times* reported that Facebook had employed over 1,000 people to work on the GDPR implementation.

226.    The GDPR would not only require Nielsen to implement steps to ensure compliance, but would affect the use of the products Nielsen sells—data and analytics—in obvious and profound ways.  After all, Nielsen had long disclosed that it depended on data collected from third-parties such as Facebook and Twitter for many of its products and services, mentioning this in its Annual Reports throughout the Class Period.  As Defendant Barns mentioned during the previously held November 9, 2017, Investor Day, Nielsen's partnerships with data providers such as Facebook and Tencent were "Critically important to what [Nielsen was] doing in digital," and it was these partnerships that enabled it to "cover the digital activity of 3 billion, that's billion with a B, 3 billion consumers around the world."

227.    It was therefore unsurprising that Analysts began to question Nielsen about the potential consequences of the legislation on its business and clients.  On February 8, 2018, during Nielsen's 4Q17 earnings call, an analyst from the Pivotal Research Group asked: "I was

wondering if you could talk about how GDPR might be impacting or might impact the business in Europe in the coming year? I can imagine might be helpful for panels?"  Defendant Barns responded: "***GDPR, we've been focused on this for some time***. We have a big team that's working on it. We've been out in front of it.  ***We're ready***. And we don't see any significant impact for our Buy business. For Watch, there'll be some things that we'll have to do to ensure our compliance with the regulations, but it's manageable. ***We don't expect to see any major impact on our business. We'll still have access to all the data that we're going to need for our products. So, yeah, we're in good shape***."

228.  Defendants also made materially false and misleading statements about the GDPR and its impact on Nielsen's business in the 2017 Form 10-K filed on February 8, 2018. Defendants misled investors by the market that the attention privacy and data protection issues attracted offered Nielsen a competitive advantage.  The 2017 10-K stated that Nielsen's operation were subject to and affected by data protection laws, but also boasted that "***The attention privacy and data protection issues attract can offer us a competitive advantage***."  It also disclosed that changes in data protections laws could limit Nielsen's access to data, but did not describe this as something that was presently occurring.  The 2017 10-K also stated that: "compliance with the GDPR is resulting in operational costs to implement new procedures corresponding to new legal rights granted under the law, ***but has had little direct impact on Nielsen products***"  This risk language was false and misleading because the problems Nielsen was phasing regarding GDPR were already manifesting by the time these statements of risk were made, and because these statements discussed the subject of data privacy without mentioning that Nielsen faced a tremendous data privacy risk in the form of its data partners shutting off access to their data.

> **(ii)** ***1Q18: Nielsen's Business Continue to Deteriorate, While Nielsen Continues to Mislead the Market Regarding Its Deteriorating Condition and GDPR***

229.    On April 26, 2018, Nielsen released its 1Q18 financial results.  In the press release and during the earnings call, Defendants revealed that Buy Developed Market revenues declined 5.2% (worse than 2018 guidance of a 2%-4% decline), that Buy Emerging Market revenues increased 6.1% (worse than 2018 guidance of an 8%-10% increase) and that free cash flow declined $245 million.  However, Defendants continued to mislead investors by touting alleged "continuous innovation" that was going to "drive a faster growing, higher margin business and create incremental value for our shareholders."  They also continued to describe their "confidence," notwithstanding alleged market pressures in the U.S. market.

230.    On this news the stock dropped $2.44 (7.10%) per share, on heavy trading volume, to close at $31.91 per share.  During the earnings call, with respect to the Buy segment, Defendant Jackson continued to blame the weak results from the Company's Developed Markets business on "a challenging set of market conditions" and in particular on "continued weakness in the U.S."  With respect to the Emerging Markets, he said "Growth was broad-based across several markets, including Latin America, Eastern Europe, Africa and China."  He also downplayed the prior quarter's issues in China, further stating that they had been resolved: "Last quarter, we highlighted some challenges in China.  However, as expected, we saw improvement here in the first quarter and we expect more to come during the year."

231.    With respect to the Watch segment, Defendant Jackson stated that: "Marketing Effectiveness was up 22.7% constant currency on continued strength in ROI solutions."  He also concluded: "Our Watch business is off to a great start to the year."  Barns said that Marketing Effectiveness was "On track to be north of $400 million in revenue in 2018."  And Defendant

Jackson added that "Advertisers are intensely focused on measuring return on their investment and media spend and this is an important source of growth for our company."

232.   Defendant Jackson also said: "We remain on track for 60 basis points of margin compression in 2018 on a constant currency basis with improving trends in the second half as our Buy growth initiatives ramp"

233.   During the earnings call, Defendant Barns said that: "In emerging markets, our global footprint serves as a significant competitive advantage, where in many of our markets, we are the sole measurement provider. Our ongoing investments in coverage and penetration, combined with positive demographic trends in these markets, position us well for the long term. We continue to see faster growth with local clients in these markets, highlighting the importance of our balanced client portfolio"  With respect to the Developed Markets, he said: "While the operating environment remains challenging in developed Buy, especially in the U.S., we're making real progress towards returning to growth and improving profitability despite the environment."

234.   The Company also increased its earnings per share guidance to reflect a positive impact from U.S. tax reform and "maintain[ed] the remaining elements of guidance."

235.   However, despite these negative results, Nielsen did not disclose the full extent of the problems that were driving its decline, including the drop in interest in its analytic insights products.  Furthermore, Nielsen continued to reassure the market that GDPR was not, and would not be, a problem for the business.

236.   During the earnings call, Defendant Barns brought up the topic of GDPR, telling investors that the Company as fully prepared because of its long history of attention to consumer privacy.  He said that while some firms access to Facebook's data had been "curtailed,"

Nielsen's relationship with Facebook remained "strong," and that it still had "***access to the data***

***that the industry needs for independent third-party measurement***." He also boasted of the

Company's "conservative approach" around the issues of consumer data privacy. He concluded

by saying: "***We're ready for this***. . . . [o]verall, we see the greater focus on privacy, including

GDPR, as a ***net positive*** for our position in the marketplace."

237.     Through this statement Defendant Barns made clear that he personally understood

and had thought about the issue of data partners like Facebook restricting Nielsen's access to

data, but nevertheless dispelled any notion that Nielsen could be subject to such concerns, by

reasserting that the Company (a) had not been cut off from access like many others had; (b) had a

good relationship with Facebook; and (c) designed their products in a privacy focused way.

238.     During that call, an analyst from Jefferies asked about Nielsen's relationship with

Facebook, as it related to access to data. Defendant Barns responded by touting Nielsen's "long-

running and very strong relationship" with Facebook. He also falsely said: "***we still had access***

***to the data we need*** for our measurement products." He then noted that for some products

Nielsen "had to make some process changes," but that despite this it was "***still able to deliver all***

***those products to our clients*** in the marketplace and we don't see any change in that going

forward." He concluded: "we really think all of ***this plays as a net positive for our business*** and

our position in the marketplace as it unfolds."

239.     And in his closing remarks on that earnings call, Defendant Barns again assured

the market that GDPR was not a threat. He said: "And, finally, consumer data privacy, it's

always been a high priority for us, both in the way we design our products and the way we run

our operations. ***We're well prepared for GDPR*** and we're well positioned in the market."

240.    The next month, at the Needham 2018 Emerging Technology Conference, on May 15, 2018, an analyst from Needham & Co. asked Defendant Abcarian, "How long are you going to able to bring in all those big datasets before Congress says no, no you're violating somebody's privacy?"—the question continued—"And what impact would that have on Nielsen's measurement ability, if they can't get these third-party data sets integrated into their own measurement?"  Defendant Abcarian responded:

> Well, everything we do, we engineer our products using privacy by design principles and our Chief Privacy Officer spends a lot of time understanding regulation and changes in consumer. And in fact whether it was the Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent level data. We're looking for an ability to create aggregated insights, because Nielsen has strong, opted-in consumer compliant panels that we can use the intelligence from in which to basically create the persons-based estimates that are required to drive and fuel the industries. . . .  So, I don't -- who knows where the industry will go?  *What I do know is that Nielsen stands in a really strong point,* because we have invested for six-plus decades in building high-quality consumer opted in panels. So, *if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.*

241.    On the issue of China, on May 16, 2018, at the Barclays Americas Select Franchise Conference, Defendant Jackson noted that: "[We] talked about in the fourth quarter specifically some of our own challenges in China. *Those things are behind us*. We've made some changes there in terms of leadership and structure, and the teams are operating pretty well." During that same conference he also said that "in the emerging markets, growth is still available and we continue to see not only our large global multinational clients invest in a meaningful way but we also see a number of local brands continue to invest in data and analytics, and our business in the emerging markets has grown quite well in this environment."  He then boasted of the "*tremendous growth opportunities*" in China and said that the Company was still expecting "higher growth" in Emerging Markets.  And when describing the Company's plans he said, "we

have a high degree of confidence in those things. All the programs are in flight. We're executing

against them. We're a little bit ahead of schedule."

242.   Also during the Barclays Americas Select Franchise Conference, amidst the

extremely positive commentary regarding Nielsen's growth prospects, Defendant Jackson

purported to describe the pressures Nielsen was facing.  He said that clients have approached it

to try to cut spending, in a way that "doesn't impact their business and helps them continue to

grow," but that these clients do not choose to cut measurement services, which are "critical to the

way they run their business."  He further explained that there are also "[a] number of . . .

analytics" that are critical, but other "things that are a little bit more discretionary in nature,

things that . . . look like deep-dive consumer studies or things that are looking at sort of the

future of consumers and some of their consumption habits."  He explained that "a lot of that

discretionary spending has gone away."  He added that the Connected System was "focused" on

delivering the analytics that clients were still "investing in."  He also explained that Nielsen had

seen that "over time" the "things that were much more discretionary, consumer insights kinds of

things, ***those are the kinds of things that have gone away***."  He then said that Nielsen had

moved about "10 points of the mix from discretionary consumer insights" to what he called

"everyday analytics kinds of efforts."  He then said that "***most of our consumer insights***

***business in North America we've jettisoned out of the portfolio***" as it had "shifted more to core

measurement and everyday analytics."

243.   This message was contrary to that which Nielsen had been sending for over a

year—that any declines were the result of a soft underlying CPG market, not that there had been

a dramatic change in the willingness of Nielsen's clients to pay for its analytics products.

However, these disclosures also continued to hide the full truth from the market: that Nielsen's

business was in free fall because of declining demand for analytics across the board.  Instead, these statements conveyed an issue limited to certain types of analytics and did not reveal the impact that Nielsen's faltering analytics business had on its performance.

244.    Roughly two weeks later, on May 31, 2018, at the Bernstein Strategic Decisions Conference, the issue of data security came up again when an analyst from Bernstein & Co. asked the very open question: "What might concern you sort of overall geopolitical and privacy concerns . . . and your relationship with Facebook in that regard . . . ***Anything going on there that we should be thinking about?***"  Defendant Barns said that: "For measurement, we still have the access to all the data that we need for our measurement products including our relationship with Facebook."  And added, "And so, yeah, that's been a more of a non-event from our side as compared to how it played out for some others."

245.    During the same conference an analyst for Bernstein & Co., asked Defendant Barns if he could "give any explanation" of the "hiccup" the Company had faced in 4Q17, noting that "I think you said something specifically in China that you think was a one-timer" and presented the open-ended question: "Is that the story?  What did happen?"  Defendant Barns responded, reasserting that the situation in China was under control, "In China, we also referenced that our – ***we made some leadership changes*** in the China market team.  Our team had gotten a little bit off track in terms of where their focus was in the business. ***We've got our team now refocused*** on the core of our business and in getting the investments back to where they should be and restoring the growth rate there that we've enjoyed now for about a decade."

246.    And during that same conference, Defendant Barns continued to boast of the allegedly bright prospects for the Company, such as by saying it was "really uniquely well positioned" and that "there frankly has never been a better time to be in the business that we're in

than right now."  However, he also provided additional context regarding the issues that it was encountering, by noting that one way to divide up the "analytic insights" Nielsen provided was between "analytics that help a client understand what should I do next year," which he called the "more strategic, consultative type-projects," as opposed to the "analytics that are more about what should I do next week or next month," which he called "everyday analytics."  He then explained that "the first kind, the more strategic type projects, those are under especially heavy pressure. Clients are just finding ways to forego that type."  Furthermore, he then stated that the Connected System was an attempt to bolster Nielsen's ability to profit from the everyday analytics that were still marketable: "we integrate those everyday analytics with the core measurement service, the everyday analytics that used to be bought on a project-by-project basis start to become bought on a subscription basis.  And also, they become much stickier [for the] client.  It's harder for them to switch between Nielsen and one of the . . . dozens of analytics providers out there, so we'll win some market share in the everyday analytics arena."  These disclosures continued to hide the full truth about Nielsen's declining analytics business.

247.    A few days later, on June 5, 2018, Nielsen again discussed the issue of GDPR at the Baird Global Consumer, Technology & Services Conference, when an analyst noted that Facebook had been in the news recently and is an partner to Nielsen, and then asked if any changes to their policies had "any impact on Nielsen."  Defendant Abcarian responded by falsely explaining that due to Nielsen's strong data privacy practices, the data it received from Facebook was not limited by GDPR, and that the Company's "product measurements continue to be able to leverage that partnership and execute on the measurement aspect of that because at no means are we producing any kind of respondent-level data against that partnership."

248.     A little over a week after that, Nielsen spoke on the subject yet again, at the

Bernstein Future of Media Conference on June 14, 2018.  At this point the Second Quarter of

2018 was nearly over—only 16 days were left in the quarter.  An analyst from Bernstein & Co.

noted that Nielsen uses "data from a lot of places" and then asked if "privacy issues" had

"caused any new sort of risk or things you've had to deal with in terms of data sources you use

and incorporate into your various services?"  Defendant Abcarian responded by boasting of

Nielsen's strong "Privacy by Design" approach, and the time that Nielsen's Chief Privacy

Officer spends focused on privacy issues, she then concluded:

> [B]ecause of these principles, because of the kind of the underpinnings of the way
> in which Nielsen operates, the privacy changes for our core measurement
> products were really, for us, *when GDPR came really a non event,* because of the
> fact that everything we're producing is anonymized and aggregated.  By no means
> do we ever at any time release or share PII data, et cetera.  *And so we continue to
> produce whether it's Digital Ad Ratings or television ratings or cross-platform
> ratings with the same metrics, same datasets that we were using prior to the
> institution of the changes.*

249.     The analyst asked the follow-up question of whether there are any implications of

the privacy issues regarding Facebook, as one of Nielsen's "publicly known big partners."  And

Defendant Abcarian, responded by saying: the way Nielsen works with "any other data provider

is that . . .  All of that data is anonymized and aggregated."  She concluded, "that is why the work

that we've done, whether it's Facebook or with other providers, *we continue to be able to

provide the anonymized aggregated measurement that we've provided to the marketplace for

years.*"

250.     Through these statements, Defendants denied any knowledge of problems for its

business caused by GDPR.  In some of these statements, Defendants spoke about GDPR, without

revealing any known problems.  This was true even in the face of extremely open-ended

questions on the subject, that Defendants purported to answer.  In other instances, Defendants

affirmatively said GDPR was a "*a net positive*" for the Company, assured investors Nielsen was "*in a very good position*" and "*in good shape*" on the issue, said that those within the Company had been "*focused*" on it "*for some time*" and that it would be a "*non-event*," which it did not expect would have "*any major impact on [the] business*," since Nielsen would "*still have access to all the data that we're going to need for our products*."

251.    Analysts believed these assurances:  On February 8, 2018, SunTrust Robinson wrote that, "GDPR should not have meaningful positive or negative impact."  Similarly, on April 26, 2018, Macquarie wrote: "while GDPR may be a risk to some, Nielsen declares it is already compliant and could be a net beneficiary of the regulatory change coming May 18."

### (2)    CWs Corroborate that Problems with GDPR Were Known to Nielsen Throughout the First Half of 2018

252.    Former employees explain that the GDPR problems were known internally at Nielsen – despite Defendants' positive statements.

253.    CW 14, Nielsen's Chief Privacy Officer, was generally defensive of Nielsen's practices,[18] and stated that he was familiar with this litigation and characterized it as relating to two different investor calls; one where Nielsen said that its business would not be negatively affected by the implementation of GDPR and; the second earnings call a few months later where Nielsen missed earnings and directly attributed the miss to the impact of GDPR.

254.    CW 14 said that when the first statements were made, GDPR had not required Nielsen to discontinue products, conduct any major re-engineering of its products, or exit any specific markets.  However, he explained that "general market conditions" related to GDPR began to impact Nielsen following the first statements.  He recounted how Nielsen was impacted

---

[18] Lead Plaintiffs do not agree with any positive characterizations of Defendants conduct and view this witness in the light of a hostile witness—*i.e.*, despite his opinions, he provided the factual statements set out in this paragraph.  Additionally in the course of the interview with CW 14, it was made clear that Lead Counsel was not seeking any privileged information.

by clients "holding off on deployment to see how Europe shakes out," general "nervousness" about committing to new work because of GDPR and pressure from partners or vendors around the "transparency consent framework" insofar as "who's going to work with who." He suggested that there were a lot of externalities (related to GDPR) that had a negative impact on Nielsen.

255.    CW 14 said the climate in the industry was dramatically different in April 2018 than in March 2018. He recounted how in the last 6 weeks before GDPR went into effect, there was a "noticeable and markedly different" trend, in that customers were pulling back. He further advised that the general climate around GDPR changed for clients, partners and vendors in those last 6 weeks prior to the enactment of GDPR.

256.    CW 15 said that he participated in multiple conference calls with Nielsen's former Chief Privacy Officer and that, on these calls, they discussed education and communications related to the implementation of GDPR and its effect on Nielsen's data.

257.    CW 15 said that he knew about customers pulling back on their spending with Nielsen's Market Effectiveness group because they wanted to see the impact of GDPR before investing in Nielsen's analytics. He advised that Market Effectiveness had partner relationships with the same clients that his team had - specifically the CPG customers. He explained that a lot of the contracts with Marketing Effectiveness partners, and in particular the contracts with the "measuring clients" are "relatively long term…certainly more than a year."

258.    CW 16 said that he and many of his Marketing Effectiveness colleagues were all laid off at the same time, in June 2018. He further advised that this was not surprising to them since there had been some indication by the First Quarter of 2018 that Nielsen's US Marketing Effectiveness business was suffering. He explained how he and his colleagues were told no later

than March 2018 that Nielsen's US Marketing Effectiveness segment had not been profitable so they were likely not going to receive any bonuses.  He recounted how they were initially told that the US Marketing Effectiveness team was not getting bonuses because their business segment was not profitable, but then they did receive modest bonuses, which was money from other parts of Nielsen's business.  According to CW 16, this was an indicator to him in Q1'18 that Nielsen's Marketing Effectiveness business was suffering and there was a possibility that layoffs could be imminent.

259.    According to CW 16, some of Nielsen's "bigger" Marketing Effectiveness customers had been "tightening their belts" for some time.  He explained that this involved them "ordering less" from Nielsen, which ultimately led to "less revenue" from those existing clients. When asked for names of specific customers with whom he recalled this occurring with, he recalled how global client Procter & Gamble was "continuously reducing projects" and the amount of money it was spending with Nielsen.  He recounted bagel and business sessions in the Cincinnati office with the Vice Presidents of Marketing Effectiveness.  According to CW 16, sometimes in these meetings, they would discuss how clients were tightening their belts and that there was a need to do "everything we can" to keep those clients.

### (3)    2Q18 (July 26, 2018): Nielsen Finally Reveals the Massive Multi-Segment Decline in its Business

260.    On July 26, 2018, Nielsen released its 2Q18 results.  Defendant Jackson began his remarks by saying that the quarter was "one of the most challenging quarters for our business in over a decade."  Macquarie Research put it bluntly in its analyst reports published that day, calling it a "Disastrous Q2," and stating that it "couldn't be much worse."  And in its report on July 27, 2018, J.P.Morgan said, "The Other Shoe Has Fallen: Poor Results, Worse Outlook, and an Extremely Frustrated Investor Base."  Defendant Jackson summarized the results as follows:

In our Buy segment, revenue remains weak as a result of the increasingly challenging fast-moving consumer goods environment. In our Watch segment, our core measurement business remains strong. However, the changing data privacy landscape has caused a near-term deceleration in our Marketing Effectiveness momentum.

261.    Concurrently with the disclosure of these terrible results, Defendant Barns revealed that he would be resigning from the Company at the end of the year.  Analyst commentary makes clear that this was a huge surprise—and that it was tied to Nielsen's terrible performance.  Macquarie Research wrote on July 26, 2018, that "the forced retirement of CEO Mitch Barns at year-end are both wholly unexpected and render the issues that much more uncertain."  SunTrust Robinson wrote on July 27, 2018, that "[g]iven the comments above" describing the surprising news in both Buy and Watched, "it is not surprising that the company is pursuing a CEO change."  Barclays wrote on July 26, 2018, that, while the CEO stated that his retirement was not related to the quarterly results, "we have to wonder otherwise."  Barclays astutely recognized that the 8-K filed about Defendant Barns' resignation describes the severance pay he would receive, an indication that this was not a planned retirement.  That 8-K describes his resignation as a "termination without cause" under the Company's severance policy.

262.    The key results for 2Q18 were as follows:

| Key Results Across Nielsen's Business | | |
| --- | --- | --- |
| | 2Q18 Revenue | Percent Change vs 2Q17 in Constant Currency |
| Buy segment | $789 million | 4.1% Decrease |
|   Emerging Markets | $293 million | 1.0% Decrease |
|   Developed Markets | $488 million | 4.3% Decrease |
| | | |
| Watch segment | $859 million | 4.5% Increase |
|   Marketing Effectiveness | $89 million | 7.2% Increase |

263.    In addition to this decline in performance, Nielsen also revealed that it was lowering its full year 2018 guidance.  The new guidance called for growth of about 2.5% in the

Watch segment (with flat to low single digits growth in Marketing Effectiveness) and in the Buy segment, Nielsen was now guiding a decline of about 5.5% (with Developed Markets down "mid-single digits" and Emerging Markets revenue to be flat).  The following chart shows the change in Nielsen's 2018 guidance, from the time it was first released:

| Nielsen's Changing Full Year 2018 Revenue Guidance | | | | | |
|---|---|---|---|---|---|
| | Investor Day (11/9/2017) | 4Q17 (2/8/2018) | 1Q18 (4/26/2018) | 2Q18 Results | Revised Guidance[19] |
| Buy segment | -1% to +1% | No change | No change | -5.4% | -4.5% |
| Emerging Markets | +8% to +10% | No change | No change | +0.3% | 0% |
| Developed Markets | -2% to -4% | No change | No change | -6.9% | -MSD** |
| | | | | | |
| Watch segment | +5% to +6% | No change | No change | +4% | +2.5% |
| Mrkg. Effectiveness | +15% to +20% | No change | No change | +6% | 0% to +LSD** |
| ** Revised Fiscal Year 2018 Guidance, as released on July 26, 2018.  All numbers approximate.  *** "LSD" refers to "low single digits" & "MSD" refers to "Mid-Single Digits") | | | | | |

264.    Defendants also substantially reduced the other components of 2018 guidance. They said adjusted EBITDA would decline 230 basis points in 2018, substantially more than the 60 basis point decline Defendants repeatedly told investors during the class period.  They said that GAAP EPS would be $0.95 to $1.00, much lower than the $1.50-$1.56 they told investors on April 26, 2018.  And they informed investors that free cash flow would be $550-$575 million, much less than the $800 million they repeatedly told investors during the Class Period.

265.    Unsurprisingly, as a result of this negative news, Nielsen's stock fell, on extremely heavy trading volume, from a close on July 25, 2018 of $29.57 per share to a close on July 26, 2018 of $22.11 per share, which was just over a 25% decline.  This compared to a 0.3% decline in the S&P 500.

266.    Analyst reactions to the written reports following the earnings call were extremely negative and clearly the analysts thought that Nielsen had misled them.  On July 26, 2018,

---

[19] Refers to the revised full-year guidance given while publishing the 2Q18 results.

Barclays wrote: "Even as the rare [underweight rated stock] on the street, the magnitude of negative change in NLSN's 2Q18 results, 2018 guidance, commentary and even strategic direction was surprising – and *the -25% hit to the shares . . . feels warranted*." They added, "*If confidence in the financials was low before, it has now been seriously damaged.*" The Pivotal Research Group wrote on July 26, 2018, that "Nielsen reported weak 2Q18 results, a diminished outlook for the year, a strategic review of its Buy segment businesses and the departure of its CEO at the end of the year, each of which were *significant negative surprises*." SunTrust Robinson wrote in their July 27, 2018, report: "We've been dead wrong on NLSN. Developed Buy pressures have worsened and now bleed into Emerging Buy while the Watch segment has been disrupted near-term by GDPR (*all counter to management 3 months ago*)." Clearly frustrated, an analyst from Jefferies asked during the earnings call: "*How much confidence should we have in your guidance at this point given the repeated misses*? Or maybe given if there's as much volatility and uncertainty as you say, why even give guidance?"

