**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NIELSEN HOLDINGS PLC SECURITIES LITIGATION | ) Case No. 18-CV-07143-JMF ) ) CLASS ACTION ) ) <u>DEMAND FOR JURY TRIAL</u> ) ) LEAVE TO FILE GRANTED BY ) COURT ON SEPTEMBER 12, 2019 ) ) |

**<u>SECOND AMENDED COMPLAINT</u>**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ...................................................................................................... 1

II.    SUMMARY OF THE ACTION ................................................................................. 1

III.   JURISDICTION AND VENUE ................................................................................ 9

IV.   PARTIES AND WITNESSES.................................................................................. 10

     A.    Named Plaintiffs ........................................................................................... 10

     B.    Defendants and Their Roles as Control Persons of Nielsen ................................ 10

     C.    Confidential Witnesses ................................................................................. 13

V.    BACKGROUND ON NIELSEN'S BUSINESS ....................................................... 18

     A.    The Buy Segment........................................................................................... 20

     B.    The Watch Segment ....................................................................................... 21

VI.   SUBSTANTIVE ALLEGATIONS .......................................................................... 22

     A.    Prior to the Class Period Defendants Assert the Strong Position of Nielsen........ 22

     B.    Defendants Hide Problems in the Buy Segment (4Q15 – 3Q16) ........................ 25

         (1)   4Q15: Nielsen Boasts of its Strength and Hides Negative Trends .......... 25

         (2)   1Q16: Nielsen Falsely Boasts of Strong Position .................................... 27

         (3)   2Q16: Nielsen Downplays "Challenging" Environment ......................... 28

         (4)   Known and Undisclosed Trends Were Undermining Nielsen................. 29

             (i)    Discretionary Buy Segment Spending was in Decline ................ 29

             (ii)   Interest in Analytics Products was Diminishing........................... 32

             (iii)  Fast Growth in Emerging Markets Would be Short-Lived.......... 34

             (iv)  Defendants Had Visibility into the Declining Performance ........ 37

         (5)   3Q16: Nielsen Partially Reveals Its Declining Performance ................... 43

C.    Despite Admitting to Some Weakness in the Developed Buy Business, Defendants Continued to Mislead the Market (3Q16 – 4Q17) ........................... 49

    (1)    Analyst Day (December 8, 2016) ........................................... 50

    (2)    4Q16 (February 9, 2017) ...................................................... 51

    (3)    2016 10-K (February 17, 2017) ............................................ 51

    (4)    1Q17 (April 25, 2017) .......................................................... 52

    (5)    2Q17 (July 27, 2017) ........................................................... 53

    (6)    3Q17 (October 25, 2017) ...................................................... 54

    (7)    2017 Investor Day (November 9, 2017) ................................ 56

D.    Defendants' Deceit Continues and Expands (4Q17 – 2Q18) .............................. 57

    (1)    Fraud about Nielsen's Performance, China, and Goodwill .................... 58

        (i)    4Q17: Results Falter as the Fraud Continues and Expands .......... 58

        (ii)    2017 10-K: Undisclosed Trends and Goodwill Impairment ......... 60

        (iii)    1Q18: Results Continue Declining as the Fraud Continues .......... 61

    (2)    Fraud About the GDPR ........................................................ 66

        (i)    Background About the GDPR ...................................... 66

        (ii)    Nielsen Defrauds Investors About the GDPR ........................... 67

        (iii)    The GDPR Problems Were Known Throughout 2018 ................. 72

    (3)    2Q18: Nielsen Reveals Its Severe and Broad Decline ............................ 75

        (i)    Revelation of Buy Segment Issues .............................. 78

        (ii)    Revelation of GDPR Issues ........................................ 82

E.    Subsequent Disclosures Further Confirm the Fraud ............................................ 88

    (1)    Abrupt Resignation of Defendant Jackson .............................. 88

    (2)    Subsequent Disclosures About Known GDPR Issues ............................ 89

    (3)    Subsequent Disclosures About Nielsen's Buy Segment Issues ................ 91

    (4)    Nielsen Takes Massive Buy Segment Goodwill Write-Down ................ 93

VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................... 94

    A.   Chronology of False and Misleading Statements ................................. 95

        (1)   February 11, 2016 (4Q15 Results)..................................... 95

        (2)   April 20, 2016 (1Q16 Results)........................................ 98

        (3)   July 26, 2016 (2Q16 Results)......................................... 99

        (4)   September 26, 2016 (J.P. Morgan Investor Conference)...................... 102

        (5)   October 25, 2016 (3Q16 Results) ........................................ 103

        (6)   December 8, 2016 (Analyst Day) ........................................ 107

        (7)   February 9, 2017 (4Q16 Results)........................................ 108

        (8)   April 25, 2017 (1Q17 Results)......................................... 110

        (9)   July 27, 2017 (2Q17 Results)........................................ 114

        (10)   October 25, 2017 (3Q17 Results) ..................................... 118

        (11)   November 9, 2017 (Investor Day) ....................................... 121

        (12)   February 8, 2018 (4Q17 Results)........................................ 123

        (13)   February 28, 2018 (Morgan Stanley Conference) ................................. 128

        (14)   April 26, 2018 (1Q18 Results)......................................... 130

        (15)   May 15, 2018 (Needham 2018 Emerging Technology Conference)...... 134

        (16)   May 16, 2018 (Barclays Americas Select Franchise Conference) ......... 135

        (17)   May 31, 2018 (Sanford Bernstein Strategic Decisions Conference) ...... 137

        (18)   June 5, 2018 (Baird Conference) ........................................ 140

        (19)   June 14, 2018 (Bernstein Future of Media Conference)........................ 141

    B.   Failure to Disclose Trends and Risks.................................... 143

    C.   Statements About the Value of Nielsen's Buy Segment and its Goodwill......... 148

VIII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER ........ 166

    A.   Facts Supporting Defendants' Scienter Preceding 3Q16................................. 166

B.     Facts Supporting Defendants' Scienter Regarding Nielsen's Buy Segment and Analytics Business from 3Q16 Onward ........................................ 171

C.     Facts Supporting Defendants' Scienter Regarding GDPR ............................... 174

D.     Facts Supporting Defendants' Scienter Regarding China .................................. 176

E.     Facts Supporting Defendants' Scienter Regarding Emerging Markets .............. 179

F.     Facts Supporting Defendants' Scienter Regarding Goodwill Impairment ......... 181

G.     Defendants Barns' and Jackson's Terminations Support Scienter .................... 183

IX.     LOSS CAUSATION ................................................................................................ 183

X.     APPLICATION OF THE PRESUMPTION OF RELIANCE ....................................... 185

XI.     NO SAFE HARBOR ............................................................................................... 187

XII.     CLASS ACTION ALLEGATIONS .......................................................................... 187

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5  Promulgated Thereunder Against All Defendants ........................................................................ 190

COUNT II Violation of § 20(a) of the Exchange Act Against the Individual Defendants .............................................................................................................. 192

XIII.     PRAYER FOR RELIEF ......................................................................................... 193

XIV.     JURY DEMAND ................................................................................................... 194

## I.     INTRODUCTION

Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS"), and additionally named Plaintiff Monroe County Employees' Retirement System (together with MissPERS, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based on personal knowledge as to Plaintiffs, and Plaintiffs' own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of press releases and other public statements issued by Nielsen Holdings plc ("Nielsen" or the "Company"), Nielsen's filings with the U.S. Securities and Exchange Commission ("SEC"), interviews with Nielsen's former employees, and a review of media and analyst reports about the Company.  Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be obtainable through a reasonable opportunity for discovery.  This suit alleges securities claims against Defendants Dwight Mitchell Barns, Kelly Abcarian, Jamere Jackson ("Individual Defendants") and Defendant Nielsen (collectively, "Defendants").

## II.     SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Nielsen common stock between February 11, 2016 and July 25, 2018, inclusive (the "Class Period").  The action is brought against Nielsen and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Nielsen collects information about what consumers buy and watch and sells data and analytical products.  Nielsen's two main reporting segments are similarly sized.  First, the Buy segment tracks billions of retail transactions around the world and transforms this data into products that consumer packaged goods ("CPG") companies (*e.g.*, The Procter & Gamble

Company and Nestle S.A.) use in understanding their markets and consumers.  Reporting on the Buy segment is split geographically into the Developed Markets and Emerging Markets.  Second, the Watch segment tracks user data from television, radio, and the internet and transforms this data into products that Nielsen's media clients use to understand their audiences.  The Watch segment houses a business focused on analyzing advertising campaigns called "Marketing Effectiveness," which was promoted as fast growing and highly promising.  Across its business, Nielsen relies on data obtained from third-parties such as Facebook and Twitter for many of its products and services.

3.     Entering 2016, Nielsen was seen by analysts as a resilient "safe haven."  This was partially due to the Company's strong visibility into its performance, since it entered each year with over 60% of revenue secured under multi-year contracts.  Even the discretionary part of its revenue was secured by 3-8 month long contracts, leaving little room for quarterly surprises.

4.     Defendants defrauded the market by knowingly or recklessly making materially false and misleading statements and omissions about Nielsen's Buy and Watch businesses.  Defendants overstated the strength of Nielsen's business, when in reality the Company was in decline, and was plagued by numerous problems that negatively affected its growth.

5.     At the start of the Class Period on February 11, 2016, Nielsen stated that the Buy segment was continuing to "***strengthen and expand***."  Defendant Barns, Nielsen's CEO, stated that revenue growth was led by "***solid growth***" in the U.S. and Defendant Jackson, Nielsen's CFO, described the "***discretionary spend environment as being pretty stable***" and said that "***clients [are] investing in analytics and innovation***."  These positive comments were coupled with ***positive guidance***, and Nielsen's stock price increased by 4.2% that day, to close at $47.33.

6.     Defendants continued to affirm positive guidance and tout the supposed strength of the Buy segment throughout the next two quarters.  During the earnings call for Nielsen's 1Q16 results, Defendant Jackson stated that the business was "***solid***" in the U.S., and that "***discretionary spend remains stable***."  The associated press release described Nielsen's "***steady and resilient business model***."  During the earnings call for Nielsen's 2Q16 results, Defendant Jackson noted some "softness" in discretionary spending, but reassured investors that some lumpiness is not uncommon and that Nielsen was coming off two "***stable quarters***" and would ***still meet its guidance***.  Analysts remained impressed by Nielsen's strong results in 2Q16 and were encouraged by these assurances about Developed Markets performance.

7.     In contrast to Defendants' public statements, former Nielsen employees describe a dramatic trend: clients no longer wanted to pay for Nielsen's analytics.  These clients were shifting to Nielsen's competitors, like InfoScout and Market Track, and even Proctor & Gamble left Nielsen for a competitor.  Clients also had decided that it was preferable to purchase data from Nielsen, and to conduct the analysis of that data themselves.  Clients just didn't want the complicated and expensive analytics that Nielsen offered, opting instead for "raw data" from Nielsen they could crunch themselves.  One former employee said that clients had doubts about the usefulness of analytics coming from Nielsen and that clients gave him feedback that Nielsen's analytics products were "antiquated" and that customers were not interested in them.  Taken together, the departure of several key clients and the slowdown in clients purchasing analytics led to what one former employee called a "terminal decline" in the Buy side of the business.

8.     Defendants were keenly aware of this decline, even while they made false statements to the market about Buy segment growth.  Many former employees described internal

Nielsen reports that were prepared regularly and sent to senior management, including

Defendants Barns and Jackson.  The reports contained detailed revenue metrics—both actual and

forecasts, broken down by each client and region, in all lines of Nielsen's business.  Another

former employee described meetings where client revenues and budgets were discussed with

Defendant Jackson and another talked about how Defendant Jackson had continuous access to

systems that provided information about the performance of Emerging Markets.

        9.      On October 25, 2016, Nielsen reported its 3Q16 results, and shocked the market

with a 3.7% (or 2.5% in constant currency) decline in Developed Markets revenues due to weak

discretionary spending in the U.S.  During the 3Q16 earnings call, Defendant Barns admitted that

the trend was known throughout 2016, and that Nielsen had actually responded to the trend

internally.  He said: "**Earlier this year . . . we saw these more challenging trends unfolding,**"

and described the changes Nielsen had made in response.  Similarly, Defendant Jackson said

"**looking back to the third quarter of last year, you saw our developed markets business**

**grow 4.8% constant currency and as part of that discussion we've said that we saw a pretty**

**strong discretionary environment.  We have not seen that since then and if you look at our**

**results in our developed Buy business they've sequentially been going in the other**

**direction**."  Following these unexpected adverse disclosures, Nielsen's stock price plummeted

16.9%, and analysts issued reports criticizing Defendants and questioning the credibility of their

previous statements.

        10.     However, even after 3Q16, Nielsen's stock price remained artificially inflated

because Defendants continued to make material misrepresentations about the Buy business and

conceal materially adverse information which was negatively impacting the Buy business.

Defendants blamed the decrease in discretionary spending on conditions in the U.S. CPG market

and failed to disclose the even more concerning shift in demand for "raw data," rather than

Nielsen's analytics, which meant that these problems were not isolated to the U.S. or solely

caused by top line revenue pressures on Developed Markets clients.

11.     Over the next several quarters Defendants continued to make materially false and

misleading statements about the condition of its business and reported results below guidance.

In December 2016 and February 2017, Defendants told investors that Developed Markets

revenues would ***decline 1%-1.5%*** but revealed on April 25, 2017, that Nielsen reported a 7.3%

decline in 1Q17 Developed Markets revenues and that Developed Markets revenues would not

meet guidance.

12.     During Nielsen's 2Q17 earnings call, Defendants told investors that Developed

Markets revenues would improve and be "***flat***" in 2018.  However, the very next quarter, they

revealed during the 3Q17 earnings call that Developed Markets revenues would decline in 2018.

One analyst commented "the fact that NLSN is walking [its guidance of flat 2018 Developed

Markets revenue] back just one quarter later (and not proactively) further hurts its credibility."

13.     Nielsen's stock price declined after this unexpected negative news but continued

to trade at artificially inflated prices because Defendants made materially false and misleading

statements about the Buy segment and concealed spending declines by clients in both the

Developed and Emerging Markets.  The poor results in the Buy Segment and the concealment of

the spending declines caused the value of the Buy segment to be considerably less than what

Defendants claimed, including the value of Buy segment goodwill which Defendants represented

was at least 20% greater than its carrying value.

14.     In late 2017, Defendants also misled investors by representing that that Emerging

Markets revenues would increase 8%-10% and that the business was "***robust***," "***exceptionally***

*strong*," and that they "***continue[d] to see solid growth from both local clients and***

***multinationals across the emerging markets***."  They represented that China was "the most

important growth market in the world" and that it was "***very healthy***."  However, according to

former Nielsen employees, the spending declines by clients in Developed Markets were also

affecting Emerging Markets.

15.     On February 8, 2018, Defendants revealed that Emerging Markets revenues

increased just 4.8% in 4Q17 and Nielsen's stock price dropped $3.66 (9.7%), on heavy trading

volume.  However, Defendant Jackson continued to inflate the stock price by downplaying these

concerning results, stating they were the result of "disruption from natural disasters and some

***revenue execution issues in China***."  Defendant Barns falsely claimed that Nielsen had ***fully***

***addressed the China issues*** and they wouldn't be a problem moving forward.

16.     On February 8, 2018, Defendants also misled investors by stating that Watch

Marketing Effectiveness revenues would increase ***15%-20%*** in 2018 and that there would ***not be***

***any major impact*** on Nielsen from the European Union's General Data Protection Regulation

("GDPR"), which would become effective on May 25, 2018.  Throughout the first half of 2018,

they assured investors that Nielsen was ready for the GDPR, which they called a "***net positive***"

for Nielsen.  After Facebook made policy changes curtailing some firms' access to data, Nielsen

assured investors it ***still had access*** to all the data it needed.

17.     Contrary to these representations, hundreds of data providers did not provide

Nielsen the data it needed to deliver its products, which prevented the Company from closing

contracts and recognizing revenue.  Defendants were fully aware of the negative effects that the

GDPR would have on the Company's business.  Nielsen's former Chief Privacy Officer, who

spoke with Lead Counsel about the matter, recounted how in the 6 weeks before the GDPR went

into effect, there was a "noticeable and markedly different" trend, in that clients were pulling

back.  He further advised that in those 6 weeks prior to the enactment of the GDPR the general

climate around the GDPR changed for clients, partners, and vendors.  He described how Nielsen

was impacted by clients "holding off on deployment," general "nervousness" about committing

to new work because of the GDPR, and pressure from partners and vendors around the

"transparency consent framework."  He suggested that there were numerous externalities related

to the GDPR that negatively impacted Nielsen.

18.    However, Defendants continued to make positive statements about the GDPR,

including statements on April 26, 2018 (the GDPR "***plays as a net positive for our business***"),

May 31, 2018 (the GDPR has "***been a more of a non-event from our side***"), and June 14, 2018

("***the privacy changes for our core measurement products were really, for us, when GDPR***

***came really a non-event***").

19.    Amidst these statements about the GDPR, Nielsen also made positive statements

on May 16, 2018, and May 31, 2018, to reassure investors that the Emerging Markets business

was alive and well and that past problems in China were over.  In particular, Defendant Jackson

echoed his earlier assurances by saying the operational issues in China were "***behind us***," as

Nielsen had made changes to "***leadership and structure***" and was now "***operating pretty well.***"

20.    On July 26, 2018, Defendants reported Nielsen's 2Q18 results and disclosed the

extent of the Company's previously undisclosed problems.  Defendant Jackson began his

remarks by saying that the quarter was "**one of the most challenging quarters for our business**

**in over a decade.**"  Nielsen unexpectedly revealed substantial declines in Emerging Markets

revenues caused by significant weakness in multinational client spending, particularly in

Southeast Asia and China.  These substantial declines were in direct contrast to the guidance,

Defendants' affirmative statements about the business, and the assurances that the 4Q17 stumble was isolated to issues in China that had been fully resolved.  They also revealed that Emerging Markets revenues would be "flat" in 2018, a severe reduction from the 8%-10% growth in revenues they had told investors to expect.

21.      Defendants also unexpectedly revealed that Marketing Effectiveness revenues had increased just 6% in 2Q18, substantially less than the 15%-20% growth they previously told investors to expect, and slashed 2018 guidance to "flat to up low single digits."  They blamed this poor performance on the GDPR and admitted that Nielsen did not have access to the data from Facebook and hundreds of other data providers for its analytical products, including data that helped advertisers target individual consumers, which caused Marketing Effectiveness clients to not purchase those products.  Moreover, Defendant Barns eventually admitted during the 2Q18 earnings call that this devastating outcome was not a surprise, but a "***logical***" result of the GDPR going into effect.  On September 12, 2018, Nielsen admitted that by the May 25, 2018 effective date of the GDPR, the large data providers prevented Nielsen from getting the data it needed—a Nielsen executive stated: "**On that day, we had 120 campaigns being measured, 120 campaigns, and it was literally switched off**" and that the access to data was flipped off, "**literally like a light switch**."

22.      Following the unexpected adverse disclosures about the Watch and Buy segments on July 26, 2018, Nielsen's stock price declined 25% in one day and closed at $22.11.  This closing price reflected a 60% decline from the Class Period high price on July 22, 2016. Analysts' reaction to the news on July 26, 2018 indicate they suspected Defendants knew about the problems well before that date.  During the 2Q18 earnings call, analysts asked questions about the previously undisclosed problems in Marketing Effectiveness, noting that the adverse

disclosures about the GDPR's impact on revenues and guidance contradicted Defendants'

positive statements during the Class Period, and questioned why the unexpected negative news

was not disclosed previously.  After the conference call, analysts issued numerous reports highly

critical of Defendants, which noted that the unexpected adverse disclosures about the GDPR

came shortly after Defendants downplayed the GDPR's relevance to Nielsen.

23.     Concurrently with the disclosure of these terrible results, Defendant Barns was

terminated, and analysts recognized that this was "wholly unexpected" but "not surprising" given

the 2Q18 disclosures.  On August 15, 2018, Defendant Jackson resigned from Nielsen as well,

upon public comments that investors would "demand significant managerial change."

24.     Nielsen reported disappointing results in 3Q18, 4Q18, and 1Q19, including a $1.4

billion goodwill impairment, wiping out a massive 54% of the Buy's segment's goodwill – a

write down they should have taken by at least late 2016 when the deceleration trends were

known to Nielsen.  Because of this, Defendants' statements concerning the goodwill value of the

Company were false and misleading throughout the entire Class Period.

25.     As a result of Defendants' wrongful acts and omissions, and the resulting

precipitous decline in the market value of the Company's securities, Plaintiffs and other Class

members have suffered significant losses and damages.

## III.    JURISDICTION AND VENUE

26.     The claims asserted herein arise under Section 10(b) of the Exchange Act, Rule

10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), and Section 20(a) of the

Exchange Act (15 U.S.C. § 78t(a)).

27.     Venue is proper in this district pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or

the effects of the fraud have occurred in this judicial district.  Many of the acts charged herein,

including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this judicial district.  Nielsen transacts business in this district, and the Company's offices are located within this judicial district.

28.     This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this suit alleges violations of the Exchange Act.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national exchange within the United States.

## IV.    PARTIES AND WITNESSES

### A.    <u>Named Plaintiffs</u>

30.     On April 22, 2019, this Court appointed Public Employees' Retirement System of Mississippi ("MissPERS") to serve as the Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (ECF No. 54).  As set forth in its PSLRA certification (ECF No. 34-1), Lead Plaintiff purchased Nielsen common stock during the Class Period and was damaged as the result of Defendants' wrongdoing as alleged herein.

31.     Additionally named Plaintiff Monroe County Employees' Retirement System ("Monroe") purchased Nielsen common stock during the Class Period (ECF No. 64), and was damaged as the result of Defendants' wrongdoing as alleged herein.

### B.    <u>Defendants and Their Roles as Control Persons of Nielsen</u>

32.     Defendant Nielsen is incorporated in the United Kingdom.  Its SEC filings list its principal executive offices at 85 Broad Street, New York, New York 10004, and at Nielsen House, John Smith Drive, Oxford, OX4 2WB, United Kingdom.  The Company also has a major

office at 200 W. Jackson Boulevard, Chicago, Illinois 60606.  Throughout the Class Period,

Nielsen issued earnings releases listing the location of the release as "New York, USA."  The

Company's stock is listed on the NYSE under the symbol "NLSN."

33.    The Individual Defendants, by virtue of their senior positions at Nielsen, directly

participated in the management of the Company, were directly involved in the day-to-day

operations of the Company at the highest levels, and were privy to confidential, proprietary

information concerning the Company and its business, operations, growth, financial statements,

and financial condition, as alleged herein.

34.    Defendant Dwight Mitchell Barns ("Barns") was, at all relevant times during the

Class Period, a member of the Board of Directors and Chief Executive Officer ("CEO") of the

Company.  As stated in Nielsen's Fiscal Year 2016 Proxy:

> His prior roles with Nielsen include President, Global Client Service from
> February 2013 through December 2013, President of Nielsen's U.S. Watch
> business from June 2011 until February 2013, President of Nielsen Greater China
> from January 2008 until June 2011, President of Nielsen's Consumer Panel
> Services from March 2007 until January 2008 and President of Nielsen's BASES
> and Analytic Consulting units from July 2004 through February 2007.  He joined
> Nielsen in March 1997 after 12 years with The Procter & Gamble Company.

35.    Defendant Barns received $10.1 million in total compensation in 2016, $10.2

million in 2017, and $10.8 million in 2018 – the same time period that Nielsen's stock price

declined approximately 60%, from $55.81 on July 22, 2016, to $22.11 on July 26, 2018.  On July

28, 2016, Defendant Barns sold 60,136 shares of Nielsen for $53.75 per share, receiving total

proceeds of $3,232,310.  On March 27, 2017, Defendant Barns sold another 46,947 shares of

Nielsen stock at $40.82 per share, receiving total proceeds of $1,916,377.  Both sales were made

when Nielsen's stock traded at artificially inflated levels due to Barns and the other Defendants

making materially false and misleading statements about Nielsen's business.

36.     As Nielsen's CEO and Board Chairman, Defendant Barns had executive control over the Company during the Class Period and would have had heightened control of the Company's statements regarding its financial condition and projections.  As alleged herein, Defendant Barns frequently signed SEC filings and participated in presentations to investors and analysts.  As alleged herein, Defendant Barns made false and misleading statements to investors during the Class Period.

37.     Defendant Jamere Jackson ("Jackson") was, at all relevant times during the Class Period, Chief Financial Officer ("CFO") of the Company.

38.     Defendant Jackson received $4.5 million in total compensation in 2016, $4.3 million in 2017, and $2.2 million in 2018 – the same time period that Nielsen's stock price declined approximately 60%, from $55.81 on July 22, 2016, to $22.11 on July 26, 2018.  On May 30, 2017, Defendant Jackson sold 11,500 shares of Nielsen stock for $38.55 per share, receiving total proceeds of $443,325.  On December 14, 2017, Defendant Jackson sold 16,000 shares of Nielsen stock for $36.30 per share, receiving total proceeds of $580,800.  On March 8, 2018, Jackson sold 19,000 shares of Nielsen stock for $32.97 per share receiving total proceeds of $626,430.  All of the sales were made when Nielsen's stock traded at artificially inflated levels due to Jackson and the other Defendants making materially false and misleading statements about Nielsen's business.

39.     As Nielsen's CFO, Defendant Jackson had control over the Company during the Class Period and had heightened control of the Company's statements regarding its financial condition and projections.  As alleged herein, Defendant Jackson frequently signed SEC filings and participated in the presentations to investors and analysts, where the false and misleading

12

statements were made.  As alleged herein, Defendant Jackson made false and misleading statements to investors during the Class Period.

40.     Defendant Kelly Abcarian ("Abcarian"), was at all relevant times during the Class Period, Senior Vice President of Product Leadership of the Company.

41.     As the Senior Vice President of Product Leadership at the Company, Defendant Abcarian had direct day-to-day control over significant portions of Nielsen's business.  As alleged herein, Defendant Abcarian made false and misleading statements to investors during the Class Period.  In particular, Defendant Abcarian made false and misleading statements about the GDPR in May and June of 2018.

### C.   Confidential Witnesses

42.     Some of the allegations in the Complaint are based on information provided by former Nielsen employees to Lead Counsel and its agents.  Lead Counsel interviewed numerous former employees of Nielsen who were employed at Nielsen during the Class Period.  These former employees are identified as Confidential Witnesses or "CW."

43.     Confidential Witness 1 ("CW 1") worked at Nielsen from before 2005 until the start of 2017.  From 2013 until the end of his[1] tenure, he was a Senior Vice President of Consumer and Shopper Insights and was responsible for client service and account management for U.S. CPG clients.  During the Class Period, he reported to Dennis Moore, the President of Professional Services at Nielsen North America, and then to Chris Morley, the U.S. President at Nielsen.

44.     Confidential Witness 2 ("CW 2") worked at Nielsen's office in Nairobi, Kenya, as an Executive Director for Emerging Markets, from April 2016 to April 2017.  He reported to the CFO of Emerging Markets, Samipendra Chaudhury, who reported to Defendant Jackson.

---

[1] All Confidential Witnesses ("CW") are referred to using male pronouns, regardless of their gender.

45.     Confidential Witness 3 ("CW 3") was a Director/Leader of Consumer Insights[2] team during the entirety of the Class Period and was in Africa, leading a region of Africa.  He reported to Akash Pal, Managing Director of Consumer Insights business in Emerging Markets, who reported to Nick Papagregoriou, President of Emerging Markets.  Nick Papagregoriou reported to the Head of Operations outside of North America, who reported to Defendant Barns.

46.     Confidential Witness 4 ("CW 4") worked at Nielsen from October 2013 until July 2018.  He was a Financial Planning and Analysis Leader ("FPA Leader") at the Associate Director level, in the Company's Dubai office, which was the headquarters for its emerging markets business.  He was the FPA leader for Nielsen's Middle East and Africa regions.  He reported to the CFO of Nielsen's Middle East, North Africa, and Pacific regions, Nalina Ranka, who reported to CFO of Emerging Markets, Samipendra Chaudhury, who reported to Defendant Jackson.

47.     Confidential Witness 5 ("CW 5") worked at Nielsen from 2011 until March 2017.  Throughout this time period, he was a Senior Vice President in Nielsen's Global Consumer Packaged Goods business.  He reported to Karen Fichuk, whose title was President, Strategic Initiatives, Developed Markets, Susan Dunn, whose title was Executive Vice President, Professional Services, and Konrad Gerszke, whose title was Group President-Lead Markets.

48.     Confidential Witness 6 ("CW 6") worked at Nielsen from August 2015 until January 2017, as the Manager of Marketing Return on Investment.  In this position, he was responsible for panel data analysis, market mix modeling, and CPG analysis.  He reported to the Vice President of Marketing Analytics.

---

[2] Consumer Insights is a business within Nielsen's Buy segment that "puts data into perspective" by providing analytics that purport to enable Nielsen's clients to understand their customers.

49.     Confidential Witness 7 ("CW 7") was a Vice President in Nielsen's Buy segment who worked remotely but rolled up into Nielsen's Central Region which was located in Chicago. He worked at Nielsen from before the Class Period until the fall of 2017.  He was responsible for selling to emerging accounts within the United States.

50.     Confidential Witness 8 ("CW 8") worked at Nielsen's office in Budapest, Hungary, from January 2013 to August 2016, as a Senior Global Report Liaison.  He reported to the Dedicated Design Manager, who reported to the Vice President of Global Product Leadership, Joe Rutecki.  He worked with the global marketing teams of Nielsen's largest clients, often for days, at the clients' corporate headquarters.  He worked with clients including PepsiCo, The Coca-Cola Company, Kimberly-Clark, and Reckitt Benckiser.

51.     Confidential Witness 9 ("CW 9") worked for Nielsen from 1995 until March 2017. Toward the end of his tenure, he was an Executive Director of Global Operations in India and was in operations roles throughout his tenure.  He supervised the Retail Measurement Services ("RMS")[3] and Consumer Panel Services ("CPS")[4] for the Southeast Asia territory for the Company.  He reported to David Ponraj, who reported to Siegfried De Smedt.

52.     Confidential Witness 10 ("CW 10") worked as a Senior Market Research Analyst in Nielsen's United Arab Emirates offices from February 2016 until June 2017.  He reported to Associate Director of Retail Measurement Services, Gaurang Kotak, who reported to Executive Director Sunil Khiani, who reported to the Managing Director of Arabian Peninsula & Pakistan ("AP&P") Cluster, Arslan Ashraf, who reported to President of Emerging Markets, Nick

---

[3] RMS refers to products through which Nielsen collects sales data from retailers and provides its customers with information about distribution, pricing, merchandizing and promotion, as well as market share and competitive sales volumes.
[4] CPS collects data from consumers on the products they buy to provide Nielsen's customers with consumer level data, rather than just tracking total sales, CPS allows the data to track what consumers and households are buying.

Papagregoriou.  In his role as a Senior Marketing Research Analyst, he collaborated with Custom Insights in Nielsen's Buy segment in analyzing data and providing Middle East and North African clients with insights on where consumer categories were trending.  Prior to that, he worked for Nielsen as a Client Consultant from October 2014 to January 2016 in the Company's Warsaw, Poland office.

53.    Confidential Witness 11 ("CW 11") worked in Nielsen's Florida offices from August 2013 until March 2018, with the title Senior Director, Global Engineering.  He worked in Nielsen's Watch segment until being transferred to the Buy segment around September 2017. His reporting chain was 3-4 levels below Megan Clarken, whose title was President – Watch.[5] His responsibility on the Buy segment included developing data partnerships for what was ultimately referred to as the Connected Buy System, though he said that it was not always called that while he worked on the project.

54.    Confidential Witness 12 ("CW 12") worked at Nielsen's offices in Dubai from September 2012 until February 2016, as a Senior Executive in Nielsen's Insights business.  His responsibilities included day-to-day client service and tracking project execution on the operations side.  He also said that beginning in 2015 and throughout the rest of his tenure, his responsibilities included revenue targets.  CW 12 last reported to Senior Manager – Public Development and Sustainability, Anand Marakani, who in turn reported to Director – Public Development & Sustainability, Jyotsna Nair, who in turn reported to Executive Director – Banking & Finance Research, MENAP Region, Anoop Sardeshpande, who in turn reported to Arslan Ashraf, who in turn reported Nick Papagregoriou.

---

[5] Megan Clarken held the title of President, Watch from September 2017 onward.  She retained her prior title of President, Product Leadership and International Media, which she had since April 2015.

55.     Confidential Witness 13 ("CW 13") worked for Nielsen from September 2015 until June 2018.  He was hired as Regional Director of APAC in Singapore, a title he had until June 2016, when he became the Head of Marketing for Central and Eastern Europe.  Then in July 2017, he moved to the United States where his title changed to Director until the end of his tenure with Nielsen in June 2018.

56.     Confidential Witness 14 ("CW 14") worked for Nielsen from September 2014 until September 2018.  His job title was "Chief Privacy Officer" and at the time of his appointment to that role he reported to Executive Vice President for External Affairs Karen Kornbluh.  In this role, he was responsible for overseeing Nielsen's global privacy program.

57.     Confidential Witness 15 ("CW 15") worked for Nielsen throughout the Class Period most recently as a Vice President in Nielsen's Watch division.  He was responsible for client development on the commercial side of the Watch division.

58.     Confidential Witness 16 ("CW 16") worked at Nielsen from 2008 to June 2018 as Data Quality Officer (Manager).  He worked as part of the Marketing Mix Modeling/Marketing Effectiveness team in a supporting role.  He was responsible for data collection and processing for the Marketing Effectiveness Models.  He worked out of the Company's Cincinnati, Ohio, offices.

59.     Confidential Witness 17 ("CW 17") was employed by Nielsen as a Vice President for a few years, with his tenure ending in March 2016.  His division was based in Rochester, New York.  His work was part of the Insights business in Nielsen's Buy segment.  In his chain of command, CW 17 was three levels below Managing Director, Consumer Insights & Innovation Mike de Vere.

60.     Confidential Witness 18 ("CW 18") was a Vice President of Client Services at Nielsen's Markham, Ontario office from 2015 to 2018.  He was responsible for negotiating contracts, business planning, and selling insights and solutions to major manufacturing CPG clients in Canada, including Pepsi, Unilever, Proctor & Gamble and Coca-Cola.  CW 18 reported to Krista Thompson, senior vice president of Client Services, who reported to Managing Director of Canada, Mike Ljubisis, who reported to Karen Fichuk, President of Strategic Initiatives/Developed Markets – North America.  Fichuk reported to Nielsen's Chief Operating Officer Hasker and Defendant Barns.

## V.     BACKGROUND ON NIELSEN'S BUSINESS

61.     Nielsen is a data analytics company that provides its clients[6] with detailed information about consumer preferences, especially in the CPG[7] industry, as well as what programming consumers watch (*e.g.*, on television and streaming platforms) and listen to (*e.g.*, radio programming).  Throughout the Class Period, Nielsen's business was divided into two main reporting segments: (1) Buy, and (2) Watch.

62.     As shown in the following chart, the two segments accounted for similar portions of Nielsen's business during the Class Period:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Buy segment Revenue | $3,322 million | $3,231 million | $3,097 million |
| Buy segment % of Total | 53% | 49% | 48% |
|  |  |  |  |
| Watch segment Revenue | $2,987 million | $3,341 million | $3,418 million |
| Watch segment % of Total | 47% | 51% | 52% |

63.     Nielsen's business depends on the collection of data.  Some of this data is collected by Nielsen through the use of surveys, panels, and by asking consumers to submit data

---

[6] Nielsen uses the terms "clients" and "customers" interchangeably, as does this Complaint.

[7] CPG items are those used regularly by ordinary consumers that require routine replacement such as food, drinks, clothes, and household products.

to the Company.  Other data is gathered in connection with partnerships with retailers, such as by receiving point of sale information.  Still other data is collected from third parties such as Facebook and Twitter.  By the Second Quarter of 2018, Nielsen's business was dependent on "data suppliers," in the form of over "200 data partners."

64.     As of 2016, Nielsen's principal competitors included Information Resources, GfK, Ipsos, Kantar, Comscore and TiVo.  Nielsen also faced competition from companies such as Oracle, Google Analytics, and Adobe Analytics, as well as many local and newer companies such as InfoScout and Market Track.

65.     Nielsen's public statements are peppered with the phrase "insights."  The term "insights" was used to describe a type of value that Nielsen could offer; it was a synonym for "analysis" or analytics and was often juxtaposed to the term "measurement."[8]  For example, Nielsen's  Annual Reports filings frequently describe "measurement and insights."  Those reports also stated that the "Buy and Watch segments are built on a foundation of proprietary data assets that are designed to yield essential insights for our clients."  When describing Nielsen's Retail Measurement Services, its Annual Reports said that it combines purchasing data with "in-house expertise" to produce "valuable insights that help our clients."

66.     Additionally, while Nielsen's two segments – Buy and Watch – have a degree of separateness, there is also significant overlap between the two businesses, especially to the extent they provide clients with analytical insights.  In each of Nielsen's Annual Reports throughout the Class Period, Defendants explained that when the "information from [the] Buy and Watch segments [is] brought together" it "can deliver powerful insights into the effectiveness of

---

[8] Some specific products offered by Nielsen included the term "insights" in their name.  For example, in November 2013, Nielsen launched a product called "Nielsen Buyer Insights," that "extend[ed] demographics in order to provide clients with superior insights" into categories such as "Retail, Travel, and Dining."

branding, advertising and consumer choice by linking media consumption trends with consumer purchasing data to better understand behavior and better manage supply and demand as well as media spend, supply chain issues, and much more."  These "integrated insights" were said to better enable clients to "enhance the return on both long-term and short-term investments."

### A.   <u>The Buy Segment</u>

67.   The Company's Buy segment tracks millions of retail transactions around the world and transforms this data into various products that assist CPG companies in their marketing decisions.  Each month throughout the Class Period, the Company processed approximately 9.5 billion purchasing data points.  Using its vast supplies of data, Nielsen then offered its clients analytics about consumers and their preferences and behavior.  The Buy segment's clients included the world's largest CPG merchandising companies such as Kraft Foods, The Coca-Cola Company, and The Procter & Gamble Company, as well as major retail chains like Safeway, Tesco, Walgreens, and Wal-Mart Stores.

68.   Throughout the Class Period, Nielsen always conveyed to the public that its business was more sophisticated than the collection and sale of this data.  Thus, it did not describe selling this data directly, but instead said that the data was collected in Nielsen's database and that clients used the Company's "proprietary software" to "query the information" and then "conduct customized analysis and generate reports and alerts."

69.   During the Class Period, the Buy segment was divided into two main sub-segments: "Developed Markets" and "Emerging Markets." [9]  The major differences between the Emerging Markets and Developed Markets were the geographic regions they covered.  The Developed Markets primarily included the United States, Canada, Western Europe, Japan, South

---

[9] Nielsen also had a general sub-segment titled "Corporate." According to Nielsen's Annual Reports, the "Corporate" sub-segment includes: slow growth and non-core services that are part of portfolio pruning initiatives."

