### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

**IN RE NIELSEN HOLDINGS PLC
SECURITIES LITIGATION**

Civil Action No. 1:18-cv-07143-JMF

**ORAL ARGUMENT REQUESTED**

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** .................................................................................................1

**BACKGROUND** .......................................................................................................................3

**ARGUMENT** .............................................................................................................................8

**I.    The Complaint Fails to Plead a Strong Inference of Scienter** ...............................9

      A.    The Complaint Does Not Allege a Fraudulent Motive ........................................ 9

      B.    The Complaint Fails to Plead Facts Supporting a Compelling Inference of
           Conscious Misbehavior or Recklessness ......................................................... 13

      C.    The Complaint Includes No Scienter Allegations Regarding Abcarian .............. 20

      D.    The Complaint Fails to Plead Corporate Scienter ............................................... 20

**II.   The Complaint Fails to Allege Any Actionable Misstatements or Omissions** ...........20

      A.    The Complaint Identifies No False or Materially Misleading Statements .......... 21

      B.    The Complaint Does Not Allege An Actionable Item 303 Violation .................. 25

      C.    The Complaint Fails to Plead Material GAAP Violations ................................. 26

      D.    The Complaint Relies on Forward-Looking Statements Subject to the
           PSLRA Safe Harbor ......................................................................................... 27

      E.    The Complaint Seeks Fraud in Non-Actionable Puffery, Corporate
           Optimism, and Opinion Statements .................................................................. 29

**III.  The Section 20(a) Claims Fail as a Matter of Law** ..............................................30

**CONCLUSION** .......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) .................................................................................................... 24

*Amgen Inc. v. Conn. Ret. Plans*,
  568 U.S. 455 (2013) .............................................................................................................. 8

*Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ............................................................................................ 13

*Arazie v. Mullane*,
  2 F.3d 1456 (7th Cir. 1993) ................................................................................................ 23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .............................................................................................................. 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................................. 8

*C.D.T.S. v. UBS AG*,
  2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ...................................................................... 20

*Campo v. Sears Holdings Corp.*,
  371 F. App'x. 212 (2d Cir. 2010) ................................................................................... 15, 18

*Carpenters Pension Trust Fund v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ................................................................................................ 30

*City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*,
  665 F. Supp. 2d 262 (S.D.N.Y. 2009) ................................................................................. 23

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*,
  967 F. Supp. 2d 771 (S.D.N.Y. 2013) ................................................................................. 10

*Cortina v. Anavex Life Sciences Corp.*,
  2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) .................................................................. 9, 14

*Das v. Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) ................................................................................. 19

*Defer LP v. Raymond James Fin. Corp.*,
  654 F. Supp. 2d 204 (S.D.N.Y. 2009)................................................................... 20

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)........................................................................................... 9

*ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)................................................................................ 10

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)................................................................................ 26

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................... 10, 16, 19

*Gregory v. ProNAi Therapeutics Inc.*,
  297 F. Supp. 3d 372 (S.D.N.Y. 2018)................................................................. 30

*Hensley v. IEC Elecs. Corp.*,
  2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)..................................................... 14

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 7537 (7th Cir. 2007) ........................................................................... 15

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)................................................................. 21

*In re Aratana Therapeutics Inc. Sec. Litig.*,
  315 F. Supp. 3d 737 (S.D.N.Y. 2018)................................................... 10, 12, 13

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................................. 19

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)................................................................. 10

*In re China Valves Tech. Sec. Litig.*,
  979 F. Supp. 2d 395 (S.D.N.Y. 2013)................................................................... 9

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .................................................... 25

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007)................................................................. 13

*In re eSpeed Sec. Litig.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006)................................................................. 13

*In re Facebook, Inc. Sec. Litig.*,
  2019 WL 4674347 (N.D. Cal. Sept. 25, 2019) ...................................................... 24

*In re Gildan Activewear, Inc. Sec. Litig.*,
  636 F. Supp. 2d 261 (S.D.N.Y. 2001) .............................................................. 11, 12

*In re GlaxoSmithKline plc*,
  2006 WL 2871968 (S.D.N.Y. Oct. 6, 2006) ........................................................ 11

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 298 (S.D.N.Y. 2005) ................................................................. 27

*In re Int'l Bus. Mach. Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) .............................................................................. 29

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 n.23 (S.D.N.Y. 2014) ...................................................... 10, 21

*In re Millennial Media, Inc. Sec. Litig.*,
  2015 WL 3443918 (S.D.N.Y. May 29, 2015) ....................................................... 18

*In re MRU Holdings Sec. Litig.*,
  769 F. Supp. 2d 500 (S.D.N.Y. 2011) ................................................................ 15

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................................... 15

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................ 19

*In re ShengdaTech, Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014) ...................................................... 30

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ................................................................ 12

*In re Travelzoo Inc. Sec. Litig.*,
  2013 WL 1287342 (S.D.N.Y. Mar. 29, 2013) ...................................................... 11

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp 2d. 326 (S.D.N.Y. 2011) ................................................................ 16

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) .............................................................................. 14

*Kuriokase v. Fed. Home Loan Mortg. Corp.*,
  897 F. Supp. 2d 168 (S.D.N.Y. 2012) ................................................................ 27

*Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010) ................................................................................ 16

*Malin v. XL Capital Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) ................................................................................ 13

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ................................................................................ 26, 30

*Medina v. Tremor Video, Inc.*,
  640 F. App'x 45 (2d Cir. 2016) ................................................................................ 25

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan and Plymouth Cty. Ret.
  Assoc. v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ................................................................ 26, 27

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ................................................................................ 15

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018) ................................................................................ 29

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................................................ 9

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017) ................................................................ 16

*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
  Commerce*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010) ................................................................................ 16

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
  793 F. Supp. 2d 651 (S.D.N.Y. 2011) ................................................................................ 28

*Ressler v. Liz Claiborne, Inc.*,
  75 F. Supp. 2d 43 (E.D.N.Y. 1998) ................................................................................ 13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ................................................................................ 21, 29

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ................................................................................ 5

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996) ................................................................................ 15, 23

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ................................................................... 10

*Serabian v. Amoskeag Bank Shares, Inc.*,
   24 F.3d 357 (1st Cir. 1994) ............................................................................................ 23

*Shemian v. Research In Motion, Ltd.*,
   2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ................................................................ 27

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ........................................................................................... 29

*Sinay v. CNOOC Ltd.*,
   2013 WL 1890291 (S.D.N.Y. May 6, 2013) ................................................................... 24

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010) ....................................................................................... 9, 28

*Steinberg v. PRT Grp., Inc.*,
   88 F. Supp. 2d 294 (S.D.N.Y. 2005) .............................................................................. 30

*Stevelman v. Alias Research, Inc.*,
   174 F.3d 79 (2d Cir. 1999) ............................................................................................. 13

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015) ............................................................................................. 13

*Tabor v. Bodisen Biotech, Inc.*,
   579 F. Supp. 2d 438 (S.D.N.Y. 2008) ............................................................................ 22

*Teamsters Local 445 Freight Div. Pension Fund. v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ..................................................................................... 15, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .......................................................................................................... 9

*Tenney v. Credit Suisse First Boston Corp.*,
   2006 WL 1423785 (2d Cir. May 19, 2005) .................................................................... 27

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
   234 F. App'x 20 (2d Cir. 2018) ...................................................................................... 23

## Rules and Statutes

15 U.S.C. § 78u-4(b) ............................................................................................................ 2, 9

15 U.S.C. § 78u-5(c)(1)(A)(i) .................................................................................................. 27

17 C.F.R. § 229.303(a)(3)(ii) ................................................................................................... 25

17 C.F.R. 229.10(b) ..................................................................................................... 28

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 8

Fed. R. Civ. P.  9(b) ..................................................................................... 2, 9, 21, 23

**Other Authorities**

Management's Discussion & Analysis of Fin. Condition & Results of Operations,
    Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989) ......................... 25

Defendants Nielsen Holdings plc ("Nielsen") and Dwight Mitchell Barns, Jamere Jackson, and Kelly Abcarian (the "Individual Defendants," and together with Nielsen, "Defendants"), respectfully submit this memorandum and the accompanying Declarations of Craig S. Waldman and Benjamin S. Hayes in support of their renewed motion to dismiss the Second Amended Complaint ("Complaint").

