# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

IN RE NIELSEN HOLDINGS PLC
SECURITIES LITIGATION

——————————————————— x

:   Case No. 1:18-cv-07143-JMF
:
:   PLAINTIFFS' OPPOSITION TO
:   DEFENDANTS' MOTION TO DISMISS
:

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II.  APPLICABLE LEGAL STANDARDS ..............................................................4

III.  ARGUMENT .........................................................................................................6

    A.  Defendants' False and Misleading Statements About the GDPR and the
           Watch Marketing Effectiveness Business in 2018.................................................6

    B.  Defendants' False and Misleading Statements About the Buy Developed
           Market Business in 2016 and 2017.......................................................................15

    C.  Defendants' False and Misleading Statements About the Fair Value of
           Buy Segment Goodwill in 2017 and 2018.............................................................23

    D.  Defendants' False and Misleading Statements About the Buy Emerging
           Market Business in 2017 and 2018.......................................................................27

    E.  Defendants Violated §20(a) of the Exchange Act .................................................30

IV.  CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*In re Avon Sec. Litig.*,
   2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ................................................................ *passim*

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   390 F. Supp. 3d 432 (S.D.N.Y. 2019) ......................................................................... 9

*Barrett v. PJT Partners Inc.*,
   No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ..................... 13

*In re BISYS Sec. Litig.*,
   397 F. Supp. 2d 430 (S.D.N.Y. 2005) ......................................................................... 13

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) ......................................................................... 30

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ............................................................................ 13-14, 27

*Cortina v. Anavex Life Scis. Corp.*,
   2016 WL 7480415 (S.D.N.Y. Dec. 29, 2016) ............................................................. 9

*Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ....................................................................................... 18

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ........................................................................ 13

*Gammel v. Hewlett-Packard Co.*,
   2013 WL 1947525 (C.D. Cal. May 8, 2013) ............................................................... 28

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
   2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ............................................... *passim*

*Hensley v. IEC Elects. Corp.*,
   2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014) ............................................................ 21

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...................................................................................... 20

*Hoff v. Popular, Inc.*,
   727 F. Supp. 2d 77 (D.P.R. 2010) .............................................................................. 26

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ................................................................ 12, 21

**Page**

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
  797 F.3d 160 (2d. Cir. 2015)................................................................30

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d 702 (7th Cir. 2008) ..............................................................20

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011).................................................................................5

*McMahan & Co. v. Wherehouse Entm't, Inc.,*
  900 F.2d 576 (2d Cir. 1990)...................................................................9

*In re MF Glob. Holdings Ltd. Sec. Litig.,*
  982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................26

*Novak v. Kasaks,*
  216 F.3d 300 (2d Cir. 2000)........................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015).............................................................................26

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC,*
  595 F.3d 86 (2d Cir. 2010).....................................................................9

*In re OSG Sec. Litig.,*
  12 F. Supp. 3d 622 (S.D.N.Y. 2014).............................................12, 30

*Pirnik v. Fiat Chrysler Autos., N.V.,*
  2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016).......................11, 14, 15, 18

*Pirnik v. Fiat Chrysler Autos., N.V.,*
  2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017)..........................20-21, 28

*Rombach v. Chang,*
  355 F.3d 164 (2d. Cir. 2004)........................................15, 17, 26, 29

*Rothman v. Gregor,*
  220 F.3d 81 (2d Cir. 2000)...................................................................25

*S. E. C. v. First Jersey Sec., Inc.,*
  101 F.3d 1450 (2d Cir. 1996)...............................................................30

*In re Sanofi Sec. Litig.,*
  155 F. Supp. 3d 386 (S.D.N.Y. 2016)..................................................13

**Page**

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................25

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)...............................................................12

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
   2019 WL 4094559 (S.D.N.Y. Aug. 29, 2019)............................................... *passim*

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. 2010)........................................................................14, 15

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015).................................................................................17

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir 2008)................................................................................15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................5, 18

*Thomas v. Shiloh Indus., Inc.*,
   No. 15 CV 7449 (KMW), 2017 WL 2937620 (S.D.N.Y. July 7, 2017)............ 12-13

*Total Equity Capital, LLC v. Flurry, Inc.*,
   2016 WL 3093993 (S.D.N.Y. June 1, 2016) .....................................11, 12, 21, 25

*In re Veon Ltd. Sec. Litig.*,
   2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018)....................................................30

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)......................................................................14, 27, 28

**Rules and Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)........................5

Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j ..................................1, 4, 30

Securities Exchange Act of 1934 § 20(a), 15 U.S.C. § 78t................................1, 4, 30

17 C.F.R. § 229.303 ...................................................................................................17

Fed. R. Civ. P. 9(b) .....................................................................................................5

**Page**

Fed. R. Civ. P. 12(b)(6)....................................................................................................................4

Plaintiffs[1] respectfully submit this memorandum of law in opposition to Defendants'[2] motion to dismiss the Second Amended Complaint for Violations of the Federal Securities Laws.[3]

## I.   INTRODUCTION

In the SAC, Plaintiffs include numerous facts from corroborating sources which raise a strong and cogent inference – significantly more compelling than any opposing inference – that Defendants knowingly or recklessly made materially false and misleading statements about Nielsen's business during the Class Period (February 11, 2016 – July 25, 2018) in violation of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

Nielsen collects data about what consumers buy and watch, and sells data and analytics. Nielsen provided guidance and reported its financial results in two segments: Buy (consumer purchasing measurement and analytics) and Watch (media audience measurement and analytics). Nielsen reported Buy results in two geographic groups, Buy Developed Markets ("BDM") and Buy Emerging Markets ("BEM").  The Watch segment included the Watch Marketing Effectiveness ("WME") business, which analyzed the effectiveness of advertising campaigns.  During the Class Period, Defendants misled investors about each of these businesses.

In 2018, Defendants repeatedly represented that WME revenues would increase 15%-20% in 2018; that the European Union's General Data Protection Regulation ("GDPR") would not have

---

[1]   "Plaintiffs" include Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") and additionally named plaintiff Monroe County Employees' Retirement System.

[2]   "Defendants" include Nielsen Holding PLC ("Nielsen" or the "Company"), former Chief Executive Officer ("CEO") Dwight Mitchell Barns ("Barns"), former Chief Financial Officer ("CFO") Jamere Jackson ("Jackson"), and Senior Vice President of Product Leadership Kelly Abcarian ("Abcarian").  ¶¶32-41.  All paragraph ("¶") references are to the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") (ECF No. 72).

[3]   "MtD" refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 76).  "Waldman Decl., Ex. _" refers to the exhibits attached to the Declaration of Craig S. Waldman (ECF No. 77).  "Villegas Decl., Ex. _" refers to the exhibits attached to the Declaration of Carol C. Villegas, filed herewith.

"any major impact" on Nielsen's WME business; and that the Company was "ready" for the GDPR and in "good shape" because Nielsen would have "access to all the data needed for its products." They also assured investors that the GDPR was a "net positive," "competitive advantage" and "non-event."  In reality, as Defendants and Nielsen executive Megan Clarken revealed *after* the Class Period, Defendants had no reasonable basis to make these representations because they did not know if Nielsen would have access to all the data needed for its products.  Moreover, no later than May 25, 2018, Defendants knew that hundreds of data providers had cut off Nielsen's access to the data needed for its products – due to the GDPR – but they continued to represent Nielsen would still have access to the data and that the GDPR was a "non-event."  Not until July 26, 2018 did Defendants admit that hundreds of data providers had cut off access to the data and that it caused WME revenues to be "significantly below expectations."  The Company's stock price plummeted 25% in response to this and other unexpected negative news about the Buy business.

