UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                    :
IN RE:                                              :          18-CV-7143 (JMF)
                                                    :
NIELSEN HOLDINGS PLC SECURITIES                     :          OPINION AND ORDER
LITIGATION                                          :
                                                    :
-------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs in this putative securities-fraud class action — brought pursuant to Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

§§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 — are

investors in Nielsen Holdings plc ("Nielsen"), a publicly traded data analytics company most

famous for its television ratings service.  Plaintiffs allege that Nielsen and several of its officers,

Dwight Mitchell Barns, Jamere Jackson, and Kelly Abcarian (the "Individual Defendants" and,

together with Nielsen, "Defendants") made various false and misleading statements overstating

the strength of Nielsen's business segments.  Defendants now move, pursuant to Rule 12(b)(6) of

the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims.  ECF No. 75 ("Motion").  For

the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

       The following facts, drawn from the Second Amended Complaint (the "Complaint"),

ECF No. 72 ("SAC"), documents incorporated by reference therein, and mandatory public

disclosure documents filed with the SEC, are assumed to be true for purposes of this motion.  *See*

*DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010); *see also Bd. of Trs. of Ft.*

*Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011),

*aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) (summary order).

Nielsen is a data analytics company that provides clients detailed information about consumer preferences.  SAC ¶ 61.  Nielsen relies on data obtained from third parties such as Facebook and Twitter for many of its products and services.  *Id*. ¶ 2.  At all relevant times, Nielsen's business was broadly divisible into two segments of roughly equivalent size: (1) "Buy," focused on consumer purchasing measurement and analytics in the Consumer Packaged Goods ("CPG") space; and (2) "Watch," focused on media audience measurement and analytics.  *Id*. ¶ 61.  The Buy Segment was further subdivided into Developed Markets, consisting of the United States, Canada, Western Europe, Japan, South Korea, and Australia; and Emerging Markets, consisting of Africa, Latin America, Eastern Europe, Russia, China, India, and Southeast Asia.  *Id*. ¶ 69.  By contrast, the Watch segment was subdivided by major product offerings: Marketing Effectiveness, Audio, Audience Measurement, and a general corporate sub-segment.  *Id*. ¶ 70.  At all relevant times, the Individual Defendants served in key leadership roles at Nielsen: Barns served as Chief Executive Officer and Board Chairman until his resignation at the end of 2018, *id*. ¶¶ 34, 36, 229; Jackson served as Chief Financial Officer until his resignation in August 2018, *id*. ¶¶ 37, 268; and Abcarian served as Senior Vice President of Product Leadership, *id*. ¶ 40.

Plaintiffs allege that Defendants made false or misleading statements in SEC filings and during earnings calls and industry conferences over a Class Period spanning from February 11, 2016, to July 25, 2018.  *See id*. ¶ 283.  The alleged false or misleading statements can be broadly grouped into two categories: statements concerning the Buy Segment and statements concerning the effect of the European Union's General Data Protection Regulation ("GDPR") on Nielsen's Watch Segment:

## A.  Buy Segment Statements

Plaintiffs allege that, beginning in 2016, Defendants repeatedly made three kinds of misstatements about Nielsen's Buy Segment.

First, in a February 11, 2016 press release reporting results for the fourth quarter of 2015, Nielsen projected that its Buy Developed Market ("BDM") segment would report 1.5% to 3.5% growth in BDM revenue.  *Id*. ¶ 81.  During an earnings call for the same quarter, Barns told investors that the "buy business continued to strengthen and expand."  *Id*. ¶ 82.  He further noted that Nielsen felt "great about [its] progress and confident about the year ahead."  *Id*.  In the same call, Jackson assured investors that Nielsen's CPG clients were "pivoting to growth" and that Nielsen viewed the environment as stable and saw its "clients investing in analytics and innovation."  *Id*. ¶ 83 (emphasis omitted).  In Nielsen's 2016 Form 10-K filed on February 19, 2016, however, Barns and Jackson hedged a little, representing that Nielsen's Buy Segment clients "may" reduce discretionary advertising spending and "may" be less likely to purchase Nielsen's analytical services, which "would" naturally have an adverse effect on revenue.  *Id*. ¶ 368.  But from then through September 2016, Barns and Jackson frequently reaffirmed that they "remain[ed] confident in [their] plan to deliver on all of the operational elements that [they] laid out on [the] fourth quarter call."  *Id*. ¶ 289; *see id.* ¶¶ 85, 90-91, 293.  Contrary to these assertions and projections, however, discretionary spending was actually declining throughout 2016.  Indeed, on October 25, 2016, Barns and Jackson admitted during an earnings call that they knew discretionary spending had been declining throughout the year, that the decline was permanent, and that it caused BDM revenues to fall 2.5% in the third quarter of 2016.  *Id*. ¶¶ 133-48, 413-16; *see also id.* ¶¶ 136-37, 414 (Barns later admitting that Nielsen had

implemented initiatives to address the decline throughout 2016).  When this news broke, Nielsen's stock plummeted nearly 17%.  *Id.* ¶ 367.

Second, Barns and Jackson misrepresented the value of Buy Segment goodwill in Nielsen's Forms 10-K for the years ending December 31, 2016, and December 31, 2017, by making unreasonable and baseless cash flow assumptions that caused Nielsen to report inflated earnings, assets, and capital.  *Id.* ¶¶ 157-58, 187-89, 278-80, 372-411, 456-60.   In addition to concealing their model's faulty assumptions, Barns and Jackson represented to investors that impairment was just a risk that "could" materially affect Nielsen's financial performance and that the fair value of the Buy Segment's goodwill exceeded its carrying value "by at least 20%." *Id.* ¶¶ 157-58, 373-74, 386, 457.  In reality, after the Class Period and after Barns and Jackson left Nielsen, Nielsen recorded a $1.4 billion impairment charge that reduced the value of the Buy Segment's goodwill by 54%.  *Id.* ¶¶ 279, 460.

