**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE NIELSEN HOLDINGS PLC SECURITIES LITIGATION | Civil Action No. 1:18-cv-07143-JMF<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, APPOINTMENT**
**AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. iii

I.     INTRODUCTION ...................................................................................................... 1

II.    STATEMENT OF FACTS COMMON TO THE CLASS ........................................ 4

      A.     Nielsen's Business ......................................................................................... 4

      B.     Defendants Fail to Inform the Market That Discretionary Spending
           By Nielsen's BDM Clients Was Declining ................................................... 5

      C.     Defendants Misled Investors About the Value of the Company's
           Goodwill ........................................................................................................ 5

      D.     Defendants Misled Investors About the Effect of the GDPR on the
           Company ........................................................................................................ 6

III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE
       CERTIFIED ............................................................................................................... 7

      A.     The Proposed Class Satisfies the Requirements of Rule 23(a) ..................... 8

           1.     The Class Is So Numerous That Joinder Is Impracticable ................ 8

           2.     Questions of Law and Fact Are Common to the Class ...................... 9

           3.     Plaintiffs' Claims Are Typical of the Class Claims ....................... 10

           4.     Plaintiffs Will Fairly and Adequately Protect the Interests
               of the Class ...................................................................................... 11

      B.     The Proposed Class Satisfies the Requirements of Rule 23(b)(3) .............. 13

           1.     Common Factual and Legal Issues Predominate ........................... 13

               (a)     Plaintiffs Are Entitled to the Fraud-on-the-Market
                    Presumption of Reliance ................................................... 14

                        (i)     Nielsen's NYSE Listing Is Strong Evidence of
                             Market Efficiency ................................................ 15

                        (ii)     The *Cammer* and *Krogman* Factors Support a
                             Finding of Market Efficiency .............................. 16

(iii)    Additional Factors Support Market Efficiency.................. 21

(b)    Reliance Is Presumed Under *Affiliate Ute* .....................................22

(c)    Damages May Be Calculated on a Class-Wide
Basis, Supporting a Finding of Predominance..............................22

2.    Superiority Is Established ......................................................................24

C.    The Court Should Appoint Labaton Sucharow as Class Counsel..........................25

IV.    CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States,*
    406 U.S. 128 (1972) ....................................................................................... 3, 13-14, 22

*In re Alstom SA Sec. Litig.,*
    253 F.R.D. 266 (S.D.N.Y. 2008) .......................................................................21

*In re Am. Realty Cap. Props., Inc. Litig.,*
    No. 15-mc-40-AKH, 2017 WL 3835881 (S.D.N.Y. Aug. 31, 2017) ....................................20

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)...........................................................................................13

*Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013).........................................................................7, 13, 14, 22

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
    222 F.3d 52 (2d Cir. 2000)............................................................................11, 12

*In re Barrick Gold Sec. Litig.,*
    314 F.R.D. 91 (S.D.N.Y. 2016) .......................................................................11

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)......................................................................................3, 13, 14

*Billhofer v. Flamel Techs., S.A.,*
    281 F.R.D. 150 (S.D.N.Y. 2012) ................................................................. *passim*

*Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................. *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,*
    310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................. *passim*

*Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed
Care, L.L.C.,*
    504 F.3d 229 (2d Cir. 2007)............................................................................8

*City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.,*
    No. 12-cv-0256-LAK-ALP, 2017 WL 3608298 (S.D.N.Y. Aug. 22, 2017) ...........................9

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013)...........................................................................................22

*Consol. Rail Corp. v. Town of Hyde Park*,
  47 F.3d 473 (2d Cir. 1995).............................................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)......................................................................................................13

*In re Facebook, Inc., IPO & Sec. & Derivative Litig.*,
  986 F. Supp. 2d 428 (S.D.N.Y. 2013)..........................................................................22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)............................................................................................11

*Fogarazzao v. Lehman Bros., Inc.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ..................................................................................22

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) ..................................................................................10

*Gross v. GFI Grp., Inc.*,
  No. 14-cv-9438, 2017 WL 3668844 (S.D.N.Y. Aug. 23, 2017)..................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)................................................................................................ 13-14

*Haw. Structural Ironworkers Pension Tr. v. AMC Ent. Holdings, Inc.*,
  No. 18-cv-299-AJN, 2021 WL 1198799 (S.D.N.Y. Mar. 30, 2021) ...........................22

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006).............................................................................................8

*In re JPMorgan Chase & Co. Sec. Litig.*,
  No. 12-cv-3852-GBD, 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)..............7-8, 16, 23-24

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
  311 F.R.D. 373 (S.D.N.Y. 2015) ..................................................................................10

*Katz v. Image Innovations Holdings, Inc.*,
  No. 06-cv-3707-JGK, 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ..................2, 13

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) .....................................................................*passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014).....................................................9, 10, 20, 21

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  328 F.R.D. 86 (S.D.N.Y. 2018) ....................................................................................19

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
  310 F.R.D. 230 (S.D.N.Y. 2015) ..................................................................................24

*Micholle v. Ophthotech Corp.*,
   No. 17-cv-210-VSB, 2018 WL 1307285 (S.D.N.Y. Mar. 13, 2018)......................................12

*In re NYSE Specialists Sec. Litig.*,
   260 F.R.D. 55 (S.D.N.Y. 2009) ...............................................................................................9

*In re Parmalat Sec. Litig.*,
   No. 04-md-1653-LAK, 2008 WL 3895539 (S.D.N.Y. Aug. 21, 2008)................................12

*Pennsylvania Ave. Funds v. Inyx, Inc.*,
   No. 08-cv-6857-PKC, 2011 WL 2732544 (S.D.N.Y. July 5, 2011)........................................9

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017).......................................................................15, 16, 19, 25

*In re Pfizer Inc. Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) .............................................................................................24

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) (Furman, J.).................................................................. *passim*

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)........................................................................................... 22-23

*In re Sanofi-Aventis Sec. Litig.*,
   293 F.R.D. 449 (S.D.N.Y. 2013) ..........................................................................................25

*In re SCOR Holding (Switz.) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)............................................................................... 24-25

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16-cv-6728-CM-RWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019).................... *passim*

*In re SLM Corp. Sec. Litig.*,
   No. 08-cv-1029-WHP, 2012 WL 209095 (S.D.N.Y. Jan. 24, 2012)........................................1

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) .............................................................................................10

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) .............................................................................................12

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*,
   552 U.S. 148 (2008)................................................................................................................13