### (i) *Final Revelation of Buy Segment Issues*

267.    Revenue from the Buy segment was down 5.4%, far below the guided annual change of between 1% growth and 1% decline. Developed Markets was down 6.9%, far below the guided annual decline of 2-4%. Emerging Markets was up 0.3%, which was shockingly distant from the 8-10% Nielsen had guided.

268.    In the Buy segment, Nielsen revealed for the first time that the weaknesses it was experiencing were not going to be isolated to Developed Markets. Defendant Jackson said that on the Buy side, the "key takeaway is that the pressure in the fast-moving consumer goods industry among global multinationals does not show signs of abating in the near term. We're now seeing this in both developed and emerging markets which impacted our 2Q results and 2018 outlook."

269.    While this was framed in terms of pressure not "abating," in reality it was the first public revelation of information Nielsen had hidden from the market quarter after quarter. Namely, the problems it was facing were not about the market its customers were operating in, and would not be isolated to any one market.  Rather, the problem for Nielsen was a pullback by its most important customers—global multinationals and their willingness to buy discretionary analytics.  With the disclosure that the problem was not isolated to one market, Nielsen effectively revealed the truth: that its business was in decline as its most important customers were pulling back from buying insights products.  Thus, Defendant Jackson continued his remarks to explain:

> While we continue to see growth from local clients in these markets, multinational spend, which represents approximately 60% of our revenue, was weakened significantly. This is especially true in markets in Southeast Asia and Greater China, two important growth regions.

270.    The recognition that spending in China was declining was also highly significant, given that China had recently stumbled, and Defendants had assured the market that it was a temporary problem.  In fact, Defendant Jackson revealed that the setbacks in fact had not been overcome, stating:

> [I]n the Emerging Markets, before, we've talked about China, we've talked about our business in China being pressured this quarter. You have the dynamic of the additional pressure from FMCGs. Quite frankly, we still have more work to do operationally there. And as I said before, we have to get China right in order for our Emerging Markets to grow. And we're focused on those challenges. We've made some changes in those marketplaces that are going to help us longer term, but we still have a little bit more work to do there operationally.

271.    The questions from analysts during the earnings call further emphasized that those following Nielsen understood that Defendants had misled them.

272.    An analyst from Morgan Stanley asked:

> I wanted to ask about emerging. In past quarters, it seemed like you were convinced that there really wasn't too much of an issue there.  There were some

sort of isolated things in China and with natural disasters in the fourth quarter and then things were getting a little bit back to normal. And so, basically, I guess what really happened? Is it the market trends? Is it specific large clients that are multinationals that were pulling back? It sounds like – you're sounding like now that it is pretty broad-based, but like, I guess why wasn't this sort of a little bit more known before?

Defendant Jackson responded:

As I mentioned before, broadly speaking, there's simply more volatility and uncertainty in the environment. The environment has gotten worse than what we expected. We saw a fairly significant pullback in multinational clients spend, really, across the emerging markets as we went through the quarter. And as I said before, we're not expecting this pressure to abate. The softness is primarily in China and Southeast Asia. And as I said before, this actually overshadowed some strong performances elsewhere, markets in Latin America, Eastern Europe and Africa. What we're seeing, broadly speaking, is that local giants are continuing to show growth. However, the multinationals are under pressure. And this pressure is working its way through the emerging markets and, as such, we've lowered our guidance appropriately.

273.    The explanation that further declining Buy performance was the result of market conditions was further undermined by the assertion by Defendant Jackson on May 16, 2018, at the Barclays Americas Select Franchise Conference, that Nielsen was not "counting on a snapback in spending, we're not counting on clients to start the [way] back in a more discretionary spending."

274.    Similarly, an analyst from J.P.Morgan asked: "It seems like you're pointing to the end market to have kind of increased pressure this quarter. Obviously, the pressure from fast-moving consumer packaged goods and U.S. food, in particular, has been around for a while. When we look at the Nielsen data, in particular, about their volumes, *it doesn't seem like it got much worse in the second quarter. So could you just give a little more explanation of why you saw more intensity from your CPG clients second quarter?*"  Defendant Jackson gave a non-response, blaming the issue on "more volatility in Buy."

275.   A very similar exchange played out when a Goldman Sachs analyst asked, "Can you elaborate on in the Developed CPG end markets, specifically where the new headwinds are rising, I guess emphasis on new versus what you didn't know about a quarter ago?"  And Defendant Jackson again cited "more volatility and uncertainty in Buy."

276.   Analyst reaction in the written reports following the earnings call was extremely negative.

277.   On July 26, 2018, Macquarie Research called the quarter "disastrous" and explained that Nielsen had disclosed that "CPG clients continue to withhold or reduce spending, including now in emerging markets."  It recognized that "[t]his is a change from prior comments that it was no better but no worse, and even Nielsen is now saying it can't see an end in sight."

278.   On July 26, 2018, Barclays wrote that the disclosure that "large multi-national companies" are "pulling back spending in key growth markets" bears a "striking resemblance to what we saw from NLSN on 3Q16 earnings, where a surprise cut in guidance on client weakness was followed by a prolonged period of developed market underperformance."

279.   On July 26, 2018, Jefferies wrote that "Earnings results missed our estimates and consensus expectations by a wide margin.  The Buy segment's challenges have accelerated within developed markets and have now spread to emerging markets."

280.   On July 27, 2018, J.P.Morgan's lengthy analysis of the Buy segment revelations quoted below:

> ***These results and outlook came as a shock***; just a few months ago . . . the company portrayed confidence that NLSN's revenue drag resulting from U.S. consumer packaged goods company headwinds was gradually moderating and that a turnaround was underway with new products coming to market. Yet the company now expects total company organic constant currency (o/cc) revenues to decline in 2018, ***a dynamic wholly uncharacteristic of Info Services firms***, and gave little reason to expect substantial improvement in 2019."

281.   J.P.Morgan's report also explained:

For the past two years, the company has faced headwinds in Developed Markets as U.S. consumer packaged goods companies pared back their spend to focus on margins. Over this time, Nielsen's Emerging Markets segment remained a beacon of hope, continuing to grow high single digits organically while management tempered investor fears of contagion into these regions. In 2Q18, ***the other shoe finally dropped***, and Emerging Markets drove total company organic constant currency (o/cc) revenue declines of (0.5)% y/y, including (5)% o/cc declines in Buy. Buy/Developed Markets results worsened to (7)% o/cc, though this was somewhat expected as mgmt had pointed to 2H18 for improvement. ***Buy/Emerging's flat o/cc revenues were the bigger disappointment and were driven by pullback in spend by multinational CPG companies, especially in Southeast Asia and China. We observe a generally stable (or even increasing) commitment by multinational CPG and food companies to emerging markets, suggesting that at least some of Nielsen's issues are company-specific.*** The company assumes this multinational pressure will continue, an assumption we find appropriate. ***After all, the issues in emerging markets feel like a lagged replication of developed markets, implying that the company may now be facing multiple years of headwinds.***

> **(ii)** ***Revelation of GDPR Issues Affecting Nielsen's Marketing Effectiveness Business***

282. As explained in Section V(B), the Marketing Effectiveness business is unique because it operates as an insight-focused product that straddles the line between the Watch and Buy segments.

283. With respect to the Marketing Effectiveness business, Defendant Jackson said that the results were "significantly below our expectations as revenues were impacted by GDPR and changes to the consumer data privacy landscape."

284. In fact, as Defendants admitted on July 26, 2018, Nielsen was unable to close contracts and recognize revenues because hundreds of clients and data partners in the Watch Marketing Effectiveness segment were grappling with the GDPR and changes in the consumer data privacy landscape. Nielsen attributed this to both issues with "data partners" and a pullback in demand for its services due to GDPR.

285. Thus, while the Marketing Effectiveness business still showed some growth, its overall trajectory was reversed, (*i.e.*, it showed deceleration of growth) as shown by the

following chart showing the business' revenue growth on a constant currency basis each quarter, as reported in each quarterly report:

| Marketing Effectiveness Revenue | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2016 | | | | 2017 | | | | 2018 | |
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| 28.8% | 15.1% | 31.8% | 9.2% | 14.0% | 18.6% | 15.6% | 32.9% | 22.7% | 6.0% |
| All figures in millions of dollars | | | | | | | | | |

286.    As this chart shows, Marketing Effectiveness publicly appeared as an area of high growth for Nielsen, and the disclosures in the Second Quarter of 2018 confirmed that this growth was reversing.  This not only undermined the direct positive revenue effects that investors hoped to obtain through Marketing Effectiveness, but was also highly revelatory of the greater problem Nielsen was facing due to its unique role as a middle ground between Nielsen's Watch and Buy segments.  It exposed that the problems Nielsen was facing were hitting its insight-focused Watch segment business as well as its Buy side.  While answering an analyst's question during the earnings call, Defendant Jackson explained that "from a measurement standpoint, media spend is continuing, we're continuing to measure that, and it's not being impacted in the near term.  But the analytics around some of that activity is being impacted in the near term and that's what we've tried to reflect in our forecast."  Macquarie Research noted that the drop in performance was "due to pullbacks on GDPR," and that Nielsen pinned the issue on "analytics", not "measurement" or "ad buying."

287.    Whether viewed as an extension of the more general decline in interest for Nielsen's higher cost Insights (already seen on the Buy side that quarter), accelerated by the GDPR, or as a stand-alone issue caused by the GDPR, Defendants knew, or were extremely reckless in not knowing, that these issues were forthcoming, even as Nielsen reiterated guidance and assured the market that GDPR was a "net positive."  As Defendant Barns eventually

admitted during the earnings call, this was not a surprise—but a "logical" result of GDPR going into effect.  In a polite understatement, the Pivotal Research Group wrote on July 26, 2018, that "investors are understandably concerned about the degree to which management anticipated the accelerated weakness in Buy and the impact of GDPR on Watch segment revenues from Marketing Effectiveness products."

288.    According to Defendant Jackson, the issue was not that they lacked the necessary data to complete their work, but rather a pullback by clients—"while the dust is still settling"— before ordering analytical Insights.  He said: "We were ready. What we're seeing in the marketplace is that it's taking clients longer to absorb the changes. What we said last quarter is that we didn't expect Measurement to be impacted, and it wasn't.  So our Digital Ad Ratings product, ***we had all the data that we needed***, and campaigns were up 82%."

289.    During the earnings call, question after question from analysts confirmed that they were not buying the prospect that Nielsen did not have visibility into the GDPR-related issues. Indeed, it made no sense to analysts that these issues were not already known when Defendants made the positive statements about GDPR.

290.    An analyst from Barclays Capital Inc. said, "I think last quarter and even intra-quarter conferences, you had said GDPR was a net positive and you cut the Watch guidance in half . . . what changes in two months that causes such a big disruption[?]"  With respect to the Marketing Effectiveness business, Defendant Jackson's response feigned ignorance—saying that GDPR affected Marketing Effectiveness "more than we anticipated," but not provide any explanation of how it would have been possible for Nielsen to so confidently say GDPR would be a non-issue, and yet to then announce such negative effects.  He reiterated: "we underestimated the impact on targeting and our data suppliers working towards compliance," and

added "it's a pretty complex environment," as if this complexity served as a justification for falsely assuring the market that Nielsen would not be negatively affected by GDPR.  He also further revealed the breadth of Nielsen's reliance on data partners.  His statement was as follows:

> If I look at the changes that we made in Watch, the fallout of GDPR and the changing data privacy landscape impacted our Marketing Effectiveness more than we anticipated. This is a short-term impact. And then if I speak more broadly as it relates to the actions that we've taken around guidance cuts, make no mistake about it, we're disappointed in our performance across the board. We don't make excuses. Our focus is on execution in the difficult environment that has more volatility and uncertainty. We'll continue to be transparent about what we see when we see it and the impact on our financial performance. The challenges that we're experiencing in the business are largely market-driven. We have been facing some headwinds here, but we continue to work to improve our processes across the company. And where there are issues, we are swift to address them. The other thing that we wanted to do is we wanted to make sure that we appropriately de-risk the back half of the year. Let me move into your point on GDPR, and I just want to be really clear. We were ready. What we're seeing in the marketplace is that it's taking clients longer to absorb the changes. What we said last quarter is that we didn't expect Measurement to be impacted, and it wasn't. So our Digital Ad Ratings product, we had all the data that we needed, and campaigns were up 82%. What did happen, though, is we underestimated the impact on targeting and our data suppliers working towards compliance. It's a pretty complex environment. We have several hundred clients and over 200 data partners in this space. And GDPR and changes in the landscape is a near-term challenge that we're working through. And then your last point around free cash flow, clearly with a reduced revenue guidance for this year, we took the EBITDA guidance down. We had higher restructuring associated with our cost-out initiatives, and so it just follows that we had to reduce the guidance. So the changes in the business rippled through the income statement and that flowed all the way through to the free cash flow portion of it. So that's what we're focused on is execution, de-risk in the back half of the year. We're disappointed in the performance, but we're focused on delivering on the guidance.

291.   An analyst from Macquarie Capital (USA), Inc., said "I still don't quite understand why this became a problem in the quarter."  Defendant Jackson responded: "So as I talked about, the entire ecosystem saw some disruption as some of the big platforms made some changes to their offerings.  The second thing that happened was, if you look at third-party targeting, there are lots of operational and policy changes that are impacting targeting, and it's taking longer for those things to sort of ripple their way through our data – our clients and our

data partners.  So we expect this to take some time to stabilize, and we've moderated our second

half outlook accordingly."  This too did nothing to explain the situation, as everyone knew that

GDPR was a big deal and would be disruptive—it was in the face of this information that

Nielsen assured investors of its guidance and of the fact that its business was prepared for and

would not be hurt by the new law.  Defendant Barns also responded to this question, saying:

> One way to think about all the services we have in our Marketing Effectiveness
> area that relate to targeting, you can divide them into two categories:  one is
> services that help advertisers target segments of consumers, and the other is
> services that help advertisers target individual consumers or personalized
> marketing. And it's that second category, personalized, that has had a bigger
> effect in the short term from the GDPR and the changes in the consumer data
> privacy landscape. And it's pretty reasonable when we think it through that while
> the dust is still settling, a lot of our clients are saying, "I'm not sure it makes sense
> to spend money on these kinds of analytics right now because I use these to guide
> some future behaviors, and maybe I'll let things stabilize before I spend the
> money." So they're not backing off on the advertising activity itself, but what
> they are backing off on is some of the analytics to inform that advertising activity.
> And it's pretty logical when we think about it that way.

292.    Through this statement, Defendant Barns effectively acknowledged that it was—

at the least—unreasonable and reckless for the Defendants to represent that GDPR would be a

non-issue.  The problem was not an unforeseen event, but a "logical" result of the new law,

which they had assured investors was not going to be a problem.

293.    An analyst from BMO Capital Markets asked Defendant Jackson about the

"shortfall due to GDPR," and specifically asked him to "tell us a little bit more about kind of

what came up short in your model?  I would think it's volumes.  But is it volumes?  Is it price?"

He responded: "in terms of your question, where we are we seeing the pressure, it's clearly

volume.  It's around being able to get contracts closed and being able to execute on those, just

given the changes that are impacting our clients and our data partners."  This response

emphasized the scope of the problem—as one related to the volume of contracts their clients

were requesting—but did nothing to explain why Nielsen had told the market this would not be a problem.

294.    Analyst reaction in the written reports following the earnings call was also extremely negative.

295.    J.P.Morgan stated in its July 27, 2018 report that the GDPR-related "impacts are most felt in Marketing Effectiveness, the subsegment in which NLSN data helps facilitate third party advertising targeting, and the sub-segment decelerated from +17% o/cc growth in 1Q18 to just +1% o/cc in 2Q18.  *Similar to Buy, this dynamic took us by surprise; when previously asked about the impact of GDPR, management had downplayed the regulation's relevance to Nielsen* but now clarified that issues arise when combining Nielsen data with third party data."

296.    In a July 27, 2018 report, SunTrust Robinson said, "The company missed 2Q and dropped forward guidance on GDPR as disrupted access to certain 3rd party data has hindered uptake of targeting products (multi-touch attribution, online/off-line conversion, Marketing Cloud). *This comes after management noted last quarter that GDPR shouldn't be an issue.* The impact comes primarily through Marketing Effectiveness (some modest knock-on effect on Audience Measurement)."

297.    Deutsche Bank wrote on July 31, 2018, that "Marketing Effectiveness offerings . . . stumbled with the fallout of GDPR and the changing data privacy landscape."  The report continued: "While management views this as a short-term issue, *we are compelled to point out that just ~3 months ago, on the 1Q18 earnings call, CEO Mitch Barns said the greater focus on privacy, including GDPR, was a net positive for Nielsen's business and position in the marketplace, and that the company was 'well prepared.'*  Perhaps that will be the case in the future, but it is not ringing true in the present."

298.     An analyst report from Jefferies on July 27, 2018, remained hopeful of an eventual bounce back, but also stated, "*we found mgmt.'s explanation of the impact of GDPR on the Marketing Effectiveness sub-segment of Watch somewhat confusing and lacking.*"

### (4)     Subsequent Disclosures Further Confirm the Fraud

#### (i)     *Abrupt Resignation of Defendant Jackson*

299.     As previously mentioned, on the day that the Second Quarter 2018 financial results were released, Nielsen abruptly "termin[ated] without cause."

300.     On August 15, 2018, an analyst report from Pivotal Research wrote that "investors would not only welcome, but would probably demand significant managerial change well beyond the departure of the Company's CEO, as was announced at the time of the company's earnings report if Nielsen is to remain as a public company focused solely on its Watch businesses."  That same day Defendant Jackson resigned from Nielsen, effective in September.  Nielsen publicly reported Jackson's resignation five days later on August 20, 2018. This news was announced on August 20, 2018.  The timing and abrupt nature of this revelation indicated a recognition of his involvement in the scheme alleged herein.

301.     On September 5, 2018, Nielsen reported that it had hired David J. Anderson as the Company's new CFO.

#### (ii)     *Subsequent Disclosures Fully Reveal Extent of GDPR Issues That Were Known to Nielsen*

302.     On September 12, 2018, at the Goldman Sachs Communacopia Conference, an analyst from Goldman Sachs & Co. asked how the GDPR had "changed the demand for Nielsen's Watch data?"  Megan Clarken, whose title was President-Product Leadership, gave a lengthy response, revealing that, contrary to Defendants' previous representations, the issues around GDPR were plainly visible within the Company and affected Nielsen's access to data, not

just the behavior of its customers.  On this point, Ms. Clarken provided the following

explanation:

> It was leading up to sort of the flicking of the switch of GDPR compliance
> day. . . .  It did tend to appear to be a moving target in the eyes of those that had to
> create compliance within the platforms or the way in which they were doing
> business. And we saw that as sort of a moving target right up until the last minute.
> And then what happened was that on the day that the GDPR regulations were put
> into place, it was literally like a light switch.  And what happened was for those
> platforms that were affected by it, particularly the large digital platforms, they
> protected themselves, rightly so, by literally also switching things off because
> they wanted to make sure that everything . . . was in place and that they were not
> at risk*.  And because there were sort of moving parts right up until that point,
> they literally sort of stopped. And so they turned off the ability for us to get any
> data from any part of their advertising platforms that would potentially be
> compromised in terms of GDPR.  On that day, we had 120 campaigns being
> measured, 120 campaigns, and it was literally switched off.* And so the knock-on
> effect to that is that we had specs leading up to that time in terms of what it would
> take for us to get compliance, but again, they were moving and changing around
> that time. And *so, now, we're doing a bunch of work to make sure that we have
> compliance in place so that we can reactivate our measurement capabilities on
> those platforms.  And we have a timeframe in place for when that work will be
> done, but that pretty much stops the business during that time while you're
> putting those things in place.* And then you've got work to do to get your
> pipeline reinforced to get back to where you were before. So it's a blip; and
> because of that blip, we de-risked the second part of the year.

303.    On October 25, 2018, Nielsen issued its 3Q18 financial results and disclosed

continued issues related to GDPR.  By this time, Marketing Effectiveness was down 10% on a

constant currency year-over-year basis, and Nielsen had a new CFO, David J. Anderson.  Mr.

Anderson explained that the weakness was "driven largely by changes to the consumer privacy

landscape, which included Marketing Cloud, [a] portion of our custom analytics business related

to targeting."  Also, in the 3Q18 earnings call, Ms. Clarksen stated that: "With the bulk of the

work to meet the new policies now behind us, we're shifting our focus back to our sales pipeline

and new product offerings. In addition, many advertisers stopped targeting ads and sharing data

until they felt that they were privacy compliant. This is an external factor that's impacted us.

Longer term, we see strong client demand for a multi-touch attribution, outcomes-based

measurement and targeting.  And recent multiyear renewals of large enterprise clients for multi-touch attribution deals underscore our optimism here."  This once again made clear that Nielsen's lack of data access had disrupted its business and the Company it was still working to get on track a full quarter later.

**(iii)** *Subsequent Disclosures Support That Nielsen Deceived Market About China Execution Issues*

304.    On October 25, 2018, Nielsen issued its 3Q18 financial results and disclosed continued issues related to China.  Patrick Dodd, whose title was President-Global Markets Group, began by describing the issues in the emerging markets related to "large multinational spending pressure" as the Company had disclosed in the prior quarter.  He explained that China was "a critical piece of our emerging market story," and said: "We now have a new management team firmly in place and they're focused on a few things.  First, expanding our e-commerce measurement and analytics solutions with relationships with JD.com, Tencent, and we've most recently signed a new deal with Suning, the third largest FMCG online retailer in China."  The implication of this was that Nielsen had just replaced the management team in China, whereas on May 16, 2018, and May 31, 2018, Nielsen stated that any changes to the team had already been made as of that date.  He then continued by saying: "we *are* rebuilding and strengthening our commercial teams across China and the China growth plan remains an important priority for us.  And I look forward to updating you on this and our progress moving forward."  This further revealed, contrary to Nielsen's assurances on May 16, 2016, that any issues with the team in China had already been resolved.

### (iv)     *Nielsen Takes Massive Buy Segment Goodwill Write-Down*

305.     The severity of the problems in the Buy segment was also illustrated by the Company's disclosure in the 4Q18 of a $1.4 billion goodwill impairment charge related to the Buy segment.

306.     On February 28, 2019, Nielsen's press release associated with its 4Q18 financial results, disclosed that "the company recorded impairment charges of $1,413 million, or $3.98 per share, primarily related to the writedown of goodwill in our Buy segment as a result of our annual impairment assessment."  For context, this impairment was about 17 times more than the Company's net income in 2017—it had negative net income in 2018.  It was also about 54% of the entire goodwill attributed to the Buy segment—and the impairment brought down goodwill from $2.84 billion to $1.34 billion and reduced total Buy segment assets by 21% from $6.9 billion to $5.4 billion.

307.     During the Company's February 28, 2019 conference call, new CEO David Kenny stated that the Buy goodwill impairment charge was a result of work he and CFO Anderson did to take a "fresh look" at the long term forecast across the business and the market environment.  He stated that work resulted in lower forecasts for the Buy business which led to the impairment charge.  However, this impairment should have been taken at an earlier time (at least as of Fiscal Year 2016 10-K), and the failure to do so misstated the value and future prospects of Nielsen's business.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

308.   During the Class Period, Defendants made numerous materially false and misleading statements and omissions, as detailed below.[20]

309.   Nielsen made each of the statements described below because they were filed by Nielsen with the SEC, posted to Nielsen's investor relations website, and/or made by individuals in their capacity as agents or representatives of Nielsen.  Each of the Individual Defendants also had ultimate control over the statements described below, because they made these statements and/or were control persons of Nielsen while it made those statements.

310.   Defendants' fraud spanned nearly two and half years.  During that time, Defendants made numerous statements to the market including statements in forms filed with the SEC, earnings calls and industry conferences.  Lead Counsel has provided Defendants' false and misleading statements below and included information released contemporaneous with these false statements to provide context for the Court.

### A.   Chronology of the Other False and Misleading Statements

#### (1)   Statements Made From February 11, 2016 through October 25, 2016

311.   During this part of the Class Period, Defendants made positive statements concerning the positive growth and stability that Nielsen was experiencing among its clients purchasing analytics products.  Nielsen touted strength in these areas, provided the guidance to match these assurances of growth and reassured the market that its Buy business was successful and would continue to be so in the future.