Korea, and Australia.  The Emerging Markets included Africa, Latin America, Eastern Europe,

Russia, China, India, and Southeast Asia.  By February 28, 2018, Nielsen reported to the market

that within the Emerging Markets, about 35% of the business was with local clients, whereas the

rest was with large-multinational corporations.  The following chart shows the total revenue and

percentage of Buy revenue each of these sub-segments accounted for from Fiscal Year 2016 to

Fiscal Year 2018:

|  | 2016 | 2017 | 2018 |
|---|---|---|---|
| Developed Markets Revenue | $2,096 million | $1,999 million | $1,922 million |
| Developed Markets % of Buy | 63% | 62% | 62% |
|  |  |  |  |
| Emerging Markets Revenue | $1,063 million | $1,164 million | $1,145 million |
| Emerging Markets % of Buy | 32% | 36% | 37% |
|  |  |  |  |
| Corporate Revenue | $163 million | $68 million | $30 million |
| Corporate % of Buy | 5% | 2% | 1% |

**B.**    **The Watch Segment**

70.    The Company's Watch segment "provides viewership and listening data and

analytics primarily to the media and advertising industries across the television, radio, print,

online, digital, mobile viewing and listening platforms."  According to the Company, its Watch

data is used by media clients to understand their audiences and establish the value of their

advertising inventory.  Within the Watch segment, Nielsen reported the following sub-segments:

Marketing Effectiveness, Audio, Audience Measurement, and a general "corporate" sub-segment.

71.    The Marketing Effectiveness sub-segment quantifies "the effectiveness of

advertising by reporting behavioral observations, attitudinal changes and actual offline purchase

activity."  To accomplish this, Nielsen collects data "to measure consumer engagement and

recall of advertisements across television and online to provide important insights on advertising

and content effectiveness."  It relies heavily on social media, such as Facebook, to collect this information.

72.      Marketing Effectiveness was touted as a fast-growing business.  It was, at least in some ways, more similar to the Buy segment than much of Nielsen's Watch segment.  On May 18, 2016, at an analyst conference, Defendant Jackson explained that the "Marketing Effectiveness" business is a "really nice product offering" where the Company brings the "Watch and Buy businesses together."  The following chart shows the business' revenue growth on a constant currency basis each quarter, as reported in each quarterly report heading into 2018:

| Marketing Effectiveness Revenue | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2016 | | | | 2017 | | | |
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| 28.8% | 15.1% | 31.8% | 9.2% | 14.0% | 18.6% | 15.6% | 32.9% |

## VI.    SUBSTANTIVE ALLEGATIONS[10]

### A.    <u>Prior to the Class Period Defendants Assert the Strong Position of Nielsen</u>

73.      Prior to the Class Period, Nielsen reported years of growth in revenues, adjusted EBITDA,[11] net income, and free cash flow, and Defendants assured investors that growth would continue despite numerous changes in the Watch and Buy markets.  During the Company's December 11, 2015 Analyst Day conference, Defendants Barns and Jackson highlighted the historical growth in various financial metrics.  For example, the following slide of the presentation emphasizes growth and consistency:

---

[10] All emphass within this Section has been added.
[11] EBITDA refers to earnings before interest, tax, depreciation and amortization.  It is a measure of a company's operating performance.



74.     The presentation also emphasized the consistent revenue growth in the

Company's Watch and Buy segments, as shown in the following slide:



75.     During the Analyst Day conference, Defendant Jackson told investors that the

Company had "remarkably consistent" revenue because it had a "powerful syndicated business

model, with long-term contracts and blue-chip clients," and because it had "invested in

expanding [its] product capabilities."  He highlighted how both segments demonstrated the

consistency of Nielsen's business.  He forecasted revenue growth for Fiscal Year 2016 at 4% to

23

6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93, and free cash

flows of $950 million.  He concluded: "We have confidence in this financial framework because

this is Nielsen: consistent, steady, mid-single digit revenue growth, ongoing margin expansion,

an attractive and compelling free cash flow profile and a balanced capital structure.  We're well

positioned to deliver incremental shareholder returns."

76.     Additionally, as part of the Analyst Day conference, a slide deck was presented

showing guidance range of $6.1 billion in total revenue, with about $2.8 billion from Watch and

about $3.3 billion from Buy.  It also showed that Developed Markets would experience 1.5% to

3.5% in constant currency revenue growth and the Emerging Markets would experience 8% to

10% in constant currency revenue growth.  For both it described "stable discretionary spend" by

its customers.

77.     Barns concluded his opening remarks at the Analyst Day conference by telling

investors: "[Y]ou should continue to expect Nielsen to continue our steady, consistent

performance" and added: "I feel great about the fundamentals of our business[,] leadership, our

strategy, [and] our ability to execute."  He concluded: "There has never been a better time to do

what we do than right now.  And we've never been better positioned to do it."

78.     During the Analyst Day presentation, Nielsen also revealed that it had developed

a new product called Connected Buy System.  COO Hasker described the product as a reaction

to the "blizzard of innovation" that was taking place in the CPG industry.  He described a move

from a "siloed and disintermediated" business to a "much more connected environment."  He

also explained that the product provided two benefits.  It would help clients who were

"demanding [Nielsen's] data much more frequently" and who "want direct access" to the data.

However, he described the "most important" trend as clients requesting to know "why my

market share went up and down, and link it in an automated, right-time manner."  In other words, the "most important trend," was a greater demand for analytic insights.  Finally, he stated that it was a "very exciting place for us to be" and said that these trends were what "leads us to the connected buy system."

79.     In the same presentation, Nielsen's Senior Vice President ("SVP") of Investor Relations said that the Connected Buy System would "drive growth for the buy segment going forward."  Andrew Somosi, who was overseeing the product, described the "enormous growth opportunity" it offered and then described the product as allowing clients who are "relying on Nielsen data, analytics, [and] software" to use the data "in unison" across their departments, rather than in a "fragmented" way.  He described the product as a "unique opportunity . . . to align organizational decision-making across our clients using one Nielsen system."

80.     Thus, despite extensive discussion of client demands and the purported purposes of the Connected Buy System, Defendants did not indicate that it was a response to any negative trends.  In fact, they stated just the opposite; that the product was an enormous opportunity—not a response to declining willingness by customers to pay for Nielsen's analytical insights, but a result of a greater willingness to do so, as well as a desire to unify data used throughout the business of Nielsen's clients.

     **B.**     <u>Defendants Hide Problems in the Buy Segment (4Q15 – 3Q16)</u>

     **(1)**     **4Q15: Nielsen Boasts of its Strength and Hides Negative Trends**

81.     The Class Period begins on February 11, 2016, when the Company reported its 4Q15 results and reiterated the strong guidance given during Analyst Day, including that Developed Markets revenues would grow 1.5%-3.5%.  In the press release, Defendants assured investors that "[i]n times of economic turmoil and market volatility, the strengths of Nielsen's

resilient business model are most evident" and that Nielsen's "core measurement and analytics businesses . . . remain[ed] stronger than ever."

82.     Similarly, during the earnings call for 4Q15, Defendant Barns told investors that the "buy business continued to strengthen and expand."  He described "solid growth" in the U.S. and stated that the Developed Markets business "exited the year with good momentum."  He concluded his opening remarks to the earnings call for 4Q15, by saying "we feel great about our progress and confident about the year ahead," before adding that Nielsen was "ready for" the possibility of "difficult economic conditions," and that in challenging conditions the "advantages and strengths" of Nielsen's business "show through more clearly."

83.     Perhaps most significantly, during the earnings call for Nielsen's 4Q15 results, Defendant Jackson assured investors that Nielsen's CPG clients were "pivoting to growth" and that "***we see the discretionary spend environment as being pretty stable.  We see our clients investing in analytics and innovation***."

84.      Following the 4Q15 earnings release and earnings call, Nielsen's stock price increased 4.2% from the $45.42 closing price on February 10, 2016, to $47.33 on February 11, 2016.  By comparison, the S&P 500 declined 1.23%.  Analysts noted the importance of Defendants' positive statements about the Buy business, given the volatile economic environment.  For example, on February 11, 2016, an analyst report from Credit Suisse stated that "the resiliency in the emerging markets, better performance from Europe, and a discretionary spend environment characterized as '***stable***' all served as encouraging updates amidst the volatile backdrop."  Analysts for BMO Capital Markets reported on February 11, 2016, that "[a]s market volatility continues, NLSN's results reinforced its 'safe haven' status and shares should get even more relatively attractive if the current environment worsens."  A

Deutsche Bank analyst wrote on February 11, 2016, that Nielsen showed "its resiliency with accelerating growth in the Buy division in both Mature and Emerging Markets, despite macro headwinds" and that this had "calmed investor's nerves."

**(2)     1Q16: Nielsen Falsely Boasts of Strong Position**

85.     On April 20, 2016, Nielsen released its 1Q16 results.  Nielsen reiterated its guidance and in the earnings call Defendant Jackson said that he remained confident on the plan to "deliver on all of the operational elements" previously laid out.  The press release stated that "strong first quarter results were underpinned by [Nielsen's] steady and ***resilient business model***" and that its "unparalleled global footprint remains a core competitive advantage for both local and multinational clients."  During the earnings call, Defendant Barns said that "2016 is off to a good start for Nielsen, underpinned by our ***consistent, resilient business model.***"

86.     Defendant Jackson also assured investors that: (1) "Our teams are continuing to execute in line with the guidance framework we gave for 2016;" (2) the Developed Markets business was "solid," while there was "broad-based growth in the Emerging Markets;" and (3) that, "***discretionary spend remained stable with relative strength in areas like innovation***."  He acknowledged that discretionary spending in the U.S. had been a bit lower in 1Q16 than in 4Q15, but stated that this was not a trend or concern, because "discretionary spending can be a little lumpy after a big quarter," and reiterated that "we feel pretty good about our two largest markets performing very well through the balance of the year."

87.     Analysts were encouraged by Defendants' positive statements about discretionary spending.  For example, Credit Suisse issued a report on April 20, 2016, stating that "we are encouraged by commentary on the discretionary environment, as well as a firming environment in Europe, and the healthier margin contribution from the Buy business this year."

27

### (3)   2Q16: Nielsen Downplays "Challenging" Environment

88.   On June 1, 2016, the financial analyst firm Sanford C. Bernstein & Co. hosted a conference with Defendant Barns.  Defendant Barns started his remarks by telling investors how stable the business was—noting that the "way we're thinking about our business at a high level for the present time and for the next several years really isn't that different from the way we thought about our business for the past several years."

89.   Defendant Barns described the Connected Buy System in glowing terms stating that in 2017 and 2018 it would really start to "show up in a meaningful way" by enhancing Nielsen's "analytics capabilities" and "integrating these capabilities into a system."  This was supposed to provide "more differentiation" which, Defendant Barns said, "is positive."

90.   On July 26, 2016, Nielsen issued its 2Q16 results.  In the press release and during the earnings call, Defendants reiterated guidance, including that Developed Markets revenues would grow 1.5%-3.5% in 2016, and stated that they "remain[ed] confident in our plan to deliver on all of the operational elements that we laid out at the beginning of the year."

91.   Defendants reported that Developed Markets revenues increased 0.9% in 2Q16 due, in part, to "softer discretionary spend."  However, as they did in the previous quarter, Defendants downplayed the softer discretionary spending, stating that it was not uncommon to see lumpy discretionary spending from time to time.  They assured investors that Nielsen would still report results in line with guidance and emphasized both Nielsen's "***consistent business model***" and that the "productivity pipeline remains strong."

92.   Following the 2Q16 earnings call, analysts stated that Nielsen reported strong results in 2Q16 and that they were encouraged by the statements made by Defendants Barns and Jackson that the Developed Markets segment would deliver full year growth in accordance with guidance, despite the "softer" discretionary spending in 2Q16.  Credit Suisse issued a report on

July 26, 2016, which stated: "In light of a more optimistic tone at Q1 around the discretionary environment (described as stable to improving), the softness this quarter was a bit of a surprise." However, the report also stated: "We continue to be encouraged by commentary that the Developed Markets segment will deliver full year growth in line with prior guidance, implying notable acceleration in 2H16 vs. Q2."

### (4) Known and Undisclosed Trends Were Undermining Nielsen

93.     However, what investors didn't know, and what Defendants concealed, was that discretionary spending was not "stable" and that Nielsen would not report 2016 results in line with guidance, due to a substantial and permanent decline in discretionary spending which had been occurring throughout the year.  Multiple former Nielsen employees collectively confirm these allegations, and on October 25, 2016, Defendants admitted that they knew discretionary spending had been declining throughout 2016.

#### (i) *Discretionary Buy Segment Spending was in Decline*

94.     CW 1 worked as a Senior Vice President of Consumer and Shopper Insights and was responsible for client service and account management for U.S. CPG clients from 2013 until the start of 2017.  CW 1 explained that the problems in underperformance within the Company's Consumer Insights business in 2016, began much earlier than 2016.  He said that the problems began when large CPG clients, like Proctor & Gamble, began cutting back on discretionary spending with Nielsen.  He said that by 2015 and into 2016, it was "standard practice" for large CPG clients to cut their spending, while wanting the same amount or even more services for less money.  He said that during 2015, it was known that CPG clients spending less was "the new norm" and that this change was a noticeable pattern of behavior to those within the Company. He recalled clients "across the board" renegotiating and asking for more competitive pricing, before the start of 2016.  CW 1 added that senior management at Nielsen knew that the "new

norm" was a decrease in spending by CPG clients on analytics, and that he participated in revenue calls with senior leaders where this was a "constant theme" of discussion. CW 1 recalled that there were monthly calls, but that the last month of each quarter, these calls were held weekly. According to CW 1, Defendant Jackson and the CEO of North America were on some of the revenue calls. He went on to say that Nielsen even assembled a renewals team led by Lori Paradowski, whose current title is SVP, Global Professional Services, to "understand the broader theme" and mitigate the concerns related to Nielsen losing business from their CPG clients.

95.    CW 5 was a Vice President in Nielsen's Global CPG business from 2011 until March 2017. He explained that the missed results in October 2016 had been "building over time." He explained that due to Nielsen's stable long-term contracts and the fact that 80% of revenue is contracted ahead of time, "there was no *Big-Bang* event that created the October 2016 missed results."

96.    CW 6, a manager of Marketing Return on Investment from August 2015 until January 2017, said that the underperformance within the consumer analytics business was addressed in a meeting in the summer of 2016. During this meeting, it was stated that the consumer analytics team was not doing well, and that "analytics overall" were taking a downturn, and that after the meeting, some employees were asked to resign. He further explained that this slowdown was caused by CPG clients cutting costs. He said that CPG cost cutting began "early on" and was not just in 2016. He stated that clients were "not paying enough" and that Nielsen had to cater to what the clients were willing to pay for, which negatively impacted Nielsen. CW 6 also explained that a "big chunk of money" comes from Nielsen's clients who buy the data.

97.     CW 8 worked at Nielsen's office in Budapest, Hungary from January 2013 to August 2016, as a Senior Global Report Liaison with some of Nielsen's largest clients.  He explained that the Company's larger CPG clients, such as Reckitt Benckiser, had decided in late 2015 that they could do without much of the Company's Insight business.  Around fall 2015, CW 8 began getting feedback from Nielsen's major clients that they did not feel the need to pay for reports on, and analysis of, the globalized data Nielsen was selling.  CW 8 added that Nielsen traditionally offered its clients a package that included data, reports, consultancy, and other services, but CPG clients decided in late 2015 that they only wanted the data.

98.     CW 17 was employed by Nielsen as a Vice President in Rochester, New York, with his tenure ending in March 2016 worked.  His work was part of the Insights business in Nielsen's Buy segment.  He recalled participating in weekly sales tracking meetings for his division that used a spreadsheet that tracked proposed dollar value and probability of winning the bid for the job.  He also recalled that during 2015, it was discussed during these weekly sales tracking meetings that sales in his division were deteriorating.  According to CW 17, during these meetings he and the other participants discussed the issues of not winning new projects and having to generate new business.  He recalled being directed to switch his focus from research to sales in the middle of 2015 by his supervisor's boss, another Senior Vice President in the Buy segment, because business in his division began slowing down, and there was not enough business coming in.

99.     CW 18, who left Nielsen in 2018, stated that Nielsen's Developed Markets business in the Company's Buy segment had been trending downwards for around the last 5 years of his tenure.  He said that clients were looking to cut discretionary spending, including in Canada, and that they most likely believed that they could do without Nielsen's analysis.  He

added that this was occurring in Canada, and he witnessed it with the retail CPG companies that

he worked with as Group Director – Retail Services from 2012 – 2015.  He described the cuts in

discretionary spending in the Canadian market as "trending," saying that they began well before

2016.

### (ii)    *Interest in Analytics Products was Diminishing*

100.    CW 1, who is discussed above describing that Nielsen's clients were cutting

spending back in 2015, also explained the changing interest in Nielsen's products.  He said that

there was a lot of building pressure resulting from CPG clients no longer wanting to purchase

Nielsen's Insights products, and instead wanting more "real-time data."  According to CW 1, this

"came to a head" at the end of 2014 into 2015, when Nielsen competitors InfoScout and Market

Track came into play with real-time data analysis.  He confirmed that Nielsen's clients were

specifically cutting back on insights and analytics.  He attributed the cuts by Nielsen's clients to

an increase in marketing research boutiques that were popping up at that same time and charging

less while providing more real-time data.  He went on to recount how Procter and Gamble, as an

example, left Nielsen for a competitor.

101.    CW 1 further explained that "Connected Buy" was Nielsen's attempt to roll out a

more modern platform to meet these changing demands.  He added that Nielsen's Connected

Buy System was a "major strategic shift" for the Company.  According to CW 1, Nielsen's

clients were building their own data lakes[12] and intelligence tools and that the Connected Buy

System was an attempt to adapt by providing faster access to data sets, such as by offering clients

---

[12] An August 27, 2018, article of *Forbes* titled "What Is A Data Lake? A Super-Simple Explanation For Anyone" by Bernard Marr, defined data lakes, saying they hold "data in an unstructured way and there is no hierarchy or organization among the individual pieces of data. It holds data in its rawest form—it's not processed or analyzed. Additionally, a data lak[e] accepts and retains all data from all data sources, supports all data types and schemas (the way the data is stored in a database) are applied only when the data is ready to be used."

an API[13] to access Nielsen's data.  He further advised that changes began in 2013, but another major shift toward Connected Buy occurred in 2015/2016.  According to CW 1, Nielsen pulled development money from other tools, such as Nielsen Answers, to put into the development of Connected Buy.  He added that after being hired, Andrew Samosi oversaw the project.  CW 1 confirmed that CEO Barns and CFO Jackson were involved in the strategy related to Connected Buy, and that Andrew Samosi rolled up to Jackson.  He added that Jackson approved the funding for Connected Buy.

102.    CW 7 said that the Buy segment was experiencing a slowdown in 2016 with global accounts, that were major CPG clients, decreasing their spending.  He explained that clients gave him feedback that Nielsen's analytics products were "antiquated" and that they weren't interested in them.  CW 7 said that clients were moving away from Nielsen to competitors and that clients had doubts about the usefulness of analytics coming from Nielsen, and that the industry was "questioning the validity of Nielsen's analytics."  He advised that it was a "constant battle" for him in trying to develop business for Nielsen during the relevant time period.  CW 7 further advised that when he spoke with clients who had "fallen flat" with Nielsen and in an effort to win them back, those clients preferred a "more quick, nimble" systems.  He added that they would have group calls within his "pod" where they would discuss the pipeline of business on a weekly or bi-weekly basis.

103.    CW 8 described that Nielsen's larger CPG clients decided in late 2015 that they could do without much of the Company's Insight business and that these clients were providing feedback to Nielsen that they did not feel the need to pay for reports on, and analysis of, the

---

[13] In this context, the term API is best understood as a system allowing users to access data owned or housed by another.  An API can be used to access raw data or can be used to request another computer conduct some operation before providing that data.  In a simple example, an API may allow a desktop office application to access a user's online calendar information hosted by another party (*e.g.*, Microsoft Outlook may use an API to download Google Calendar information).

globalized data Nielsen was selling.  CW 8 further explained that these clients just wanted to pay

for the data and conduct their own analysis.  CW 8 also explained that he would discuss this

feedback and it was communicated up the chain to his direct report Joe Rutecki, including during

meetings with Account Managers for the particular client, and the manager responsible for all

accounts.  CW 8 added that he updated the team either by email, Skype call, or SharePoint, as

they all worked in different offices around the world.  He added that information on client

feedback was recorded in a form in SharePoint.

104.    CW 15 explained that the Buy side of the business was in "terminal decline."  He

attributed the decline in Buy to "increased competition" at retailers such as Walmart and

Amazon.  CW 15 went on to say that "the growth and power of the retailer," was detrimental to

Nielsen.  He explained that retailers began to gather their own point-of sale data, then they would

add their own analytics by hiring their own data scientists so there was no need to continue to

outsource it to Nielsen.  He referred to this as the overall "market challenge" for Nielsen's Buy

segment in the last few years.

### (iii)    *Fast Growth in Emerging Markets Would be Short-Lived*

105.    Despite Nielsen's assurances that there was broad-based growth in the Emerging

Markets, and despite continuous assurances that Nielsen's business was poised to continue

growing, those within the Company reported that the situation was more negative.

106.    CW 3 worked as a Director / Leader of Consumer Insights during the entire Class

Period and was in Africa, leading a region of Africa.  He explained that the Africa Emerging

Markets business experienced growth, but that Insights' performance in China, India, and the

Middle East declined or performed worse than expected, and that this began around the start of

2016.

107.    CW 4, a Financial Planning and Analysis Leader, at the Associate Director level in the Company's Dubai office, recalled that there was a pullback specifically in Nielsen's insights and analytics business in the Emerging Markets.  According to CW 4, because global CPG clients' businesses were global in nature, global trends impacted their businesses globally, including in Emerging Markets.  He also recalled that Emerging Markets CPG business was not on track in 2017, as most of those clients pulled back.

108.    CW 9 left Nielsen in March 2017.  He said that Nielsen was having trouble retaining clients, and that clients were not renewing contracts or were renegotiating the terms of their existing contracts with Nielsen.  He explained that operations produced the reports that the client requested and operations were indirectly part of the renewal process for clients, and if the client was not satisfied with the product that was generated by Nielsen, the client would not renew the expiring contracts.  He said that Nielsen was not adding new clients or getting the desired subscription rates, and clients were cutting back on marketing expenses.  He added that the Company cut costs and positions were eliminated in the Operations Division in India, due to declining profits.

109.    CW 13, explained that clients stopped buying analytics over time.  CW 13 also explained that clients could always buy only data, if they wanted, and Emerging Markets tended to only want data, and not Nielsen's analytics.  CW 13 said that he believed Nielsen's clients had declining interest in the Insights' businesses technology.

110.    CW 10 was a Senior Market Research Analyst for the Gulf Coast from February 2016 until June 2017.  He recalled that during his tenure there were monthly town hall meetings in a big conference room in the Company's office in the United Arab Emirates, and that he attended the meetings in person.  He said that these meetings were led by Arslan Ashraf, the

Managing Director AP&P Cluster, where Ashraf often stated that Emerging Markets was not performing well as a segment.  According to CW 10, Arslan Ashraf often stated that Consumer Insights was not performing well across the Emerging Markets segment.  He explained that Emerging Markets Consumer Insights was divided into two parts based on the size of the clients. He added that the Consumer Insights business was struggling across both parts.

111.    CW 10 also said that his supervisor, Associate Director of Retail Measurement Services, Gaurang Kotak, told him that Arslan Ashraf was supposed to tell senior management in the U.S. that the teams in the United Arab Emirates, Saudi Arabia, Bahrain, Oman, Qatar, Kuwait, and Pakistan regions were not performing well and that the U.S. would be needed to pay wages.

112.    CW 11 worked at Nielsen from August 2013 to March 2018, and was transferred from the Watch segment to Buy segment around September 2017.  He said that he was transferred along with some of the other "best" employees from across the Watch segment because the Buy segment "fell behind."  He added that he was transferred to the Buy segment to reverse its "downward spiral," and at that time he became aware that the Buy side had actually been in trouble for quite a while.  CW 11 said that CPG clients were asking for better pricing on their insights business.  He explained that this was not just a problem in the United States, but was taking place with those clients of Nielsen that had a global presence, and that those clients were looking for better pricing for every market.  CW 11 also explained that Nielsen was under pressure in certain markets because its analytics cost more than clients were willing to spend.  In particular, he said that Germany was facing a lot of difficulty, and that Nielsen's Germany and Brazil markets were losing Buy clients.

113.    As previously described, this mirrors the statements of CW 7, who explained that the Buy segment was experiencing a slowdown in 2016 with global accounts that were major CPG clients decreasing their spending, and according to CW 7, these clients were no longer interested in Nielsen's legacy Insights business.

114.    CW 12 worked as a Senior Executive in Nielsen's Insights business from September 2012 until February 2016.  He said Consumer Insights in the Middle East Region of Nielsen's Emerging Markets was not performing well during his entire tenure.  CW 12 explained that Ashraf would host town hall meetings, throughout his tenure, and he would explain that Consumer Insights in the Middle East region of Emerging Markets was not doing well.

### (iv)    *Defendants Had Visibility into the Declining Performance*

115.    Defendants knew about the decline in the business due to their clear visibility into Nielsen's own metrics.  Given that the subject of Nielsen's business is accurately and quickly measuring performance, it is no surprise that Nielsen has the capabilities to accurately measure its own performance.  This is especially true because the demand for Nielsen's product is driven by the demand for its clients' business - the very thing that Nielsen measures and analyzes at every moment.

116.    Given Nielsen's laser-focus on analytics and performance measurement, it is unsurprising that former employees also corroborated that real-time data about Nielsen's performance was available to those within the Company, including those in the C-Suite and the Individual Defendants in this Action.

117.    CW 1, a Vice President in Nielsen's U.S. Consumer & Shopper Insights business, explained the access to data available within the Company.  He explained that he would receive weekly reports from the finance department containing metrics such as detailed revenues and budget breakdowns by each client.  He further explained that all client service leaders received

these reports from Vice Presidents all the way up to CEO Barns.  He also explained that upper

management, including Defendant Barns, would have quarterly meetings at a minimum where

client budgets and revenues were discussed in depth.  He explained that these metrics were

tracked on a platform and that he had reports transferred from the platform into Excel sheets.  He

added that he received weekly reports for his line of business and that CEO Mitch Barns was

receiving similarly formatted reports.  He added that he was receiving the reports from his point

of contact in finance and the data was coming from an internal share drive.

118.    According to CW 2, Nielsen's "systems were good enough" to provide CFO

Jamere Jackson with various aspects of the Emerging Markets segment's performance at any

given time, as well as for any region.  CW 2 recalled that CFO of Emerging Markets Chaudhury

met at least quarterly with CFO Jackson in New York, and the two spoke occasionally together

on the phone.  CW 2 also advised that he attended quarterly market calls, in which headquarters

participated.

119.    CW 3, a director of Consumer Insights at Nielsen, also explained the access to

data available within the Company.  He explained that very detailed reports on Consumer

Insights metrics, both actual and forecasted metrics, were kept and saved on Google Drives that

could be accessed by corporate headquarters in the United States.  He and his counterparts in the

Africa and Middle East regions discussed their metrics with Akash Pal on a quarterly basis on

Google Hangout (Google video conference) calls.  He added that he knew Akash Pal then

reported the information up to Nick Papagregoriou (who CW 3 advised also visited the Africa

region 2 or 3 times a year) and that Nielsen's emerging markets metrics, including sales and

financials, were "absolutely presented" to CEO Mitch Barns, at least on a quarterly basis.

120.    CW 3 also explained that Financial Planning and Analysis ("FP&A") information and metrics were kept on Google Drives that corporate headquarters could access, and FP&A reports made it "all the way up" to Defendant Jackson.  He also said that all Financial Planning and Analysis data was entered into Nielsen's SAP[14] system, which was accessed by corporate FP&A and CFO Jackson.  CW 3 explained that he was aware of corporate headquarters' exposure and access to the Company's FP&A metrics because FP&A colleagues at Nielsen had told him so.

121.    CW 4, an Associate Director at Nielsen, with the job title "Financial Planning and Analysis Leader" ("FP&A Leader") for Nielsen's Middle East and Africa Regions, also explained the access to data available within the Company.  He said that one of his responsibilities was compiling weekly forecasts on revenue, costs, and EBITDA, for all lines of Nielsen's business (including insights) in the Africa and Middle East regions.  CW 4 added that Emerging Markets was divided into eight clusters or regions, each with their own FP&A Leader (like CW 4 was for Africa and the Middle East), and that each FP&A Leader prepared their own weekly report on their cluster, similar to CW 4's, that was sent to Samipendra Chaudhury.[15]

122.    CW 4 further explained that he and other FP&A Leaders collected data on a "granular level" and compiled that data into reports that were entered into Nielsen's Google Drives, that could be accessed by corporate headquarters.  These reports were communicated up the chain of command on a weekly basis.  CW 4 explained that the eight regions in Emerging Markets participated in weekly scheduled calls, which he recalled were held every Monday.  CW 4 described these as roughly 3-hour long discussions, with each region getting approximately 30-minutes each to explain and answer questions about their respective forecasts.  CW 4 recalled

---

[14] SAP software is used by companies to track customer and business interactions.
[15] Samipendra Chaudhury is a Senior Vice President at Nielsen.  From July 2016 until August 2018, he was the CFO of Nielsen's Emerging Markets business.

that Defendant Jackson occasionally participated on these calls.  He continued to explain that the Finance heads of Emerging Markets and their counterparts from Nielsen's other businesses then had their own weekly corporate conference calls which Jamere Jackson regularly participated in. The CFO for the Middle East, North Africa, Pacific regions, Nalina Ranka, informed him that his reports were used on weekly corporate conference calls that Defendant Jackson participated in. He described the reporting on both actual and forecasts as "robust and accurate."  He advised that the granular data should have meant few surprises for those above him in the chain of command.

123.    CW 4 said that the forecasts provided in the weekly reports that he prepared were based on the exact amount of operations that would be completed at a given time.  He added that projections included exact numbers, and that field personnel in the operations team provided updates on project completions to him (as an FP&A Leader) on a daily basis.  He further clarified that this forecasting method was used because Nielsen recognized revenue based on the amount of the project that had been completed with reference to Nielsen's completion of the requested tasks.  He clarified that analytics projects typically ran for 3-8 months, and that Nielsen would recognize revenue throughout that period as they completed the project.

124.    CW 17, who worked in Nielsen's Insights business in the U.S., stated that he participated in weekly sales tracking meetings for his division and that his division used a spreadsheet that tracked proposed dollar value and probability of winning the bid for the job.  He also stated that sales and revenue projections were kept in Excel spreadsheets and that he would pass his updates to his boss, a Senior Vice President in Nielsen's Buy segment.  CW 17 also stated that the Managing Director, Consumer Insights & Innovation Mike de Vere provided updates at least on a monthly basis to Nielsen's corporate office.

40

125.    CW 18, a Vice President – Client Services out of Nielsen's Canadian offices from 2015-2018, explained that he saved his projected revenue reporting in an Excel chart, and emailed it to Nielsen – Canada's finance team, with Krista Thompson[16] copied in on the email. He further recalled that an emphasis developed on reporting expected revenue during the last few years of his tenure.  He said that this "immense pressure" on revenue reporting was reflected in the increased rate it was expected to be done and added that he went from reporting revenue monthly, quarterly, and sometimes weekly, to almost daily during the last few years of his tenure. He further recalled that, during that time, Krista Thompson, Mike Ljubicic,[17] and Nielsen Canada's head of finance were on revenue calls with corporate headquarters in the U.S. every two weeks.  He believed that either CFO Jamere Jackson, or someone just under Jackson, attended these calls from corporate headquarters.

126.    Furthermore, in its public filings, Nielsen routinely informed the market about how much visibility it had into forthcoming annual performance at the start of each year. Beginning with its Fiscal Year 2015 Annual Report and in each report throughout the Class Period, Nielsen informed the market that typically, at the start of the year, "more than 70%" of its "annual revenue has been committed under contracts in our combined Buy and Watch segments."  In each of these Annual Reports, Nielsen also explained that its business was stable because it was driven by "long-term client relationships [] made up largely of multi-year contracts and high contract renewal rates."

127.    On October 25, 2016, Defendant Jackson said that the terms "discretionary business" and "analytics" were synonymous, and that the discretionary business accounted for

---

[16] Krista Thompson was a Senior Vice President at Nielsen.  From 2015 until 2016 she was a Senior Vice President of Strategy and Insights in the Toronto, Canada area.  From 2016 onward her title was "Senior Vice President – Client Services."
[17] Mike Ljubicic was a Senior Vice President of Client Service for Nielsen in Canada from August 2015 until September 2016.  From September 2016 onward, his title was "Managing Director Canada."

about 30% of total revenue at that time—meaning that about 70% was the non-discretionary
chunk known at the start of the year.

128.    Nielsen further explained that it had this same type of visibility with both of its
segments.  For example, Nielsen informed the market in each Annual Report, beginning with
Fiscal Year 2015 and continuing through the Class Period, that both its segments had historically
"generated stable revenue streams that are characterized by multi-year contracts and high
contract renewal rates."  In each Annual Report, for both segments, Nielsen explained the
percentage of annual revenue for the upcoming year that is "typically" committed under existing
agreements.  It also explained the percentage of revenue attributable to their top clients in each
segment as between 18% and 24% across each Annual Report, and that for each segment each
year no one client accounted for more than 10%.  This diversified client base meant that any
major changes could only result from a trend, as opposed to issues with a single client.

129.    The assertion of visibility into annual revenue at the start of each year was not a
"projection."  Rather, it was a description of what sort of visibility the Company typically had
into full-year revenue based on prior actual commitments.  The following chart shows the
statements Nielsen made regarding overall visibility, and visibility into each segment in the
Annual Report for each respective fiscal year:

|          | 2015      | 2016      | 2017      | 2018      |
|----------|-----------|-----------|-----------|-----------|
| Buy      | Over 60%  | Over 60%  | Over 60%  | Over 60%  |
| Watch    | Over 85%  | Over 80%  | Over 80%  | Over 80%  |
| Combined | Over 70%  | Over 70%  | Over 70%  | Over 70%  |

130.    As late as May 16, 2018, at the Barclays Americas Select Franchise Conference,
Defendant Jackson said that the "visibility is still about the same as it has been."  He added "[we]
typically wal[k] into a year in our Buy business with about 60% on backlog in a contract.  The
other 40% was more discretionary, more ad hoc in nature.  In today's world, again, the overall

number has come down.  So, the visibility in terms of the year looks more like a 70/30-ish kind of mix."

131.    CW 5 explained 75%-80% of the revenue for Nielsen's Buy clients in 2016 was predicated on contracts that were not up for renewal.  He further explained that the portion of Nielsen's revenue that was not from long-term contracts was from contracts that were typically 3-8 months in length.  He further explained that Nielsen could book some of the revenue right away, but under accounting rules, would need to book other revenue as the work was performed. He explained that when the terms of contracts were negotiated, Nielsen would not feel any changes right away.  He then said that for long-term contracts, Nielsen may not feel the changes for nine months or more, depending on the terms of those contracts.

132.    CW 17, who worked in Nielsen's Insights business, explained that his division's contracts were normally for 3-8 months depending upon the scope of work, while other divisions' contracts could be 3-5 years in duration.

### (5)    3Q16: Nielsen Partially Reveals Its Declining Performance

133.    On October 25, 2016, before the markets opened, Nielsen released its 3Q16 results and hosted an earnings call with Defendants Barns and Jackson.  In the press release, Nielsen shocked the market by reporting that Developed Markets revenues had declined 3.7%, or 2.5% on a constant currency basis, and that these disappointing results were due to softness in discretionary spending – the same softness which Defendants had repeatedly assured investors was not a problem and would not prevent Nielsen from reporting 2016 results in line with guidance.

134.    Despite the softness in Developed Markets, Defendant Barns stated during the earnings call that the Emerging Markets "continued to produce solid top line growth as our

investments in coverage and granularity and our balanced strength with both local and global clients continue to pay off."

135.     Defendant Jackson explained the financial results: the Buy business constant currency revenue was $809 million, with Developed Markets at $542 million, for a decrease of 2.5%, which he said was due to "softness [in] discretionary spend, especially in the U.S."  He said the Emerging Markets business was at $267 million.  He then explained that the Company was slashing full year 2016 guidance to 1.5%-2% for the Buy segment and, more specifically, 3.5%-4% for the full Company.

136.     Defendant Barns also admitted, in his opening remarks, that (consistent with the information provided by former employees) **the trend was known earlier in the year**, and that Nielsen had actually responded to the trend internally—all while misleading the market to the contrary.  He said: "**Earlier this year, as we saw these more challenging trends unfolding**, we realigned our Buy business to be more focused in our product development and more efficient in our overhead.  More recently as the trends continued for our clients, we stepped up our efforts to reduce our cost base, reallocate resources and accelerate our investments in initiatives that will help our clients and better position our business for the future."

137.     Defendant Barns also explained the Company's purported response to this situation.  It apparently was going to aggressively move away from slower-growing non-core services and instead invest in the Connected Buy product.  The Connected Buy product would supposedly provide "faster data-driven decisions on everyday questions related to pricing, promotion, distribution, new product innovation, assortment and marketing mix optimization."  Emphasizing management's knowledge of the trend and involvement in the Connected Buy product as a response, Defendant Barns said: "We have been hard at work on these initiatives."

138.     Thus, not only did Defendant Barns admit to knowledge of the trends by at least earlier that year, he admitted that the Company had known about the trends for long enough to launch a major new product in response to those issues.  However, this contrasted sharply with Nielsen's prior promotion of the Connected Buy product in glowing terms, assuring investors that it was a reaction to positive trends regarding Nielsen's enhanced market position as clients demanded more—not less—of its analytics.

139.     Defendant Barns also said Nielsen's "[c]lients [were] shifting away from custom insights delivered via deep-dive projects, and they are shifting **toward everyday analytics**."  He said that this shift in the Developed Markets was a "secular shift" not a "passing phase or a cycle that will swing back."

140.     Thus, while Defendants disclosed part of the problem—that its business was seeing sustained softness in discretionary spending and that there was a shift away from ***certain*** of its analytics products, they misleadingly continued to conceal the extent and magnitude of the issues.  Namely, that the problems it was facing were related to its analytics products more broadly, not just a subsection of those products.  Nielsen also continued to mislead investors in two additional ways, both of which succeeded in partially concealing the issues Nielsen faced.

141.     First, Nielsen provided assurances that its Emerging Markets business was strong.  But, as shown in Section IV(C), Emerging Markets was already seeing problems—which was unsurprising since most of Nielsen's Buy clients in both Developed Markets and Emerging Markets were global CPG companies.

142.     Second, Nielsen assured the market that the decrease in demand was driven by a lack of growth among Nielsen's clients, and not a decrease in their intrinsic interest in the products Nielsen was selling.  For example, Defendant Barns said that Nielsen's U.S. clients,

"found it increasingly difficult to achieve growth in markets with growing fragmentation in consumer demand, more competition from smaller and local players and increased commodity pric[es]," and that this lead them to "seek efficiencies and productivity in their business and our business." This explanation conflicted with Nielsen's prior assurances that it was prepared for tough market conditions, and concealed the true cause of Nielsen's declining performance.