## PRELIMINARY STATEMENT

The European Union's General Data Protection Regulation ("GDPR") became effective in May 2018.  On July 26, 2018, Nielsen announced revised guidance for the remainder of 2018, as well as a strategic review of one of its two major business units.  Nielsen, which is primarily a data analytics company, disclosed that "changes in the consumer data privacy landscape" had affected its growth rates in the near term as clients and partners "grappl[ed] with the GDPR" and "work[ed] to ensure compliance."  The Company's stock price declined.  Plaintiffs quickly alleged federal securities fraud, claiming that the Defendants lied about the impact of the GDPR and the slowdown in one of its major business units.

After Defendants filed their initial motion to dismiss, the Court granted Lead Plaintiff an opportunity to amend its complaint.  Nevertheless, the Second Amended Complaint pleads no new facts, offers no new "witnesses," and is no better than the prior complaint.  The latest Complaint does nothing more than abandon the claims against one defendant and shuffle the order of the paragraphs in the prior complaint.  The Complaint continues to argue that Defendants' statements in 2016 and 2017 regarding the outlook of Nielsen's business must have been knowingly false because Defendants knew "the Company was in decline, and was plagued by numerous problems."  But to survive a motion to dismiss, the Complaint must plead *facts* demonstrating that Defendants knew the earlier statements were false when made, not make simplistic conclusions.

The Complaint should be dismissed.  *First*, the Complaint does not plead facts supporting a strong inference of scienter, that is, that each Defendant knew that the Company's business prospects were overstated and each Defendant intended to deceive investors about those prospects.  Plaintiffs offer summaries of information they represent came from numerous Confidential Witnesses ("CWs"), but none of these CWs assert that Defendants had knowledge of any falsity, and in fact none of them was ever in a position to have an informed view on the subject.  The Complaint selectively quotes CWs discussing general market trends in their own office or business line and speculating that senior management may have been aware of these trends or had access to information about them.  Speculative conclusions and immaterial observations from unidentified, non-management employees do not give rise to a strong inference of scienter.  Even more concerning—as Defendants demonstrated in their initial motion—one of the key CWs, "Confidential Witness 14," has stated not only that he does not believe Defendants made any misstatement, but also that he told Plaintiffs he did not believe Defendants made a misstatement.

*Second*, the Complaint does not plead any actionable false or misleading statement by Defendants.  The Complaint, even as now amended, still block-quotes large sections of Nielsen's public disclosures and asserts in conclusory fashion these statements were false and misleading for such generic reasons as "they misstated the true condition of the Company" or "omitted then known information."  Conclusory, hindsight allegations do not satisfy Rule 9(b) or the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) ("PSLRA"), because they fail to plead with particularity each allegedly false or misleading statement and the contrary facts known to Defendants at the time.

For these and other reasons discussed below, Plaintiffs have failed to meet their burden and the Complaint must be dismissed.

## BACKGROUND

### A.  Nielsen And Its Business

Nielsen is a data analytics company that provides clients detailed information about consumer preferences.  ¶ 61.[1]  At all relevant times, Nielsen's business was broadly divisible into two reporting segments of roughly equivalent size: (i) "Buy," focused on consumer purchasing measurement and analytics in the Consumer Packaged Goods ("CPG") space; and (ii) "Watch," focused on media audience measurement and analytics.  *Id.*  The Buy segment was further subdivided into Developed Markets, consisting of the United States, Canada, Western Europe, Japan, South Korea, and Australia; and Emerging Markets, consisting of Africa, Latin America, Eastern Europe, Russia, China, India, and Southeast Asia.  ¶ 69.  The Watch segment was subdivided by major product offerings, consisting of Marketing Effectiveness, Audio, Audience Measurement.  ¶ 70.

Dwight Mitchell Barns was Chief Executive Officer and a member of Nielsen's Board of Directors.  ¶ 34.  Mr. Barns retired from Nielsen at the end of 2018.  ¶ 229.  Jamere Jackson was Nielsen's Chief Financial Officer, ¶ 37, until his resignation from Nielsen in August 2018.  ¶ 268.  At all relevant times, Individual Defendant Kelly Abcarian was Nielsen's Senior Vice President of Product Leadership.  ¶ 40.

### B.  Plaintiffs' Claims

This action was commenced on August 8, 2018.  Plaintiffs served a Corrected Amended Complaint on July 12, 2019, which Defendants moved to dismiss on September 6, 2019.  Following Defendants' initial motion to dismiss and at the direction of the Court, Plaintiffs served the operative Second Amended Complaint on September 27, 2019.

---

[1]     All citations to "¶ __" reference the Complaint.

Plaintiffs assert Securities Exchange Act claims against all Defendants under Section 10(b) and against the Individual Defendants under Section 20(a).  The Complaint asserts that Defendants issued materially false and misleading statements between February 11, 2016 and July 25, 2018 (the "Class Period"), including in Form 10-K and 10-Q filings, on earnings calls, and at industry events.  The allegedly misleading statements fit broadly into two categories: those involving the GDPR and those involving the Buy segment.[2]  *See* Compl. § 7.

*First*, the Complaint alleges that Defendants misled the market about how the GDPR would affect Nielsen.  ¶ 16.  The GDPR, a "sweeping data privacy law passed by the European Parliament and Council of the European Union in April 2016," was implemented in May 2018 and required that companies take steps to protect the personal data of European Union citizens.  ¶¶ 202-204.  Plaintiffs challenge general statements such as "[T]here'll be some things we'll have to do to ensure our compliance with the [GDPR] regulations, but it's manageable," ¶ 331(a), and "Overall, we see the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace," ¶ 344(b).  According to the Complaint, Defendants downplayed the GDPR's potential effect on Nielsen's business, stating that Nielsen had been "focused" on the GDPR for some time and was "in good shape," despite knowing that the GDPR would have a negative impact.  *See, e.g.*, ¶¶ 18, 22, 207.

*Second*, the Complaint alleges that Defendants overstated the outlook of Nielsen's business throughout the Class Period.  ¶ 4.  Plaintiffs challenge general statements about Nielsen's future, such as: "While we certainly don't wish for difficult economic conditions,

---

[2]     Plaintiffs identify the following categories of statements: "Growth and Guidance"; "Status of Buy Segment and Analytics Business"; "The GDPR's Effect on Nielsen"; and "Nielsen's Performance Issues in China."  *See* Compl. § 7(A).  Aside from those characterized as pertaining to "The GDPR's Effect on Nielsen," each statement principally relates to the Buy segment or a sub-section thereof.  Defendants have catalogued these allegedly false and misleading statements in Appendix A hereto.  In addition, Plaintiffs assert Nielsen failed to disclose known adverse trends in violation of Item 303 of Regulation S-K, and allege Nielsen materially overstated its goodwill in violation of generally accepted accounting principles ("GAAP").  *See* Compl. §§ 7(B), (C).

we're ready for them," ¶ 287(f), and "As we look forward, we remain confident in our strategy to manage through the tough environment while building a stronger business for the long term." ¶ 314(c). Plaintiffs allege that, in fact, Nielsen's business was in decline and plagued by problems that negatively affected its growth. ¶ 4. The problems were allegedly most prominent in the Buy segment, where cutbacks in client spending on bespoke data analytics led to a "terminal decline" in business (¶ 7) across the Buy segment and infected both the Developed Markets and Emerging Markets sectors, including China. *See, e.g.*, ¶¶ 13-15. Defendants are alleged to have known of the extent of these issues at all times because supposed "former employees" state Defendants received unspecified "internal Nielsen reports" with "detailed revenue metrics," and had "access to systems" that could provide financial data. ¶ 8.

The Complaint studiously ignores or flat-out mischaracterizes the portions of Nielsen's filings that warn investors about these very issues. For example, Nielsen cautioned that "compliance with the GDPR is resulting in operational costs" in connection with the law's "new and more stringent requirements regarding the handling of personal data." *See, e.g.*, Ex. A at 18 (Nielsen Form 10-K, dated February 8, 2018).[3] Nielsen also expressly warned the public that "[c]ontinued adverse market conditions, particularly in the consumer packaged goods . . . industr[y], could adversely impact our revenue" (¶ 368) and that "opportunities in major international markets around the world, including China . . . could expose us to various additional risks," including "difficulties in managing international operations." Ex. A at 21.