Throughout the Class Period, Barns and Jackson also made materially false and misleading statements about Nielsen's Buy business.  In 2016, they repeatedly represented that discretionary spending by BDM clients was "stable," that some softness in discretionary spending was not uncommon, and that Nielsen would report 1.5%-3.5% growth in BDM revenues.  Numerous former Nielsen employees, referred to herein as confidential witnesses ("CWs"), stated that discretionary spending was declining throughout 2016 and on October 25, 2016, Barns and Jackson admitted they knew discretionary spending had been declining *since 4Q15*, that the decline was *permanent,* and that it caused BDM revenues to fall 2.5% in 3Q16.  The Company's stock price plummeted 17% in response to this unexpected negative news but continued to trade at artificially inflated prices because Barns and Jackson continued to mislead investors about the BDM business.

In Nielsen's Forms 10-K for the years ending December 31, 2016 and December 31, 2017, Barns and Jackson misrepresented the value of Buy Segment goodwill, which caused Nielsen to report inflated earnings, assets, and capital in violation of Generally Accepted Accounting Principles ("GAAP"). They concealed from investors that unreasonable and baseless cash flow assumptions were utilized in Nielsen's goodwill impairment model and falsely represented that: (i) impairment was just a risk that "could" materially affect the Company's financial performance; (ii) the undisclosed cash flow assumptions utilized in the goodwill impairment model were "reasonable"; and (iii) the fair value of Buy business goodwill actually exceeded its carrying value "by at least 20%." After the Class Period, and after Barns and Jackson left the Company, Nielsen recorded a $1.4 billion goodwill impairment charge which reduced the value of Buy Segment goodwill by 54%.

In 2017 and 2018, Barns and Jackson misled investors by representing that BEM revenues would increase 8%-10% in 2018, that the business was "exceptionally strong" and "robust," and that they "continue[d] to see solid growth from both local clients and multinationals across the emerging markets." They claimed that "revenue execution issues" in China, that contributed to 4Q17 BEM revenues being less than guidance, had been "addressed" and were "behind" the Company, and that the China market was "very healthy" with "tremendous growth opportunities." In reality, as admitted by Defendants and Nielsen executive Patrick Dodd after the Class Period, BEM clients were significantly reducing spending throughout 2018, particularly in China and Southeast Asia, and the revenue execution issues were still a problem.

Defendants challenge only the SAC's scienter and falsity allegations. But Defendants fail to address many of the facts showing falsity and scienter, including their statements and statements by other Nielsen executives during and after the Class Period, which raise a strong inference Defendants knew facts or had access to information contradicting their public statements. For the facts

Defendants do address, they improperly view them in isolation rather than collectively as required. Defendants devote much of their MtD attacking the CWs; but they mischaracterize the information provided by the CWs, improperly consider the CW allegations in isolation, and misstate the law.

Defendants contend some of their statements were immaterial but improperly view the statements in isolation rather than in context with their other statements.  They ignore binding precedent that establishes their statements were material and not protected by the Company's risk warnings.  Indeed, the facts raise a strong inference Defendants knew their statements were materially misleading and that the risk warnings were too general to be meaningful, and were themselves materially misleading because the warned-of risks had transpired.

When all of the facts in the SAC are considered collectively, they are more than sufficient to state a claim under §§10(b) and 20(a).  Accordingly, Defendants' motion should be denied.

## II.   APPLICABLE LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2019 WL 4094559, at *5 (S.D.N.Y. Aug. 29, 2019) (citing *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018)).  A claim will survive a motion to dismiss if the plaintiff alleges facts sufficient to state a claim to relief that is plausible on its face.  *Id*. (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads "'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plaintiffs' §10(b) claim requires a material misrepresentation or omission ("falsity"), scienter, a connection between the falsity and sale of Nielsen securities, reliance, economic loss, and

loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).[4] Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), require falsity and scienter to be pled with particularity. *Gen. Elec.*, 2019 WL 4094559, at *5 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

To satisfy Rule 9(b), a plaintiff must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id*. (citing *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012)). To satisfy the PSLRA, the complaint must, "'with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id*. at *6. Courts must consider the complaint in its entirety and determine whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Tellabs*, 551 U.S. at 323. The Court must permit a claim to proceed if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 323-24.

Here, Plaintiffs satisfy the PSLRA scienter pleading requirement by alleging facts "'constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *Gen. Elec.*, 2019 WL 4094559, at *6.[5] Plaintiffs allege numerous facts from corroborating sources that raise a strong inference Defendants knew facts or had access to information contradicting their public statements. *Id*. (citing *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015)).

---

[4]   All internal citations and footnotes are omitted and emphasis is added unless otherwise indicated.

[5]   Thus, Defendants' contention that their stock sales are insufficient to demonstrate a fraudulent motive is unavailing. MtD at 9-13. While it is undisputed that Barns and Jackson sold stock at prices far higher than the $22.11 price to which Nielsen's stock price fell after the full extent of the fraud was publicly revealed (¶¶46, 49), there is no allegation that the sales were a motive for Defendants' fraud.

### III.    ARGUMENT

#### A.    Defendants' False and Misleading Statements About the GDPR and the Watch Marketing Effectiveness Business in 2018

From February 8, 2018 through June 14, 2018, Defendants Barns, Jackson, and Abcarian misled investors about the GDPR and its impact on the WME business.

On February 8, 2018, Barns and Jackson stated that WME revenues would increase 15%-20% in 2018 and that Nielsen was "ready" for the GDPR and "[did not] expect to see any major impact" on the Buy and Watch businesses because Nielsen would "still have access to all the data that we're going to need for our products." ¶¶206-07, 331.

On April 26, 2018, Barns and Jackson reaffirmed WME revenue guidance and stated that despite Facebook policy changes limiting the availability of third-party data sets for audience targeting on their platform, Nielsen's "relationship with Facebook remain[s] 'strong,'" and that, unlike other companies, Nielsen "still [had] access to the data the industry needs for independent third-party measurement." ¶¶209-10, 344(a). They assured investors Nielsen was "ready" for the GDPR and saw "the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace." ¶¶210-12, 344(b). After an analyst asked if there had been "any change" in the level of data Nielsen was able to get from Facebook, Barns said Nielsen "still had access to the data we need for our measurement products." ¶¶211, 344(c). For analytics products, Barns said Nielsen "had to make some process changes" and assured investors Nielsen was "still able to deliver all those products to our clients in the marketplace and we don't see any change in that going forward." *Id*. Indeed, he emphasized Nielsen "weathered this period especially well" compared to Facebook's other data partners because Nielsen had "always taken a more conservative approach . . . [to] consumer data privacy." *Id*. He stated Nielsen was "in a very good position" and that they "really

[thought]" that "the implications of the Facebook situation and the implications of GDPR . . . plays as a net positive for our business and our position in the marketplace as it unfolds." *Id*.

During a May 15, 2018 investor conference, Abcarian was asked what the impact would be if Nielsen could not get third party data sets integrated into its own measurement products and assured investors that "if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory." ¶¶213, 346(a).  During a May 31, 2018 investor conference, Barns was asked if ***anything*** had changed about Nielsen's ability to work with Facebook.  ¶¶214, 358.  He responded that Nielsen "still [had] access to all the data that we need for our measurement products" and that, unlike other firms, privacy concerns were a "non-event" for Nielsen because it took a "conservative approach" to how it used, handled and managed data.  *Id*.

At another investor conference on June 5, 2018, Abcarian was asked if policy changes at Facebook had "***any*** impact on Nielsen." ¶¶215, 360.  She responded that Nielsen could access the data from Facebook that Nielsen provided in its measurement products because the data was anonymized and aggregated.  *Id*.  She made the same misleading statement at a June 14, 2018 investor conference and assured investors the GDPR was a "non-event" after being asked if privacy issues had "caused ***any*** new sort of risk or things you've had to deal with in terms of data sources you use and incorporate into your various services." ¶¶216-17, 362.