Third, in 2017 and 2018, Barns and Jackson represented that Nielsen's Buy Emerging Market ("BEM") revenue would increase by 8% to 10% in 2018, that business was "exceptionally strong" and "robust," and that Nielsen "continue[d] to see solid growth from both local clients and multinationals across the emerging markets."  *Id.* ¶¶ 14, 174-75, 183, 322-23. Barns and Jackson also represented that any revenue execution issues in China that had contributed to lower revenue than projected for the fourth quarter of 2017 had been resolved and that the Chinese Buy market was "very healthy," with "tremendous growth opportunities."  *Id.* ¶¶ 333-34, 348.  In actuality, Nielsen's BEM clients were significantly reducing spending throughout 2018, particularly in China and Southeast Asia, and the revenue execution issues were ongoing.  *Id.* ¶ 184, 238, 274.

**B.  GDPR-Related Statements**

Plaintiffs also allege false or misleading statements about the effect of GDPR on Nielsen's ability to acquire data from providers such as Facebook.  GDPR, a sweeping data privacy regulation adopted in April 2016, and effective on May 25, 2018, created a system of rules restricting the use of personal data.  *Id*. ¶¶ 16, 202, 204, 206.  Among other things, it requires "the consent of those whose data is being used" and "the anonymization of certain collected data to protect privacy prior to the processing of that data."  *Id.* ¶ 202.  It also includes "provisions regarding data breach notifications[] and rules regarding establishing policies for ensuring the safe handling of data across borders."  *Id.*  Prior to its enactment, the legislation was heavily scrutinized for its likely adverse effect on the data collecting industry.  *See id*. ¶¶ 204-05.  Nevertheless, leading up to its enactment, Nielsen's senior officials repeatedly assured the public that Nielsen was ready for the regulation and that it would be a "non-event."  *Id*. ¶ 18.  Barns and Abcarian continued to make these assurances even after GDPR went into effect, further representing that Nielsen had access to all of the data it would need for its products.  *Id*. ¶¶ 16, 214-19.  On September 12, 2018, however, Megan Clarken, then the President of Product Leadership, revealed that, on the day GDPR was enacted, Nielsen's clients cut the company's access to their data, shutting off 120 of Nielsen's campaigns and raising doubts with respect to the truth of Nielsen's past assurances.  *Id*. ¶ 270.

## LEGAL STANDARDS

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012).  The Court will not dismiss claims unless Plaintiffs have failed to plead sufficient facts to state a

claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007), that is, one that contains "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  More specifically, Plaintiffs must allege facts showing "more than a sheer

possibility that a defendant has acted unlawfully."  *Id.*  A complaint that offers only "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555.  If Plaintiffs have not "nudged their claims across the line from

conceivable to plausible, [those claims] must be dismissed."  *Id.* at 570.

Because Plaintiffs in this case allege securities fraud, they must also satisfy the

heightened pleading requirements of both Rule 9(b), which requires that the circumstances

constituting fraud be "state[d] with particularity," Fed. R. Civ. P. 9(b), and the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which requires that scienter — that is,

a defendant's "intention to deceive, manipulate, or defraud" — also be pleaded with

particularity, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (internal

quotation marks omitted).  To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent.'"

*Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v.

Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  To satisfy the PSLRA, a complaint must, "with

respect to each act or omission alleged to [constitute securities fraud], state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C.

§ 78u-4(b)(2)(A)).  A plaintiff may do so by "alleging facts (1) showing that the defendants had

both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* For an inference of scienter to be "strong," a reasonable person must deem the inference "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## DISCUSSION

As noted, Plaintiffs bring claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5. To state a claim that Defendants made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (internal quotation marks omitted); *see IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015). To state a claim under Rule 20(a), Plaintiffs must, at a minimum, plead a plausible "primary violation" of Section 10(b). *See, e.g.*, *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996); *Total Equity Cap., LLC v. Flurry, Inc.*, No. 15-CV-4168 (JMF), 2016 WL 3093993, at *2 (S.D.N.Y. June 1, 2016).

Applying these standards, the Court concludes that some of Plaintiffs' claims survive Defendants' motion and some do not. The Court will begin with Defendants' alleged misstatements and omissions about the Buy Segment — (1) the projected growth of the BDM business in 2016 and 2017; (2) the fair value of Buy Segment goodwill in 2017 and 2018; and (3) the strength of the BEM business in 2017 and 2018 — and then turn to their statements about the effects of GDPR on Nielsen's Watch Marketing Effectiveness ("WME") Segment in 2018.

## A.  Projected Growth of the BDM Business in 2016 and 2017

The Court begins with Plaintiffs' allegations regarding Defendants' BDM-related statements in 2016 and 2017.  Plaintiffs point to a series of press releases and earnings calls in which Defendants assured investors that the BDM was "stable" and projected to see 1.5% to 3.5% growth in revenue in 2016.  *See* SAC ¶¶ 81-82, 285-87; *id*. ¶¶ 85-86 (Barns and Jackson on April 20, 2016, reaffirming that the BDM business remained "solid" and that "discretionary spend remained stable with relative strength in areas like innovation"); *id*. ¶¶ 90-91, 295-96 (Barns and Jackson on July 26, 2016, reaffirming that they "remain[ed] confident in our plan to deliver on all of the operational elements that we laid out at the beginning of the year" and that it was "not uncommon to see these [lumpy] dynamics from time to time"); *id*. ¶ 298 (Barns on September 26, 2016, at a conference stating that "clients prefer real-time analytics . . . over more bespoke solutions" and that Nielsen's "most important initiative" — the Connected Buy system — would "expand [Nielsen's] margins").  Nielsen's initial forecast and later reaffirmations were untenable, Plaintiffs allege, because senior management knew as early as 2015 that it was the "new norm" for Nielsen's CPG clients to reduce their discretionary spending on Nielsen's analytical services, preferring instead to buy only "real-time data" and run their own analyses. *Id*. ¶¶ 94, 97-100.  Because discretionary spending constituted 30% of total revenue, Defendants knew this decline would have a negative impact on its BDM business and misled investors with optimistic statements and by failing to disclose the trend.  *Id*. ¶ 127.