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd, Waggoner*, 875 F.3d 79......................................16, 20

*Sykes v. Mel S. Harris & Assocs. LLC*,
   780 F.3d 70 (2d Cir. 2015)......................................................................................................23

*Vargas v. Howard*,
    324 F.R.D. 319 (S.D.N.Y. 2018) ........................................................................7

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    No. 15-cv-1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ...............................1, 9, 10, 14

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).........................................................................9

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)........................................................................ *passim*

*In re Warner Chilcott Ltd. Sec. Litig.*,
    No. 06-cv-11515-WHP, 2008 WL 344715 (S.D.N.Y. Feb. 4. 2008) .....................................24

*Wilson v. LSB Indus., Inc.*,
    No. 15-cv-7614-RA-GWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)...............17, 18, 21

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) ...........................................................16, 17, 18

## Statutes

Securities Exchange Act of 1934 Section 10(b), 15 U.S.C. § 78j(b)................................... *passim*

Securities Exchange Act of 1934 Section 20(a), 15 U.S.C. § 78t(a) ..................................1, 10, 11

Private Securities Litigation Reform Act of 1995 .......................................................12

17 C.F.R. §239.13 ..................................................................................18

## Other Authorities

Fed. R. Civ. P. 23 ............................................................................... *passim*

Fed. R. Civ. P. 23(a) ............................................................................ *passim*

Fed. R. Civ. P. 23(b) ............................................................................ *passim*

Fed. R. Civ. P. 23(g) ..............................................................................3, 25

H.R. Rep. No. 104-369 (1995)......................................................................12

Lead Plaintiff Public Employees' Retirement System of Mississippi ("MissPERS") and additionally named Plaintiff Monroe County Employees' Retirement System ("Monroe") (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their Motion for Class Certification, requesting that, pursuant to Federal Rules of Civil Procedure ("Rules") 23(a), 23(b)(3), and 23(g), the Court: (i) certify this case as a class action; (ii) appoint Plaintiffs as Class Representatives; and (iii) appoint Labaton Sucharow LLP as Class Counsel.

## I.    INTRODUCTION

This is a federal securities action against Nielsen Holdings plc ("Nielsen" or the "Company"), former CEO Dwight Mitchell Barns ("Barns"), former CFO Jamere Jackson ("Jackson"), and Senior Vice President of Product Leadership Kelly Abcarian ("Abcarian") (collectively, the "Defendants")[1] for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§78j(b) and 78t(a).

As courts in this Circuit have recognized, "claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification." *In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *3 (S.D.N.Y. Jan. 24, 2012); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) (securities fraud claims are "especially amenable to class certification") (citation omitted).

This case is no exception—and it is well-suited for class treatment. Plaintiffs therefore respectfully request certification pursuant to Rule 23 on behalf of a class (the "Class") consisting of: all persons and entities that purchased or otherwise acquired Nielsen publicly traded common stock during the period from July 26, 2016 through July 25, 2018, inclusive (the "Class Period"), and were damaged thereby, except as excluded below (the "Class").[2] Excluded from the Class

---

[1] Barns, Jackson, and Abcarian are referred to herein collectively as the "Individual Defendants."
[2] The proposed Class Period, as defined herein, is consistent with the claims sustained in the Court's motion to dismiss order. ECF No. 85. Should discovery produced in this case support a claim for the dismissed statements

are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Nielsen during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) affiliates of Nielsen, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(iv) of this paragraph.

For a class to be certified, "the Court must determine that the party seeking certification has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation." *Katz v. Image Innovations Holdings, Inc.*, 2010 WL 2926196, at *1 (S.D.N.Y. July 22, 2010). The Court must also find that the party qualifies under one of the three sets of criteria set forth in Rule 23(b)(1), (2), or (3). *See id.* Rule 23(b)(3), in particular, permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each of these requirements is met here.

***First***, with over 350 million shares of Nielsen common stock outstanding throughout the Class Period, during which time the average weekly trading volume for Nielsen common stock was 15.3 million shares, there are likely thousands of Class members, satisfying numerosity. *See In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (finding numerosity satisfied where defendant corporation had between 60.5 and 80.5 million shares outstanding and an average of 1.34 million shares traded daily).

---

from early 2016, Plaintiffs may seek leave to file a motion to expand or modify the class definition to include claims for purchasers of Nielsen publicly traded common stock during that period.

*Second*, the commonality prerequisite is met because this action involves several class-wide questions of law and fact, including whether: (1) Defendants made material misrepresentations and omissions in the Company's Securities and Exchange Commission ("SEC") filings and other public disclosures during the Class Period; (2) Defendants acted with scienter; (3) the price of Nielsen's common stock was artificially inflated and/or artificially maintained during the Class Period by Defendants' fraudulent conduct; (4) Class members suffered damages; and (5) the Individual Defendants were control persons of Nielsen.

*Third*, the typicality prerequisite is met because Plaintiffs' injuries and those of Class members arise from the same alleged fraudulent conduct. Plaintiffs and Class members purchased Nielsen common stock at prices that had been artificially inflated and/or artificially maintained by Defendants' material misrepresentations and omissions. When the true condition of Nielsen—which Defendants concealed from investors during the Class Period—was finally revealed, the price of Nielsen's common stock dropped, injuring Plaintiffs and the Class.

*Fourth*, the adequacy requirement is met here because Plaintiffs have demonstrated that they will fairly and adequately protect the interests of the Class by vigorously prosecuting this case and because no antagonism exists between Plaintiffs and the Class. Additionally, Plaintiffs' choice of counsel, Labaton Sucharow LLP ("Labaton Sucharow"), are highly experienced in securities class actions and are well-suited for appointment as Class Counsel under Rule 23(g).

*Fifth*, this action satisfies the predominance requirement of Rule 23(b)(3). Several issues of fact and law—including falsity, materiality, scienter, loss causation, and damages—are subject to common proof and predominate over any individual issues. The same is true with the issue of reliance, which may be presumed under the "fraud-on-the-market" presumption, *see Basic Inc. v. Levinson*, 485 U.S. 224 (1988), or the presumption of reliance for omissions under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972). Indeed, *Basic*

3

permits the presumption in this case because, as established in the accompanying Expert Report

of Chad Coffman, CFA, the market for Nielsen common stock, which traded on the New York

Stock Exchange ("NYSE"), was efficient throughout the Class Period. *See* Declaration of

Christine M. Fox ("Fox Decl."), Ex. A ("Coffman Report" or "Coffman Rpt."), ¶25. Further,

*Affiliated Ute* permits a presumption of reliance since Plaintiffs allege material omissions.