---

[20] The statements that are ***bolded and italicized*** in this Section are statements alleged to be false and misleading.

(i)      *February 11, 2016 (4Q 2015)*

312.     On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015 financial results, Defendant Barns told investors that Nielsen was "***reiterating our guidance for 2016.***"  This reiteration referred to the guidance stated on December 11, 2015 (before the Class Period), when Nielsen hosted its annual Analyst Day conference, in which Defendant Jackson spoke to investors and issued the Company's 2016 revenue guidance of ***revenue growth for Fiscal Year 2016 at 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93, and free cash flows of $950 million***.  Additionally, on December 11, 2015, as part of the Analyst Day presentation, a slide deck was presented containing a slide titled "2016 Revenue Guidance Range."  That slide showed total guided revenue of approximately ***$6.1 billion, with about $2.8 billion from Watch and about $3.3 billion from Buy***.  More specifically, it showed that ***the Developed Markets would experience 1.5% to 3.5% in constant currency revenue growth and the Emerging Markets would experience 8% to 10% in constant currency revenue growth***.  Next to these numbers a bracket was drawn that said: "***stable discretionary spend***."

313.     On February 11, 2016, Nielsen announced its Fourth Quarter 2015 results.  The slide deck presentation ***reiterated the same guidance*** that had been presented since the Investor Day.

314.     On February 11, 2016, in the earnings call announcing its Fourth Quarter Financial results, Defendant Jackson said:

> Great. ***So we did give guidance for 50 to 70 basis points of margin expansion, and that is on a total Company basis.  And we do expect buy to be a slightly bigger contributor in 2016. The reason for that is really two key drivers. Number one, we're continuing to scale in the emerging markets and we have a focus on profitability.  And as those investments that we've made in the emerging markets continue to scale, then buy margins are moving in the right***

*direction and you've seen buy margins expand over the last six quarters.  And*
*we expect that to continue into 2016.*

315.    On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Barns said:

*Turning to buy, as we closed 2015, our buy business continued to strengthen*
*and expand.* Revenues grew nearly 6% in the quarter, led by emerging markets,
as well as a solid growth in key developed markets, including the US and Europe.
We continued to win new clients in the relatively faster growing mid tier and
small client segments. Just last week, Dole Foods named Nielsen as their referred
provider of consumer information and analytics.

316.    On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results, in response to an analyst's question about watch margins for 2015, Defendant Jackson

said:

Great. So we did give guidance for 50 to 70 basis points of margin expansion, and
that is on a total Company basis. *And we do expect to buy to be a slightly bigger*
*contributor in 2016.* The reason for that is really two key drivers.

Number one, we're continuing to scale in the emerging markets, and we have a
focus on profitability. And as those investments that we've made in the emerging
markets continue to scale, then buy margins are moving in the right direction.
And you've seen buy margins expand over the last six quarters, and we expect
that to continue into 2016.

And then, the second dynamic is that we're just running the place with intensity
around costs and productivity. We've done that for a number of years, and we're
going to continue that in 2016. So we feel good about the 50 to 70 basis points of
margin expansion in the Company, and we expect buy to be a bigger contributor.

317.    On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Barns told investors that Nielsen had "*solid growth in key developed markets*

*including the US and Europe.*"

318.    On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Barns said:

*We also continued to strengthen our positions with retailers around the world.*
Retailers are long-time data partners for Nielsen but they also have a growing

need for our analytics to help with their advertising, marketing, and merchandising decisions both online and offline. Our business with retailers saw strong growth in 2015, boosted in part by 40 new e-commerce clients worldwide.

319.   On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Barns said:

> **Developed markets also exited the year with good momentum.** Revenues increased 4.8% in Q4. And notably this was helped by Europe, where we're starting to see growth at the region level, low single-digits, but growth and we're happy to have it.

320.   On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Jackson told investors that:

> *[W]e see the discretionary spend environment as being pretty stable. We see our clients investing in analytics and innovation to help them drive top line growth. And you've seen from a number of CPG clients, as they've come out of a restructuring cycle, that they're pivoting to growth by investing in innovation.*

321.   On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results, Tim McHugh from William Blair asked about the "US and Europe, parts of the buy

segment.  Defendant Jackson said:

> Yes, this is Jamere. So a couple of things, one, we see the discretionary spend environment as being pretty stable. We see our clients investing in analytics and innovation to help them drive top line growth. And you've seen from a number of CPG clients, as they've come out of a restructuring cycle, that they're pivoting to growth by investing in innovation.
>
> So the US for us was up low single-digits in the fourth quarter, but up mid single-digits for 2015. And in Western Europe, we saw our business being up mid single-digits, behind strong results from new client wins and innovation. *So we feel very good about where we are in the cycle, and our clients are starting to see some growth.*

322.   On February 11, 2016, in the earnings call announcing its Fourth Quarter 2015

results Defendant Barns told investors that:

> *To sum up, we feel great about our progress and confident about the year ahead. While we certainly don't wish for difficult economic conditions, we're ready for them.* In fact, we know from experience that when economic conditions

grow more challenging, our business model's advantages and strengths show through more clearly.

323.    On February 11, 2016, Nielsen issued a press release discussing its earnings. In that press release, Defendant Barnes stated:

> *We look forward in 2016 with confidence.  In times of economic turmoil and market volatility, the strengths of Nielsen's resilient business model are most evident.  Our consistent mid-single digit constant currency revenue growth, margin expansion and free cash flow generation continue to be fueled by our core measurement and analytics businesses which remain stronger than ever.*

324.    The statements that describe the strength or stability of Nielsen's business or the demand for Nielsen's products from its customers, were false and misleading because they misstated the true condition of the Company, which was not strong or stable and was in declining demand from Nielsen's customers.  These statements were also false and misleading because they failed to disclose the known trends and risks that were harming and jeopardizing Nielsen's business, including the decline in interest for the analytic products Nielsen offered, and more generally the decrease in demand from Nielsen's customers.

325.    The statements that convey or affirm guidance, growth, or positive future financial results were false and misleading because they omitted then known information that undermined the reasonableness of the guidance or growth projections, including that Nielsen's analytics business was in decline (instead of growing) and its customers' interest in Nielsen's products was not "stable".  The guidance did not take into account or disclose known risks and uncertainties, including the fact that Nielsen's performance would continue to decline because of a decline in demand for Nielsen's analytical products, and that Nielsen's performance would decline in the Emerging Markets due to the same forces that were causing its Developed Market businesses to decline.  Nielsen's long-term contracts and visibility into those contracts meant that Defendants' statements knew the expected performance was unachievable.  These statements

were either not accompanied by meaningful cautionary language, or were conveying information

that Defendants knew was false and misleading at the time they were made.

(ii)     *April 20, 2016 (1Q16)*

326.     On April 20, 2016, Nielsen released its First Quarter 2016 results and the

accompanying slide deck stated that Nielsen was ***reiterating the same guidance*** that had been

presented since the Investor Day.

327.     On April 20, 2016 during the earnings call for Nielsen's first quarter 2016 results

Defendant Jackson said that:

> *Our teams are continuing to execute in line with the guidance framework we gave for 2016. In the developed markets, our core measurement business was solid in our two largest markets, the U.S. and Western Europe. We also saw broad-based growth in the emerging markets with double-digit growth in Latin America, China, and Southeast Asia along with mid to high single-digits in Eastern Europe and Africa. Overall, discretionary spend remained stable with relative strength in areas like innovation.*

328.     On April 20, 2016, during the earnings call for Nielsen's first quarter 2016 results,

Defendant Jackson said:

> *Moving to 2016 guidance, we are maintaining our annual guidance. We remain confident in our plan to deliver on all of the operational elements that we laid out on our fourth quarter call, highlighted by revenue growth of 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93 per share, and free cash flow of roughly $950 million.*

329.     On April 20, 2016, during the earnings call for Nielsen's first quarter 2016 results,

Defendant Barns said:

> *2016 is off to a good start for Nielsen, underpinned by our consistent resilient business model. Our strong financial results in the first quarter were fueled by our Watch segment's progress, with Total Audience Measurement; and our Buy segment's continued strength in emerging markets and growing momentum with retailers. In both Watch and Buy, our teams are executing well, and there's a lot to look forward to for the rest of the year and beyond.*

330.    On April 20, 2016, Nielsen released its first quarter 2016 results and the press release stated that "***Nielsen's strong first quarter results were underpinned by our steady and resilient business model***" and that its "***unparalleled global footprint remains a core competitive advantage for both local and multinational clients.***"

331.    The statements concerning guidance were false and misleading for the reasons stated in paragraph 325.  The statements about the strength or stability of Nielsen's business or the demand for Nielsen's products were false and misleading for the reasons stated in paragraph 324.

### (iii)    *May 18, 2016*

332.    On May 18, 2016, at the Barclays Americas Select Conference, in discussing the Company's business generally, Defendant Jackson said:

> ***Our business is remarkably resilient and consistent through the cycles. We're a steady, consistent mid-single-digit revenue grower. We expand margins 50 to 70 basis points. Great free cash flow, very capital efficient model and then we take that free cash flow*** and actually return a big chunk of that back to investors after first investing in growing our business.

333.    The statements about the strength or stability of Nielsen's business or the demand for Nielsen's products were false and misleading for the reasons stated in paragraph 324.

### (iv)    *June 1, 2016*

334.    On June 1, 2016, the financial analyst firm Sanford C. Bernstein & Co. hosted a conference with analysts and Defendant Barns.  At that conference with analysts, in discussing the Connected Buy System, Defendant Barns said:

> The way we're thinking about our business at a high level for the present time and for the next several years really isn't that different from the way we thought about our business for the past several years, and that is to say our focus is on measurement, measurement performance for our clients, mostly in the media and fast-moving consumer goods industries, and then providing the analytics to help them drive improvement in that performance. So we do that in a sense of measuring both what consumers watch, primarily for the media industry and also

106

what consumers buy for fast-moving consumer goods companies, and that's been true at Nielsen now for a long, long time, for decades and it will be true for Nielsen for as long as we can see into the future. So, the what that we're focused on isn't changing a whole lot.

*What is changing at our Company right now, however, and what we're very excited about that will unfold over the next several years is how, how we're going about this measurement and this process of driving improvement for our clients through the analytics capabilities that we provide. What's changing in that arena is we're leveraging technology in a much bigger way than we ever have before. The way to think about our Company in years past, I would say is, it's been much more a People as a Service business model. We have data, we have technology, but primarily the value gets conveyed to our clients through a People as a Service business model, where we're moving to now and for the next several years is much more toward a Data as a Service and Software as a Service business model. Leveraging technology in a much bigger way, taking a much more platform-oriented, system-oriented approach, putting more of our services and capabilities in the cloud, and through that we did a lot more leverage. And for our clients, we deliver a lot more speed and, in essence, a lot more power in the information that we provide to them. That's the biggest area that will change.*

335.    On June 1, 2016, at a conference with analysts, in discussing the Connected Buy

System, Defendant Barns said:

*So what we're doing, what we're in the process of doing now is re-engineering, re-designing that portfolio so that it operates much more as a integrated or a connected system so that the core measurement service and the analytics capabilities that's around it are interoperable with one another; and then once that system is fully up and running, that system connects directly in to our clients' systems that run their marketing and sales processes at their companies. That's the path that we're on right now, the vision that we have. We've shared it with a number of our clients in the fast-moving consumer goods industry and got great feedback from it.*

*We've had a handful of charter clients sign up to be the early subscribers of that new system orientation, that new collection of capabilities, and that will be what we'll be focused on the Buy side of the business over the next several years.*

*As that unfolds and it will be 2017, 2018 until it really starts to show up in a meaningful way, we expect two main things to happen, one is a lot better differentiation of what Nielsen does versus all the competitive alternatives out there, in particular for the analytics capabilities that we have, because for anyone analytics capability that we have, there is a dozen or more competitors for it. But by integrating these capabilities into a system, we, in essence, put*

*ourselves into a class by ourselves, nobody else has the breadth of portfolio and the global footprint of Nielsen and so you bring all these other capabilities into that into a connected system and its more differentiation, which we think is positive.*

336.    On June 1, 2016, at a conference with analysts, in discussing the Buy segment

generally, Defendant Barnes said:

*I feel great about how we've done and also about the growth opportunity that still remains. Let me say this, when the Buy part of our business in the developed markets, our business is somewhat correlated with growth in GDP in these markets. In the emerging markets, much less so and the reason why that's true is because the state of development of our kinds of services in the emerging world is we're still pretty much at the early part of that development opportunities. So even if the overall economy is slowing down in terms of its growth rate, we saw a lot of white space to fill in. We still have a lot of opportunity that is under-developed in those markets and that's the reason why our business is able to grow double-digits in China last year and 11% in the first quarter of this year, despite the volatility in the market.*

337.    These guidance statements are false and misleading for the reasons stated in

paragraph 325.  The statements about the strength or stability of Nielsen's business or the

demand for Nielsen's products were false and misleading for the reasons stated in paragraph 324.

338.    The statements about Connected Buy were false and misleading because

Defendants touted Connected Buy as an exciting new product for customers while masking that

Connected Buy was actually developed to try and stem the declining demand for the analytics

products which had markedly diminished.

**(v)    *July 26, 2016 (2Q16)***

339.    On July 26, 2016, Nielsen issued its Second Quarter 2016 financial results and the

accompanying slide deck stated that Nielsen was ***reiterating the same guidance*** that had been

presented since the Investor Day.

340.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016

financial results, Defendant Jackson, in discussing the Company's annual guidance, said:

> *Moving to 2016 guidance, we are maintaining our annual guidance. We remain confident in our plan to deliver on all of the operational elements that we laid out at the beginning of the year, highlighted by revenue growth of 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93 a share, and free cash flow of roughly $950 million.*

341.    On July 26, 2016, in the press release for Nielsen's Second Quarter 2016 financial

results, Defendant Barns said:

> *Once again, in the quarter we saw solid revenue growth, strong margin expansion and earnings growth driven by our scalable, consistent business model, investments, and a continuous focus on productivity….*

342.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016

financial results, Defendant Barns said:

> *When we look at the developed markets, the environment continues to be challenging. In the absence of strong top line growth, our clients are looking to find efficiencies in their business, which in some instances includes their marketing, sales, or innovation processes. One action we took in the quarter was to realign our buy business globally, into the clusters of countries with similar market characteristics. We also accelerated our investments in our buy businesses connected system, which will enhance the value and speed we bring to our clients.*

343.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016

financial results, Defendant Barns, in discussing developed markets, said:

> *When we look at the developed markets, the environment continues to be challenging. In the absence of strong top line growth, our clients are looking to find efficiencies in their business, which in some instances includes their marketing, sales, or innovation processes. One action we took in the quarter was to realign our buy business globally, into the clusters of countries with similar market characteristics. We also accelerated our investments in our buy businesses connected system, which will enhance the value and speed we bring to our clients.*

344.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016

financial results, Defendant Barns, in discussing the Company's "connected system" said:

> *Clients have been enthusiastic in their feedback, and they want it now, and that's a key reason why we've accelerated the pace of our investment in this platform-based connected system. We'll begin with an initial group of clients*

*who will be on board by the end of the year, with more transitioning through 2017. A faster, more efficient system creates more value for our clients, and bolsters our position as the leading global provider of measurement and analytics to the FMCG industry.*

\* \* \*

*We're looking forward to the rest of the year, with continued confidence and excitement about the progress to come.*

345.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016 financial results, Defendant Barns said: "Lastly, *we're reiterating our guidance for 2016*."

346.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016 financial results, Defendant Jackson said: "*Our productivity pipeline remained strong and we're confident in our guidance* of 50 basis points to 70 basis points of constant currency margin expansions for the total company in 2016."

347.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter results, Defendant Jackson said:

> Finally, we generated free cash flow of $98 million compared to $156 million in the second quarter of last year. *This was primarily driven by working capital timing and CapEx investments and our growth initiatives in Watch and Buy and we remain on track to deliver our 2016 guidance of approximately $950 million. Again, a solid quarter of consistent and steady results.*

348.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter results, Defendant Jackson said:

> *For Nielsen, the U.S. and Europe represents over 85% of our developed markets. Europe actually saw a modest growth in core measurement, while the discretionary side was a little soft as was in the U.S.  And, I'll just remind you that discretionary spending can be a little lumpy. We're coming off two stable quarters, so it's not uncommon to see these dynamics from time to time. And in the second half, I expect developed Buy to be within the range we gave at Analyst Day of 1.5% to 3.5%.*

349.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016 financial results, an analyst asked Defendant Jackson for "a little more color . . . on the Buy

business" in the Developed Markets, and expressly asked: "I know you called out more pressure

on discretionary spending trends in the quarter, but is there anything else worth calling out?"

Defendant Jackson said:

> **So clearly we're in a two-speed world where our clients have seen slower growth in the developed markets for some time now, while the emerging market growth has been fairly robust despite some volatility and uncertainty. For Nielsen, the U.S. and Europe represents over 85% of our developed markets. Europe actually saw a modest growth in core measurement, while the discretionary side was a little soft as was in the U.S.**
>
> **And, I'll just remind you that discretionary spending can be a little lumpy. We're coming off two stable quarters, so it's not uncommon to see these dynamics from time to time. And in the second half, I expect developed Buy to be within the range we gave at Analyst Day of 1.5% to 3.5%.**

350.    On July 26, 2016, during the earnings call for Nielsen's Second Quarter 2016

financial results, an analyst asked Defendant Jackson: "The discretionary spending slowdown, if

that's the right word in Q2, I think, Jamere, you were saying that was really just something of a

blip and maybe there were some tough comps. Is this not something to worry about?" Defendant

Jackson responded:

> Yeah. So, just to reiterate my comments on the discretionary portion of the business, as I said. **We saw modest growth in core measurement and the discretionary side was a little soft in the developed markets, both in the U.S. and the UK. What I've always reminded you of is that discretionary spend can be a little lumpy, we're coming off a couple of stable quarters. So, it's not uncommon to see these dynamics from time to time. And in the second half, we expect developed Buy to be within the range that we gave at Analyst Day, 1.5% to 3.5%.**

351.    On July 26, 2016, during the earnings call for Nielsen's 2016 Second Quarter

financial results, an analyst asked Defendant Barns: "[R]oughly when do you expect [the

Connected Buy System] to start more materially impacting Buy developed revenue in a positive

way?" Defendant Barns responded:

> Hey, Jeff, happy to – one of the key milestones in fact the next one I would point you to is that **we plan to have initial group of clients on board this system at the**

*end of this year.* So, we'll keep this group updated on that progress, and then as we move through 2017 we'll begin to bring additional clients from our FMCG client base, both manufacturers and retailers onto this system as well.

And then as they come on to the system and then start to experience it, start to be able to run their businesses off of it, *then the next thing that happens is those long-term contracts that are generally in place with our larger clients on that side of the business, as those contracts renew, they will start to be folded into the arrangements that those contracts describe and then that's how it starts to flow through into the financials for the Buy side of our business.*

*So, nothing is going to happen immediately in regard to the Connected system.* This is a long-term initiative with a long-term timeline in terms of how it unfolds. And I think the perfect analogy is to look at the timeline and the process that you saw unfold on the Watch side of our business as we took on a very similar challenge, building a Total Audience Measurement system, which – it's been multiyear process, but now we're starting to see the delivery of the benefits of that in our financials.

352.     These guidance statements are false and misleading for the reasons stated in paragraph 325.  The statements about the strength or stability of Nielsen's business or the demand for Nielsen's products were false and misleading for the reasons stated in paragraph 324. The statements about Connected Buy were false and misleading for the reasons stated in paragraph 338.  The statements concerning the "challenging environment" were false and misleading because they attributed the challenge to issues customers were having internally versus customers diminished demand for Nielsen's products.  The statements made about a "challenging environment" also downplayed the effects Nielsen was seeing by claiming that growth could continue and that "lumpiness" was normal.

**(vi)     *October 25, 2016 (3Q16) – Partial Revelation of the Truth***

353.     On October 25, 2016, Defendants announced the crippling weakness in the Developed Buy Markets and the negative effect this would have on the Company.  They credited this weakness to customers shifting away from deep dive analytics to everyday analytics, and they touted instead the continuing strength in the Emerging Buy Markets.

354.    However, these statements continued to be false and misleading because Defendants failed to tell the market that customers weren't just moving from deep dive analytics to everyday analytics but rather decreasing their analytics spend all together (across all analytics products).  These statements were also false and misleading because the trend towards just purchasing raw data would (and did) negatively affect Emerging Markets in the same way that Developed Markets was being affected.  These statements were also false and misleading because Nielsen attributed the declines to internal customer issues when the real issue was that customers did not want Nielsen's analytics products.  Due to the common customer base and declining demand, it was only a matter of time before Emerging Markets would see the same decline that Developed Markets had experienced.

355.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results, Defendant Barns said:

> *For our Buy business, emerging markets continued to produce solid top line growth as our investments in coverage and granularity and our balanced strength with both local and global clients continue to pay off. But regarding developed markets, while Europe made good progress in the quarter, our U.S. results were down versus the prior year as clients looked for more efficiency and productivity in the face of an increasingly difficult growth environment.*
>
> *Earlier this year, as we saw these more challenging trends unfolding, we realigned our Buy business to be more focused in our product development and more efficient in our overhead. More recently, as the trends continued for our clients, we stepped up our efforts to reduce our cost base, reallocate resources and accelerate our investments and initiatives that would help our clients and better position our business for the future.*

356.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results, Defendant Barns said:

> *In developed markets, specifically the US, the environment in which we operate has become more challenging. Large, global manufacturers are the strength of our client base. And as I'm sure you've seen in the recent press, they found it increasingly difficult to achieve growth in markets with growing fragmentation*

*in consumer demand, more competition from smaller and local players, and increased commodity prices.*

Together, these factors have led them to seek efficiencies and productivity in their business and our business has not been immune. Our clients continue to value our Core Measurement Services, especially given the growing product and retail fragmentation in the market. But when it comes to analytics, their needs have been shifting.

Clients are shifting away from custom insights delivered via deep dive projects and they are shifting toward every day analytics, often called activation, delivered directly to multiple end-users. Our view is that this is a secular shift, not a passing phase or a cycle that will swing back.

Clients want analytics that will help them answer the question of, what do I need to do this week or tomorrow or even today to drive sales, protect market share, or improve my competitive position? In today's challenging growth environment, that's what's most valuable to them. Now let me walk you through what we are doing to respond to this. First, you'll see us aggressively moving away from slower growing, non-core services. These moves are enabling us to accelerate and increase our investments in our key initiatives that will better position our business for the future. The most important of these initiatives are Total Consumer Measurement and our Connected System.

Total Consumer Measurement is about following consumers across all retail formats to ensure full coverage of sales. In a changing and fragmenting retail environment, this requires ongoing effort to help our clients understand emerging channels like specialty retailers, hard discounters, direct-to-consumer models, and of course, e-commerce.