143.    Analysts were surprised by these adverse disclosures given Defendants' previous repeated assurances that Nielsen would report results in line with guidance despite any softness in discretionary spending. For example, during the 3Q16 earnings call, an analyst from Morgan Stanley asked for more information about the decline in discretionary spending and, in response, Defendant Barns admitted that the decline in discretionary spending **was known in 2015** (again, a fact that is consistent with the information provided by former employees) and was a trend expected to continue in the long run. Specifically, he said:

> What we're seeing in the U.S. market – let me give you a couple of examples in terms of the external environment that our clients are dealing with. First, if you just focus in on food and beverage manufacturers, **2015, we saw this trend starting to emerge** where the small and medium sized manufacturers accounted for about half of the growth in the categories. Private label accounted for about a quarter of the growth [and] the big – the top 25 players, they accounted collectively for only 3% of the growth in food and beverage categories in 2015. **That situation really hasn't changed that much in 2016.** The reason why that's especially noteworthy for our business is the strength of our business just so happens to be the biggest global companies, the biggest global players. And so, you see that reflected in our U.S. results.
>
> ***
>
> Now for us, what that means in terms of their discretionary spend, as I said, they're shifting from these more deep dive projects that help them think about what they're going to do next year and focused much more on these everyday analytics that help them with activation. What should I do today or tomorrow or this week and that's where the shift is happening in the marketplace.
>
> So we're realigning our portfolio to better serve those client interests and those client needs. And as I mentioned, we don't see this as just a passing phase that

the marketplace is going through.  We see this as a trend that will continue on more of a secular basis over the long run.

As we make this shift and as we build out this Connected System, you see us building a very different business really frankly.  Right now, it's very much a professional services model for Nielsen, as that Connected System starts to unfold in the marketplace, it helps us to move from a professional service or people as a service business model to much more as a data as a service and software as a service business model.  That all results in us, as Jamere said in his opening comments, having a stronger higher margin business.

144.    An analyst asked Defendant Barns how long it would take to "make this transition" toward the use of the Connected Buy System, and asked "how long will this be a headwind?" Defendant Barns admitted that the Connected Buy System would not help with the problems over the short term—as it would only be rolled out to 20-30 clients by the middle of 2017—he concluded: "it will start to show up meaningfully and significantly in our business, especially the financial results, in the 2018 timeframe."

145.    After hearing that the unexpected decline in 3Q16 Developed Markets revenues was caused by a decline in discretionary spending, which Defendants knew about in 2015, and that the Connected Buy System would not address the decline for over a year, an analyst from Barclays pointed out that "the revenue backdrop you described doesn't seem that new," and the "margin investments in Connected and the Total Buy System or whatever, that isn't new as well," so he asked, "Q-over-Q what really changed . . . I'm just a little confused quite honestly on what changed over the quarter."  Defendants Jackson and Barns made another admission that demonstrated the falsity of their statements:

> [Jackson] So, a couple things. First of all, if you're **looking back to the third quarter of last year**, you saw our developed markets business grow 4.8% constant currency and as part of that discussion **we've said that we saw a pretty strong discretionary environment.[18] We have not seen that since** then and if you look at our results in our developed Buy business they've sequentially been

---

[18] Jackson stated that the Developed Markets business grew 4.8% in 3Q15.  In fact, the Developed Markets business grew 4.8% in 4Q15, not 3Q15.

going in the other direction and part of that is because that stable or I would say the environment in the third quarter last year actually ran a little hot.

[Barns] And, what I'll add to that . . . is that **you're right, it's not new.** But we've always viewed this part of the business as lumpy. And so, some quarters up, some quarters down. I think what it comes down to is, we're just not thinking of it so much that way. This – some of these characteristics we're not viewing as lumpiness, we're as I said seeing them more as secular shifts. We just reached the conclusion that it's not viable for the long term to keep running after these short-term revenue opportunities and keep trying to chase these and work our way through the lumpy nature of this part of our business.

Instead, a much better future is about investing in something that transforms our product portfolio. That takes some of the lumpiness out of this part of our business that better fits with what our clients need and where their needs are evolving toward. And, that's what that Connected System is designed to do.

146.    Defendants also admitted the situation would not improve over the short term. An analyst asked, "how should we be thinking about the growth rates in the developed markets beyond 2016?" Defendant Barns responded that "especially for the U.S." Nielsen was "planning for it to continue to be a tough environment next year," and added "[W]e don't see this as just a cycle that the market is passing through . . . we see it as more of a secular shift. We're designing and transforming our product portfolio accordingly."

147.    On this news, Nielsen's stock fell $9.28 per share, or 16.89%, to close at $45.65 per share.

148.    Unsurprisingly, analysts reacted negatively to this news. Perhaps most notably, on October 25, 2016, Barclays said "**it's hard for us not to be critical about . . . the surprising nature of the miss**" and noted that "NLSN boasts about the visibility of the business." The report added that the situation "**invites . . . credibility issues**" around Nielsen's other guidance. Credit Suisse wrote on October 25, 2016, that "The deceleration in NLSN's Developed Buy business came as a surprise to us, particularly after the confident tone that management struck at 2Q." Morgan Stanley wrote on October 25, 2016, that "NLSN delivered weaker-than-expected

48

3Q16 results, as Buy growth decelerated dramatically and management lowered [2016] guidance."  On October 25, 2016, Jefferies stated "NLSN reported earnings that missed on both [revenues] and EPS . . . as Buy results significantly below expectations overwhelmed nice growth in Watch."  The report also stated: "We are not surprised to see shares trading down materially on the print and the unexpectedly negative discretionary Buy commentary."

**C.    Despite Admitting to Some Weakness in the Developed Buy Business, Defendants Continued to Mislead the Market (3Q16 – 4Q17)**

149.    During this time period, Nielsen continued the Fraud, by continuing to make positive statements about its guidance and growth, by continuing to downplay any negative issues as isolated or driven by market conditions unrelated to demand for Nielsen's products, by failing to disclose the known trends compromising the Company's business, and by making false and misleading statements about the value of the Buy segment goodwill.

150.    With the abysmal 3Q16 results, Defendants acknowledged the permanent decline in discretionary spending by Developed Markets clients.  They also partially revealed that there was a decline in interest in certain of its analytics products, but as previously stated, this was only part of the story.  In truth, as the Confidential Witnesses explained in Section VI(B)(4), Nielsen's clients had lost interest in Nielsen's analytics generally and were shifting towards purchasing data.

151.    Another core aspect of the fraudulent story that Defendants maintained following 3Q16, was that any issues Nielsen was experiencing were the result of changes in the underlying CPG market, which allegedly hurt Nielsen's clients, and resulted in them pushing to cut spending on Nielsen.  It was misleading to attribute the problems Nielsen was facing to this softness, rather than admit to the true issues observed within the Company regarding demand for its products.  Defendants tried to misdirect the market by boasting of Nielsen's short-lived growth

in various aspects of its business, but the Company ultimately repeatedly underperformed as a result of the undisclosed systemic problems with the Company's business.

152. One allegedly fast-growing area of Nielsen's business was the Emerging Markets component of the Buy segment. While this segment did post growth for several quarters, it was set to decline for the same undisclosed reasons that Developed Markets was faltering—a decline in interest for its analytics. The Confidential Witnesses in Section IV(C) described this decline. The other reason the eventual downturn in Emerging Markets was inevitable, was that—while Nielsen broke out its reporting by geographic region—in reality, most of its revenue came from multinational CPG companies. The same declining interest in Nielsen's analytics products that had pushed those companies to reduce spending on Nielsen's products in the U.S. market, would soon lead them to the same result around the globe.

### (1)   Analyst Day (December 8, 2016)

153. On December 8, 2016, Nielsen hosted its annual Analyst Day, where Defendants boasted of the strong performance within the Emerging Markets business. Defendant Barns represented that the Emerging Markets business "continues to be very solid." He downplayed any internal issues Nielsen was facing by saying that the spending declines by Developed Markets clients were due to "zero-based budgeting" constraints faced by those clients.[19] He continued to boast of the Company's supposed strong position, and dismiss any issues as isolated trends in the underlying U.S. CPG market.

154. Defendants told investors that Developed Markets revenues in 2017 were expected to decline 1% to 1.5% on a constant currency basis, and that Emerging Markets revenues were expected to increase 8% to 10%. Altogether, they guided that there would be total

---

[19] Zero-based budgeting is a phrase that refers to budgeting based on value created by expenses in coming periods, rather than based on historic practices. In a zero-based budgeting system, organizations do not justify budgetary decisions with reference to historic costs.

core Buy revenue growth of 2% to 3% and that total Buy revenue would span between a 0.5%

decrease and a 0.5% increase.  COO Hasker stated that the guidance was "pretty conservative"

and based on conditions being "very difficult" for Developed Markets clients.

### (2)    4Q16 (February 9, 2017)

155.    On February 9, 2017, Nielsen released its 4Q16 and 2016 results.  Developed

Markets revenue was $545 million, which represented growth of 0.4% on a constant currency

basis.  Due to the Company's acquisition of a company called Gracenote, Nielsen increased its

2017 revenue guidance for the full business up from 2% to 3% (as stated at Analyst Day) to 5%

to 6%, but the guidance for the Buy segment remained unchanged.  Defendant Jackson said:

"There is no change to our original underlying core growth forecast."

156.    During the earnings call, Defendants noted the 0.4% modest growth in Developed

Markets revenues in 4Q16 but stated that Nielsen's data "remain[ed] as mission critical as ever"

for Developed Markets clients and that "contract renewal rates remain high," including renewals

by 100% of the Company's largest global clients.  Defendant Jackson described "broad-based

growth in the emerging markets."  Defendant Barns said that a "healthy demand for our broad

range of analytics offerings will continue to drive growth in this part of our business."  An

analyst asked Defendant Jackson to explain the 7% revenue growth in Emerging Markets in

4Q16, noting that it was the third consecutive quarter of declining growth."  During the earnings

call, Defendant Jackson said that the change was just a quarterly "swing," that Nielsen had "good

momentum," and that there were "no concerns there in terms of a deceleration."

### (3)    2016 10-K (February 17, 2017)

157.    On February 17, 2017, Nielsen filed its 2016 Form 10-K with the SEC.  The 10-K

was signed by Defendants Barns and Jackson.  As detailed in Section VII(B)-(C), despite an

obligation to describe known trends and uncertainties affecting Nielsen's business, Defendants

misled investors by failing to disclose that the negative revenue trends in the Buy segment had

caused a decline in the value of Buy segment goodwill.  They misled investors by representing

that any downward revisions in the fair value of Nielsen's goodwill was just a risk that "***could***"

materially affect the Company's financial performance.  In addition, they misled investors by

representing that total assets in the Buy business were $6.697 billion (including $2.696 billion of

goodwill), that there was no impairment of the value of the Buy business goodwill and that the

Buy business goodwill actually exceeded the $2.696 billion carrying value by at least 20%.

158.    As detailed in Section VII(C), these representations were materially false and

misleading because Nielsen's impairment assessment assumed, but did not disclose, that Buy

segment cash flows would grow by more than 8% from 2017-2021 and then grow 1.0%-3.0%

thereafter.  Those assumptions were unreasonable and contradicted by the lowered 2016 Buy

segment revenue guidance revealed on October 25, 2016, the 0.7% decline in Buy Segment

revenues reported by Nielsen in 2016 and the 2017 Buy revenue guidance initially provided on

December 8, 2016 which projected Buy Segment revenues would range between a 0.5% increase

and a 0.5% decrease.

### (4)    1Q17 (April 25, 2017)

159.    On April 25, 2017, Nielsen released its 1Q17 results.  It reported an unexpected

decline in Developed Markets revenues of 7.3% on a constant currency basis, a decline in total

Buy segment revenues of 3.7% on a constant currency basis.  These results were substantially

worse than the supposedly conservative guidance of a 1%-1.5% decline in Developed Markets

revenues and the plus/minus 0.5% growth in total Buy revenues.

160.    Further, Defendants revealed that Developed Markets revenues "could actually be

down low single digits in 2017."  They reiterated overall guidance and acknowledged the decline

in Developed Markets revenue guidance would require the Watch and Emerging Markets

businesses to be "larger contributors" to "overall results" compared to the "original plan." Following the release of Nielsen's First Quarter 2017 results, the Company's stock price fell $1.61 (3.87%) per share, on heavy trading volume, to close at $39.98 per share on April 25, 2017, while the S&P500 increased 0.61%.  Analysts attributed the decline in share price to the unexpected 7.3% decline in Developed Markets revenues, the unexpected revelation that Developed Markets revenues would be down low single digits in 2017, and the pressure those developments put on the other parts of Nielsen's business.

161.    Nielsen continued to mislead investors by depicting weakness in the Developed Markets as the result of market conditions in the U.S. CPG market.  Nielsen continued to promote the Emerging Markets segment as "robust," as a "growth driver," a "compelling story," and as having "good momentum."

**(5)    2Q17 (July 27, 2017)**

162.    On July 27, 2017, Nielsen released its 2Q17 results, including a 1.2% decline in Developed Markets revenues in 2Q17.  Defendants reported that Developed Markets revenues were expected to decline 3%-5% in 2017 – consistent with the low single digits decline unexpectedly revealed on April 25, 2017.

163.    However, Defendant Jackson misled investors during the 2Q17 earnings call by representing that Nielsen continued to benefit from strong, long-term contract renewals with its largest clients and that Nielsen would report improvements in Developed Markets revenues during the remainder of 2017.  Moreover, he misled investors by stating that results were improving "versus the first half" of the year and by guiding that in the U.S. Nielsen would "return to flat revenue in developed Buy for the full year for 2018 versus 2017," based on "a review of [Nielsen's] revenue pipeline for 2018, which includes renewals and new business, suggests an improvement in our business in 2018."

164.    During the earnings call, an analyst from Morgan Stanley asked, "what gives you the confidence in being able to forecast the business to be flat in 2018?"  Defendant Jackson repeated that the "current revenue pipeline, which includes renewals and new business wins, suggests that developed Buy should be flat for 2018."  He added, "from our client's perspective, again, *we know that our* data and *analytics are critical to help them understand their performance and business drivers*."

165.    Following the July 27, 2017, earnings call, Nielsen's stock price increased 3.3% to $41.21.  By comparison, the S&P 500 declined 0.10%.  Analysts attributed the increase to Emerging Markets revenue growth,  the decline in Developed Markets revenues of just 1.2%, the representation that Developed Markets revenues would improve in the second half of 2017 and then improve further and be "flat" in 2018  and Defendants' other positive statements about Nielsen winning new business and renewing contracts with its largest clients.

166.    Macquarie Research analyst Tim Nollen issued a report on July 27, 2017, titled "Much needed relief in Q2" in which he wrote that Defendants' positive statements were the reasons for the increase in Nielsen's stock price and added, "[w]e hope Q2 results set the tone for the remainder of the year."  Credit Suisse issued a report on July 27, 2017, titled "2Q In-Line, Guide Cut, but *Relief Emerges on Developed Buy*; Execution Crucial."

**(6)    3Q17 (October 25, 2017)**

167.    On October 25, 2017, Nielsen reported its results for 3Q17.  In the press release and during the earnings call, Defendants unexpectedly revealed that Developed Markets revenues declined 5.4% on a constant currency basis.  This was not the improvement in Developed Markets revenues that Defendants told investors to expect on July 27, 2017.  Further, Defendants did not reveal that Developed Markets revenues would decline in 2018 in the October 25, 2017 press release or during their opening remarks during the earnings call.  This

54

unexpected negative news was not revealed until an analyst asked, "last quarter, you said the Buy segment's developed revenue would be flat in 2018.  Just wanted to confirm that you still see it that way."  Defendant Jackson responded: "We do still expect the Developed Buy business to be down less in 2018 than in 2017."

168.    Following the October 25, 2017, earnings call, Nielsen's stock price declined $2.57 (6.25%), on heavy trading volume, to close at $38.56.  By comparison, the S&P 500 declined just 0.47%.  Analysts attributed the decline to Developed Markets revenue declining more in 3Q17 than 2Q17, and the reduction in 2018 Developed Markets revenue guidance.  A Barclays analyst report complained of Nielsen about-face on 2018, stating "the fact that NLSN is walking it back just one quarter later (and not proactively) *further hurts its credibility*."  The report drove the point home, reiterating: "***This headwind is not surprising, but what is, is the decision making that prompted NLSN to proactively put out 'flat' during 2Q and then reactively walk away from it one quarter later.***"  An analyst from Credit Suisse issued a report on October 25, 2017 stating: "***the real (negative) surprise*** came on the earnings call" when "Mgmt. commentary dampened 2018 Developed Buy expectations once again, after the uplift provided by the 2Q commentary that Developed Buy could be flat in 2018."

169.    Following these unexpected negative partial disclosures and the decline in Nielsen's stock price, Nielsen's stock continued to trade at artificially inflated prices because Defendants continued to make materially misleading statements and conceal material adverse information.

170.    On October 25, 2017, Defendants misled investors by representing that the Emerging Markets business was "exceptionally strong" and "robust," and that the Company's "global footprint, coverage expansion, and broad product offerings continue to position us well

with both local and multinational clients in these markets." They also assured investors that Emerging Markets revenues would continue double digit growth in 4Q17 and 2018 (they grew just 4.8% in 4Q17 and just 2.0% in 2018). And Defendants misled investors by failing to correct their materially misleading statements in 2016 Form 10-K about Buy segment goodwill despite further deterioration in the Buy business.

171. Defendants concealed that Emerging Markets customers were reducing spending which would cause Emerging Markets revenues to come nowhere close to growing double-digits in 4Q17 or 2018, and even cause declines in Emerging Markets revenues in 2Q18 and 3Q18.

172. Defendants also continued to mislead investors by representing that the decline in Developed Markets revenues was "a result of the challenging, fast-moving consumer goods environment in the U.S." and clients "cycling through their own significant cost cuts" as they "faced . . . price and volume pressure in their own businesses."

173. Defendants also misled investors by representing that the revenue declines in the U.S. were "improving" and that they knew Nielsen's "measurement and analytics are critical and that, over time, clients must invest in the day-to-day need to drive growth and run their business."

### (7)   2017 Investor Day (November 9, 2017)

174. On November 9, 2017, Defendant Barns, Defendant Jackson, and other Nielsen executives hosted Nielsen's Investor Day conference and made additional materially misleading statements. First, they reiterated the Company's full-year 2017 guidance. They also provided initial guidance for 2018, stating that Watch segment revenues were expected to increase 5%-6% to $3.3 billion.[20] Defendants stated that Buy Segment revenues would be plus or minus 1%,

---

[20] Defendant Jackson also said that Marketing Effectiveness revenues would increase 15% to 20%, driven by "tremendous momentum" and "tremendous demand."

including a 2%-4% decline in Developed Markets revenues and an 8%-10% growth in Emerging Markets revenues.

175.     Defendants assured investors that they "continue[d] to see very strong growth" in Emerging Markets and that they "continue[d] to see solid growth for our clients in the key emerging markets around the world."  Defendants stated that they saw 8%-10% revenue growth in 2018 because Nielsen had "tremendous momentum in the emerging markets" and because "multinationals and locals who are continuing to invest in those growth markets."  Noting those facts and strong demographic trends, Defendants stated, "we have a lot of confidence in our emerging markets profile going into 2018."

176.     Speaking about the Developed Markets, Defendant Barns repeated the false narrative that the expected 2%-4% decline in 2018 revenues was the result of underlying low growth in the CPG market.  As they did on October 25, 2017, Defendants concealed that Emerging Markets customers were reducing spending which would cause Emerging Markets revenues to increase just 4.8% in 4Q17 and just 2% in 2018.  Indeed, by November 9, 2017, 4Q17 was just about half over and yet Defendants did not disclose the spending declines and less than expected Emerging Markets revenues that Nielsen was already seeing in the quarter.

**D.     Defendants' Deceit Continues and Expands (4Q17 – 2Q18)**

177.     In Sections VI(D)(ii) and VI(D)(iii) below, for convenience, the allegations about GDPR have been separated from other allegations (which relate to Nielsen's performance, execution issues in China, and the impairment of its Goodwill), even where they relate to the same time period.

### (1) Fraud about Nielsen's Performance, China, and Goodwill

#### (i) *4Q17: Results Falter as the Fraud Continues and Expands*

178.    On February 8, 2018, Nielsen reported its 4Q17 and 2017 results.  Defendant Jackson explained that Developed Markets revenues declined 6.7% on a constant currency basis in 4Q17 (more than the 3%-5% 2017 guidance and the 2%-4% 2018 guidance), and blamed this on "continued softness in the U.S."  Although, he had indicated in the prior quarter that the environment was "getting better," and that contracts were renewing at 100%, Jackson now revealed that they were "not contemplating a snapback" in Developed Markets in 2018. Altogether, Nielsen ended 2017 down 5.2% in the Developed Markets on a constant currency basis.

179.    Defendants also unexpectedly revealed that Emerging Markets revenues had increased just 4.8% on a constant currency basis, significantly below the 8%-10% growth they told investors to expect on October 25, 2017 and November 9, 2017.  Defendants stated that the less than expected results were "due primarily to disruption from natural disasters and some revenue execution issues in China that caused our growth rates to dip."

180.    On the news of these results, Nielsen's stock price fell 9.7% to close at $33.90, compared to a prior day close of $37.56.  By comparison the S&P 500 declined 3.75%.  Analysts attributed the price decline to the disappointing results in the Developed Markets and Emerging Markets businesses.

181.    On February 8, 2018, J.P.Morgan wrote that "the NLSN story continues to be driven by *negative* trends within the Company's Buy/Developed Markets (Buy/DM) segment caused by ongoing struggles at U.S. consumer packaged goods companies, and the NLSN stock was down ~10% today."  Pivotal Research Group wrote on February 8, 2018, that "Nielsen reported 4Q17 earnings that were generally in line with our expectations, although they featured

surprisingly weak Buy segment revenues in developed markets.  Still, we think that a rebound is likely to occur eventually and note the relative strength of the more important Watch segment." And Jefferies wrote on February 8, 2018, that: "Strong results in Watch were offset by greater than expected weakness in Buy.  DM Buy headwinds do not [show] any signs of letting up, while slower than anticipated growth in EM Buy puts it on our radar."

182.    Nielsen's stock price continued to trade at artificially inflated prices because of Defendants' materially false and misleading representations and omissions related to the Emerging Markets business, the value of the Buy Reporting unit's goodwill, and, as alleged below, Defendants' materially false and misleading representations and omissions related to the Marketing Effectiveness business and the GDPR.

183.    On February 8, 2018, Defendants falsely represented that Nielsen "remain[ed] well positioned in Emerging Markets" and that the Company's "global footprint, coverage expansion, and broad product offerings continued to position us well with both local and multinational clients in these markets."  Defendants assured investors that "the underlying market environment in our emerging markets remains very strong" and that they "continue[d] to see solid growth from both local clients and multinationals across markets where we operate." They maintained 2018 guidance – originally provided at the November 9, 2017 Investor Day – which included strong revenue growth in the Emerging Markets business of 8%-10%.

184.    Defendants misled investors by concealing that weak spending by multinational clients in the Emerging Markets business, particularly in China and Southeast Asia, was causing a decline in Emerging Markets revenue growth and by falsely assuring investors that the disappointing 4.8% increase in Emerging Markets revenue in 4Q17 was caused by "some

revenue execution issues in China" that had been "addressed" and that the China market was "very healthy."

185.    During the earnings call an analyst asked "Can you elaborate on what execution issues were?  [And] how did you address whatever issues were there?"  Defendant Barns said that Nielsen has a "very innovative team in China, but some of the recent bets . . . didn't pay off," which caused Nielsen to "stumble."  He then concluded:

> *[W]hat I can assure you is we've addressed those. And the team's refocused on the core business. And we'll be back on track during 2018. This is still the most important growth market in the world, have no doubt about that. Our balanced client portfolio with the local clients and the global clients remains just as much of the strength today as it was before. And there's still plenty of opportunity to grow our penetration in the market, as I mentioned before.*

186.    In their reports, analysts were persuaded by this false narrative about limited and resolved execution issues in China.  Deutsche Bank wrote on February 9, 2018, that "Emerging Markets growth came in light to expex due to disruption from natural disasters and execution issues in an otherwise healthy China market."  And Jefferies wrote on February 8, 2018, that: "EM growth of 6.8% is actually better than the headline 4.8% after normalizing for revenue execution problems in China (*i.e.*, bad bets) and natural disasters in countries such as India." J.P.Morgan issued an analyst report on February 8, 2018, stating that they were "reassured" that Nielsen stated that the lower growth in Emerging Markets "was an anomaly and that growth will return to high single digit normalcy."

### (ii)    *2017 10-K: Undisclosed Trends and Goodwill Impairment*

187.    As detailed in Section VII(C), Defendants continued to mislead investors by representing in Nielsen's 2017 Form 10-K that any downward revisions in the fair value of the Company's reporting units "could" result in impairment charges for goodwill that ***could*** materially affect Nielsen's financial performance.  In addition, they misled by representing that

Buy Segment goodwill was not impaired and that the fair value of Buy Segment goodwill was actually 20% higher than the $2.844 billion carry value.

188.     As detailed in Section VII(C), these representations were materially false and misleading because Nielsen's impairment assessment assumed, but did not disclose, that Buy segment cash flows would grow by more than 19% from 2018-2022 and then grow 2.5%-3.0% thereafter.  Those assumptions were baseless and contradicted by the lowered 2017 Buy revenue guidance revealed on April 25, 2017 and July 27, 2017, the 3.3% *decline* in Buy Segment revenues reported by Nielsen in 2017 and the 2018 Buy revenue guidance initially provided on November 9, 2017, which projected Buy Segment revenues would range between a 1.0% increase and a 1.0% decrease.  Indeed, despite further deterioration in the Buy business in 2017, the assumed growth rates were higher than the assumed growth rates utilized in the 2016 impairment assessment.

189.     Further, by February 8, 2018, Nielsen's stock price closed at $33.90, which represented a decline of $21.91 or 39.3% from the $55.81 closing price on July 22, 2016, and a decline of $14.19 or 29.5% from the $48.09 closing price on February 19, 2016, the date Nielsen filed the 2016 Form 10-K.  All of the price declines were caused by unexpected negative news about the Buy reporting unit.  Therefore, the decline in Nielsen's stock price also raises a strong inference Defendants did not genuinely believe their statements about the Buy reporting unit goodwill were true and knew that their failure to disclose the assumed cash flow growth rates caused their statements to be materially false and misleading.

### (iii)     *1Q18: Results Continue Declining as the Fraud Continues*

190.     On April 26, 2018, Nielsen released its 1Q18 financial results.  In the press release and during the earnings call, Defendants revealed that Developed Markets revenues declined 5.2% (worse than 2018 guidance of a 2%-4% decline), that Emerging Markets revenues

increased 6.1% (worse than 2018 guidance of an 8%-10% increase) and that free cash flow declined $245 million.

191.   However, Defendants continued to mislead investors by making material misrepresentations.  For example, they represented that "Emerging Markets saw broad-based growth across markets in Latin America, Eastern Europe, Africa, and China" and that Nielsen's "global footprint, coverage expansion, and broad product offerings continued to position us well with both local and multinational clients in these markets."  They reiterated 2018 revenue guidance, including the 8%-10% growth in Emerging Markets revenues.  They also assured investors that Nielsen "remain[ed] on track for 60 basis points of margin compression in 2018 on a constant currency basis with improving trends in the second half as our Buy growth initiatives ramp" and that Nielsen "remain[ed] on track for our full-year free cash flow plan of approximately $800 million to fuel growth and return cash to our shareholders."  Defendants also continued to describe their "confidence," notwithstanding alleged market pressures in the U.S. market.

192.   Regarding the revenue execution issues in China that caused Nielsen to report just a 4.8% increase in Emerging Markets revenues in 4Q17, Jackson stated that the 6.1% increase in Emerging Markets revenues in 1Q18 was an improvement, stating "Last quarter, we highlighted some challenges in China.  However, as expected, we saw improvement here in the first quarter and we expect more to come during the year."

193.    Defendants misled investors by making these representations and concealing that spending by Emerging Markets multinational clients had significantly weakened, particularly in China and Southeast Asia.  They also continued to conceal the decrease in interest in Nielsen's analytics products.  During the earnings call, with respect to the Buy segment, Defendant

Jackson continued to blame the weak results on "a challenging set of market conditions" and in particular on "continued weakness in the U.S." Defendant Barns said that Nielsen was well positioned for the long term in Emerging Markets and said that they continued "to see faster growth with local clients in these markets," which he said was "highlighting the importance of our balanced client portfolio." With respect to the Developed Markets, he continued to point to the "challenging" "environment" in the U.S., but said that Nielsen was making "real progress towards returning to growth and improving profitability."

194. After this unexpected negative news, the price of Nielsen's stock dropped 7.1% or $2.44 per share, on heavy trading volume, to close at $31.91 per share. Analysts attributed the 7.1% decline in Nielsen's stock price to the disappointing results in the Developed Markets and Emerging Markets businesses and the unexpected decline in free cash flow. But their reports also reflected Defendants positive misleading representations which caused Nielsen's stock price to remain artificially inflated.

195. For example, on April 26, 2018, Pivotal issued a report upgrading the stock from hold to buy and wrote that investor sentiment was overly negative. This report acknowledged the negative factors Nielsen had disclosed but cited a continued belief that the "long-term durability of the business remains in place." William Blair issued a report on April 26, 2018, which reflected on the negative disclosures but the author took comfort in the fact that Nielsen "maintained its constant currency revenue growth guidance for 2018 and increased its GAAP EPS guidance," the "impressive" Watch segment performance, and the "modest improvement" in the Emerging Markets business.

196. On May 16, 2018, Defendant Jackson spoke at the Barclays Americas Select Franchise Conference. At the time, Nielsen was halfway through 2Q18 and would soon disclose

that significantly weak multinational client spending had caused Nielsen to report just a 0.3% increase in Emerging Markets revenue in 2Q18 and to slash 2018 Emerging Markets revenue growth guidance from 8%-10% to no growth.  Nevertheless, Jackson represented that despite the challenges in Developed Markets, growth in Emerging Markets was "still available" and that Nielsen "continue[d] to see not only our large global multinational clients invest in a meaningful way but we also see a number of local brands continue to invest in data and analytics, and our business in the emerging markets has grown quite well in this environment."  Jackson also stated that were "tremendous growth opportunities" in China and India.

197.    Defendant Jackson misled again by stating that multinationals were investing in a meaningful way and that the issues in China, which caused lower than expected revenue growth in the Emerging Markets segment in 4Q17, were behind the Company.  Defendant Jackson stated: "Those things are behind us.  We've made some changes there in terms of leadership and structure, and the teams are operating pretty well."

198.    On May 31, 2018, Defendant Barns spoke at the Sanford Bernstein Strategic Decisions Conference.  At the time, Nielsen was two-thirds of the way through 2Q18 and would shortly disclose that weak multinational client spending, particularly in China and Southeast Asia, had caused Nielsen to report just a 0.3% increase in Emerging Markets revenue in 2Q18 and to slash 2018 Emerging Markets revenue growth guidance from 8%-10% to no growth. Nevertheless, Defendant Barns represented that the problems in China that caused disappointing revenue growth in the Emerging Markets segment had been fixed.

199.    An analyst asked Defendant Barns if he could "give any explanation" of the "hiccup" the Company had faced in 4Q17, noting that "I think you said something specifically in China that you think was a one-timer" and presented the open-ended question: "Is that the story?

What did happen?"  Defendant Barns responded, reasserting that the situation in China was

under control, stating: "In China, we also referenced that our – *we made some leadership*

*changes* in the China market team.  Our team had gotten a little bit off track in terms of where

their focus was in the business.  *We've got our team now refocused* on the core of our business

and in getting the investments back to where they should be and restoring the growth rate there

that we've enjoyed now for about a decade."

200.    Defendant Barns acknowledged the "little bit of a slowdown in growth" in the

Emerging Markets business as reflected in the 4.8% increase in 4Q17 revenues and the 6.1%

increase in 1Q18 revenues but stated that "in the long term the outlook still looks very bright."

He said that "local companies in particular … continue[d] to perform well" and that

"multinationals still know the emerging markets are the best place for them to be investing in

growth."  Defendant Barns also said that Nielsen "continues to have opportunity to increase its

penetration in these markets with local clients" and had "lots of growth levers to pull in these

emerging markets over the long run and our long-term outlook remains the same."

201.    And during that same conference, Defendant Barns continued to boast of the

allegedly bright prospects for the Company, such as by saying it was "really uniquely well

positioned" and that "there frankly has never been a better time to be in the business that we're in

than right now."  However, he also provided additional context regarding the issues that it was

encountering, by noting that one way to divide up the "analytic insights" Nielsen provided was

between "analytics that help a client understand what should I do next year," which he called the

"more strategic, consultative type-projects," as opposed to the "analytics that are more about

what should I do next week or next month," which he called "everyday analytics."  He then

explained that "the first kind, the more strategic type projects, those are under especially heavy

pressure.  Clients are just finding ways to forego that type."  These disclosures continued to hide the full truth about Nielsen's declining analytics business.

### (2)   Fraud About the GDPR

#### (i)   *Background About the GDPR*

202.    The GDPR was a sweeping data privacy law passed by the European Parliament and Council of the European Union in April 2016.  It provides a regulatory system governing the use of personal data.  Several of its key provisions require the consent of those whose data is being used, the anonymization of certain collected data to protect privacy prior to the processing of that data, provisions regarding data breach notifications, and rules regarding establishing policies for ensuring the safe handling of data across borders.

203.    The GDPR is not limited in application to European companies, and purports to regulate the behavior of those processing data covered by the act regardless of location.  For example, anyone who markets goods and services to EU residents or who processes the data of EU residents must comply with the GDPR.  Fines for failing to abide by the GDPR are massive. They can range from 2-4% of a Company's global annual revenue or between €10m or €20m, whichever is greater; for a Company the size of Nielsen this could have meant fines of $131 million to $263 million based on 2017 Revenue.

204.    The GDPR was set to go into effect on May 25, 2018.  Leading up to its implementation, it was a heavily publicized piece of legislation and the focus of intense scrutiny. For example, on May 24, 2018, the *New York Times* reported that Facebook had employed roughly 1,000 people to work on the GDPR implementation.

205.    The GDPR would not only require Nielsen to implement steps to ensure compliance, but would affect the use of the products Nielsen sells—data and analytics—in obvious and profound ways.  After all, Nielsen had long disclosed that it depended on data

collected from third-parties such as Facebook and Twitter for many of its products and services,

mentioning this in its Annual Reports throughout the Class Period.  As Defendant Barns

mentioned during the previously held November 9, 2017, Investor Day, Nielsen's partnerships

with data providers such as Facebook and Tencent were "[c]ritically important to what [Nielsen

was] doing in digital," and it was these partnerships that enabled it to "cover the digital activity

of 3 billion, that's billion with a B, 3 billion consumers around the world."

(ii)    ***Nielsen Defrauds Investors About the GDPR***

206.    On February 8, 2018, the Company announced its 4Q17 and 2017 financial results

in a press release and during a conference call hosted by Defendants Barns and Jackson.

Defendants misled investors by representing that Marketing Effectiveness revenues would

increase by 15%-20% in 2018 and by assuring investors that the GDPR would not negatively

impact the business.

207.    Given the GPDR's importance and Nielsen's reliance on data, it was unsurprising

that Analysts began to question Nielsen about the potential consequences of the legislation on its

business and clients.  During Nielsen's 4Q17 earnings call, an analyst from the Pivotal Research

Group asked: "I was wondering if you could talk about how GDPR might be impacting or might

impact the business in Europe in the coming year?  I can imagine might be helpful for panels."

Defendant Barns responded:

> ***GDPR, we've been focused on this for some time***. We have a big team that's
> working on it. We've been out in front of it.  ***We're ready***. And we don't see any
> significant impact for our Buy business. For Watch, there'll be some things that
> we'll have to do to ensure our compliance with the regulations, but it's
> manageable. ***We don't expect to see any major impact on our business. We'll
> still have access to all the data that we're going to need for our products. So,
> yeah, we're in good shape***.

208.    Defendants also made misleading statements about the GDPR and its impact

on Nielsen's business in the 2017 Form 10-K filed on February 8, 2018.  Defendants misled

67

investors by telling market that the attention privacy and data protection issues attracted offered Nielsen a competitive advantage.  The 2017 10-K stated that Nielsen's operation were subject to and affected by data protection laws, but also boasted that "***The attention privacy and data protection issues attract can offer us a competitive advantage.***"  It also disclosed that changes in data protections laws ***could*** limit Nielsen's access to data, but did not describe this as something that was presently occurring.  The 2017 10-K also stated that: "compliance with the GDPR is resulting in operational costs to implement new procedures corresponding to new legal rights granted under the law, ***but has had little direct impact on Nielsen products.***"  This risk language was false and misleading because the problems Nielsen was facing regarding the GDPR were already manifesting by the time these statements of risk were made, and because these statements discussed the subject of data privacy without mentioning that Nielsen faced a tremendous data privacy risk in the form of its data partners shutting off access to their data.

209.     When Nielsen reported its 1Q18 results on April 26, 2018 Defendant Barns misled investors by representing that Marketing Effectiveness revenues would increase by 15%-20% in 2018 and that it was "on track to be north of $400 million in revenue in 2018" and that "advertisers are intensely focused on measuring return on their investment and media spend and this is an important source of growth for our company."

210.     During the earnings call for Nielsen's 1Q18 results, Defendant Barns brought up the topic of the GDPR, telling investors that the Company was fully prepared because of its long history of attention to consumer privacy.  He assured investors that Nielsen had embedded "privacy protections into the design" of its products "from the very start" and asserted that "from the very start and our relationships with data providers, they're no exception."  He said that in March Facebook had made some policy changes that had "curtailed" some firms' access to its

68

"third-party datasets" Nielsen's relationship with Facebook remained "strong," and that it still had "***access to the data that the industry needs for independent third-party measurement***."

211.     During that call, an analyst from Jefferies asked about Nielsen's relationship with Facebook, as it related to access to data.  He specifically asked: "has there been any change in perhaps the level of data that you're able to get?"  Defendant Barns replied by first touting the Company's "very long-running and very strong relationship."  He then stated that while there had been "some process changes," that Nielsen was "still able to deliver all" of its products and that it he did not "see any change in that going forward."  He then added "one of the reasons" Nielsen had not had its access curtailed is that the Company has "always taken a more conservative approach" to data privacy, such as by ensuring the data is "anonymized and aggregated" before being used in Nielsen's services.  He concluded that Nielsen was "in a very good position" and that the GDPR "plays as a net positive" for the Company's business.

212.     In his closing remarks on that earnings call, Defendant Barns again assured the market that the GDPR was not a threat.  He said: "And, finally, consumer data privacy, it's always been a high priority for us, both in the way we design our products and the way we run our operations.  ***We're well prepared for GDPR*** and we're well positioned in the market."