### C.  Use of Confidential Witness Summaries

The Complaint continues to be heavily reliant on Plaintiffs' own *summaries* of what

---

[3]     All citations to "Ex. __" reference exhibits attached to the Declaration of Craig S. Waldman dated November 26, 2019. On a motion to dismiss, a court may consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The Court may consider all of a defendant's SEC filings. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

"Confidential Witnesses" purportedly said, rather than what the witnesses actually said.  None of the Confidential Witnesses are quoted for more than a few words.  In at least one instance, Plaintiffs' summary is demonstrably misleading.  *See* Declaration of Benjamin S. Hayes ("Hayes Decl.") ("Confidential Witness 14").

In addition, the witnesses had zero to vanishingly little contact of any kind with any members of Nielsen's management.  None were themselves members of senior management, reported directly to management, or spoke directly to management.  *See* ¶ 42-60.  Only five of the eighteen Confidential Witnesses even reference any discussions with management: CW 1 (¶¶ 94, 101, 117); CW 2 (¶ 118); CW 3 (¶¶ 119-20); CW 4 (¶ 122); and CW 18 (¶ 125).  But even these five are characterized by counsel only as having heard conference calls on which members of management *may* have participated, or otherwise simply offer their opinions as to what internal financial documents management *may* have had access to at some points in time.  *See, e.g.*, CW 18 (¶ 125: "He believed that either CFO Jamere Jackson, or someone just under Jackson, attended these calls").  These characterizations are valueless here.

Of the remaining CWs who do not intersect with management at all, twelve speak narrowly about their personal understanding of the business environment and market trends at different times.  *See* CW 5 (¶¶ 95, 131); CW 6 (¶ 96); CW 7 (¶¶ 102, 113); CW 8 (¶¶ 97, 103); CW 9 (¶ 108); CW 10 (¶¶ 110-11); CW 11 (¶112); CW 12 (¶ 114); CW 13 (¶ 109); CW 15 (¶ 104); CW 16 (¶¶ 226-27); CW 17 (¶¶ 98, 124).  These CWs were typically three or more reporting lines below management.  *See, e.g.*, CW 11 (¶ 112: "Nielsen was under pressure in certain markets because its analytics cost more than clients were willing to spend.  In particular . . . Germany and Brazil"); CW 12 (¶ 114: "Consumer Insights in the Middle East Region . . . was not performing well").  These conclusions are irrelevant.

Only Confidential Witnesses 14 and 15 are alleged to have information concerning

Nielsen's understanding of the GDPR.  *See* CW 14 (¶¶ 221-223); CW 15 (¶¶ 224-25).  Most

disturbingly, one of the witnesses—Nielsen's former Chief Privacy Officer, CW 14—

"explicitly" told Plaintiffs that their focus on Nielsen's GDPR-related statements was

"misguided *because the statements were "made in good faith and were true when made."*

Hayes Decl. ¶ 9.  CW 15 had no independent conversations about the GDPR but only spoke *with*

*CW 14* and therefore adds nothing to the allegations.  *See* ¶ 224.

## D.  Purported Corrective Disclosures

The Complaint identifies a bevy of alleged corrective disclosures beginning with

Nielsen's release of its Q3 2016 financial results on October 25, 2016.  All of these disclosures

have a single theme—Nielsen announced a steady drum beat of negative news.

For example, according to the Complaint, Nielsen "shocked the market" with its Q3 2016

financial results by reporting a "decline in Developed Markets revenues."  ¶ 9.  Six months later,

on April 25, 2017, Nielsen issued allegedly disappointing financial results again, attributed in

large part to weakness in the Buy segment.  *See* ¶¶ 159-161.  Plaintiffs claim the April 25

"disclosure" nevertheless misled investors because it "blame[d] any declining performance on

underlying weakness in the . . . market, without disclosing the truth regarding the specific

declining demand for Nielsen's analytics."  ¶ 315.

On October 25, 2017, Nielsen announced allegedly disappointing financial results

attributed to the Developed Markets sector of the Buy segment.  ¶¶ 167-68.  On February 8,

2018, Nielsen again announced negative results and attributed them to the Developed Markets

sector of the Buy segment.  ¶ 178.  "[N]atural disasters and some revenue execution issues in

China" were also identified as reasons for underperformance.  ¶ 179.  On April 26, 2018, Nielsen

again reported financial results below its previously-issued guidance, identifying the miss as

caused by "a challenging set of market conditions."  ¶¶ 190, 193.

The final alleged corrective disclosure occurred on July 26, 2018.  ¶ 228.  Nielsen again announced that its results were negatively affected in significant part by "Buy segment[] revenue remain[ing] weak as a result of the increasingly challenging fast-moving consumer goods environment."  *Id.*  Nielsen also noted that while the Watch segment "remain[ed] strong," results were affected by "near-term deceleration" in its Marketing Effectiveness business caused "by GDPR and changes to the consumer data privacy landscape."  ¶¶ 228, 250.

### E.  Lead Plaintiff's Amendments

Following Defendants' initial motion to dismiss, this Court ordered Plaintiffs to submit any amendments intended "to address issues raised by the motion to dismiss" no later than September 27, 2019.  ECF No. 71.  Plaintiffs subsequently filed the Complaint, which abandons claims against former Nielsen Chief Operating Officer, Stephen Hasker, and includes minor revisions in language and organization.  *See, e.g.*, ¶¶ 284-363 (purporting to categorize Defendants' allegedly false and misleading statements).  The Second Amended Complaint adds no new facts or allegations and is materially identical to its predecessor.

## <u>ARGUMENT</u>

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege facts sufficient to show "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Amgen Inc. v. Conn. Ret. Plans*, 568 U.S. 455, 460-61 (2013)

Under Rule 12(b)(6), a complaint must contain "allegations plausibly suggesting (not merely consistent with)" an "entitle[ment] to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  A complaint cannot survive if it "pleads facts that are merely consistent with a defendant's liability" but "stops short of the line between possibility and plausibility of

entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

"[R]everse-engineered" allegations "craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendants] far earlier in time" do not satisfy this standard. *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669–70 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).

## I.      **The Complaint Fails to Plead a Strong Inference of Scienter**

Under Rule 9(b) and the PSLRA, Plaintiffs bear the burden of "stat[ing] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1)–(2)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "In reaching its conclusion, the Court must consider plausible, nonculpable explanations for the defendant's conduct." *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 406 (S.D.N.Y. 2013). If a fraudulent inference is not "at least as compelling" as a nonfraudulent one, it must be rejected, even in "a close case." *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010). To establish scienter, Plaintiffs must allege facts (a) showing Defendants possessed motive and opportunity to perpetrate fraud or (b) constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Cortina v. Anavex Life Sciences Corp.*, 2016 WL 7480415, at *6 (S.D.N.Y. Dec. 29, 2016). The Complaint does neither.

### A.      **The Complaint Does Not Allege a Fraudulent Motive**

Over a Class Period stretching from February 2016 to July 2018, the Complaint identifies just five allegedly fraudulent stock sales by two insiders, Individual Defendants Barns and Jackson. *See* ¶¶ 35, 38. These allegations are fundamentally flawed.

1.      *The Complaint Misrepresents the Barns and Jackson Stock Sales*

To establish fraudulent motive, the Complaint must plausibly allege that Defendants

"benefited in some concrete and personal way from the purported fraud."  *Schaffer v. Horizon*

*Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) (Furman, J.) (quoting *ECA,*

*Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d

Cir. 2009)).  Allegations "common to most corporate officers, such as the desire for the

corporation to appear profitable and the desire to keep stock prices high," are insufficient.  *ECA*

*Local 134*, 553 F.3d at 198.  When allegations are premised on sales of stock by individual

defendants, such sales must be "suspicious" or "unusual" to support a strong inference of

scienter.  *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 798-99

(S.D.N.Y. 2013).  Factors relevant to determining whether sales are suspicious or unusual

include the amount of net profit from the sales, the portions of stockholdings sold, the change in

volume of insider sales, the number of insiders selling, the timing of the alleged sales, and

whether sales were made pursuant to trading plans, such as Rule 10b5-1 plans.  *Glaser v. The9,*

*Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011).  Sales must also be "considered in context of

[the defendant's] overall holdings of [Company] stock."  *In re Lululemon Sec. Litig.*, 14 F. Supp.