Statements by Barns, Jackson, and Nielsen executive Megan Clarken after the Class Period establish that Defendants knew in 2Q18 that Nielsen did ***not*** have access to all the data needed for its products and that they had no basis to claim otherwise before 2Q18. ¶¶250-61, 270-72; *Gen. Elec.*, 2019 WL 4094559, at *6 ("'[w]here plaintiffs contend defendants had access to contrary facts, they

must specifically identify the reports *or statements* containing the information'") (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

On September 12, 2018, Clarken revealed that on May 25, 2018 (the effective date of the GDPR), data providers "turned off the ability for [Nielsen] to get *any* data from *any* part of their advertising platforms that would potentially be compromised in terms of GDPR." ¶270. She revealed that 120 campaigns were negatively impacted that day, that Nielsen had to do "a bunch of [compliance] work" before "reactivat[ing] our measurement capabilities on those platforms," and that the compliance work "pretty much *stops the business* during that time while you're putting those things in place." *Id.* On October 25, 2018, Clarken stated "many advertisers stopped targeting ads and sharing data until they felt that they were privacy compliant" and that the resulting compliance work was "very complex" and would not be completed before the end of the year. ¶¶271-72. She disclosed that the assurances about the GDPR in the U.S. market could not have been well-founded before May 25, 2018 because GDPR was a "moving target in the eyes of those [data providers] that had to create compliance within the platforms or the way in which they were doing business" and that Nielsen "saw that as sort of a moving target right up until the last minute." ¶270.

On July 26, 2018, Barns and Jackson admitted they knew in 2Q18 that Nielsen did *not* have access to data from Facebook and hundreds of other data providers for analytical products, preventing Nielsen from closing contracts and recognizing revenues and causing 2Q18 WME revenues to be "significantly below expectations." ¶¶250-61. They revealed that "the digital advertising ecosystem saw a disruption *in the second quarter* as large digital platforms made changes to their offerings to increase security for consumer data," and that clients and data providers were still working toward compliance as it related to targeting and data usage right. ¶258; Villegas Decl., Ex. 1 at 5. They revealed the GDPR disrupted the "entire ecosystem," including "several

hundred clients and . . . data partners," as they "made some changes to their offerings" to increase security for consumer data.  ¶¶257-58.  They acknowledged it was "pretty reasonable" and "pretty logical" that "a lot of Nielsen's clients [were] saying I'm not sure it makes sense to spend money on these kinds of analytics right now" until "things stabilize" and "while the dust" settles.  ¶258.

These admissions directly contradicted Defendants' repeated representations that Nielsen would still have access to all the data needed for its products, that Nielsen was "ready" for the GDPR and in a "very good position," and that the GDPR was a "non-event," "net positive," and "competitive advantage."  Indeed, on May 31, 2018, June 5, 2018 and June 14, 2018 – *after* Defendants knew WME revenues would be "significantly below expectations" because hundreds of data providers had "literally switched off" data access – Defendants concealed these material adverse facts and falsely represented that "[w]e still had access to all the data we need for our measurement products" and that the GDPR was a "non-event."  ¶¶214-17, 270-72, 358-63.  Moreover, they made these false statements in response to analysts asking if the GDPR had "any impact" on Nielsen or if it "caused any new sort of risk or things you've had to deal with in terms of data sources you use and incorporate into your various services."  *Id.*[6]

Information provided by former Nielsen employees shows the GDPR was negatively impacting Nielsen's business *before* data access was cut off on May 25, 2018.  ¶¶220-27; *Novak*,

---

[6]   Even if Nielsen had access to the data needed for its measurement products, which Nielsen's new CFO indicated was untrue (Villegas Decl., Ex. 2 at 18), Defendants misled by concealing that Nielsen did not have access to data needed for its analytical products.  *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers."); *see also In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 449 (S.D.N.Y. 2019) ("'upon choosing to speak,' one acquires a 'duty to be both accurate and complete'") (citing *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)); *Cortina v. Anavex Life Scis. Corp.*, 2016 WL 7480415, at *5 (S.D.N.Y. Dec. 29, 2016) ("Rule 10b-5(b) 'prohibits the telling of material half-truths'").

216 F.3d at 313-14.  Nielsen's former Chief Privacy Officer, Benjamin Hayes ("Hayes"), stated that Nielsen clients were generally nervous about committing to new work because of the GDPR, that by April 2018 the climate in the industry was "dramatically different," and that six weeks before the GDPR went into effect (*i.e.*, April 13, 2018), there was a "noticeable and markedly different" trend in that customers were pulling back.  ¶¶222-23.[7]  Even in his declaration, Hayes states the GDPR negatively impacted Nielsen before the GDPR became effective.  ECF No. 70 at ¶¶7-8.[8]  CW 15 also said customers were pulling back their spending on WME products because they wanted to see the impact of the GDPR before investing in analytics, an action Barns and Jackson acknowledged on July 26, 2018 and admitted was pretty logical and reasonable.  ¶¶57, 225, 258.  CW 16 said that he and many of his WME colleagues were all laid off in June 2018 and that it was not surprising because by 1Q18 Nielsen's WME business was suffering.  ¶¶58, 226-27.

Defendants' repeated assurances about the GDPR support the inference they knew facts or had access to information suggesting their statements were materially misleading because "'[i]n

---

[7]   Hayes filed a declaration stating that he "believ[ed]" statements attributed to him were inaccurate, incomplete and misleading.  ECF No. 70; ¶221 nn.21-22.  Besides that vague conclusory assertion, he does not contest the factual statements attributed to him, and ***his opinions*** on the veracity of Nielsen's disclosures are irrelevant.  ¶221 n.22 (disclaiming reliance on his opinions).

Additionally, Defendants suggest that Plaintiffs' fell short of best practices by not confirming Hayes' statements with him.  MtD at 2, 7, 18-19 (citing *In re Millennial Media Inc., Sec. Litig.*, 2015 WL 3443918, at *11 (S.D.N.Y. May 29, 2015)).  Misleadingly, they fail to disclose that: (i) Plaintiffs sent Hayes a draft of the allegations attributed to him before the complaint was filed on June 21, 2019, and Hayes signed for it; (ii) Plaintiffs then sent a copy of the filed complaint to Hayes and confirmed it was received at his residence; and (iii) Hayes did not raise any dispute until he filed the September 6, 2019 declaration.  Villegas Decl., Exs. 3-4.  Given this, the Hayes declaration should either not be considered or Plaintiffs should be allowed to take discovery.  ¶221 n.21.

[8]   Defendants argue that Hayes was not alleged to be involved in management or have access to management.  MtD at 19 n. 10.  But, statements by CWs are credited if they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak*, 216 F.3d at 314.  Abcarian indicated that Hayes discussed the GDPR with management and Defendants, stating on May 15, 2018 that "everything" Nielsen did related to privacy involved the Chief Privacy Officer.  ¶346(a).

order to speak so knowledgeably regarding the'" topic, Defendant "'must have educated himself regarding'" the topic.  *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 2019 WL 4601644, at *17 (S.D.N.Y. Sept. 23, 2019); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (frequent discussion of misleading topic in press releases, earnings calls and SEC filings raises a strong inference of scienter).  Defendants either knew their statements were false or were reckless by making the assertions without determining if there was a basis for them.  *Novak*, 216 F.3d at 308-09 (recklessness alleged when a defendant consistently makes assertions without determining whether there is a basis for the assertions); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (failure to investigate whether statements were accurate constitutes reckless indifference).  During the July 26, 2018 conference call, analysts noted the adverse disclosures about the GDPR contradicted Defendants' positive statements during the Class Period and questioned why the unexpected negative news was not disclosed previously.  ¶¶253, 256-61.  After the conference call, analysts issued numerous reports highly critical of Defendants, noting the unexpected adverse GDPR disclosures came shortly after Defendants downplayed the GDPR's relevance to Nielsen.  ¶¶262-66.