Broadly speaking, Plaintiffs' claims relating to these allegations are premised on two distinct theories: first, that Defendants failed to disclose in Nielsen's 2016 Form 10-K and 10-Qs that discretionary spending was trending downward as a result of its clients' lack of interest in the company's analytics offerings, in violation of Item 303 of SEC Regulation S-K ("Item 303"),

17 C.F.R. § 229.303; and second, that Defendants made materially misleading revenue forecasts and other statements about the stability of the BDM business from 2016 to 2017.  SAC ¶¶ 140-142; 364-69.  With respect to the former, Defendants do not dispute that Plaintiffs adequately allege that discretionary spending was on the decline.  Instead, they argue that Plaintiffs fail to plead "*management's* knowledge of that trend."  ECF No. 76 ("Defs.' Mem."), at 25.  With respect to the remaining BDM-related statements, Defendants primarily argue that Plaintiffs fail to plead scienter because they rely on "generic claims of corporate knowledge made" by unreliable cooperating witnesses, *id*. at 14, and because Barns's and Jackson's departures were not motivated by fraud, *id*. at 19.  Defendants also contend that Plaintiffs fail to plausibly plead falsity on the ground that they do not explain "how the statements were false or misleading," *id*. at 22, and merely rely on the unreliable confidential witnesses, Nielsen's later disclosures, *id*. at 23, and forward-looking statements that were accompanied by cautionary language, *id*. at 27-28. The Court addresses each set of allegations in turn.

### 1. Item 303 Claims

Item 303 requires corporate entities to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  "[A] failure to make a required Item 303 disclosure in a 10-Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim.  However, such an omission is actionable only if it satisfies the materiality requirements outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and if all of the other requirements to sustain an action under Section 10(b) are fulfilled." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015).  "Information is material if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by

the reasonable investor as having significantly altered the total mix of information made available." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (internal quotation marks omitted); *see id.* (finding that information regarding book returns was adequately alleged to be material where defendant's stock rating was boosted in response to misleading representations and analysts' response was sharply critical once information was released).

For purposes of this motion, Defendants do not dispute that, during the Class Period, Nielsen faced a downward trend in its clients' discretionary spending. Nor do they — or could they — argue that their SEC filings prior to September 2016 adequately disclosed the trend or that the trend had a material, adverse impact on Nielsen's revenues. *See* Defs.' Mem. 25-26; ECF No. 84 ("Reply"), at 1-10. Instead, Defendants hang their hat on scienter, arguing that Plaintiffs, in relying on the testimony of confidential witnesses, fail to sufficiently allege that management knew of the trend in 2016. *See* Defs.' Mem. 25-26. But that argument disregards Defendants' own admissions. Most notable is the October 25, 2016 earnings call, during which Barns stated:

> *Earlier this year, as we saw these more challenging trends unfolding*, we realigned our Buy business to be more focused in our product development and more efficient in our overhead. *More recently as the trends continued for our clients, we stepped up our efforts* to reduce our cost base, reallocate resources and accelerate our investments in initiatives that will help our clients and better position our business for the future.

SAC ¶ 136 (emphases added); ECF No. 80 ("Opp'n"), at 17. During the same call, Jackson also acknowledged they "ha[d] not seen [a strong discretionary environment] since [the fourth quarter of 2015]." SAC ¶ 145; *see id.* at 47 n.18; *see also id.* ¶ 91(describing a July 26, 2016 earnings call during which Jackson and Barns attributed the below-guidance results in the second quarter of 2016 to "softer discretionary spend," suggesting access to such information).

Drawing all inferences in Plaintiffs' favor, as the Court must, these statements provide a basis to conclude that Barns and Jackson knew that Nielsen's clients were decreasing their discretionary spending throughout 2016 to a degree that warranted a change in business practices. *See, e.g.*, *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (explaining that for conduct to qualify as reckless, it must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" (alteration in original)). More specifically, it cannot be said that, by the beginning of the third quarter of 2016, Defendants were merely in the process of assessing the risk because they actively responded to the trend by implementing internal changes, for instance by shifting the Buy Segment's business and operations to focus on product development. *See* SAC ¶¶ 136, 414; *see also, e.g.*, *In re Scholastic*, 252 F.3d at 73 (considering the defendant's shift to "engag[ing] in aggressive sales practices during the second and third quarters of its 1996-97 fiscal year" as supporting an inference "that company sales officials were aware of declining sales and increasing returns"). Thus, this is not a case in which the Complaint is wholly "silent about when the employees realized that the more pessimistic assessments of the market were likely to come to fruition." *Stratte-McClure*, 776 F.3d at 107. To the contrary, taken together, these allegations are sufficient to suggest that Barns and Jackson knew about the adverse trend in 2016, yet did not timely disclose it to the public in Nielsen's July 2016 Form 10-Q or any subsequent Form filed with the SEC during the Class Period. *See* SAC ¶ 366.

That said, the Complaint does not adequately allege that Defendants were aware of the trend in 2015 or in the first quarter of 2016 — that is, when they filed the company's 2016 Form 10-K or April 2016 Form 10-Q. In his October 25, 2016 statement, Barns admitted that

Defendants had seen the trend unfold "[e]arlier this year," meaning in 2016; he said little about what they knew in 2015.  To be sure, Barns also stated that Defendants "saw the trend starting to emerge" in 2015, at least with respect to "small and medium sized [food and beverage] manufacturers."  SAC ¶ 143.  But given that Nielsen experienced 4.8% growth in BDM revenue in the fourth quarter of 2015 by presumably relying on its classic business model, *see* SAC 47 n.18, and 2.0% growth in BDM revenue in the first quarter of 2016, *see* April 2016 Form 10-Q, at 29, the "most cogent inference" from these allegations "is that [Nielsen] delayed releasing information on its [2016 Form 10-K and April 2016 Form 10-Q] to carefully review all of the relevant evidence and was *at worst* negligent as to the effect of the delay on investors."  *Stratte-McClure*, 776 F.3d at 107 (internal quotation marks omitted); *see also Matrixx Initiatives, Inc.*, 563 U.S. at 49 n.15.  "Because 'a reasonable person' would not deem the inference that [Nielsen] was consciously reckless about whether its mandated filings would mislead investors 'at least as compelling' as this opposing inference," *Stratte-McClure*, 776 F.3d at 107 (quoting *Tellabs*, 551 U.S. at 324), Plaintiffs do not adequately plead scienter with respect to their Item 303 claims based on the 2016 Form 10-K and April 2016 Form 10-Q.[1]

The only other allegations Plaintiffs point to as evidence of Defendants' knowledge in 2015 come from confidential witnesses who were formerly employed by Nielsen, but these allegations do not satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.  A plaintiff may rely on confidential witnesses so long as allegations in the complaint are sufficient to "provide an adequate basis for believing that the defendants' statements were false."  *Novak v.*

---

[1]     For similar reasons, Plaintiffs do not adequately establish that the 2016 Form 10-K's general warning about discretionary spending was misleading, as it is not clear from the Complaint that the trend had fully materialized in 2015.  Instead, "the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability." *Rombach*, 355 F.3d at 173-74.

*Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  That is, "confidential source allegations must show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements; conclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient." *Glaser v. The9, Ltd*., 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (emphasis added).  Here, one confidential witness — a former Vice President in Nielsen's U.S. Consumer & Shopper Insights business identified in the Complaint as "CW1" — claims that "weekly reports from the finance department containing metrics such as detailed revenues and budget breakdowns by each client" were "received" by "all client service leaders . . . from Vice Presidents all the way up to CEO Barns."  SAC ¶ 117.  He also claims that "upper management, including . . . Barns, would have quarterly meetings at a minimum where client budgets and revenues were discussed in depth." *Id*.  Other confidential witnesses describe how the financial data was kept on Nielsen's servers and made accessible to the senior officials.  *See* SAC ¶¶ 94-132, 417.  But such general musings about information to which corporate officials had access do not suffice.  *See, e.g.*, *Shetty v. Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019); *see also, e.g.*, *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461-62 (S.D.N.Y. 2010) ("Notably, these [confidential witness] allegations do not establish what specific contradictory information the Individual Defendants received or when they received it. . . .  Indeed, if 'detailed' reports were circulated regularly among AMEX's senior management, [the confidential witness] should be able to identify the names and contents of these documents, or recount specific meetings at which the Individual Defendants actually received contradictory information. . . .  [B]land assertions that they 'would have received' such information offer

nothing concrete and are not allegations of fact."). Thus, Plaintiffs' allegations do not suffice to show that Defendants actually possessed knowledge about the trend in 2015.

Accordingly, to the extent that Plaintiffs allege an Item 303 violation with respect to Nielsen's 2016 Form 10-K and April 2016 Form 10-Q based on a failure to disclose a downward trend in discretionary spending, *see* SAC ¶ 364, Defendants' motion is granted and such claims are dismissed. By contrast, Defendants' motion is denied with respect to Plaintiffs' claim that Defendants failed to disclose the trend in Nielsen's July 2016 Form 10-Q and thereafter.

**2. Statements About the Strength and Stability of the BDM Business**

For similar reasons, the Court concludes that some, but not all, of Plaintiffs' claims with respect to Defendants' statements concerning the strength and stability of the BDM business survive. Nielsen's BDM revenue growth steadily declined from 4.8% growth in the fourth quarter of 2015, to 2.0% growth in the first quarter of 2016, to 0.9% growth in the second quarter, to a 2.5% *decrease* in the third quarter of 2016. *Id.* ¶¶ 47 n.18, 91, 419; April 2016 Form 10-Q. And as previously discussed, Plaintiffs plausibly allege that Defendants were aware of the trend by the beginning of the third quarter of 2016. In light of these allegations, Plaintiffs state plausible claims with respect to Defendants' statements in July 2016 about the strength and stability of their BDM business. *See, e.g.*, SAC ¶¶ 295-96 (downplaying the softer spending, stating "discretionary spending can be a little lumpy" and that it was "not uncommon to see these dynamics from time to time"); *see also, e.g.*, *In re Scholastic*, 252 F.3d at 70 (finding sufficient allegations that the defendants reported "constant" sales and "strong" performance shortly before announcing expected losses); *Novak*, 216 F.3d at 312-13 (finding that specific factual allegations regarding the defendants' writing off inventory were sufficient to support a claim "that the defendants' positive public statements concerning inventory growth were false and misleading").

By contrast, Defendants' earlier affirmations — in the 2016 Form 10-K, the April 2016

Form 10-Q, and earnings calls — are not actionable because the Complaint does not plausibly

allege that the downward trend had taken root by then, that Defendants omitted facts that

rendered their statements of opinion misleading, or that Defendants did not believe their

optimistic statements.  *See, e.g.*, *id.* ¶¶ 85, 289 (Barns and Jackson stating, in an earnings call for

the first quarter of 2016, that they "remain[ed] confident in our plan to deliver on all of the

operational elements that we laid out on [the] fourth quarter call"), *id.* ¶ 291(a)-(b) (Barns

stating, in the same call, that "2016 is off to a good start for Nielsen, underpinned by our

consistent resilient business model," and that, "[i]n the developed markets, our core

measurement business was solid in our two largest markets, the US and Western Europe."); *id.*

¶ 291(c) (press release for the first quarter of 2016 stating that "Nielsen's strong first quarter

results were underpinned by our steady and resilient business model" and that its "unparalleled

global footprint remains a core competitive advantage for both local and multinational clients").

"In the absence of particularized allegations that [the company] was experiencing or internally

predicting" growth materially less than its projections, "the subsequent disclosures" alone

"provide no basis to conclude that Defendants recklessly misstated" the strength of the business.

*In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011).  Along similar

lines, Plaintiffs do not allege facts sufficient to suggest that Barns's September 26, 2016

statement that "Connected Buy will expand [Nielsen's] margins," SAC ¶ 298, or that any of

Defendants' BDM-related statements in 2017, *id.* ¶¶ 308-330, were false or misleading.  That is

particularly true in the latter case given that, in October 2016, Defendants acknowledged that

they viewed the decline in discretionary spending as a secular shift.  *Id.* ¶ 145-46.

### 3. BDM Revenue Forecasts

By contrast, all of Defendants' BDM-related forecasts in 2016 and 2017 are inactionable. Revenue forecasts are, by definition, forward-looking statements. *See* 15 U.S.C. § 78u–5(i)(1)(A)-(C) (defining forward-looking statements as projections of revenues, income, or earnings per share; management's plans or objectives for future operations; and predictions of future economic performance). Significantly, under the PSLRA's safe-harbor provision for "forward-looking" statements, *see* 15 U.S.C. § 78u–5(c), such statements are not actionable if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," (2) the forward-looking statement "is immaterial," or (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010). "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245-46 (2d Cir. 2016) (internal quotation marks and alteration omitted). In other words, "liability lies only to the extent that the statement was both objectively false *and* disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.,* 655 F.3d 105, 110 (2d Cir. 2011) (emphasis added); *see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp*., 679 F.3d 64, 67-68 (2d Cir. 2012) (per curiam) (applying *Fait*'s reasoning to claims under Section 10(b)). Where a complaint alleges that the defendant had access to information that was inconsistent with its alleged misstatements, it "must specifically identify the reports or statements containing this information." *Shetty*, 796 F. App'x at 35.