**Sixth**, the superiority requirement of Rule 23(b)(3) is satisfied because: (1) thousands of

geographically dispersed investors who purchased Nielsen stock during the Class Period were

harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors

who lost small amounts of money would file individual actions; (3) it is desirable to hear all such

claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

### A.   Nielsen's Business

Nielsen is a data analytics company that provides its customers with information about

consumer preferences and the programming consumers watch and listen to. ¶61.[3] Nielsen's

business is divided into two main reporting segments: (1) Buy, and (2) Watch. *Id.* The Buy

segment tracks retail transactions and transforms this data into products that assist companies in

their marketing. ¶67. The Buy segment is reported in two main geographic groups, Buy

Developed Markets ("BDM") and Buy Emerging Markets ("BEM"). ¶69. The Watch segment

provides viewership and listening data and analytics primarily to the media and advertising

industries across the television, radio, print, online, digital, mobile viewing and listening

platforms. ¶70. The Watch segment included the Watch Marketing Effectiveness ("WME")

business, which analyzed the effectiveness of advertising campaigns. ¶¶70-71. Nielsen's

business relies on the collection of data, some of which is obtained from third parties. ¶63.

---

[3] The Second Amended Complaint (ECF No. 72) is referred to herein as the "Complaint," (cited as "¶__").

**B.      Defendants Fail to Inform the Market That Discretionary Spending By Nielsen's BDM Clients Was Declining**

Throughout the Class Period, Defendants made materially false and misleading statements and omissions about Nielsen's Buy business. ¶¶285–99. In 2016, Defendants repeatedly represented that discretionary spending by BDM clients was "stable," that some softness in discretionary spending was not uncommon, and that Nielsen would report 1.5%-3.5% growth in BDM revenues. *Id.* However, this business was in a steady decline due to falling demand for Nielsen's analytics products as customers were choosing not to purchase the Company's complicated and expensive analytics, opting instead for "raw data" from Nielsen they could crunch themselves. ¶¶7, 299–300. In fact, on October 25, 2016, Defendants revealed they knew discretionary spending had been declining since 2015, that the decline was permanent, and that it caused BDM revenues to fall 2.5% in 3Q16. ¶¶414, 419.

The Company's stock price plummeted nearly 17% on October 25, 2016 in response to this unexpected negative news. ¶464. Moreover, Defendants continued to mislead investors by failing to disclose the known negative trends in the BDM business. ¶¶364–371. As a result, Nielsen stock continued to trade at artificially inflated prices, and investors were injured when the truth was revealed and the Company's stock fell precipitously.

**C.      Defendants Misled Investors About the Value of the Company's Goodwill**

Nielsen's goodwill—which is an asset that represents the future economic benefits that arise from the other assets acquired in a business combination that are not otherwise individually identified or separately recognized—was important to investors as it represented nearly 50% of the total assets of $15.7 billion carried on Nielsen's balance sheet as of December 31, 2016. ¶374. Specifically, the Buy reporting unit's goodwill totaled $2.696 billion, representing 35% of total goodwill and nearly 17% of total assets. *Id.*

Defendants misrepresented, in Nielsen's Forms 10-K for the years ending December 31, 2016 and December 31, 2017, the value of the Company's Buy Segment goodwill, by, among other things, asserting that it was not impaired and that the fair value of Buy Segment goodwill was actually 20% higher than the $2.844 billion carry value as of December 31, 2017. ¶¶187, 372–411. Defendants concealed that unreasonable and baseless cash flow assumptions were utilized in Nielsen's goodwill impairment model. ¶¶381-402. As a result, Nielsen reported inflated earnings, assets, and capital in violation of Generally Accepted Accounting Principles ("GAAP"). ¶372, 403-11. Defendants also falsely represented that any downward revisions in the fair value of the Company's reporting units "could" result in impairment charges for goodwill that "could" materially affect Nielsen's financial performance. ¶187.

On February 28, 2019, after Defendants Barns and Jackson had left the Company, Nielsen reported that it had recorded a $1.4 billion impairment charge, which reduced the carrying value of the Buy reporting unit's goodwill by 54% to $1.34 billion. ¶279. On February 27, 2020, Nielsen reported that it had recorded an additional $1.0 billion impairment charge for 2019, which reduced the carrying value of the Buy reporting unit's goodwill to just $331 million. *See* Nielsen Holdings plc, Annual Report (Form 10-K) (Feb. 27, 2020).

### D.     Defendants Misled Investors About the Effect of the GDPR on the Company

Nielsen's business, especially, its WME business, is dependent upon access to data from third-party data providers, such as Facebook and Twitter. ¶¶63, 205. In 2018, the European Union's General Data Protection Regulation ("GDPR") was going into effect, and it was the general consensus that GDPR would have major implications for data collection and sharing. ¶¶202-05. However, in 2018, Defendants repeatedly represented that WME revenues would increase 15%-20% in 2018 (¶¶206-09); that the GDPR would not have "any major impact" on Nielsen's business (¶207); and that the Company was "ready" for the GDPR and in "good shape"

because Nielsen would have "access to all the data needed for [its] products" (*id.*). Moreover, Defendants affirmatively represented that GDPR was "a net positive" for the Company. ¶218.

In fact, as was revealed after the Class Period, Defendants knew that hundreds of data providers had cut off Nielsen's access to the data needed for its products – due to the GDPR – with Nielsen's President-Product Leadership, Megan Clarken stating, on the day GDPR regulations were put into place, that 120 campaigns being measured were "literally switched off." ¶270. Despite this, Defendants referred to the GDPR as a "non-event" for Nielsen. ¶362. Not until July 26, 2018 did Defendants admit that hundreds of data providers had cut off access to the data and that it caused WME revenues to be "significantly below . . . expectations." ¶250. The Company's stock price plummeted 25% on July 26, 2018 in response to this and other unexpected negative news about the Buy business. ¶464.

## III.   THE PROPOSED CLASS SATISFIES RULE 23 AND SHOULD BE CERTIFIED

Certification is appropriate where a putative class meets all four requirements of Rule 23(a) and one requirement of Rule 23(b). *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 73 (S.D.N.Y. 2015). Though "a court's class-certification analysis must be 'rigorous' . . . Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013). For this reason, "[a] motion for class certification should not become a mini-trial on the merits; the question before the Court is whether Plaintiff[s] meets Rule 23's requirements, not whether Plaintiff[s] will prevail on the merits." *Signet*, 2019 WL 3001084, at *7; *Vargas v. Howard*, 324 F.R.D. 319, 324 (S.D.N.Y. 2018) ("The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction.").