357.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Barns said:

> *Turning to the Buy business, in emerging markets, our business continues to deliver solid broad-based growth, including double-digit growth across several key markets in Latin America, Southeast Asia, Eastern Europe and India.  As a group, these markets still have a lot of runway for continued growth via added coverage, granularity and increasing penetration of the related analytics that help our clients to drive progress in their business. Our investments in coverage and granularity and our balanced strength with both local and global clients continue to pay off.*

358.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016

financial results, Defendant Barns said:

114

*In developed markets, specifically the U.S., the environment in which we operate has become more challenging. Large global manufacturers are the strength of our client base. And as I'm sure you've seen in the recent press, they found it increasingly difficult to achieve growth in markets with growing fragmentation in consumer demand, more competition from smaller and local players and increased commodity prices.*

*Together, these factors have led them to seek efficiencies in productivity in their business and our business has not been immune. Our clients continue to value our core measurement services, especially given the growing product and retail fragmentation in the market. But, when it comes to analytics, their needs have been shifting. Clients are shifting away from custom insights delivered via deep-dive projects, and they are shifting toward every day analytics, often called activation, delivered directly to multiple end users. Our view is that this is a secular shift, not a passing phase or a cycle that will swing back. Clients want analytics that will help them answer the question of what do I need to do this week or tomorrow or even today to drive sales, protect market share or improve my competitive position. In today's challenging growth environment, that's what's most valuable to them.*

359.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Jackson said:

*Overall, as Mitch mentioned, our business grew in a much more challenging environment than we have seen in the past few quarters, highlighting the strength of our balanced portfolio. First, let me cover our total Company results for the third quarter. On the left side of the page, our results on a US GAAP basis, revenue was just under $1.6 billion, up 2.5% on a reported basis, driven by solid growth in our Watch segment, partially offset by softness in the developed markets in our Buy segment.*

360.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Jackson said:

*As you've often heard me say, we are clearly operating in a two speed world with significantly higher growth rates in the emerging markets versus developed markets.*

*In the third quarter, our business in the emerging markets was $267 million up 8.5% on a constant currency basis. As Mitch mentioned, growth was broad based across a number of markets. In addition, we saw double-digit growth from multinationals that gives us more confidence that emerging markets will continue to be a tailwind for our Buy segment revenue into 2017.*

115

361.   On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Jackson said:

> *Turning to Buy, third quarter total Buy revenue was $809 million, up just under 1% on a constant currency basis. On a total segment basis, our syndicated recurring revenue business remained solid. However, our ad hoc discretionary revenue declined. Our business in the developed markets was $542 million, down 2.5% on a constant currency basis, as we continued to see softness and discretionary spend, especially in the US.*

362.   On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Jackson said:

> *These key investments, along with an unfavorable mix between our developed and emerging markets' revenue are the key drivers for our Buy adjusted EBITDA margins being down 91 basis points versus the prior year. Based on our year-to-date results and fourth-quarter outlook in developed Buy, we now expect our Buy revenues to grow approximately 1.5% to 2% for 2016.*

> *          *     *     ***

> *Moving to 2016 guidance. In light of our third-quarter results and fourth-quarter outlook in developed Buy, we are updating our full-year guidance, highlighted by revenue growth of approximately 3.5% to 4% on a constant currency basis; adjusted EBITDA margin growth of 30 basis points; adjusted net income per share of $2.73 to $2.79; and free cash flow of approximately $850 million.*

> *So to wrap up, our third quarter was highlighted by revenue growth and margin expansion and in a more challenging environment. First, our Watch business has tremendous momentum behind our total audience initiatives and by our subscription-based recurring revenue business remains solid and emerging market growth remains robust while our developed markets business in the US has declined.*

> *But importantly, across both Watch and Buy, we continue to invest in a disciplined way to build a stronger, higher-margin business. In addition, we remain on track to return over $800 million in cash back to shareholders in 2016 in the form of dividends and buybacks. With that, I will turn it back to Yaeni.*

363.   On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Defendant Barns said:

116

*Our Buy business, emerging remained solid. Even within developed, Europe, the Pacific, Canada all turned in solid quarters of growth. The U.S. is where we have the declines. A tough environment, we've talked about, we're judging these to be secular shifts and we're responding accordingly. In terms of the magnitude and the pace of the changes we're making in our business to reduce our cost base, reallocate our resources, accelerate our investments, in particular in this Connected system that helps us move from what today is much of a people as a service business model to be much more of a data as a service and software as a service business model in the future.*

364.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

Toni Kaplan from Morgan Stanley asked Defendant Barnes about reduced spending in the Buy

business.

<u>Kaplan</u>

So you've mentioned the secular shift away from custom insights to everyday analytics, and so I was hoping you could give a little more color on the drivers behind the reduced spending.   Are you losing share?   Is the competitive environment changing or are customers just tightening budgets?  And is there any way to quantify that and basically, in terms of the investments that you're going to be making in buy to address this shift, how much has this impact Buy margins? Thanks.

<u>Defendant Barns</u>

Thanks, Toni. Let me start and I'm sure Jamere will add. First, with regard to Buy developed, that is the challenging spot for our business in the quarter**.** But I would even narrower it further for you. Because within Buy developed, Europe grew, the Pacific grew, Canada grew. It's really the US, where the problem is focused at the moment.

\*\*\*

You add up all these things together and that's the situation that our clients are contending with, and you see that reflected back in our results. *Now, for us, what that means in terms of their discretionary spend, as I said, they're shifting from these more deep-dive projects that help them think about what they're going to do next year and focused much more on these everyday analytics that help them with activation.*

What should I do today or tomorrow or this week? And that's where the shift is happening in the marketplace. So we are realigning our portfolio to better serve those client interests and those client needs and, as I mentioned, *we don't see this*

117

*as just a passing phase that the marketplace is going through. We see this as a trend that will continue on more of a secular basis over the long run.*

As we make this shift and as we build up this Connected System, you see us building a very different business, really, frankly**.** Right now, it's very much a professional services model for Nielsen. As that Connected System starts to unfold more in the marketplace, it helps us to move from a professional service, or people-as-a-service business model to much more as a data-as-a-service and software-as-a-service business model. That all results in us, as Jamere said in his opening comments, having a stronger, higher-margin business. Jamere, what would you add?

365.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

in discussing the Company's Buy business, Defendant Jackson said:

Our Buy business grew just under 1% constant currency, ***led by continued strength in the emerging markets***, which was partially offset by a decline in the developed markets. Adjusted EBITDA was $498 million, up 4% constant currency and adjusted EBITDA margins were 31.7%, up 10 basis points on a constant currency basis.

366.    On October 25, 2016, at the earnings call for Nielsen's Third Quarter 2016 results,

in discussing the Company's Buy business, Defendant Barnes said:

***Our Buy business emerging remains solid, even within developed, Europe, the Pacific, Canada, all turned to be solid quarters of growth. The US is where we had the decline. The tough environment. We've talked about where judging needs to be secular shifts. And we're responding accordingly in terms of the magnitude and the pace of the changes we're making in our business to reduce our cost base, reallocate our resources, accelerate our investments, in particular, in this Connected System that helps us move from what today is much of a people-as-a-service business model to be much more of a data-as-a-service and software-as-a-service business model in the future.***

367.    On October 25, 2016, before the market opened, Nielsen filed a Form 8-K and

attached a press release.  In that press release, Defendant Barns said:

In the Buy segment, while emerging markets continued to produce top-line growth, our results in the developed markets were disappointing, particularly in the U.S.  Many of our clients are seeking efficiency and productivity in the face of a challenging growth environment. Given these evolving needs, we are realigning our portfolio by exiting non-core services, reallocating resources and accelerating our investments in our strategic initiatives to help our clients grow and to better position our business for the future. ***In short, our Buy business is working***

*through a process of change that is similar to what we've been executing on successfully in our Watch business.*

368.    Also in that press release, the Company stated:

*Revenues within the Buy segment for the third quarter of 2016 decreased 0.9% to $809 million, but increased 0.9% on a constant currency basis. Buy revenues in developed markets decreased 3.7%, or 2.5% on a constant currency basis, due to softness in our discretionary services, especially in the U.S. market, as well as portfolio pruning initiatives which target slow growth and non-core services. Buy emerging markets revenues increased 5.5%, or 8.5% on a constant currency basis, as our global footprint, coverage expansion and broad product offerings continue to position us well with both local and multinational clients.*

\*   \*   \*

*Based on third quarter performance and our outlook for the remainder of the year in developed Buy, we are updating our 2016 full year guidance for total revenue growth on a constant currency basis to 3.5% - 4.0%, Adjusted EBITDA Margin Growth to 30 basis points, Adjusted Net Income Per Share to $2.73 - $2.79 and Free Cash Flow to approximately $850 million. A reconciliation of these forward-looking non-GAAP measures to the most directly comparable GAAP measure has not been provided in reliance on Item 10(e)(1)(i)(B) of Regulation S-K because such reconciliation is not available without unreasonable efforts as a result of certain of the adjustments utilized, including the impact of foreign exchange and income taxes.*

369.    These statements were false and misleading for the reasons described in 354.

**(2)    Statements Made From December 8, 2016 through July 25, 2018**

370.    Over the next several quarters, Defendants continued to mislead the market about the strength of their business.  They discussed the problems in the US Developed Buy market but failed to tell the market that customers weren't just moving from deep dive analytics to everyday analytics but rather decreasing their analytics spend all together (across all analytics products). This shift caused Developed Buy to continue to deteriorate – even more so than Defendants let on.  Defendants also made statements concerning the strength of the Emerging Buy markets. These statements were false and misleading because the trend towards just purchasing raw data would (and did) negatively affect Emerging Markets in the same way that Developed Markets

was being affected.  These statements were also false and misleading because Nielsen attributed the declines to market conditions its customers were facing, when the real issue was that Nielsen's customers did not want its analytics products.  Due to the common customer base and declining demand, it was only a matter of time before Emerging Markets would see the same decline that Developed Markets had experienced.  During this time, Defendants also made additional false statements about the Chinese market and GDPR; these two items also negatively affected Nielsen's growth.  First, Nielsen claimed that weakness Nielsen had experienced in the China market (which affected Nielsen's growth) was a blip that had been remedied, but this was false and misleading because the China market was in decline for the same reasons the US Buy and Emerging Buy markets were declining and because the issues Nielsen's team was facing China had not been resolved.  And during this period, Defendants also misled the market about how GDPR would affect their business.  They said it would benefit the Company, but the truth was that it was another detractor to Nielsen's success and growth.

**(i)**      *December 8, 2016*

371.    On December 8, 2016, Nielsen hosted its annual Analyst Day, where it stated that its **guidance for 2017 for the Developed Markets was a decrease in revenue of 1% to 1.5% on a constant currency basis, and its guidance in the Emerging Markets was growth of 8% to 10%**.

372.    On December 8, 2016, Nielsen hosted its annual Analyst Day, and Andrew Steinerman of JP Morgan asked: "My question is what has to happen in the CPG industry for us to feel comfortable with that number? Is it assuming CPG does as it's doing right now, or is this really just your execution? What do we have to assume in the CPG industry to feel comfortable with the minus 1.5% to 1%?"  Defendant Hasker responded: "Yeah. So, Andrew, **and we've been being pretty conservative, with that estimate. Basically as Jamere said, we think it's going to be the sort of prevailing industry conditions for our clients continue to be very difficult.**"

373.     On December 8, 2016, at Nielsen's annual Analyst Day, in discussing Emerging

Markets and underlying trends in the CPG market, Defendant Barns said:

> ***By the end of 2016, we expect emerging markets to add up to more than $1 billion in total global revenues. We expect 2017 to be another good growth year for our business in emerging markets. As many of you will recall, over the past several years we've consistently been investing in better coverage and better granularity in our core measurement business in emerging markets, and those investment have continued to pay off. And we expect that they'll continue to pay off into the future as well.***
>
> Next, ***developed markets. Here it's a little bit more of a mixed picture.*** Our business is seeing growth this year in 2016 in Europe, Canada, and the Pacific, which for us consists of Australia and New Zealand. But in the US, our business is down this year, so let's focus in a little bit more on the US.
>
> What I'll do is I'll break it down by segment, client segment. When we think about our manufacturer clients in the US, we typically think of three main client segments, the largest global clients, the mid-tier client segment, and the small clients, so I'll walk through them one by one.
>
> First, with the largest global clients, ***our position in this particular client segment is very strong.*** We have a very high market share of the overall business in this segment. That's in large part thanks to our global footprint, which no one comes anywhere close to. We're in over 100 countries around the world.  So, almost every single one of the largest global clients chooses to work with Nielsen in the US. ***So, our position is strong, but growth has been more challenging, not only for us but also for these clients. They've been challenged to find top line growth in the marketplace.***
>
> ***In addition, many of these clients have been contending with the so-called 3G effect, zero-based budgeting. That puts a lot of cost pressure on their business. And a lot of that, of course, reflects back onto our business.***
>
> ***And one more thing. There's also been some client consolidations in this particular client segment over the past couple of years, and that has not been favorable to our business. So, when you add it all up, we've seen minimal growth in this segment despite the fact that our position remains as strong as ever in this client segment.***
>
> ***Now, looking forward, the connected system will help in a big way here.*** It'll add more speed and efficiency on the side of our clients and it'll also help them find more growth in what will continue to be a challenging growth environment for these clients. And it'll also add more efficiency on our side as we deliver our products to clients in this segment.

Let's next turn to the mid-tier client segment. Here the overall market is solid. *These clients are tending to find a little bit more growth than what is the case for the largest global clients.*

*Our market share in this particular client segment is not as strong as it is with the largest global clients, and so that spells opportunity for our business in 2017 and beyond. And in fact, the connected system will help us here. It'll help us to compete more effectively to grow our market share over the next couple of years.*

Finally, the third client segment. As a group, these clients are performing relatively well in the marketplace, and one reason for that is these clients are on trend. What I mean by that is, over the past couple of years, in particular in the US, consumers have been shifting more of their purchases to local and specialty products, which is a better fit with the product portfolios of clients in this segment.

And so, they have been seeing more growth in their business than the clients generally in the other two client segments. And similarly, *our business has been growing in this client segment. The connected system, going forward, will help us continue that growth with these clients.*

For the existing small clients, the connected system will make it possible for them to lean in more, to subscribe for more of their categories and more of their brands because the connected system, in essence, lowers the access cost, the starting price, if you will, for all of the clients in the marketplace. But that's especially important for the smaller companies.

374.    On December 8, 2016, at Nielsen's annual Analyst Day, Defendant Barns said:

*First, in our Buy business, I want to just reiterate, emerging markets continues to be very solid, high single-digit growth. Developed markets, 2017 will be a bit of a transition year, in particular for our U.S. business. But it's a transition that leads to a stronger, higher margin business.*

*And as Steve Hasker showed with his slide, it's not only a stronger higher margin business, but the way we're going about navigating through that transition, it's a transition that takes us to a much bigger pie of opportunity. So, it's going to be well worth it. Certainly, well worth it for us, we believe well worth it for all of our investors as well.*

375.    On December 8, 2016, at Nielsen's annual Analyst Day, Defendant Barns said:

*First, with the largest global clients, our position within this particular client segment is very strong. We have a very high market share of the overall business in this segment. It's in large part thanks to our global footprint which no one comes anywhere close to.* We're in over a 100 countries around the world

so almost every single one of the largest global clients chooses to work with Nielsen in the U.S. ***So, our position is strong but growth has been more challenging not only for us but also for these clients. They've been challenged to find top line growth in the marketplace. In addition, many of these clients have been contending with the so-called 3G effect, zero-based budgeting that puts a lot of cost pressure on their business and a lot of that, of course, reflects back on to our business. And one more thing, there's also been some client consolidations in this particular client segment over the past couple of years, and that has not been favorable to our business. So, when you add it all up, we've seen minimal growth in this segment despite the fact that our position remains as strong as ever in this client segment.***

376.    The guidance statements were false and misleading for the reasons stated in 325.

The statements concerning Developed Markets and Emerging Markets were false and misleading

for the reasons stated in 354.

### (ii)    *February 9, 2017 (4Q16)*

377.    On February 9, 2017, Nielsen released its Fourth Quarter 2016 results.  ***Nielsen increased its full year 2017 guidance for the full business up from 2% to 3% as stated at Analyst Day to 5% to 6%, but did not update its segment by segment guidance.***

378.    On February 9, 2017, during the earnings call for Nielsen's Fourth Quarter 2016 results, in discussing the Buy business, Defendant Barns stated:

Let's turn to buy. Segment revenues grew nearly 1% in the fourth quarter on a constant-currency basis, led by 7% growth in emerging markets. In developed markets, revenues increased modestly. Earlier I mentioned the pressure we're seeing in our US buy business, but I think it's worth spending a few more minutes on the environment in which we're operating. ***As we've discussed, our fast-moving consumer goods clients are under pressure in their developed markets, and this is most acute in the US market, where our large global clients are reining in costs in the face of challenging top-line growth.***

379.    On February 9, 2017, during the earnings call for Nielsen's Fourth Quarter 2016 results, Defendant Jackson stated:

Moving to guidance, we are updating our full-year guidance to reflects the Gracenote acquisition in our watch segment, and the exit from some custom survey research services in buy. We now expect total Company revenue growth to be 5% to 6%, and we are maintaining our 2017 EPS guidance. ***There is no***

*change to our original underlying core growth forecast; however Gracenote helps boost core revenue growth to 6.5% to 7.5%.*

380.     On February 9, 2017, during the earnings call for Nielsen's Fourth Quarter 2016

results, Defendant Barns stated:

> *We have a compelling story in emerging markets. As a global company with a footprint in over 100 markets, we have a strong position in the markets that are growing the fastest. This is a significant competitive advantage. Our balanced portfolio of global and local clients, ongoing investments in better coverage and granularity for our measurement products, and the healthy demand for our broad range of analytics offerings will continue to drive growth in this part of our business, which accounts for nearly one-third of our total Buy revenues.*

381.     On February 9, 2017, during the earnings call for Nielsen's Fourth Quarter 2016

results, an analyst asked Defendant Jackson to explain the reported deceleration in Nielsen's

Emerging Markets growth and Defendant Jackson said:

> *In terms of the emerging markets and the deceleration. Listen, a couple million dollars in a quarter can swing the emerging markets by a point or two. We feel pretty good about where we exited the year at 8.6% growth for the total year, which is right in line with our forecast. And we have good momentum going into next year, based on the broad-based growth that we see in the markets that we talked about.  So no concerns there in terms of a deceleration. Right in line with where we expect to finish for the year. And good momentum heading into next year.*

382.     The guidance statements were false and misleading for the reasons stated in 325.

The statements concerning Developed and Emerging Markets were false and misleading for the

reasons stated in 354.

**(iii)     *April 25, 2017 (1Q17)***

383.     On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017

financial results, Defendant Barns said:

> In our Buy segment, we continue to see a 2-speed world. Emerging markets are producing solid growth. However, in developed markets, particularly in the U.S., our clients are under pressure. Our measurement and analytics are as important as ever for our clients. But many of these clients are cutting costs, and our business is not immune. ***We're executing on our own productivity actions, which help***

124

> *mitigate the revenue softness while also enabling us to invest in our key initiatives, including coverage enhancements and the Connected System.*

384.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Defendant Barns said:

> *First, emerging markets. We continue to have a compelling story. Over the past several years, we've invested consistently in increased measurement coverage and granularity. And those investments continue to pay off. Our global measurement footprint is unrivaled. And this is a significant competitive advantage for us with the big multinationals. At the same time, our growth is even better with the local and regional players in the emerging markets. And we have a lot of confidence in the emerging market story in 2017 and beyond.*

385.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Defendant Jackson said:

> *Moving to 2017 guidance. We are maintaining our full-year guidance, highlighted by total company revenue growth of 5% to 6% constant currency, $1.40 to $1.46 GAAP EPS, and approximately $900 million of free cash flow. There is no change to our original forecast for the total company. However, we expect Watch and the emerging markets to be larger contributors to our overall results compared to our original plan.*

386.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Defendant Barns said:

> *Our conversations with clients continue to reinforce the mission-critical nature of our data and analytics. But our business is not immune to the pressures they're facing. And this is reflected in our first quarter results and our outlook for the year. As we look forward, we remain confident in our strategy to manage through the tough environment while building a stronger business for the long term. In the near term, we're focused on driving productivity and adding to our measurement coverage in a fragmenting market. And we'll also continue to invest in our Connected System initiative, which is our top strategic priority.*

387.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Patrick Timothy Halfmann from Morgan Stanley asked: "Could you please give us a bit of color on how Buy Info and Insights performed during the quarter?"  Defendant Jackson responded:

Yes. So if you look at our Buy business, first quarter was actually our toughest comp from 2016. So the dynamics of the current environment were really felt beginning in the second, third and fourth quarters. If you look at developed Buy in particular, we were up almost 4% in the first quarter. And if you look at the second, third and fourth quarters, we were up -- we were down 40 basis points in the second quarter, we were flat in the third and then up 40 basis points in the fourth quarter. *We're certainly not expecting the environment to get any better, which means that our developed Buy business could actually be down low single digits in 2017.*

388.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Matthew Thornton of SunTrust Robinson Humphrey asked about the 14% growth in Marketing Effectiveness and that "the guide for the year was 15% to 20%."  Defendant Jackson responded:

Yes, so Marketing Effectiveness grew 14% in the quarter. And you're right, we did guide 15% to 20% annually. *I'll remind you that Marketing Effectiveness can be a little bit lumpy from quarter-to-quarter. But what we feel good about is really the strong demand that we're seeing from both advertisers and publishers for ROI solutions and datasets that really amplify the value of a publisher's inventory.* So in the first quarter, our Nielsen Marketing Cloud, which is powered by the eXelate assets, was up double digits. Our spend with CPG advertisers was up double digits. TV publishers was up. Nielsen Buyer Insights was up mid-single digits. So we feel good about the demand that's coming from advertisers and publishers. And as a result of that, the 15% to 20% annual guidance that we gave for the year still holds for us.

389.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, William A. Warmington asked Defendant Jackson about the Buy business:

Warmington

I wanted to ask some additional color around the developed Buy business. Specifically, what should we expect for the growth rate there to be for the remainder of 2017, meaning that was Q1 the trough? Does it remain in the negative 7% range? What drives the improvement? And what's the timing of that likely to be?

Defendant Jackson

All right. Thanks, Bill, for the question. So as I said, our first quarter is our toughest comp. If you look at the developed Buy business in the first quarter of last year, it was up almost 4%. And then the dynamics of the current environment,

again, were really felt beginning in the second, third and fourth quarters, where we were essentially flat over the back half of the year. So our comps should get better just based on those dynamics alone. However, as I said before, we're not expecting the environment to get any better, which means that you could see developed Buy for the year be down low single digits. And we're confident in the revenue forecast that we have for the total company just based on Watch and emerging being larger contributors to our overall results. So comps get better in the back half of the year. ***We see good momentum in the emerging markets, particularly because of the strength with both locals. And those same multinational clients that quite frankly are driving the Buy business down in the U.S. are actually spending more in the emerging markets, so we feel good about that. As a result of that, we're hanging in there with a total company guidance for revenue and more importantly, EPS. And what we'll say is that, listen, from a revenue standpoint, certainly the revenue targets that we have are tough targets. But given the outlook that we have for the total portfolio, we believe that revenue target is something that is still achievable and something that we still have a path to. And probably most importantly is that we're running the productivity play with intensity such that the things that we're doing on cost and productivity are going to protect the earnings forecast. So that's how I would frame how we're thinking about guidance for 2017.***

390.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Defendant Jackson said:

> ***I think the important thing there is as we look at our client base and you listen to our clients in terms of where they see growth opportunities, the emerging markets represent a significant growth opportunity for our clients, and so you're seeing them continue to invest in the emerging markets and even more so because it is going to be a growth driver for the business. So, while the U.S. business has been a little bit challenged, we've seen the activity in emerging markets pick up, and that's a good sign for our emerging markets business as well.***

391.    On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017 financial results, Defendant Jackson said:

> And then, as it relates to info and insights, as we've talked about overall, what we're seeing is that we're maintaining our share with our clients, but just spend overall is down, and particularly in the U.S. We're down significantly in the U.S. with the rest of the world being up low single digits. ***And I think the other things that gives us a lot of confidence about the position that we have with our clients is that this was the first quarter in a really long time where we actually saw our multinationals have a very strong performance for us in the form of revenue in the emerging markets, where our multinational clients were actually up mid-single digits in the emerging markets.  So it gives us a lot of confidence about***

127

*the robust nature of what we're seeing in the emerging markets sort of going forward.*

392.     On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017

financial results, Defendant Jackson said:

*Our business in the emerging markets remains robust.* Revenue was $267 million, up just under 10% constant currency. Our teams are expanding coverage, continuing to execute and delivering growth. And growth was broad-based across markets in Latin America, Southeast Asia, Eastern Europe and Greater China. *Of particular note is the strong revenue performance of both multinationals and local clients in these markets as we continue to expand our coverage and service offerings.*

393.     On April 25, 2017, during the earnings call for Nielsen's First Quarter 2017

financial results, Defendant Barns said:

*In our Buy business, continued strength in emerging markets with our balanced client portfolio there. And we're driving productivity to help mitigate the tough growth environment that our business is experiencing right now in the U.S.* Meanwhile, we continue to invest in coverage, e-commerce, specialty retailers, health and wellness and fresh categories. *And we're continuing to invest in and execute well on the development of our Connected System, which ultimately leads to a stronger and higher-margin business for the Buy side of our company.* So thanks again, everybody, for joining us this morning. And we look forward to talking with you in the days and weeks ahead.

394.     On April 25, 2017, in the Press Release for Nielsen's First Quarter 2017 financial

results, Defendant Barns said:

*Our first quarter results highlight the importance of our balanced portfolio. We saw continued strength in our Watch segment and in emerging markets, partially offset by a decline in the U.S. for our Buy segment.*

395.     On April 25, 2017, in the Press Release for Nielsen's First Quarter 2017 financial

results, Nielsen said:

*Revenues within the Buy segment for the first quarter of 2017 decreased 4.5% to $757 million, or 3.7% on a constant currency basis. Buy revenues in developed markets decreased 8.5%, or 7.3% on a constant currency basis, due to continued softness in our U.S. market. Buy emerging markets revenues increased 9.9% on a reported and constant currency basis, as our global footprint, coverage expansion, and broad product offerings continue to position*

*us well with both local and multinational clients. Revenues in Corporate Buy decreased by $16 million, or 45.7% on a reported and constant currency basis primarily due to the sale of our Claritas business in December 2016.*

396.     The guidance statements were false and misleading for the reasons stated in 325.

The statements concerning Developed and Emerging Markets were false and misleading for the

reasons stated in 354.