213.     The next month, at the Needham 2018 Emerging Technology Conference, on May 15, 2018, an analyst from Needham & Co. asked Defendant Abcarian, "How long are you going to able to bring in all those big datasets before Congress says no, no you're violating somebody's privacy?"—the question continued—"And what impact would that have on Nielsen's measurement ability, if they can't get these third-party data sets integrated into their own measurement?"  Defendant Abcarian responded:

> Well, everything we do, we engineer our products using privacy by design
> principles and our Chief Privacy Officer spends a lot of time understanding

regulation and changes in consumer. And in fact whether it was the Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent level data. We're looking for an ability to create aggregated insights, because Nielsen has strong, opted-in consumer compliant panels that we can use the intelligence from in which to basically create the persons-based estimates that are required to drive and fuel the industries. . . . So, I don't -- who knows where the industry will go? *What I do know is that Nielsen stands in a really strong point,* because we have invested for six-plus decades in building high-quality consumer opted in panels. So, *if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.*

214.    Roughly two weeks later, on May 31, 2018, Defendant Barns boasted that "[T]he Watch part of our business continues to perform incredibly well" and pointed to the Marketing Effectiveness business as one business driving this performance.  During this conference, an analyst asked, "[W]hat might concern you sort of overall geopolitical and privacy concerns . . . and your relationship with Facebook in that regard . . . *[a]nything going on there that we should be thinking about?*"  Defendant Barns said that: "*For measurement, we still have the access to all the data that we need for our measurement products including our relationship with Facebook.*"  And added, "*And so, yes, that's been a more of a non-event from our side as compared to how it played out for some others.*"

215.    A few days later, on June 5, 2018, Nielsen again discussed the issue of GDPR at the Baird Global Consumer, Technology & Services Conference, when an analyst noted that Facebook had been in the news recently and is a partner to Nielsen, and then asked if any changes to their policies had "any impact on Nielsen."  A Nielsen executive responded by falsely explaining that due to Nielsen's strong data privacy practices, the data it received from Facebook was not limited by GDPR, and that the Company's "product measurements continue to be able to leverage that partnership and execute on the measurement aspects of that because at no means are we producing any kind of respondent-level data against that partnership."

216.    A little over a week after that, Nielsen spoke on the subject yet again, at the

Bernstein Future of Media Conference on June 14, 2018.  At this point the second quarter of

2018 was nearly over—only 16 days were left in the quarter.  An analyst from Bernstein & Co.

noted that Nielsen uses "data from a lot of places" and then asked if "privacy issues" had

"caused any new sort of risk or things you've had to deal with in terms of data sources you use

and incorporate into your various services?"  Defendant Abcarian responded by boasting of

Nielsen's strong "Privacy by Design" approach, and the time that Nielsen's Chief Privacy

Officer spends focused on privacy issues, she then concluded:

> [B]ecause of these principles, because of the kind of the underpinnings of the way
> in which Nielsen operates, the privacy changes for our core measurement
> products were really, for us, ***when GDPR came really a non-event,*** because of the
> fact that everything we're producing is anonymized and aggregated.  By no means
> do we ever at any time release or share PII data, et cetera.  ***And so we continue to
> produce whether it's Digital Ad Ratings or television ratings or cross-platform
> ratings with the same metrics, same datasets that we were using prior to the
> institution of the changes.***

217.    The analyst asked the follow-up question of whether there are any implications of

the privacy issues regarding Facebook, as one of Nielsen's "publicly known big partners."  And

Defendant Abcarian, responded by saying: the way Nielsen works with "any other data provider

is that . . .  All of that data is anonymized and aggregated."  She concluded, "that is why the work

that we've done, whether it's Facebook or with other providers, ***we continue to be able to

provide the anonymized aggregated measurement that we've provided to the marketplace for

years.***"

218.    Through these statements, Defendants denied any knowledge of problems for

Nielsen's business caused by GDPR.  In some of these statements, Defendants spoke about

GDPR, without revealing any known problems.  This was true even in the face of extremely

open-ended questions on the subject, that Defendants purported to answer.  In other instances,

Defendants affirmatively said GDPR was a "*a net positive*" for the Company, assured investors Nielsen was "*in a very good position*" and "*in good shape*" on the issue, said that those within the Company had been "*focused*" on it "*for some time*" and that it would be a "*non-event*," which it did not expect would have "*any major impact on [the] business*," since Nielsen would "*still have access to all the data that we're going to need for our products*."

219.    Analysts believed these assurances:  On February 8, 2018, SunTrust Robinson wrote that, "GDPR should not have meaningful positive or negative impact."  Similarly, on April 26, 2018, Macquarie wrote: "while GDPR may be a risk to some, Nielsen declares it is already compliant and could be a net beneficiary of the regulatory change coming May 18."

### (iii)    *The GDPR Problems Were Known Throughout 2018*

220.    Former employees explain that the GDPR problems were known internally at Nielsen, despite Defendants' positive statements.

221.    CW 14,[21] Nielsen's Chief Privacy Officer, was generally defensive of Nielsen's practices,[22] and stated that he was familiar with this litigation and characterized it as relating to two different investor calls; one where Nielsen said that its business would not be negatively

---

[21] The identity of CW 14, Benjamin S. Hayes, was revealed on September 6, 2019 when Mr. Hayes filed a declaration with the Court.  ECF No. 70 (the "Hayes Declaration").  The Hayes Declaration is not incorporated by reference herein, and is not relied upon as the basis for any allegations herein.  The Hayes Declaration is wholly inappropriate and should not be considered by the Court when considering the sufficiency of the complaint.  If the Court decides to consider it, then Plaintiffs should be given fulsome discovery related to circumstances under which the declaration was obtained and the actual veracity of the allegations therein surrounding Defendants' GDPR statements. Plaintiffs stand by the accuracy of the allegations that are stated herein based on information provided by Mr. Hayes.  Lead Plaintiffs draw the court's attention to the following footnote (n.22), which remains unchanged from the previously filed Amended Complaint (ECF No. 60).

[22] Plaintiffs do not agree with any positive characterizations of Defendants' conduct and view this witness in the light of a hostile witness—*i.e.*, despite his opinions, he provided the factual statements set out in this paragraph.  Additionally in the course of the interview with CW 14, it was made clear that Lead Counsel was not seeking any privileged information.

affected by the implementation of GDPR and; the second earnings call, a few months later, where Nielsen missed earnings and directly attributed the miss to the impact of GDPR.

222.    CW 14 said that when the first statements were made, GDPR had not required Nielsen to discontinue products, conduct any major re-engineering of its products, or exit any specific markets.  However, he explained that "general market conditions" related to GDPR began to impact Nielsen following the first statements.  He recounted how Nielsen was impacted by clients "holding off on deployment to see how Europe shakes out," general "nervousness" about committing to new work because of GDPR and pressure from partners or vendors around the "transparency consent framework" insofar as "who's going to work with who."  He suggested that there were a lot of externalities (related to GDPR) that had a negative impact on Nielsen.

223.    CW 14 said the climate in the industry was dramatically different in April 2018 than in March 2018.  He recounted how in the last 6 weeks before GDPR went into effect, there was a "noticeable and markedly different" trend, in that customers were pulling back.  He further advised that the general climate around GDPR changed for clients, partners and vendors in those last 6 weeks prior to the enactment of GDPR.

224.    CW 15 said that he participated in multiple conference calls with Nielsen's former Chief Privacy Officer and that, on these calls, they discussed education and communications related to the implementation of GDPR and its effect on Nielsen's data.

225.    CW 15 said that he knew about customers pulling back on their spending with Nielsen's Market Effectiveness group because they wanted to see the impact of GDPR before investing in Nielsen's analytics.  He advised that Market Effectiveness had partner relationships with the same clients that his team had - specifically the CPG customers.  He explained that a lot

of the contracts with Marketing Effectiveness partners, and in particular the contracts with the "measuring clients" are "relatively long term . . . certainly more than a year."

226.    CW 16 said that he and many of his Marketing Effectiveness colleagues were all laid off at the same time, in June 2018.  He further advised that this was not surprising to them since there had been some indication by the first quarter of 2018 that Nielsen's U.S. Marketing Effectiveness business was suffering.  He explained how he and his colleagues were told no later than March 2018 that Nielsen's U.S. Marketing Effectiveness segment had not been profitable so they were likely not going to receive any bonuses.  He recounted how they were initially told that the US Marketing Effectiveness team was not getting bonuses because their business segment was not profitable, but then they did receive modest bonuses, which was money from other parts of Nielsen's business.  According to CW 16, this was an indicator to him in Q1'18 that Nielsen's Marketing Effectiveness business was suffering and there was a possibility that layoffs could be imminent.

227.    According to CW 16, some of Nielsen's "bigger" Marketing Effectiveness customers had been "tightening their belts" for some time.  He explained that this involved them "ordering less" from Nielsen, which ultimately led to "less revenue" from those existing clients. When asked for names of specific customers with whom he recalled this occurring with, he recalled how global client Procter & Gamble was "continuously reducing projects" and the amount of money it was spending with Nielsen.  He recounted bagel and business sessions in the Cincinnati office with the Vice Presidents of Marketing Effectiveness.  According to CW 16, sometimes in these meetings, they would discuss how clients were tightening their belts and that there was a need to do "everything we can" to keep those clients.

### (3)  2Q18: Nielsen Reveals Its Severe and Broad Decline

228.    On July 26, 2018, Nielsen released its 2Q18 results.  Defendant Jackson began his

remarks by saying that the quarter was "one of the most challenging quarters for our business in

over a decade."  Macquarie Research put it bluntly in its analyst reports published that day,

calling it a "Disastrous Q2," and stating that it "couldn't be much worse."  And in its report on

July 27, 2018, J.P.Morgan said, "The Other Shoe Has Fallen: Poor Results, Worse Outlook, and

an Extremely Frustrated Investor Base."  Defendant Jackson summarized the results as follows:

> In our Buy segment, revenue remains weak as a result of the increasingly
> challenging fast-moving consumer goods environment. In our Watch segment,
> our core measurement business remains strong. However, the changing data
> privacy landscape has caused a near-term deceleration in our Marketing
> Effectiveness momentum.

229.    Concurrent with the disclosure of these terrible results, Defendant Barns revealed

that he would be resigning from the Company at the end of the year.  Analyst commentary makes

clear that this was a huge surprise—and that it was tied to Nielsen's terrible performance.

Macquarie Research wrote on July 26, 2018, that "the forced retirement of CEO Mitch Barns at

year-end are both wholly unexpected and render the issues that much more uncertain."  SunTrust

Robinson wrote on July 27, 2018, that "[g]iven the comments above" describing the surprising

news in both Buy and Watched, "it is not surprising that the company is pursuing a CEO

change."  Barclays wrote on July 26, 2018, that, while the CEO stated that his retirement was not

related to the quarterly results, "we have to wonder otherwise."  Barclays astutely recognized

that the 8-K filed about Defendant Barns' resignation describes the severance pay he would

receive, an indication that this was not a planned retirement.  That 8-K describes his resignation

as a "termination without cause" under the Company's severance policy.

230.    The key results for 2Q18 were as follows:

| Key Results Across Nielsen's Business | | |
|---|---|---|
| | 2Q18 Revenue | Percent Change vs 2Q17 in Constant Currency |
| Buy segment | $789 million | 5.4% Decrease |
|   Emerging Markets | $293 million | 0.3% Increase |
|   Developed Markets | $488 million | 6.9% Decrease |
| | | |
| Watch segment | $858 million | 4.0% Increase |
|   Marketing Effectiveness | $89 million | 6.0% Increase |

231.    In addition to this decline in performance, Nielsen also revealed that it was lowering its full year 2018 guidance.  The new guidance called for growth of about 2.5% in the Watch segment (with flat to low single digits growth in Marketing Effectiveness) and in the Buy segment, Nielsen was now guiding a decline of about 4.5% (with Developed Markets down "mid-single digits" and Emerging Markets revenue to be flat).  The following chart shows the change in Nielsen's 2018 guidance, from the time it was first released:

| Nielsen's Changing Full Year 2018 Revenue Guidance | | | | | |
|---|---|---|---|---|---|
| | Investor Day (11/9/2017) | 4Q17 (2/8/2018) | 1Q18 (4/26/2018) | 2Q18 Results* | Revised Guidance[23] |
| Buy segment | -1% to +1% | No change | No change | -5.4% | -4.5% |
|   Emerging Markets | +8% to +10% | No change | No change | +0.3% | 0% |
|   Developed Markets | -2% to -4% | No change | No change | -6.9% | -MSD** |
| | | | | | |
| Watch segment | +5% to +6% | No change | No change | +4% | +2.5% |
|   Mrkg. Effectiveness | +15% to +20% | No change | No change | +6% | 0% to +LSD** |
| * Change in constant currency as compared to prior quarter<br>** "LSD" refers to "low single digits" & "MSD" refers to "Mid-Single Digits") | | | | | |

232.    Defendants also substantially reduced the other components of 2018 guidance. They said adjusted EBITDA would decline 230 basis points in 2018, substantially more than the 60 basis point decline Defendants repeatedly told investors during the Class Period.  They said that GAAP EPS would be $0.95 to $1.00, much lower than the $1.50-$1.56 they told investors

---

[23] Refers to the revised full-year guidance given while publishing the 2Q18 results.

on April 26, 2018.  And they informed investors that free cash flow would be $550-$575 million, much less than the $800 million they repeatedly told investors during the Class Period.

233.    Unsurprisingly, as a result of this negative news, Nielsen's stock fell, on extremely heavy trading volume, from a close on July 25, 2018 of $29.57 per share to a close on July 26, 2018 of $22.11 per share, which was just over a 25% decline.  This compared to a 0.3% decline in the S&P 500.

234.    In reports issued after the unexpected negative disclosures on July 26, 2018, analysts were highly critical of Defendants and questioned their credibility.  On July 26, 2018, Barclays wrote: "Even as the rare [underweight rated stock] on the Street, the magnitude of negative change in NLSN's 2Q18 results, 2018 guidance, commentary and even strategic direction was surprising – and ***the -25% hit to the shares . . . feels warranted***."  They added, "***If confidence in the financials was low before, it has now been seriously damaged.***"  The Pivotal Research Group wrote on July 26, 2018, that "Nielsen reported weak 2Q18 results, a diminished outlook for the year, a strategic review of its Buy segment businesses and the departure of its CEO at the end of the year, each of which were ***significant negative surprises***."  SunTrust Robinson wrote in their July 27, 2018, report: "We've been dead wrong on NLSN.  Developed Buy pressures have worsened and now bleed into Emerging Buy while the Watch segment has been disrupted near-term by GDPR (***all counter to management 3 months ago***)."  Clearly frustrated, an analyst from Jefferies asked during the earnings call: "***How much confidence should we have in your guidance at this point given the repeated misses***?  Or maybe given if there's as much volatility and uncertainty as you say, why even give guidance?"  Jeffries issued an analyst report on July 27, 2018, stating, "2Q results and mgmt's explanations disappointed in almost every respect."

### (i)   *Revelation of Buy Segment Issues*

235.    On July 26, 2018, Defendants also revealed unexpected negative news about the Buy segment.  Revenue from the Buy segment declined 5.4% in 2Q18, far below the guided annual change of between 1% growth and 1% decline.  Developed Markets revenues declined 6.9%, far below the guided annual decline of 2-4%.  Emerging Markets revenues increased just 0.3%, substantially below the 8-10% growth Defendants repeatedly told investors to expect.

236.    In the Buy segment, Defendants admitted to weaknesses in the Emerging Markets business which contradicted Defendants' positive representations about the Emerging Markets business on October 25, 2017, February 8, 2018, April 26, 2018, May 16, 2018, and May 31, 2018, Defendant Jackson said that on the Buy side, the "key takeaway is that the pressure in the fast-moving consumer goods industry among global multinationals does not show signs of abating in the near term.  We're now seeing this in both developed and emerging markets which impacted our 2Q results and 2018 outlook."

237.    While this was framed in terms of pressure not "abating," in reality it was the first public revelation of information Nielsen had hidden from the market previously.  Namely, the problems it was facing were not about the market its customers were operating in, and would not be isolated to any one market.  Rather, the problem for Nielsen was a pullback by its most important customers—global multinationals and their willingness to buy discretionary analytics.  Defendant Jackson further admitted that Defendants had been aware of the breadth of these undisclosed problems, stating: "***the pressures that we've been seeing,*** as it relates our big multinational clients, is largely driven by the pressures that they're facing in the end markets. . . . And so ***what we've been focused on*** is how do we help those clients pivot to growth."  With the disclosure that the problem was not isolated to one market, Nielsen effectively revealed the truth:

that its business was in decline as its most important customers were pulling back from buying

insights products.  Thus, Defendant Jackson continued his remarks to explain:

> While we continue to see growth from local clients in these markets, multinational spend, which represents approximately 60% of our revenue, has weakened significantly. This is especially true in markets in Southeast Asia and Greater China, two important growth regions.

238.    The admission that spending in China had weakened significantly contradicted

Defendants' previous assertions that the revenue execution issues in China were behind the

Company, that the trend in the emerging markets was "very healthy," that there were

"tremendous growth opportunities" in China and that multinationals continued to invest in a

"meaningful way."  In fact, Defendant Jackson revealed that the setbacks in fact had not been

overcome, stating:

> [I]n the Emerging Markets, before, we've talked about China.  We talked about our business in China being pressured this quarter. You have the dynamic of the additional pressure from FMCGs. Quite frankly, we **still** have more work to do operationally there. And as I said before, we have to get China right in order for our Emerging Markets to grow, and we're focused on those challenges. We've made some changes in those marketplaces that are going to help us longer term, but we still have a little bit more work to do there operationally.

239.    The questions from analysts during the earnings call further emphasized that those

following Nielsen understood that Defendants had misled them.

240.    An analyst from Morgan Stanley asked:

> I wanted to ask about emerging. In past quarters, it seemed like you were convinced that there really wasn't too much of an issue there.  There were some sort of isolated things in China and with natural disasters in the fourth quarter and then things were getting a little bit back to normal. And so, basically, I guess what really happened? Is it the market trends? Is it specific large clients that are multinationals that were pulling back? It sounds like – you're sounding like now that it is pretty broad-based, but like, I guess why wasn't this sort of a little bit more known before?

Defendant Jackson responded:

> As I mentioned before, broadly speaking, there's simply more volatility and uncertainty in the environment. The environment has gotten worse than what we expected. We saw a fairly significant pullback in multinational client spend, really, across the emerging markets as we went through the quarter. And as I said before, we're not expecting this pressure to abate. The softness is primarily in China and Southeast Asia. And as I said before, this actually overshadowed some strong performances elsewhere, markets in Latin America, Eastern Europe and Africa. What we're seeing, broadly speaking, is that local giants are continuing to show growth. However, the multinationals are under pressure. And this pressure is working its way through the emerging markets and, as such, we've lowered our guidance appropriately.

241.    After assuring investors at the May 16, 2018 Barclays Americas Select Franchise Conference, that the revenue execution issues in China were behind the Company, that the trend in the emerging markets was "very healthy," that there were "tremendous growth opportunities" in China, and that multinationals continued to invest in a "meaningful way," Jackson stated that Nielsen was not "counting on a snapback in spending, we're not counting on clients to start the [way] back in a more discretionary spending."

242.    Similarly, an analyst from J.P.Morgan asked: "It seems like you're pointing to the end market to have kind of increased pressure this quarter.  Obviously, the pressure from fast-moving consumer packaged goods and U.S. food, in particular, has been around for a while. When we look at the Nielsen data, in particular, about their volumes, **it doesn't seem like it got much worse in the second quarter.  So could you just give a little more explanation of why you saw more intensity from your CPG clients second quarter?**"  Defendant Jackson gave a non-response, blaming the issue on "more volatility . . . in Buy."

243.    A very similar exchange played out when a Goldman Sachs analyst asked, "Can you elaborate on in the Developed CPG end markets, specifically where the new headwinds are rising, I guess emphasis on new versus what you didn't know about a quarter ago?"  And Defendant Jackson again cited "more volatility and uncertainty in Buy."

244.     Analyst reaction in their written reports following the earnings call was extremely negative.

245.     On July 26, 2018, Macquarie Research called the quarter "disastrous" and explained that Nielsen had disclosed that "CPG clients continue to withhold or reduce spending, including now in emerging markets."  It recognized that "[t]his is a change from prior comments that it was no better but no worse, and even Nielsen is now saying it can't see an end in sight."

246.     On July 26, 2018, Barclays wrote that the disclosure that "large multi-national companies" are "pulling back spending in key growth markets" bears a "striking resemblance to what we saw from NLSN on 3Q16 earnings, where a surprise cut in guidance on client weakness was followed by a prolonged period of Developed market underperformance."

247.     On July 26, 2018, Jefferies wrote that "Earnings results missed our estimates and consensus expectations by a wide margin.  The Buy segment's challenges have accelerated within developed markets and have now spread to emerging markets."

248.     On July 27, 2018, J.P.Morgan's lengthy analysis of the Buy segment revelations quoted below:

> **These results and outlook came as a shock**; just a few months ago . . . the company portrayed confidence that NLSN's revenue drag resulting from U.S. consumer packaged goods company headwinds was gradually moderating and that a turnaround was underway with new products coming to market. Yet the company now expects total company organic constant currency (o/cc) revenues to decline in 2018, **a dynamic wholly uncharacteristic of Info Services firms**, and gave little reason to expect substantial improvement in 2019."

249.     J.P.Morgan's report also explained:

For the past two years, the company has faced headwinds in Developed Markets as U.S. consumer packaged goods companies pared back their spend to focus on margins. Over this time, Nielsen's Emerging Markets segment remained a beacon of hope, continuing to grow high single digits organically while management tempered investor fears of contagion into these regions. In 2Q18, ***the other shoe finally dropped***, and Emerging Markets drove total company organic constant currency (o/cc) revenue declines of (0.5)% y/y, including (5)% o/cc declines in

Buy. Buy/Developed Markets results worsened to (7)% o/cc, though this was somewhat expected as mgmt had pointed to 2H18 for improvement. ***Buy/Emerging's flat o/cc revenues were the bigger disappointment and were driven by pullback in spend by multinational CPG companies, especially in Southeast Asia and China. We observe a generally stable (or even increasing) commitment by multinational CPG and food companies to emerging markets, suggesting that at least some of Nielsen's issues are company-specific.*** The company assumes this multinational pressure will continue, an assumption we find appropriate. ***After all, the issues in emerging markets feel like a lagged replication of developed markets, implying that the company may now be facing multiple years of headwinds.***

### (ii)   Revelation of GDPR Issues

250.    As explained in Section V(B), the Marketing Effectiveness business is unique because it operates as an insight-focused product that straddles the line between the Watch and Buy segments.  With respect to the Marketing Effectiveness business, Defendant Jackson said that the results were "significantly below our expectations as revenues were impacted by GDPR and changes to the consumer data privacy landscape."

251.    In fact, Defendants admitted on July 26, 2018, that Nielsen was unable to close contracts and recognize revenues because hundreds of clients and data partners in the Marketing Effectiveness segment were grappling with the GDPR and changes in the consumer data privacy landscape.  Nielsen attributed this to both issues with "data partners" and a pullback in demand for its services due to GDPR.

252.    Thus, while the Marketing Effectiveness business still showed some growth, its overall trajectory was reversed, (*i.e.*, it showed deceleration of growth) as shown by the following chart showing the business' revenue growth on a constant currency basis each quarter, as reported in each quarterly report:

| Marketing Effectiveness Revenue | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2016 | | | | 2017 | | | | 2018 | |
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| 28.8% | 15.1% | 31.8% | 9.2% | 14.0% | 18.6% | 15.6% | 32.9% | 22.7% | 6.0% |

253.     As this chart shows, Marketing Effectiveness publicly appeared as an area of high growth for Nielsen, and the disclosures in the 2Q18 confirmed that this growth was reversing. This not only undermined the direct positive revenue effects that investors hoped to obtain through Marketing Effectiveness, but was also highly revelatory of the greater problem Nielsen was facing due to its unique role as a middle ground between Nielsen's Watch and Buy segments. It exposed that the problems Nielsen was facing were hitting its insight-focused Watch segment business as well as its Buy side.  While answering an analyst's question during the earnings call, Defendant Jackson explained that "from a measurement standpoint, media spend is continuing, we're continuing to measure that, and it's not being impacted in the near term.  But the analytics around some of that activity is being impacted in the near term and that's what we've tried to reflect in our forecast."  Macquarie Research noted that the drop in performance was "due to pullbacks on GDPR," and that Nielsen pinned the issue on "analytics," not "measurement" or "ad buying."

254.     Whether viewed as an extension of the more general decline in interest for Nielsen's higher cost analytics (already seen on the Buy side that quarter), accelerated by the GDPR, or as a stand-alone issue caused by the GDPR, Defendants knew, or were extremely reckless in not knowing, about these issues even as Nielsen reiterated guidance and assured the market that GDPR was a "net positive."  As Defendant Barns eventually admitted during the earnings call, this was not a surprise—but a "logical" result of GDPR going into effect.  In a polite understatement, the Pivotal Research Group wrote on July 26, 2018, that "investors are understandably concerned about the degree to which management anticipated the accelerated weakness in Buy and the impact of GDPR on Watch segment revenues from Marketing Effectiveness products."

255.     According to Defendant Jackson, clients pulled back—"while the dust [was] still settling"— before ordering analytical Insights.  He said: "We were ready.  What we're seeing in the marketplace is that it's taking clients longer to absorb the changes.  What we said last quarter is that we didn't expect Measurement to be impacted, and it wasn't.  So our Digital Ad Ratings product, *we had all the data that we needed*, and campaigns were up 82%."

256.     During the earnings call, question after question from analysts confirmed that they were not buying the prospect that Nielsen did not have visibility into the GDPR-related issues. Indeed, it made no sense to analysts that these issues were not already known when Defendants made the positive statements about GDPR.

257.     Clearly frustrated with Defendants' deception, an analyst from Barclays Capital Inc. stated: "you've had several opportunities here to reset . . . But even just from last quarter, I think last quarter and even intra-quarter conferences, you had said GDPR was a net positive . . . what changes in 2 months that causes such a big disruption[?]"  With respect to the Marketing Effectiveness business, Defendant Jackson's response feigned ignorance—saying that GDPR affected Marketing Effectiveness "more than we anticipated," but not provide any explanation of how it would have been possible for Nielsen to so confidently say GDPR would be a non-issue, and yet to then announce such negative effects.  His statement was as follows:

> If I look at the changes that we made in Watch, the fallout of GDPR and the changing data privacy landscape impacted our Marketing Effectiveness more than we anticipated. This is a short-term impact.
>
> And then if I speak more broadly as it relates to the actions that we've taken around guidance cuts, make no mistake about it, we're disappointed in our performance across the board. We don't make excuses. Our focus is on execution in the difficult environment that has more volatility and uncertainty. We'll continue to be transparent about what we see when we see it and the impact on our financial performance. The challenges that we're experiencing in the business are largely market-driven. We have been facing some headwinds here, but we continue to work to improve our processes across the company. And where there are issues, we are swift to address them. The other thing that we wanted to do is

we wanted to make sure that we appropriately de-risk the back half of the year. Let me move into your point on GDPR, and I just want to be really clear. We were ready. What we're seeing in the marketplace is that it's taking clients longer to absorb the changes. What we said last quarter is that we didn't expect measurement to be impacted, and it wasn't. So our Digital Ad Ratings product, we had all the data that we needed, and campaigns were up 82%. What did happen, though, is we underestimated the impact on targeting and our data suppliers working towards compliance. It's a pretty complex environment. We have several hundred clients and over 200 data partners in this space. And GDPR and changes in the landscape is a near-term challenge that we're working through. And then your last point around free cash flow, clearly with a reduced revenue guidance for this year, we took the EBITDA guidance down. We had higher restructuring associated with our cost-out initiatives, and so it just follows that we had to reduce the guidance. So the changes in the business rippled through the income statement, and that flowed all the way through to the free cash flow portion of it. So that's what we're focused on is execution, de-risk in the back half of the year. We're disappointed in the performance, but we're focused on delivering on the guidance.

258.    An analyst from Macquarie Capital (USA), Inc., said "I still don't quite understand why this became a problem in the quarter."  Defendant Jackson responded: "So as I talked about, the entire ecosystem saw some disruption as some of the big platforms made some changes to their offerings.  The second thing that happened was, if you look at third-party targeting, there are lots of operational and policy changes that are impacting targeting, and it's taking longer for those things to sort of ripple their way through our data – our clients and our data partners.  So we expect this to take some time to stabilize, and we've moderated our second half outlook accordingly."  This too did nothing to explain the situation, as everyone knew that GDPR was a big deal and would be disruptive—it was in the face of this information that Nielsen assured investors of its guidance and of the fact that its business was prepared for and would not be hurt by the new law.  Defendant Barns also responded to this question, saying:

One way to think about all the services we have in our Marketing Effectiveness area that relate to targeting, you can divide them into two categories:  one is services that help advertisers target segments of consumers, and the other is services that help advertisers target individual consumers or personalized marketing. And it's that second category, personalized, that has had a bigger effect in the short term from the GDPR and the changes in the consumer data

privacy landscape. And it's pretty reasonable when we think it through that while the dust is still settling, a lot of our clients are saying, "I'm not sure it makes sense to spend money on these kinds of analytics right now because I use these to guide some future behaviors, and maybe I'll let things stabilize before I spend the money." So they're not backing off on the advertising activity itself, but what they are backing off on is some of the analytics to inform that advertising activity. And it's pretty logical when we think about it that way.

259.    Through this statement, Defendant Barns effectively acknowledged that it was—at the least—unreasonable and reckless for the Defendants to represent that GDPR would be a non-issue.  The problem was not an unforeseen event, but a "logical" result of the new law, which they had assured investors was not going to be a problem.

260.    An analyst from BMO Capital Markets asked Defendant Jackson about the "shortfall due to GDPR," and specifically asked him to "tell us a little bit more about kind of what came up short in your model?  I would think it's volumes.  But is it volumes?  Is it price?" He responded:

Yes.  And in terms of your question, where [are] we seeing the pressure?  It's clearly volume.  It's around being able to get contracts closed and being able to execute on those just, given the changes that are impacting our clients and our data partners. . . .  And there's a pretty significant backlog of work that we'll be doing for clients once we work our way through these challenges.

This response emphasized the scope of the problem—as one related to the volume of contracts their clients were requesting—but did nothing to explain why Nielsen had told the market this would not be a problem.  It also acknowledged that the disruption in data had prevent Nielsen from completing work, resulting in "a pretty significant backlog."

261.    An analyst from Sanford C. Bernstein recognized that "this GDPR thing, it seems to be the topic of the day" and then asked for "reassurance" about "exactly what's going on" with respect to Nielsen's "continued access" to data from Facebook and other data partners. Defendant Jackson noted that Nielsen had retained some of the data it needed, but that Nielsen was seeing "challenges" as its clients and "data partners are having to basically get themselves in

a position to be compliant." He then added that "as those challenges sort of ripple their way through the marketplace, **obviously**, it's disruptive to clients that are signing up new contracts with us, our ability to go close revenue." Defendant Barns admitted that:

> It's really the third-party data sets, and there's a lot of them because that's the way measurement and, more importantly in this case, analytics works these days. It's a team sport, as our colleague Megan Clarken often says. And a lot of these products these days, what it's all about is integrating a variety of data sets to create something that is better and can do more than any one data set can do. And, well, that's in the long run a great thing, but in the short run with some of these changes in the privacy landscape is posing some of these challenges for our partners.

262. Analyst reactions in their written reports following the earnings call was also extremely negative.

263. J.P.Morgan stated in its July 27, 2018 report that the GDPR-related "impacts are most felt in Marketing Effectiveness, the subsegment in which NLSN data helps facilitate third party advertising targeting, and the sub-segment decelerated from +17% o/cc growth in 1Q18 to just +1% o/cc in 2Q18. *Similar to Buy, this dynamic took us by surprise; when previously asked about the impact of GDPR, management had downplayed the regulation's relevance to Nielsen* but now clarified that issues arise when combining Nielsen data with third party data."

264. In a July 27, 2018 report, SunTrust Robinson said, "The company missed 2Q and dropped forward guidance on GDPR as disrupted access to certain 3rd party data has hindered uptake of targeting products (multi-touch attribution, online/off-line conversion, Marketing Cloud). *This comes after management noted last quarter that GDPR shouldn't be an issue.* The impact comes primarily through Marketing Effectiveness (some modest knock-on effect on Audience Measurement)."

265. Deutsche Bank wrote on July 31, 2018, that "Marketing Effectiveness offerings . . . stumbled with the fallout of GDPR and the changing data privacy landscape." The

report continued: "While management views this as a short-term issue, ***we are compelled to point out that just ~3 months ago, on the 1Q18 earnings call, CEO Mitch Barns said the greater focus on privacy, including GDPR, was a net positive for Nielsen's business and position in the marketplace, and that the company was 'well prepared.'*** Perhaps that will be the case in the future, but it is not ringing true in the present."

266.  An analyst report from Jefferies on July 27, 2018, remained hopeful of an eventual bounce back, but also stated, "***we found mgmt.'s explanation of the impact of GDPR on the Marketing Effectiveness sub-segment of Watch somewhat confusing and lacking.***"

### E.  Subsequent Disclosures Further Confirm the Fraud

#### (1)  Abrupt Resignation of Defendant Jackson

267.  As previously mentioned, on the day that the 2Q18 financial results were released, Defendant Barns was abruptly terminated.

268.  On August 15, 2018, an analyst report from Pivotal Research wrote that "investors would not only welcome, but would probably demand significant managerial change well beyond the departure of the Company's CEO, as was announced at the time of the company's earnings report if Nielsen is to remain as a public company focused solely on its Watch businesses."  That same day Defendant Jackson resigned.  Nielsen publicly reported Jackson's resignation five days later on August 20, 2018.  The timing and abrupt nature of Jackson's resignation indicates it was related to his material misrepresentations and omissions during the Class Period.

269.     On September 5, 2018, Nielsen reported that it had hired David J. Anderson as the

Company's new CFO.  Notably, during the earnings call for Nielsen's 3Q18 financial results, on

October 25, 2018, Anderson recognized that the Company's new management had to improve

planning, forecasting and investor communications to rebuild credibility with investors, stating:

> [O]ne of the things in the center of the financial plate that we have to address is
> planning and forecasting. . . .  Our goal is to provide you with clarity on the range
> of outcomes that represent our guidance are in our best judgment, and then to
> deliver against that. . . .  To sum up the page, we know that credibility is built
> with time. . . .

> And finally, strengthened communications with investors.  I've had the
> opportunity to speak with a number of you already and the themes have been
> consistent in terms of feedback that you've provided to me.  I know and we know
> how important transparency and clarity are to you.  You have our commitment
> that this is going to be a top priority.  We're going to seek your inputs on the
> redesign of our financial reporting framework and I'm going to talk more about
> that a little bit in a few minutes at the end of my remarks.

### (2)     Subsequent Disclosures About Known GDPR Issues

270.     On September 12, 2018, at the Goldman Sachs Communacopia Conference, an

analyst from Goldman Sachs & Co. asked how the GDPR had "change[d] the demand for

Nielsen's Watch data?"  Megan Clarken, whose title was President-Product Leadership, gave a

lengthy response, revealing that, contrary to Defendants' previous representations, the issues

around GDPR were plainly visible within the Company and affected Nielsen's access to data, not

just the behavior of its customers.  On this point, Clarken provided the following explanation:

> Yea.  So, firstly, let me say it doesn't affect the audience measurement business,
> which is clearly the biggest part of business.  What it does have an impact on is
> the portfolio of marketing effectiveness and the work that we do there, both on
> our ability to provide segments for targeting and our ability to provide ROI
> measurement or multitouch attribution measurement.  And I do want to spend a
> minute on this because I think it's worth sort of explaining the dynamics that are
> in play here.

> We see this as there are two different things going on here.  They're separate, but
> they're similar.  The first one is the impact of GDPR, which did take us by
> surprise and I think did take the marketplace, by and large, by surprise.  Firstly,

many, including us, thought that it would be isolated to Europe. But the multinational clients clearly feel the impact of it and want to make sure that they're ready in the U.S. market as things move across to the U.S. market.

So I think it took a lot of people by surprise. It was leading up to sort of the flicking of the switch of GDPR compliance day. . . . It did tend to appear to be a moving target in the eyes of those that had to create compliance within the platforms or the way in which they were doing business. And we saw that as sort of a moving target right up until the last minute. And then what happened was that on the day that the GDPR regulations were put into place, it was literally like a light switch.

And what happened was for those platforms that were affected by it, particularly the large digital platforms, they protected themselves, rightly so, by literally also switching things off because they wanted to make sure that everything . . . was in place and that they were not at risk.

And because there were sort of moving parts right up until that point, they literally sort of stopped. And so they turned off the ability for us to get any data from any part of their advertising platforms that would potentially be compromised in terms of GDPR.

On that day, we had 120 campaigns being measured, 120 campaigns, and it was literally switched off. And so the knock-on effect to that is that we had specs leading up to that time in terms of what it would take for us to get compliance.

But again, they were moving and changing around that time. And so, now, we're doing a bunch of work to make sure that we have compliance in place so that we can reactivate our measurement capabilities on those platforms.

And we have a timeframe in place for when that work will be done, but that pretty much stops the business during that time while you're putting those things in place.

271.   On October 25, 2018, Nielsen issued its 3Q18 financial results and disclosed

continued issues related to GDPR.  By this time, Marketing Effectiveness was down 10% on a

constant currency year-over-year basis.  Nielsen's new CFO, David Andersen, stated that the

10.1% decline in Marketing Effectiveness revenue in 3Q18 was "disappointing and primarily

reflect the impact of changes in the consumer data privacy landscape" and that the poor

performance was "driven largely by changes to the consumer privacy landscape."  Also, in the

3Q18 earnings call, Clarksen stated that:

> The consumer data privacy landscape has been a big area of focus for both
> Nielsen and the industry.  So, let me unpack the dynamics for you.  As consumer
> data privacy changes went into effect in late May, our publisher and platform data
> partners changed their requirements for how data is sent and received.
>
> With the bulk of the work to meet the new policies now behind us, we're shifting
> our focus back to our sales pipeline and new product offerings. In addition, many
> advertisers stopped targeting ads and sharing data until they felt that they were
> privacy compliant.  This is an external factor that's impacted us. Longer term, we
> see strong client demand for a Multi-Touch Attribution, outcomes-based
> measurement and targeting.  And recent multiyear renewals of large enterprise
> clients for Multi-Touch Attribution deals underscore our optimism here.

272.   Clarken also admitted that the required retooling by Nielsen and its data partners

was "very complex" and would take at least until the end of the year.

> The retooling, as I said before, is well and truly under way, and it's very complex.
> It means that we have to do deeper integration with our digital partners and we
> aim to have that fully done by the end of this year.