3d 553, 586 n.23 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Omitted from the Complaint are Defendant Barns' Form 4s, which reveal a significant

*increase* in his holdings of Nielsen stock over the Class Period.  It is well-established that an

increase in company holdings is "wholly inconsistent with fraudulent intent" and rebuts

allegations of fraudulent motive.  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549,

561 (S.D.N.Y. 2004); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 763

(S.D.N.Y. 2018) (no motive where defendant's holdings increased by 34 percent in class period).

Barns' trading activity shows 170,116 shares owned as of February 11, 2016 and 376,541 as of

June 20, 2018, the date of Barns' last trade in the Class Period—an increase of *121 percent*.

*Compare* Ex. B (Barns Form 4, Feb. 12, 2016) (first trade in Class Period) *with* Ex. C (Barns

Form 4, June 22, 2018) (last trade in Class Period).  Isolated sales do not suggest wrongdoing

where the sales volume is dwarfed by an overall increase in ownership.[4]  *See, e.g.*, *In re*

*GlaxoSmithKline plc*, 2006 WL 2871968, at *13 (S.D.N.Y. Oct. 6, 2006) (finding defendant's

"stock sale[s] cannot be said to have been unusual or suspicious" where "the public record

discloses" an increase in net holdings).  The increase in Barns' overall holdings bars a finding

that he acted with fraudulent motive in selling shares during the Class Period.

According to the Complaint, Defendant Jackson sold 11,500 shares on May 30, 2017;

16,000 shares on December 14, 2017; and 19,000 shares on March 8, 2018.  ¶ 38.  As a result,

Jackson garnered aggregate "proceeds" of $1,650,555.  *Id.*  Once again the Complaint omits the

pertinent information: Jackson retained 74 percent of his holdings of Company stock over the

Class Period.[5]  This fact nullifies any suggestion of motive.  A decrease in holdings alone fails to

render sales "suspicious or unusual" where a significant percentage of stock is retained.  *See,*

*e.g., In re Travelzoo Inc. Sec. Litig.*, 2013 WL 1287342, at *10 (S.D.N.Y. Mar. 29, 2013)

(rejecting Plaintiffs' contention that executive's sales of $186 million worth of Company stock

were suspicious because defendant "retained 78% of his total stockholdings"); *In re Gildan*

*Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270, 271 n.5 (S.D.N.Y. 2001) (finding that

"Plaintiffs['] allegations fail[ed] to raise the requisite strong inference of scienter" because the

"volume of shares that the Individual Defendants sold as compared to their total holdings"—25

---

[4]      The Complaint notes that Barns sold 60,136 shares on July 28, 2016 and 46,947 shares on March 27, 2017, yielding "total proceeds" of $5,148,687.  ¶ 35; *see also* Ex. D (Barns Form 4, Aug. 1, 2016); Ex. E (Barns Form 4, Mar. 29, 2017).  As explained in Section I.A.2 below, Plaintiffs make no attempt to tie Barns' sales to any particular alleged disclosure or misrepresentation, nor do they grapple with Barns' increase in aggregate stock ownership.

[5]      Jackson owned 98,504 shares as of February 11, 2016, the first day of the Class Period.  Ex. F (Jackson Form 4, February 17, 2016) (showing 97,715 owned shares after disposition of 789 shares on February 12).  He owned 72,696 shares following his last trade in the Class Period.  Ex. G (Jackson Form 4, June 22, 2018).

and 53 percent, respectively—"was not unusual and does not raise a strong inference of scienter").  In addition, none of the allegations suggest Jackson's sales were suspicious.  They fail to allege that Jackson actually profited from these sales or that Jackson's trading was inconsistent with his normal trading activity, both of which are required to support a finding of fraudulent motive.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 275, 276 (S.D.N.Y. 2008) (finding no motive where plaintiffs' claims were "predicated solely upon the gross proceeds of alleged insider stock stales" and there was "no attempt to demonstrate that the pertinent sales . . . were unusual").

2.   *Barns' And Jackson's Sales Are Not Linked To Any Misrepresentation*

The Complaint does not even try to link Barns' or Jackson's sales to any particular misrepresentation or corrective disclosure, as it must.  Nor could it: all but one of the identified trades were made pursuant to Rule 10b5-1 trading plans.[6]  The existence of Rule 10b5-1 trading plans "undermines any allegation that the timing or amounts of the trades was unusual or suspicious."  *In re Gildan*, 636 F. Supp. at 272.  *See also In re Aratana*, 315 F. Supp. 3d at 764 ("Trades made pursuant to a Rule 10b5-1 trading plan do not give rise to a strong inference of scienter") (internal citations omitted).

The single identified sale not made pursuant to a Rule 10b5-1 plan was Jackson's March 8, 2018 disposition of shares.  Ex. J (Jackson Form 4, Mar. 12, 2018).  That trade, which involved a sale of under nineteen percent of Jackson's holdings, post-dated Nielsen's most recent alleged disclosure by a month and preceded Nielsen's next alleged misrepresentation, on April 26, 2018, by over six weeks.  *See* ¶¶ 178-189 (discussing statements issued on February 8, 2018); 190-94 (discussing statements issued on April 26, 2018).  Sales after disclosures are

---

[6]    *Compare* ¶ 35 (discussing Barns' trading) *with* Ex. D (Barns Form 4, Aug. 1, 2016) *and* Ex. E (Barns Form 4, Mar. 29, 2017); ¶ 38 (discussing Jackson's trading) *with* Ex. H (Jackson Form 4, May 31, 2017) *and* Ex. I (Jackson Form 4, Dec. 18, 2017).

presumptively valid, as it would make no sense to trade following a downturn in share price. *See, e.g.*, *In re Aratana*, 315 F. Supp. 3d at 764.  Similarly, sales well *before* misstatements are inconsistent with fraudulent motive.[7]  *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999), citing *Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 60 (E.D.N.Y. 1998) (insider stock sales two weeks prior to misstatements "would have to be much closer in time to the alleged misstatements to give rise to a suspicion of fraud"), *aff'd*, 189 F.3d 460 (2d Cir. 1999).

> 3.     *There Is No Other Evidence of Fraudulent Intent*

Finally, the Complaint fails to identify any sales in the Class Period by Individual Defendant Abcarian or any other insider, which alone renders its allegations fatally deficient. Allegations that only a limited number of insiders engaged in stock sales during the Class Period are regularly deemed insufficient to support a strong inference of scienter.  *See In re eSpeed Sec. Litig.*, 457 F. Supp. 2d 266, 291 (S.D.N.Y. 2006) ("[T]he dispositive factor is that other insiders, including the other two individual defendants, did not sell during the putative class period"); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 570 (S.D.N.Y. 2007) (collecting cases).

**B.     The Complaint Fails to Plead Facts Supporting a Compelling Inference of Conscious Misbehavior or Recklessness**

The Complaint likewise fails to raise a compelling inference of conscious misbehavior or recklessness.  To satisfy this standard, Plaintiffs must allege at least "conscious recklessness— *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence."  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).  The

---

[7]     The 29-month length of the Class Period further undermines any inference of scienter that could otherwise be drawn from the timing of Defendants' stock sales.  *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 151 (D. Conn. 2007) (noting a class period of 24 months "weaken[ed] any inference of scienter" and "strengthen[ed] a competing inference that plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim" because it "sweep[s] as many stock sales into [the class period] as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period").

allegations must specify "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Cortina*, 2016 WL 7480415, at *6; *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Because Plaintiffs fail to plead a fraudulent motive, their allegations regarding conscious misbehavior or recklessness must be "correspondingly greater." *Kalnit*, 264 F.3d at 142.