The magnitude and duration of the GDPR's negative impact on Nielsen's business supplements the inference of scienter.  *Total Equity Capital, LLC v. Flurry, Inc.*, 2016 WL 3093993, at *5 (S.D.N.Y. June 1, 2016).  As noted above, Barns, Jackson, and Clarken admitted the widespread nature of the problem, stating the "entire ecosystem" saw disruption because hundreds of data providers cut off access to data requiring complex compliance work that would not be completed before the end of the year.  Nielsen reported just a 6% increase in WME revenues in 2Q18, which was "significantly below" expectations, and told investors WME revenues would be "flat" in FY18 rather than increase 15%-20% as previously represented.  ¶¶230-34.  They actually

*declined* 4% in FY18.  ¶275.  In October 2018, the Company's new CFO revealed the privacy changes would also slow down the Watch Audience Measurement business, which generated $1.8 billion of revenue through September 30, 2018, the most revenue of any Nielsen business and more than seven times the revenue generated by the WME business.  ¶271; Villegas Decl., Ex. 2 at 18.  In April 2019, the new CFO revealed that FY19 guidance reflected "continued pressures related to privacy" that was "something that's going to be with us for a while."  ¶277.

The close proximity between Abcarian's misrepresentations on June 14, 2018 and the July 26, 2018 revelation of the truth strengthens the inference of scienter.  *Total Equity Capital*, 2016 WL 3093993, at *5; *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385-86 (E.D.N.Y. 2003).  It is implausible Abcarian did not know her statements were false as just two weeks remained in 2Q18 and data access had already been cut off by hundreds of data providers.

The circumstances and timing of Barns's "retirement" strengthen the inference of scienter because it was unexpectedly announced July 26, 2018, when Nielsen revealed the unexpected negative news about the GDPR and the Buy business.  ¶¶229, 461;  *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) (resignations on same day as unexpected negative news supports scienter).  Defendants' authority is not to the contrary.  MtD at 19;  *see, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 381, 394 n.176 (S.D.N.Y. 2007) (resignation on day that negative news was revealed was "'highly unusual and suspicious'").

Additionally, the statements by Mr. Hayes further confirm Nielsen's scienter—such statements show that Hayes knew of the issues related to GDPR by April 2018.  ¶¶220-23; *cf.* 224-27.  The knowledge of Mr. Hayes—who held a "Chief" title, was responsible for Nielsen's global privacy program, and discussed "everything" related to privacy with Defendant Abcarian—can be imputed to Nielsen.  ¶¶56, 346(a); *see Thomas v. Shiloh Indus., Inc.*, 2017 WL 2937620, at *3

(S.D.N.Y. July 7, 2017) ("judges have imputed scienter . . . from employees [at] many different positions with varying degrees of seniority."); *e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (imputing scienter from regional VP and VP of corporate finance); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408-09 (S.D.N.Y. 2016) (imputing scienter from VP of Special Projects and VP of U.S. Diabetes Unit).  *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017) (imputing scienter to parent company from CFO of subsidiary).

Defendants do not dispute or even address many of the facts summarized above, including the statements by Clarken.  Instead, they make arguments that ignore and mischaracterize many of the facts alleged and misstate the law.  Defendants contend their statements on February 8, 2018 (that some things Nielsen had to do to ensure compliance with the GDPR were manageable and that Nielsen would still have access to all the data they were going to need) were not misleading because their admissions that the impact of the GDPR was greater than anticipated is just fraud by hindsight. MtD at 23-24.  That contention ignores the fact that before the GDPR became effective on May 25, 2018, Defendants did not know if Nielsen would have access to all the data it needed or if compliance was manageable, and therefore had no reasonable basis to make the statements. Defendants' reliance on *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809 (N.D. Cal. 2019), is misplaced.  MtD at 24.  In that case, the statements were forward-looking opinions and informed investors there could be limits on data usage.  *Facebook*, 405 F. Supp. 3d at 826-27, 834-35.  Here, Defendants repeatedly stated Nielsen would have access to all the data needed for its products.

Defendants contend one statement made on April 26, 2018 ("'[w]e're well prepared for GDPR and we're well positioned in the market'") is an immaterial generalized optimistic statement. MtD at 29 (citing ¶344(d)).  But the statement was not a general statement about reputation or integrity, or an explicitly aspirational statement.  *City of Pontiac Policemen's & Firemen's Ret. Sys.*

- 13 -

*v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).  Further, the test for materiality is "'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'"  *Gen. Elec.*, 2019 WL 4094559, at *5 (emphasis omitted) (citing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016)).  When Defendants assured investors Nielsen was well prepared and well positioned for the GDPR, they also made many other assurances, including that Nielsen would still have access to the data needed for ***all*** its products.  ¶344; *Pirnik*, 2016 WL 5818590, at *6 (comforting statements about compliance measures viewed in combination with other statements "'could be found by a trier of fact to be . . . misleading'").  Defendants repeatedly made these statements and similar statements they now contend are immaterial, thereby communicating to investors they were important.  ¶¶331, 344, 358, 362; *Avon*, 2019 WL 6115349, at *16.

Defendants contend their statements that Nielsen did not expect any major impact on the business from the GDPR were forward looking and not actionable under the PSLRA safe harbor because Nielsen included a risk factor in the 2017 Form 10-K which disclosed compliance with the GDPR was resulting in operational costs.  MtD at 5, 27-28; Waldman Decl., Ex. A at 18.[9]  That disclosure was too "boilerplate," "general," and "vague" to be meaningful because it failed to disclose that Nielsen not having access to all the data needed for its products would cause significant declines in revenue.  *AMC*, 2019 WL 4601644 at *14 (citing *Slayton*, 604 F.3d at 770-72); *Slayton*, 604 F.3d at 772 ("'[c]autionary language must be extensive and specific,'" and "convey[] substantive information").  Nielsen not changing the cautionary language in the Forms 10-Q filed in 2018, even after data access was cut off no later than May 25, 2018, bolsters Plaintiffs' claim that it was not meaningful.  *Slayton*, 604 F.3d at 772-73.

---

[9]   Defendants do not contend that the other language in the risk factor was meaningful.  *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (refusing to consider language defendants did not argue was meaningful cautionary language).

Clarken's statements show that Defendants knew their statements before May 25, 2018 were misleading because they did not know if Nielsen would still have access to all the data needed for its products. *Id*. at 775 (facts supporting an inference defendants did not know a fact establishes defendants had no reasonable basis for asserting the fact). Moreover, after hundreds of data providers cut off access to their data no later than May 25, 2018, Defendants knew their statements, including the risk factor included in the 2017 Form 10-K (¶370) were false. *Id*. at 774-75; *Rombach v. Chang*, 355 F.3d 164, 173 (2d. Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").

Defendants' contention that no alleged facts support scienter as to Abcarian or Nielsen, MtD at 20, ignores the numerous facts included in the SAC, many of which Defendants do not address.[10]

## B.   Defendants' False and Misleading Statements About the Buy Developed Market Business in 2016 and 2017

From February 11, 2016 to September 26, 2016, Barns and Jackson made materially false and misleading statements about the BDM business. On February 11, 2016, they stated that BDM revenues would increase 1.5%-3.5%, and assured investors that spending by BDM clients was "stable" and that those clients were "pivoting to growth" despite "difficult economic conditions" and "market volatility." ¶¶81-83, 285-87.[11] In the Company's 2015 Form 10-K filed on February 19,

---

[10] The statements by Barns, Jackson, and Abcarian are attributable to Nielsen because they were agents of the Company. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[11] Contrary to Defendants' contention (MtD at 29), Barns' statement on February 11, 2016 that Nielsen was ready for difficult economic times was not immaterial puffery when viewed in context with Defendants' other representations. *Gen. Elec.*, 2019 WL 4094559, at *5; *Pirnik*, 2016 WL 5818590, at *6. Barns was summarizing his opening remarks during the conference call, including his representation that retailers had "a growing need for [Nielsen's] analytics," when retailers were reducing discretionary spending on analytics. ¶287(c). Later in the call, Jackson falsely represented that discretionary spending was stable and that BDM clients were pivoting to growth and investing in analytics and innovation. ¶287(e).