Applying these standards here, Plaintiffs' claims with respect to Defendants' forecasts fall short. In particular, Plaintiffs fail to allege any specific, contemporaneous reports or

statements showing Defendants did not believe their projections when they were made.  That is, although Plaintiffs adequately allege (and Defendants appear to concede) that Defendants knew of a material *trend* in BDM revenue, they do not point to particular facts or data suggesting that Defendants did not believe that they would see 1.5% to 3.5% growth in revenue in 2016 *despite* the trend.  *See, e.g.*, *In re Scholastic*, 252 F.3d at 73 (citing the *magnitude* of a downward trend in sales as a basis for concluding that public statements were misleading); *cf. Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 396 (S.D.N.Y. 2019) ("Compounding this deficiency is the dearth of specific allegations about both how pervasive these problems were . . . and which Defendants knew how much about them.  The fact that some Defendants may have known of some issues with respect to an unspecified number of models in lower-level GE Capital insurance subsidiaries, as Plaintiffs allege, . . . does not show that any particular Defendant did not believe in the accuracy of GE's insurance reserve estimates.").  If anything, the facts alleged point in the opposite direction:  BDM revenue in the first quarter of 2016 grew 2.0%, which was in accordance with projections, and revenue in the second quarter of 2016 grew 0.9%, which was below projections, but still growth.  April 2016 Form 10-Q; SAC ¶ 90, 419.  Moreover, some time around then, Defendants implemented operational changes in an effort to meet their projections, none of which are plausibly alleged to have been doomed to fail.

Plaintiffs point to the earnings report for the third quarter of 2016, which revealed that BDM revenue declined 3.7%, SAC ¶ 133, but that amounts to pleading "fraud by hindsight," which is impermissible, *see, e.g., Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 723 F. App'x 20, 22 (2d Cir. 2018) (finding "fraud by hindsight" where the plaintiffs failed to establish that the "Company did not actually believe [its statements] . . . []or . . . identify any contemporaneous facts that would have rendered such a belief unfounded" (internal quotation

marks omitted)); *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262, 269 (S.D.N.Y. 2009) ("[M]anagement's failure to accurately forecast evolving business conditions does not equate to fraudulent conduct").  Citing Defendants' December 8, 2016 and February 9, 2017 projections that BDM revenue would decline 1.0% to 1.5% in 2017 — and their subsequent July 27, 2017 adjustment predicting a decline of 3.0% to 5.0% — Plaintiffs also argue that Defendants' projections grossly underestimated the decline in revenue.  *See* Opp'n 22.  But the magnitude (or duration) of an adverse result does not provide "an independent basis for scienter."  *In re ShengdaTech, Inc. Sec. Litig*., No. 11-CV-1918 (LGS), 2014 WL 3928606, at *9 (S.D.N.Y. Aug. 12, 2014).  At most, therefore, the Complaint establishes Defendants' "projections may have been unduly optimistic and even negligent." *Total Equity Cap., LLC*, 2016 WL 3093993, at *6 (internal quotation marks omitted); *see also Novak*, 216 F.3d at 309 (explaining that scienter cannot be found where the defendants merely "should have anticipated future events and made certain disclosures earlier than they actually did").  "[N]egligence alone," however, "is insufficient to demonstrate the extreme departure from standards of ordinary care necessary to show recklessness."  *Total Equity Cap., LLC*, 2016 WL 3093993, at *6; *see also Acito v. IMCERA Grp., Inc*., 47 F.3d 47, 53 (2d Cir. 1995) ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").  Accordingly, Defendants' motion with respect to Plaintiffs' claims based on the BDM-related revenue forecasts must be and is granted.

## B.  Statements About the BEM Business in 2017 and 2018

Plaintiffs allege similar claims regarding Defendants' statements concerning the BEM business between October 25, 2017, and May 31, 2018.  Specifically, Plaintiffs allege that on October 25, 2017, Barns and Jackson falsely represented that an "exceptionally strong" and

"robust" BEM business was "led by strength in Latin America, Eastern Europe, Southeast Asia and Greater China" and that it would "continue to be a growth engine."  SAC ¶¶ 170, 322(c).  Similarly, on November 9, 2017, Barns and Jackson stated that Nielsen "continue[d] to see very strong growth" and "tremendous momentum" in the BEM business, that BEM revenues would grow 8% to 10% in 2018, and that they had "a lot of confidence in our emerging markets profile going into 2018."  *Id.* ¶¶ 174-75, 324-25.  Finally, on February 8, 2018, and thereafter, Barns and Jackson repeatedly represented that "revenue execution issues" in China that contributed to disappointing results in the fourth quarter of 2017 had been "addressed" and were "behind" the company, that the underlying market in China was "very healthy" with "tremendous growth opportunities," and that BEM revenues would still increase 8% to 10% in 2018.  *Id.* ¶¶ 179-86, 329, 333 (February 8, 2018), 337 (February 28, 2018), 190-93, 341-42 (April 26, 2018), 196-97, 348, 350 (May 16, 2018), 198-201, 354 (May 31, 2018).  In the second quarter of 2018, however, BEM revenue increased just 0.3%, *id.* ¶ 230, upon news of which Jackson acknowledged that client spending had been weak throughout the quarter, *id.* ¶ 240 ("We saw a fairly significant pullback in multinational client spend, really, across the emerging markets as we went through the quarter.")

These claims are easily rejected.  Indeed, Plaintiffs' BEM-related allegations are even thinner than their unsuccessful BDM-related allegations and ultimately fail because scienter is not sufficiently pleaded.  To establish scienter, Plaintiffs rely on general statements from confidential witnesses, SAC ¶¶ 105-14, and subsequent, unexpected negative quarterly results, *see id.* ¶¶ 170-71.  But the confidential witness statements do not support the weight Plaintiffs put on them, for reasons the Court already discussed.  And the fact that Nielsen later reported unexpectedly negative results is nothing more than fraud by hindsight.  To accept that as proof of

scienter would effectively convert the securities laws into insurance against unexpected losses. Even taking together the magnitude and duration of the adverse results, Defendants' optimistic projections, and Jackson's statements in the second quarter of 2018, *see* Opp'n 28-29, the more cogent inference is that Defendants' failure to disclose a downward trend in Nielsen's BEM business and their related statements about the business's strength were a product of negligence, not conscious recklessness.  *See Stratte-McClure*, 776 F.3d at 107.  Accordingly, Plaintiffs' BEM-related claims must be and are dismissed.