"If the Court finds that the requirements of Rule 23 have been met, the Court may, in its discretion, certify the [C]lass." *Signet*, 2019 WL 3001084, at *7. "The Second Circuit has

construed Rule 23 liberally and directed district courts to err on the side of granting class certification." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *2 (S.D.N.Y. Sept. 29, 2015); *see also In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41-42 (2d Cir. 2006) (instructing courts to "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met," but cautioning against "assess[ing] any aspect of the merits unrelated to a Rule 23 requirement"); *Pirnik v. Fiat Chrysler Autos., N.V.,* 327 F.R.D. 38, 43 (S.D.N.Y. 2018) (Furman, J.) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.").

### A.     The Proposed Class Satisfies the Requirements of Rule 23(a)

#### 1.     The Class Is So Numerous That Joinder Is Impracticable

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity "does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). The Second Circuit has recognized that "numerosity is presumed at a level of 40 members." *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). In securities class actions, "the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Signet*, 2019 WL 3001084, at *8.

Here, the Class is so numerous that joinder would be impracticable. During the Class Period, there were over 350 million common shares of Nielsen stock outstanding, and the average weekly trading volume of Nielsen stock on the NYSE was 15.3 million shares,

representing 4.30% of all outstanding shares. ¶474; Coffman Rpt. ¶25.[4] The numerosity

requirement is therefore easily satisfied. *See Signet*, 2019 WL 3001084, at * 8 (finding

numerosity satisfied where defendant corporation had between 60.5 and 80.5 million shares

outstanding and an average of 1.34 million shares traded daily); *Virtus*, 2017 WL 2062985, at *2

(numerosity established where the daily trading volume averaged approximately 65,000 shares);

*Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 153-54 (S.D.N.Y. 2012) (finding numerosity

where there was 23 million ADRs outstanding and between 71 and 82 institutional investors).

### 2.     Questions of Law and Fact Are Common to the Class

Rule 23(a)(2) requires that "there are questions of law or fact common to the class," Fed.

R. Civ. P. 23(a)(2). It is a "low hurdle," *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.

Supp. 3d 415, 424 (S.D.N.Y. 2014), requiring only that Plaintiffs "identify some unifying thread

among the members' claims that warrants class treatment." *In re Vivendi Universal, S.A.*, 242

F.R.D. 76, 84 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223 (2d

Cir. 2016); *see also City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 2017 WL

3608298, at *5 (S.D.N.Y. Aug. 22, 2017) (commonality "met if plaintiffs' grievances share a

common question of law or of fact."). Courts have explained that "[e]ven a single common legal

or factual question will suffice." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 70 (S.D.N.Y.

2009). In Section 10(b) cases, "[c]ommon questions of law and fact include whether certain

statements were false and misleading, whether those statements violated the federal securities

laws, whether those statements were knowingly and recklessly issued, and ensuing causation

issues." *Pennsylvania Ave. Funds v. Inyx, Inc.*, 2011 WL 2732544, at *4 (S.D.N.Y. July 5, 2011).

---

[4] In addition, Defendants admit that as of September 30, 2018, Nielsen had over 350 million common shares
outstanding, and that more than 1,000 persons and entities acquired Nielsen common stock during the Class Period.
*See* Fox Decl. Ex. D (Defendants' Responses and Objections to Plaintiffs' First Set of Requests for Admission
Directed to All Defendants, served on Plaintiffs on July 12, 2021 ("RFA Responses")) at 13, 24.

Here, there are numerous questions of law and fact that are common to all Class members, whose claims for redress all arise from Defendants' misrepresentations concerning: (1) the negative trend in discretionary spending by Nielsen's BDM customers, (2) the Company's goodwill valuation, and (3) that the Company's readiness for GDPR and the impact the GDPR would have on Nielsen's business. These common issues create related common questions of law and fact, including whether: (1) the alleged misrepresentations and/or omissions were material; (2) Defendants acted knowingly or recklessly; (3) Defendants violated Section 10(b) and Section 20(a); and (4) investors suffered resulting damages. ¶478. The commonality prong is therefore satisfied. *See Virtus*, 2017 WL 2062985, at *2 ("[C]ommonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages.").

### 3.     Plaintiffs' Claims Are Typical of the Class Claims

Rule 23(a)(3)'s typicality requirement is "not demanding," *Kaplan v. S.A.C. Capital Advisors, L.P*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015), and is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability. *See McIntire*, 38 F. Supp. 3d at 424. When assessing typicality, courts focus on "the defendant's actions." *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 132 (S.D.N.Y. 2014). Thus, when "the same unlawful conduct was directed at or affected both" the class and its representative, typicality "is usually met irrespective of minor variations in the fact patterns underlying individual claims." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 45-46 (S.D.N.Y. 2013). For this reason, "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar" to the proposed class representative." *Id.* at 46.

Here, typicality is easily met. Plaintiffs' claims arise out of the same alleged facts and legal theories as the claims of all other Class members—*i.e.*, Plaintiffs allege that Defendants made materially false and misleading public statements and omissions, in violation of Sections 10(b) and 20(a) of the Exchange Act. ¶476. Moreover, the injury Plaintiffs suffered is alleged to be the same as the injury suffered by the proposed Class—*i.e.*, Plaintiffs purchased Nielsen common stock at artificially inflated and/or artificially maintained prices during the Class Period, suffering losses when the truth about Defendants' common course of conduct was revealed to the market, just like all other Class members. ¶¶476, 487. Thus, Plaintiffs' claims are typical of—if not identical to—those of other members of the Class. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 103 (S.D.N.Y. 2016) ("[T]ypicality is established because all class members' claims arise from the same course of events and involve similar arguments on liability").

### 4.    Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement seeks to ensure that Plaintiffs' interests are not antagonistic to those of the Class, and that Plaintiffs' attorneys are qualified, experienced, and able to conduct the litigation. *See Signet*, 2019 WL 3001084, at *9; *see also Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). "The purpose of this inquiry is to uncover conflicts of interest between the named parties and the class." *Gross v. GFI Grp., Inc.*, 2017 WL 3668844, at *2 (S.D.N.Y. Aug. 23, 2017) (citation omitted). "[H]ypothetical conflict[s] of interest, without more," are not enough to warrant denial of class certification on "adequacy grounds." *Id.* at *3; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (conflict "must be fundamental" to defeat class certification).