**(iv)     July 27, 2017 (2Q17)**

397.     On July 27, 2017, Nielsen released its Second Quarter 2017 financial results, ***and***

***the associated slide presentation showed the revised guidance.  It did not provide a break-down***

***by segment.***

398.     On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Defendant Barnes said:

> ***In developed markets, late last year, we began planning for the tougher environment in 2017, particularly in the U.S., and we continue to see that play out as our fast-moving consumer goods clients are faced with unprecedented change in their business. They're dealing with both price and volume pressure, and as a result, they're managing their spend very carefully and. And as we've discussed, our business is not immune to the spending pressure, but just like in Watch, we're adapting to this changing market with innovation, strengthening our leadership position in measurement and analytics for the long term.***

399.     On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Defendant Jackson stated that:

> Overall, our business continues to deliver growth and margin expansion in a challenging environment. In our Buy segment, revenue remains weak, as a result of a challenging fast-moving consumer goods environment in the U.S. ***However, we continue to drive growth across the rest of the business in both Watch and Buy, while also delivering margin expansion. This is indicative of the strength of the portfolio and the resiliency of this business.***
>
> Let me give a few more details on our total company performance in the second quarter. On the left side of the page are our results on a U.S. GAAP basis. Revenue was just over $1.64 billion, up 3% on a reported basis, ***driven by solid growth in*** our Watch segment and ***the emerging markets in Buy, partially offset***

*by 110 basis points of currency headwind and continued softness in our U.S.*
*Buy market.*

400.    On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Defendant Jackson stated that:

*Now, let me provide some additional color on what we're seeing in the U.S. We*
*continue to benefit from strong, long-term contract renewals with our largest*
*clients. However, as we have discussed, some of these clients are seeing*
*challenging market conditions and cycling through significant cost cuts, and as*
*a result, they make nearterm decisions about some of our products and services*
*as they lower overall spend. We know that our measurement and analytics are*
*critical and that, over time, clients must invest in the data they need to run their*
*businesses. And in the second quarter, we saw this dynamic play out to some*
*extent, as clients spent a bit more behind some of their data and analytics needs.*

401.    On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Defendant Jackson stated that:

*In the U.S., we expect the second half to continue to improve versus the first*
*half, though not enough to land us at our prior guidance. We're not forecasting*
*an improvement in the market environment for the back half of 2017. However,*
*a review of our revenue pipeline for 2018, which includes renewals and new*
*business, suggests an improvement in our business in 2018. This, along with an*
*improving market environment, suggests a return to flat revenue in developed*
*Buy for the full year for 2018 versus 2017.*

402.    On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Defendant Jackson stated that:

Moving to 2017 guidance, we are maintaining our full-year EPS guidance of
$1.40 to $1.46 and free cash flow guidance of approximately $900 million. We
are raising our adjusted EBITDA margin outlook to plus 20 basis points of
constant currency expansion as a result of our cost out actions. We're lowering
our total revenue guidance to approximately 4% to reflect our first-half results,
our outlook in developed Buy, and some updated timing on noncore product exits.
This includes approximately 6% core revenue growth and approximately 3% core
revenue growth excluding Gracenote. There are no changes to our expectations
for other financial metrics provided on the right-hand side of the page. *And as we*
*look at 2017 revenue growth, a few dynamics are playing out. One, our Watch*
*business remained solid. Two, we continue to see robust growth in the emerging*
*markets.* And three, we continue to plan for a tough U.S. market*. We now expect*
*developed Buy revenue to be down 3% to 5% on a constant currency basis for*
*2017. In the U.S., we expect the second half to continue to improve versus the*

130

*first half, though not enough to land us at our prior guidance. We're not forecasting an improvement in the market environment for the back half of 2017. However, a review of our revenue pipeline for 2018, which includes renewals and new business, suggests an improvement in our business in 2018. This, along with an improving market environment, suggests a return to flat revenue in developed Buy for the full year for 2018 versus 2017.*

403.   On July 27, 2017, during the earnings call for Nielsen's Second Quarter 2017

financial results, Toni Michele Kaplan from Morgan Stanley asked Defendants Jackson and

Barns about the Buy business:

<u>Kaplan</u>

[W]hat gives you the confidence in being able to forecast the business to be flat in 2018? And basically, it sounds like for 2017, you're lowering the revenue guidance because Buy will continue to be challenging in the back half of the year. Are you seeing worsening trends in the business from here, or is it just that the business will continue to be challenging for longer than you previously expected?

<u>Defendant Jackson</u>

*We're still working through our operating plan for 2018. However, as I said in my opening comments, our current revenue pipeline, which includes renewals and new business wins, suggests that developed Buy should be flat for 2018. I'd point more to the back half of 2018 than the front half. We'll obviously share more details when we give the 2018 outlook later in the year. But, from our client's perspective, again, we know that our data and analytics are critical to help them understand their performance and business drivers. And while they've had to make some tough cost trade-outs quite frankly, ultimately they'll need to invest in those data and analytics to help them grow their business. And what we see as we look into 2018 are a few dynamics. One is, we're continuing to win with both retailers and manufacturers. We're renewing 100% of our long-term contracts with our large global manufacturers. Those contracts are staggered, so even the ones that renewed with a lower base spending have price escalators through the contracts. And we're comping against a pretty tough 2017 environment. The last thing I'll add is that, and our Connected System has actually given us incremental capabilities to sell-in during renewals. And this is a pretty positive impact on the value of those agreements. On developed Buy. I'd look at the first half for trending purposes. And in the first half, our U.S. business is down double digits. The back half comps get a little easier, but as I said, we're not forecasting a change in the environment. So the guidance framework that we gave of down 3% to 5% for developed Buy represents relatively easier comps in the U.S. in the back half, and tougher comps in Western Europe which, quite frankly, was up high single digits in the back half of 2016.*

Defendant Barnes

One thing I'll add, Toni, is in my conversations with a number of our client CEOs over the past couple of months, there's a growing recognition among our clients that the zero-based budgeting activities, the cost-cutting activities are going to get them only so far. And they're all now focused on, "Hey, we got to get the top line moving," and they're working to figure that out. ***But as they do, and I'm confident that they will, we expect some of that benefit also to flow into the results that we're going to see in our business in 2018.***

404.    The guidance statements were false and misleading for the reasons stated in 325.

The statements concerning Developed and Emerging Markets were false and misleading for the

reasons stated in 354.

### (v)    *October 25, 2017 (3Q17)*

405.    On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

***and the associated slide presentation showed the same guidance that Nielsen had used in the***

***prior quarter.***

406.    On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and during the earnings call Defendant Barns said:

> ***In the quarter, we continued to execute on our strategy to provide uniquely better measurement and analytics products to drive growth and efficiency for our clients and for Nielsen. We made significant progress even while facing rapidly changing environments in both Watch and Buy.*** For more than 90 years, we've leveraged change as a means for progress by innovating the services we provide and adapting to the changing environments in which we operate. This is both our legacy and our future. Our ongoing commitment to innovation will drive growth and efficiency in the years to come.

407.    On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and during the earnings call Defendant Jackson said:

> Let me give a few more details on our total company performance in the third quarter. On the left side of the page, our results on a U.S. GAAP basis: ***Revenue was just over $1.64 billion, up 4.5% on a reported basis, driven by solid growth in our Watch segment and the emerging markets in Buy, partially offset by softness in our U.S. Buy market.*** In addition, foreign currency rates added 90 basis points to our revenue growth in the quarter. Net income was $146 million,

up 12.3%. And net income per share was $0.41, up 13.9%. Our net income per share results were driven by revenue growth, margin expansion and lower restructuring charges.

408.   On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and during the earnings call Defendant Jackson said:

> Turning to Buy. The key takeaway is that year-to-date Buy revenue trends are in line with the framework we gave in 2Q, with continued strength in the emerging markets offset by a soft U.S. market. Third quarter total Buy revenue was $803 million, down 2.1% constant currency. Core Buy revenue was roughly flat on a constant currency basis. ***Previously announced dispositions were a 2-point drag to our Buy revenue growth. Our revenue in the developed markets was $491 million, down 5.4% constant currency, behind continued softness in the U.S. and a tough comparison in Europe. The developed Buy results year-to-date are in line with the full year framework we gave in the second quarter.***
>
> Let me provide some additional color on the U.S. Sequentially, the revenue declines are improving, although the environment remains tough. ***As we have discussed, some of our clients are cycling through their own significant cost cuts and lowering overall spend. We expect this trend to continue for the next few quarters. However, we also know that our measurement and analytics are critical and that, over time, clients must invest in the day-to-day need to drive growth and run their businesses. In addition, we are investing in coverage initiatives that will present growth opportunities for us in 2018 and beyond. And we look forward to sharing more details at our Investor Day in a couple of weeks.***
>
> ***Our business in the emerging markets is exceptionally strong.*** Revenue was $297 million, up 10.8% constant currency. We're adding coverage and scale to drive broad-based growth and margin expansion in all of our key markets. Our Corporate Buy revenue was down 54.5% constant currency, reflecting pruning of noncore Buy assets that we have previously flagged. Buy EBITDA was $145 million, down 5.2% constant currency, in the third quarter. ***We're investing in growth and efficiency initiatives across our businesses that will help us expand coverage and drive significant margin upside in Buy by 2020.***

409.   On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and during the earnings call, Defendant Barns said:

> Turning to Buy. ***Our business in emerging markets continues to be robust, driven by our balanced portfolio of local and multinational clients, along with our investments in coverage and granularity. Revenues were up nearly 11% in the quarter, led by strength in Latin America, Eastern Europe, Southeast Asia and Greater China.*** In developed markets, the operating environment in the U.S.

remains challenged, as our large, fast-moving consumer goods clients are faced with price and volume pressure in their own businesses. They're carefully managing their spending across all functions, and our results continue to reflect these near-term pressures. ***At the same time, we're continuing to invest for the long term, adapting and evolving to strengthen our leadership position for the future.***

410.     On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and, during the earnings call, Defendant Barns said:

***In developed markets, the operating environment in the U.S. remains challenged, as our large, fast-moving consumer goods clients are faced with price and volume pressure in their own businesses. They're carefully managing their spending across all functions, and our results continue to reflect these near-term pressures.***

411.     On October 25, 2017, Nielsen published its results for the Third Quarter of 2017

and, during the earnings call, Surinder Singh Thind of Jefferies asked Defendant Jackson about

the Company's growth:

Thind

I actually would just like to clarify some earlier comments around the developed markets Buy business. The last quarter, I left with the impression that your expectations for growth in 2018 were to be relatively flat. And so on this call, I heard that maybe you're looking at trends to continue to improve year-over-year. There seems to be a delta, in my mind, for that given that the developed markets is down roughly about 4.5% year-to-date, so between 0 to 4.5%. Any additional color on that?

Defendant Jackson

Yes. So again, as I said, we'll share more details when we give our 2018 outlook in a couple of weeks. ***We do expect developed Buy to be down less in 2018 than 2017. And then as I said in my opening comments, the U.S. is actually improving. The fundamentals are improving, although the environment there remains challenging. Again, there are 3 things that we feel very good about heading into next year. It's our wins with retailers and manufacturers. As we go through our operating plans, we're looking at our contract renewals with our large global manufacturers. We're renewing all of those at 100%. I think the environment there is getting better.*** The Connected System is giving us incremental capabilities to sell in. We'll see some incremental revenue from the Connected Partner Program. So those 3 things are the dynamics that are -- will help us drive improving trends in 2018. And the final factor, as I said, is what

happens in the client environment. And it's still tough, and clients are making cost tradeoffs. We expect that to continue for the next few quarters, and it's a question of the pace and timing of that spending snapback.

412.    On October 25, 2017, during the earnings call for Nielsen's Third Quarter 2017

financial results, Defendant Jackson said:

> *Moving to 2017 guidance, we are maintaining our full-year guidance, highlighted by EPS of $1.40 to $1.46 per share, and free cash flow of approximately $900 million. On the right-hand side, we have updated our restructuring expense to approximately $85 million and D&A to approximately $650 million.*

413.    On October 25, 2017, during the earnings call for Nielsen's Third Quarter 2017

financial results, Defendant Jackson said:

> *Yeah. So, we gave a framework last quarter on this, and I'll just reiterate that. We said our total Buy business is going to be down 2.5% to 3%. On a year-to-date basis, we're at about 2.6% down. Developed Buy, we said, is going to be down minus 3% to minus 5%. Year-to-date, as I said, we're at about 4.6%. And given that we have one quarter left in the year, we don't expect improvement in the fourth quarter. Emerging markets, 8% to 10%, we've been trending towards a high end, year-to-date, just a little over 10%. And then Corporate is down 60%. Year-to-date, we're down 54.5%. So, that gives you the pieces for the Buy business being down 2.5% to 3%. On the Watch business, we said, up 11% to 13%. Year-to-date, we're at 10.6%. Audio is going to be flat. We had a 130-basis point headwind in the third quarter that won't repeat on the Watch side of our business. Audience Measurement of Video and Text, 14% to 16%, Marketing Effectiveness, 15% to 20%. And Other Watch, as I said, down 10%. So, that just gives you the framework for how we see the guidance shaping up, and we said no change to our overall guidance. We'll give guidance on 2018 in our Investor Day in a couple of weeks, and we'll unpack all the details at that time.*

414.    The guidance statements were false and misleading for the reasons stated in 325.

The statements concerning Developed and Emerging Markets were false and misleading for the

reasons stated in 354.

### (vi)    *November 9, 2017*

415.    On November 9, 2017, at Nielsen's annual Analyst Day presentation, Nielsen

stated that its *guidance for 2018 was a 1% gain to 1% loss in the Buy Segment, with Emerging*

*Markets growing 8% to 10% and Developed Markets falling by 2% to 4%, and 5% to 6% gains*

*in the Watch segment with 15% to 20% growth in Marketing Effectiveness.*

416.    On November 9, 2017, at Nielsen's annual Analyst Day presentation, Defendant

Barns said:

> And I want to emphasize just what it says on the bottom of the slide here. These efficiency initiatives that we're going to share more with you about are based on ideas that have already been tested in the market, already proven capabilities. We don't have to go invent anything, we don't have to cross our fingers and hope it's going to work, we already know it's going to work because we've already done it at limited scale and in selected markets. It's now about rolling it out to more markets around the world, and that's one of the reasons why we have a high level of confidence in our ability to deliver what you see here.
>
> *It also is why we have a high level of confidence that we'll continue to deliver on our long-term financial framework, which is about mid-single-digit revenue growth, consistent margin expansion, double-digit EPS growth, all while continuing to follow our balanced approach to capital allocation, with the dividend at the center, toggling back and forth between the tuck-in acquisitions you've seen us make over the past few years with the remaining cash devoted to share repurchase. This is Nielsen.*

417.    On November 9, 2017, at Nielsen's annual Analyst Day presentation, Defendant

Jackson said:

> *Marketing Effectiveness will be up 15% to 20%. This is driven by, again, the tremendous momentum that we have in Marketing Effectiveness, the new product offerings that we have from the initiatives in our Visual IQ acquisition but also, there's strong demand for ROI-based metrics in Marketing Effectiveness.*

418.    On November 9, 2017, at Nielsen's annual Analyst Day presentation, Defendant

Jackson said:

> *Let me shift now to guidance. I'm going to first start with 2017 guidance, and I'll start by reiterating our 2017 guidance highlighted by total revenue growth of approximately 4%. Our GAAP net income per share of $1.40 to $1.46 a share, and free cash flow of approximately $900 million; and again, this is exactly what we showed on our third quarter call.*

419.     On November 9, 2017, at Nielsen's annual Analyst Day presentation, Defendant

Jackson said:

> Let me now start to give you the pieces for the 2018 framework. ***Starting with revenue, and I'll start with our Buy business. Our Buy business is going to be down 1% to up 1% in 2018, and let me give you a few of the dynamics there. From an emerging market standpoint, we see the emerging markets growing 8% to 10% next year, we have tremendous momentum in the emerging markets. Our emerging markets will be roughly 40% of the Buy revenue in 2018 and we have a great story there. It's driven by the investments that we've made in coverage and penetration, but it's also driven by the fact that we have multinationals and locals, who continue to invest in those growth markets. You combine that with the strong demographic trends there and we have a lot of confidence in our emerging markets profile going into 2018.***
>
> ***Developed markets will be down 2% to 4%; a couple of dynamics there. We've talked pretty extensively about the environment that our large clients are going through, in terms of low growth and the competitive pressures, but one of the things that you're going to see us talk a little bit more about on the backs of the investments that we're making in retailer data and analytics, is that, that will be a growth driver for us in 2018 and beyond – and I'll give you more of that story in a little bit.***
>
> ***The final item is our corporate revenue being down 50% and this is really just a carryover from the 2017 pruning activity. So our Buy business will be down 1% to up 1% in 2018.***

420.     On November 9, 2017, at Nielsen's Investor Day conference, Defendant Barns

said:

> ***On the buy side of our business, we continue to see solid growth for our clients in the key emerging markets around the world. You see that reflected back in our business as well. In developed markets, it's much more a story about growth, I'm sorry, about cost. And this is zero-based budgeting and clients who are actively working to reduce their spend on the kinds of things that we provide. So, we have to adapt to that and adjust to that. And a big part of what we're doing with the Connected System does exactly that.***

421.     On November 9, 2017, at Nielsen's annual Analyst Day presentation, Defendant

Jackson said:

> ***Moving to the Watch revenue framework. Our Watch business will be up 5% to 6% on a constant currency basis in 2018. It's driven by a very strong performance and audience measurement of video and text. Audience***

137

*measurement of video and text will be up 5.5% to 6.5% next year, it's driven by the tremendous momentum that we have in Total Audience measurement, but also the new product offerings, some of which you're going to hear from Megan Clark later today, and we have a stable local business heading into 2018.*

*Marketing effectiveness will be up 15% to 20%. This is driven by the – again the tremendous momentum that we have in marketing effectiveness. The new product offerings that we have from the initiatives in our Visual IQ acquisition, but also there's a strong demand for ROI-based metrics and marketing effectiveness.*

422.    On November 9, 2017, at Nielsen's Investor Day conference, Defendant Jackson

said:

*From an emerging market standpoint, we see the emerging markets growing 8% to 10% next year, we have tremendous momentum in the emerging markets. Our emerging markets will be roughly 40% of the Buy revenue in 2018 and we have a great story there. It's driven by the investments that we've made in coverage and penetration, but it's also driven by the fact that we have multinationals and locals, who continue to invest in those growth markets. You combine that with the strong demographic trends there and we have a lot of confidence in our emerging markets profile going into 2018. Developed markets will be down 2% to 4%; a couple of dynamics there. We've talked pretty extensively about the environment that our large clients are going through, in terms of low growth and the competitive pressures, but one of the things that you're going to see us talk a little bit more about on the backs of the investments that we're making in retailer data and analytics, is that, that will be a growth driver for us in 2018 and beyond – and I'll give you more of that story in a little bit. The final item is our corporate revenue being down 50% and this is really just a carryover from the 2017 pruning activity. So our Buy business will be down 1% to up 1% in 2018.*

423.    On November 9, 2017, at Nielsen's annual Analyst Day presentation, Todd

Michael Juenger of Sanford C. Bernstein asked about the Watch and Buy segments.

Juenger

And then my broader question is more about the relationship, if one exists, between sort of Buy and Watch more largely. And so I guess Jamere and Mitch, Jamere, if you look at your -- the guidance, and we talked a lot about the investments in each segment and the growth rates of each segment, and they have different growth characteristics, different margin profiles, different invested capital needs. How important is it – where are the interconnections? Are there any in your financials that you can point to that are intangible benefits of these

businesses being together? And sort of, Mitch, more notionally, how important is it to be in both of these businesses? What value does that create to you that we can identify tangibly?

<u>Defendant Barns</u>

On your other question about Watch and Buy, Todd, there are a couple of different aspects to it. ***One is the Marketing Effectiveness part of our business that we often talk a lot about, as you know, it includes assets from the Watch side of our business and the Buy side of our business. It includes clients from Watch and from Buy. That's where we're connecting our information about what consumers watch and what consumers buy, usually, to inform the return on investment and advertising or the effectiveness of advertising in some way. We are in a much better position because we own both of these businesses to do that than what we would be if those businesses weren't under the same company umbrella.*** All of Marketing Effectiveness you all see is part of our Watch business in terms of how we report externally. But again, it draws from both sides of our business. The second thing I would point to is our data science organization -- John Tavolieri mentioned it earlier. It's a 1,000 people-strong. The scale of our business, both Watch and Buy, is a big draw in terms of our ability to attract some of the best data scientists on the planet, and that is only growing in importance in terms of where we go in the future and how we're going to get there. And the third thing I'll say and we're really now starting to take advantage of, it's always been an opportunity, but not fully leveraged opportunity, is -- from an operations and technology standpoint, we were pretty separate, Buy and Watch, historically. And even today, they're still pretty separate. But a lot of what we're now pursuing in terms of automation, consolidation, platform convergence puts us in a position to leverage the size, turn it into scale and turn those -- turn that scale into scale benefits in the efficiency that you'll see us continue to drive over the coming years. Watch and Buy under the same corporate umbrella, again, will play out in that way as well. So a lot of good arguments to make in favor of it, for sure.

424.    On November 9, 2017, at Nielsen's Investor Day conference, Defendant Barns

said:

> ***The investment comes first. You see that in our 2018 guidance. But the efficiency and growth will follow, and we have a high level of confidence in our ability to deliver on what we put in front of you today, in part, because these are already based on market-tested, proven capabilities that we've already begun the deployment of. And the opportunity to push them across a much greater portion of our business is where the opportunity lies in the next couple of years.***

139

425.     The guidance statements were false and misleading for the reasons stated in 325. The statements concerning Developed and Emerging Markets were false and misleading for the reasons stated in 354.

### (vii)     *February 8, 2018 (4Q17)*

426.     On February 8, 2018, Nielsen released its Fourth Quarter 2017 financial results, *and the associated slide presentation showed the same guidance that Nielsen had used in the prior Analyst Day*.

427.     On February 8, 2018, Nielsen reported its Fourth Quarter 2017 financial results and in the earnings call, Defendant Jackson said:

> Let's move to Buy. Fourth quarter total Buy revenue was $848 million, down 5.3% on a constant currency basis. Core Buy revenue was down 2.8% constant currency. Previously announced dispositions were just over a 2 point drag to our Buy revenue growth. *Our business in the developed markets was $527 million, down 6.7% on a constant currency basis behind growth in Europe and continued softness in the U.S.*
>
> *                   *                   *
>
> *Our business in the emerging markets was $304 million, up nearly 5% on a constant currency basis. Overall, the underlying market environment in our emerging markets remains very strong. Our results in the quarter were below our full year performance, due primarily to disruption from natural disasters and some revenue execution issues in China that caused our growth rate to dip. These represented approximately a 2-point drag on our 4Q results.*
>
> *                   *                   *
>
> *Moving to 2018 guidance. We are maintaining our 2018 guidance, highlighted by revenue growth of approximately 3%; $1.40 to $1.46 a share GAAP EPS; and approximately $800 million of free cash flow. There's no change to the revenue framework we've provided at the Investor Day in November.* Our 2018 EPS guidance does not yet reflect the impact of U.S. tax reform.

428.     On February 8, 2018, Nielsen released its Fourth Quarter 2017 financial results, and during the earnings call, Defendant Barns said:

*Turning to Buy, segment revenues declined approximately 3% on a constant currency basis for the full-year 2017. Emerging markets performed well with revenues up almost 9% constant currency despite the fourth quarter that Jamere addressed. We remain confident in the growth outlook for our business in emerging markets. We're well positioned with our balanced portfolio of local and multinational clients, our investments in coverage and our global footprint. In developed markets, the operating environment in U.S. remained tough. Many of our large fast-moving consumer goods clients continue to hold back on their spending as a result of their own top line challenges. While we're not expecting a bounce-back in spending in the near-term, we're working to ensure that when our clients do invest in new products or their existing brands to revitalize top line growth, our measurement and analytics will be uniquely well-positioned to help them.*

429.    On February 8, 2018, Nielsen reported its Fourth Quarter Results for 2017, and

Defendant Jackson explained that:

*Our business in the emerging markets was $304 million, up nearly 5% on a constant currency basis. Overall, the underlying market environment in our emerging markets remained very strong. Our results in the quarter were below our full-year performance due primarily to disruption from natural disasters and some revenue execution issues in China that caused our growth rate to dip.* These represented approximately a 2 point drag on our 4Q results. Excluding these dynamics, we saw broad based growth in the emerging markets with double digits in Latin America, our second largest emerging market, and Africa our fastest-growing emerging market.