### (3)   Subsequent Disclosures About Nielsen's Buy Segment Issues

273.   On October 25, 2018, Nielsen issued its 3Q18 financial results and disclosed

continued issues related to China.  Patrick Dodd, whose title was President-Global Markets

Group, began by describing the issues in the emerging markets related to "large multinational

spending pressure" as the Company had disclosed in the prior quarter.  He explained that China

was "a critical piece of our emerging market story," and said: "We now have a new management

team firmly in place and they're focused on a few things.  First, expanding our e-commerce

measurement and analytics solutions with relationships with JD.com, Tencent, and we've most

recently signed a new deal with Suning, the third largest FMCG online retailer in China."  The

implication of this was that Nielsen had just replaced the management team in China, whereas on

February 8, 2018, May 16, 2018, and May 31, 2018, Nielsen stated that any changes to the team

had already been made as of that date.  He then continued by saying: "we *are* rebuilding and

strengthening our commercial teams across China and the China growth plan remains an

important priority for us.  And I look forward to updating you on this and our progress moving

forward."  This further revealed, contrary to Nielsen's assurances on May 16, 2018, that any

issues with the team in China had already been resolved.

274.    During the 3Q18 earnings call, Dodd revealed that multinational clients in the

Emerging Markets had been reducing spending for the entire year.  In response to a question

from a Goldman Sachs analyst regarding whether the spending weakness by large multinationals

in the Emerging Markets business was starting to stabilize or continuing to have a negative

trajectory, Dodd revealed that Nielsen's larger clients had been reducing spending for the entire

year.

> [W]hat we have been seeing *over this year* for some of our larger clients is
> pulling back on some of their lower-priority brands. . . .  [T]here has been some
> pressure in consumer research and innovation research, and that's facing some
> headwinds for us right now as our clients are looking for simpler, faster solutions
> in the ad hoc world.

275.    On February 28, 2019, Nielsen reported 4Q18 and 2018 results, including a 22.3%

decline in Marketing Effectiveness revenues in 4Q18 due to pressure on clients and partners

from changes to the consumer data privacy landscape.  For 2018, Marketing Effectiveness

revenues declined 4%, substantially worse than the 15%-20% growth Defendants represented

during the Class Period.  Emerging Markets revenues increased just 2% in 2018, substantially

worse than the 8%-10% growth Defendants represented during the Class Period.  The Company acknowledged that the slower growth in revenues was caused by continued pressure from multinational clients.  Developed Markets revenue declined 7.1% in 4Q18 due to continued pressure on spending from large multinational clients.  Developed Markets revenues declined 5.1% in 2018, worse than the 2%-4% decline represented during the Class Period.

276.    The Company reported that Adjusted EBITDA was $1.85 billion or 28.5% of total revenues compared to the 30% Defendants represented during the Class Period.  Adjusted EBITDA in the Buy Segment plummeted 30% from $584 million or 18.1% of Buy Segment revenues in 2017 to $411 million or 13.1% of Buy Segment revenues in 2018.  Nielsen reported GAAP *net loss* of $3.20 per share, substantially less than the GAAP net income of $1.50-$1.56 per share Defendants represented during the Class Period.  One reason for the loss was that Nielsen belatedly recorded a $1.413 billion impairment charge primarily related to the writedown of Buy segment goodwill.  Free cash flow was $542 million, substantially less than the $800 million Defendants represented during the Class Period.

277.    On April 30, 2019, Nielsen reported its 1Q19 results, including declines in Watch Plan/Optimize (includes the former Marketing Effectiveness business) revenues and Global Connect (former Buy segment) revenues.  CFO Anderson revealed that soft performance in China contributed to the 0.7% decline in emerging markets revenue and that 2019 guidance for the Media Plan and Optimize business reflected "continued pressures related to privacy" that was "something that's going to be with us for a while."

### (4)    Nielsen Takes Massive Buy Segment Goodwill Write-Down

278.    The severity of the problems in the Buy segment was also illustrated by the Company's disclosure in the 4Q18 of a $1.4 billion goodwill impairment charge related to the Buy segment.

279.    On February 28, 2019, Nielsen's press release associated with its 4Q18 financial results, disclosed that "the company recorded impairment charges of $1,413 million, or $3.98 per share, primarily related to the writedown of goodwill in our Buy segment as a result of our annual impairment assessment."  For context, this impairment was about 17 times more than the Company's net income in 2017—and caused Nielsen to report a net loss in 2018.  The $1.4 billion impairment charge reduced Buy segment goodwill by 54%, from $2.84 billion to $1.34 billion and reduced total Buy segment assets by 21% from $6.9 billion to $5.4 billion.

280.    During the Company's February 28, 2019, conference call, new CEO David Kenny stated that the Buy goodwill impairment charge was a result of work he and CFO Anderson did to take a "fresh look" at the long term forecast across the business and the market environment.  He stated that work resulted in lower forecasts for the Buy business which led to the impairment charge.  However, this impairment should have been taken at an earlier time (at least as of Fiscal Year 2016 10-K), and the failure to do so misstated the value and future prospects of Nielsen's business.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

281.    During the Class Period, Defendants made numerous materially false and misleading statements and omissions, as detailed below.[24]

282.    Nielsen made each of the statements described below because they were filed by Nielsen with the SEC, posted to Nielsen's investor relations website, and/or made by individuals in their capacity as agents or representatives of Nielsen.  Each of the Individual Defendants also had ultimate control over the statements described below, because they made these statements and/or were control persons of Nielsen while it made those statements.

---

[24] The statements that are **_bolded and italicized_** in this Section are statements alleged to be false and misleading.

283.     Defendants' fraud spanned nearly two and half years.  During that time, Defendants made numerous statements to the market including statements in forms filed with the SEC, and during earnings calls and industry conferences.  Lead Counsel has provided Defendants' false and misleading statements below and included information released contemporaneous with these false statements to provide context for the Court.

A.     **Chronology of False and Misleading Statements**

284.     This Section details certain of the false and misleading statements or omissions that Defendants made throughout the Class Period.  Statements about the failure to disclose risk factors and trends as required by regulations are separately described in Section VII(B) and statements related to Nielsen's misleading statements regarding its Goodwill are described in Section VII(C).  This Section is organized based on the date of statements at issue and unless otherwise stated, each statement within a given subsection occurred on the date at issue in that subsection.

(1)     **February 11, 2016 (4Q15 Results)**

285.     **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     In the earnings call announcing Nielsen's 4Q15 results, Defendant Barns told investors that Nielsen was "***reiterating [its] guidance for 2016***."  This reiteration referred to the guidance stated on December 11, 2015 (before the Class Period), when Nielsen hosted its annual Analyst Day conference, and stated that ***revenue growth for Fiscal Year 2016 would be 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93, and free cash flows of $950 million***.  The same reiterated guidance presentation stated that total revenue would be approximately ***$6.1 billion, with about $2.8 billion from Watch and about $3.3 billion from Buy***.  More specifically, it showed that ***the Developed Markets would experience 1.5% to***

***3.5% in constant currency revenue growth and the Emerging Markets would experience 8% to 10% in constant currency revenue growth***.

(b)     The slide deck used to announce Nielsen's 4Q15 results stated that Nielsen ***reiterated the same guidance*** that had been presented since its prior Analyst Day.

286.    These statements, which convey or affirm positive guidance, growth, and positive performance prospects (including guidance of 1.5%-3.5% constant currency growth in Developed Markets growth), were false and misleading because they omitted then known information that undermined the reasonableness of this guidance, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

287.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)     In the earnings call for Nielsen's 4Q15 results, Defendant Barns stated:

"***[A]s we closed 2015, our buy business continued to strengthen and expand***."

(b)     In the earnings call for Nielsen's 4Q15 results, Defendant Barns stated that Nielsen had "***solid growth in key developed markets including the US and Europe.***"

(c)     In the earnings call for Nielsen's 4Q15 results, Defendant Barns stated that:

***We also continued to strengthen our positions with retailers around the world.*** Retailers are long-time data partners for Nielsen but they also have a growing need for our analytics to help with their advertising, marketing, and merchandising decisions both online and offline. Our business with retailers saw strong growth in 2015, boosted in part by 40 new e-commerce clients worldwide.

(d)     In the earnings call for Nielsen's 4Q15 results, Defendant Barns stated that "***[d]eveloped markets also exited the year with good momentum.***"

(e)      In the earnings call for Nielsen's 4Q15 results, an analyst asked about the "US and Europe, parts of the buy segment."  In response, Defendant Jackson stated:

> [*W*]*e see the discretionary spend environment as being pretty stable. We see our clients investing in analytics and innovation to help them drive top line growth. And you've seen from a number of CPG clients, as they've come out of a restructuring cycle, that they're pivoting to growth by investing in innovation. . . .* So we feel very good about where we are in the cycle, and our clients are starting to see some growth.

(f)      In the earnings call for Nielsen's 4Q15 results, Defendant Barns stated:

> To sum up, we feel great about our progress and confident about the year ahead. *While we certainly don't wish for difficult economic conditions, we're ready for them.* In fact, we know from experience that when economic conditions grow more challenging, our business model's advantages and strengths show through more clearly.

(g)      In the press release for Nielsen's 4Q15 results, Defendant Barns stated:

> We look forward in 2016 with confidence.  *In times of economic turmoil and market volatility, the strengths of Nielsen's resilient business model are most evident.*  Our consistent mid-single digit constant currency revenue growth, margin expansion and free cash flow generation continue to be fueled by our core measurement and analytics businesses which remain stronger than ever.

288.    These statements describe Nielsen's Buy segment as strong and growing, describe the demand for and discretionary spending on Nielsen's Buy segment products as stable, and downplay any concerns with economic factors affecting Nielsen's customers, including by stating that Nielsen was ready for challenging economic conditions and by stating that its business model was resilient to economic turmoil.  These statements were false and misleading because they misstated the true condition of the Company, and contradicted then-existing facts, including the decline in discretionary spending on Nielsen's products and a decline in demand for Nielsen's analytics products.  These statements falsely explained that Nielsen's measurement and analytics businesses remained stronger than ever, when those businesses were in decline.

(2)     **April 20, 2016 (1Q16 Results)**

289.     **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     The slide deck used to announce Nielsen's 1Q16 results stated that Nielsen was *reiterating the same guidance* that had been presented since the Analyst Day.

(b)     In the earnings call for Nielsen's 1Q16 results, Defendant Jackson stated:

> *Our teams are continuing to execute in line with the guidance framework we gave for 2016.*  In the developed markets, our core measurement business was solid in our two largest markets, the U.S. and Western Europe. We also saw broad-based growth in the emerging markets with double-digit growth in Latin America, China, and Southeast Asia along with mid to high single-digits in Eastern Europe and Africa. Overall, discretionary spend remained stable with relative strength in areas like innovation.

(c)     In the earnings call for Nielsen's 1Q16 results, Defendant Jackson stated:

> *Moving to 2016 guidance, we are maintaining our annual guidance.* We remain confident in our plan to deliver on all of the operational elements that we laid out on our fourth quarter call, highlighted by revenue growth of 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93 per share, and free cash flow of roughly $950 million.

290.     These statements which affirm positive guidance and state that Nielsen is executing in line with that guidance (including guidance of 1.5%-3.5% constant currency growth in Developed Markets growth), were false and misleading because they omitted then known information that undermined the reasonableness of this guidance, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

291.     **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)     In the earnings call for Nielsen's 1Q16 results, Defendant Barns said:

*2016 is off to a good start for Nielsen, underpinned by our consistent resilient business model.* Our strong financial results in the first quarter were fueled by our Watch segment's progress, with Total Audience Measurement; and our Buy segment's continued strength in emerging markets and growing momentum with retailers. *In both Watch and Buy, our teams are executing well, and there's a lot to look forward to for the rest of the year and beyond.*

(b)     In the earnings call for Nielsen's 1Q16 results, Defendant Jackson stated:

*In the developed markets, our core measurement business was solid in our two largest markets, the US and Western Europe.* We also saw broad-based growth in the emerging markets, with double-digit growth in Latin America, China, and Southeast Asia, along with mid to high single digits in Eastern Europe and Africa. *Overall, discretionary spend remains stable, with relative strength in areas like innovation.*

(c)     The press release for Nielsen's 1Q16 results stated that "*Nielsen's strong first quarter results were underpinned by our steady and resilient business model*" and that its "*unparalleled global footprint remains a core competitive advantage for both local and multinational clients*."

292.    These related statements describe Nielsen's businesses as strong, growing and resilient.  These statements were false and misleading because they misstated the true condition of the Company, which was not strong or stable and was experiencing a decline in demand from Nielsen's customers.  These statements were also false and misleading because they failed to disclose the known trends and risks that were harming and jeopardizing Nielsen's business, including the decline in interest for the analytic products Nielsen offered, and more generally the decrease in demand from Nielsen's customers.

**(3)     July 26, 2016 (2Q16 Results)**

293.    **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     The slide deck used to announce Nielsen's 2Q16 results stated that

Nielsen was *reiterating the same guidance* that had been presented since the Investor Day.

(b)     In the earnings call for Nielsen's 2Q16 results, Defendant Jackson stated:

> *Moving to 2016 guidance, we are maintaining our annual guidance. We remain confident in our plan to deliver on all of the operational elements that we laid out at the beginning of the year*, highlighted by revenue growth of 4% to 6% on a constant currency basis, adjusted net income per share of $2.83 to $2.93 a share, and free cash flow of roughly $950 million.

(c)     In the earnings call for Nielsen's 2Q16 results, Defendant Barns said:

"Lastly, *we're reiterating our guidance for 2016*."

(d)     In the earnings call for Nielsen's 2Q16 results, Defendant Jackson said:

"*Our productivity pipeline remained strong and we're confident in our guidance* of 50 basis points to 70 basis points of constant currency margin expansions for the total company in 2016."

(e)     In the earnings call for Nielsen's 2Q16 results, Defendant Jackson said:

> Finally, we generated free cash flow of $98 million compared to $156 million in the second quarter of last year. This was primarily driven by working capital timing and CapEx investments and our growth initiatives in Watch and Buy and *we remain on track to deliver our 2016 guidance of approximately $950 million. Again, a solid quarter of consistent and steady results.*

294.    These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

295.   **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)   In the press release for Nielsen's 2Q16 results, Defendant Barns stated:

*Once again, in the quarter we saw solid revenue growth, strong margin expansion and earnings growth driven by our scalable, consistent business model, investments, and a continuous focus on productivity.*

(b)   In the earnings call for Nielsen's 2Q16 results, an analyst asked Defendant Jackson for "a little more color . . . on the Buy business" in the Developed Markets, and expressly asked: "I know you called out more pressure on discretionary spending trends in the quarter, but is there anything else worth calling out?"  Defendant Jackson said:

So clearly we're in a two-speed world where our clients have seen slower growth in the developed markets for some time now, while the emerging market growth has been fairly robust despite some volatility and uncertainty. For Nielsen, the U.S. and Europe represents over 85% of our developed markets. Europe actually saw a modest growth in core measurement, while the discretionary side was a little soft as was in the U.S

*And, I'll just remind you that discretionary spending can be a little lumpy. We're coming off two stable quarters, so it's not uncommon to see these dynamics from time to time.* And in the second half, I expect developed Buy to be within the range we gave at Analyst Day of 1.5% to 3.5%.

296.   In the earnings call for Nielsen's 2Q16 results, an analyst asked Defendant Jackson: "The discretionary spending slowdown, if that's the right word in Q2, I think, Jamere, you were saying that was really just something of a blip and maybe there were some tough comps.  Is this not something to worry about?"  Defendant Jackson responded:

Yeah. So, just to reiterate my comments on the discretionary portion of the business, as I said. We saw modest growth in core measurement and the discretionary side was a little soft in the developed markets, both in the U.S. and the UK. *What I've always reminded you of is that discretionary spend can be a little lumpy, we're coming off a couple of stable quarters. So, it's not uncommon to see these dynamics from time to time.* And in the second half, we expect developed Buy to be within the range that we gave at Analyst Day, 1.5% to 3.5%.

297.    These statements described the well-known slower growth in the CPG market, but firmly communicated that these trends were not a challenge to Nielsen by stating that the "little" bit of "softness" seen in 2Q16 was just a "blip" or some "lumpiness" that was "not uncommon," rather than the product of anything more concerning.  These statements were false and misleading because they portrayed the quarterly deceleration as an isolated and unexpected occurrence, when in truth Nielsen was experiencing a prolonged decline in demand for its Buy segment products and its analytics.  The statements were also misleading because they attributed the slowdown to underlying pressures Nielsen's customers were facing, without disclosing that in truth Nielsen's customers were simply demanding less of its Buy segment services and its analytics.

### (4)    September 26, 2016 (J.P. Morgan Investor Conference)

298.    **Status of Buy Segment and Analytics Business.**  On September 26, 2016, J.P.Morgan issued a report following a conference in London with Defendant Barns.  During the conference, Defendant Barns touted the Connected Buy product at Nielsen stating that Buy clients preferred real-time analytics usable for daily tactical decision making.  Despite addressing Buy clients' preferences and knowing that significant reductions in discretionary spending would cause Nielsen to report disappointing 3Q16 results and to slash 2016 guidance (because there were only four days remaining in 3Q16), Barns continued to conceal the reductions in discretionary spending by Developed Markets clients and their adverse impact on Nielsen's business.  J.P.Morgan wrote the following based on Barns' comments, which makes clear that Barns failed to disclose the true conditions plaguing the Company:

> Aside from TAM [Total Audience Management], Connected Buy is internally considered the most important initiative at NLSN. . . . ***Consumer packaged goods clients prefer real-time analytics usable for daily tactical decision making ("activation") over more bespoke solutions, even if they must sacrifice some customization in the process.*** NLSN benefits by being more intimately

embedded in clients' daily processes rather than aiding less frequent, and thereby less lucrative, longer term strategic questions. ***Connected Buy will expand NLSN's margins*** by reducing the expense to deliver solutions, and help the top line since smaller potential clients will now be able to afford less manual, automated options.  We expect visible P&L benefits in 2018.

### (5)      October 25, 2016 (3Q16 Results)

299.    **Status of Buy Segment and Analytics Business.**  On October 25, 2016, as more thoroughly described in Section VI(C), Nielsen disclosed a severe weakness in the Developed Markets portion of its Buy segment.  While these disclosures revealed certain negative pressures in the Buy segment, Defendants continued to mislead investors by misstating the nature and extent of the negative developments by continuing to make false statements about the condition of its Buy segment and analytics business, such as the following statements.

(a)      In the earnings call for Nielsen's 3Q16 results, Defendant Barns said:

[W]hile Europe made good progress in the quarter, our U.S. results were down versus the prior year *as clients looked for more efficiency and productivity in the face of an increasingly difficult growth environment*.

(b)      In the earnings call for Nielsen's 3Q16 results, Defendant Barns said:

*In developed markets, specifically the US, the environment in which we operate has become more challenging. Large, global manufacturers are the strength of our client base. And as I'm sure you've seen in the recent press, they found it increasingly difficult to achieve growth in markets with growing fragmentation in consumer demand, more competition from smaller and local players, and increased commodity prices.*

*Together, these factors have led them to seek efficiencies and productivity in their business and our business has not been immune.* Our clients continue to value our Core Measurement Services, especially given the growing product and retail fragmentation in the market. But when it comes to analytics, their needs have been shifting.

*Clients are shifting away from custom insights delivered via deep dive projects and they are shifting toward every day analytics, often called activation, delivered directly to multiple end-users.* Our view is that this is a secular shift, not a passing phase or a cycle that will swing back.

*Clients want analytics that will help them answer the question of, what do I need to do this week or tomorrow or even today to drive sales, protect market share, or improve my competitive position? In today's challenging growth environment, that's what's most valuable to them*. Now let me walk you through what we are doing to respond to this. First, you'll see us aggressively moving away from slower growing, non-core services. These moves are enabling us to accelerate and increase our investments in our key initiatives that will better position our business for the future. The most important of these initiatives are Total Consumer Measurement and our Connected System.

(c)      In the earnings call for Nielsen's 3Q16 results, Defendant Jackson said:

As you've often heard me say, we are clearly operating in a two speed world with significantly higher growth rates in the emerging markets versus developed markets. . . .  In the third quarter, our business in the emerging markets was $267 million up 8.5% on a constant currency basis. As Mitch mentioned, growth was broad based across a number of markets. In addition, *we saw double-digit growth from multinationals that gives us more confidence that emerging markets will continue to be a tailwind for our Buy segment revenue into 2017*.

(d)      In the earnings call for Nielsen's 3Q16 results, Defendant Jackson said:

So to wrap up, *our third quarter was highlighted by revenue growth and margin expansion and in a more challenging environment.* First, our Watch business has tremendous momentum behind our total audience initiatives and by our subscription-based recurring revenue business remains solid and emerging market growth remains robust while our developed markets business in the US has declined.

(e)      In the earnings call for Nielsen's 3Q16 results, Defendant Barns said:

*Our Buy business, emerging remained solid.  Even within developed, Europe, the Pacific, Canada all turned in solid quarters of growth. The U.S. is where we have the declines. A tough environment, we've talked about, we're judging these to be secular shifts and we're responding accordingly.*

(f)      In the earnings call for Nielsen's 3Q16 results, Defendant Barns

responded to an analyst question about reduced spending in the Buy business.

First, with regard to Buy developed, that is the challenging spot for our business in the quarter**.** But I would even narrower it further for you. Because within Buy developed, Europe grew, the Pacific grew, Canada grew. *It's really the US, where the problem is focused at the moment.*

\*\*\*

104

You add up all these things together and that's the situation that our clients are contending with, and you see that reflected back in our results. ***Now, for us, what that means in terms of their discretionary spend, as I said, they're shifting from these more deep-dive projects that help them think about what they're going to do next year and focused much more on these everyday analytics that help them with activation.***

(g)     In the earnings call for Nielsen's 3Q16 results, in discussing the

Company's Buy business, Defendant Jackson said:

Our Buy business grew just under 1% constant currency, ***led by continued strength in the emerging markets***, which was partially offset by a decline in the developed markets. Adjusted EBITDA was $498 million, up 4% constant currency and adjusted EBITDA margins were 31.7%, up 10 basis points on a constant currency basis.

(h)     In the press release for Nielsen's 3Q16 results, Defendant Barns stated:

In the Buy segment, while emerging markets continued to produce top-line growth, our results in the developed markets were disappointing, particularly in the U.S.   ***Many of our clients are seeking efficiency and productivity in the face of a challenging growth environment***. Given these evolving needs, we are realigning our portfolio by exiting non-core services, reallocating resources and accelerating our investments in our strategic initiatives to help our clients grow and to better position our business for the future.

300.    These statements disclosed a single narrow problem at Nielsen: a decline in

performance in the Developed Markets due to a decline in discretionary spending by U.S.

customers, which Nielsen claimed was the result of slow growth in the underlying market of

Nielsen's customers.  While it was true that Nielsen was seeing declining discretionary spending

by its customers, Defendants' statements were materially misleading and incomplete because

they failed to disclose that Nielsen was experiencing a declining business due to declining

demand for its analytic products.  These statements were rendered misleading in three similar

ways by inaccurately describing the cause of Nielsen's performance decline.

301.    First, Nielsen falsely assured investors that the declining discretionary spending

was caused by weak growth in the underlying business of Nielsen's customers.  For example,

Defendant Barns stated that Nielsen's customers were pulling back on spending because they were finding it "increasingly difficult to achieve growth."  ¶299(b).  His statements contradicted and hid the truth: that Nielsen's customers were cutting their spending on Nielsen due to the customers' own declining demand for Nielsen's specific analytics products.

302.    Second, these statements assured investors that the problems were isolated to the U.S.  For example, Defendant Barns said that the Buy segment "remains solid" in markets outside the United States and that "the US is where [Nielsen] had the decline."  However, the problems Nielsen was facing were systemic to its business and were not isolated to any one market.  Thus, for example, touting the growth of multinational spending in the emerging markets, without disclosing the underlying weakness in demand for Nielsen's analytics, was misleading because Defendants misleadingly omitted to disclose the declining demand in analytics, which was not a problem tied to or limited to the U.S. market.  While Nielsen may have been outrunning the declining demand for its analytics with other forms of growth in some markets, it was misleading to pretend the problem was isolated to the United States, and it was misleading to hide this known trend.

303.    Third, within the United States, Defendants admitted that there had been a shift away from "deep dive" analytics, but misleadingly stated that this was because of greater demand for "everyday analytics."  This was a misleading half-truth because it falsely depicted this as a change toward demanding more—not less—of Nielsen's analytics products.  Defendant Barns described this as clients "want[ing] analytics that will help them answer the question of, what do I need to do this week or tomorrow" and said, "that's what's most valuable to them." ¶299(b).  In reality, this was subterfuge intended to hide from the investors that Nielsen's clients

did not want Nielsen's analytics—whether "everyday" or "deep dive"—and instead were content to simply purchase the Company's data.

### (6)      December 8, 2016 (Analyst Day)

304.    **Growth and Guidance.**  Defendants made the following false and misleading statement about the growth that its business would achieve.

(a)      During its Analyst Day presentation, Nielsen stated that its guidance for 2017 for the Developed Markets was a ***decrease in revenue of 1% to 1.5%*** on a constant currency basis, and its guidance in the ***Emerging Markets was growth of 8% to 10%***.

305.    These statements, which convey or affirm positive guidance and growth were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

306.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)      During Nielsen's Analyst Day conference, in discussing Emerging Markets and underlying trends in the CPG market, Defendant Barns said:

> ***First, with the largest global clients, our position in this particular client segment is very strong.*** We have a very high market share of the overall business in this segment. That's in large part thanks to our global footprint, which no one comes anywhere close to. We're in over 100 countries around the world.  So, almost every single one of the largest global clients chooses to work with Nielsen in the US. ***So, our position is strong, but growth has been more challenging, not***

*only for us but also for these clients. They've been challenged to find top line growth in the marketplace.*

*In addition, many of these clients have been contending with the so-called 3G effect, zero-based budgeting. That puts a lot of cost pressure on their business. And a lot of that, of course, reflects back onto our business.*

(b)     During Nielsen's Analyst Day conference, Defendant Barns said:

*First, in our Buy business, I want to just reiterate, emerging markets continues to be very solid, high single-digit growth. Developed markets, 2017 will be a bit of a transition year, in particular for our U.S. business. But it's a transition that leads to a stronger, higher margin business.*

307.     These statements continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding the specific declining client demand for Nielsen's analytics. These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business, namely a decreased demand for its analytics products across the board.

### (7)     February 9, 2017 (4Q16 Results)

308.     **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     In the presentation for Nielsen's 4Q16 results, it increased its full year 2017 guidance for the full business up from 2% to 3% as stated at Analyst Day to *5% to 6%* and did not update its segment by segment guidance.

(b)     During the earnings call for Nielsen's 4Q16 results, Defendant Jackson stated:

Moving to guidance, we are updating our full-year guidance to reflects the Gracenote acquisition in our watch segment, and the exit from some custom survey research services in buy. **We now expect total Company revenue growth to be 5% to 6%, and we are maintaining our 2017 EPS guidance. *There is no***

*change to our original underlying core growth forecast; however Gracenote helps boost core revenue growth to 6.5% to 7.5%.*

309.    These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

310.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)     During the earnings call for Nielsen's 4Q16 results, in discussing the Buy business, Defendant Barns stated:

> *As we've discussed, our fast-moving consumer goods clients are under pressure in their developed markets, and this is most acute in the US market, where our large global clients are reining in costs in the face of challenging top-line growth.*

(b)     During the earnings call for Nielsen's 4Q16 results, an analyst asked Defendant Jackson to explain the reported deceleration in Nielsen's Emerging Markets growth and Defendant Jackson said:

> In terms of the emerging markets and the deceleration. Listen, a couple million dollars in a quarter can swing the emerging markets by a point or two. We feel pretty good about where we exited the year at 8.6% growth for the total year, which is right in line with our forecast. *And we have good momentum going into next year, based on the broad-based growth that we see in the markets that we talked about.  So no concerns there in terms of a deceleration. Right in line with*

*where we expect to finish for the year. And good momentum heading into next year.*

(c)      During the earnings call for Nielsen's 4Q16 results, Defendant Barns stated:

> We have a compelling story in emerging markets. As a global company with a footprint in over 100 markets, *we have a strong position in the markets that are growing the fastest.* This is a significant competitive advantage. *Our balanced portfolio of global and local clients, ongoing investments in better coverage and granularity for our measurement products, and the healthy demand for our broad range of analytics offerings will continue to drive growth in this part of our business, which accounts for nearly one-third of our total Buy revenues.*

311.      These statements continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding the specific declining demand for Nielsen's analytics. These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business, namely a decreased demand for its analytics products, and without disclosing that the problems Nielsen was facing in the United States were also affecting its business more broadly. These statements also describe "healthy demand" for Nielsen's analytics, which was misleading given the undisclosed declining demand for Nielsen's analytics.

**(8)      April 25, 2017 (1Q17 Results)**

312.      **Growth and Guidance.** Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)      During the earnings call for Nielsen's 1Q17 results, Defendant Jackson said:

> Moving to 2017 guidance. *We are maintaining our full-year guidance*, highlighted by total company revenue growth of 5% to 6% constant currency, $1.40 to $1.46 GAAP EPS, and approximately $900 million of free cash flow. *There is no change to our original forecast for the total company.* However, we

expect Watch and the emerging markets to be larger contributors to our overall results compared to our original plan.

(b)     During the earnings call for Nielsen's 1Q17 results, an analyst asked about the 14% growth in Marketing Effectiveness and that "the guide for the year was 15% to 20%." Defendant Jackson responded:

> Yes, so Marketing Effectiveness grew 14% in the quarter. And you're right, we did guide 15% to 20% annually. *I'll remind you that Marketing Effectiveness can be a little bit lumpy from quarter-to-quarter. But what we feel good about is really the strong demand that we're seeing from both advertisers and publishers for ROI solutions and datasets that really amplify the value of a publisher's inventory*. So in the first quarter, our Nielsen Marketing Cloud, which is powered by the eXelate assets, was up double digits. Our spend with CPG advertisers was up double digits. TV publishers was up. Nielsen Buyer Insights was up mid-single digits. *So we feel good about the demand that's coming from advertisers and publishers. And as a result of that, the 15% to 20% annual guidance that we gave for the year still holds for us*.

313.     These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

314.     **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)     During the earnings call for Nielsen's 1Q17 results, Defendant Barns said:

> *In our Buy segment, we continue to see a 2-speed world. Emerging markets are producing solid growth. However, in developed markets, particularly in the*

**U.S., our clients are under pressure. Our measurement and analytics are as important as ever for our clients. But many of these clients are cutting costs, and our business is not immune.** We're executing on our own productivity actions, which help mitigate the revenue softness while also enabling us to invest in our key initiatives, including coverage enhancements and the Connected System.

> (b)     During the earnings call for Nielsen's 1Q17 results, Defendant Barns said:

First, emerging markets. We continue to have a compelling story. Over the past several years, we've invested consistently in increased measurement coverage and granularity. And those investments continue to pay off. **Our global measurement footprint is unrivaled. And this is a significant competitive advantage for us with the big multinationals. At the same time, our growth is even better with the local and regional players in the emerging markets. And we have a lot of confidence in the emerging market story in 2017 and beyond.**

> (c)     During the earnings call for Nielsen's 1Q17 results, Defendant Barns said:

Our conversations with clients continue to reinforce the mission-critical nature of our data and analytics. But our business is not immune to the pressures they're facing. **And this is reflected in our first quarter results and our outlook for the year. As we look forward, we remain confident in our strategy to manage through the tough environment while building a stronger business for the long term.** In the near term, we're focused on driving productivity and adding to our measurement coverage in a fragmenting market. And we'll also continue to invest in our Connected System initiative, which is our top strategic priority.

> (d)     During the earnings call for Nielsen's 1Q17 results, Defendant Jackson

stated:

We see good momentum in the emerging markets, particularly because of the strength with both locals. **And those same multinational clients that quite frankly are driving the Buy business down in the U.S. are actually spending more in the emerging markets, so we feel good about that.** As a result of that, we're hanging in there with a total company guidance for revenue and more importantly, EPS. And what we'll say is that, listen, from a revenue standpoint, certainly the revenue targets that we have are tough targets. But given the outlook that we have for the total portfolio, we believe that revenue target is something that is still achievable and something that we still have a path to. And probably most importantly is that we're running the productivity play with intensity such that the things that we're doing on cost and productivity are going to protect the earnings forecast. So that's how I would frame how we're thinking about guidance for 2017.

(e)        During the earnings call for Nielsen's 1Q17 results, Defendant Jackson

stated:

> I think the important thing there is as we look at our client base and you listen to our clients in terms of where they see growth opportunities, the emerging markets represent a significant growth opportunity for our clients, and so you're seeing them continue to invest in the emerging markets and even more so because it is going to be a growth driver for the business. ***So, while the U.S. business has been a little bit challenged, we've seen the activity in emerging markets pick up, and that's a good sign for our emerging markets business as well.***

(f)        During the earnings call for Nielsen's 1Q17 results, Defendant Jackson

said:

> And then, as it relates to info and insights, as we've talked about overall, what we're seeing is that we're maintaining our share with our clients, but just spend overall is down, and particularly in the U.S. We're down significantly in the U.S. with the rest of the world being up low single digits. ***And I think the other things that gives us a lot of confidence about the position that we have with our clients is that this was the first quarter in a really long time where we actually saw our multinationals have a very strong performance for us in the form of revenue in the emerging markets, where our multinational clients were actually up mid-single digits in the emerging markets.  So it gives us a lot of confidence about the robust nature of what we're seeing in the emerging markets sort of going forward.***

(g)        During the earnings call for Nielsen's 1Q17 results, Defendant Jackson

said:

> ***Our business in the emerging markets remains robust.*** Revenue was $267 million, up just under 10% constant currency. Our teams are expanding coverage, continuing to execute and delivering growth. And growth was broad-based across markets in Latin America, Southeast Asia, Eastern Europe and Greater China. ***Of particular note is the strong revenue performance of both multinationals and local clients in these markets as we continue to expand our coverage and service offerings.***

(h)        During the earnings call for Nielsen's 1Q17 results, Defendant Barns

stated:

> In our Buy business, continued strength in emerging markets with our balanced client portfolio there. ***And we're driving productivity to help mitigate the tough growth environment that our business is experiencing right now in the U.***S.

Meanwhile, we continue to invest in coverage, e-commerce, specialty retailers, health and wellness and fresh categories. And we're continuing to invest in and execute well on the development of our Connected System, which ultimately leads to a stronger and higher-margin business for the Buy side of our company.

315.    These statements were false and misleading because they continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding the specific declining demand for Nielsen's analytics.  These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business, namely a decreased demand for its analytics products more broadly.

**(9)    July 27, 2017 (2Q17 Results)**

316.    **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)    During the earnings call for Nielsen's 2Q17 results, Defendant Jackson stated that:

[A]s we look at 2017 revenue growth, a few dynamics are playing out. One, our Watch business remained solid. ***Two, we continue to see robust growth in the emerging markets. And three, we continue to plan for a tough U.S. market.*** We now expect developed Buy revenue to be down 3% to 5% on a constant currency basis for 2017. In the U.S., we expect the second half to continue to improve versus the first half, though not enough to land us at our prior guidance. ***We're not forecasting an improvement in the market environment for the back half of 2017. However, a review of our revenue pipeline for 2018, which includes renewals and new business, suggests an improvement in our business in 2018. This, along with an improving market environment, suggests a return to flat revenue in developed Buy for the full year for 2018 versus 2017.***

114

(b)     During the earnings call for Nielsen's 2Q17 results, an analyst asked

Defendant Jackson why they had "confidence in being able to forecast" flat performance in 2018,

and Defendant Jackson stated that:

> We're still working through our operating plan for 2018. However, ***as I said in my opening comments, our current revenue pipeline, which includes renewals and new business wins, suggests that developed Buy should be flat for 2018.*** I'd point more to the back half of 2018 than the front half. We'll obviously share more details when we give the 2018 outlook later in the year. But, ***from our client's perspective, again, we know that our data and analytics are critical to help them understand their performance and business drivers. And while they've had to make some tough cost trade-outs quite frankly, ultimately they'll need to invest in those data and analytics to help them grow their business.*** And what we see as we look into 2018 are a few dynamics. One is, we're continuing to win with both retailers and manufacturers. We're renewing 100% of our long-term contracts with our large global manufacturers. Those contracts are staggered, so even the ones that renewed with a lower base spending have price escalators through the contracts. And we're comping against a pretty tough 2017 environment. The last thing I'll add is that, and our Connected System has actually given us incremental capabilities to sell-in during renewals. And this is a pretty positive impact on the value of those agreements. On developed Buy. I'd look at the first half for trending purposes. And in the first half, our U.S. business is down double digits. The back half comps get a little easier, but as I said, we're not forecasting a change in the environment. So the guidance framework that we gave of down 3% to 5% for developed Buy represents relatively easier comps in the U.S. in the back half, and tougher comps in Western Europe which, quite frankly, was up high single digits in the back half of 2016.

> [Defendant Barns stated that:]

> One thing I'll add Toni is, ***in my conversations with a number of our client CEOs over the past couple of months, there's a growing recognition among our clients that the zero-based budgeting activities, the cost-cutting activities, are going to get them only so far.  And they're all now focused on, hey, we got to get the top line moving.  And they're working to figure that out.  But as they do, and I'm confident that they will, we expect some of that benefit also to flow into the results that we're going to see in our business in 2018.***

317.    These statements, which convey or affirm positive guidance, growth, and positive

performance prospects were false and misleading because they omitted then known information

that undermined the reasonableness of these statements, including that Nielsen's performance

was in decline because of a decline in discretionary spending on its products and a decline in

demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

318.  **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)  During the earnings call for Nielsen's 2Q17 results, Defendant Barns said:

In developed markets, late last year, we began planning for the tougher environment in 2017, particularly in the U.S., and we continue to see that play out as our fast-moving consumer goods clients are faced with unprecedented change in their business. ***They're dealing with both price and volume pressure, and as a result, they're managing their spend very carefully[.] And as we've discussed, our business is not immune to the spending pressure, but just like in Watch, we're adapting to this changing market with innovation, strengthening our leadership position in measurement and analytics for the long term.***

(b)  During the earnings call for Nielsen's 2Q17 results, Defendant Jackson stated that:

Overall, our business continues to deliver growth and margin expansion in a challenging environment. In our Buy segment, revenue remains weak, as a result of a challenging fast-moving consumer goods environment in the U.S. ***However, we continue to drive growth across the rest of the business in both Watch and Buy, while also delivering margin expansion. This is indicative of the strength of the portfolio and the resiliency of this business.***

(c)  During the earnings call for Nielsen's 2Q17 results, Defendant Jackson stated that:

***Turning to Buy, the key takeaway here is that revenue declines in margins are slightly better than 1Q as we navigate a tough U.S. market.  The rest of the developed markets remain resilient and we see ongoing strength in emerging markets. . . .  Now, let me provide some additional color on what we're seeing in the U.S. We continue to benefit from strong, long-term contract renewals with our largest clients. However, as we have discussed, some of these clients are seeing challenging market conditions and cycling through significant cost cuts,***

*and as a result, they make near-term decisions about some of our products and services as they lower overall spend. We know that our measurement and analytics are critical and that, over time, clients must invest in the data they need to run their businesses. And in the second quarter, we saw this dynamic play out to some extent, as clients spent a bit more behind some of their data and analytics needs.*

      (d)     During the earnings call for Nielsen's 2Q17 results, Defendant Barns

stated that:

*And third, the Connected System, our top strategic priority.* As a reminder, the Connected System is an open platform-based system that integrates Nielsen's data and other data sources, and then seamlessly connects measurement and the everyday analytics our clients rely on to run their business. The system delivers two important client needs – speed and efficiency – helping them to answer what happened, why it happened, and then, most importantly, what should I do next. . . *Last month, we officially unveiled the Connected System at our client conference in Los Angeles. The . . . collective response from the hundreds of clients in attendance was overwhelmingly positive.* Manufacturers and retailers of all sizes recognize the value they can unlock through the speed and efficiency gains delivered by the Connected System. . . . *In my 20 years at Nielsen, I've ever seen a more positive response to a new Nielsen product.* As we said last quarter, the rollout of the Connected System will be similar to Total Audience Measurement where some clients will want an end-to-end system right away, while others will begin by using selective components. We're making progress on both fronts.