1.   *The Complaint Speculates About Defendants' Visibility Into Nielsen's Business*

The Complaint alleges that Defendants should have known public statements concerning Nielsen's business outlook were false because "the subject of Nielsen's business is accurately and quickly measuring performance" and, therefore, "Nielsen ha[d] the capabilities to accurately measure its own performance." *See* ¶¶ 115-16; *see also, e.g.*, ¶ 429 (noting Defendants' "profound visibility into Nielsen's business").[8] To demonstrate Defendants' detailed internal insights, Plaintiffs note that Nielsen regularly issued statements in its Annual Reports indicating, in broad terms such as "over 60%," the portion of anticipated annual segment revenue "'typically' committed under existing agreements." ¶¶ 128-29. As discussed further below, Plaintiffs also rely heavily on generic claims of corporate knowledge made by CWs, none of whom actually specify what Defendants allegedly knew or should have known, or when they should have known it during the Class Period. *See* ¶ 117-25. Conclusory allegations of corporate knowledge do not raise a strong inference of scienter: "Where plaintiffs contend defendants had access to contrary facts . . . they must specifically identify the reports or

---

[8]   To the extent Plaintiffs intend to invoke the discredited "core operations doctrine" in arguing Defendants must have known their statements were false due to the "magnitude" of the alleged issues, their claims fail. *See, e.g.*, ¶¶ 140, 417, 419, 423, 425, 4258, 431, 449, 454, 460, 466. The core operations doctrine "permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business," but "many courts have held that it is no longer valid." *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014).

statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812-13 (2d Cir. 1996).  Even if Defendants' statements were false or misleading, conclusory assertions that Defendants recklessly disregarded unspecified internal metrics are plainly insufficient to state a claim of securities fraud.  *Compare Teamsters Local 445 Freight Div. Pension Fund. v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (finding no inference of scienter where senior executives allegedly had access to "collection data" that revealed the "true reason" for company's underperformance, but plaintiffs alleged only "broad reference[s] to raw data") *with In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (finding recklessness where "complaint contain[ed] detailed allegations as to what defendants knew on a daily, weekly and monthly basis").

2.    *Musings of Unidentified, Non-Management Employees Do Not Give Rise to a Strong Inference of Scienter*

Vague statements purportedly summarized from anonymous former employees also fail to raise a compelling inference of conscious misbehavior or recklessness.  As an initial matter, and as courts in this Circuit have held, information from such anonymous sources "must be discounted" because "[i]t is hard to see how information from anonymous sources could . . . take account of plausible opposing inferences.  Perhaps these confidential sources have axes to grind." *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516 (S.D.N.Y. 2011) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)); *Campo v. Sears Holdings Corp.*, 371 F. App'x. 212, 216 n.4 (2d Cir. 2010) ("The anonymity of the sources of plaintiffs' factual allegations concerning scienter frustrates the requirement . . . that a court weigh competing inferences to determine whether a complaint gives rise to an inference of scienter that is 'cogent and at least as compelling as any opposing inference of nonfraudulent intent'").  Anonymous statements are especially suspect where no confidential witness is alleged

15

to have "met the [defendants], reported any concerns, received any instructions, or made any personal contact with [defendants] during the Class Period." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp 2d. 326, 352 (S.D.N.Y. 2011). Confidential witness statements add no weight to scienter assertions when they "merely parrot [] . . . conclusory allegations contained in the complaint" by stating that defendants "were aware" of or "would have" or "should have" had access to knowledge rendering their statements untrue. *See Glaser*, 772 F. Supp. 2d at 590-591.

To survive a motion to dismiss on the back of confidential witnesses, those witnesses must articulate what Defendants knew, how they knew it, and how it related to the alleged misstatements. *See, e.g., Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928, at *3 (S.D.N.Y. Aug. 1, 2017) (Furman, J.) (dismissing where confidential witnesses did not "allege[] that [individual defendant] reviewed tests or reports that actually revealed" evidence that would have made public statements misleading); *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010) (dismissing where plaintiff failed to "specifically identif[y] any reports or statements or any dates or time frame in which Defendants were put on notice of contradictory information"); *Local No. 38 Intern. Broth. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (no scienter where plaintiff advanced a "gossamer patchwork of general statements" from twelve confidential witnesses whose "anecdotes and conclusory statements of belief" failed to "identify [] report[s] demonstrating that the Individual Defendants were aware [of information] contradicting their public statements").

The Complaint takes an unabashed quantity-over-quality approach, but none of the eighteen Confidential Witnesses are alleged to have directly interacted with *any* Individual Defendant. *Id.* This fact significantly undermines their probative value. *See In re Wachovia*, 753 F. Supp. 2d at 352; *Intern. Broth. of Elec. Workers*, 724 F. Supp. at 460 (disregarding

confidential sources "employed in rank-and-file positions . . . [who] had no contact with the Individual Defendants").  Only five of these Confidential Witnesses suggest that the Individual Defendants came into contact with or had access to supposedly relevant information, and even then only in the vaguest possible terms:

- CW 1, who is described as three reporting lines below management, maintains "Defendant Jackson . . . w[as] on some of the revenue calls" where decreasing CPG client spending was discussed, ¶ 94; "CEO Barns and CFO Jackson were involved in the strategy related to Connected Buy," ¶ 101; and "all client service leaders . . . from Vice Presidents . . . to CEO Barns" received "weekly reports from the finance department," ¶ 117.
- CW 2, described as two levels below management, allegedly stated Nielsen's "'systems were good enough' to provide . . . Jackson with various aspects of the Emerging Markets segment's performance," and that the CFO of Emerging Markets "met at least quarterly with CFO Jackson . . . and the two spoke occasionally together on the phone," ¶ 118.
- CW 3, four reporting lines below management, maintained that "sales and financials[] were 'absolutely presented' to CEO Mitch Barns" since he reported such information to his boss, Akash Pal, who CW 3 believed reported the information to his boss, Nick Papagregoriou, who reported the information to his boss, the Head of Operations Outside North America, who reported to his boss, Barns.  ¶ 119.  CW 3 also purportedly explained that financial metrics "kept on Google Drives" were "expos[ed]" to corporate headquarters because unidentified "colleagues at Nielsen had told him so."  ¶ 120.
- CW 4, three reporting lines below management, allegedly "recalled that Defendant Jackson occasionally participated" on calls during which Emerging Markets representatives discussed "their respective forecasts" and "regularly participated" on other calls where CW 4 was not present but where financial reports prepared by CW 4 were allegedly "used," which he knew because his boss "informed him" of such use.  ¶ 122.
- CW 18, four reporting lines below management, allegedly stated that "either CFO Jamere Jackson, or someone just under" him, attended biweekly revenue calls with personnel from Nielsen's Canada offices.  ¶ 125.

These fragmentary, secondhand allegations about access to information include no statement that any Confidential Witness actually spoke with any Defendant or explain how the *totality of the information* is relevant and compels an inference of scienter.  As such, the statements—lacking any description of what specific information was discussed with or conveyed to or accessed by Defendants, how and when such information was discussed or conveyed or accessed, and who

actually did the discussing, conveying, or accessing, and what contrary information existed—cannot give rise to an inference of scienter.

The remainder of the Confidential Witnesses likewise fail to give rise to any compelling or cogent inference of conscious misbehavior or recklessness.[9]  None allege that any Individual Defendant or any other member of Nielsen management had any knowledge of information that contradicted Defendants' public statements.  The majority of the remaining Confidential Witnesses are alleged to have discussed general market trends in relation to Nielsen's business, such as that in 2016 "clients were moving away from Nielsen" and "the industry was 'questioning the validity of Nielsen's analytics.'"  ¶ 102.  Others are cited to suggest, with no indication of firsthand knowledge, that general information *may* have filtered up to management.  *See, e.g.*, ¶ 111 ("CW 10 also said that his supervisor . . . told him that [his supervisor's supervisor] was supposed to tell senior management in the U.S. that the teams in" Emerging Markets countries were "not performing well").