2016, Barns and Jackson represented that during challenging economic times Buy segment clients "may" reduce discretionary advertising spending and "may" be less likely to purchase Nielsen's analytical services, which in turn "would" have an adverse effect on revenue. ¶368.

On April 20, 2016, Barns and Jackson reaffirmed FY16 guidance and stated they "remain[ed] confident in our plan to deliver on all of the operational elements that we laid out on the fourth quarter call." ¶¶85, 289. They represented that the BDM business remained "solid" and that "discretionary spend remained stable with relative strength in areas like innovation." ¶¶86, 289. Defendants stated that discretionary spending was a bit lower in 1Q16 but that it was not uncommon for discretionary spending to be a little lumpy after a big quarter. *Id.*

On July 26, 2016, Nielsen reported a 0.9% increase in BDM revenues (less than guidance) due to softer discretionary spending. ¶91. But Barns and Jackson reaffirmed FY16 guidance and assured investors that they "remain[ed] confident in our plan to deliver on all of the operational elements that we laid out at the beginning of the year." ¶¶90-91, 293. They downplayed the softer spending, stating it was "not uncommon to see these dynamics from time to time." ¶¶295-96.

At a September 26, 2016 J.P. Morgan Investor conference, just four days before the end of 3Q16, Barns addressed discretionary spending by stating that "clients prefer real-time analytics . . . over more bespoke solutions" and that Nielsen's "most important initiative" – the Connected Buy system – would allow the Company to provide those real-time analytics at a lower cost. ¶298.

On October 25, 2016, Barns and Jackson admitted they knew facts which contradicted their statements in 2016 – that discretionary spending by BDM clients had been declining throughout 2016. ¶¶133-48, 414-16. *Gen. Elec.*, 2019 WL 4094559, at *6; *Novak*, 216 F.3d at 312-13. Jackson admitted that "a pretty strong discretionary environment" caused BDM revenues to grow 4.8% in 4Q15 but that the Company "[had] not seen that since then" as BDM results had "sequentially been

going in the other direction." ¶¶145, 415.  Barns also admitted the spending declines were occurring throughout 2016 and that spending declines by food and beverage manufacturers began in 2015. ¶¶136, 143, 414, 416.  He also admitted the decline in discretionary spending was "not new" or "lumpiness" but "a secular shift, not a passing phase or a cycle that will swing back."  ¶¶139, 143, 145-46, 414.

Barns admitted that Nielsen had implemented various initiatives to address the decline in spending throughout 2016, stating, "earlier this year as we saw these more challenging trends unfolding we realigned our Buy business to be more focused in our product development and more efficient in our overhead." ¶¶136, 414.  He admitted that "as the trends continued for our clients, we stepped up our efforts" and "[w]e've been hard at work on these initiatives." ¶¶136-37, 414.  This admission—that Defendants "saw" and responded to the trend—is more than sufficient to establish knowledge of the undisclosed trend.

Defendants' knowledge of the trend establishes that they violated Item 303 of SEC regulation S-K, 17 C.F.R. §229.303, which requires disclosure of any known trend and its reasonably likely material impact on results. ¶¶364-69; *Stratte-McClure*, 776 F.3d at 101-03.  Defendants' contention that Plaintiffs fail to allege knowledge of the decline, MtD at 25-26, ignores their admissions and other facts described below.  Defendants' knowledge of the spending declines also establishes they knew the risk warnings in the 2015 Form 10-K (¶368) were misleading because the warned-of risks – reduced discretionary spending – had materialized.  *Rombach*, 355 F.3d at 173.

Defendants' knowledge of the permanent decline in discretionary spending in 2016 is strongly inferred from their repeated representations about discretionary spending and BDM revenues, and their representations in the 2015 Form 10-K that visibility into the Company's future performance was a "competitive advantage" because more than 60% of Buy Segment revenues were

committed to at the beginning of the year; and the Buy segment generated stable revenue streams characterized by longstanding and multi-year contractual relationships. ¶¶126-30, 421; *AMC*, 2019 WL 4601644, at *17; *Pirnik*, 2016 WL 5818590, at *7.[12]  Further, Defendants knew any decline in discretionary spending would have a larger impact on FY16 results because, as they revealed on October 25, 2016, the discretionary analytic/insights portion of BDM revenues – which Defendants stopped reporting in FY16 – had increased from 25% to 30% or more in FY16.  ¶127.  Analysts noted the importance of Defendants' assurances about discretionary spending when they were made (¶¶84, 87, 92) and then questioned Defendants during the October 25, 2016 conference call about when they really knew about the spending declines given their prior representations.  ¶¶143-46, 420.  After the conference call, analysts reported they were surprised by the "unexpectedly negative discretionary Buy commentary," that it was "hard for us not to be critical about . . . the surprising nature of the miss" given Defendants' previous representations and their "boasts about the visibility of the business" and that the situation "invites . . . credibility issues."  ¶¶148, 421.

Information provided by former Nielsen employees corroborate Defendants' admissions and provide an additional adequate basis for believing their statements were knowingly false when made. ¶¶42-60, 94-132, 417; *Novak,* 216 F.3d at 314.   The witnesses are described with sufficient particularity (job title, responsibilities, and when employed at Nielsen) to support the probability that a person in the position would possess the information alleged.  ¶¶42-60; *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).  The former employees corroborate one another and are corroborated by the other facts alleged.  *Tellabs*, 551 U.S. at 310.

---

[12]   Defendants contend their visibility into Nielsen's future financial results is a conclusory allegation they knew about the decline in discretionary spending and BDM revenues in 2016.  MtD at 14-15.  But that contention improperly views the allegation in isolation.  *Tellabs*, 551 U.S. at 310.  Considered with the other facts, Defendants' boasts about visibility into Nielsen's future results strengthens the inference they knew about the declines and their impact on BDM revenues.  *Id*.

Former Nielsen employees stated that real-time data about Nielsen's financial performance was available to those within the Company, including Defendants, and that the data showed BDM clients were reducing discretionary spending in 2015 and throughout 2016.  ¶¶94-132, 417.  CW 1, CW 6, CW 8, CW 17, and CW 18 said the spending declines and deteriorating sales began no later than 2015.  ¶¶94-98.  CW 1 said the spending declines were a "new norm" and a "constant theme" of discussion during monthly and weekly revenue calls, in which CW 1 participated with senior management, including Jackson.  ¶94.  CW 5 said the missed results publicly revealed on October 25, 2016 had been building over time.  ¶95.  CW 6 participated in a meeting in summer 2016 where the spending declines were discussed and said employees were asked to resign after the meeting. ¶96.  By fall 2015, Nielsen's largest clients were telling CW 8 that they did not need the Company's analytical products and that the problem was discussed during meetings.  ¶¶97, 103.  CW 17 said deteriorating sales were discussed during weekly sales tracking meetings in 2015.  ¶98.

Former Nielsen employees also said clients were reducing discretionary spending because Nielsen did not offer real-time data.  ¶¶100-04.  CW 1 said this problem "came to a head" in 2015 when Nielsen competitors InfoScout and Market Track offered real-time analytics.  ¶100.  CW 7 said the slowdown in the Buy segment in 2016 was caused by clients reducing spending on Nielsen's analytical products and instead purchasing real-time analytical products from Nielsen competitors. ¶102.  CW 15 said the Buy business was in "terminal decline" due to increased competition and large clients conducting their own analysis of data.  ¶104.