**C.  Statements Regarding the Value of Buy Segment Goodwill**

Next, the Court considers Plaintiffs' allegations that Defendants misrepresented the fair value of Nielsen's Buy Segment and its goodwill in the company's 2016 and 2017 Form 10-Ks. According to Plaintiffs, Nielsen's goodwill was "one of the most important assets carried on Nielsen's balance sheet during the Class Period."  SAC ¶ 374.  An intangible asset, goodwill "represents the future economic benefits that arise[] from the other assets acquired in a business combination that are not otherwise individually identified or separately recognized."  *Id.*; *see also id.* ("Nielsen's Buy reporting unit goodwill balance was originally calculated as the excess of the purchase price paid over the fair value of the assets and liabilities acquired when Nielsen purchased the Buy entity.").  Plaintiffs contend that the $1.4 billion impairment charge that Nielsen recorded in 2019 should have been recorded during the Class Period.  In light of that, they allege that Defendants misled investors in the 2016 and 2017 Forms 10-K by representing that (1) any downward revisions in the fair value of Nielsen's goodwill were just a risk that "could" materially affect the Company's financial performance; (2) total assets in the Buy business were $6.697 billion (including $2.696 billion of goodwill); (3) the "expected future cash flows and growth rates" utilized in the goodwill impairment model were "based on assumptions

about the level of business activity in the marketplace as well as applicable cost levels that drive

[their] budget and business plans"; and (4) the company's annual goodwill impairment

assessment resulted in "no impairment" and that the fair value of Buy business goodwill actually

exceeded the $2.696 billion carrying value "by at least 20%."  *Id.* ¶¶ 157-58, 386.

As several judges in this District have held, goodwill estimates qualify as opinion

statements because they "depend on management's determination of the 'fair value' of the assets

acquired and liabilities assumed, which are not matters of objective fact" and "will vary

depending on the particular methodology and assumptions used."  *N. Collier Fire Control &*

*Rescue Dist. Firefighter Pension Plan & Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*, No.

15-CV-6034 (RJS), 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016) (Sullivan, J.) (quoting

*Fait*, 655 F.3d at 110-11); *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173

(S.D.N.Y. 2015) ("[A]ctuarial or accounting assumptions . . . are, by definition, not statements of

fact.").  As such, they are actionable only if "(1) the speaker does not hold the belief professed;

(2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits

information that makes the statement misleading to a reasonable investor."  *Martin v.*

*Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (summary order) (internal quotation marks and

alterations omitted).  Moreover, that Nielsen "may have believed the accounting estimate to be

accurate is irrelevant, even when read as an opinion statement.  The core inquiry when

determining whether an omission renders an opinion misleading is whether the omitted facts

conflict with what a reasonable investor would take from the statement itself."  *In re Avon Sec.*

*Litig.*, No. 19-CV-1420 (CM), 2019 WL 6115349, at *17 (S.D.N.Y. Nov. 18, 2019) (internal

quotation marks omitted).  Notably, "allegations of [accounting] violations or accounting

irregularities, standing alone, are insufficient to state a securities fraud claim.  Only where such

allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient."  *Novak*, 216 F.3d at 309 (internal quotation marks and citations omitted).

Applying those standards here, the Court concludes that Plaintiffs' goodwill-related claims pass muster.  Notably, Defendants do not raise any serious arguments against Plaintiffs' allegations except to assert that "Plaintiffs cannot state a claim of fraud through a retroactive math exercise lacking any allegation that Defendants disbelieved their goodwill valuations at the time they were publicly presented."  Defs.' Mem. 27; *see* Reply 5 & n.5 (cursorily arguing that "allegations regarding the magnitude of the fraud are not capable of serving as an independent basis for scienter" (internal quotation marks omitted)).[2]  But this is not a case where Plaintiffs allege "nothing more than disagree[ment] with [Nielsen's] accounting judgments[, which] cannot support a fraud claim."  Defs.' Mem. 27 (internal quotation marks omitted); *see, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270-71 (2d Cir. 1996) (finding recklessness insufficiently pleaded where the complaint alleged that the defendant erred in relying on its subsidiary to monitor its own financial reporting); *MDC Partners, Inc.*, 2016 WL 5794774, at *11 (dismissing securities fraud claim where the complaint alleged that defendant failed to record a "necessary" impairment charge for its subsidiary without alleging fraudulent intent).  Instead, Plaintiffs adequately allege that Defendants' rosy valuation of Buy Segment goodwill was based on baseless cash flow growth rates that they failed to disclose in their 2017 and 2018 Form 10-Ks.

---

[2]   In a footnote, Defendants contend that Plaintiffs fail to allege loss causation as to these claims, Defs.' Mem. 27 n.15, but the loss occurred when Nielsen's stock sharply dropped when its financial condition was revealed in the second quarter of 2018.  *See* Opp'n 26 n.15; *see also In re Vivendi*, 838 F.3d at 261-63.  In any event, an argument "relegated to a footnote . . . does not suffice to raise [an] issue."  *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 43 n.2 (S.D.N.Y. 2018) (citing cases).