The adequacy requirement is satisfied here. ***First***, neither of Plaintiffs' interests are antagonistic to those of the proposed Class. Plaintiffs, like all Class members, purchased Nielsen

common stock at inflated market prices during the Class Period and were injured by the same

material misrepresentations and omissions, and subsequent stock price decline. Plaintiffs'

interests in establishing Defendants' liability and maximizing recovery are aligned with those of

absent Class members. *Billhofer*, 281 F.R.D. at 157 (stating "the interests of the other members

of the proposed class will be adequately protected by [p]laintiff" in securities case where all

claims arose from the same conduct).[5] ***Second***, Plaintiffs have already proven their willingness

and ability to serve as Class Representatives by, among other things,: (i) actively supervising and

monitoring this litigation and reviewing draft filings; (ii) participating in discussions with

counsel concerning case developments; (iii) reviewing Court filings; (iv) responding to discovery

requests from Defendants, including preserving, collecting, and producing responsive

documents, and responding to Defendants' interrogatories; and (v) receiving regular case status

reports from counsel. Plaintiffs intend to continue to perform similar activities, including

participating in discovery and trial preparation. Plaintiffs understand their duty to the Class and

are committed to prosecuting this Action to maximize the recovery of all Class members.[6]

 ***Finally***, Plaintiffs have engaged competent counsel that are "qualified, experienced and

able to conduct the litigation." *Baffa*, 222 F.3d at 60. Labaton Sucharow has extensive

experience litigating securities class actions throughout the country and has successfully

prosecuted hundreds of securities class actions on behalf of injured investors. *See* Fox Decl. Ex.

B (Labaton Sucharow Firm Resume).[7] The interests of the Class are therefore protected.

---

[5] Further bolstering their adequacy, neither Plaintiff is subject to unique defenses. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 94 (S.D.N.Y. 2010) (the question is "whether the defenses will become the focus of the litigation, thus overshadowing the primary claims, and prejudicing other class members"); *In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (the unique defense rule "is not rigidly applied in this Circuit," and "is intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit").

[6] Further, as institutional investors, Plaintiffs are particularly well-qualified to serve as Class Representatives. The PSLRA was intended "to increase the likelihood that institutional investors will serve as lead plaintiffs." *See* H.R. Rep. No. 104-369, at 34 (1995) (Conf. Rep.); *see also Micholle v. Ophthotech Corp.*, 2018 WL 1307285, at *6 (S.D.N.Y. Mar. 13, 2018) (recognizing such intent).

[7] Additional Counsel for the Proposed Class is also qualified, experienced, and able to conduct this litigation. *See* Fox Decl. Ex. C (Robbins Geller Firm Resume).

**B.      The Proposed Class Satisfies the Requirements of Rule 23(b)(3)**

The proposed Class also satisfies Rule 23(b)(3)'s requirements that common questions of

law or fact predominate and that a class action be the superior method to adjudicate this dispute.

*See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

**1.      Common Factual and Legal Issues Predominate**

"Predominance is satisfied if resolution of some of the legal or factual questions that

qualify each class member's case as a genuine controversy can be achieved through generalized

proof, and if these particular issues are more substantial than the issues subject only to

individualized proof." *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017) (citation

omitted). "Predominance is a test readily met in certain cases alleging consumer or securities

fraud." *Image Innovations*, 2010 WL 2926196, at *5.

The analysis of whether common questions predominate "begins . . . with the elements of

the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-

810 (2011) ("*Halliburton I*"). The elements of Plaintiffs' fraud claims are: (1) a material

misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss

causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The Supreme Court has held that falsity, materiality, and loss causation are common

issues to a class, *Amgen*, 568 U.S. at 474-75, which means that whether common questions of

law or fact predominate in a securities fraud action "often turns on the element of reliance."

*Halliburton I*, 563 U.S. at 810. Here, Plaintiffs and the Class are entitled to a presumption of

Class-wide reliance under the fraud-on-the-market theory set forth in *Basic Inc. v. Levinson*, 485

U.S. 224 (1998), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258,

276 (2014) ("*Halliburton II*"), or set forth in *Affiliated Ute Citizens v. United States*, 406 U.S.

128, 153-54 (1972). As set forth below, damages will also be determined on a class-wide basis using the same formula and measure of artificial inflation attributable to Defendants' conduct. Accordingly, the predominance requirement is satisfied.

(a)      <b>Plaintiffs Are Entitled to the Fraud-on-the-Market Presumption of Reliance</b>

In *Basic*, the Supreme Court held that investors could satisfy the reliance element of Section 10(b) by invoking a rebuttable presumption of reliance. 485 U.S. at 245-49. The *Basic* presumption of reliance is premised on the fact that "the price of a security traded in an efficient market will reflect all publicly available information about a company; accordingly, a buyer of the security may be presumed to have relied on that information in purchasing the security." *Amgen*, 568 U.S. at 458; *Basic*, 485 U.S. at 229-30 (concluding that anyone who buys or sells stock at the market price may be considered to have relied on material misstatements).

Plaintiffs may invoke the presumption by establishing that "the alleged misrepresentations were public, that [Nielsen's] stock traded on an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." *Virtus*, 2017 WL 2062985, at *4. Once the *Basic* presumption of reliance is invoked (as is the case here), "the burden then shifts" and Defendants "bear the burden of persuasion [under *Halliburton II*] to rebut the Basic presumption by a preponderance of the evidence." *Signet*, 2019 WL 3001084, at *11 (citation omitted). "To meet their burden, [D]efendants must 'do more than merely produce evidence that *might* result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the evidence.'" *Id.* (citing *Waggoner*, 875 F.3d at 101).

Plaintiffs have successfully invoked the *Basic* presumption. First, Plaintiffs allege that Defendants made material misrepresentations and omissions in their public statements to investors through Nielsen's SEC filings and press releases, as well as during earnings conference

14

calls and investor conferences, that artificially inflated and/or artificially maintained the market price of Nielsen common stock. ¶¶285, 287, 289, 291, 293, 295-96, 298-99, 304, 306, 308, 310, 312, 314, 316, 318, 320, 322, 324-25, 327, 329, 331, 333, 335, 337, 339, 341-42, 344, 346, 348, 350, 352, 354, 356, 358, 360, 362, 366, 368, 370, 372-411. Second, with respect to market timing, Plaintiffs allege that they, like other members of the proposed Class, bought Nielsen stock during the Class Period at artificially inflated prices and suffered losses when that inflation was removed upon the disclosure of the truth. ¶¶462-67. Third, as alleged and as detailed below and in the Coffman Report, the market for Nielsen's common stock was efficient at all relevant times during the Class Period. ¶¶468-70; Coffman Rpt. ¶25.