430.    On February 8, 2018, Nielsen reported its Fourth Quarter Results for 2017, and

Defendant Jackson explained that:

Yeah. *So, as I mentioned, our emerging markets grew nearly 5% in the quarter. We did see growth from both locals and multinationals. We were about $6 million to $7 million of revenue below our 4Q plan in the emerging markets, which is relatively small, but quite frankly, that impacted the our growth rate by 2 points to 3 points. The big drivers, as I mentioned, were natural disasters in places like India, and Puerto Rico, and Mexico. And while we're a global multinational, something always happens somewhere in the world. Quite frankly, this is a little bit more than normal. And then China, our largest market, was impacted by some revenue execution issues in the fourth quarter that caused our growth rate to dip. We've addressed these, and we expect the improvement in 1Q in 2018, but the underlying China market is very healthy.*

431.    On February 8, 2018, Nielsen reported its Fourth Quarter Results for 2017, and

Defendant Jackson explained that:

*Yeah Tim, I was on the ground in China with our team back in December. I came away with that, from that visit, with a really clear sense that the market opportunity remains strong. We're still far from fully penetrated in that market. Second our market share in China continues to grow. For the full year 2017, we grew more than our global competitors. And we've outgrown our global competition fairly consistently over the past few years. But what I can assure you is we've addressed those. And the team's refocused on the core business. And we'll be back on track during 2018. This is still the most important growth market in the world, have no doubt about that. Our balanced client portfolio with the local clients and the global clients remains just as much of the strength today as it was before. And there's still plenty of opportunity to grow our penetration in the market, as I mentioned before.*

432.    On February 8, 2018, Nielsen reported its Fourth Quarter 2017 financial results

and in the earnings call, Defendant Jackson said:

*So, as I mentioned, our emerging markets grew nearly 5% in the quarter. We did see growth from both locals and multinationals. We were about $6 million to $7 million of revenue below our 4Q plan in the emerging markets, which is relatively small, but quite frankly, that impacted the our growth rate by 2 points to 3 points. The big drivers, as I mentioned, were natural disasters in places like India, and Puerto Rico, and Mexico. And while we're a global multinational, something always happens somewhere in the world. Quite frankly, this is a little bit more than normal. And then China, our largest market, was impacted by some revenue execution issues in the fourth quarter that caused our growth rate to dip. We've addressed these, and we expect the improvement in 1Q in 2018, but the underlying China market is very healthy.*

433.    On February 8, 2018, during Nielsen's Fourth Quarter 2017 earnings call,

Defendant Jackson said:

*On Digital Content Ratings, we've seen great momentum among both TV and digital publishers. Our ability to include viewing from Hulu, Facebook, and YouTube was positively received by the industry. Content owners are excited they can now better demonstrate the reach of their audience across these three major digital platforms.*

434.    On February 8, 2018, Nielsen reported its Fourth Quarter 2017 financial results

and the associated press release said:

*"We executed well on our key initiatives in Watch and Buy while contending with rapidly changing markets in 2017. In 2018, we'll continue to invest in innovation to drive growth and efficiency as we proceed on the path towards 2020,"* said Mitch Barns, Chief Executive Officer of Nielsen. Barns continued,

"*In Watch, we had a strong year. Our teams were relentless in their efforts to enhance our Total Audience Measurement system and drive client adoption across all of its components. As the market further evolves due to ongoing media fragmentation, Total Audience Measurement will serve as the foundation for our future, providing the measurement capability, scale, and flexibility necessary to best meet our clients' needs. In Buy, we remain well positioned in Emerging Markets due to our investments in coverage and our balanced client portfolio. In Developed Markets, the U.S. remains under pressure as clients persist in seeking efficiencies in their own businesses in a difficult growth environment. We continue to drive the rollout of the Connected System and increase coverage and granularity within our Total Consumer initiative, both of which will enable us to drive growth for Nielsen and our clients despite the environment.*"

435.    On February 8, 2018, during Nielsen's Fourth Quarter 2017 earnings call, an analyst from the Pivotal Research Group asked: "I was wondering if you could talk about how GDPR might be impacting or might impact the business in Europe in the coming year? I can imagine might be helpful for panels?"  Defendants Barns responded:

*GDPR, we've been focused on this for some time. We have a big team that's working on it. We've been out in front of it.  We're ready. And we don't see any significant impact for our Buy business. For Watch, there'll be some things that we'll have to do to ensure our compliance with the regulations, but it's manageable. We don't expect to see any major impact on our business. We'll still have access to all the data that we're going to need for our products. So, yeah, we're in good shape.*

436.    The statements in this Section about data privacy and GDPR and/or Nielsen's readiness for GDPR were false and misleading because they conveyed that Nielsen was ready for GDPR, that GDPR would not be a problem for Nielsen, that Nielsen would not and had not had access to data disrupted by GDPR, and that GDPR would be positive for Nielsen.  They were also false and misleading because they failed to disclose that Nielsen's customers were reducing their spending with Nielsen due to GDPR.

437.    The statements in this Section about China were false and misleading because they conveyed that Nielsen's declining performance in China were solely or primarily result of short term issues with Nielsen's execution in that country, when in fact they were the result of

the same forces that caused Nielsen's business to decline generally.  These statements were also false and misleading because Nielsen said, and even assured investors that the issues affecting its performance in China had been resolved by the end of 2017, when in fact both the operational issues and the issue of Nielsen's declining business, were not resolved.  These statements were also false and misleading to the extent that they assured investors that performance in China would improve.

438.    The statements that convey or affirm guidance, growth, or positive future financial results were false and misleading because they omitted then known information that undermined the reasonableness of the guidance or growth projections, including that Nielsen's analytics business was in decline (instead of growing) and its customers' interest in Nielsen's products was not "stable."  The guidance did not take into account or disclose known risks and uncertainties, including the fact that Nielsen's performance would continue to decline because of a decline in demand for Nielsen's analytical products, and that Nielsen's performance would decline in the Emerging Markets due to the same forces that were causing its Developed Market businesses to decline.  This guidance also failed to take into account weakness in China and the negative effects of GDPR.  Nielsen's long-term contracts and visibility into those contracts meant that Defendants' knew the expected performance was unachievable.  Defendants' statements were either not accompanied by meaningful cautionary language, or were conveying information that Defendants knew were false and misleading at the time they were made.

439.    The statements concerning Developed and Emerging Markets were false and misleading for the reasons stated in 354.

(viii)    *February 28, 2018*

440.    On February 28, 2018, at the Morgan Stanley Technology, Media & Telecom Conference, an analyst asked: "And I just wanted to ask about just develop Buy in general

declined 5% last year, 3% decline expected this year.  So it's driven by weakness in the U.S. And correct me if I'm wrong, but you're viewing it more as a cyclical thing, not secular, but there are certain secular things going on in the market like ship to private label and e-commerce.  So how are you viewing private label on the business and then I'll ask about ecommerce afterwards."

Defendant Jackson responded:

> *Yes, so there have been some changes in terms of the marketplace. So if you look, first of all starting with the consumer, the way the consumer is shopping today has changed. We talk a little bit about e-commerce being one of those dynamics, but there are also some changes in consumer taste, if you will, that have driven some of the changes in terms of what's happened at retail and what's happened for some of our clients. And if you look at the strength of our client base, large multi-nationals that we've won over several years, some of which have been with us for 30 years plus, they've been impacted in a significant way and they've responded to that as they've had growth challenges. They've responded to those challenges by finding a way to go trim costs. Some are doing zero-based budgeting, some are on their second or third iterations of zero-based budgeting, and even though our data is mission-critical for those clients, we're certainly not immune to those dynamics. And so that piece of it as it relates to the growth challenges is certainly cyclical in nature, but they're also facing the changes in terms of the consumer and changes in terms of the way consumer shops as being something other than cyclical. The answer to those challenges for our clients and they all notice is to, A, continue to invest in innovation to drive new products into the marketplace, continue to advertise and make sure that they're top of mind and relevant for consumers. And the third piece is to make sure that they're investing in data and analytics to help them understand business drivers and how to activate against those business drivers and that's certainly going to have a positive lift for our business. So we're not counting on a snapback in the environment any time soon. That's why the investments that we're making in the Connected System, the investments that we're making in the retailer platforms, the investments that we're making in e-commerce are all focused on helping clients operate in this environment and they'll be a growth driver for us and it'll help our clients sort of pivot to growth as well.*

441.    On February 28, 2018, at the Morgan Stanley Technology, Media & Telecom Conference, an analyst asked: "I wonder if you could maybe provide a bit more detail on some of the Chinese execution issues that have come up recently," and Defendant Jackson responded:

> *We talked about on the fourth quarter that we had some execution issues in China. I'd say overall the markets are in great shape there. Their volume*

*opportunities, their growth opportunities, our teams in China have a tremendous number of opportunities to go after. We quite frankly very simply put, we have things that we were trying to get done in the quarter and closing the quarter that we didn't get done. And as a result of that, we sort of missed our estimate by a couple of points but the underlying markets are in great shape in China and you can expect us to improve that performance in the first quarter and throughout 2018.*

The analyst responded by asking: "Could those deals be closed in the first quarter, or should we expect this. . . ." (ellipsis in original), and Defendant Jackson cut in, saying:

*Some of which will actually flow through in the first quarter. As I said, we'll see the first quarter be a little bit better than the fourth quarter. I think the broader opportunity for us as it relates to China is again, if you look at what's happening in that marketplace with urbanization for example, you have another 250 markets with 1 million people or so in those marketplaces. There is a lot of consumption that's happening in China. We'll have an opportunity to get more granular on our coverage. It is still the most important emerging market for our clients and they're investing at a healthy clip. The local giants that are in those marketplaces are getting more sophisticated. They're investing more in Nielsen data, so the market dynamics are very strong there and we feel good about the longterm prospects.*

442.    The statements about guidance are false and misleading for the reasons stated in paragraph 438.  The statements about Developed and Emerging Buy are false and misleading for the reasons stated in paragraph 354.  The statements about China are false and misleading for the reasons stated in paragraph 437.

**(ix)    *April 26, 2018 (1Q18)***

443.    On April 26, 2018, Nielsen reported its First Quarter 2018 financial results and in the earnings call, Defendant Jackson said:

*Moving to 2018 guidance, we are increasing full-year EPS guidance to reflect the impact of U.S. tax reform. We now expect GAAP EPS to be $1.50 to $1.56 per share. This is a $0.10 increase versus our prior guidance and reflects our updated 34% GAAP tax forecast. We are maintaining the remaining elements of guidance, highlighted by revenue growth of approximately 3% constant currency and free cash flow guidance of approximately $800 million.*

146

444.    On April 26, 2018, during the earnings call for Nielsen's First Quarter 2018

financial results, Defendant Jackson said:

> *Overall, we continue to deliver positive top line growth due to the strength of our portfolio across Watch and Buy, while our Buy business continues to operate in a challenging set of market conditions. Our teams are focused on execution, which means driving growth in Watch and the emerging markets in Buy, investing in key initiatives and driving efficiency and productivity across our entire business. Our results in the first quarter reflect these dynamics.*
>
> *       *       *
>
> Other Watch was down $16 million or 35.3% due to previously announced product exits. Watch adjusted EBITDA was $350 million, up 7.4% constant currency. Watch margins were 42%, up 12 basis points constant currency. Excluding the drag from unfavorable mix from Gracenote, Watch margins were up 85 basis points constant currency, driven by a strong top line and productivity improvements. *Our Watch business is off to a great start to the year. Importantly, we continue to invest in our Watch business to drive solid revenue and EBITDA growth. Turning to Buy, first quarter total Buy revenue was $776 million, down 2.1% constant currency. On an organic basis, Buy revenue declined 1.3%. Our revenue in the developed markets was $471 million, down 5.2% constant currency, driven by continued weakness in the U.S.*

445.    On April 26, 2018, during the earnings call for Nielsen's First Quarter 2018

financial results, Defendant Barns said:

> *To summarize the picture for our Buy segment, while the operating environment remains challenging in developed Buy, especially in the U.S., we're making real progress towards returning to growth and improving profitability despite the environment, in line with our Path to 2020 plan. Additionally, our Operations transformation for Buy is heavily focused on emerging markets.*

446.    On April 26, 2018, Nielsen released its First Quarter 2018 financial results, during

the earnings call, Defendant Barns said:

> *In emerging markets, our global footprint serves as a significant competitive advantage where, in many of our markets, we are the sole measurement provider. Our ongoing investments in coverage and penetration, combined with positive demographic trends in these markets, position us well for the long term. We continue to see faster growth with local clients in these markets, highlighting the importance of our balanced client portfolio. . . . To summarize the picture for our Buy segment, while the operating environment remains*

*challenging in developed Buy, especially in the U.S., we're making real progress towards returning to growth and improving profitability despite the environment, in line with our Path to 2020 plan. Additionally, our Operations transformation for Buy is heavily focused on emerging markets.*

447.    On April 26, 2018, Nielsen released its First Quarter 2018 financial results, and

during the earnings call, Defendant Jackson said:

Audio was up just under 1% in the quarter. Marketing Effectiveness was up 22.7% constant currency on continued strength in ROI solutions. On an organic basis, Marketing Effectiveness grew 17.3%. This is just for the Visual IQ acquisition and the exit of TV Brand Effect. ***Advertisers are intensely focused on measuring return on their investment and media spend. And this is an important source of growth for our company.***

*        *        *

Turning to Buy. First quarter total Buy revenue was $776 million, down 2.1% constant currency. On an organic basis, Buy revenue declined 1.3%. Our revenue in the developed markets was $471 million, down 5.2% constant currency, driven by continued weakness in the U.S. Emerging markets revenue was $294 million, up 6.1% constant currency. As expected, we saw improvement in the growth rate from 4Q, but we still have more to go here. ***Growth was broad-based across several markets, including Latin America, Eastern Europe, Africa and China.***

***Last quarter, we highlighted some challenges in China. However, as expected, we saw improvement here in the first quarter.*** And we expect more to come during the year. Our Corporate Buy revenue was down $8 million or 42.1% behind previously announced pruning actions. Buy adjusted EBITDA was $84 million, down 24.3% constant currency in the first quarter. The quarterly results were driven by the launch of new retailer programs, most notably Walmart.

448.    On April 26, 2018, during Nielsen's First Quarter 2018 earnings call, Defendant

Barns brought up the topic of GDPR, telling investors that:

***We still have access to the data that the industry needs for independent third-party measurement. We've always taken a conservative approach around consumer data privacy and this has proven to serve us well in the long term. Another key focus of the industry has been the General Data Protection Regulation or GDPR, a new EU data protection law going into effect on May 25.***

449.    On April 26, 2018, during Nielsen's First Quarter 2018 earnings call, Defendant

Barns brought up the topic of GDPR, telling investors that:

*Because we've been at the forefront of privacy compliance for years, many of the steps required by GDPR were already in place. Overall, we see the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace.*

450.    On April 26, 2018, during Nielsen's First Quarter 2018 earnings call, Defendant

Barns responded to a question from an analyst about Nielsen's relationship with Facebook, as

related to access to data, and Defendant Barns said:

*As you mentioned, it is a very long-running and very strong relationship that we have with Facebook. We still had access to the data we need for our measurement products. For some of our products, the analytics products, we've had to make some process changes. We are in the process of making some process changes in order to accommodate some of their policy changes, but we're still able to deliver all those products to our clients in the marketplace and we don't see any change in that going forward. I think one of the reasons why we've weathered this period, especially well, relatively well, better than, I think, a lot of the other data partners with Facebook is because we've always taken a more conservative approach with regard to consumer data protection, consumer data privacy. One thing we've said in the past in terms of how we use the data that we access from Facebook is that it's anonymized and aggregated before it's actually used in our services. And so, there's a certain extra level of protection in terms of the data access we use and how it's deployed in our products. So, yeah, again, we're in a very good position. I think as we think about the implications of the Facebook situation and the implications of GDPR, we really think all of this plays as a net positive for our business and our position in the marketplace as it unfolds.*

451.    On April 26, 2018, during Nielsen's First Quarter 2018 earnings call, Defendant

Barns said:

*And, finally, consumer data privacy, it's always been a high priority for us, both in the way we design our products and the way we run our operations. We're well prepared for GDPR and we're well positioned in the market.*

452.    On April 26, 2018, Nielsen released its First Quarter 2018 financial results and

during the earnings call, Defendant Barns said:

*A lot of the activity during the Upfronts and Newfronts draws from our Marketing Effectiveness capabilities. On track to be north of $400 million in revenue in 2018, this is where Watch and Buy come together, to deliver metrics that address advertising ROI and attribution. These are some of the most important topics for our clients these days, both buyers and sellers of media.*

*This part of our business has consistently been growing double digits for quite some time.*

453.    On April 26, 2018, Nielsen released its First Quarter 2018 financial results, the

press release stated:

*"In the first quarter, we continued to execute on our key initiatives while focusing on our Path to 2020 objectives. Through continuous innovation, we are transforming our business in three major areas, Watch, Buy, and Operations, to drive a faster growing, higher margin business and create incremental value for our shareholders,"* said Mitch Barns, Chief Executive Officer of Nielsen. Barns continued, "*Watch had another great quarter with growth driven by Total Audience Measurement. Our ability to provide independent, comparable measurement to the industry is pivotal as media and audiences continue to fragment. In our Buy business, Developed Markets continued to see pressure in the fast moving consumer goods industry in the U.S., but we are confident that our investments in the Connected System, Total Consumer Measurement, and retailer partnerships will drive improved results despite this environment. Emerging Markets saw broad-based growth across markets in Latin America, Eastern Europe, Africa, and China. Our significant competitive advantages, including our balanced client portfolio and global footprint, position us well here."*

454.    The statements about guidance are false and misleading for the reasons stated in

paragraph 438.  The statements about Developed and Emerging Buy are false and misleading for

the reasons stated in paragraph 354.  The statements about China are false and misleading for the

reasons stated in paragraph 437.  The statements about GDPR are false and misleading for the

reasons stated in paragraph 436.

### (x)    *May 15, 2018*

455.    On May 15, 2018, at the Needham 2018 Emerging Technology Conference, an

analyst from Needham & Co. asked Defendant Abcarian, "How long are you going to be able to

bring in all those big datasets before Congress says no, no you're violating somebody's

privacy? . . . And what impact would that have on Nielsen's measurement ability, if they can't

get these third party data sets integrated into their own measurement?"  Defendant Abcarian said:

*Well, everything we do, we engineer our products using privacy by design principles and our Chief Privacy Officer spends a lot of time understanding regulation and changes in consumer. And in fact whether it was Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent level data. We're looking for an ability to create aggregated insights, because Nielsen has strong, opted-in consumer compliant panels that we can use the intelligence from in which to basically create the person based estimates that are required to drive and fuel the industry.*

*       *       *

So, I don't -- who knows where the industry will go.  *What I do know is that Nielsen stands in a really strong point, because we have invested for six-plus decades in building high quality consumer opted in panels. So, if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.*

456.    One or more statement in this Section is about data privacy or GDPR.  These

statements are false and misleading for the reasons stated in paragraph 436

**(xi)    *May 16, 2018***

457.    On May 16, 2018 at the Barclays Americas Select Franchise Conference,

Defendant Jackson said:

*The other interesting thing, again, about those large clients is, as I said, the emerging markets, those clients continue to see growth opportunities. If you look at what's happening in markets like India, in China and Brazil and the continent of Africa, there are tremendous growth opportunities there. So, those same clients that are challenged in the developed markets are continuing to invest in a major way in the emerging markets, and we continue to expand our coverage capabilities in the emerging markets. And that global footprint is really a big benefit for us. So, we do see sort of this multi-speed world, if you will, with higher growth in the emerging markets, challenges in the developed markets. We're focused on building the portfolio.*

458.    On May 16, 2018, at the Barclays Americas Select Franchise Conference,

Defendant Jackson said:

*Yeah. So, what we're seeing with our largest clients is they have been challenged from a topline standpoint. Many of them have gone to the middle of the income statement to find a way to drive earnings growth in the face of a*

*challenging topline environment. So, what we've seen in that dynamic is zero-based budgeting from some of our largest clients, and they literally go through every line item of the contract to find an opportunity to squeeze out some margins.*

*Some of them have had a tremendous amount of success in doing so. And in doing so, they look to sort of trim spending really across the board. So, a fewer spending of $100. Last year, you're trying to spend $95 in a tough growth environment. And they asked us to help them do that in a way that doesn't impact their business and helps them continue to grow.*

*So, our retail measurement services is critical to the way they run their business. A number of our analytics are critical to the way they run their business, but things that are a little bit more discretionary in nature, things that look like deep-dive consumer studies or things that are looking at sort of the future of consumers and some of their consumption have. And so a lot of that discretionary spending has gone away.*

*So, we see clients continuing to invest in things that are focused on how they manage their revenue. So, we still see them investing in things like pricing, promotion, shelf assortment, space optimization, those are the kinds of things our clients are doubling down on their investment. We call those things everyday analytics and clients are still investing pretty heavily in those things along with retail measurement. And those are the things that we're focused on as part of our Connected System platform.*

459.    On May 16, 2018, at the Barclays Americas Select Franchise Conference,

Defendant Jackson said:

*You know, in today's environment, the mix between what we historically call insights and analytics has become a little bit more fungible, in other words, the client is, as I alluded to, saying, listen, I need to go and turn $5 out of the contract, how do I go do that in a way that helps me continue to have the critical data needs that I have and the critical set of analytics that I have?*

*So, what we've seen over time is that the things that were much more discretionary consumer insights kinds of things, those are the kinds of things that have gone away, which means almost by default, you have more money being spent on retail measurement in everyday analytics as opposed to consumer insight.*

*So, that makes us – we probably moved 10 points of mix from discretionary consumer insights kinds of things to more syndicated everyday analytics kinds of efforts.*

460.    On May 16, 2018, at the Barclays Americas Select Franchise Conference,

Defendant Jackson said:

> Yeah. For multi-nationals, I mean, you occasionally see fits and starts with multi-nationals even in growth markets like the emerging markets, for example. So, what you'll see from time to time is a client or two in a couple of countries will have some challenges in terms of growth, et cetera. And they will shift some priorities, but longer term, ***the trend in the emerging market is very healthy. We see a lot of demand there. Multi-nationals are continuing to invest there in a meaningful way.***
>
> And also, the local clients are investing in the emerging markets as well. We see gains with the local clients. They are Walmart of double-digits in the emerging markets, and they're about 35% or 40% of our business. So, we have a nice hedge, if you will, against some of the blips in fits and starts that you typically see with multi-nationals. But longer term, the trend is going to be fine. ***We talked about in the fourth quarter specifically some of our own challenges in China. Those things are behind us. We've made some changes there in terms of leadership and structure, and the teams are operating pretty well.***

461.    The statements about guidance are false and misleading for the reasons stated in

paragraph 438.  The statements about Developed and Emerging Buy are false and misleading for

the reasons stated in paragraph 354.  The statements about China are false and misleading for the

reasons stated in paragraph 437.