      319.    These statements continued to tout Nielsen's strength with large global clients and

continued to blame any declining performance on underlying weakness in the CPG market,

without disclosing the truth regarding the declining demand for Nielsen's analytics. These

statements also continued to describe the weakness in Nielsen's business as isolated to the

United States without disclosing the breadth of the underlying problems with Nielsen's business,

namely a decreased demand for its analytics products, and without disclosing that the problems

Nielsen was facing in the United States were also affecting its business more broadly. The

statements in ¶318(d) boasting of the positive response to the Connected Buy product were also

misleading because they furthered the false impression that clients continued to demand

Nielsen's analytics, and that the Connected Buy system provided such analytics to customers.

(10)     **October 25, 2017 (3Q17 Results)**

320.     **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     The slide presentation for Nielsen's 3Q17 results showed the ***same guidance*** that Nielsen had used in the prior quarter.

(b)     During the earnings call for Nielsen's 3Q17 results, Defendant Jackson said:

> Turning to Buy. The key takeaway is that year-to-date Buy revenue trends are in line with the framework we gave in 2Q, with continued strength in the emerging markets offset by a soft U.S. market. Third quarter total Buy revenue was $803 million, down 2.1% constant currency. Core Buy revenue was roughly flat on a constant currency basis. ***Previously announced dispositions were a 2-point drag to our Buy revenue growth. Our revenue in the developed markets was $491 million, down 5.4% constant currency, behind continued softness in the U.S. and a tough comparison in Europe. The developed Buy results year-to-date are in line with the full year framework we gave in the second quarter.***

(c)     During the earnings call for Nielsen's 3Q17 results, Defendant Jackson said:

> ***Moving to 2017 guidance.  We are maintaining our full year guidance,*** highlighted by EPS of $1.40 to $1.46 per share, and free cash flow of approximately $900 million. On the right-hand side, we have updated our restructuring expense to approximately $85 million and D&A to approximately $650 million.

(d)     During the earnings call for Nielsen's 3Q17 results, Defendant Jackson said:

> [***W]e gave a framework last quarter on this, and I'll just reiterate that. We said our total Buy business is going to be down 2.5% to 3%. On a year-to-date basis, we're at about 2.6% down. Developed Buy, we said, is going to be down minus 3% to minus 5%. Year-to-date, as I said, we're at about 4.6%. And given that we have one quarter left in the year, we don't expect improvement in the fourth quarter. Emerging markets, 8% to 10%, we've been trending towards a high end, year-to-date, just a little over 10%.*** And then Corporate is down 60%. Year-to-date, we're down 54.5%. So, that gives you the pieces for the Buy business being down 2.5% to 3%. On the Watch business, we said, up 11% to 13%. Year-

118

to-date, we're at 10.6%. Audio is going to be flat. We had a 130-basis point headwind in the third quarter that won't repeat on the Watch side of our business. Audience Measurement of Video and Text, 14% to 16%, Marketing Effectiveness, 15% to 20%. And Other Watch, as I said, down 10%. So, that just gives you the framework for how we see the guidance shaping up, and we said no change to our overall guidance. We'll give guidance on 2018 in our Investor Day in a couple of weeks, and we'll unpack all the details at that time.

321.    These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

322.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)    During the earnings call for Nielsen's 3Q17 results, Defendant Barns said:

***In the quarter, we continued to execute on our strategy to provide uniquely better measurement and analytics products to drive growth and efficiency for our clients and for Nielsen.*** We made significant progress even while facing rapidly changing environments in both Watch and Buy. For more than 90 years, we've leveraged change as a means for progress by innovating the services we provide and adapting to the changing environments in which we operate. This is both our legacy and our future. Our ongoing commitment to innovation will drive growth and efficiency in the years to come.

(b)    During the earnings call for Nielsen's 3Q17 results, Defendant Jackson said:

Let me provide some additional color on the U.S. Sequentially, the revenue declines are improving, although the environment remains tough. ***As we have***

*discussed, some of our clients are cycling through their own significant cost cuts and lowering overall spend. We expect this trend to continue for the next few quarters. However, we also know that our measurement and analytics are critical and that, over time, clients must invest in the day-to-day need to drive growth and run their businesses. In addition, we are investing in coverage initiatives that will present growth opportunities for us in 2018 and beyond.* And we look forward to sharing more details at our Investor Day in a couple of weeks. . . . *Our business in the emerging markets is exceptionally strong.*

      (c)     During the earnings call for Nielsen's 3Q17 results, Defendant Barns said:

*Turning to Buy. Our business in emerging markets continues to be robust, driven by our balanced portfolio of local and multinational clients, along with our investments in coverage and granularity. Revenues were up nearly 11% in the quarter, led by strength in Latin America, Eastern Europe, Southeast Asia and Greater China. In developed markets, the operating environment in the U.S. remains challenged, as our large, fast-moving consumer goods clients are faced with price and volume pressure in their own businesses. They're carefully managing their spending across all functions, and our results continue to reflect these near-term pressures. At the same time, we're continuing to invest for the long term, adapting and evolving to strengthen our leadership position for the future. . . .  To sum up on Buy, emerging markets continue to be a growth engine.*

      (d)     During the earnings call for Nielsen's 3Q17 results, Defendant Jackson

stated:

*We do expect developed Buy to be down less in 2018 than 2017. And then as I said in my opening comments, the U.S. is actually improving. The fundamentals are improving, although the environment there remains challenging. Again, there are 3 things that we feel very good about heading into next year. It's our wins with retailers and manufacturers. As we go through our operating plans, we're looking at our contract renewals with our large global manufacturers. We're renewing all of those at 100%. I think the environment there is getting better.*

323.    These statements continued to tout Nielsen's strength with large global clients and

continued to blame any declining performance on underlying weakness in the CPG market,

without disclosing the truth regarding the declining demand for Nielsen's analytics.  These

statements also continued to describe the weakness in Nielsen's business as isolated to the

United States without disclosing the breadth of the underlying problems with Nielsen's business.

**(11)   November 9, 2017 (Investor Day)**

324.   **Growth and Guidance.**  Defendants made the following false and misleading

statements about the growth that its business would achieve.

(a)   During the conference, Nielsen presented slides showing its guidance for

2018 was a *1% gain to 1% loss in the Buy Segment, with Emerging Markets growing 8% to 10%*

*and Developed Markets falling by 2% to 4%, and 5% to 6% gains in the Watch segment with*

*15% to 20% growth in Marketing Effectiveness*.

(b)   During the conference, Defendant Barns said:

*It also is why we have a high level of confidence that we'll continue to deliver on our long-term financial framework, which is about mid-single-digit revenue growth, consistent margin expansion, double-digit EPS growth*, all while continuing to follow our balanced approach to capital allocation, with the dividend at the center, toggling back and forth between the tuck-in acquisitions you've seen us make over the past few years with the remaining cash devoted to share repurchase.

(c)   During the conference, Defendant Jackson said:

*Marketing Effectiveness will be up 15% to 20%. This is driven by, again, the tremendous momentum that we have in Marketing Effectiveness, the new product offerings that we have from the initiatives in our Visual IQ acquisition but also, there's strong demand for ROI-based metrics in Marketing Effectiveness*.

(d)   During the conference, Defendant Jackson said:

*Let me shift now to guidance. I'm going to first start with 2017 guidance, and I'll start by reiterating our 2017 guidance highlighted by total revenue growth of approximately 4%. Our GAAP net income per share of $1.40 to $1.46 a share, and free cash flow of approximately $900 million; and again, this is exactly what we showed on our third quarter call.*

(e)   During the conference, Defendant Jackson said:

Let me now start to give you the pieces for the 2018 framework. Starting with revenue, and I'll start with our Buy business. *Our Buy business is going to be down 1% to up 1% in 2018,* and let me give you a few of the dynamics there. *From an emerging market standpoint, we see the emerging markets growing 8% to 10% next year, we have tremendous momentum in the emerging markets.*

*Our emerging markets will be roughly 40% of the Buy revenue in 2018 and we have a great story there. It's driven by the investments that we've made in coverage and penetration, but it's also driven by the fact that we have multinationals and locals, who continue to invest in those growth markets. You combine that with the strong demographic trends there and we have a lot of confidence in our emerging markets profile going into 2018.*

(f)      During the conference, Defendant Jackson said:

*From an emerging market standpoint, we see the emerging markets growing 8% to 10% next year, we have tremendous momentum in the emerging markets. Our emerging markets will be roughly 40% of the Buy revenue in 2018 and we have a great story there.* It's driven by the investments that we've made in coverage and penetration, but it's also driven by the fact that we have multinationals and locals, who continue to invest in those growth markets. You combine that with the strong demographic trends there and we have a lot of confidence in our emerging markets profile going into 2018. *Developed markets will be down 2% to 4%; a couple of dynamics there. We've talked pretty extensively about the environment that our large clients are going through, in terms of low growth and the competitive pressures, but one of the things that you're going to see us talk a little bit more about on the backs of the investments that we're making in retailer data and analytics, is that, that will be a growth driver for us in 2018 and beyond – and I'll give you more of that story in a little bit. The final item is our corporate revenue being down 50% and this is really just a carryover from the 2017 pruning activity. So our Buy business will be down 1% to up 1% in 2018.*

325.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statement about the condition of its Buy segment and analytics business.

(a)      During the conference, Defendant Barns said:

*Also, in our Buy business for emerging markets, we've been investing in our emerging market business and those investments continue to pay off.   We continue to see very strong growth in that part of our business*. . . .

*On the buy side of our business, we continue to see solid growth for our clients in the key emerging markets around the world, and you see that reflected back in our business as well. In developed markets, it's much more a story about . . . costs. And this is zero-based budgeting and clients who are actively working to reduce their spend on the kinds of things that we provide.* So, we have to adapt to that and adjust to that. And a big part of what we're doing with the Connected System does exactly that.

326.     These statements continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding customers' declining demand specifically for Nielsen's analytics.  These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business.  These statements are also false because convey or affirm positive guidance and growth, while omitting then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in demand for its analytical products.

### (12)     February 8, 2018 (4Q17 Results)

327.     **Growth and Guidance.**  Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)     The slide presentation for Nielsen's 4Q17 results shows the ***same guidance*** that Nielsen had used in the prior Investor Day conference.

(b)     During the earnings call for Nielsen's 4Q17 results, Defendant Jackson said:

> ***Moving to 2018 guidance. We are maintaining our 2018 guidance, highlighted by revenue growth of approximately 3%; $1.40 to $1.46 a share GAAP EPS; and approximately $800 million of free cash flow. There's no change to the revenue framework we've provided at the Investor Day in November.*** Our 2018 EPS guidance does not yet reflect the impact of U.S. tax reform.

328.     These statements were false and misleading because Nielsen was projecting positive growth across the Buy segment without disclosing the underlying problem it was facing of declining demand from its clients in its analytics products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were

not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

329.   **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)   During the earnings call for Nielsen's 4Q17 results, Defendant Barns said:

Turning to Buy, segment revenues declined approximately 3% on a constant currency basis for the full-year 2017. Emerging markets performed well with revenues up almost 9% constant currency despite the fourth quarter that Jamere addressed. *We remain confident in the growth outlook for our business in emerging markets. We're well positioned with our balanced portfolio of local and multinational clients, our investments in coverage and our global footprint. In developed markets, the operating environment in U.S. remained tough. Many of our large fast-moving consumer goods clients continue to hold back on their spending as a result of their own top line challenges.* While we're not expecting a bounce-back in spending in the near-term, we're working to ensure that when our clients do invest in new products or their existing brands to revitalize top line growth, our measurement and analytics will be uniquely well-positioned to help them.

(b)   The press release for Nielsen's 4Q17 results stated that:

"*We executed well on our key initiatives in Watch and Buy while contending with rapidly changing markets in 2017. In 2018, we'll continue to invest in innovation to drive growth and efficiency as we proceed on the path towards 2020,*" said Mitch Barns, Chief Executive Officer of Nielsen. Barns continued, "In Watch, we had a strong year. Our teams were relentless in their efforts to enhance our Total Audience Measurement system and drive client adoption across all of its components. As the market further evolves due to ongoing media fragmentation, Total Audience Measurement will serve as the foundation for our future, providing the measurement capability, scale, and flexibility necessary to best meet our clients' needs. *In Buy, we remain well positioned in Emerging Markets due to our investments in coverage and our balanced client portfolio. In Developed Markets, the U.S. remains under pressure as clients persist in seeking efficiencies in their own businesses in a difficult growth environment. We continue to drive the rollout of the Connected System and increase coverage and granularity within our Total Consumer initiative, both of which will enable us to drive growth for Nielsen and our clients despite the environment.*"

* * *

Revenues within the Buy segment for the fourth quarter of 2017 decreased 2.3% to $848 million, or 5.3% on a constant currency basis, compared to the fourth

124

quarter of 2016. Emerging markets revenue increased 7.4%, or 4.8% on a constant currency basis, as ***our global footprint, coverage expansion, and broad product offerings continued to position us well with both local and multinational clients in these markets***.

330. These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products. These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products. These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

331. **The GDPR's Effect on Nielsen.** Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a) During the earnings call for Nielsen's 4Q17 results, an analyst from the Pivotal Research Group asked: "I was wondering if you could talk about how GDPR might be impacting or might impact the business in Europe in the coming year? I could imagine it might be helpful for panels?" Defendants Barns responded:

> GDPR, we've been focused on this for some time. We have a big team that's working on it. ***We've been out in front of it. We're ready. And we don't see any significant impact for our Buy business. For Watch, there'll be some things that we'll have to do to ensure our compliance with the regulations, but it's manageable. We don't expect to see any major impact on our business. We'll still have access to all the data that we're going to need for our products. So, yes, we're in good shape.***

332. This statement touted Nielsen's focus on and readiness for GDPR, and stated that Nielsen did not expect any major impact on the business from the law. It also stated that Nielsen

would have all the data it would need for its products.  This statement was false and misleading

because it misstated the negative effects the GDPR would have on the Company and its ability to

access data.  It assured investors that the law would not affect the Company's ability to access

the data it needed.  In truth Nielsen was not ready for GDPR and the law would severely affect

its access to data and the demand for its products.

333.  **Nielsen's Performance Issues in China.**  Defendants made the following false

statements about what they described as discrete revenue execution issues in China.

(a)  During the earnings call for Nielsen's 4Q17 results, Defendant Jackson

said:

> Our business in the emerging markets was $304 million, up nearly 5% on a
> constant currency basis.  ***Overall, the underlying market environment in our
> emerging markets remains very strong.  Our results in the quarter were below
> our full year performance, due primarily to disruption from natural disasters
> and some revenue execution issues in China that caused our growth rate to dip.
> These represented approximately a 2-point drag on our 4Q
> results. . . . Excluding these dynamics, we saw broad-based growth in the
> emerging markets . . . .  Importantly, we continue to see solid growth from both
> local clients and multinationals across markets where we operate. . .***

(b)  During the earnings call for Nielsen's 4Q17 results, an analyst asked if

there were any other causes to the under performance in the Emerging Markets besides those

Defendants had called out and Defendant Jackson did not mention any other issues, reiterating

that:

> Yes.  So, as I mentioned, our emerging markets grew nearly 5% in the quarter.
> We did see growth from both locals and multinationals.  We were about $6
> million to $7 million of revenue below our 4Q plan in the emerging markets,
> which is relatively small, but quite frankly, that impacted the our growth rate by 2
> points to 3 points.  The big drivers, as I mentioned, were natural disasters in
> places like India, and Puerto Rico, and Mexico.  And while we're a global
> multinational, something always happens somewhere in the world.  Quite frankly,
> this is a little bit more than normal.  ***And then China, our largest market, was
> impacted by some revenue execution issues in the fourth quarter that caused
> our growth rate to dip.  We've addressed these, and we expect the improvement
> in 1Q in 2018, but the underlying China market is very healthy.  What I'll say***

*about the emerging markets overall is that the markets are healthy.* We grew 9% in 2017. Volume and price growth is solid. In 2017, we saw local giants grow in mid-teens and multinationals grow in mid-singles. And I'm actually encouraged by the growth I see in the fourth quarter. As I mentioned, Latin America, which is our second largest market is up double digits; Eastern Europe up high singles; and Africa, our fastest-growing market is up double digits as well. *So, no change to the long-term framework. And we've addressed the issues that we talked about in the quarter.*

>     (c)       During the earnings call for Nielsen's 4Q17 results, Defendant Barns

stated that:

> Yes Tim, I was on the ground in China with our team back in December. *I came away with that, from that visit, with a really clear sense that the market opportunity remains strong.* We're still far from fully penetrated in that market. Second our market share in China continues to grow. For the full year 2017, we grew more than our global competitors. And we've outgrown our global competition fairly consistently over the past few years. But what I can assure you is we've addressed those. And the team's refocused on the core business. And we'll be back on track during 2018. This is still the most important growth market in the world, have no doubt about that. *Our balanced client portfolio with the local clients and the global clients remains just as much of the strength today as it was before. And there's still plenty of opportunity to grow our penetration in the market, as I mentioned before.*

334.    The statements in this Section about China were false and misleading because they conveyed that Nielsen's declining performance in China were solely or primarily the result of short-term issues with Nielsen's execution in that country, when in fact it was the result of the same forces that caused Nielsen's business to decline generally. These statements were also false and misleading because Nielsen said, and even assured investors that the issues affecting its performance in China had been resolved by the end of 2017, when in fact both the operational issues and the issue of Nielsen's declining business, were not resolved. These statements were also false and misleading to the extent that they assured investors that performance in China would improve.

### (13)    February 28, 2018 (Morgan Stanley Conference)

335.    **Status of Buy Segment and Analytics Business.**  Defendants made the following false statement about the condition of its Buy segment and analytics business.

(a)    During the Morgan Stanley Technology, Media & Telecom Conference, an analyst asked: "And I just wanted to ask about just develop Buy in general declined 5% last year, 3% decline expected this year.  So it's driven by weakness in the U.S.  And correct me if I'm wrong, but you're viewing it more as a cyclical thing, not secular, but there are certain secular things going on in the market like ship to private label and e-commerce.  So how are you viewing private label on the business and then I'll ask about ecommerce afterwards."  Defendant Jackson responded:

> Yes, so there have been some changes in terms of the marketplace. So if you look, first of all starting with the consumer, the way the consumer is shopping today has changed. We talk a little bit about e-commerce being one of those dynamics, but there are also some changes in consumer taste, if you will, that have driven some of the changes in terms of what's happened at retail and what's happened for some of our clients. ***And if you look at the strength of our client base, large multi-nationals that we've won over several years, some of which have been with us for 30 years plus, they've been impacted in a significant way and they've responded to that as they've had growth challenges. They've responded to those challenges by finding a way to go trim costs. Some are doing zero-based budgeting, some are on their second or third iterations of zero-based budgeting, and even though our data is mission-critical for those clients, we're certainly not immune to those dynamics. And so that piece of it as it relates to the growth challenges is certainly cyclical in nature, but they're also facing the changes in terms of the consumer and changes in terms of the way consumer shops as being something other than cyclical.*** The answer to those challenges for our clients and they all notice is to . . .continue to invest in innovation to drive new products into the marketplace, continue to advertise and make sure that they're top of mind and relevant for consumers. And ***the third piece is to make sure that they're investing in data and analytics to help them understand business drivers and how to activate against those business drivers*** and that's certainly going to have a positive lift for our business. So we're not counting on a snapback in the environment any time soon. That's why the investments that we're making in the Connected System, the investments that we're making in the retailer platforms, the investments that we're making in e-commerce are all focused on helping clients operate in this environment and they'll be a growth driver for us and it'll help our clients sort of pivot to growth as well.

128

336.    These statements were material false and misleading because they continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding customers' declining demand for Nielsen specific analytics.  These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business.

337.    **Nielsen's Performance Issues in China.**  Defendants made the following false statements about what they described as discrete revenue execution issues in China.

(a)    During the conference, an analyst asked: "I wonder if you could maybe provide a bit more detail on some of the Chinese execution issues that have come up recently," and Defendant Jackson responded:

> *We talked about on the fourth quarter that we had some execution issues in China. I'd say overall the markets are in great shape there. Their volume opportunities, their growth opportunities, our teams in China have a tremendous number of opportunities to go after. We quite frankly very simply put, we have things that we were trying to get done in the quarter and closing the quarter that we didn't get done. And as a result of that, we sort of missed our estimate by a couple of points but the underlying markets are in great shape in China and you can expect us to improve that performance in the first quarter and throughout 2018.*

338.    The statement in this Section about China was false and misleading because it conveyed that Nielsen's declining performance in China was solely or primarily result of short-term issues with Nielsen's execution in that country, when in fact it was the result of the same forces that caused Nielsen's business to decline generally.  This statement was also false and misleading because Nielsen said, and even assured investors that the issues affecting its performance in China had been resolved by the end of 2017 and that performance would improve.  This statement was also false and misleading to the extent that it assured investors that performance in China would improve.

(14)     **April 26, 2018 (1Q18 Results)**

339.     **Growth and Guidance.**  Defendants made the following false and misleading

statements about the growth that its business would achieve.

(a)     During the earnings call for Nielsen's 1Q18 results, Defendant Jackson

said:

> *Moving to 2018 guidance, we are increasing full-year EPS guidance to reflect the impact of U.S. tax reform. We now expect GAAP EPS to be $1.50 to $1.56 per share. This is a $0.10 increase versus our prior guidance and reflects our updated 34% GAAP tax forecast. We are maintaining the remaining elements of guidance, highlighted by revenue growth of approximately 3% constant currency and free cash flow guidance of approximately $800 million.*

(b)     During the earnings call for Nielsen's 1Q18 results, Defendant Jackson

said:

> *Our Watch business is off to a great start to the year. Importantly, we continue to invest in our Watch business to drive solid revenue and EBITDA growth. Turning to Buy, first quarter total Buy revenue was $776 million, down 2.1% constant currency. On an organic basis, Buy revenue declined 1.3%. Our revenue in the developed markets was $471 million, down 5.2% constant currency, driven by continued weakness in the U.S.*

340.     These statements, which convey or affirm positive guidance, growth, and positive

performance prospects were false and misleading because they omitted then known information

that undermined the reasonableness of these statements, including that Nielsen's performance

was in decline because of a decline in discretionary spending on its products and a decline in

demand for its analytical products.  These statements were also false and misleading because

Nielsen knew it would not meet this guidance, due to its access to non-public information about

its contracts and client demand for its products.  These statements were not accompanied by

meaningful cautionary language and conveyed information that Defendants knew was false and

misleading at the time they were made.

341.   **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)   During the earnings call for Nielsen's 1Q18 results, Defendant Barns said:

In emerging markets, our global footprint serves as a significant competitive advantage where, in many of our markets, we are the sole measurement provider. Our ongoing investments in coverage and penetration, combined with positive demographic trends in these markets, position us well for the long term. *We continue to see faster growth with local clients in these markets, highlighting the importance of our balanced client portfolio. . . .   To summarize the picture for our Buy segment, while the operating environment remains challenging in developed Buy, especially in the U.S., we're making real progress towards returning to growth and improving profitability despite the environment, in line with our Path to 2020 plan. Additionally, our Operations transformation for Buy is heavily focused on emerging markets.*

(b)   During the earnings call for Nielsen's 1Q18 results, Defendant Jackson said:

Audio was up just under 1% in the quarter. Marketing Effectiveness was up 22.7% constant currency on continued strength in ROI solutions. On an organic basis, Marketing Effectiveness grew 17.3%. This is just for the Visual IQ acquisition and the exit of TV Brand Effect. *Advertisers are intensely focused on measuring return on their investment and media spend. And this is an important source of growth for our company.*

\*      \*      \*

Turning to Buy. First quarter total Buy revenue was $776 million, down 2.1% constant currency. On an organic basis, Buy revenue declined 1.3%. Our revenue in the developed markets was $471 million, down 5.2% constant currency, driven by continued weakness in the U.S. Emerging markets revenue was $294 million, up 6.1% constant currency. As expected, we saw improvement in the growth rate from 4Q, but we still have more to go here. *Growth was broad-based across several markets, including Latin America, Eastern Europe, Africa and China.*

*Last quarter, we highlighted some challenges in China. However, as expected, we saw improvement here in the first quarter.* And we expect more to come during the year. Our Corporate Buy revenue was down $8 million or 42.1% behind previously announced pruning actions. Buy adjusted EBITDA was $84 million, down 24.3% constant currency in the first quarter. The quarterly results were driven by the launch of new retailer programs, most notably Walmart.

342.     The press release for Nielsen's 1Q18 results stated:

*"In the first quarter, we continued to execute on our key initiatives while focusing on our Path to 2020 objectives. Through continuous innovation, we are transforming our business in three major areas, Watch, Buy, and Operations, to drive a faster growing, higher margin business and create incremental value for our shareholders," said Mitch Barns, Chief Executive Officer of Nielsen. Barns continued, "Watch had another great quarter with growth driven by Total Audience Measurement. Our ability to provide independent, comparable measurement to the industry is pivotal as media and audiences continue to fragment. In our Buy business, Developed Markets continued to see pressure in the fast moving consumer goods industry in the U.S., but we are confident that our investments in the Connected System, Total Consumer Measurement, and retailer partnerships will drive improved results despite this environment. Emerging Markets saw broad-based growth across markets in Latin America, Eastern Europe, Africa, and China. Our significant competitive advantages, including our balanced client portfolio and global footprint, position us well here."*

343.     These related statements describe Nielsen's analytics business and Buy segment as strong and growing.  These statements were false and misleading because they misstated the true condition of the Company, which was not strong or stable and was in declining demand from Nielsen's customers.  These statements were also false and misleading because they failed to disclose the known trends and risks that were harming and jeopardizing Nielsen's business, including the decline in interest for the analytic products Nielsen offered and, more generally, the decrease in demand from Nielsen's multi-national customers.

344.     **The GDPR's Effect on Nielsen.**  Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a)     During the earnings call for Nielsen's 1Q18 results, Defendant Barns stated:

*We still have access to the data that the industry needs for independent third-party measurement*. We've always taken a conservative approach around consumer data privacy and this has proven to serve us well in the long term. Another key focus of the industry has been the General Data Protection Regulation or GDPR, a new EU data protection law going into effect on May 25.

(b)     During the earnings call for Nielsen's 1Q18 results, Defendant Barns stated:

> ***Because we've been at the forefront of privacy compliance for years, many of the steps required by GDPR were already in place. Overall, we see the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace.***

(c)     During the earnings call for Nielsen's 1Q18 results, an analyst asked whether "there been any change in perhaps the level of data that you're able to get at this point in terms of segmentation that you have access to," and Defendant Barns responded:

> As you mentioned, it is a very long-running and very strong relationship that we have with Facebook. ***We still had access to the data we need for our measurement products. For some of our products, the analytics products, we've had to make some process changes. We are in the process of making some process changes in order to accommodate some of their policy changes, but we're still able to deliver all those products to our clients in the marketplace and we don't see any change in that going forward. I think one of the reasons why we've weathered this period, especially well, relatively well, better than, I think, a lot of the other data partners with Facebook is because we've always taken a more conservative approach with regard to consumer data protection, consumer data privacy. One thing we've said in the past in terms of how we use the data that we access from Facebook is that it's anonymized and aggregated before it's actually used in our services. And so, there's a certain extra level of protection in terms of the data access we use and how it's deployed in our products. So, yeah, again, we're in a very good position. I think as we think about the implications of the Facebook situation and the implications of GDPR, we really think all of this plays as a net positive for our business and our position in the marketplace as it unfolds.***

(d)     During the earnings call for Nielsen's 1Q18 results, Defendant Barns said:

> ***And, finally, consumer data privacy, it's always been a high priority for us, both in the way we design our products and the way we run our operations. We're well prepared for GDPR and we're well positioned in the market.***

345.     These related statements describe Nielsen as well prepared for the GDPR, state that the GDPR would be a net positive for Nielsen, and state that the GDPR was not affecting Nielsen's access to data.  These statements were false and misleading because they misstated the negative effects the GDPR was having and would have on the Company and falsely conveyed

that Nielsen was prepared for the law.  In truth, the GDPR had severely undermined Nielsen's ability to access data that it needed to conduct its business and it had severely undermined demand for Nielsen's products.  Additionally, it was misleading to simultaneously tout preparedness for the GDPR and describe a positive outlook for Nielsen's analytics products, including its Marketing Effectiveness products, while failing to disclose the severely negative implications that the GDPR was having on Nielsen's business.

(15)    <strong>May 15, 2018 (Needham 2018 Emerging Technology Conference)</strong>

346.    **The GDPR's Effect on Nielsen.**  Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a)    During the conference, an analyst asked Defendant Abcarian, "How long are you going to be able to bring in all those big datasets before Congress says no, no you're violating somebody's privacy? . . . And what impact would that have on Nielsen's measurement ability, if they can't get these third party data sets integrated into their own measurement?" Defendant Abcarian said:

> *Well, everything we do, we engineer our products using privacy by design principles and our Chief Privacy Officer spends a lot of time understanding regulation and changes in consumer. And in fact whether it was Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent level data. We're looking for an ability to create aggregated insights, because Nielsen has strong, opted-in consumer compliant panels that we can use the intelligence from in which to basically create the person based estimates that are required to drive and fuel the industry.*
>
> *\*       \*       \**
>
> *So, I don't -- who knows where the industry will go.  What I do know is that Nielsen stands in a really strong point, because we have invested for six-plus decades in building high quality consumer opted in panels. So, if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.*

347.     This statement describe Nielsen as prepared for the GDPR, denied any risks associated with access to data through Nielsen's data providers like Facebook, and assured investors that even if access to this data was shut down it would not affect Nielsen's ability provide its products and services.  These statements were false and misleading because they misstated the effects the negative GDPR was having and would have on the Company and falsely conveyed that Nielsen was prepared for the law.  In truth, the GDPR had severely undermined Nielsen's ability to access data that it needed to conduct its business and it had severely undermined demand for Nielsen's products.

**(16)     May 16, 2018 (Barclays Americas Select Franchise Conference)**

348.     **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)     During the conference, Defendant Jackson said:

The other interesting thing, again, about those large clients is, as I said, *the emerging markets, those clients continue to see growth opportunities. If you look at what's happening in markets like India, in China and Brazil and the continent of Africa, there are tremendous growth opportunities there. So, those same clients that are challenged in the developed markets are continuing to invest in a major way in the emerging markets, and we continue to expand our coverage capabilities in the emerging markets. And that global footprint is really a big benefit for us. So, we do see sort of this multi-speed world, if you will, with higher growth in the emerging markets, challenges in the developed markets. We're focused on building the portfolio.*

(b)     During the conference, Defendant Jackson said:

Yeah. *So, what we're seeing with our largest clients is they have been challenged from a topline standpoint. Many of them have gone to the middle of the income statement to find a way to drive earnings growth in the face of a challenging topline environment. So, what we've seen in that dynamic is zero-based budgeting from some of our largest clients, and they literally go through every line item of the contract to find an opportunity to squeeze out some margins.*

\* \* \*

135

So, our retail measurement services is critical to the way they run their business. ***A number of our analytics are critical to the way they run their business, but things that are a little bit more discretionary in nature, things that look like deep-dive consumer studies or things that are looking at sort of the future of consumers and some of their consumption have. And so a lot of that discretionary spending has gone away.***

So, we see clients continuing to invest in things that are focused on how they manage their revenue. ***So, we still see them investing in things like pricing, promotion, shelf assortment, space optimization, those are the kinds of things our clients are doubling down on their investment. We call those things everyday analytics and clients are still investing pretty heavily in those things along with retail measurement. And those are the things that we're focused on as part of our Connected System platform.***

(c)     During the conference, Defendant Jackson said:

Yeah. For multi-nationals, I mean, you occasionally see fits and starts with multi-nationals even in growth markets like the emerging markets, for example. So, what you'll see from time to time is a client or two in a couple of countries will have some challenges in terms of growth, et cetera. And they will shift some priorities, but longer term, ***the trend in the emerging market is very healthy. We see a lot of demand there. Multi-nationals are continuing to invest there in a meaningful way.***

349.    These statements were materially false and misleading because they continued to tout Nielsen's strength with large global clients and continued to blame any declining performance on underlying weakness in the CPG market, without disclosing the truth regarding customers' declining demand for Nielsen specific analytics.  These statements also continued to describe the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems with Nielsen's business, namely a decreased demand for its analytics products.

350.    **Nielsen's Performance Issues in China.**  Defendants made the following false statements about what they described as discrete revenue execution issues in China.

(a)     During the conference, Defendant Jackson said:

And also, the local clients are investing in the emerging markets as well. We see gains with the local clients. They are Walmart of double-digits in the emerging

markets, and they're about 35% or 40% of our business. So, we have a nice hedge, if you will, against some of the blips in fits and starts that you typically see with multi-nationals. But longer term, the trend is going to be fine. ***We talked about in the fourth quarter specifically some of our own challenges in China. Those things are behind us. We've made some changes there in terms of leadership and structure, and the teams are operating pretty well.***

351. This statement about the supposedly resolved and discrete issues in China was false and misleading because it conveyed that Nielsen's declining performance in China was solely or primarily result of short-term issues with Nielsen's execution in that country, when in fact it was the result of the same forces that caused Nielsen's business to decline generally. This statement was also false and misleading because it assured investors that the issues affecting its performance in China had been resolved by the end of 2017, when in fact both the operational issues and the issue of Nielsen's declining business, were not resolved. This statements was also false and misleading to the extent that it assured investors that performance in China would improve.

**(17)    May 31, 2018 (Sanford Bernstein Strategic Decisions Conference)**

352. **Growth and Guidance.** Defendants made the following false and misleading statements about the growth that its business would achieve.

(a)    During the conference, an analyst asked Defendant Barns, "what comfort can you give regarding this year's cash flow target?" Defendant Barns responded, indicating that the company was "***on track***" to meet its previous guidance.

(b)    During the conference, Defendant Barns said:

***So the Watch part of our business continues to perform incredibly well, driven by this Total Audience Measurement system, strengthened marketing effectiveness, which is the area where you bring Watch data together with Buy data to inform the effectiveness of advertising for both buyers and sellers of media in the marketplace that continues to grow really well. So Watch, we feel really good about.***

353.     These statements, which convey or affirm positive guidance, growth, and positive performance prospects were false and misleading because they omitted then known information that undermined the reasonableness of these statements, including that Nielsen's performance was in decline because of a decline in discretionary spending on its products and a decline in demand for its analytical products.  These statements were also false and misleading because Nielsen knew it would not meet this guidance, due to its access to non-public information about its contracts and client demand for its products.  These statements were not accompanied by meaningful cautionary language and conveyed information that Defendants knew was false and misleading at the time they were made.

354.     **Nielsen's Performance Issues in China.**  Defendants made the following false statement about what they described as discrete revenue execution issues in China.

(a)     During the conference, an analyst for Bernstein & Co. asked Defendant Barns if he could "give any explanation" of the "hiccup" the Company had faced in 4Q17, noting: "I think you said something specifically in China that you think was a one-timer" and presented the open-ended question: "So is that the story, what did happen?"  Defendant Barns, without correcting the characterization of the situation in China as a "*hiccup*" or a "*one-timer,*" responded:

> *In China, we also referenced that our – we made some leadership changes in the China market team.  Our team had gotten a little bit off track in terms of where their focus was in the business. We've got our team now refocused on the core of our business and in getting the investments back to where they should be and restoring the growth rate there that we've enjoyed now for about a decade.*

355.     This statement about the supposedly resolved and discrete issues in China was false and misleading because it conveyed that Nielsen's declining performance in China was solely or primarily result of short-term issues with Nielsen's execution in that country, when in

fact it was the result of the same forces that caused Nielsen's business to decline generally.  This statement was also false and misleading because it assured investors that the issues affecting its performance in China had been resolved by the end of 2017, when in fact both the operational issues and the issue of Nielsen's declining business, were not resolved.  This statements was also false and misleading to the extent that it assured investors that performance in China would improve.

356.   **Status of Buy Segment and Analytics Business.**  Defendants made the following false statements about the condition of Nielsen's Buy segment and analytics business.

(a)   During the conference, Defendant Barns said:

And in terms of just analytics, I think I would segregate analytics into two kinds. You can divide it up in many ways but two kinds – one is the kind of analytics that help a client understand what should I do next year. The more strategic consultative type projects and then separately the analytics that are more about what should I do next week or next month, we call those the everyday analytics. The first kind, the more strategic type projects, those are under especially heavy pressure. Clients are just finding ways to forego that type. Fortunately, while we have some business in that area, that's not the focus of our business. ***Our business in terms of analytics is more focused on the everyday analytics and that's holding up much better and the more we can integrate those analytics with the core measurement data, which is exactly what we're doing with the connected systems, the stronger we're going to be in the future, and that's been our approach.***

357.   This statement was false and misleading because it continued to tout client demand for "everyday analytics" when clients were moving away from these types of analytics products to raw data.

358.   **The GDPR's Effect on Nielsen.**  Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a)   During the conference, an analyst asked "what might concern you sort of overall geopolitical and privacy concerns?  Certainly for your panel-based solutions there's really no privacy issue that I can think of, but when . . . I think about especially some of the

inputs used for your digital side of your business and your relationship with Facebook in that regard, anything we should be – anything changing there about your ability to work with Facebook and use their – help together to as an ingredient to how you characterize digital audiences and anything going on there that we should be thinking about?"  Defendant Barns responded:

> *For measurement, we still have the access to all the data that we need for our measurement products including our relationship with Facebook. I think a reason why we weren't as affected as some other firms who may receive data from Facebook or others is because we've always historically taken a fairly conservative approach to how we use data, handle data, manage data and that conservative approach served us pretty well in this particular instance. And so, yeah, that's been a more of a non-event from our side as compared to how it played out for some others.*

359.    These related statements describe Nielsen as well prepared for the GDPR, state that the GDPR would be a net positive for Nielsen, and state that the GDPR was not affecting Nielsen's access to data.  These statements were false and misleading because they misstated the negative effects the GDPR was having and would have on the Company and falsely conveyed that Nielsen was prepared for the law.  In truth, the GDPR had severely undermined Nielsen's ability to access data that it needed to conduct its business and it had severely undermined demand for Nielsen's products.  Additionally, it was misleading to simultaneously tout preparedness for the GDPR and describe a positive outlook for Nielsen's analytics products, including its Marketing Effectiveness products, while failing to disclose the severely negative implications that the GDPR was having on Nielsen's business.