Just two of these witnesses—CWs 14 and 15—mention the GDPR.  CW 14, Benjamin Hayes, "explicitly" informed Plaintiffs that their focus on Nielsen's GDPR-related statements on earnings calls was "misguided" because the statements "were made in good faith and were true when made."  *See* Hayes Decl. ¶ 9.  While Plaintiffs contest the propriety of Mr. Hayes' declaration in this proceeding (*see* ¶ 221 n.21), it plainly should be considered.  Aside from its substantive merit, the Hayes Declaration casts doubt on how Plaintiffs procured the statements of the CWs.  *See In re Millennial Media, Inc. Sec. Litig.*, 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015) (discussing means by which Plaintiffs' counsel procured confidential witness statements); *see also Campo*, 371 F. App'x at 216 n.4 (noting with approval district court's

---

[9]        *See* CW 5 (¶¶ 95, 131); CW 6 (¶ 96); CW 7 (¶¶ 102, 113); CW 8 (¶¶ 97, 103); CW 9 (¶ 108); CW 10 (¶¶ 110-11); CW 11 (¶ 112); CW 12 (¶114); CW 13 (¶ 109); CW 14 (¶¶ 221-23); CW 15 (¶¶ 104, 224-25); CW 16 (¶¶ 226-227); CW 17 (¶¶ 98, 124, 132); CW 18 (¶¶ 99, 125).

consideration of confidential witness testimony at pleadings stage "for the limited purpose of determining whether the confidential witnesses acknowledge the statements attributed to them in the complaint").[10]  CW 15, meanwhile, does not appear to have a view of his own on this subject because his only discussions on the topic were apparently with CW 14.  *See* ¶¶ 224-25.  Plaintiffs cannot establish a cogent and compelling inference of scienter by blatantly mischaracterizing the alleged statements of one confidential witness or relying on a second whose only discussions on the matter were with the first.

### 3.   The Departures of Defendants Barns and Jackson Do Not Show Scienter

The departure of employees, whether by resignation or termination, is insufficient to establish scienter.  *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 815 (S.D.N.Y. 2018); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446 & n.85 (S.D.N.Y. 2005) (rejecting argument that resignations supported inference of scienter because "[i]n reality, there are any number of reasons that an executive might resign, most of which are not related to fraud").  Accordingly, departures must be "highly unusual and suspicious" to constitute evidence of scienter.  *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).  Plaintiffs state, with no further elaboration, that "[t]he timing and abrupt nature of Jackson's resignation indicates it was related to his material misrepresentations and omissions during the Class Period" (¶ 268), and "[t]he termination of Defendant Barns and abrupt resignation of Defendant Jackson provide additional indications of scienter."  ¶ 461.  Absent allegations that the departures were motivated by fraud, these conclusions demonstrate nothing.

---

[10]     Even if Plaintiffs' characterization of their discussion with CW 14 is taken at face value, their recitation of CW 14's alleged statements do not establish a cogent or compelling inference of scienter.  The subjective feelings of CW 14, a non-management employee, do not render any earlier statements made by Nielsen false, nor do they demonstrate Defendants' had any knowledge contrary to any statement.  *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 590-91 (rejecting confidential witness allegations that did not allege witness was involved in management of company or have access to management of company).

C.      **The Complaint Includes No Scienter Allegations Regarding Abcarian**

Scienter "must be separately pled and individually supportable as to each defendant."

*Cortina*, 2016 WL 7480415, at *9 (quoting *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *6

(S.D.N.Y. Dec. 13, 2013)).  *See also Defer LP v. Raymond James Fin. Corp.*, 654 F. Supp. 2d

204, 17 (S.D.N.Y. 2009) (dismissing action where "[p]laintiff fail[ed] to allege facts that

particularize how and why *each* defendant actually knew, or was reckless in not knowing, that

the alleged statements and omissions were fraudulent at the time they were made") (emphasis in

original).  Because Plaintiffs allege no facts supporting an inference of scienter as to Individual

Defendant Abcarian, the claims against her must be dismissed.

D.      **The Complaint Fails to Plead Corporate Scienter**

For the reasons set forth above, the Complaint also fails to adequately allege scienter on

the part of any Nielsen employee that could be attributed to Nielsen.  *See, e.g.*, *Teamsters Local*

*445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When

the defendant is a corporate entity, this means that the pleaded facts must create a strong

inference that someone whose intent could be imputed to the corporation acted with the requisite

scienter.").  Nor does the Complaint allege statements so "dramatic[ally]" false that the

statements raise a strong inference of corporate scienter.  *See id.* at 195-96 (citation omitted).

II.     **The Complaint Fails to Allege Any Actionable Misstatements or Omissions**

The Complaint also fails because it does not plead any actionable false or misleading

misstatements or omissions by Defendants.  Broadly speaking, Plaintiffs categorize statements as

false or misleading in one of two ways: (i) stating that Nielsen's Buy segment was not in

"decline" when in fact it was, or (ii) stating that Nielsen was "ready for" the GDPR when it was

not.[11]

### A.      The Complaint Identifies No False or Materially Misleading Statements

To plead a claim under Rule 9(b) and the PSLRA, the Complaint must "state with particularity the specific facts" demonstrating the challenged statements "were false when made." *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  Alternatively, the Complaint must allege the challenged statements omit material information in violation of a duty to disclose, such as where necessary to avoid rendering the statements misleading.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571-72.  The Complaint does neither.

As a threshold matter, the Complaint should be dismissed for its deficiencies in pleading style.  Plaintiffs repeatedly block quote lengthy excerpts from Defendants' public statements, often many paragraphs in succession, and then summarily declare all statements in the preceding section false and misleading for the same reasons.  *See, e.g.*, ¶¶ 314(a)-(h) (eight paragraphs concerning "Status of Buy Segment and Analytics Business" false and misleading for reasons enumerated in ¶ 315).  Often the explanations of why the statements were false and misleading are largely copied and pasted from other paragraphs addressing entirely different statements. *Compare, e.g.*, ¶ 315 *with* ¶¶ 307, 311, 319, 323, 326, 336, 349, 357.  This manner of pleading falls far short of the particularity required to sustain a claim of securities fraud.  *See In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing where "Plaintiffs list various statements—often setting forth lengthy quotations . . . then follow each with a similar (in most cases identical) laundry list of 'specific' reasons the statements were allegedly false"); *Tabor v.*

---

[11]      As explained in footnote 2 above, Plaintiffs categorize the statements as relating to "Growth and Guidance," "Status of Buy Segment and Analytics Business," "The GDPR's Effect on Nielsen," and "Nielsen's Performance in China."  Defendants have catalogued these statements in Appendix A hereto.  Plaintiffs also assert violations of Item 303 of Regulation S-K (¶¶ 364-371) and allege Nielsen materially overstated its goodwill in violation of GAAP (¶¶ 372-411).  Each of these statements principally relates either to the Buy segment or the GDPR.  The allegations concerning "Nielsen's Performance in China," for example, relate to the performance of the Emerging Markets sub-division of the Buy segment.

*Bodisen Biotech, Inc.*, 579 F. Supp. 2d 438, 453 (S.D.N.Y. 2008) (dismissing for lack of particularity because plaintiffs "use of large block quotes from SEC filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements").

The Complaint's allegations fare no better as a substantive matter.  The majority of the Complaint challenges Defendants' statements concerning the Buy segment's performance and outlook.  Plaintiffs do not assert that Nielsen concealed the Buy segment's struggles during the Class Period, but rather argue that Nielsen's statements misled investors as to the *reasons* for the struggles.  As a representative example, Plaintiffs identify the following statement issued on April 25, 2017 as false and misleading:

> In our Buy segment, we continue to see a 2-speed world.  However, in developed markets, particularly in the U.S., our clients are under pressure. Our measurement and analytics are as important as ever for our clients. But many of these clients are cutting costs, and our business is not immune.