Former Nielsen employees described reports provided to Defendants and meetings Defendants attended that related to forecasted and actual revenues by business unit and client. ¶¶115-25.  CW 1 received weekly reports provided to Barns, Jackson, and others that detailed revenues by client and said Barns and upper management participated in quarterly meetings where

they were discussed in depth.  ¶117.  CW 3 said detailed reports tracking actual and forecasted metrics, including sales, could be accessed by Defendants and were presented to Barns on at least a quarterly basis.  ¶¶119-20.  CW 4 compiled weekly forecasts of revenue, costs, and EBITDA by business unit that were discussed during weekly conference calls, in which Jackson regularly participated.  ¶¶121-23.  CW 17 said that revenue projections were kept in Excel spreadsheets, that he participated in weekly sales tracking meetings for the U.S. consumer insights business, and that the Managing Director of Consumer Insights & Innovation, Mike de Vere, provided monthly updates on forecasted sales to Nielsen's corporate office.  ¶124.  CW 18 said that projected revenues for the Canadian division were reported to the Canadian finance team on a quarterly, monthly, weekly and even daily basis and that the Canadian finance team participated in revenue calls every two weeks with executives in Nielsen's corporate headquarters, including Jackson.  ¶125.

Without citing any supporting facts, Defendants contend the information provided by the CWs must be discounted because they may not exist or may be lying, disgruntled former employees with axes to grind.  MtD at 15-16 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007)).  Numerous courts have rejected *Higginbotham*, noting that the "weight of the case law points in the other direction."  *AMC*, 2019 WL 4601644, at *17.  The Seventh Circuit has noted the rule is limited to where none of the CWs worked for the defendant corporation and not applicable if, as here, the CWs were in a position to know the facts attributed to them.  *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 711-12 (7th Cir. 2008).

Defendants' contention that the CWs just speculate Defendants were aware of, or had access to information about, the spending declines in 2016 (MtD at 2, 15-16) ignores the specific reports and meetings described by the witnesses.  Thus, the authority cited by Defendants, including *Pirnik v. Fiat Chrysler Autos., N.V.*, 2017 WL 3278928 (S.D.N.Y. Aug. 1, 2017), is inapposite.  In *Pirnik*,

this Court found that vague statements by witnesses that emissions reports were provided to management were insufficient to raise a strong inference of scienter because there were not ***any*** allegations Defendants received test results, reports or other communications indicating that vehicles were not in compliance with emission regulations. *Pirnik*, 2017 WL 3278928, at *2. Here, the reports and meetings described by the witnesses, and Defendants' admissions, establish that Defendants knew discretionary spending was declining throughout 2016.

Defendants contend none of the CWs asserted that Defendants had knowledge of any falsity and that none of the CWs directly interacted with the Defendants. MtD at 2, 5-6, 15-18. "The notion that the CWs cannot be believed because none had direct contact with any individual Defendant is contrary to law." *Avon*, 2019 WL 6115349, at *21.

The magnitude and duration of the negative impact the spending declines had on Nielsen's BDM business strengthens the inference of scienter. *Total Equity Capital*, 2016 WL 3093993, at *5; *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014). Nielsen reported a 2.5% decline in 3Q16 BDM revenues and slashed guidance. ¶¶133, 135, 419. Barns admitted the spending declines were a permanent trend that would continue over the long run. ¶¶139, 143. They did. BDM revenues ***declined*** 5.2% in 2017 and 5.1% in 2018. ¶¶419, 449.

The close proximity between Barns' September 26, 2016 statements and the unexpected negative news revealed on October 25, 2016 strongly suggests he knew about the spending declines and its negative impact on Nielsen's results. *Total Equity Capital*, 2016 WL 3093993, at *5; *Keyspan*, 383 F. Supp. 2d at 385-86. It is implausible he did not know as there were only four days left in 3Q16 when Barns made the statements.

Nielsen's stock continued to trade at artificially inflated prices after the October 25, 2016 adverse disclosures because Defendants did not reveal the full impact of the spending declines and

continued to make misleading statements.  On December 8, 2016 and February 9, 2017, Barns and Jackson stated that BDM revenues would decline just 1.0%-1.5% in 2017, that it was a "pretty conservative" estimate and that 2017 would be a transition year that would lead to a stronger and higher margin business in 2018.  ¶¶154-56, 304-11.  Several facts raise a strong inference Defendants had no reasonable basis to make these claims.  ¶¶424-35.  The CWs described the magnitude of the spending declines and Defendants admitted on April 25, 2017, that "significant downward spending pressure" caused BDM revenues to decline 7.3% in 1Q17 and that they would be down low single digits for the year.  ¶¶159-61, 424-26, 429.  Nielsen reported declines in BDM revenues every quarter in 2017 and 2018.  ¶¶428, 449.  The cause and magnitude of the 1Q17 revenue decline, the subsequent revenue declines and Defendants' repeated boasts about their visibility into Nielsen's future results, shows they had no reasonable basis for their statements.

On July 27, 2017, Barns and Jackson stated that BDM revenues would be down 3%-5% in 2017 but that they would improve and be "flat" in 2018.  ¶¶163-64, 316.  Additional facts raise a strong inference Defendants knew they had no reasonable basis for this representation.  ¶¶424-35.  In the very next quarter, Defendants revealed that BDM revenues would decline in 2018 – not during their prepared remarks but only after an analyst asked Jackson to confirm the "flat" guidance previously provided.  ¶430.  Further, the guidance was lowered even though: (i) year-to-date revenue trends in the Buy segment were in line with the framework provided on July 27, 2017; (ii) soft spending by BDM clients had improved in 3Q17 after being down double-digits in the first half of the year; and (iii) the BDM business was stabilizing with improving fundamentals.  ¶433.  Analysts criticized Defendants, including one who reported that Nielsen "walking [the guidance] back just one quarter later (and not proactively) further hurts its credibility."  ¶¶168, 435.

C.     **Defendants' False and Misleading Statements About the Fair Value of Buy Segment Goodwill in 2017 and 2018**

In the Forms 10-K for the years ending December 31, 2016 and December 31, 2017, Defendants made materially misleading statements about the value of Buy Segment goodwill, which caused Nielsen to report inflated earnings, assets, and capital in violation of GAAP.  ¶¶157-58, 187-89, 278-80, 372-411, 456-60.  Defendants misled investors in the 2016 Form 10-K by representing that: (i) any downward revisions in the fair value of Nielsen's goodwill were just a risk that "could" materially affect the Company's financial performance; (ii) total assets in the Buy business were $6.697 billion (including $2.696 billion of goodwill); (iii) the "expected future cash flows and growth rates" utilized in the goodwill impairment model were "based on assumptions about the level of business activity in the market place as well as applicable cost levels that drive [their] budget and business plans"; (iv) they "believe[d] that the estimates and assumptions we made are reasonable"; and (v) the Company's annual goodwill impairment assessment "resulted in no impairment" and that the fair value of Buy business goodwill actually exceeded the $2.696 billion carrying value "by at least 20%."  ¶¶157-58, 373-74, 386, 457.[13]

Defendants provided the assumed discount rates (2016: 8.5%-9.5%; 2017: 9%-12%) and long-term growth rates (2016: 1%-3%; 2017: 2.5%-3%) used in their impairment model but failed to include the assumed cash flows and growth rates.  ¶¶380-81, 393.  After Nielsen belatedly recorded a $1.4 billion impairment charge in 2019, Nielsen disclosed sufficient information for Plaintiffs to determine the assumed cash flows and growth rates Defendants used in their impairment assessment.  ¶¶380-85, 393-95.  Plaintiffs determined that an 8.2% cash flow growth rate in 2016 and a 19.7%

---

[13]   The same statements were in the 2017 Form 10-K except total Buy assets were $6.862 billion, including $2.844 billion of goodwill.  ¶¶187-89; Waldman Decl., Ex. A at 24, 34-35, 79-80.

cash flow growth rate in 2017 were required for the fair value of Buy Segment goodwill to exceed the carrying value by 20%.  ¶¶383-85, 394-95.

The assumption that Buy Segment cash flows would increase 8.2% from 2017-2021 was unreasonable because Buy segment revenues grew just 0.9% in 2016; 2017 Buy segment revenues were projected to range between a 0.5% increase and a 0.5% decrease; and Buy Segment adjusted EBITDA declined *every* year from 2011 to 2016, with an overall 9.1% decline from 2011 ($685 million) to 2016 ($623 million).  ¶¶385-86.[14]  The fair value of Buy Segment goodwill would have been $300 million lower than the $2.696 billion carrying value if a 0.5% growth rate was utilized and impairment was worse if more reasonable assumptions were utilized.  ¶¶387-91, 406.