Specifically, the Complaint alleges that after Defendants sustained the $1.4 billion impairment charge in 2019, Plaintiffs were able to determine Defendants' valuation of the Buy Segment's goodwill assumed an 8.2% cash flow growth rate in 2016 and a 19.7% cash flow growth rate in 2017.  Opp'n 23-24; SAC ¶¶ 380-85, 393-95.  According to Plaintiffs, however, Defendants had no basis to estimate these high cash flow growth rates because Buy Segment revenue had been projected to range between a 0.5% increase and a 0.5% decrease.  Opp'n 24; SAC ¶ 385.  Plaintiffs further allege that Defendants failed to consider the sustained decrease in Nielsen's stock price, SAC ¶ 459, as Generally Accepted Accounting Principles ("GAAP") require.  *See* Opp'n 25.  It was only after Barns and Jackson resigned from Nielsen that on February 28, 2019, Nielsen reported an impairment charge of $1.4 billion, reducing the reporting unit's goodwill by a staggering 54%.  SAC ¶ 460; Opp'n 26 n.15.  And while the magnitude of this charge is not an independent basis for finding scienter, it can and does supplement Plaintiffs' other allegations.  *See, e.g.*, *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *9.  In short, taken together, Plaintiffs' allegations — namely, that Defendants failed to disclose certain accounting elements, utilized baseless assumptions, and failed to take successive write-downs during the Class Period — provide sufficiently strong circumstantial evidence of recklessness on the part of Nielsen to survive Defendants' motion.  *See, e.g.*, *In re Avon*, 2019 WL 6115349, at *17 (finding scienter sufficiently alleged where the defendants had failed to disclose the company's change in credit criteria and correspondingly made false and misleading GAAP calculations).

**D.  The Effect of GDPR on Nielsen's Watch Segment in 2018**

Plaintiffs' final claims rest on Defendants' statements about the effect of GDPR on Nielsen's Watch Segment.  In particular, Plaintiffs take issue with Defendants' repeated

representations from February 8, 2018, through June 14, 2018, that Nielsen's WME business would grow and remain unaffected by GDPR.  Significantly, some of Plaintiffs' claims relate to statements that Defendants made before GDPR went into effect on May 25, 2018, and some relate to statements that Defendants made after that date.  First, Plaintiffs claim that, prior to GDPR's effective date, Barns and Jackson misled investors when they projected that WME revenues "would increase 15-20% in 2018," that GDPR would not have "any major impact" on Nielsen's WME business, and that the company was "ready" for GDPR and in "good shape" because it would have "access to all the data needed for its products."  SAC ¶¶ 16, 206-07, 213, 331; *see* Opp'n 1-2.  Barns and Jackson also assured investors that GDPR was a "net positive" and "competitive advantage," and that because Nielsen had always taken a "conservative approach" to data privacy by ensuring that its data was "anonymized and aggregated" before being used in its services, the company was "well prepared for GDPR."  SAC ¶¶ 208-12; *see* Opp'n 2.  Plaintiffs aver that Defendants had no reasonable basis to make these representations because "they did not know if Nielsen would have access to all the data needed for its products." Opp'n 2; *see id.* at 7-8.  In fact, by May 25, 2018, GDPR's effective date, "Defendants knew that hundreds of data providers had cut off Nielsen's access to the data needed for its products." Opp'n 2.

Second, on May 31, 2018, six days after GDPR went into effect, Barns continued to represent that Defendants "still [had] . . . access to all the data [they] need for [their] measurement products" and that GDPR was a "non-event" for Nielsen "as compared to how it played out for some others."  SAC ¶ 214.  Additionally, on June 5, 2018, "[a] Nielsen executive" assured investors that Nielsen remained able to "leverage [its] partnership" with Facebook.  *Id.* ¶¶ 215, 360.  Nine days later, at a conference, Abcarian similarly described GDPR's impact on

Nielsen as a "non-event" that allowed Nielsen to "continue to . . . provide the anonymized aggregated measurement that [it had] provided to the marketplace for years." *Id.* ¶ 216-17, 362. On July 26, 2018, however, Nielsen released its results for the second quarter of 2018, reporting only a 6.0% increase for the WME business and adjusting its guidance to project "growth of about 2.5% in the Watch segment (with flat to low single digits growth in Marketing Effectiveness)." *Id.* ¶¶ 228, 230-31. Barns also reported that many of the company's clients were pulling back on their spending on WME products pending further data on how GDPR would affect the market. *Id.* ¶ 253-54. The announcement of GDPR's effect on the Watch Segment, negative growth in the Buy Segment, and Nielsen's adjustments to its guidance precipitated a 25% drop in the stock price. Opp'n 2; SAC ¶¶ 228, 233. It was not until September 12, 2018, that Clarken revealed that on the day GDPR was enacted, Nielsen's clients cut Nielsen's access to their data, shutting off 120 of Nielsen's campaigns "like a light switch." SAC ¶ 270.

The Court will address the pre- and post-GDPR statements separately.

**1. Pre-GDPR Statements**

In their Opposition, Plaintiffs distort Defendants' post-GDPR statements to suggest that Defendants knew prior to GDPR's enactment that Nielsen would not have access to data from its data providers. Opp'n 8. As the Complaint alleges, however, Defendants' post-GDPR statements actually reveal that they were as surprised as any market watcher when Nielsen's clients abruptly cut off the company's access to their data on May 25, 2018. SAC ¶ 440. Plaintiffs claim that Clarken "disclosed that the assurances about . . . GDPR . . . could not have been well-founded . . . because GDPR was a 'moving target in the eyes of those [data providers] that had to create compliance within the platforms.'" Opp'n 8 (fourth alteration in original). But

describing GDPR as a "moving target" does not indicate that Nielsen's clients had cut off Nielsen's access to their data prior to May 25, 2018, or that Defendants knew that clients would do so when Defendants made their pre-GDPR projections.  Nor does Plaintiffs' other evidence of knowledge — most notably, the accounts of confidential witnesses who allegedly attest that, leading up to GDPR, there was a "'noticeable and markedly different' trend, in that customers were pulling back," SAC ¶¶ 223-25 — get them across the line.  Even taken together, these allegations do not come close to meeting the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See, e.g.*, *Shetty*, 796 F. App'x at 35.  Moreover, Plaintiffs provide no color with respect to how many clients were withdrawing their data, let alone establish that the number was high enough to render Defendants' forward-looking statements misleading.  Absent specific reports or statements showing that Defendants did not have access to their clients' data — or knew that they would not have access the day GDPR was enacted — Plaintiffs once again allege nothing more than fraud by hindsight.  Accordingly, Plaintiffs' pre-GDPR-related claims must be and are dismissed.  *See, e.g.*, *Acito*, 47 F.3d at 53 ("[D]efendants' lack of clairvoyance simply does not constitute securities fraud.").