The Second Circuit has held that the burden to show market efficiency at class certification "is not an onerous one." *In re Petrobras Sec. Litig.*, 862 F.3d 250, 278 (2d Cir. 2017); *see also Waggoner*, 875 F.3d at 97. Instead, it is a flexible inquiry for which the Second Circuit has declined to adopt any particular test, instead directing "a holistic analysis based on the totality of the evidence presented." *Id.* at 94, 96-97. As detailed herein and in the accompanying Coffman Report, Plaintiffs have established that the market for Nielsen stock was efficient at all relevant times, triggering the presumption of reliance.

          **(i)**     **Nielsen's NYSE Listing Is Strong Evidence of Market Efficiency**

Nielsen's listing on the NYSE alone supports a presumption of market efficiency.[8] *See Billhofer*, 281 F.R.D. at 159 (stating that a security listed on NASDAQ, the American Stock Exchange, or NYSE is presumed efficient at class certification stage); *Carpenters*, 310 F.R.D. at 81 (collecting cases noting that some courts presume securities traded on national markets to be efficient); *Pirnik*, 327 F.R.D. at 44 (referring to the NYSE as a "paradigmatic efficient market").

---

[8] Defendants admit that Nielsen's common stock traded on the New York Stock Exchange throughout the Class Period. *See* Fox Decl. Ex. D (RFA Responses) at 20.

At a minimum, Nielsen's trading on a national exchange provides "a strong indication" of efficiency. *JPMorgan*, 2015 WL 10433433, at *7; *accord Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is a good indicator of efficiency"), *aff'd, Waggoner*, 875 F.3d 79. *See also* Coffman Rpt. ¶¶40-41.

(ii)    **The *Cammer* and *Krogman* Factors Support a Finding of Market Efficiency**

The "prevailing tests for market efficiency," *Signet*, 2019 WL 3001084, at *11, are the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)—known as the *Cammer* and *Krogman* factors.

The five *Cammer* factors are (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price. *Signet*, 2019 WL 3001084, at *11. The three *Krogman* factors are: (1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders. *Id.*

Courts are clear that these factors should be used "as an analytical tool rather than as a checklist," *Billhofer*, 281 F.R.D. at 160, and should be analyzed holistically "based on the totality of the evidence presented." *Petrobras*, 862 F.3d at 275, 277. A holistic consideration of the *Cammer* and *Krogman* factors overwhelmingly supports a finding that the market for Nielsen common stock was efficient during the Class Period.

***Cammer* One: Weekly Trading Volume**. "Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citation omitted). High trading volume suggests efficiency "because it implies significant investor

16

interest in the company" which, "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Carpenters*, 310 F.R.D. at 79 (certifying securities class). Nielsen's average weekly trading volume of 4.30% of shares outstanding easily exceeds *Cammer's* 2% threshold. Coffman Rpt. ¶28; *Pirnik*, 327 F.R.D. at 44 (average weekly trading volume of 2.5% justified "a strong presumption of efficiency").

     **Cammer Two: Number of Analysts**. Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. Defendants admit that at least 15 securities analysts reported on Nielsen during the Class Period. *See* Fox Decl. Ex. D (RFA Responses) at 25. These analysts (which included major firms like Barclays, J.P. Morgan, and Deutsche Bank) issued at least 148 reports on Nielsen during the Class Period. Coffman Rpt. ¶34. The extensive coverage of Nielsen easily satisfies *Cammer* Two and supports a finding of market efficiency. *Winstar*, 290 F.R.D. at 446 (finding market efficient with three analysts); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *11 (S.D.N.Y. Aug. 13, 2018) (45 reports by at least 5 analysts supported efficiency and well surpassed the 15 research reports in *Cammer*).

     Courts also recognize that widespread media coverage supports a finding of efficiency. *See Carpenters*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency); *Billhofer*, 281 F.R.D. at 153-54 (noting the publication of over two dozen press releases and articles supported finding of efficiency). Here, over 1,800 unique news articles concerning Nielsen were published during the Class Period, further supporting the efficiency of the market for Nielsen common stock. Coffman Rpt. ¶36.

     **Cammer Three: Market Makers**. The number of market makers and arbitrageurs supports a finding of market efficiency because they "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *LSB*

*Indus.*, 2018 WL 3913115, at *10; *Winstar*, 290 F.R.D. at 446 ("Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level.").[9] Courts in this Circuit "have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92 (citing cases). Here, according to Bloomberg, there were more than 100 market makers for Nielsen common stock throughout the Class Period, which satisfies a finding of efficiency. Coffman Rpt. ¶42; *see Winstar*, 290 F.R.D. at 447 (six market markers evidenced market efficiency); *Carpenters*, 310 F.R.D. at 92 (51 market makers sufficient).

**Cammer Four: SEC Registration Form S-3**. "The ability to file [a Form S-3 registration statement] indicates that the company is easily able to issue new securities," and is evidence of market efficiency. *Winstar*, 290 F.R.D. at 447. A company is eligible to file a Form S-3 registration statement if it has filed SEC reports for 12 consecutive months and possesses a market capitalization of at least $75 million. *See* 17 C.F.R. §239.13. Based on his analysis, Mr. Coffman found no evidence that Nielsen was not S-3 eligible during the Class Period. Coffman Rpt. ¶45. Indeed, Mr. Coffman observed that Nielsen filed Form S-3ASRs before the Class Period and met the eligibility criteria for filing a Form S-3 throughout the Class Period. *Id.*  ¶¶25, 45. This factor therefore supports a finding of market efficiency.

**Cammer Five: Price Reaction**. The fifth (and final) *Cammer* factor allows, but does not require, plaintiffs to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94. In this Circuit, "a Plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies,"

---

[9] The NYSE does not have market makers as the term was used in *Cammer*, and instead relies on "a computerized system to match orders and provide quotes" and minimum requirements for listing that "virtually guarantee a liquid market for [the] security." Coffman Rpt. ¶41.

particularly where the "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency. *Waggoner*, 875 F.3d at 96-98. Here, the first four *Cammer* factors, and all of the *Krogman* factors, support market efficiency, obviating the Court's need to analyze the fifth *Cammer* factor. *Pirnik*, 327 F.R.D. at 45 n.3 ("As Plaintiffs easily satisfy the first four Cammer factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters*, 310 F.R.D. at 86 ("In the usual case of common or other highly traded and analyzed stock, there is no reason to burden the court with review of an event study and the opposing expert's attack of it."); *Signet*, 2019 WL 3001084, at *13 (finding market efficiency on basis of first four *Cammer* factors and three *Krogman* factors).