**(xii)    *May 31, 2018***

462.    On May 31, 2018, at the Sanford Bernstein Strategic Decisions CEO Conference,

an analyst asked Defendant Barns: "How about the fiscal year 18 guide? What comfort can you

give, especially regarding the cash flow targets [indiscernible] which is probably somewhat a

function of – it seems like some cash went missing in Q1, in particular, maybe your working

capital. So the question is what comfort can you give regarding this year's cash flow target? And

I'm just adding a little bit of my own on, there was especially given Q1's cash flow, which was I

think year-over-year worse than we're used to seeing?"  Defendant Barns responded:

> Yeah, first quarter, our free cash flow was in the minus $275 million range. I mean a lot of that reflected the investments we're making associated with retailers

and other components of our three-year plan. And so usually the first quarter for us is not positive from a free cash flow point, you made that point before in the prior year, was minus 70-ish and a bigger number this year reflecting those investments. Our free cash flow target for the year is $800 million. Most of our free cash flow historically shows up in the second half of the year and in particular, the fourth quarter. *And so that's what we're working on to deliver and we're on track for that.*

463.     On May 31, 2018, at the Sanford Bernstein Strategic Decisions CEO Conference, an analyst for Bernstein & Co. asked Defendant Barns if he could "give any explanation" of the "hiccup" the Company had faced in 4Q17, noting: "I think you said something specifically in China that you think was a one-timer" and presented the open-ended question: "So is that the story, what did happen?"  Defendant Barns, without correcting the characterization of the situation in China as a "*hiccup*" or a "*one-timer,*" responded:

> *In China, we also referenced that our – we made some leadership changes in the China market team.  Our team had gotten a little bit off track in terms of where their focus was in the business. We've got our team now refocused on the core of our business and in getting the investments back to where they should be and restoring the growth rate there that we've enjoyed now for about a decade.*

464.     During the May 31, 2018, Sanford Bernstein Strategic Decisions CEO Conference, Defendant Barns said:

> *So raw data is one thing the – the managed data, the curated data that we provide to the marketplace is a different thing. And the fact that the raw data is becoming richer in more datasets, more granular, that's a net positive for us. We have better raw materials to work with today than we ever did in the past. We're able to do more powerful things more efficiently today than we ever could have been in the – been able to do in the past in a way that's economically affordable for our clients. So all these new datasets, all this new technology, there frankly has never been a better time to be in the business that we're in than right now.*

465.     During the May 31, 2018, Sanford Bernstein Strategic Decisions CEO Conference, Defendant Barns said:

> *And in terms of just analytics, I think I would segregate analytics into two kinds. You can divide it up in many ways but two kinds – one is the kind of*

154

*analytics that help a client understand what should I do next year. The more strategic consultative type projects and then separately the analytics that are more about what should I do next week or next month, we call those the everyday analytics. The first kind, the more strategic type projects, those are under especially heavy pressure. Clients are just finding ways to forego that type. Fortunately, while we have some business in that area, that's not the focus of our business. Our business in terms of analytics is more focused on the everyday analytics and that's holding up much better and the more we can integrate those analytics with the core measurement data, which is exactly what we're doing with the connected systems, the stronger we're going to be in the future, and that's been our approach.*

466.   On May 31, 2018, at the Bernstein Strategic Decisions Conference, Defendant

Barns said:

*So the Watch part of our business continues to perform incredibly well, driven by this Total Audience Measurement system, strengthened marketing effectiveness, which is the area where you bring Watch data together with Buy data to inform the effectiveness of advertising for both buyers and sellers of media in the marketplace that continues to grow really well. So Watch, we feel really good about.*

467.   On May 31, 2018, at the Bernstein Strategic Decisions Conference, an analyst

asked "what might concern you sort of overall geopolitical and privacy concerns? Certainly for

your panel-based solutions there's really no privacy issue that I can think of, but when . . . I think

about especially some of the inputs used for your digital side of your business and your

relationship with Facebook in that regard, anything we should be – anything changing there

about your ability to work with Facebook and use their – help together to as an ingredient to how

you characterize digital audiences and anything going on there that we should be thinking about?"

Defendant Barns responded:

*For measurement, we still have the access to all the data that we need for our measurement products including our relationship with Facebook. I think a reason why we weren't as affected as some other firms who may receive data from Facebook or others is because we've always historically taken a fairly conservative approach to how we use data, handle data and that conservative approach served us pretty well in this particular instance. And so, yeah, that's been a more of a non-event from our side as compared to how it played out for some others.*

468.     The statements about guidance are false and misleading for the reasons stated in paragraph 438.  The statements about Developed and Emerging Buy are false and misleading for the reasons stated in paragraph 354.  The statements about China are false and misleading for the reasons stated in paragraph 437.  The statements about GDPR were false and misleading for the reasons stated in paragraph 436.

### (xiii)   *June 5, 2018*

469.     On June 5, 2018, at the Baird Global Consumer, Technology & Services Conference, an analyst asked: "Facebook had a lot of headlines recently. There's been some policy changes there. Obviously, a big digital marketing platform. It's also a partner in enabling Nielsen digital measurement.  So the changes to their policies, any impact on Nielsen?" Defendant Abcarian responded:

> *Yeah. Look, for more than a decade we've built our products and services based on privacy by design which is also fueling kind of the GDPR principles, and everything that we do has been built on those privacy principles into our products and services. When we work with Facebook, the data that we're providing back in the form of measurement is aggregated and anonymized. At no point in time is it ever individualized [to] a respondent level, and all of that is being done in a safe haven environment than anonymization and aggregation. And so our product measurements continue to be able to leverage that partnership and execute on the measurement aspects of that because at no means are we producing any kind of respondent-level data against that partnership.*

470.     The statements about data privacy or GDPR are false and misleading for the reasons stated in paragraph 436.

### (xiv)   *June 14, 2018*

471.     On June 14, 2018, at the Bernstein Future of Media Conference, an analyst asked Defendant Abcarian the following question: "Something that . . . I ought to ask because it seems to [have become] increasingly important recently is privacy issues.  So from a product standpoint . . . you use data from a lot of places.  Your panels are obviously privacy-compliant.

But are there any – [has] this cause[d] any new sort of risk or things you've had to deal with in terms of data sources you use and incorporate into your various services?"  Defendant Abcarian responded, saying:

> *I think we took a stance a long time even before the whole GDPR kind of came on to the scene around embracing privacy by design. And so when we built our product, our products are actually built under the principles of Privacy by Design. We probably have one of the largest privacy organizations, our Chief Privacy Officer and privacy lawyers that sit underneath have spent a lot of time both with product as well as with government bodies, et cetera, in which to understand the changing evolution of privacy.*
>
> *Obviously, Nielsen, as you mentioned, for decades we've built privacy opted-in panels and privacy has been the cornerstone of everything we do. Because we're measuring consumers, and we need our consumers to trust our brands and to trust Nielsen with the datasets in which we're using in which to produce measurement out to the marketplace.*
>
> *And so we've – because of these principles, because of the kind of the underpinnings of the way in which Nielsen operates, the privacy changes for our core measurement products were really, for us, when GDPR came really a non event, because of the fact that everything we're producing is anonymized and aggregated.  By no means do we ever at any time release or share PII data, et cetera.  And so we continue to produce whether it's Digital Ad Ratings or television ratings or cross-platform ratings with the same metrics, same datasets that we were using prior to the institution of the changes.*

472.     On June 14, 2018, at the Bernstein Future of Media Conference, an analyst asked Defendant Abcarian the following question: "And one your publicly known big partners is Facebook.  So no implications for you with that specific relationship that you can talk about?" Defendant Abcarian responded by saying:

> *Yeah, I mean, we – the way in which we work with Facebook just like we work with any other data provider is that, once again, bringing privacy by design straight into the principles of that partnership.  All of that data is anonymized and aggregated and sits behind the – basically, the walls of Facebook.  And by no means, at any point, have we released, any type of disaggregated data. We're there to produce what is the reach of digital impressions to this property for men, 18 to 49. There's no personal identification inside of that. So that is why the work that we've done, whether it's Facebook or with other providers, we continue to be able to provide the anonymized aggregated measurement that we've provided to the marketplace for years.*

473. The statements about data privacy or GDPR are false and misleading for the reasons stated in paragraph 436.

**B.** **MD&As During the Class Period**

474. Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). Among other things, Item 303 of Regulation S-K required that Nielsen's Class Period Forms 10-K and 10-Q disclose known events or uncertainties that had, *or were reasonably likely to have had*, a material impact on its revenues or income from continuing operations.

475. The SEC issued interpretative guidance associated with the requirements of Item 303 of Regulation S-K concerning the disclosure of material events or uncertainties. The interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.
>
> *        *        *
>
> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

476.     The MD&A disclosures in Nielsen's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends associated with the decline for demand for analytic products and in particular a shift towards raw data over analytic products, as alleged herein. These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.

477.     Further, Item 9A of Form 10-K and Item 4 of Form 10-Q requires SEC registrants to furnish the information called for under Item 307 of Regulation S-K [17 C.F.R. §229.307], Disclosure Controls and Procedures.  Item 307 of Regulation S-K requires Nielsen's Class Period Forms 10-K and 10-Q to disclose Defendant Barns' and Defendant Jackson's conclusions about the effectiveness of Nielsen's disclosure controls, defined by relevant regulation as the controls and procedures designed to ensure that information required to be disclosed in reports filed with the SEC is appropriately recorded, processed, summarized and reported.

478.     Throughout the Class, Period, Nielsen issued quarterly and Annual Reports with the SEC.  Defendants had a duty to disclose all known events or uncertainties that had, or were reasonably likely to have had, a material impact on its revenues or income from continuing operations.  When these reports were issued on (1) April 20, 2016; (2) July 26, 2016; (3) October 25, 2016; (4) February 9, 2017; (5) April 25, 2017; (6) July 27, 2017; (7) October 25, 2017; (8) February 8, 2018; and (9) April 26, 2018, Defendants failed to satisfy this duty and violated a disclosure duty by omitting to disclose material information that they had a duty to disclose. Each of the reports and/or the accompanying Sarbanes Oxley certifications were signed by Defendants Jackson and Barns.

479.    Specifically, Defendants failed to disclose that Nielsen was facing a known trend, in which its customers were choosing not to purchase or were significantly reducing their demand for Nielsen's analytical insight products.  This information was material because it indicated that Nielsen was facing and undergoing a long-term decline that was directly related to the viability of its business.  It was also material because it downplayed any decreases in performance as being driven by less serious or cyclical forces affecting the market of Nielsen's customers, rather than as a change in the demand for Nielsen's products.

480.    The risk factor disclosure included in the Form 10-Ks deceptively referred to potential risks, and not actual trends, associated with reduced discretionary spending by the Company's CPG customers, as follows:

*Continued adverse market conditions, particularly in the consumer packaged goods, media, entertainment, telecommunications or technology industries, could adversely impact our revenue.*

*A number of adverse financial developments continue to impact the global financial markets. The current economic environment has witnessed continued malaise in consumer confidence and demand, impacting the demand for our customers' products and services. Those reduced demands* <u>*could*</u> *adversely affect the ability of some of our customers to meet their current obligations to us and hinder their ability to incur new obligations until the economy and their businesses strengthen. The inability of our customers to pay us for our services and/or decisions by current or future customers to forego or defer purchases may adversely impact our business, financial condition, results of operations, profitability and cash flows and may continue to present risks for an extended period of time. We cannot predict the impact of economic slowdowns on our future financial performance.*

*We expect that revenues generated from our measurement and analytical services will continue to represent a substantial portion of our overall revenue for the foreseeable future. To the extent the businesses we service, especially our clients in the consumer packaged goods, media, entertainment, telecommunications and technology industries, are subject to the financial pressures of, for example, increased costs or reduced demand for their products, the demand for our services, or the prices our clients are willing to pay for those services, may decline.*

> *During challenging economic times, clients, typically advertisers, within our Buy segment may reduce their discretionary advertising expenditures and may be less likely to purchase our analytical services, which would have an adverse effect on our revenue.*
>
> *Clients within our Watch segment derive a significant amount of their revenue from the sale or purchase of advertising. During challenging economic times, advertisers may reduce advertising expenditures and advertising agencies and other media may be less likely to purchase our media information services, which would have an adverse effect on our revenue.*

481.   Notably, this was the identical language that Nielsen had used in each of its Form 10-K Annual Reports since its first report in 2011, meaning that the identical language appeared in its reports for the year endings 2011, 2012, 2013, 2014, 2015, 2016, and 2017.  This meant that the challenges and negative trends known internally to Nielsen (as described by former employees) were not incorporated into the MDNA's during the Class Period, as Nielsen was required to do. Through the use of "may" language and by continuing to use the identical cautionary language, this "risk statement" conveyed that, while there was a risk regarding diminishing demand, it remained just that.  This representation was materially false and misleading because it failed to disclose that the warned of risks, namely reduced spending by Buy segment clients adversely impacting revenues, were already occurring and that there was a serious business-threatening decline in those clients' demand for Nielsen's analytic insights products.

**C.    Statements About the Value of Nielsen's Buy Segment and its Goodwill**

482.   Goodwill was one of the most important assets carried on Nielsen's balance sheet during the Class Period.  Goodwill is an asset that represents the future economic benefits that arises from the other assets acquired in a business combination that are not otherwise individually identified or separately recognized.  Nielsen's goodwill for the Buy reporting unit was important to investors during the Class Period because it reflected the future discounted cash

flows that the Company expected to realize from its acquisition of that reporting unit.  Under

Generally Accepted Accepted Principles ("GAAP"),[21] goodwill impairment exists when the fair

value of the reporting unit is less than its book or carrying value on the balance sheet.[22]

483.    As detailed below, Defendants overstated the value of Nielsen's goodwill

throughout the class period.

484.    As of December 31, 2016, Nielsen reported $7.845 billion of goodwill, which

represented nearly 50% of the Company's total assets of $15.7 billion.  The Buy reporting unit's

goodwill totaled $2.696 billion, representing 35% of total goodwill and nearly 17% of total

assets.  Nielsen's Buy reporting unit goodwill balance was originally calculated as the excess of

the purchase price paid over the fair value of the assets and liabilities acquired when Nielsen

purchased the Buy entities that are accounted for within its Buy Segment.  As of December 31,

2016, Defendants falsely represented that the carrying value of the Buy reporting unit's goodwill

exceeded the fair value by at least 20%.  Defendants knew or were extremely reckless in not

knowing this representation was materially false and misleading because it required Defendants

to assume that projected cash flows in the Buy segment would grow by 8.2% from 2017-2021.

---

[21] GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation SX, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.
[22] GAAP states that goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying . . . the acquisition method."  ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  ASC 350-20-35-16 states that "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill."  "A reporting unit is an operating segment [of a company] or one level below an operating segment (also known as a component)."  ASC 350-20-20.

485.    Nielsen continued to conceal its inflated goodwill until it belatedly recognized the impairment in 4Q18.  Consequently, Defendants reported materially false financial results in 4Q17, 1Q18, and 2Q18, in violation of GAAP.[23]  This misled investors by failing to accurately value the segment, and by falsely conveying that the Company's value and prospects were more positive than they actually were.  The failure to take the necessary impairment also assisted in the deception described throughout this Complaint, by hiding the true decline of Nielsen's business.

486.    The following analysis describes the basis for the allegations that Goodwill was overstated throughout the Class Period.

487.    Defendants represented that Nielsen relied primarily on the discounted cash flow method under the income approach to calculate the fair value of the Buy reporting unit's goodwill, supplemented by the market approach.[24]  The Discounted Cash Flow ("DCF") valuation method is generally recognized as "the [valuation] approach that merits the greatest confidence within the financial community."[25]  Despite this fact, the DCF method is only as good as the quality, integrity, and reliability of the inputs that go into the DCF model.  And if the inputs used fail to measure up to those characteristics, a particular DCF model can readily

---

[23] Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

[24] The income approach is "a general way of determining a value indication of a business [] using one or more methods that convert anticipated economic benefits into a present single amount."  American Institute of Certified Professional Accountants ("AICPA"), Statement on Standards for Valuation Services (VS Section 100), *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*.  The discounted cash flow method is "a method within the income approach whereby the present value of future expected net cash flows is calculated using a discount rate."  *Id.*  A discount rate is "a rate of return used to convert a future monetary sum into present value."  *Id.*  The market (market-based) approach is "a general way of determining a value indication of a business [] by using one or more methods that compare the subject to similar businesses[.]"  *Id.*

[25] *Cede & Co. v. JRC Acquisition Corp.*, No. 18648-NC, 2014 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) (quoting *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 702 (Del.Ch. 1996).  The Delaware Chancery Court is widely recognized as authoritative on valuation matters.

produce a "garbage-in, garbage-out" determination of value, regardless of the DCF method's consistency with modern economics and its empirical validity and mathematical sophistication.

488.   Defendants did not explicitly disclose whether their goodwill assessment compared the fair value of equity to the book value of equity or the fair value of invested capital to the book value of invested capital.  These are the two commonly used methods to determine whether the goodwill of a reporting unit is impaired or not.  Under the equity method, the fair value of the reporting unit's equity is determined and then compared to the company's equity book balance shown in its internal balance sheet for the reporting unit.  Invested capital, on the other hand, is "the sum of equity and debt in a business enterprise."[26]  "Debt is typically (a) all interest-bearing debt or (b) long-term, interest-bearing debt."  *Id*.  Consequently, under the invested capital method, the fair value of the Buy reporting unit's combined equity and debt is compared to the book or carrying values of the reporting unit's combined equity and debt. Under the Gordon growth two-stage DCF model, the indicated value produced is the fair value of the invested capital of the reporting unit.

489.   However, statements made by Nielsen's new CFO during the Company's February 28, 2019 earnings call—*after the Class Period*—indicate that Nielsen compared the fair value of invested capital to the book value of invested capital, and allow for the reconstruction of Nielsen's goodwill testing process, sufficient to determine that Nielsen's goodwill was overstated throughout the Class Period.[27]  Defendants provided sufficient

---

[26] American Institute of Certified Professional Accountants ("AICPA"), Statement on Standards for Valuation Services (VS Section 100), *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*.

[27] CFO Anderson stated the following: "So our updated [4Q18 goodwill] assessment let [*sic*, meant "led"] us to record a noncash goodwill impairment charge of $1.4 billion, $3.97 per share and resulted in an updated carrying [or book] value for the Buy business [reporting unit] of $3.5 billion."  Plaintiffs can reasonably infer from Anderson's statement that $3.5 billion was both Nielsen's fair value conclusion at 4Q18 for the Buy reporting unit and the book value of its invested capital at 4Q18.  Plaintiffs can infer

information for Plaintiffs to reasonably reconstruct the DCF models utilized by Defendants during the Class Period and Plaintiffs determined that Defendants artificially inflated the fair value of the Buy reporting unit goodwill until Nielsen belatedly recorded a $1.4 billion goodwill impairment charge in 4Q18.[28]

490.    Based on Defendants' explanation of their goodwill impairment testing process, Plaintiffs determined that Defendants relied specifically on the Gordon growth two-stage model because Defendants described in considerable detail the three major inputs they used in each reporting unit valuation: (1) the business (cash flow) projections, (2) the long-term growth rate, and (3) the discount rate.

491.    Defendants also provided sufficient information for Plaintiffs to determine that Defendants' representations about the value of Buy segment goodwill as of December 31, 2016 were materially misleading because the carrying value of Buy segment goodwill was not at least 20% greater than the carrying value and was likely impaired, and that Defendants' representations about Buy segment goodwill as of December 31, 2017 were materially false and misleading because the Buy reporting unit's goodwill was impaired by at least $1.4 billion.

492.    For 2016, Defendants stated in the 2016 Form 10-K that they designated October 1, 2016 as the date in which the annual goodwill impairment assessment was performed and that their DCF models used discount rates ranging from 8.5% to 9.5% and long-term growth rates

---

that Anderson was referring to Buy's $3.5 billion invested capital (rather than just Buy's total equity) because Nielsen's total consolidated equity on its balance sheet as of December 31, 2018 was only $3.043 billion.  Anderson could not be referring to $3.5 billion as Buy's equity because the Buy equity could not be greater than the Company's $3.043 billion consolidated equity unless the Watch segment's equity was negative, an impossibility.

[28] Plaintiffs reconstructed Defendants' FY 2016 DCF model based on publicly available information, but all essential information, critically, was not available until well after the Class Period.  Therefore, reconstructing Defendants' DCF models could not be reasonably performed until after the Class Period, even assuming investors could forensically reverse engineer Defendants' inputs from a broad array of public sources.

ranging from 1.0% to 3.0%.  Defendants did not disclose the expected future cash flows in the

Buy segment that were utilized in the DCF model but did disclose information which permitted

Plaintiffs to reasonably estimate the expected future cash flows.  That information included

Nielsen's free cash flow guidance for 2016, adjusted EBITDA and capital expenditures in the

Buy and Watch segments in 2016.  On October 1, 2016, Nielsen's consolidated cash flows

guidance was $950 million for 2016.  As shown in the following chart, Plaintiffs determined that

28% of the $950 million or $266 million represented Buy segment cash flow by using the

percentages of Buy and Watch segment adjusted EBITDA less the amount of Buy and Watch

segment capital expenditures.

| $ in Millions | Buy Segment | Watch Segment | Total |
|---|---|---|---|
| Adjusted EBITDA | $623 | $1,352 | |
| Capital Expenditures | $196 | $227 | |
| Difference | $427 | $1,125 | $1,552 |
| % of Total | 27.5% | 72.5% | |
| % x $950M | $266 | $684 | |

493.    Plaintiffs rounded up the 27.5% to 28% and multiplied it by the $950 million of

free cash flow guidance to arrive at the $266 million of free cash flow attributable to the Buy

segment.  The $266 million was then plugged into the model and Plaintiffs calculated the growth

rate of projected cash flows necessary for the fair value of Buy segment invested capital to

exceed the carrying value by 20% and for Defendant to achieve a pass result under their own

sensitivity test, whereby the discount rate was increased by 1% and the long term growth rate

was decreased by 1%.  Plaintiffs used 3% for the long term growth rate (the highest of the 1%-3%

rates Defendants included in their model) and an 8.5% discount rate (the lowest discount rate

used by Defendants in their models).  The result was a required growth rate of 8.2% for Buy cash

flows from 2017-2021.  An 8.2% growth rate was unreasonable because Defendants told

investors that Buy segment revenues in 2017 were expected to range between a 0.5% increase and a 0.5% decrease.

494.    Moreover, if a 1.7% growth rate for the Buy reporting unit's cash flows is assumed for 2017-2021, the resulting fair value of invested capital is the same as the carrying value of invested capital.  The 1.7% growth rate was also unreasonable given Defendants' representations about expected Buy segment revenues in 2017.  Thus, a reasonable assumed growth rate of projected Buy cash flows would at best be 0.5% and that would result in the fair value of Buy invested capital being materially impaired as the fair value would be $300 million lower than the carrying value.

495.    Defendants also represented in the 2016 Form 10-K that they performed sensitivity analyses on their DCF assumptions by testing a one percent movement in both the long-term rate and discount rate assumptions, and that the sensitivity analyses also resulted in the fair value of Buy goodwill being greater than the carrying value.  The analysis above establishes that this would only be possible by Defendants utilizing baseless assumptions about the growth of the Buy reporting unit's cash flows from 2017-2021.

496.    In every instance above, Plaintiffs used conservative assumptions that were biased in Defendants' favor to give Defendants all benefit of the doubt.  The only factor that Plaintiffs changed to determine those results was to employ a cash flow compounded annual growth rate ("CAGR") and an average annual growth rate ("AAGR") during each goodwill assessment period that was still robust, but not greater than the rates that the most optimistic market participants would use under the circumstances.

497.    Defendants' statements were materially false or misleading because Defendants knowingly or extremely recklessly misapplied certain inputs and assumptions which inflated the

fair value of the Buy reporting unit goodwill.  They key inputs and assumptions they applied in their DCF model to calculate the Buy reporting unit's fair value would not be used by market participants.  Far from a more than 20% cushion against goodwill impairment, the Buy reporting unit was already perilously close to impairment by December 31, 2016, even when applying the most optimistic inputs and assumptions.

498.    And Defendants also knew or recklessly disregarded that their statements regarding their sensitivity analyses were misleading.  Defendants failed to warn investors in the 2016 Form 10-K, that when they increased the discount rate by one percent and decreased the long-term growth rate by one percent, the Buy reporting unit's assumed projected future cash flows for their DCF model would have needed to increase at an effective CAGR and AAGR of 8.2% or more to escape goodwill impairment, a rate of growth far greater than market participants would use, given the adverse trends of falling revenues; operating income; adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and cash flows.

499.    In fact, even with Defendants' original optimistic discount rate and long-term growth rate assumptions, Defendants knew or recklessly disregarded that if they had used their own October 25, 2016 revised, reduced free cash flow guidance of $850 million for 2016, instead of their original 2016 $950 million consolidated free cash flow guidance, and applied a still overly robust 3.0% assumed cash flow CAGR, the Buy reporting unit would have been underwater, with fair value below book value by $300 million.  Defendants, instead, used carefully crafted disclosures to falsely convey to investors that a substantial margin of protection from goodwill impairment or cushion existed between the Buy reporting unit's fair value and its book value as of the close of 2016.  In truth, Defendants knew and/or recklessly disregarded that

the Buy reporting unit's actual margin of fair value over book value was razor-thin and was not "more than 20%" in 2016 as they falsely represented in the 2016 Form 10-K.

500.    The material misrepresentations about the value of the Buy reporting unit's goodwill as of December 31, 2017 contained in the 2017 Form 10-K were much more egregious than those in the 2016 Form 10-K because (i) Defendants utilized assumptions that were even more unreasonable than the assumptions utilized in the 2016 Form 10-K, and (ii) there had been further deterioration in the Buy segment.