### (18)    June 5, 2018 (Baird Conference)

360.    **The GDPR's Effect on Nielsen.**  Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a)     During the Baird Global Consumer, Technology & Services Conference, an analyst asked: "Facebook had a lot of headlines recently.  There's been some policy changes there.  Obviously, a big digital marketing platform.  It's also a partner in enabling Nielsen digital measurement.  So the changes to their policies, any impact on Nielsen?"  A Nielsen executive responded:

> *Yeah. Look, for more than a decade we've built our products and services based on privacy by design which is also fueling kind of the GDPR principles, and everything that we do has been built on those privacy principles into our products and services. When we work with Facebook, the data that we're providing back in the form of measurement is aggregated and anonymized. At no point in time is it ever individualized [to] a respondent level, and all of that is being done in a safe haven environment than anonymization and aggregation. And so our product measurements continue to be able to leverage that partnership and execute on the measurement aspects of that because at no means are we producing any kind of respondent-level data against that partnership.*

361.     This statements that Nielsen was able to access the data it needed for its products to work despite the GDPR and that Facebook was not restricting Nielsen's access to data was false and misleading because Nielsen's access to data had been severely restricted due to the GDPR.  Slightly more generally, these statements discussed the GDPR's effect on Nielsen's business without disclosing that the GDPR had severely affected demand for the Company's products including its Marketing Effectiveness products.

**(19)     June 14, 2018 (Bernstein Future of Media Conference)**

362.     **The GDPR's Effect on Nielsen.**  Defendants made the following false statements about the effect of the GDPR on Nielsen.

(a)     During the conference, an analyst asked Defendant Abcarian the following question: "Something that . . . I ought to ask because it seems to [have become] increasingly important recently is privacy issues.  So from a product standpoint . . . you use data from a lot of places.  Your panels are obviously privacy-compliant.  But are there any – [has] this cause[d] any

new sort of risk or things you've had to deal with in terms of data sources you use and

incorporate into your various services?"  Defendant Abcarian responded, saying:

> Obviously, Nielsen, as you mentioned, for decades we've built privacy opted-in
> panels and privacy has been the cornerstone of everything we do. Because we're
> measuring consumers, and we need our consumers to trust our brands and to trust
> Nielsen with the datasets in which we're using in which to produce measurement
> out to the marketplace. . . . .  And so we've – ***because of these principles,***
> ***because of the kind of the underpinnings of the way in which Nielsen operates,***
> ***the privacy changes for our core measurement products were really, for us,***
> ***when GDPR came really a non-event, because of the fact that everything we're***
> ***producing is anonymized and aggregated.***  By no means do we ever at any time
> release or share PII data, et cetera.  And so we continue to produce whether it's
> Digital Ad Ratings or television ratings or cross-platform ratings with the same
> metrics, same datasets that we were using prior to the institution of the changes.

>        (b)        During the conference, an analyst asked Defendant Abcarian the following

question: "And one your publicly known big partners is Facebook.  So no implications for you

with that specific relationship that you can talk about?"  Defendant Abcarian responded by

saying:

> ***Yeah, I mean, we – the way in which we work with Facebook just like we work***
> ***with any other data provider is that, once again, bringing privacy by design***
> ***straight into the principles of that partnership.  All of that data is anonymized***
> ***and aggregated and sits behind the – basically, the walls of Facebook.  And by***
> ***no means, at any point, have we released, any type of disaggregated data. We're***
> ***there to produce what is the reach of digital impressions to this property for***
> ***men, 18 to 49. There's no personal identification inside of that. So that is why***
> ***the work that we've done, whether it's Facebook or with other providers, we***
> ***continue to be able to provide the anonymized aggregated measurement that***
> ***we've provided to the marketplace for years.***

        363.        These statements stated that Nielsen was able to access the data it needed for its

products to work despite the GDPR and that Facebook was not restricting Nielsen's access to

data.  This was false and misleading because Nielsen's access to data had been severely

restricted due to the GDPR.  These statements also described the GDPR as a "non-event" for

Nielsen which was false and misleading because the GDPR had severely affected demand for the

Company's products including its Marketing Effectiveness products.

B.     **Failure to Disclose Trends and Risks**

364.     Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish

the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303],

*Management's Discussion and Analysis of Financial Condition and Results of Operations*

("MD&A").  Among other things, Item 303 of Regulation S-K required that Nielsen's Class

Period Forms 10-K and 10-Q disclose known events or uncertainties that had, *or were*

*reasonably likely to have had*, a material impact on its revenues or income from continuing

operations.

365.     The SEC issued interpretative guidance associated with the requirements of Item

303 of Regulation S-K concerning the disclosure of material events or uncertainties.  The

interpretative guidance states, in pertinent part, as follows:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and reasonably likely to have material
> effects on the registrant's financial condition or results of operation.
>
> *             *             *
>
> Events that have already occurred or are anticipated often give rise to known
> uncertainties. For example, a registrant may know that a material government
> contract is about to expire. The registrant may be uncertain as to whether the
> contract will be renewed, but nevertheless would be able to assess facts relating to
> whether it will be renewed. More particularly, the registrant may know that a
> competitor has found a way to provide the same service or product at a price less
> than that charged by the registrant, or may have been advised by the government
> that the contract may not be renewed. The registrant also would have factual
> information relevant to the financial impact of non-renewal upon the registrant. In
> situations such as these, a registrant would have identified a known uncertainty
> reasonably likely to have material future effects on its financial condition or
> results of operations, and disclosure would be required.

366.     Throughout the Class Period, Nielsen issued Quarterly and Annual Reports with

the SEC.  Defendants had a duty to disclose all known events or uncertainties that had, or were

reasonably likely to have had, a material impact on its revenues or income from continuing

operations.  When these reports were issued on (1) April 20, 2016; (2) July 26, 2016; (3) October 25, 2016; (4) February 17, 2017; (5) April 25, 2017; (6) July 27, 2017; (7) October 25, 2017; (8) February 8, 2018; and (9) April 26, 2018, Defendants failed to satisfy this duty and violated a disclosure duty by omitting to disclose material information that they had a duty to disclose. Each of the reports and/or the accompanying Sarbanes Oxley certifications were signed by Defendants Jackson and Barns.

367.    The MD&A disclosures in Nielsen's Forms 10-K and 10-Q filed with the SEC during the Class Period were materially false and misleading because Defendants failed to disclose material uncertainties and trends detailed herein.  These undisclosed material uncertainties and events, which were then known to management, were reasonably likely to, and did, have a material effect on the Company's future operating results.  Specifically:

(a)    From the start of the Class Period until 3Q16, Defendants failed to disclose that Developed Markets clients were reducing spending – and had been doing so since 2015 – or the reasonably likely impact of the reduced spending on Nielsen's Developed Markets revenues.  More specifically, Defendants failed to disclose the declining demand for Nielsen's analytics products.  Indeed, when Defendants revealed the actual impact on 3Q16 results, Nielsen's stock price declined 16.9%.  In addition, Defendants failed to disclose the full extent of the decline in spending by Developed Markets clients in 2017 or the reasonable likely impact on Developed Markets revenues. When Defendants further revealed the extent of the decline in spending and/or lowered Developed Markets revenue guidance in April 2017 and October 2017, Nielsen's stock price declined substantially.

(b)     From 3Q16 onwards, Defendants failed to disclose the extent of the trends regarding declining discretionary spending, that such trends were not isolated to the United States, or that Nielsen was experiencing declining demand for its analytics products.

(c)     As alleged above, Defendants failed to disclose in 2018 that the GDPR and policy changes by Facebook and other data providers were reasonably likely to and did adversely impact Nielsen's Marketing Effectiveness business.  Specifically, Defendants knew that Facebook and other data providers changed policies, thereby preventing Nielsen from offering its Marketing Effectiveness clients analytic products containing data that helped advertisers target individual consumers.  Indeed, after the Class Period, Defendants admitted that Nielsen was unable to close contracts (and recognize revenue) because several hundred clients and more than 200 data partners were grappling with the GDPR and changes in the consumer data privacy landscape and working to ensure compliance.  They revealed that the "entire ecosystem saw some disruption" and that there were "lots of operational and policy changes that are impacting targeting."  Defendants also admitted that there was a "pretty significant backlog" of work that Nielsen would be doing for clients once contracts were closed.  That, in turn, led to substantial declines in Marketing Effectiveness revenues in 2018.

368.    The risk factor disclosure included in Nielsen's Form 10-Ks deceptively referred to potential risks, and not actual trends, associated with reduced discretionary spending by the Company's CPG customers, as follows:

> Continued adverse market conditions, particularly in the consumer packaged goods, media, entertainment, telecommunications or technology industries, ***could*** adversely impact our revenue.
>
> A number of adverse financial developments continue to impact the global financial markets. The current economic environment has witnessed continued malaise in consumer confidence and demand, impacting the demand for our customers' products and services. Those reduced demands ***could*** adversely affect the ability of some of our customers to meet their current obligations to us and

hinder their ability to incur new obligations until the economy and their businesses strengthen. The inability of our customers to pay us for our services and/or decisions by current or future customers to forego or defer purchases *may* adversely impact our business, financial condition, results of operations, profitability and cash flows and may continue to present risks for an extended period of time. We cannot predict the impact of economic slowdowns on our future financial performance.

*We expect that revenues generated from our measurement and analytical services will continue to represent a substantial portion of our overall revenue for the foreseeable future.* To the extent the businesses we service, especially our clients in the consumer packaged goods, media, entertainment, telecommunications and technology industries, are subject to the financial pressures of, for example, increased costs or reduced demand for their products, the demand for our services, or the prices our clients are willing to pay for those services, *may* decline.

During challenging economic times, clients, typically advertisers, within our Buy segment *may* reduce their discretionary advertising expenditures and *may* be less likely to purchase our analytical services, which would have an adverse effect on our revenue.

Clients within our Watch segment derive a significant amount of their revenue from the sale or purchase of advertising. During challenging economic times, advertisers *may* reduce advertising expenditures and advertising agencies and other media *may* be less likely to purchase our media information services, which would have an adverse effect on our revenue.

369.    Notably, this language was nearly identical to what Nielsen had used in each of its Form 10-K Annual Reports since 2011, meaning that the nearly identical language appeared in its reports for the years 2011, 2012, 2013, 2014, 2015, 2016, and 2017.  This meant that the challenges and negative trends known internally to Nielsen (as described herein by former employees) were not incorporated into the MD&A's during the Class Period, as Nielsen was required to do.  Through the use of "may" language and by continuing to use the identical cautionary language, this "risk statement" conveyed that, while there was a risk regarding diminishing demand, it remained just that.  This representation was materially false and misleading because it failed to disclose that the warned of risks, namely reduced spending by Buy segment clients adversely impacting revenues, were already occurring and that there was a

serious business-threatening decline in those clients' demand for Nielsen's analytic insights products.

370.    Nielsen's 2017 10-K also discussed certain risks associated with data protection laws, such as the GDPR.  The risk factor disclosure included in the Form 10-Ks deceptively referred to potential risks rather than disclosing the actual issues Nielsen was facing and did not discuss the actual risks Nielsen faced.  Those risks included (a) the GDPR negatively affecting its access to data because of decisions by its data partners to shut off its access to such data, and (b) changing demand for Nielsen's products as a result of the GDPR, regardless of whether Nielsen had access to the data necessary to create its products.  The risk language in the 2017 10-K was as follows:

> Data protection laws and self-regulatory codes *may* restrict our activities and increase our costs. Various statutes and rules regulate conduct in areas such as privacy and data protection which may affect our collection, use, storage and transfer of information both abroad and in the United States.  The definition of "personally identifiable information" and "personal data" continues to evolve and broaden, and new laws and regulations are being enacted, so that this area remains in a state of flux.  In addition, some of our products and services are subject to self-regulatory programs relating to digital advertising.  Compliance with these laws and self-regulatory codes *may* require us to make certain investments or may dictate that we not offer certain types of services or only offer such services after making necessary modifications. Failure to comply with these laws and self-regulatory codes *may* result in, among other things, civil and criminal liability, negative publicity, restrictions on further use of data and/or liability under contractual warranties.

> In addition, there is an increasing public concern regarding data and consumer protection issues, with the result that the number of jurisdictions with data protection laws continues to increase and the scope of existing privacy laws and the data considered to be covered by such laws is expanding. Changes in these laws (including newly released interpretations of these laws by courts and regulatory bodies) *may* limit our data access, use and disclosure, and *may* require increased expenditures by us or may dictate that we *may* not offer certain types of services.

> The European Union's General Data Protection Regulation ("GDPR"), will take effect in May 2018 and will require EU member states to meet new and more stringent requirements regarding the handling of personal data. Failure to meet the

GDPR requirements could result in penalties of up to 4% of worldwide revenue. ***Additionally, compliance with the GDPR is resulting in operational costs to implement new procedures corresponding to new legal rights granted under the law, but has had little direct impact on Nielsen products.*** The forthcoming EU "ePrivacy" Regulation is expected to have potentially significant impacts for the online/mobile behavioral advertising industry as a whole. Nielsen is continuing to monitor the development of the ePrivacy Regulation and industry response and will determine whether to take further action, as needed, following its final adoption.

371.     Additionally, this language was false and misleading because it stated that compliance with the GDPR has had little direct impact on Nielsen's products.  On April 26, 2018, Nielsen published its 1Q18 quarterly report, in which it was obligated to disclose risks and trends, as described above, and yet despite the heightening of risks and issues associated with the GDPR, Nielsen did not update this risk language, and instead relied entirely on the risk language provided by the 2017 10-K.  Finally, following publication of Nielsen's 2017 10-K on February 2, 2008, Nielsen made a variety of subsequent statements as described in Section VI(D)(2)(ii), which disclaimed and downplayed the existence of GDPR-related risks, including by making specific assurances that Nielsen did not face issues related to data access.

### C.     Statements About the Value of Nielsen's Buy Segment and its Goodwill

372.     As of December 31, 2017, Nielsen materially overstated the value of its goodwill by at least $1.4 billion, which inflated various financial metrics on the Company's balance sheet and income statement.  Nielsen continued to conceal its inflated goodwill until it belatedly recognized the goodwill impairment in 4Q18.  Consequently, Defendants reported materially false financial results in 4Q17, 1Q18, and 2Q18, in violation of generally accepted accounting principles ("GAAP"), as follows[25]:

---

[25] GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other

**Misstatement of Key Financial Results for the Fourth Quarter of 2017**

**(*in millions, except percentages*)**

|  | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $8,495 | ($1,400) | $7,095 | -16% |
| Total Assets | $16,866 | ($1,400) | $15,466 | -8% |
| Total Equity | $4,245 | ($1,400) | $2,845 | -33% |
| Operating Income/(Loss) | $1,225 | ($1,400) | ($175) | -114% |
| Income/ (Loss) from continuing operations before Income Taxes | $828 | ($1,400) | ($572) | -169% |

**Misstatement of Key Financial Results for the First Quarter of 2018**

**(*in millions, except percentages*)**

|  | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $ 8,524 | ($1,400) | $ 7,124 | -16% |
| Total Assets | $ 16,923 | ($1,400) | $ 15,523 | -8% |
| Total Equity | $ 4,258 | ($1,400) | $ 2,858 | -33% |
| Operating Income/(Loss) | $ 207 | ($1,400) | $ (1,193) | -676% |
| Income/ (Loss) from continuing operations Income Taxes | $ 114 | ($1,400) | $ (1,286) | -1228% |

**Misstatement of Key Financial Results for the Second Quarter of 2018**

**(*in millions, except percentages*)**

|  | Reported | Correcting Adjustments | Actual | Percent Misstatement |
|---|---|---|---|---|
| Goodwill | $ 8,441 | ($1,400) | $ 7,041 | -17% |
| Total Assets | $ 16,698 | ($1,400) | $ 15,298 | -8% |
| Total Equity | $ 4,049 | ($1,400) | $ 2,649 | -35% |
| Operating Income/(Loss) | $ 228 | ($1,400) | $ (1,172) | -614% |
| Income/ (Loss) from continuing operations Income Taxes | $ 121 | ($1,400) | $ (1,279) | -1157% |

373.     As of December 31, 2016, Defendants represented that the carrying value of the

Buy reporting unit's goodwill exceeded the fair value by at least 20%, conveying that an ample

cushion against goodwill impairment existed.  Defendants knew or were reckless in not knowing

this representation was materially false and misleading because, as explained in detail below, it

required Defendants to assume that projected cash flows in the Buy segment would grow by 8.2%

from 2017-2021, a growth rate that was not reasonably based on facts and rationality and could

not be justified under even the most optimistic business plan.

---

disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with
the exception that interim financial statements need not include disclosures that would be duplicative of
disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

374.    Goodwill was one of the most important assets carried on Nielsen's balance sheet during the Class Period.  Goodwill is an asset that represents the future economic benefits that arises from the other assets acquired in a business combination that are not otherwise individually identified or separately recognized.  As of December 31, 2016, Nielsen reported $7.845 billion of goodwill, which represented nearly 50% of the Company's total assets of $15.7 billion.  The Buy reporting unit's goodwill totaled $2.696 billion, representing 35% of total goodwill and nearly 17% of total assets.  Nielsen's Buy reporting unit goodwill balance was originally calculated as the excess of the purchase price paid over the fair value of the assets and liabilities acquired when Nielsen purchased the Buy entity.

375.    Nielsen's goodwill for the Buy reporting unit was important to investors during the Class Period because it reflected the future discounted cash flows that the Company expected to realize from its acquisition of that reporting unit.  Goodwill impairment exists when the fair value of the reporting unit is less than its book or carrying value on the balance sheet.

376.    Defendants represented that Nielsen relied primarily on the discounted cash flow ("DCF") method under the income approach to calculate the fair value of the Buy reporting unit's goodwill, supplemented by the market approach.[26]  The DCF method is generally recognized as "the [valuation] approach that merits the greatest confidence within the financial

---

[26] The income approach is "a general way of determining a value indication of a business [] using one or more methods that convert anticipated economic benefits into a present single amount."  Association of International Certified Professional Accountants ("AICPA"), Statement on Standards for Valuation Services (VS §100), *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*.  The discounted cash flow method is "a method within the income approach whereby the present value of future expected net cash flows is calculated using a discount rate."  *Id.*  A discount rate is "a rate of return used to convert a future monetary sum into present value."  *Id.*  The market (market-based) approach is "a general way of determining a value indication of a business [] by using one or more methods that compare the subject to similar businesses[.]"  *Id.*

community."[27]  Despite this fact, the DCF method is only as good as the quality, integrity, and reliability of the inputs that go into the DCF model.  And if the inputs used fail to measure up to those characteristics, a particular DCF model can readily produce a "garbage-in, garbage-out" determination of value, regardless of the DCF method's consistency with modern economics and its empirical validity and mathematical sophistication.

377.    Defendants did not explicitly disclose whether their goodwill assessment compared the fair value of equity to the book value of equity or the fair value of invested capital to the book value of invested capital.  These are the two commonly used methods used to determine whether the goodwill of a reporting unit is impaired or not.  Under the equity method, the fair value of the reporting unit's equity is determined and then compared to the company's equity book balance shown in its internal balance sheet for the reporting unit.  Invested capital, on the other hand, is "the sum of equity and debt in a business enterprise."[28]  "Debt is typically (a) all interest-bearing debt or (b) long-term, interest-bearing debt."  *Id.*  Consequently, under the invested capital method, the fair value of the Buy reporting unit's combined equity and debt is compared to the book or carrying values of the reporting unit's combined equity and debt. Under the Gordon growth two-stage DCF model, the indicated value produced is the fair value of the invested capital of the reporting unit.  Statements made by Nielsen's new CFO during the Company's February 28, 2019 conference call indicate that Nielsen compared the fair value of invested capital to the book value of invested capital.[29]

---

[27] *Cede & Co. v. JRC Acquisition Corp.*, No. Civ.A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) (quoting *Ryan v. Tad's Enters., Inc.*, 709 A.2d 682, 702 (Del.Ch. 1996).  The Delaware Chancery Court is widely recognized as authoritative on valuation matters.

[28] AICPA, Statement on Standards for Valuation Services (VS §100), *Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset*.

[29] CFO Anderson stated the following: "So our updated [4Q18 goodwill] assessment let [*sic*, meant "led"] us to record a noncash goodwill impairment charge of $1.4 billion, $3.97 per share and resulted in an updated carrying [or book] value for the Buy business [reporting unit] of $3.5 billion."  Plaintiff can

378.    Based on Defendants' explanation of their goodwill impairment testing process, Plaintiffs determined that Defendants relied specifically on the Gordon growth two-stage model because Defendants described in considerable detail the three major inputs of that model that they used in each reporting unit valuation: (1) the business (cash flow) projections; (2) the long-term growth rate; and (3) the discount rate.  Defendants provided sufficient information for Plaintiffs to reasonably reconstruct the DCF models utilized by Defendants during the Class Period and Plaintiffs determined that Defendants artificially inflated the fair value of the Buy reporting unit goodwill until Nielsen belatedly recorded a $1.4 billion goodwill impairment charge in 4Q18.[30]

379.    The mathematical formula for the Gordon growth two-stage model that Defendants used to value the Buy reporting unit as of 2016 and 2017 was as follows:

$$PV = \frac{NCF_1}{(1+k)^{0.5}} + \frac{NCF_2}{(1+k)^{1.5}} + \cdots + \frac{NCF_n}{(1+k)^{n-0.5}} + \frac{\dfrac{NCF_n(1+g)(1+k)^{0.5}}{k-g}}{(1+k)^n}$$

where:

| | | |
|---|---|---|
| $PV$ | = | Present value |
| $NCF_1 \ldots NCF_n$ | = | Net cash flow expected in each of the periods 1 through $n$, $n$ being the last period of the discrete cash flow projections |
| $g$ | = | Expected long-term sustainable growth rate in net cash flow, starting with the last period of the discrete projections as the base year |
| $k$ | = | Discount rate (cost of capital) |
| $n$ | = | Number of periods in the series |

---

reasonably infer from Anderson's statement that $3.5 billion was both Nielsen's fair value conclusion at 4Q18 for the Buy reporting unit and the book value of its invested capital at 4Q18.  Plaintiff can infer that Anderson was referring to Buy's $3.5 billion invested capital (rather than just Buy's total equity) because Nielsen's total consolidated equity on its balance sheet as of December 31, 2018 was only $3.043 billion.  Anderson could not be referring to $3.5 billion as Buy's equity because the Buy equity could not be greater than the Company's $3.043 billion consolidated equity unless the Watch segment's equity was negative, an impossibility.  Therefore, the Buy unit's book value of invested capital prior to the $1.4 billion goodwill impairment was about $4.9 billion (i.e., $3.5 billion plus $1.4 billion).

[30] Plaintiff reconstructed Defendants' 2016 DCF model based on publicly available information, but all essential information, critically, was not available until well after the Class Period.  Therefore, reconstructing Defendants' DCF models could not be reasonably performed until after the Class Period, even assuming investors could forensically reverse engineer Defendants' inputs from a broad array of public sources.

Shannon P. Pratt, with Alina V. Niculita and Doug Twitchell, *Business Valuation Body of Knowledge*, *Workbook* (2d ed. 2003).

380.    As explained below, Defendants provided sufficient information for Plaintiffs to determine or reasonably estimate all variables of this DCF model for 2016 and 2017.  Defendants provided sufficient information for Plaintiffs to determine that Defendants' representations about the value of the Buy segment goodwill as of December 31, 2016 were materially misleading because the carrying value of Buy segment goodwill was not at least 20% greater than the carrying value and was, at best, perilously close to being impaired.  Plaintiffs were also able to determine from Defendants' information that Defendants' representations about the Buy segment goodwill as of December 31, 2017 were materially false and misleading because not only did a 20% cushion against impairment not exist, but the Buy reporting unit's goodwill was impaired by at least $1.4 billion.

381.    For 2016, Defendants stated in the 2016 Form 10-K that they designated October 1, 2016 as the date for the annual goodwill impairment assessment and that their DCF models used discount rates ranging from 8.5% to 9.5% and long-term growth rates ranging from 1% to 3%.  For the Buy unit, Plaintiffs used 3% for the long-term growth rate (the highest of the 1%-3% rates Defendants included in their model) and an 8.5% discount rate (the lowest discount rate used by Defendants in their models).  Plaintiffs did this to produce the largest possible fair value amount for the Buy reporting unit, based on Defendants' own assumptions, giving Defendants all benefit of the doubt.  On October 1, 2016, Nielsen's consolidated cash flows guidance was $950 million for 2016.  As shown in the following chart, Plaintiffs determined that 27.5% of the $950 million or $261 million represented Buy segment cash flow by using the percentages of Buy and Watch segment adjusted EBITDA less the amount of Buy and Watch segment capital expenditures.

| $ in Millions | Buy Segment | Watch Segment | Total |
|---|---|---|---|
| Adjusted EBITDA | $623 | $1,352 | $1,975 |
| Capital Expenditures | $196 | $227 | $423 |
| Difference | $427 | $1,125 | $1,552 |
| % of Total | 27.5% | 72.5% | |
| % x $950M | $261 | $689 | |

382.     Plaintiffs rounded up the 27.5% to 28% and multiplied it by the $950 million of free cash flow guidance to arrive at $266 million of free cash flow attributable to the Buy segment as of December 31, 2016.

383.     Plaintiffs then applied Defendants' own 1% sensitivity test, whereby the 8.5% discount rate was increased by 1% to 9.5% and the 3% long-term growth rate was decreased by 1% to 2%.  Accordingly, for the 2016 DCF model, applying Defendants' own 1% sensitivity test, Plaintiffs used a discount rate or "*k*" of 9.5% and a long-term growth rate or "*g*" of 2%. Plaintiffs also used a present value or "*PV*" of $4.9 billion for the 2016 DCF model, based on Plaintiff's reasonable inference from CFO Anderson's disclosure regarding the book value of the Buy unit's invested capital.[31]  The present value is presumed to be equal to the $4.9 billion book value of the Buy unit's invested capital because this would be the minimum amount necessary to comport with Defendants' stated conclusion that the Buy unit's goodwill was not impaired.

384.     To complete the 2016 DCF model, applying all known components, Plaintiffs substituted the expression "$266 million *x* (1 + discrete period compounded or average annual growth rate)" for "$NCF_1$" making this the new "$NCF_1$" in the DCF formula.  Plaintiffs deployed $266 million as part of this variable because that was the amount that Plaintiffs estimated for the Buy unit's cash flows as of December 31, 2016.  However, the variable "$NCF_1$" is intended to represent next year's expected cash flows (or for 2017, not 2016).  And, Defendants implicitly

---

[31] *See* n.29.

used some compounded annual growth rate ("CAGR") or average growth rate ("AAGR") for the 5-year 2017-2021 discrete period of this DCF formula.[32]

385.    Consequently, all amounts or percentages that Defendants deployed in their 2016 DCF model were either disclosed by Defendants or could by inferred or reasonably estimated from Defendants' other disclosures – except for the discrete period CAGR or AAGR, which was the only unknown variable in the DCF equation.  Accordingly, for the 2016 DCF model, Plaintiffs solved the equation by applying algebra or an iterative procedure and determined that Defendants were using a minimum discrete period CAGR or AAGR of 8.2% for the Buy cash flows from 2017-2021.  But an 8.2% growth rate was unreasonable because Defendants told investors that the Buy segment revenues in 2017 were expected to range between a 0.5% increase and a 0.5% decrease, not an 8.2% increase.

386.    The unreasonableness of the 8.2% assumed growth rate is also shown by the fact that Nielsen reported *declines* in the Buy Segment EBITDA from 2011 through 2016, with a CAGR and AAGR of *negative* 1.9%.[33]  As shown in the following chart, Defendants' assumption that the Buy Segment adjusted EBITDA would then increase by 8.2% annually from 2016-2021 was objectively and subjectively false and was not reasonably based on facts and rationality.  Defendants knew that they had no plans at the time by which to accomplish such a dramatic reversal in the Buy segment's profitability and that their statement in the 2016 Form 10-K was false that "expected future cash flows and growth rates [were] based on assumptions

---

[32] For 2018 and for the "$NCF_2$" variable, Plaintiff substituted the expression "$NCF_1$" $x$ (1 + discrete period CAGR or AAGR)."  Similarly, for 2019 and for the "$NCF_3$" variable, Plaintiff substituted "$NCF_2$" $x$ (1 + discrete period CAGR or AAGR)."  For 2020 and for the "$NCF_4$" variable, Plaintiff substituted "$NCF_3$" $x$ (1 + discrete period CAGR or AAGR)."  And for 2021 and the "$NCF_5$" variable, Plaintiff substituted "$NCF_4$" $x$ (1 + discrete period CAGR and AAGR)."

[33] The adjusted EBITDA for the Buy segment is the largest and most important component of the cash flows for the Buy reporting unit.  And with respect to Nielsen's projections, the cash flow projections move in tandem with the adjusted EBITDA projections.

about the level of business activity in the marketplace as well as applicable cost levels that drive

[their] budget and business plans."



387.    Moreover, if a 1.7% growth rate for the Buy reporting unit's cash flows is

assumed for 2017-2021, the resulting fair value of invested capital is the same as the carrying

value of invested capital, meaning that no cushion against goodwill impairment actually existed.

But even the 1.7% growth rate was unreasonable given Defendants' representations about

expected Buy segment revenues in 2017.  Thus, a reasonable presumed growth rate of projected

Buy cash flows would at best be 0.5%, and that would result in the fair value of Buy invested

capital being materially impaired, since the fair value would be $300 million lower than the

carrying value.

388.    In every instance above, Plaintiffs used conservative inputs that were biased in Defendants' favor to give Defendants all benefit of the doubt.  The only factor that Plaintiffs changed to determine those results was to deploy a CAGR and an AAGR during each goodwill assessment period that was still robust, but not greater than the rates that the most optimistic market participants would use under the circumstances.

389.    Defendants' statements were materially false or misleading because Defendants knowingly or recklessly misapplied certain inputs and assumptions which inflated the fair value of the Buy reporting unit goodwill.  The key inputs and assumptions they applied in their DCF model to calculate the Buy reporting unit's fair value would not be used by market participants. Far from a more than 20% cushion against goodwill impairment, the Buy reporting unit was already perilously close to impairment by December 31, 2016, even when applying the most optimistic inputs.

390.    And Defendants also knew or recklessly disregarded that their statements regarding their sensitivity analyses were misleading.  Defendants failed to warn investors in the 2016 Form 10-K, that when they increased the discount rate by 1% and decreased the long-term growth rate by 1%, the Buy reporting unit's assumed projected future cash flows for their DCF model would have needed to increase at an effective CAGR and AAGR of 8.2% or more to escape goodwill impairment, a rate of growth far greater than market participants would use, given the Buy segment's adverse trends of falling revenues, operating income, adjusted EBITDA, and cash flows.

391.    In fact, even with Defendants' original optimistic discount rate and long-term growth rate assumptions, Defendants knew or recklessly disregarded that if they had used their own October 25, 2016 revised, reduced free cash flow guidance of $850 million for 2016, instead

of their original 2016 $950 consolidated free cash flow guidance, and applied a still overly robust 3% assumed cash flow CAGR, the Buy reporting unit would have been underwater, with fair value below book value by $300 million. Defendants, instead, used carefully crafted disclosures to falsely convey to investors that a substantial margin of protection from goodwill impairment or cushion existed between the Buy reporting unit's fair value and its book value as of the close of 2016. In truth, Defendants knew that the Buy reporting unit's actual margin of fair value over book value was razor thin and was not "more than 20%" in 2016 as they falsely represented in the 2016 Form 10-K.

392.    The material misrepresentations about the value of the Buy reporting unit's goodwill as of December 31, 2017 contained in the 2017 Form 10-K were much more egregious than those in the 2016 Form 10-K because (i) Defendants utilized assumptions that were even more unreasonable than the assumptions utilized in the 2016 Form 10-K; and (ii) there had been further deterioration in the Buy segment.

393.    In the 2017 Form 10-K, Defendants stated that they designated October 1, 2017 as the date for the annual goodwill impairment assessment and that their DCF models used discount rates ranging from 9% to 12% and long-term growth rates ranging from 2.5% to 3%. As with the 2016 DCF model, Defendants did not disclose the assumed future cash flows in the Buy segment that were utilized in the 2017 DCF model, but did disclose information which permitted Plaintiffs to reasonably estimate Nielsen's assumed future cash flows. That information included Nielsen's free cash flow guidance for 2017, adjusted EBITDA and capital expenditures in the Buy and Watch segments in 2017. On October 1, 2017, Nielsen's consolidated cash flows guidance was $900 million for 2017. As shown in the following chart, Plaintiffs determined that 19.8% of the $900 million or $178 million represented Buy segment cash flow by using the

percentages of Buy and Watch segment adjusted EBITDA less the amount of Buy and Watch

segment capital expenditures ($ in millions).

| $ in Millions | Buy Segment | Watch Segment | Total |
|---|---|---|---|
| Adjusted EBITDA | $587 | $1,485 | $2,072 |
| Capital Expenditures | $272 | $211 | $483 |
| Difference | $315 | $1,274 | $1,589 |
| % of Total | 19.8% | 80.2% | |
| % x $900M | $178 | $722 | |

394.    Plaintiffs rounded up the 19.8% to 20% and multiplied it by the $900 million of

free cash flow guidance to arrive at the $180 million of free cash flow attributable to the Buy

reporting unit.  The $180 million was then plugged into the 2017 model in the same way that

$266 million was plugged into the 2016 model and Plaintiffs then calculated the growth rate of

projected cash flows necessary for the carrying value of Buy segment invested capital to exceed

the fair value by 20% and to obtain a result of no impairment applying Defendants' own 1%

sensitivity test.  Plaintiffs used 3% for the long-term growth rate (the highest rate Defendants

utilized in their model) and a 9% discount rate (the lowest discount rate used by Defendants in

their models).  Plaintiffs then applied Defendants' 1% sensitivity test and increased the 9%

discount rate to 10% and decreased the 3% long-term growth rate to 2%.  Plaintiffs also

substituted similar expressions for the "*NCF*" amounts in the 2017 DCF model that Plaintiffs

used in the 2016 DCF model.

395.    As was the case for the 2016 DCF model, all amounts or percentages that

Defendants deployed in their 2017 DCF model were either disclosed by Defendants or could by

inferred or reasonably estimated from Defendants' other disclosures – except for the discrete

period CAGR or AAGR, which was the only unknown variable in the DCF equation.

Accordingly, for the 2017 DCF model, Plaintiffs solved the equation by applying algebra or an

iterative procedure and determined that Defendants were using a minimum discrete period CAGR or AAGR of 19.7% for the Buy unit cash flows from 2018-2022.

396.    But the 19.7% growth rate was baseless because Defendants told investors that Buy segment revenues in 2018 were expected to range between a 1% increase and a 1%, decrease, not a 19.7% increase.  Defendants knew that they had no plans at the time by which to accomplish an even greater dramatic reversal in the Buy segment's profitability and that their statement in the 2017 Form 10-K was false that "expected future cash flows and growth rates [were] based on assumptions about the level of business activity in the marketplace as well as applicable cost levels that drive [their] budget and business plans."

397.    Defendants also represented in the 2017 Form 10-K that they performed sensitivity analyses on their DCF assumptions by testing a 1% movement in both the long-term rate and discount rate assumptions, and that the sensitivity analyses also resulted in the fair value of Buy goodwill being greater than the carrying value.  The analysis above establishes that this would only be possible by Defendants utilizing baseless assumptions about the growth of Buy segment cash flows from 2018-2022.

398.    The unreasonableness of the 19.7% assumed growth rate is also shown by the fact that Nielsen reported declines in Buy Segment adjusted EBITDA from 2012 through 2017, with a CAGR and AAGR of *negative* 2.8%.  As shown in the following chart, the assumption that the Buy Segment adjusted EBITDA would then increase by 19.7% from 2017-2022 was objectively and subjectively false and was not reasonably based on facts and rationality.



399.   Moreover, even if a 13% compounded annual growth rate for Buy segment cash flows is assumed for 2018-2022, the resulting fair value of invested capital is the same as the carrying value of invested capital, meaning that no cushion against goodwill impairment actually existed.  But the 13% growth rate was also baseless given Defendants' own 2018 Buy segment revenue guidance.

400.   If a still robust 5% growth rate for Buy segment cash flows was assumed for 2018-2022, the resulting fair value of invested capital was less than the carrying value by $1.4 billion.  That establishes that the Buy goodwill impairment charge needed to be recorded by December 31, 2017.

401.   Further, the 5% growth rate was not reasonable given Nielsen's Buy segment revenues guidance for 2018.  Thus, a reasonable presumed growth rate of projected Buy cash flows would at best be 1% and that would have resulted in the Buy unit's goodwill being materially impaired, since the fair value would be $1.9 billion lower than the carrying value.

402.    At the close of 2017, Defendants not only knowingly or recklessly applied certain inappropriate inputs and assumptions in their annual goodwill impairment assessment as of October 1, 2017 that vastly inflated the fair value of the Company's Buy reporting unit, but they overstated the value of its goodwill by at least $1.4 billion as of December 31, 2017, March 31, 2018 and June 30, 2018.  As a result, Defendants caused Nielsen to overstate various financial metrics as reflected in the charts above.

403.    All of Nielsen's misstatements and the information it omitted that made Nielsen's statements misleading referred to above were material to investors.  A misrepresented fact or an omitted fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision.  It does not require proof of a substantial likelihood that truthful disclosure of the fact would have been a determinative factor in making an investment decision.  Instead, it requires only a showing that the misrepresented or omitted fact would have assumed actual significance in a reasonable investor's investment decision.  There must be a substantial likelihood that the misrepresented or omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.  "Information is material if omitting it or misstating it could influence decisions that users make on the basis of the financial information of a specific reporting entity."  Statement of Financial Accounting Concepts ("SFAC") No. 8, Financial Accounting Standards Board, September 2010.  These misstatements were also material to investors because misstatements or omissions representing 5% or more of reported financial items are deemed to be material, although amounts less than 5% can also be material depending upon the facts and circumstances.[34]

---

[34] "The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified

404.     Defendants accomplished their effort to misstate their assets and financial results by using bogus inputs for their DCF models used to calculate the fair value and falsely report the goodwill of Nielsen's Buy reporting unit.  By inflating goodwill, Defendants avoided recording impairment charges necessary to properly account for the true value of the reporting unit.  More specifically, Defendants, in violation of GAAP, primarily deployed inflated future cash flow projections to improperly avoid recognizing material goodwill impairment of the Buy reporting unit, even when giving Defendants all benefit of the doubt for their otherwise abnormally low discount rates and abnormally high terminal or long-term growth rates.  Consequently, Nielsen's disclosures regarding its goodwill valuations and testing were false and misleading in Nielsen's 2016 Form 10-K, 2017 Form 10-K, and in the Company's Forms 10-Q for 1Q18, 2Q18, and 3Q18.