¶ 314(a).  Plaintiffs allege this statement, like numerous others, was "false and misleading" because it "tout[ed] Nielsen's strength with large global clients . . . blame[d] any declining performance on underlying weakness in the CPG market . . . [and] describe[d] the weakness in Nielsen's business as isolated to the United States without disclosing the breadth of the underlying problems . . ."  ¶ 315.  Plaintiffs reiterate near-identical explanations for each allegedly false and misleading statement.  Conspicuously absent is any explanation of how these statements were false or misleading at the time they were made.  Plaintiffs' claims of contemporaneous falsity rest principally on their Confidential Witnesses (*see, e.g.*, ¶¶ 94-132), *none* of whom claim Defendants' public statements were false or misleading, and *all* of whom are unreliable for the reasons discussed in in Section I.B.2.  But even if credited, generalized claims of internal company information contradictory to Defendants' public statements do not establish that such public statements were false or misleading.  *See San Leandro*, 75 F.3d at 812-

13, citing *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 365 (1st Cir. 1994) ("requiring plaintiffs to 'specifically identify the internal reports and the public statements underlying their claims, providing names and dates'"); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("'[R]eferences to unreleased or internal information that allegedly contradict[s] [defendants'] public statements' should indicate such matters as 'who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them'"). Cognizant of these deficiencies, Plaintiffs also point to Nielsen's later disclosures as evidence of earlier fraud.[12]   Lacking any showing of contemporaneous knowledge, these claims are merely prototypical examples of fraud-by-hindsight and cannot sustain a claim under Rule 9(b) and the PSLRA.  *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 234 F. App'x 20, 22 (2d Cir. 2018) (finding "fraud by hindsight" where plaintiffs did not establish "Company did not actually believe [its statements] . . . [ ]or . . . identify any contemporaneous facts that would have rendered such a belief unfounded"); *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Co.*, 665 F. Supp. 2d 262, 269 (S.D.N.Y. 2009) ("[M]anagement's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct").

The Complaint's allegations concerning the GDPR are similarly deficient.  Plaintiffs repeatedly assert that Defendants' GDPR-related statements, most of which were issued well before the GDPR's effective date, were false and misleading because the regulation had a greater-than-anticipated effect on Nielsen.  As an initial matter, Nielsen disclosed that data privacy regulations could adversely affect business and that compliance with the GDPR, in

---

[12]     For example, Plaintiffs identify Nielsen's disclosures on July 26, 2018, which purportedly revealed that Buy segment issues were not "isolated to any one market," as "the first public revelation of information Nielsen had hidden from the market previously."  ¶ 276.  The disclosure included references to "the pressures that we've *been seeing*" and "what we've *been focused on.*"  *Id.* (emphasis added).  Working backwards from there, Plaintiffs find fraud in numerous and otherwise anodyne earlier statements, such as "We're well positioned [in Emerging Markets] with our balanced portfolio of local and multinational clients . . . In developed markets, the operating environment . . . remained tough." ¶ 329(a).

particular, was resulting in operational costs. *See, e.g.*, Ex. A at 18.  But even on their own

terms, Plaintiffs' allegations fail to establish Defendants' statements were false or materially

misleading.  Plaintiffs contend, for example, that Defendants' statement that "[T]here'll be some

things that'll have to do to ensure our compliance [with GDPR] . . . but it's manageable [and]

[w]e'll still have access to all the data that we're going to need" (¶ 331(a)) was false and

misleading because it "misstated the negative effects the GDPR would have on the Company" (¶

332).  In support of this assertion, Plaintiffs point only to two unreliable Confidential Witnesses

(CWs 14 and 15) and to post-GDPR statements that the law's impact was greater than

anticipated.[13]  Statements are not rendered false or misleading simply because, with the benefit

of hindsight, they appear imperfect.  *See, e.g.*, *Acito IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir.

1995) ("[D]efendants' lack of clairvoyance does not constitute securities fraud").  Indeed, the

Northern District of California recently dismissed analogous allegations against Facebook

pertaining to the GDPR's onset precisely because the risk had been disclosed and plaintiffs relied

on impermissible fraud-by-hindsight pleading.  *See In re Facebook, Inc. Sec. Litig.*, 2019 WL

4674347, at *26 (N.D. Cal. Sept. 25, 2019).  This Court should do the same.

The remaining categories of allegedly false and misleading statement—"Nielsen's

Performance Issues in China" and "Growth and Guidance"—fare no better.  The former pertain

to China-specific operational and management issues in the Buy segment's Emerging Markets

sub-division.[14]  Defendants disclosed these risks.  *See, e.g.*, Ex. A at 21 ("[O]pportunities in

major international markets around the world, including China . . . could expose us to . . .

difficulties in managing international operations").  Even if they had not, Plaintiffs fail yet again

---

[13]     Many of these statements post-date the Class Period and are therefore appropriate for consideration "only when contradictory information is properly alleged to have been available to defendant[s] in the first place." *Sinay v. CNOOC Ltd.*, 2013 WL 1890291, at *8 (S.D.N.Y. May 6, 2013), *aff'd* 554 F. App'x 40 (2d Cir. 2014).  As explained in Section I.B, Plaintiffs have not made the requisite showing.

[14]     *See, e.g.*, ¶ 350(a) ("We talked about . . . some of our own challenges in China. Those things are behind us. We've made some changes there in terms of leadership and structure, and the teams are operating pretty well").

to demonstrate Defendants' statements were false or misleading *when made*.  The challenged "Growth and Guidance" statements, meanwhile, uniformly relate to Defendants' then-accurate view of Nielsen's anticipated future performance, and are inactionable as forward-looking statements.  *See* Section II.D.

### B.    The Complaint Does Not Allege An Actionable Item 303 Violation

The Complaint asserts violations of Item 303 of Regulation S-K concerning the Company's statements regarding the Buy segment and the GDPR.  *See* ¶¶ 364-371.  Item 303 requires disclosure of, among other things, "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenue or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Thus, a duty to disclose exists if the trend or uncertainty is "presently known to management" and "reasonably likely to have material effects on the registrant's financial condition or results of operation."  Management's Discussion & Analysis of Fin. Condition & Results of Operations, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

Plaintiffs allege Nielsen's risk disclosures violated Item 303 because they "deceptively referred to potential risks, and not actual trends" associated with (i) "reduced discretionary spending by the Company's [Buy segment] CPG customers" (¶ 368) and (ii) "data protection laws, such as the GDPR" (¶ 370).  Assuming *arguendo* that Nielsen did not adequately disclose the alleged trends, the Complaint nevertheless fails to satisfy Item 303's "essential element triggering disclosure": *management's* knowledge of that trend.  *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5, *7 (S.D.N.Y. Mar. 29, 2016); *Medina v. Tremor Video, Inc.*, 640 F. App'x 45, 48 (2d Cir. 2016) (requiring "specific facts" supporting a "plausible inference" that management "had actual knowledge of the trends or uncertainties" at issue).  Plaintiffs assert that "the challenges and negative trends known internally to Nielsen (as described by former

employees) were not incorporated into the MD&A's during the Class Period." ¶ 369.  As explained in Section I.B, the alleged former employees relied on by Plaintiffs do not establish knowledge on the part of any member of Nielsen's management.  Absent such knowledge, Item 303 imposes no disclosure obligation.

### C.    The Complaint Fails to Plead Material GAAP Violations

The Complaint's effort to spin a web of fraud from Nielsen's valuations of its Buy segment's goodwill is also unsuccessful.  In Plaintiffs' telling, Nielsen reported "materially false financial results in 4Q17, 1Q18, and 2Q18, in violation of [GAAP]" (¶ 372) by "misappl[ying] certain inputs and assumptions which inflated the fair value of the Buy reporting unit goodwill." ¶ 389.  Relying on hindsight analysis of Nielsen's post-Class Period impairment charge, Plaintiffs claim to have reconstructed Nielsen's goodwill methodology and determined Defendants "deployed inflated future cash flow projections to improperly avoid recognizing material goodwill impairment of the Buy reporting unit."  ¶ 404.