The misrepresentations in the 2017 Form 10-K were much more egregious because the assumed cash flow growth rate increased to 19.7% despite further deterioration in the Buy Segment.  ¶¶392-404.  The concealed assumption that Buy segment cash flows would grow 19.7% from 2018 to 2022 was baseless because Buy Segment revenues *declined 3.3%* in 2017; 2018 Buy Segment revenues were projected to range between a 1.0% increase and a 1.0% decrease in 2018, and Nielsen reported *declines* in Buy Segment adjusted EBITDA every year from 2013 to 2017, and a 13.2% overall decline from 2012 ($676 million) to 2017 ($587 million).  ¶¶395-98.  A 5% growth rate

---

[14]    Adjusted EBITDA for the Buy Segment was the largest and most important component of cash flows for the Buy reporting unit.  ¶386 n.33.  In the 2016 and 2017 Forms 10-K, Nielsen defined adjusted EBITDA "as net income or loss from our consolidated statements of operations before interest income and expense, income taxes, depreciation and amortization, restructuring charges, stock-based compensation expense and other non-operating items from our consolidated statements of operations as well as certain other items considered outside the normal course of our continuing operations."  Waldman Decl., Ex. A at 40-41.  The Company also reported that adjusted EBITDA was "a significant measure of performance for management purposes" and "provides useful information to investors regarding financial and business trends related to our results of operations" and, when viewed with GAAP financial information, "provided investors with a more meaningful understanding of our ongoing operating performance."  *Id.*

would be unreasonably high given the actual results in the Buy Segment from 2012-2017 but would still require a $1.4 billion impairment charge.  ¶400-02.

The 39.3% decline in Nielsen's stock price from July 22, 2016 and February 8, 2018 strengthens the inference Defendants knew their goodwill representations in the 2017 Form 10-K were materially misleading.  ¶459.  All of the price declines were caused by unexpected negative news about the Buy business, and GAAP requires a "sustained decrease in share price" to be considered in evaluating impairment.  *Id*.  Nielsen did not record any goodwill impairment charge until the $1.4 billion charge was recorded in February 2019, after Barns and Jackson left the Company.  ¶¶278-80, 372, 460; *Gen. Elec.*, 2019 WL 4094559, at *12 (successive write downs of goodwill during the class period "'contradicts an inference of scienter'"); *id*. (factual allegations linking executives' resignation to alleged fraud raises a strong inference of scienter).

The magnitude of the $1.4 billion impairment charge, which reduced Buy segment goodwill 54% and caused reported earnings in 4Q17, 1Q18 and 2Q18 to be overstated by as much as 1,228%, supports scienter.  *Total Equity Capital*, 2016 WL 3093993, at *5; *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir. 2001).  So do the GAAP violations.  ¶¶404-411; *Novak*, 216 F.3d at 309; *Avon*, 2019 WL 6115349, at *17-*21. Defendants violated GAAP by failing to record an impairment charge, ¶406; utilizing unreasonable and baseless growth rates, ¶¶407-11; and failing to consider the sustained decrease in Nielsen's stock price.  ¶459.  The failure to record the impairment charge also violated Nielsen's goodwill valuation policy.  *Novak*, 216 F.3d at 311; *Rothman*, 220 F.3d at 91; *Scholastic*, 252 F.3d at 77.

Contrary to Defendants' contentions (MtD at 26-27) these facts – which Defendants do not dispute – raise a strong inference Defendants did not believe their representations that the assumed, but undisclosed, cash flow growth rates were "reasonable" and "based on assumptions about the

level of business activity in the market place as well as applicable cost levels that drive [their] budget and business plans" or that the fair value of Buy Segment goodwill exceeded the carrying value "by at least 20%."  ¶¶373, 386; *Gen. Elec.*, 2019 WL 4094559, at *9 (opinion statements actionable if defendants "'did not hold the belief [they] professed'").

These facts also show Defendants' statements were materially misleading because they failed to disclose the assumed cash flow growth rates but disclosed other key assumptions.  *Id.* (opinion statements actionable "if the statement 'omits material facts about the issuer's inquiry into or knowledge concerning [the] opinion, and . . . those facts conflict with what a reasonable investor would take from the statement itself'").   Indeed, the unreasonable and baseless cash flow assumptions did not "'fairly align'" with information (actual Buy Segment results and projected future results) in Defendants' possession at the time.  *Id.*; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187-92 (2015), at 1328-30; *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 313-14 (S.D.N.Y. 2013) (projections of increased income unreasonable if high-risk or unsustainable); *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 90 (D.P.R. 2010) (unreasonable to interpret historical results as an aberration or anything but a continuing condition).   Moreover, the SEC required Defendants to disclose these "critical accounting estimate[s]" because they were subjective, were susceptible to change, and materially impacted Nielsen's financial results.  *Avon*, 2019 WL 6115349, at *10 (citing SEC Release No. 33-8350).

The foregoing facts also raise a strong inference Defendants knew the risk warnings in the 2016 and 2017 Forms 10-K (¶¶157, 187) were materially false and misleading because the warned-of risks – goodwill impairment – had materialized.  *Rombach,,* 355 F.3d at 173.[15]

---

[15]   In a footnote, Defendants contend Plaintiffs fail to explain how the post class period $1.4 billion goodwill impairment charge caused losses during the Class Period.  MtD at 27 n.15.  The failure to record the $1.4 billion charge during the Class Period concealed the true condition of the Buy

D.    **Defendants' False and Misleading Statements About the Buy
      Emerging Market Business in 2017 and 2018**

From October 25, 2017 through May 31, 2018, Defendants made material misrepresentations about the BEM business.  On October 25, 2017 Barns and Jackson falsely represented that an "exceptionally strong" and "robust" BEM business was "led by strength in Latin America, Eastern Europe, Southeast Asia and Greater China," would "continue to be a growth engine" and would cause revenues to grow 8%-10% in 4Q17 and 2018.  ¶¶170, 322(c).  On November 9, 2017, they stated that Nielsen "continue[d] to see very strong growth" and "tremendous momentum" in the BEM business, that BEM revenues would grow 8%-10% in 2018 and that they had "a lot of confidence in our emerging markets profile going into 2018."  ¶¶174-75, 324-25.

After revealing just a 4.8% increase in 4Q17 BEM revenues on February 8, 2018, Barns and Jackson repeatedly represented that "revenue execution issues" in China that contributed to the disappointing results had been "addressed" and were "behind" the Company, that the underlying market in China was "very healthy" with "tremendous growth opportunities," and that Buy Emerging Market revenues would still increase 8%-10% in 2018.[16]  ¶¶179-86, 329, 333 (2/8/18), 337 (2/28/18), 190-93, 341-42 (4/26/18), 196-97, 348, 350 (5/16/18), 198-201, 354 (5/31/18).

Segment thereby inflating Nielsen's stock price.  Although Nielsen's stock price did not decline following the disclosure of the charge on February 28, 2019, it declined 25% on July 26, 2018 when the true financial condition of the Buy Segment was fully revealed, including, *inter alia*, that adjusted EBITDA decreased 8.1%, or 8.2% on a constant currency basis in 2Q18, compared to 2Q17.  That is sufficient to allege loss causation. *Vivendi,* 838 F.3d at 261-63.

[16]    The representation on February 8, 2018 that the revenue execution issues in China had been addressed was not immaterial puffery as Defendants assert (MtD at 29) because it was not a general statement about reputation or integrity, or an explicitly aspirational statement.  *City of Pontiac*, 752 F.3d at 183.  Rather, it addressed measurable areas of Nielsen's performance (whether the revenue execution issues had been addressed) and misrepresented existing facts (they were not). *AMC*, 2019 WL 4601644, at *13; *Novak*, 216 F.3d at 315.  Barns again assuring the issues had been addressed in response to an analyst's question on February 8, 2018 (¶333(b), 444) and Jackson falsely assuring investors on May 16, 2018, that the challenges in China were behind the Company also establishes materiality.  ¶¶350, 444; *Avon*, 2019 WL 6115349, at *16.