Relatedly, Plaintiffs' Item 303 claims premised on Nielsen's failure to disclose GDPR-related uncertainties also fail.  As the Complaint itself alleges, Nielsen's 2017 Form 10-K "discussed certain risks associated with data protection laws, such as . . . GDPR."  SAC ¶ 370.  Specifically, the disclosure warned that

> there is an increasing public concern regarding data and consumer protection issues, with the result that the number of jurisdictions with data protection laws continues to increase and the scope of existing privacy laws and the data considered to be covered by such laws is expanding.  Changes in these laws (including newly released interpretations of these laws by courts and regulatory bodies) ***may*** limit our data access, use and disclosure, and ***may*** require increased expenditures by us or may dictate that we ***may*** not offer certain types of services.

26

*Id*.  That is, more than a year before GDPR was enacted, Nielsen expressly warned investors that data protection laws — including GDPR — could affect Nielsen's access to data.  And although that same disclosure also stated that GDPR "has had little direct impact on Nielsen products," *id*., these statements are not at odds.  That is, any reasonable investor would read the latter disclosure as affirming that, as of 2017, Nielsen had not yet encountered data-related obstacles due to GDPR.  That left open the possibility that, once GDPR was enacted, Nielsen would be adversely affected.  Put another way, contrary to Plaintiffs' assertions, *see* Opp'n 15, this is not a case where Defendants' warnings were misleading because the warned-of event had already occurred or was ongoing.  Instead, Nielsen's cautionary language preceded GDPR and its negative effects on the company and adequately warned investors of the impending risk.  This language not only establishes that Defendants' forward-looking statements are inactionable, but it also establishes that Plaintiffs fail to sufficiently allege an Item 303 violation based on the pre-GDPR statements.  Accordingly, Plaintiffs' pre-GDPR-related Item 303 claim must be and is also dismissed.

### 2.  Post-GDPR Statements

By contrast, Plaintiffs sufficiently allege that, on at least two occasions *after* GDPR was enacted, Defendants issued misleading statements regarding the regulation's effect on Nielsen.  In particular, in light of Clarken's September 2018 revelation that 120 campaigns were abruptly shut off on May 25, 2018, it was misleading for Barns, only six days later, to describe GDPR as a non-event and assure the public that Nielsen had access to all of the data it needed.  SAC ¶ 214, 358.  Abcarian's June 14, 2018 statement reiterating Barns's assurance was similarly misleading.[3]  *Id*. ¶ 216-17, 362.  Defendants' repeated assurances about GDPR's *de minimis*

---

[3]      In their Opposition, Plaintiffs attribute the June 5, 2018 statement to Abcarian as well, Opp'n 7, but the Complaint merely identifies the speaker as "[a] Nielsen executive," SAC ¶¶ 215, 360(a).  Accordingly, any claim premised on that statement fails to satisfy Rule 9(b).

impact on Nielsen throughout the first half of 2018 and the magnitude of the event support an inference that Defendants knew facts or had access to information suggesting that these statements were materially misleading.  *See, e.g.*, *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 850 (S.D.N.Y. 2019) ("In order to speak so knowledgeably regarding the state of Carmike's theaters, Aron must have educated himself regarding the condition of these theaters presumably by reviewing data given to him by Carmike and by performing his own due diligence." (internal quotation marks omitted)); *Pirnik v. Fiat Chrysler Autos., N.V.*, No. 15-CV-7199 (JMF), 2016 WL 5818590, at *7 (S.D.N.Y. Oct. 5, 2016) (citing frequent discussion of a misleading topic in press releases, earnings calls, and SEC filings as a basis for a strong inference of scienter).

Relying on *In re Facebook, Inc. Securities Litigation*, 405 F. Supp. 3d 809, 847 (N.D. Cal. 2019), Defendants urge the Court to find that even Plaintiffs' claims relating to Defendants' post-GDPR statements amount to nothing more than fraud by hindsight.  *See* Defs.' Mem. 24; Reply 9.  But that case is inapposite because the statements at issue there concerned whether Facebook misleadingly assured investors that it was fully in compliance with GDPR.  *See* 405 F. Supp. 3d at 847.  In dismissing the claims, the court found not only that Facebook did express caution with its statement (rather than framing it as a guarantee), but also that the plaintiffs had failed to "identify a single provision of . . . GDPR that Facebook had not implemented at the time the challenged statements were made."  *Id*.  Here, Plaintiffs sufficiently allege that Defendants made misleading guarantees about GDPR's impact on Nielsen's business that negate any previous disclosure and plausibly allege scienter.  Accordingly, while Defendants' motion is granted as to Plaintiffs' pre-GDPR-related claims, it is denied as to their post-GDPR-related claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  In particular, the Court concludes that Plaintiffs plausibly allege that Defendants (1) failed to disclose a downward trend in discretionary spending in Nielsen's July 2016 Form 10-Q and subsequent Forms filed with the SEC during the Class Period; (2) made misleading opinion statements about the BDM business in July 2016; (3) made misleading statements about the fair value of Buy Segment goodwill in Nielsen's 2016 and 2017 Form 10-Ks; and (4) made false and misleading statements about GDPR's effect on the Watch Segment after the regulation went into effect.  It follows that Plaintiffs' claims relating to these statements — under Section 10(b), Rule 10b-5, *and* Section 20(a) — survive.  By contrast, Plaintiffs' Section 20(a) claims relating to the failed Section 10(b) claims must be and are dismissed.

The only remaining question is whether Plaintiffs should be permitted to replead their claims to the extent they have been dismissed.  Opp'n 30 (requesting leave to replead "[i]f any part of Defendants' motion is granted").  Given the deficiencies discussed above and the fact that Plaintiffs were granted leave to amend already, *see* ECF No. 71, the Court is skeptical that Plaintiffs can cure the defects that it has found in their claims and, thus, would likely be on firm ground denying leave to amend.  *See, e.g.*, *Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) ("[I]t is proper to deny leave to replead where . . . amendment would be futile.").  Out of an abundance of caution, however, the Court will grant Plaintiffs leave to amend once more.  *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015); *see also, e.g.*, *Pasternack v. Shrader*, 863 F.3d 162, 175 (2d Cir. 2017) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." (internal quotation marks omitted)).  No later than **January 19, 2021**, the parties shall confer and

submit a proposed stipulation setting forth deadlines for the filing of any amended complaint and

any answers or motions with respect to the existing Complaint or any amended complaint

      The Clerk of Court is directed to terminate ECF No. 75.


      SO ORDERED.

Dated: January 4, 2021
      New York, New York

                                        JESSE M. FURMAN
                                      United States District Judge