However, Plaintiffs have also established the fifth *Cammer* factor. Mr. Coffman "performed an event study to determine whether Nielsen Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no Nielsen-related news."[10] Coffman Rpt.  ¶49. After controlling for market and industry factors, Mr. Coffman's event study found "a clear cause-and-effect relationship between new public information about Nielsen and the market price of Nielsen Common Stock." *Id.* As the report details, Mr. Coffman has shown through empirical analyses based on the results of his event study that Nielsen's stock price reacted in an efficient manner to new material information about the Company. *Id.* at ¶60; *see Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98 (S.D.N.Y. 2018) (finding efficiency even where defendants were able to "poke[] some holes" in plaintiffs' expert's conclusions, as "the event study goes to the basic premise of *Cammer* 5").[11] Thus, Mr. Coffman's analysis further establishes market efficiency.

---

[10] "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.'" *Petrobras*, 862 F.3d at 278 (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).

[11] In addition, Defendants admit that information during the Class Period, such as Nielsen's announcements of financial results and certain presentations, were widely disseminated. *See* Fox Decl. Ex. D (RFA Responses) at 33.

*Krogman* **One: Market Capitalization**.[12] During the Class Period, the market capitalization for Nielsen Common Stock averaged $14.26 billion, and there was a minimum of 355 million shares of Nielsen Common Stock outstanding throughout the Class Period. Coffman Rpt. ¶69. This supports a finding of market efficiency. *See, e.g.*, *Carpenters*, 310 F.R.D at 92 (market capitalization of $0.5 to $3.2 billion supported market efficiency); *McIntire*, 38 F. Supp. 3d at 433 (market capitalization of $292 to $585 million supported market efficiency); *Billhofer*, 281 F.R.D. at 154 (market capitalization of $288 million to $717 supported efficiency).

*Krogman* **Two: Bid/Ask Spread**. The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares. *See Krogman*, 202 F.R.D. at 478. "[A] small bid-ask spread indicate[s] that trading in the stock [is] inexpensive, suggesting efficiency." *Strougo*, 312 F.R.D. at 316. During the Class Period, the time-weighted average percentage bid-ask spread for Nielsen Common Stock in each month was between 0.0087% and 0.0266%. Coffman Rpt. ¶72. This is well within what courts have found indicative of market efficiency. *See Signet*, 2019 WL 3001084, at *12 (noting that "the average bid-ask spread for all stocks trading on the NYSE and NASDAQ was .68%"); *In re Am. Realty Cap. Props., Inc. Litig.*, 2017 WL 3835881, at *1 (S.D.N.Y. Aug. 31, 2017) (bid-ask spread averaging 0.18% supported efficiency).

*Krogman* **Three: Public Float**. A stock's public float is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities. A higher public float indicates greater market efficiency. *Krogman*, 202 F.R.D. at 478. Here, Nielsen's public float during the Class Period was more than 99% of shares outstanding. Coffman Rpt. ¶73. The large size and high percentage of Nielsen's float supports a finding of market efficiency. *See*

---

[12] Market capitalization is an indicator of market efficiency because more highly-capitalized corporations tend to be more well-known and closely followed. *See Krogman*, 202 F.R.D. at 478.

*Signet*, 2019 WL 3001084, at *12 (finding public float ranging from 99.4 and 99.8% to "weigh heavily in favor of a finding of market efficiency"); *McIntire*, 38 F. Supp. 3d at 433 (finding that float between 57% and 69% of shares outstanding supported efficiency).

### (iii)   Additional Factors Support Market Efficiency

The Coffman Report also addresses three additional factors that demonstrate market efficiency: institutional ownership (Coffman Rpt. ¶74); autocorrelation (*id.* at ¶¶75–78); and the presence of option trading (*id.* at ¶79). High institutional ownership has been considered indicative of market efficiency. *See, e.g.*, *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Here, institutional investors owned, on average, more than 99% of the public float and over 100% of shares outstanding, further supporting a finding of market efficiency. Coffman Rpt. ¶74; *id.* (Exhibit 12); *see also LSB Indus.*, 2018 WL 3913115, at *12 (finding ownership of company stock by 251 major institutions supported efficiency). Mr. Coffman also ran accepted autocorrelation analyses, which "test[] for the presence of a statistical relationship between price changes (also known as returns) on successive trading dates," *Billhofer*, 281 F.R.D at 160, finding "no evidence of statistically significant autocorrelation," further indicating an efficient market. Coffman Rpt. ¶78. Finally, Mr. Coffman also analyzed the option trading activity related to Nielsen – activity that academics have cited as "improv[ing] efficiency by permitting an expansion of the contingencies that are covered by the market." *Id.* at ¶79. According to Mr. Coffman, there was "considerable option trading in Nielsen Common Stock during the Class Period," supporting a finding of market efficiency. *Id*.

Because all of the *Cammer* and *Krogman* factors, as well as additional market analyses, demonstrate here that the market for Nielsen's common stock was efficient during the Class Period, Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance.

**(b)      Reliance Is Presumed Under *Affiliate Ute***

Where, as here, a claim "involv[es] primarily a failure to disclose, positive proof of

reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153. Instead, "[a]ll that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have

considered them important in the making of [their] decision." *Id.* at 153-54. The *Affiliated Ute*

presumption reflects the reality that where no positive statements exist "'reliance as a practical

matter is impossible to prove.'" *In re Facebook, Inc., IPO & Sec. & Derivative Litig.*, 986 F.

Supp. 2d 428, 469 (S.D.N.Y. 2013) (citation omitted). Furthermore, because materiality itself is

a common question, plaintiffs need not prove materiality in order to invoke the *Affiliated Ute*

presumption at the class certification stage; it need only be alleged. *See Amgen*, 568 U.S. at 466.