501.    In the 2017 Form 10-K, Defendants stated that they designated October 1, 2017 as the date in which the annual goodwill impairment assessment was performed and that their DCF models used discount rates ranging from 9.0% to 12.0% and long-term growth rates ranging from 2.5% to 3.0%.  Defendants did not disclose the expected future cash flows in the Buy segment that were utilized in the DCF model but did disclose information which permitted Plaintiffs to reasonably estimate the expected future cash flows.  That information included Nielsen's free cash flow guidance for 2017, adjusted EBITDA and capital expenditures in the Buy and Watch segments in 2017.  On October 1, 2017, Nielsen's consolidated cash flows guidance was $900 million for 2017.  As shown in the following chart, Plaintiffs determined that 19.8% of the $900 million or $178 million represented Buy segment cash flow by using the percentages of Buy and Watch segment adjusted EBITDA less the amount of Buy and Watch segment capital expenditures ($ in millions).

| $ in Millions | Buy Segment | Watch Segment | Total |
|---|---|---|---|
| Adjusted EBITDA | $587 | $1,485 | |
| Capital Expenditures | $272 | $211 | |
| Difference | $315 | $1,274 | $1,589 |
| % of Total | 19.8% | 80.2% | |
| % x $900M | $178 | $722 | |

502.     Plaintiffs rounded up the 19.8% to 20% and multiplied it by the $900 million of free cash flow guidance to arrive at the $180 million of free cash flow attributable to the Buy reporting unit.  The $180 million was then plugged into the model and Plaintiffs calculated the growth rate of projected cash flows necessary for the carrying value of Buy segment invested capital to exceed the fair value by 20%.  Plaintiffs used 3.0% for the long term growth rate (the highest rate Defendants utilized in their model) and a 9.0% discount rate (the lowest discount rate used by Defendants in their models).  The result was a growth rate of 19.7% for Buy cash flows from 2018-2022.  The 19.7% growth rate was baseless Defendants told investors that Buy segment revenues in 2018 were expected to range between a 1.0% increase and a 1.0% decrease.

503.     Moreover, if a 13.0% growth rate for Buy segment cash flows is assumed for 2018-2022, the resulting fair value of invested capital is the same as the carrying value of invested capital.  The 13.0% growth rate was also baseless given the 2018 Buy segment revenue guidance.

504.     If a 5% growth rate for Buy segment cash flows was assumed for 2018-2022, the resulting fair value of invested capital was less than the carrying value by $1.4 billion.  That establishes that the Buy goodwill impairment charge needed to be recorded by December 31, 2017.

505.     Further, the 5% growth rate was not reasonable given the Buy segment revenues guidance for 2018.  Thus, a reasonable assumed growth rate of projected Buy cash flows would at best be 1.0% and that would result in the fair value of Buy invested capital being materially impaired as the fair value would be $1.9 billion lower than the carrying value.

506.     Defendants also represented in the 2017 Form 10-K that they performed sensitivity analyses on their DCF assumptions by testing a one percent movement in both the

long-term rate and discount rate assumptions, and that the sensitivity analyses also resulted in the fair value of Buy goodwill being greater than the carrying value. The analysis above establishes that this would only be possible by Defendants utilizing baseless assumptions about the growth of Buy segment cash flows from 2018-2022.

507.    At the close of 2017, Defendants not only knowingly or recklessly applied certain inappropriate inputs and assumptions in their annual goodwill impairment assessment as of October 1, 2017, that vastly inflated the fair value of the Company's Buy reporting unit, but they overstated the value of its goodwill by at least $1.4 billion as of December 31, 2017, March 31, 2018 and June 30, 2018. As a result, Defendants caused Nielsen to overstate various financial metrics as reflected in the charts above. These misstatements were material to investors because misstatements or omissions representing 5% or more of reported financial items are deemed to be material, although amounts less than 5% can also be material depending upon the facts and circumstances.[29]

508.    As the following charts show, Nielsen's Financial Statements in 4Q17, 1Q18, 2Q18 were grossly overstated due to the failure to take the goodwill impairment.

**Misstatement of Key Financial Results for the Fourth Quarter of 2017**

*(in millions, except percentages)*

| | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $8,495 | ($1,400) | $7,095 | -16% |
| Total Assets | $16,866 | ($1,400) | $15,466 | -8% |
| Total Equity | $4,245 | ($1,400) | $2,845 | -33% |
| Operating Income/(Loss) | $1,225 | ($1,400) | ($175) | -114% |
| Income/ (Loss) from continuing operations before Income Taxes | $828 | ($1,400) | ($572) | -169% |

---

[29] "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material." SEC Staff Accounting Bulletin No. 99. "Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the [SEC] staff believes that there are numerous circumstances in which misstatements below 5% could well be material." *Id.*

**Misstatement of Key Financial Results for the First Quarter of 2018**

***(in millions, except percentages)***

| | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $    8,524 | ($1,400) | $    7,124 | -16% |
| Total Assets | $  16,923 | ($1,400) | $  15,523 | -8% |
| Total Equity | $    4,258 | ($1,400) | $    2,858 | -33% |
| Operating Income/(Loss) | $       207 | ($1,400) | $    (1,193) | -676% |
| Income/ (Loss) from continuing operations Income Taxes | $       114 | ($1,400) | $    (1,286) | -1228% |

**Misstatement of Key Financial Results for the Second Quarter of 2018**

***(in millions, except percentages)***

| | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $    8,441 | ($1,400) | $    7,041 | -17% |
| Total Assets | $  16,698 | ($1,400) | $  15,298 | -8% |
| Total Equity | $    4,049 | ($1,400) | $    2,649 | -35% |
| Operating Income/(Loss) | $       228 | ($1,400) | $    (1,172) | -614% |
| Income/ (Loss) from continuing operations Income Taxes | $       121 | ($1,400) | $    (1,279) | -1157% |

509.    Defendants accomplished this scheme by using bogus inputs for the DCF model used to calculate the fair value and goodwill of Nielsen's Buy reporting unit.  By inflating goodwill, Defendants avoided recording impairment charges necessary to properly account for the true value of the reporting unit.  More specifically, Defendants, in violation of GAAP, primarily employed inflated future cash flow projections to improperly avoid recognizing material goodwill impairment of the Buy reporting unit, even when giving Defendants all benefit of the doubt for their otherwise abnormally low discount rates and abnormally high terminal or long-term growth rates.  Consequently, Nielsen's disclosures regarding its goodwill valuations and testing were false and misleading in Nielsen's 2016 Form 10-K, 2017 Form 10-K, and in the Company's Forms 10-Q for 1Q18, 2Q18, and 3Q18.

510.    ASC 350-20-35-2 states that "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value."  Following an acquisition, companies are required to account for any goodwill recorded as part of the

acquisition in accordance with ASC 350-20.  ASC 350-20-35-28 requires goodwill to be tested

annually and, as is at issue here, for any quarter when certain circumstances are present.

511.    Moreover, factors that are based on observable inputs are entitled to greater

weight than those based on inputs (such as forecasts) in the step zero analysis because observable

inputs reflect the assumptions market participants would use.  ASC 820-10-05-1C requires that:

> When a price for an identical asset or liability is not observable, a reporting entity
> measures fair value using another valuation technique that maximizes the use of
> relevant observable inputs and minimizes the use of unobservable inputs.
> Because fair value is a market-based measurement, it is measured using the
> assumptions that market participants would use when pricing the asset or liability,
> including assumptions about risk.

512.    Further, FASB Statement of Accounting Concepts No. 8 ("SFAC No. 8") requires

accounting to strictly avoid bias, slanting and manipulation undertaken "to increase the

probability that financial information will be received favorably."  According to GAAP, a

"reporting entity shall measure the fair value of an asset or a liability using the assumptions that

market participants would use in pricing the asset or liability, assuming that market participants

act in their economic best interest."  ASC 820-10-35-9.  GAAP defines market participants as:

> Buyers and sellers in the principal (or most advantageous) market for the asset or
> liability that [among other things] are independent of each other, that is, they are
> not related parties [and] are knowledgeable, having a reasonable understanding
> about the asset or liability and the transaction using all available information,
> including information that might be obtained through due diligence efforts that
> are usual and customary.

ASC 820-10-20, Glossary.

513.    Importantly, Nielsen did not need to perform additional analysis beyond the step

one comparison of the fair value of the reporting unit to the book value of the reporting unit to

comply with GAAP.  Completing step one of the goodwill impairment test was sufficient.

Defendants acknowledged this as follows:

In January 2017, the FASB issued an ASU, "*Intangibles – Goodwill and Other*" to simplify the subsequent measurement of goodwill.  The update requires only a single-step quantitative test to identify and measure impairment based on the excess of a reporting unit's carrying amount over its fair value.  A qualitative assessment may still be completed first for an entity to determine if a quantitative impairment test is necessary.  The update is effective for fiscal year 2021 and is to be adopted on a prospective basis. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017.  We elected to early adopt this ASU effective January 1, 2017.  There was no impact on our consolidated financial statements.

514.    Defendants' DCF models relied entirely on unsupported and unreasonable inputs and assumptions that Defendants knew did not comport with GAAP.  Defendants knew, for example, that:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence.  The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections.

ASC 360-10-35-30.[30]

515.    In particular, GAAP states that, "[i]n developing unobservable inputs, a reporting entity may begin with its own data, but it shall adjust those data if reasonably available information indicates that other market participants would use different data."  ASC 820-10-35-54A.

## VIII.  ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

516.    At all relevant times, the Individual Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein.  The Individual

---

[30] Although ASC 360 applies to long-lived assets, specifically property, plant and equipment, this guidance similarly applies to the ASC 350 income approach's use of future cash flows in the DCF model.  "If the guidance for a transaction or event is not specified within a source of authoritative GAAP for that entity, an entity shall first consider accounting principles for similar transactions or events within a source of authoritative GAAP for that entity and then consider nonauthoritative guidance from other sources."  ASC 105-10-05-2.

Defendants had actual knowledge that the statements and omissions made by them were false and misleading, and/or acted with reckless disregard for the truth or falsity of those statements and omissions.  The Individual Defendants' intent to deceive, or reckless disregard for the truth, is demonstrated by substantial direct and circumstantial evidence supporting a strong inference of scienter, including the following:

### A.    CWs Confirm Declining Business and that Defendants Knew of This Decline Because of Their Visibility into the Business

517.    The Confidential Witnesses cited in Sections IV(C) and IV(F)(2), confirm that the issues at Nielsen were clearly understood throughout the Class Period.  As described in Section IV(C)(2), Nielsen had tremendous visibility into its performance.  These allegations support a strong inference of scienter.

### B.    Additional Facts Supporting Scienter Preceding 3Q16 Partial Revelation of the Truth

518.    As described in Section IV(C), in addition to the CW testimony that the decline in Nielsen's business and declining client demand was visible well before 3Q16, three additional facts indicate that the Company knew it was misleading investors prior to that date.  First, Defendants own admissions indicate that they knew about the problems at Nielsen and yet did not disclose them.  For example, Defendant Barns disclosed that, contrary to the assurances that discretionary spending was "stable," the Company actually had not seen strong discretionary spending since the 3Q15.  Second, Nielsen began developing a major new product – Connected Buy System - precisely to respond to the undisclosed trend of declining consumer interest in analytics.  Third, the size of the guidance miss, relative to the Company's visibility into future performance, demonstrates that Defendants knew they would not meet guidance at the time it was confirmed.

C.     **Additional Allegations of Knowledge or Recklessness That Nielsen was Misleading Investors Regarding GDPR**

519.     Defendants repeatedly assured investors that GDPR would not be a problem.  The later revelation of problems, which Defendant Barns referred to as "pretty logical," cannot be construed as anything less than extreme recklessness.  A person necessarily knows they are providing false assurances when those assurances are ultimately proven to be undermined by obvious and foreseeable issues, as they were here.  .

520.     Similarly, the repeated question about GDPR expressly prompted Defendants to think about GDPR preparedness, meaning that their assurances of preparedness regarding those very issues cannot be construed as anything less than either knowing or recklessly misleading.

521.     Additionally, as described in Section VI(F)(2), statements made by former employees confirm Defendants' knowledge of these issues.

522.     After the Class Period disclosure (on September 12, 2018), Nielsen also was disclosed that Nielsen its access to data was "literally switched off," when GDPR was enacted.  This statement makes it clear, beyond doubt, that GDPR affected Nielsen in an enormous and obvious way, and that senior employees speaking to investors about GDPR knew of these issues or at the very least were reckless in not knowing of them.  Nielsen also stated that as of September 12, 2018, Nielsen was still working to resolve these issues.  Clearly, Defendants would have been aware of this enormous problem in Nielsen's business when it occurred (on May 25, 2018).  Similarly, by October 25, 2018, it was disclosed that Nielsen was still working to meet the new policies, so that it could return to focusing on sales.

523.     The size of the problem, combined with Nielsen's high visibility into its performance, and the timing of the false and misleading statements also support the conclusion

that Defendants knew of the problems and were reckless at the time they made the false and misleading statements.

**D.**     **Additional Facts Supporting Scienter Regarding Statements About China**

524.     Defendants' statements assuring investors that the issues in China were limited to execution issues 4Q17, and that those issues were resolved, are disproven both by the CW testimony that Nielsen's emerging markets, was facing serious undisclosed issues, and by specific disclosures by Nielsen that its issues in China were not limited, as it claimed.  On July 26, 2018, Defendant Barns told investors during Nielsen's 4Q17 earnings call, "Quite frankly, *we __still__ have more work to do operationally there*" and "We've made some changes in those marketplaces that are going to help us longer term, but we still have a little bit more work to do there operationally."  He could not possibly have "assure[d]" investors that those issues had been fully resolved in 4Q17, when he subsequently admitted that work still needed to be done. Furthermore, after the Class Period on October 25, 2018, Patrick Dodd, whose title was President-Global Markets Group, indicated that the Company "now" (as in on that date) had a management team in place in China, meaning that the issues were not resolved until then. Again, the Defendants who spoke on the issue of the execution problems in China, would have known that those issues were not resolved (*e.g.*, the market was facing decline and the management team change-over was not then complete), at the time when they assured investors that the issues had been fully resolved.  Similarly, Patrick Dodd said on October 25, 2018, that "we *are* rebuilding and strengthening our commercial teams across China."  Again, Defendants must have known the issues were not fully resolved, as assured, if the Company was still rebuilding the commercial team as of October 25, 2018.

**E.** **By Speaking on the Subjects at Issue in this Complaint, Defendants Must Have Had Knowledge of the Conditions in Nielsen or They Were Reckless in Speaking On Those Subjects**

525.    As alleged in Section VII, many of the false and misleading statements were made by Defendants and affirmatively represented an understanding of the conditions within Nielsen's business.  Thus, Defendants can be assumed to have had knowledge of those subjects upon which they spoke, or can be presumed to have been reckless when speaking on those subjects. Furthermore, the detailed truthful information that they provided, alongside their false and misleading statements and omissions, further demonstrates their detailed knowledge of the subjects upon which they spoke.

**F.** **The Significance of the Subject of the False and Misleading Statements to Nielsen's Business Supports Scienter**

The matters at issue here are of such enormous importance to Nielsen that it is not possible that the Individual Defendants, as senior officers of Nielsen, would not have known the truth.  The issues regarding the analytics insights business were—and ultimately have proven to be—an existential threat to the viability of Nielsen's business.  The insights business is disclosed as representing about 30% of Nielsen's revenue, and plays a central role in its long-term ability to compete in a market where raw data will quickly become a low-margin commodity. Moreover, Nielsen's issues in China were core, because—as Defendant Jackson admitted during the period of the misstatements—it was "***the most important growth market in the world***," for Nielsen.  Similarly, because access to third-party data was absolutely critical to Nielsen so that issues regarding the access to that data were core to Nielsen—in fact, as was later disclosed the disruption to the data "pretty much stop[ped] the business."

### G.   **Defendants Barns' and Jackson's Terminations Support Scienter**

526.    The termination of Defendant Barns and abrupt resignation of Defendant Jackson provide additional indications of scienter.  Though the Company has not stated as much, the abrupt nature of these events and the fact that Barns was terminated, suggests that those inside the Company realized their involvement in wrongdoing.  Taken together with the other allegations herein this supports the inference of scienter.

## IX.   LOSS CAUSATION

1.    During the Class Period, as detailed herein, Defendants false representations and omissions of material facts about Nielsen's business caused Nielsen's stock to trade at artificially inflated prices and operated as a fraud and deceit on purchasers of the Company's securities. Nielsen's stock price reached a class period high of $55.81 on July 22, 2016 as a result of Defendants falsely representing that discretionary spending by Buy Developed Market clients remained stable and that Nielsen would report full year 2016 results in line with full year 2016 guidance.

2.    After Defendants revealed some of the previously concealed adverse information on October 25, 2016, April 25, 2017, October 25, 2017, February 8, 2018, April 26, 2018 and July 26, 2018, Nielsen's stock price declined substantially.  These drops removed inflation from the price of Nielsen common stock, causing real economic loss to investors who had purchased Nielsen common stock during the Class Period.  By July 26, 2018, Nielsen's stock price declined to just $22.11, a 60% or $33.70 per share decline from the class period high price of $55.81 on July 22, 2016 as the artificial inflation was removed from the Company's stock price.  Class members who purchased Nielsen stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

527.     As a result of their purchases of Nielsen's common stock during the Class Period,

Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal

securities laws.  Defendants' false and misleading statements had the intended effect and caused

Nielsen's common stock to trade at artificially inflated levels throughout the Class Period,

closing at $47.33 per share on February 11, 2016 (the first day of the Class Period), closing at a

high of $58.81 per share on July 22, 2016, and falling by $9.28 (16.8%), $1.61 (3.9%), $2.57

(6.25%), $3.66 (9.74%), $2.44 (7.10%), and $7.46 (25%) per share on October 25, 2016, April

25, 2017, October 25, 2017, February 8, 2018, April 26, 2018, and July 26, 2018, respectively.

528.     By concealing from investors the adverse facts detailed herein, Defendants

presented a misleading picture of Nielsen's business and prospects.  As Defendants began to

reveal these adverse facts to the market, the price of Nielsen's common stock fell dramatically.

This decline removed the artificial inflation from the price of Nielsen's common stock, causing

economic loss to investors who had purchased Nielsen's common stock during the Class Period.

529.     The decline in the price of Nielsen's common stock following these revelations

was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being

revealed to investors and the market.  The timing and magnitude of the price declines and analyst

reactions to the news, individually and collectively, negate any inference that the loss suffered by

Plaintiffs and the other Class members was caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to Defendants'

fraudulent conduct.

530.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class

members was a direct result of Defendants' fraudulent scheme and course of conduct to

artificially inflate the price of Nielsen's common stock and the subsequent material decline in the

value of Nielsen's common stock when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

## X.      APPLICATION OF THE PRESUMPTION OF RELIANCE

531.    Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

532.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)      Nielsen's common stock met the requirements for listing on, and was traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b)      Nielsen's common stock traded at high volumes during the Class Period, and its weekly trading volume during the Class Period was 14.3 million shares, or approximately 4.0% of the average total outstanding shares, the "float" or shares not owned by insiders comprised approximately 98% of outstanding shares during the Class Period, and the Class Period bid/ask spread median was $0.012.

(c)      The market capitalization of Nielsen during the Class Period was between $7.9 billion and $20.1 billion and institutional investors owned more than 90% of Nielsen's shares during the Class Period;

(d)      Nielsen's common stock was registered with the SEC, Nielsen filed Annual Reports, and routinely filed quarterly unaudited financial reports;

(e)      Nielsen communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases

on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)     The market reacted promptly to public information disseminated by Nielsen;

(g)     Nielsen's common stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, and each of these reports was publicly available and entered the public marketplace;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nielsen's common stock; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class bought Nielsen's common stock between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

533.     As a result of the foregoing, the market for Nielsen common stock promptly digested current information regarding Nielsen from all publicly available sources and reflected such information in the Company's stock price.

## XI.     NO SAFE HARBOR

534.     The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

535.    First, Defendants' statements and omissions alleged to be false and misleading

relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor.

Second, to the extent any of the false and misleading statements alleged may be characterized as

forward-looking, they were not adequately identified as "forward-looking" statements when

made.  Third, any purported forward-looking statements were not accompanied by meaningful

cautionary language because risks that Defendants warned of had already come to pass, and any

cautionary language did not mention important factors of similar significance to those actually

realized.  Fourth, to the extent that there were any forward-looking statements that were

identified as such, Defendants are liable because, at the time each of those forward-looking

statements was made, the speaker knew the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

536.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or

otherwise acquired Nielsen publicly traded common stock during the period from February 11,

2016 through July 25, 2018, inclusive (the "Class Period"), and were damaged thereby, except as

excluded below (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the

immediate family of any Individual Defendant; (iii) any person who was an officer or director of

Nielsen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any

Defendant has or had a controlling interest; (v) affiliates of Nielson, including its employee

retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made

purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-

interest, or assigns of any such excluded person in (i)-(iv) of this paragraph.

537.    The members of the Class are so numerous that joinder of all members is

impracticable.  During the Class Period, Nielsen had over 350 million common shares

outstanding.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

538.    While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained either by Nielsen or by other customary means and may be notified of the pendency of this action by mail, using a form of notice as is customary in securities class actions.

539.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

540.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.

541.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)      whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)      whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)      whether Defendants acted with the intent to defraud class members regarding the true value of Nielsen's common stock;

(g)      whether Defendants' fraudulent conduct inflated the price of Nielsen's common stock during the Class Period;

(h)      whether the Individual Defendants were controlling persons of Nielsen;

(i)      whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(j)      whether and to what extent the shareholders of Nielsen suffered losses due to Defendants' fraudulent conduct.

542.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

543.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth

above as if fully set forth herein.

544.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule

10b-5 promulgated thereunder by the SEC against all Defendants.

545.     Defendants, individually and in concert, directly and indirectly, by the use of the

means or instrumentalities of interstate commerce, the mails, and/or the facilities of national

securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated

thereunder by the SEC.

546.     Defendants made false and misleading statements of material facts, omitted to

state material facts which they had a duty to disclose and omitted to state material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading.

547.     Defendants made their false and misleading statements and omissions and

engaged in the fraudulent activity described herein knowingly and intentionally or in such a

reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of

the Class who sold Nielsen's common stock.

548.     Defendants intended to and did, as alleged herein, (i) deceive the investing public,

including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of

Nielsen's common stock; and (iii) cause Plaintiffs and members of the Class to buy Nielsen's

common stock at artificially inflated prices.

549.     The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

550.     In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nielsen's common stock, Plaintiffs and other members of the Class bought Nielsen's stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have bought Nielsen's common stock at such artificially inflated prices.  By buying the Nielsen common stock at these artificially inflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

551.     By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT II

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

552.     Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein.

553.     This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

554.    As alleged above, Nielsen violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements and omitting material information in connection with the purchase and sale of Nielsen's common stock.

555.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Nielsen is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

556.    As set forth above, the Individual Defendants were controlling persons of Nielsen during the Class Period, due to their senior executive positions with the Company, positions on the Board and significant control over the Company's stock.  Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations.

557.    By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nielsen, including the content of its public statements.

558.    The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who bought Nielsen's common stock during the Class Period.

559.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nielsen's common stock, Plaintiffs and other members of the Class bought Nielsen's common stock at artificially inflated prices during the Class Period.  But for the fraud,

Plaintiffs and members of the Class would not have bought Nielsen's common stock at such artificially inflated prices.  By buying Nielsen's common stock at these artificially inflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

560.   By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of Nielsen in violation of Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

561.   WHEREFORE, Plaintiffs respectfully prays for judgment against the Defendants as follows:

A.   Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

B.   Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.   Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

D.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.   Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

562.   Plaintiffs demands a trial by jury of all issues so triable.

DATED:  June 21, 2019

By:   */s/ Carol C. Villegas*
**LABATON SUCHAROW LLP**

Carol C. Villegas
Eric J. Belfi
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
          ebelfi@labaton.com
          jbissell-linsk@labaton.com

***Attorneys for Lead Plaintiff Public Employees'
Retirement System of Mississippi and Lead Counsel
for the Proposed Class***

**ROBBINS GELLER RUDMAN
& DOWD LLP**

Shawn A. Williams
Chris Seefer (Pro Hac Vice Application Forthcoming)
Post Montgomery Center,
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: shawnw@rgrdlaw.com
Email: ChrisS@rgrdlaw.com

***Counsel for Additionally Named Plaintiff Monroe
County Employees' Retirement System, and
Additional Counsel for the Proposed Class***

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

By: _____ */s/ Carol C. Villegas* _____
                                  **Carol C. Villegas**