405.     GAAP states that goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying . . . the acquisition method."  ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition.  ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  ASC 350-20-35-16 states that "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill."  "A reporting unit is an operating

---

percentage with respect to a particular item on the registrant's financial statements is unlikely to be material."  SEC Staff Accounting Bulletin No. 99; ASC 250-10-S99-1.  "Evaluation of materiality requires a registrant and its auditor to consider all the relevant circumstances, and the [SEC] staff believes that there are numerous circumstances in which misstatements below 5% could well be material."  *Id.*

segment [of a company] or one level below an operating segment (also known as a component)."
ASC 350-20-20 Glossary.

406.    ASC 350-20-35-2 states that "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value."  Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20.  ASC 350-20-35-28 requires goodwill to be tested annually and, as is at issue here, for any quarter when certain circumstances are present.

407.    Moreover, factors that are based on observable inputs are entitled to greater weight than those based on inputs (such as forecasts) in the step zero analysis because observable inputs reflect the assumptions market participants would use.  ASC 820-10-05-1C requires that:

> When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk.

408.    Further, SFAC No. 8 requires accounting to strictly avoid bias, slanting and manipulation undertaken "to increase the probability that financial information will be received favorably."  According to GAAP, a "reporting entity shall measure the fair value of an asset or a liability using the assumptions that market participants would use in pricing the asset or liability, assuming that market participants act in their economic best interest."  ASC 820-10-35-9.

GAAP defines market participants as:

> Buyers and sellers in the principal (or most advantageous) market for the asset or liability that [among other things] are independent of each other, that is, they are not related parties [and] are knowledgeable, having a reasonable understanding about the asset or liability and the transaction using all available information, including information that might be obtained through due diligence efforts that are usual and customary.

ASC 820-10-20, Glossary.

409.     Importantly, Nielsen did not need to perform additional analysis beyond the step one comparison of the fair value of the reporting unit to the book value of the reporting unit to comply with GAAP.  Completing step one of the goodwill impairment test was sufficient. Defendants acknowledged this as follows:

> In January 2017, the FASB issued an ASU, "*Intangibles – Goodwill and Other* "to simplify the subsequent measurement of goodwill.  The update requires only a single-step quantitative test to identify and measure impairment based on the excess of a reporting unit's carrying amount over its fair value.  A qualitative assessment may still be completed first for an entity to determine if a quantitative impairment test is necessary.  The update is effective for fiscal year 2021 and is to be adopted on a prospective basis.  Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017.  We elected to early adopt this ASU effective January 1, 2017.  There was no impact on our consolidated financial statements.

410.     Defendants' DCF models relied entirely on unsupported and unreasonable inputs and assumptions that Defendants knew did not comport with GAAP.  Defendants knew, for example, that:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence.  The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections.

ASC 360-10-35-30.[35]

411.     In particular, GAAP states that, "[i]n developing unobservable inputs, a reporting entity may begin with its own data, but it shall adjust those data if reasonably available

---

[35] Although ASC 360 applies to long-lived assets, specifically property, plant and equipment, this guidance similarly applies to the ASC 350 income approach's use of future cash flows in the DCF model. "If the guidance for a transaction or event is not specified within a source of authoritative GAAP for that entity, an entity shall first consider accounting principles for similar transactions or events within a source of authoritative GAAP for that entity and then consider nonauthoritative guidance from other sources." ASC 105-10-05-2.

information indicates that other market participants would use different data." ASC 820-10-35-54A.

## VIII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

412.    At all relevant times, the Defendants acted with scienter in making the materially false and misleading statements and omissions alleged herein.  The Defendants had actual knowledge that the statements and omissions made by them were false and misleading, and/or acted with reckless disregard for the truth or falsity of those statements and omissions. Defendant Nielsen has the knowledge of the Individual Defendants and other knowledgeable persons within the Company, including Megan Clarken, CW-14, and COO Hasker.  Defendants' scienter is supported by the allegations herein, and the following Sections provide additional allegations or further highlights which allegations support scienter.

### A.    Facts Supporting Defendants' Scienter Preceding 3Q16

413.    Numerous facts raise a strong inference Defendants knew or recklessly disregarded that their statements about the Developed Markets business from February 2016 through September 2016 were materially false and misleading.  *See e.g.*, ¶¶ 287(e), 289(b), 291(b), 295(b), 296, 298.  Defendants knew or recklessly disregarded the then-undisclosed decline in discretionary spending on Nielsen's products by Nielsen's customers and the then-undisclosed declining demand for Nielsen's analytics products.  Individually and together these undisclosed truths contradicted Defendants' statements.  In addition to other facts alleged herein, the following facts establish that Defendants knew or recklessly disregarded these undisclosed truths.

414.    First, during the earnings call for Nielsen's 3Q16 results, Defendants admitted that they knew about the reduced discretionary spending throughout 2016 and that the decline was a permanent secular change.  In addition, they admitted that Nielsen had taken various

initiatives throughout 2016 to address the permanent decline in discretionary spending. During

the earnings call, Defendant Barns stated that:

> [O]ur U.S. results were down versus the prior year as clients looked for more efficiency and productivity in the face of an increasingly difficult growth environment. **Earlier this year, as we saw these more challenging trends** unfolding, we realigned our Buy business to be more focused in our product development and more efficient in our overhead. More recently, as **the trends continued** for our clients, we stepped up our efforts to reduce our cost base, reallocate resources and accelerate our investments in initiatives that will help our clients and better position our business for the future. **We've been hard at work on these initiatives. . . .** [O]ur Buy business is **working through a process of change** that's similar to what we've been executing on successfully in our Watch business and we're confident that our Buy initiatives will produce similar results.
>
> * * *
>
> In developed markets, specifically the U.S., the environment in which we operate has become more challenging. Large global manufacturers are the strength of our client base. And as I'm sure you've seen in the recent press, they found it increasingly difficult to achieve growth in markets with growing fragmentation in consumer demand, more competition from smaller and local players and increased commodity pricing. Together, these factors have led them to seek efficiencies in productivity in their business and our business has not been immune. Our clients continue to value our core measurement services, especially given the growing product and retail fragmentation in the market. But, when it comes to analytics, **their needs have been shifting**, clients are shifting away from custom insights delivered via deep-dive projects, and they are shifting toward every day analytics, often called activation, delivered directly to multiple end users. Our view is that this is a secular shift, not a passing phase or a cycle that will swing back.

415.     During the earnings call, an analyst asked what had changed over the quarter,

leading to the declining results, Defendant Jackson's response further revealed that nothing new

occurred in 3Q16, as the trends had been persisting throughout the year. Specifically, he

admitted that, while the Company had seen a "pretty strong discretionary environment" for the

Developed Markets business back in 3Q15, that "*[w]e have not seen that since then* and if you

look at our results in our developed Buy business they've sequentially been going in the other

direction." Defendant Barns then said, "*what I'll add to that . . . is that you're right, it's not*

167

*new*," and that "*some of these characteristics we're not viewing as lumpiness, we're as I said seeing them more as secular shifts*."

416.    During the earnings call, an analyst asked for more color on the reduced spending. Defendant Barns responded that the Developed Markets were "the challenging spot for [the] business in the quarter," and then went on to clarify that the trends were actually not new, by giving what he labeled as an "example," stating that in "2015, we saw this trend starting to emerge" where smaller food and beverage manufacturers and private label manufacturers were collecting dominating the market share of growth, and that Nielsen's strength is with the "biggest global companies," which trend he said was "reflected in our U.S. results."  He then explained how these companies were facing various pressures (e.g., zero-based budgeting) and that "what that means in terms of their discretionary spend," is that clients were "shifting" away "from these more deep dive projects."  He added that this was a "trend that will continue on more of a secular basis over the long run" and confirmed that the Connected Buy system was being built as a response to this trend.

417.    Second, the statements of confidential witnesses, described in Section VI(B)(4) further demonstrate Defendants' scienter.  In summary, these witnesses describe the presence and magnitude of the trends, describe that these trends were generally known throughout Nielsen, describe the detailed financial data available to Defendants and their receipt of reports containing metrics such as detailed revenues and budget breakdowns by each client.

418.    Third, statements about the Connected Buy product further demonstrate Defendants' knowledge of the trends.  As Defendants disclosed during the 3Q16 earnings call, the product had been developed in reaction to the negative undisclosed trends.  That such a large project was commonly discussed in investor-facing presentations and was designed to respond to

the trends, further emphasizes that these trends were known to Nielsen's management.  For example, on June 1, 2016, Defendant Barns described the Connected Buy system as enhancing Nielsen's "analytics capabilities" and "integrating these capabilities into a system."  While this description was misleading, it further revealed Defendant Barns' very involvement in the product that Nielsen would later describe as a response to the undisclosed trends of declining discretionary spending by Nielsen's customers.

419.    Fourth, the magnitude and duration of the negative impact on Nielsen's Developed Markets business caused by the decline in discretionary spending strengthens the inference that Defendants knew or were reckless in not knowing their statements were materially false and misleading.  In 3Q16 Developed Markets revenues declined 3.7% or 2.5% on a constant currency basis, substantially worse than the 1.5%-3.5% increase they repeatedly told investors to expect.  Total Buy segment revenues declined 0.9% (increased 0.9% on a constant currency basis), substantially worse than the 3.5%-5.5% increase they repeatedly told investors to expect.  Defendants also slashed full year guidance for 2016, indicating that they knew these trends would continue, which further speaks to the magnitude of the issue.  And, as alleged above, Defendants repeatedly admitted the decline in discretionary spending was a permanent trend.  The permanent change in discretionary spending caused further declines in Developed Markets revenues in 2017, as Nielsen reported revenue declines in every quarter and 5.2% decline for the year.  Similarly, during the earnings call for Nielsen's 3Q16 results, Defendant Jackson disclosed that the "Analytics or Discretionary business" had increased in size during the prior year to account for about 30% of Nielsen's total portfolio.  This emphasized that the Defendants were aware of the significance of any decline in this business.

420.    Fifth, the reaction of analysts to the unexpected negative news revealed on October 25, 2016 strengthens the inference of scienter.  During the October 25, 2016 conference call, analysts questioned Defendants about when they really knew about the impact softer discretionary spending would have on Developed Markets revenue.  The first four analysts to ask questions during the October 25, 2016 conference call asked about the unexpected decline in Developed Markets revenues and their questions reflected a belief that Defendants knew about the problem earlier.  After the conference call, analysts issued reports highly critical of Defendants that questioned their credibility.

421.    Sixth, as some analysts noted, Defendants repeatedly boasted about their visibility into Nielsen's future performance due to its (i) longstanding and multi-year contractual relationships with Buy Segment clients and (ii) more than 60% of Buy Segment revenues being committed to before the beginning of the year.  Furthermore, as CW-4 explained, Nielsen's analytics projects, ran for periods of 3-8 months and revenue was recognized throughout the project.  These facts, considered with the other facts alleged herein, raise a strong inference that Defendants knew Developed Markets clients were reducing discretionary spending which would cause Developed Markets revenues to decline.

422.    Seventh, the close temporal proximity between Defendant Barns' statements at the September 26, 2016 investor conference and the unexpected negative news revealed on October 25, 2016 strongly suggests that he knew about the decline in discretionary spending and its negative impact on Nielsen's 3Q16 and 2016 results.  Indeed, there were only four days left in 3Q16 when Barns made the statements.

423.    Eighth, Defendants repeatedly spoke on the subjects at issue in such a way as to convey a detailed understanding of the facts at hand.  These statements evidence their familiarity

with the relevant facts, and given the magnitude of the trends at issue, their scienter may be inferred from their familiarity with the topics discussed.

> **B.** **Facts Supporting Defendants' Scienter Regarding Nielsen's Buy Segment and Analytics Business from 3Q16 Onward**

424. Numerous facts raise a strong inference that Defendants knew or recklessly disregarded that their statements from 3Q16 onward about the growth that Nielsen's business would achieve and the condition of its Buy segment and analytics business were materially false and misleading. *See* Section VII(A)(1)-(4) . Defendants knew or recklessly disregarded the then-undisclosed declining demand for Nielsen's analytics products and the breadth of the problems in declining spending on Nielsen's products. Individually and together these undisclosed truths contradicted Defendants' statements. In addition to other facts alleged in herein, the following facts establish that Defendants knew or recklessly disregarded these undisclosed truths.

425. First, the information provided by confidential witnesses, described in Section VI(B)(4) further demonstrates Defendants' scienter. In summary, these witnesses describe the existence and magnitude of the trends, describe that these trends were generally known throughout Nielsen and describe the detailed financial data available to Defendants and their receipt of reports containing metrics such as detailed revenues and budget breakdowns by each client. The CW's not only describe a decline in discretionary spending, but describe a trend of reduced demand for and willingness to spend on Nielsen's analytics products.

426. Second, Defendants made statements indicating their awareness of the subject matter of the undisclosed trends and the significance of those subjects. For example, during Nielsen's 1Q17 conference call, Defendant Barns revealed that there was "significant downward

spending pressure" in 1Q17 by global multinational clients that represented nearly half of Nielsen's Developed Markets business.

427.    Third, as some analysts noted, Defendants repeatedly boasted about their visibility into Nielsen's future performance due to its (i) longstanding and multi-year contractual relationships with Buy Segment clients and (ii) more than 60% of Buy Segment revenues being committed to before the beginning of the year.  Furthermore, as CW-4 explained, Nielsen's analytics projects, ran for periods of 3-8 months and revenue was recognized throughout the project.  These facts, considered with the other facts alleged herein, raise a strong inference that Defendants knew Developed Markets clients were reducing discretionary spending which would cause Developed Markets revenues to decline.

428.    Fourth, the magnitude of the decline in Nielsen's Buy segment further supports a finding of scienter.  Developed Markets revenues declined by 7.3% in 1Q17, 1.2% in 2Q17, 5.4% in 3Q17, 6.7% in 4Q17 and 5.2% in 2017.

429.    Fifth, Defendants' repeated and severe guidance misses along with their profound visibility into Nielsen's business reflect a pattern of intentionally misleading investors.  For example, on April 25, 2017, Nielsen reported its 1Q17 results, and Defendants acknowledged their 2017 guidance was inaccurate and misleading by unexpectedly revealing that Developed Markets revenues had declined 7.3% in 1Q17 and that Developed Markets revenues would be down low single digits in 2017.  On July 27, 2017, Defendants again acknowledged their 2017 guidance was inaccurate and misleading when they lowered Developed Markets revenue guidance from a decline of 1.0%-1.5% to a decline of 3%-5%.

430.    Sixth, Defendants' scienter is supported by failing to provide forthcoming truthful information when meeting with analysts.  For example, during the 2Q17 earnings call,

Defendants stated that Developed Markets revenue would be "flat" in 2018, which was then a very positive disclosure compared to the declines Nielsen had been experiencing.  The next quarter, during the 3Q17 earnings call, Defendants did not correct this statement during their remarks, despite knowing that it no longer remained true.  Instead, it took an analyst asking Defendant Jackson to "confirm" that the guidance remained the same.  Even then, he intentionally buried the lead, stating only that "We do still expect the Developed Buy business to be down less in 2018 than in 2017," which meant that Nielsen was now reversing its guidance form "flat" to "down less than in 2017."

431.  Eighth, Defendants repeatedly spoke on the subjects at issue in such a way as to convey a detailed understanding of the facts at hand.  *See* Section VII.  These statements evidence their familiarity with the relevant facts, and given the magnitude of the trends at issue, their scienter may be inferred from their familiarity with the topics discussed.

432.  The following several facts support showing of scienter more narrowly, with respect to specific statements about Nielsen's Buy segment and analytics business.

433.  First, during the October 25, 2017 conference call, Jackson acknowledged that the year-to-date revenue trends in the Buy segment were in line with the framework provided on July 27, 2017, including the soft spending in the U.S. Developed Markets business.  In addition, Jackson stated the soft spending by U.S. Developed Markets clients improved in 3Q17 after being down double-digits in the first half of 2017.  Barns stated that the Developed Markets business was stabilizing, that the fundamentals of the business were improving and that he was really pleased with the trajectory of the Developed Markets business, especially the U.S. business.  The fact that Defendants lowered Developed Markets revenue guidance for 2018 when (i) Buy segment revenue trends had not changed from July 27, 2017 to October 25, 2017, and (ii)

the weak spending in the U.S. Developed Markets business was improving strengthens the inference Defendants knew their representation on July 27, 2017 that Developed Markets revenues in 2018 would improve and be flat was materially false and misleading.

434.    Second, the short time between the July 27, 2017 statements and Defendants walking back those statements raises a strong inference there was no reasonable basis for the representations when made on July 27, 2017.  Defendants reported the unexpected 3Q17 decline in Developed Markets revenues and that Developed Markets revenues would decline in 2018 in the quarter immediately following 2Q17, when they represented that Developed Markets revenues would be down 3%-5% in 2017 and that they would improve and be "flat" in 2018.

435.    Third, the reactions by analysts after Defendants unexpectedly revealed on October 25, 2017 that Developed Markets revenues had declined 5.4% in 3Q17 and that Developed Markets revenues would decline in 2018 strengthens the inference that Defendants knew there was no reasonable basis for the representations made on July 27, 2017.  Indeed, analysts directly questioned Defendants' credibility.  For example, Barclays Capital wrote on October 25, 2017, that it was "surprising" that Nielsen "proactively put out 'flat' during 2Q and then reactively walk away from it one quarter later."

### C.    Facts Supporting Defendants' Scienter Regarding GDPR

436.    Numerous facts raise a strong inference Defendants knew or recklessly disregarded that their statements regarding GDPR not posing issues for Nielsen, that the law would be a net positive for Nielsen, and that Nielsen continued to have access to the data it needed, were materially false and misleading.  *See e.g.*, ¶¶ 331, 344, 346, 358, 360, 362. Defendants knew or recklessly disregarded that the GDPR was having significant negative impacts on Nielsen's access to the data it needed for its products and on the demand for those products.  Individually and together these undisclosed truths contradicted Defendants statements.

In addition to other facts alleged herein, the following facts establish that Defendants knew or recklessly disregarded these undisclosed truths.

437.    First, Defendants repeatedly assured investors that GDPR would not be a problem. The later revelation of problems, which Defendant Barns referred to as "pretty logical," cannot be construed as anything less than extreme recklessness.  A person necessarily knows they are providing false assurances when those assurances are ultimately proven to be undermined by obvious and foreseeable issues, as they were admitted to be here.

438.    Second, the repeated question about GDPR described in Section VI(D)(2)(ii) expressly prompted Defendants to think about GDPR preparedness and the effects of GDPR on Nielsen's business, meaning that their assurances of preparedness regarding those very issues cannot be construed as anything less than either knowingly or recklessly misleading.  Similarly, Defendants' frequent and seemingly informed statements about GDPR further evidence their scienter regarding the law's effect on the Company.

439.    Third, as described in Section VI(D)(2)(iii), statements made by former employees confirm Defendants' knowledge of these issues.

440.    Fourth, after the Class Period (on September 12, 2018), Nielsen disclosed that its ac*cess to data was "literally switched off," when GDPR was enacted*.  This statement makes it clear, beyond doubt, that GDPR affected Nielsen in an enormous and obvious way, and that senior employees speaking to investors about GDPR knew of these issues or at the very least were reckless in not knowing of them.  Nielsen also stated that as of September 12, 2018, Nielsen was still working to resolve these issues.  Clearly, Defendants would have been aware of this enormous problem in Nielsen's business when it occurred (on May 25, 2018).  Similarly, by October 25, 2018, it was disclosed that Nielsen was still working to meet the new policies, so

that it could return to focusing on sales and it was again stated that GDPR "resulted in third-party data being switched off," and that this "pretty much stops the business" until the issues are resolved.  That the business was essentially stopped demonstrates that Defendants knew or were reckless in not knowing about the data access problems.

441.    Fourth, size of the problem, combined with Nielsen's high visibility into its performance, and the timing of the false and misleading statements also support the conclusion that Defendants knew of the problems and, at a minimum, were reckless at the time they made the false and misleading statements.

442.    Fifth, during the Class Period, Defendants acknowledged that access to third-party data was absolutely critical to Nielsen.  They understood that issues regarding access to that data were core to Nielsen.

### D.    Facts Supporting Defendants' Scienter Regarding China

443.    Numerous facts raise a strong inference Defendants knew or recklessly disregarded that their statements regarding performance in China were materially false and misleading.  *See e.g.*, ¶¶ 322(c), 333, 337, 341, 342, 348(a), 350, 354.  Defendants stated that performance in China had stumbled in 4Q17 but falsely assured investors that this performance issue was caused by discrete execution issues not a broader decline in performance in the country and that these execution issues had been fully resolved.  In truth, Defendants knew or recklessly disregarded that the performance issues in China were broader than stated and that the specific issues identified had not been resolved as stated.  Individually and together these undisclosed truths contradicted Defendants' statements.  In addition to those facts alleged herein, the following facts establish that Defendants knew or recklessly disregarded these undisclosed truths.

444.    First, Defendants stated the execution issues Nielsen faced in China during 4Q17 were promptly resolved.  Most glaringly, Defendant Barns noted these issues on February 8,

2018, but then stated, "[W]hat *I can assure you* is we've addressed those.  And the team's refocused on the core business.  And we'll be back on track during 2018.  This is still the most important growth market in the world, have no doubt about that."  On May 16, 2018, Defendant Jackson noted the issues in China and then stated "[t]hose things are behind us" adding "We've made some changes there in terms of leadership and structure, and the teams are operating pretty well."  These assurances were so directly at odds with the truth, that they defy non-fraudulent explanation.

445.    In fact, on July 26, 2018, Defendant Jackson told investors during Nielsen's 2Q18 earnings call, "Quite frankly, **we <u>still</u> have more work to do operationally there**" and stated that while Nielsen had made "some changes" it still had "more work to do there operationally." He also acknowledged that "we have to get China right in order for our Emerging Markets to grow."  Defendant Barns could not possibly have "assure[d]" investors that those issues had been fully resolved in 4Q17, when Nielsen subsequently admitted that work still needed to be done. Furthermore, after the Class Period on October 25, 2018, Patrick Dodd, whose title was President-Global Markets Group, indicated that the Company "now" (as in on that date) had a management team in place in China, meaning that the issues were not resolved until then. Again, the Defendants who spoke on the issue of the execution problems in China, would have known that those issues were not resolved (*e.g.*, the market was facing decline and the management team change-over was not then complete), at the time when they assured investors that the issues had been fully resolved.  Similarly, Patrick Dodd said on October 25, 2018, that "we *are* rebuilding and strengthening our commercial teams across China."  Again, Defendants must have known the issues were not fully resolved in 4Q17, as assured, if the Company was still rebuilding the commercial team as of October 25, 2018.

446.    Second, the statements of confidential witnesses, described in Section [●] further demonstrate Defendants' scienter.  These witnesses describe declining demand for Nielsen's analytics products and faltering performance in the Emerging Markets.  Notably, CW 3 states that insights performance in China were facing issues around the start of 2016.

447.    Third, on February 8, 2018, Barns admitted he was directly involved with the China operations in 4Q17.  Indeed, he acknowledged that he was in China in December 2017. Barns was also president of Nielsen's China operations from 2008 to June 2011.  These facts support an inference that Defendant Barns was aware of the true situation regarding Nielsen's operations in China and attentive to the significance of those issues.

448.    Fourth, Defendants' knowledge of the revenue execution problems in China is strongly inferred from the fact that China was one of Nielsen's most important emerging markets. In fact, during the February 8, 2018 conference call, Defendant Barns stated that China was the most important growth market in the world.  During the Company's October 25, 2018 conference call, Nielsen executive Patrick Dodd stated China was a "key component" to Nielsen's Emerging Markets growth plan and a "critical piece of [Nielsen's] emerging market story" because China generated approximately $200 million in revenue.

449.    Fifth, Nielsen would report substantial declines in the growth of Emerging Markets revenues in 2018 caused by significant weakness in multinational client spending, particularly in markets in Southeast Asia and China.  Nielsen reported 6.1% growth of Emerging Markets revenues in 1Q18, 0.3% growth in 2Q18, a decline of 2.5% in 3Q18, and a 4% increase in 4Q18.  The continuation of the problems and their magnitude strengthens the inference that Defendants knew their positive representations about the Emerging Markets business on October 25, 2017 and November 9, 2017 were materially false and misleading.  For example, during the

October 25, 2018 conference call, Nielsen executive Dodd stated that the 9.4% decline in

Emerging Markets revenues in 3Q18 (2.5% decline on a constant currency basis) was primarily

driven by "pressure on multinational client spend and also some continued softness in China."

### E.     Facts Supporting Defendants' Scienter Regarding Emerging Markets

450.     Numerous facts raise a strong inference Defendants knew or recklessly

disregarded that their statements regarding Nielsen's performance in the Emerging Markets in

2018 were false and misleading. *See e.g.*, ¶¶ 327-30, 333-34, 341-42, 348-55. Defendants

issued positive guidance and made other positive statements about the direction of growth in the

Emerging Markets, while failing to disclose the dramatic deceleration and decline in the business.

In addition to other facts alleged herein, the following facts establish that Defendants knew or

recklessly disregarded these undisclosed truths.

451.     First, the facts alleged in Section VIII(D) regarding Defendants' scienter as to

their false statements about China also support an inference of scienter regarding the decline in

performance in the Emerging Markets segment generally, given that China was the most

important country in Nielsen's Emerging Markets business—problems in China meant problems

in the Emerging Markets.

452.     Second, after the Class Period, during the October 25, 2018 conference call,

Nielsen executive Dodd revealed that multinational clients in the Emerging Markets had been

reducing spending for the entire year. An analyst asked whether the spending weakness by large

multinationals in the Emerging Markets business was starting to stabilize and Dodd responded

that "[w]hat we have been seeing over this year for some of our larger clients is pulling back on

some of their lower-priority brands."

453.     Third, during the July 26, 2018 conference call, Defendants admitted they knew throughout 2Q18 about the problems that caused Nielsen to report just a 0.3% increase in Emerging Markets revenues and to slash Emerging Markets revenue guidance.

454.     Fourth, in 2018, Nielsen reported Emerging Markets revenues that were dramatically less than the 8%-10% guidance.  Nielsen reported a 6.1% increase in 1Q18, a 0.3% increase in 2Q18, a 2.5% decline in 3Q18 and a 4% increase in 4Q18.  On July 26, 2018, Defendant slashed guidance and told investors that Emerging Markets revenues would be "roughly flat" in 2018, a substantial reduction from the 8%-10% growth they repeatedly told investors to expect to in 2018.  The magnitude and duration of the negative impact on Nielsen's Emerging Markets results caused by the undisclosed problems in the business strengthen the inference of scienter.

455.     Fifth, analysts' reactions to the unexpected negative news about the Emerging Markets business on July 26, 2018 establishes that they believed Defendants knew about the problems earlier.  Analysts specifically questioned Defendants about their statements on February 8, 2018 during the July 26, 2018 conference call and whether they knew about the spending declines earlier.  For example, a Morgan Stanley analyst asked "what really happened?" and noted that Defendants' statements on July 26, 2018 made the reduction in spending sound "pretty broad-based" and questioned whether Defendants knew about the problems earlier.  Jackson admitted that he did know about the problems earlier, including throughout 2Q18.  Specifically, Jackson stated that Nielsen "saw a fairly significant pullback in multinational clients spending really across the Emerging Markets *as we went through the quarter"* and that Nielsen was "not expecting this pressure to abate."  He repeated that the softness was primarily in China and Southeast Asia.  He explained that multinationals were under pressure, that the

pressure was working its way through the Emerging Markets and that Nielsen had therefore lowered guidance.

### F.    Facts Supporting Defendants' Scienter Regarding Goodwill Impairment

456.    Numerous facts raise a strong inference Defendants knew or recklessly disregarded that their statements regarding Nielsen's goodwill were false and misleading.  These statements are found in Section VII(C).  Defendants falsely stated the value of Nielsen's goodwill and falsely stated that Nielsen's goodwill was not impaired.  Defendants knew or recklessly disregarded that Nielsen's goodwill was badly impaired by at least February 17, 2017, when Nielsen filed its 2016 10-K.  In addition to other facts alleged herein, the following facts establish that Defendants knew or recklessly disregarded these undisclosed truths.

457.    In Nielsen's 2016 Form 10-K filed with the SEC on February 17, 2017, Defendants Barns and Jackson misled investors by representing that total assets in the Buy business were $6.697 billion (including $2.696 billion of goodwill), that there was no impairment of the value of the Buy business goodwill and that the Buy business goodwill actually exceeded the $2.696 billion carrying value by at least 20%.  As detailed in Section VII(C), Defendants did not genuinely believe these representations because Nielsen's impairment assessment assumed, but did not disclose, that Buy segment cash flows would grow by more than 8% from 2017-2021 and then grow 1.0%-3.0% thereafter.  Those assumptions were baseless and contradicted Nielsen's lowered 2016 Buy segment revenue guidance revealed on October 25, 2016, the 0.7% decline in Buy segment revenues reported by Nielsen in 2016 and the 2017 Buy revenue guidance initially provided on December 8, 2016 which projected Buy revenues would range between a 0.5% increase and a 0.5% decrease.

458.    Defendants misled investors in the 2017 Form 10-K filed with the SEC on February 8, 2018 by representing that total assets in the Buy business were $6.862 billion

(including $2.844 billion of goodwill), that there was no impairment of the value of the Buy business goodwill and that the Buy business goodwill actually exceeded the $2.844 billion carrying value by at least 20%.  As detailed in Section VII(C), Defendants did not genuinely believe these representations because Nielsen's impairment assessment assumed, but did not disclose, that Buy segment cash flows would grow by more than 19% from 2018-2022 and then grow 2.5%-3.0% thereafter.  Those assumptions were baseless and contradicted by the lowered 2017 Buy revenue guidance revealed on April 25, 2017 and July 27, 2017, the 3.3% *decline* in Buy Segment revenues reported by Nielsen in 2017 and the 2018 Buy revenue guidance initially provided on November 9, 2017, which projected Buy Segment revenues would range between a 1.0% increase and a 1.0% decrease.  Indeed, despite further deterioration in the Buy business in 2017, the assumed growth rates were higher than the assumed growth rates utilized in the 2016 impairment assessment.

459.    Further, by February 8, 2018, Nielsen's stock price closed at $33.90, which represented a decline of $21.91 or 39.3% from the $55.81 closing price on July 22, 2016, and a decline of $14.19 or 29.5% from the $48.09 closing price on February 19, 2016, the date Nielsen filed the 2016 Form 10-K.  All of the price declines were caused by unexpected negative news about the Buy reporting unit.  GAAP, specifically Accounting Standards Codification ("ASC") 350-20-35-3C(g), requires a "sustained decrease in share price" to be considered in evaluating whether it is more likely than not that the fair value of a reporting unit is less than the carrying amount.  Therefore, the decline in Nielsen's stock price also raises a strong inference that Defendants did not genuinely believe their statements about the Buy reporting unit goodwill were true and knew that their failure to disclose the assumed cash flow growth rates caused their statements to be materially false and misleading.

460.    On February 28, 2019, after Defendants Barns and Jackson were no longer employed by Nielsen, the Company reported that it had recorded a $1.4 billion impairment charge which reduced the carrying value of the Buy reporting unit's goodwill by 54%.  The magnitude of the impairment charge and the fact it was not recorded until Defendants Barns and Jackson were no longer employed by Nielsen strengthens the inference that they did not genuinely believe their statements about the value of goodwill given the unreasonable cash flow assumptions utilized in the impairment analysis and that their failure to disclose the unreasonable cash flow assumptions was a material omission which misled reasonable investors.

### G.    Defendants Barns' and Jackson's Terminations Support Scienter

461.    The termination of Defendant Barns and abrupt resignation of Defendant Jackson provide additional indications of scienter.  Though the Company has not stated as much, the abrupt nature of these events and the fact that Barns was terminated suggests that those inside the Company realized their involvement in wrongdoing.  Taken together with the other allegations herein, this supports the inference of scienter.

## IX.    LOSS CAUSATION

462.    During the Class Period, as detailed herein, Defendants false representations and omissions of material facts about Nielsen's business caused its stock to trade at artificially inflated prices and operated as a fraud and deceit on purchasers of the Company's securities. Nielsen's stock price reached a Class Period high of $55.81 on July 22, 2016 as a result of Defendants falsely representing that discretionary spending by Developed Markets clients remained stable and that Nielsen would report full year 2016 results in line with guidance.

463.    After Defendants revealed some of the previously concealed adverse information on October 25, 2016, April 25, 2017, October 25, 2017, February 8, 2018, April 26, 2018 and July 26, 2018, Nielsen's stock price declined substantially.  These drops removed inflation from

the price of Nielsen common stock, causing real economic loss to investors who had purchased Nielsen common stock during the Class Period.  By July 26, 2018, Nielsen's stock price declined to just $22.11, a 60% or $33.70 per share decline from the Class Period high price of $55.81 on July 22, 2016 as the artificial inflation was removed from the Company's stock price.  Class members who purchased Nielsen stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

464.    As a result of their purchases of Nielsen's common stock during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Nielsen's common stock to trade at artificially inflated levels throughout the Class Period, closing at $47.33 per share on February 11, 2016 (the first day of the Class Period), closing at a high of $55.81 per share on July 22, 2016, and falling by $9.28 (16.89%), $1.61 (3.9%), $2.57 (6.25%), $3.66 (9.74%), $2.44 (7.10%), and $7.46 (25%) per share on October 25, 2016, April 25, 2017, October 25, 2017, February 8, 2018, April 26, 2018, and July 26, 2018, respectively.

465.    By concealing the adverse facts alleged herein from investors, Defendants presented a misleading picture of Nielsen's business and prospects.  As Defendants began to reveal these adverse facts to the market, the price of Nielsen's common stock fell dramatically.  This decline removed the artificial inflation from the price of Nielsen's common stock, causing economic loss to investors who had purchased Nielsen's common stock during the Class Period.

466.    The decline in the price of Nielsen's common stock following these revelations was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines and analyst reactions to the news, individually and collectively, negate any inference that the loss suffered by

Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

467.     The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Nielsen's common stock and the subsequent material decline in the value of Nielsen's common stock when Defendants' prior misrepresentations, misleading half-truths and other fraudulent conduct were revealed.

## X.   APPLICATION OF THE PRESUMPTION OF RELIANCE

468.     Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

469.     In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)     Nielsen's common stock met the requirements for listing on, and was traded on the NYSE, an informationally efficient market, throughout the Class Period;

(b)     Nielsen's common stock traded at high volumes during the Class Period, and its weekly trading volume during the Class Period was 14.3 million shares, or approximately 4.0% of the average total outstanding shares, the "float" or shares not owned by insiders comprised approximately 98% of outstanding shares during the Class Period, and the Class Period bid/ask spread median was $0.012.

(c)     The market capitalization of Nielsen during the Class Period was between $7.9 billion and $20.1 billion and institutional investors owned more than 90% of Nielsen's shares during the Class Period;

(d)     Nielsen's common stock was registered with the SEC, Nielsen filed Annual Reports, and routinely filed quarterly unaudited financial reports;

(e)     Nielsen communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(f)     The market reacted promptly to public information disseminated by Nielsen;

(g)     Nielsen's common stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, and each of these reports was publicly available and entered the public marketplace;

(h)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Nielsen's common stock; and

(i)     Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class bought Nielsen's common stock between the time Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

470.    As a result of the foregoing, the market for Nielsen common stock promptly digested current information regarding Nielsen from all publicly available sources and reflected such information in the Company's stock price.

## XI.    NO SAFE HARBOR

471.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  The statements at issue are not protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

472.    First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the safe harbor. Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

## XII.    CLASS ACTION ALLEGATIONS

473.    Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that purchased or otherwise acquired Nielsen publicly traded common stock during the period from February 11, 2016 through July 25, 2018, inclusive (the "Class Period"), and were damaged thereby, except as

excluded below (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Nielsen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) affiliates of Nielsen, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(iv) of this paragraph.

474.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Nielsen had over 350 million common shares outstanding.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

475.    While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained either by Nielsen or by other customary means and may be notified of the pendency of this action by mail, using a form of notice as is customary in securities class actions.

476.    Plaintiffs' claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

477.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.

478.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)     whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     whether Defendants acted with the intent to defraud Class members regarding the true value of Nielsen's common stock;

(g)     whether Defendants' fraudulent conduct inflated the price of Nielsen's common stock during the Class Period;

(h)     whether the Individual Defendants were controlling persons of Nielsen;

(i)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(j)     whether and to what extent the shareholders of Nielsen suffered losses due to Defendants' fraudulent conduct.

479.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

480.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

481.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

482.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

483.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

484.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who sold Nielsen's common stock.

485.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the prices of Nielsen's common stock; and (iii) cause Plaintiffs and members of the Class to buy Nielsen's common stock at artificially inflated prices.

486.    The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

487.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nielsen's common stock, Plaintiffs and other members of the Class bought Nielsen's stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have bought Nielsen's common stock at such artificially inflated prices.  By buying the Nielsen common stock at these artificially inflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

488.    By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

489.    Plaintiffs repeat, incorporate, and reallege each of the allegations set forth above as if fully set forth herein.

490.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

491.    As alleged above, Nielsen violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements and omitting material information in connection with the purchase and sale of Nielsen's common stock.

492.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Nielsen is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

493.    As set forth above, the Individual Defendants were controlling persons of Nielsen during the Class Period, due to their senior executive positions with the Company, positions on the Board and significant control over the Company's stock.  Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations.

494.    By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Nielsen, including the content of its public statements.

495.    The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Plaintiffs and the other members of the Class who bought Nielsen's common stock during the Class Period.

496.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Nielsen's common stock, Plaintiffs and other members of the Class bought Nielsen's common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and members of the Class would not have bought Nielsen's common stock at such artificially inflated prices.  By buying Nielsen's common stock at these artificially inflated prices, the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

497.    By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and the members of the Class as controlling persons of Nielsen in violation of Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

498.    WHEREFORE, Plaintiffs respectfully prays for judgment against the Defendants as follows:

A.    Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Labaton Sucharow LLP as lead class counsel pursuant to Rule 23(g);

B.      Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C.      Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E.      Granting such other and further relief as the Court deems just and proper.

## XIV.   JURY DEMAND

499.    Plaintiffs demands a trial by jury of all issues so triable.

DATED: September 27, 2019

By: _____/s/ Carol C. Villegas_____
**LABATON SUCHAROW LLP**

Carol C. Villegas
Eric J. Belfi
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  cvillegas@labaton.com
          ebelfi@labaton.com
          jbissell-linsk@labaton.com

*Attorneys for Lead Plaintiff Public Employees'*
*Retirement System of Mississippi and Lead*
*Counsel for the Proposed Class*


**ROBBINS GELLER RUDMAN**
**& DOWD LLP**

Shawn A. Williams
Post Montgomery Center,
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email: shawnw@rgrdlaw.com

*Counsel for Additionally Named Plaintiff Monroe*
*County Employees' Retirement System, and*
*Additional Counsel for the Proposed Class*

195

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2019, a copy of the foregoing was filed electronically via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties whose counsel has appeared in this action, by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

By:  _____ */s/ Carol C. Villegas* _____
         Carol C. Villegas