The Second Circuit has long held "that goodwill estimates are opinion statements because 'they depend on management's determination of the "fair value" of the assets acquired and liabilities assumed, which are not objective matters of fact' and 'will vary depending on the particular methodologies and assumptions used.'"  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan and Plymouth Cty. Ret. Assoc. v. MDC Partners, Inc.*, 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-11 (2d Cir. 2011)).  Thus, where allegations of fraud are premised on goodwill valuations, Plaintiffs must plead facts sufficient to show "(1) 'the speaker d[oes] not hold the belief . . . professed'; (2) the 'fact[s] [] supplied' in support of the belief professed are 'untrue'; or (3) the speaker 'omits information' that 'makes the statement misleading to a reasonable investor.'" *Martin v. Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (alterations in original).  Allegations

that do "nothing more than disagree[] with [Defendants'] accounting judgments . . . cannot

support a fraud claim."  *N. Collier Fire Control*, 2016 WL 5794774, at *11.  Plaintiffs cannot

state a claim of fraud through a retroactive math exercise lacking any allegation that Defendants

disbelieved their goodwill valuations at the time they were publicly presented.[15]

### D.     The Complaint Relies on Forward-Looking Statements Subject to the PSLRA Safe Harbor

A number of allegedly false or misleading statements, particularly concerning "The

GDPR's Effect on Nielsen" and "Growth and Guidance," are forward-looking and therefore

inactionable under the PSLRA's safe harbor.[16]  *See* Appendix A hereto.  A statement cannot give

rise to liability if it is "identified as a forward-looking statement, and is accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).

"The cautionary information need not be in the same document that contains the forward-looking

statement" provided it is "reasonably available to investors and affect[s] the total mix of

information."  *Kuriokase v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 179 (S.D.N.Y.

2012) (internal quotations omitted).

Plaintiffs maintain, for example, a number of statements made by Nielsen in the run-up to

the GDPR were false and misleading because they "stated that Nielsen did not expect any major

impact on the business from the law."  *See* ¶ 332 (discussing statements made on Nielsen's

Fourth Quarter 2017 earnings call); *see also* ¶¶ 345, 347, 359, 361, and 363 (identifying other

---

[15]     The Complaint also fails to explain how Nielsen's post-Class Period impairment of goodwill caused losses for Plaintiffs during the Class Period.  *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) ("[A] concealment can only cause losses after it is disclosed"), *aff'd sub nom.*, *Tenney v. Credit Suisse First Boston Corp.*, 2006 WL 1423785 (2d Cir. May 19, 2005).

[16]     The forward-looking statements identified in the Complaint are also inactionable under the common law "bespeaks caution" doctrine. *See Shemian v. Research In Motion, Ltd.*, 2013 WL 1285779, at *23 (S.D.N.Y. Mar. 29, 2013) (explaining that under the common law "bespeaks caution" doctrine, forward-looking statements are "immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same [communication]") (internal citation omitted).

GDPR-related statements as false and misleading for essentially identical reasons, such as that they "falsely conveyed that Nielsen was prepared for the law").  The majority of these statements were expressly prefaced by appropriate cautionary language.[17]  Appropriate cautionary language was also available to investors at all times, including in Nielsen's financial reports.  *See, e.g.*, Ex. A at 2; Appendix A hereto.

The Complaint also alleges that Nielsen's forward-looking financial guidance statements were false or misleading because "they omitted then known information that undermined the reasonableness of the guidance or growth projections."  ¶ 286 (referring to February 11, 2016 Earnings Call); ¶¶ 290, 294, 305, 309, 313, 317, 321, 328, 340, 353 (referring to subsequent guidance statements).  But as explained above, Plaintiffs fail to demonstrate that Defendants knew their statements were false or misleading, and, in any event, each of these statements was inherently forward-looking, appropriately identified as such, and was accompanied by appropriate cautionary language.  *See* Appendix A hereto.  Indeed, the "Growth and Guidance" statements are precisely those for which the safe harbor provision was intended.  *See, e.g.*, 17 C.F.R. 229.10(b) (2018) (SEC "encourages the use . . . of management's projections of future economic performance").  Accordingly, these statements are non-actionable.[18]

---

[17]     Nielsen's earnings calls include statements such as "[T]he following discussion contains forward-looking statements [and] may include comments about Nielsen's outlook, expectations, and prospects [that] are based on Nielsen's views as of today."  *See, e.g.*, Ex. K at 3 (Q4 2017 Earnings Call Transcript, Feb. 8, 2018).  The accompanying presentations and press releases likewise expressly note the inclusion of forward-looking statements. *See, e.g.*, Ex. L at 2 (Q4 2017 Earnings Presentation, Feb. 8, 2018); Ex. M at 3 (Q4 2017 Press Release, Feb. 8, 2018).

[18]     In a generic paragraph purportedly applicable to *all* forward-looking statements made by Defendants, Plaintiffs contend that no safe harbor applies to any statement because all statements (i) relate to historical fact or existing conditions; (ii) were not adequately identified as forward-looking; (iii) were not accompanied by meaningful cautionary language; and (iv) were issued by speakers who knew the statements were false when made. *See* ¶ 472.  Plaintiffs cannot vitiate the safe harbor with such generic assertions, but must instead demonstrate its inapplicability to each of the challenged statements.  *See Slayton*, 604 F.3d at 766; *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 793 F. Supp. 2d 651, 669 (S.D.N.Y. 2011).

**E.    The Complaint Seeks Fraud in Non-Actionable Puffery, Corporate Optimism, and Opinion Statements**

The Complaint alleges that Defendants misled the market through a variety of statements that can only be characterized as "expressions of puffery and corporate optimism," which "do not give rise to securities violations." *Rombach*, 355 F.3d at 174.  "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage." *Id.*, citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994).  Such statements are only actionable where "worded as guarantees" or "the speaker does not genuinely or reasonably believe them." *In re Int'l Bus. Mach. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998).

Plaintiffs challenge numerous examples of puffery and corporate optimism:

- "While we certainly don't wish for difficult economic conditions, we're ready for them."  ¶ 287(f).
- "[W]e remain confident in our strategy to manage through the tough environment while building a stronger business . . . ." ¶ 314(c).
- "We're well prepared for GDPR and we're well positioned in the market." ¶ 344(d).
- "China . . . was impacted by some revenue execution issues . . . We've addressed these, and we expect improvement . . ." ¶ 333(b).

*See also* Appendix A hereto.  These statements, and similar statements strewn throughout Plaintiffs' two-hundred page Complaint, are nothing more than expressions of optimism or confidence on which no reasonable investor could rely.  This Court routinely dismisses such allegations.  *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (statements that proprietary platform "differentiate[d] [the company] from competitors around the world" could not "reasonably be found to be misleading"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 399 (S.D.N.Y. 2018), *aff'd* 757 F. App'x 35

(2d Cir. 2018) (statement that company was "a leader in developing and commercializing a broad and diverse portfolio" was puffery); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) (statements expressing "belief in [company's] competitive advantage" not actionable).[19]  The puffery statements in the Complaint cannot sustain allegations of securities fraud because none were framed as guarantees and Plaintiffs cannot show they contradicted Defendants' actual beliefs.

## III.   The Section 20(a) Claims Fail as a Matter of Law

To state a claim for control person liability, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Trust Fund v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).  The Complaint does not plead a primary violation of Rule 10b-5.  Nor does it allege "culpable" participation by any Individual Defendant, which must be pled with the same particularity as scienter under Section 10(b).  *See In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *10-11 (S.D.N.Y. Aug. 12, 2014).  Accordingly, the Section 20(a) claims must be dismissed.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[19]    Even if statements such as the foregoing are characterized as opinions rather than puffery or corporate optimism, Plaintiffs' claims still fail.  As explained in Section II.D, opinion statements are actionable only if the speaker does not hold the belief professed; the facts supplied in support of the belief are untrue; or the speaker omits information that makes the statement misleading to a reasonable investor.  *Martin*, 732 F. App'x at 40.  The Complaint does not satisfy this high standard with respect to the challenged statements.

Dated: November 26, 2019          /s/ Paul C. Curnin
      New York, New York          Paul C. Curnin
                                    Craig S. Waldman
                                    Tyler A. Anger
                                    SIMPSON THACHER & BARTLETT LLP
                                    425 Lexington Avenue
                                    New York, NY 10017
                                    Tel.: 212-455-2000
                                    Fax: 212-455-2502

*Attorneys for Defendants Nielsen Holdings plc, Dwight Mitchell Barns, Jamere Jackson, and Kelly Abcarian*