Several facts raise a strong inference Defendants knew about the revenue execution issues in China and spending declines by BEM clients by October 25, 2017.  Defendants revealed unexpected negative news about the BDM business (reduced revenue guidance) for the third time on October 25, 2017, ¶¶167-71, and did not want to also disclose weak spending by BEM clients or it preventing Nielsen from reporting 8%-10% BEM revenue growth.  *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) ("It is far from implausible that a corporate executive who had spent months building excitement and momentum . . . might recklessly misrepresent the inability to deliver on those promises."); *Vivendi*, 838 F.3d at 250.  CW 3, CW 4, CW 9, CW 10, CW 11, CW 12, and CW 13, stated that BEM clients were reducing spending in 2017 and 2018, including clients in China.  ¶¶105-14; *Novak*, 216 F.3d at 313-14.  CW 1, CW 2, CW 3, CW 4, and CW 17 stated that Defendants had access to reports that reflected the spending declines and participated in meetings where client budgets and revenues were discussed.  ¶¶115-25.

Defendants' knowledge is plausibly inferred from their repeated statements about their visibility into Nielsen's future results and that the Chinese market was the most important growth market in the world.  ¶¶126-30, 184; *Pirnik*, 2017 WL 3278928, at *2; *Novak*, 216 F.3d at 309.  Further, these were the same multinationals that were reducing BDM spending for the past two years.  ¶314(d).  The magnitude of the revenue miss in 4Q17 and the continuation of the problems throughout 2018 strengthen the inference Defendants knew of the problems by October 25, 2017.  The 4.8% increase in BEM revenue in 4Q17 was substantially less than the 8%-10% growth Defendants repeatedly told investors to expect, and Nielsen reported just 0.3% growth in 2Q18, a ***decline*** of 2.5% in 3Q18, a 4% increase in 4Q18, and just a 2% increase in FY18.  ¶454.

The foregoing facts and other facts raise a strong inference Defendants knew their statements from February 8, 2018 through May 31, 2018 were materially misleading.  On July 26, 2018,

Defendants unexpectedly revealed that BEM revenues increased just 0.3% in 2Q18; that they would be "roughly flat" in 2018; and that the cause of the disappointing results was significant weakness in spending by BEM clients, particularly in China and Southeast Asia.  ¶¶235-49.  Jackson admitted Defendants knew of the weak spending ***throughout 2Q18***, stating, "***[w]e saw a fairly significant pullback in multinational client spend, really, across the emerging markets as we went through the quarter***."  ¶¶240, 453; *Gen. Elec.*, 2019 WL 4094559, at *6; *Novak*, 216 F.3d at 309-12.  On October 25, 2018, Dodd revealed that Nielsen's larger multinational clients had been reducing spending ***throughout 2018***, stating that "what ***we have been seeing over this year*** for some of our larger clients is pulling back on some of their lower-priority brands."  ¶¶274, 452.

On July 26, 2018, Jackson also revealed the revenue execution issues in China were still a problem, stating, "[q]uite frankly, we still have more work to do operationally there" and "we have to get China right in order for our Emerging Markets to grow."  ¶¶238, 445.  On October 25, 2018, Dodd revealed Nielsen was still rebuilding and strengthening the Company's commercial teams across China.  ¶¶273, 445.  Dodd stated China was a "key component" to Nielsen's Emerging Markets growth plan and a "critical piece of [Nielsen's] emerging market story" because China generated approximately $200 million in revenue.  ¶448.[17]  During the conference call, an analyst noted the broad-based problems in the BEM business contradicted Defendants' previous assurances and asked what "really happened" and why it was not known before.  ¶240.  Jackson admitted the significant pullback in spending was known throughout 2Q18 and not expected to abate but failed to explain why it was not disclosed earlier.  *Id*.  After the July 26, 2018 conference call, analysts issued reports in which they criticized Defendants and questioned their credibility.  ¶¶234, 244-49.

---

[17]   The statements by Barns, Jackson, and Dodd show that the risk warning Defendants contend insulate them from liability (that "difficulties in managing international operations . . . could adversely affect [Nielsen's] business" (MtD at 24; Waldman Decl., Ex. A at 21)) was itself materially misleading because the warned of risk had transpired. *Rombach*, 355 F.3d at 173.

Barns' "retirement" strengthens the inference of scienter because it was unexpectedly announced July 26, 2018, when Nielsen revealed the unexpected negative news about the GDPR and the BEM business. *See OSG*, 12 F. Supp. 3d at 632-33.

###### E.    Defendants Violated §20(a) of the Exchange Act

To state a claim of control person liability under §20(a), a plaintiff must show: (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *Gen. Elec.*, 2019 WL 4094559, at *23. Whether a person is a "controlling person" is a fact-intensive inquiry and generally should not be resolved on a motion to dismiss. *In re Cannavest Corp. Sec. Litig.,* 307 F. Supp. 3d 222, 253 (S.D.N.Y. 2018); *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *21 (S.D.N.Y. Aug. 30, 2018). Contrary to Defendants' contention, MtD at 30, Plaintiffs have adequately pled that Nielsen (and the individual Defendants) violated §10(b).[18]

### IV.   CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss. If any part of Defendants' motion is granted, Plaintiffs request leave to amend.[19]

---

[18]    Though there are intra-circuit divides on whether culpable participation is necessary for a §20(a) claim, *Gen. Elec.*, 2019 WL 4094559, at *23, the facts showing that each individual Defendant knowingly or recklessly made materially misleading statements is sufficient to allege culpable participation. *Veon*, 2018 WL 4168958, at *22; *Cannavest Corp.*, 307 F. Supp. 3d at 254-55. Defendants do not dispute that each individual Defendant controlled Nielsen, MtD at 30; corporate officers usually are presumed to possess the ability to control, and the allegations show they did. ¶¶32-41, 492-97; *S. E. C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996); *Veon*, 2018 WL 4168958, at *21.

[19]    On September 12, 2019, the Court issued an order stating that Plaintiffs would not be given any further opportunity to amend after filing the SAC. ECF No. 71. Plaintiffs believe they should still be provided an opportunity to amend if the Court grants any part of defendants' motion. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190-91 (2d Cir. 2015) (improper to deny leave to amend when Court "presented plaintiffs with a Hobson's choice: agree to cure deficiencies not yet fully briefed and decided or forfeit the opportunity to replead").

DATED:  January 27, 2020                    By: _____ */s/ Carol C. Villegas* _____
                                                 Carol C. Villegas

                                            **LABATON SUCHAROW LLP**
                                            Carol C. Villegas
                                            Eric J. Belfi
                                            Jake Bissell-Linsk
                                            140 Broadway
                                            New York, NY 10005
                                            Telephone: (212) 907-0700
                                            Facsimile: (212) 818-0477
                                            Email:   cvillegas@labaton.com
                                                     ebelfi@labaton.com
                                                     jbissell-linsk@labaton.com

                                            *Attorneys for Lead Plaintiff Public*
                                            *Employees' Retirement System of Mississippi*
                                            *and Lead Counsel for the Proposed Class*

                                            **ROBBINS GELLER RUDMAN**
                                            **& DOWD LLP**
                                            Shawn A. Williams
                                            Post Montgomery Center
                                            One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
                                            Telephone:  (415) 288-4545
                                            Facsimile: (415) 288-4534
                                            Email:  shawnw@rgrdlaw.com

                                            *Counsel for Additionally Named Plaintiff*
                                            *Monroe County Employees' Retirement*
                                            *System, and Additional Counsel for the*
                                            *Proposed Class*