Plaintiffs' Complaint includes numerous allegations regarding what Defendants failed to

disclose. *E.g.*, ¶¶157-58, 187-89, 366, 368, 370. Under these circumstances, a showing of

reliance on the omissions is unnecessary, even if Plaintiffs also allege that Nielsen disseminated

affirmative misstatements. *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186

(S.D.N.Y. 2005) ("*Affiliated Ute* . . . is not undermined simply because a defendant makes

misstatements at the same time it omits material information."); *Haw. Structural Ironworkers*

*Pension Tr. v. AMC Ent. Holdings, Inc.*, 2021 WL 1198799, at *7 (S.D.N.Y. Mar. 30, 2021)

(*Affiliated Ute* applied where §10(b) claims focused on the omission of material information).

**(c)      Damages May Be Calculated on a Class-Wide Basis,**
**            Supporting a Finding of Predominance**

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), "the Supreme Court held that, 'at the

class-certification stage (as at trial), any model supporting a Plaintiffs' damages case must be

consistent with its liability case[,]' and that 'courts must conduct a rigorous analysis to determine

whether that is so.'" *Signet*, 2019 WL 3001084, at *19 (citation omitted). As the Second Circuit

acknowledged, *Comcast* does not require "a finding that damages are capable of measurement on

a classwide basis." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015). "All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Pirnik*, 327 F.R.D. at 47 (holding that issues relating to damages model were "merits issues" and went "beyond the Rule 23 inquiry").

While not necessary for class certification, damages in this case can be calculated on a class-wide basis using a common methodology. *See Signet*, 2019 WL 3001084, at *20 ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at this juncture to establish that common issues relating to damages predominate.").

Mr. Coffman concludes that "that damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole." Coffman Rpt. ¶85. Specifically, Mr. Coffman explains that there "is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act" known as the "out-of-pocket" method, which measures damages as "the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale." *Id.* ¶80. To quantify artificial inflation, Mr. Coffman proposes the use of an "event study," which will "measure[] price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations." *Id.* ¶83. "Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process." *Id.* ¶81. Courts frequently find that an event study is "the generally accepted method for measuring damages in a securities fraud class action." *Signet*, 2019 WL 3001084, at *20; *Waggoner*, 875 F.3d at 105-06 (common damages issues predominated where model measured harm due to defendants' fraud by examining share price decline after corrective disclosures); *JPMorgan*, 2015 WL 10433433,

23

at *7 (common damages issues predominated where plaintiffs' expert proposed calculating class-wide, per-share damages through an event study analysis of the inflation caused by the alleged misrepresentations). Accordingly, common issues concerning damages predominate.

### 2.      Superiority Is Established

Four factors are relevant when determining whether a class action is superior to other methods for fair and efficient adjudication: (1) the interests of members of the class in "individually controlling the prosecution of defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). It is widely recognized that "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3)." *In re MF Glob. Holdings Ltd. Inv. Litig.,* 310 F.R.D. 230, 239 (S.D.N.Y. 2015). Indeed, each of the superiority factors is satisfied here.

First, the proposed Class consists of hundreds, if not thousands, of potential Class members "who are asserting claims based on predominantly common issues" and, as a result, "[a]djudicating individual claims would be a significant waste of judicial resources." *Billhofer*, 281 F.R.D. at 164; *see also In re Warner Chilcott Ltd. Sec. Litig.*, 2008 WL 344715, at *2 (S.D.N.Y. Feb. 4. 2008) (securities class action "superior to other methods for adjudication because separate actions would be inefficient and repetitive"). Second, Plaintiffs are unaware of any other related securities litigations commenced by Class members. Third, "concentrating the litigation in this forum would promote judicial economy." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 53 (S.D.N.Y. 2012). Finally, Plaintiffs do not foresee any management difficulties that will preclude this action from being maintained as a class action. Indeed, "[l]itigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial

resources." *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008).[13]

> **C.      The Court Should Appoint Labaton Sucharow as Class Counsel**

Under Rule 23(g)(1)(A), the Court must appoint counsel who will fairly and adequately

represent the Class and, to that end, consider: (i) the work counsel has done in identifying or

investigating potential claims in the action; (ii) counsel's experience in handling class actions

and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

and (iv) the resources that counsel will commit to representing the class. *In re Sanofi-Aventis*

*Sec. Litig.*, 293 F.R.D. 449, 459 (S.D.N.Y. 2013).

Labaton Sucharow has investigated and vigorously pursued the Class's claims in the

action and will continue to do so. Counsel prepared and filed several complaints, successfully

opposed defendants' motion to dismiss, issued numerous discovery requests to Defendants and

third parties, and is reviewing documents and responses received in response to those requests.

Additionally, as discussed above, *see supra* at 12-13, and as supported by its firm résumé, *see*

Fox Decl., Ex. B, Labaton Sucharow has consistently demonstrated its ability to litigate

securities cases, has extensive knowledge of the securities laws, and has proven its willingness to

commit substantial time and resources to representing the Class.[14] Finally, Labaton Sucharow

and Additional Counsel Robbins Geller Rudman & Dowd LLP have no known conflicts that

would prevent them from fairly and adequately representing the Class. Plaintiffs respectfully

request that the Court appoint Labaton Sucharow as Class Counsel pursuant to Rule 23(g).

## IV.      CONCLUSION

Plaintiffs respectfully request that the Court certify the proposed Class and appoint

MissPERS and Monroe as Class Representatives, and Labaton Sucharow as Class Counsel.

---

[13] The Class meets the implied "ascertainability requirement" of Fed. R. Civ. P. 23 because it is defined using objective criteria with definite boundaries. *Petrobras*, 862 F.3d at 257, 264-65 (2d Cir. 2017).
[14] *See also* Fox Decl. Ex. C (Robbins Geller Firm Resume).

Dated: July 14, 2021

LABATON SUCHAROW LLP

*/s/ Christine M. Fox*
Carol C. Villegas
Eric J. Belfi
Christine M. Fox
Jake Bissell-Linsk
Charles Farrell
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:   cvillegas@labaton.com
         ebelfi@labaton.com
         cfox@labaton.com
         jbissell-linsk@labaton.com
         cfarrell@labaton.com

**Attorneys for Lead Plaintiff Public
Employees' Retirement System of
Mississippi and Lead Counsel for the
Proposed Class**

**ROBBINS GELLER RUDMAN
& DOWD LLP**
Shawn A. Williams
Christopher P. Seefer
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone: (415) 288-4545
Facsimile: (415) 288-4534
Email:  shawnw@rgrdlaw.com
         chriss@rgrdlaw.com

Patton L. Johnson
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
Email: pjohnson@rgrdlaw.com

**Counsel for Additionally Named Plaintiff
Monroe County Employees' Retirement
System and Additional Counsel for the
Proposed Class**